IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| POWER INTEGRATIONS, INC., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>BCD SEMICONDUCTOR CORPORATION, a California corporation, SHANGHAI SIM-BCD SEMICONDUCTOR MANUFACTURING, CO., LTD, a China corporation,<br><br>Defendants. | C.A. No. 07-633-JJF |

**DECLARATION OF KYLE WAGNER COMPTON
IN SUPPORT OF PLAINTIFF POWER INTEGRATIONS' MOTION FOR
ENTRY OF PRELIMINARY INJUNCTION**

FISH & RICHARDSON P.C.
William J. Marsden, Jr. (#2247) (marsden@fr.com)
Kyle Wager Compton (#4693) (kcompton@fr.com)
919 N. Market Street, Suite 1100
P.O. Box 1114
Wilmington, DE  19899-1114
Telephone: (302) 652-5070
Facsimile:  (302) 652-0607

Frank E. Scherkenbach
225 Franklin Street
Boston, MA  02110-2804
Telephone: (617) 542-5070
Facsimile:  (617) 542-8906

Howard G. Pollack
Michael R. Headley
500 Arguello Street, Suite 500
Redwood City, CA  94063
Telephone: (650) 839-5070
Facsimile:  (650) 839-5071

Attorneys for Plaintiff
POWER INTEGRATIONS, INC.

I, Kyle Wagner Compton, declare as follows:

1.      I am an Associate with Fish & Richardson P.C., counsel for Plaintiff Power Integrations, Inc. ("Power Integrations").  I make the following statements based on personal knowledge, except where noted.

2.      James Hauck, who is employed as an information technology specialist by Fish & Richardson's Delaware office, Steven Thompson who is employed by Parcels, Inc. and works on a contract basis in Fish & Richardson's Delaware office, purchased several Samsung-branded cell phones and cell phone chargers from a variety of stores in Wilmington and Newark at my direction in October, 2007.  We opened the chargers that were packaged with the Samsung branded cell phones, and each of them contained chips manufactured by BCD.  We also found BCD chips in many of the stand-alone cell phone chargers Mr. Hauck purchased.

3.      Attached to this Declaration as Exhibit A is a true and accurate copy of D.I. 555, Verdict Form, entered in the matter *Power Integrations v. Fairchild Semiconductor*, No. 04-1371 JJF (D. Del.).

4.      Attached to this Declaration as Exhibit B is a true and accurate copy of D.I. 557, excerpts from the September 19, 2007 trial transcript in the matter *Power Integrations v. Fairchild Semiconductor*, No. 04-1371 JJF (D. Del.).

5.      Attached to this Declaration as Exhibit C is a true and accurate copy of D.I. 231, Memorandum Opinion (regarding claim construction), entered March 31, 2006 in the matter *Power Integrations v. Fairchild Semiconductor*, No. 04-1371 JJF (D. Del.).

6.      Attached to this Declaration as Exhibit D are true and accurate copy of  D.I. 232, Order (regarding claim construction), entered March 31, 2006 in the matter *Power Integrations v. Fairchild Semiconductor*, No. 04-1371 JJF (D. Del.).

7.      Attached to this Declaration as Exhibit E are true and accurate copies of D.I. 557 and 558, excerpts from the September 19, 2007 and September 20, 2007 trial transcripts in the matter *Power Integrations v. Fairchild Semiconductor*, No. 04-1371 JJF (D. Del.).

8.     Attached to this Declaration as Exhibit F is a true and accurate copy of D.I. 418, excerpts from the October 4, 2006 trial transcript in the matter *Power Integrations v. Fairchild Semiconductor*, No. 04-1371 JJF (D. Del.);

9.     Attached to this Declaration as Exhibit G is a true and accurate copy of the February 3, 2006 SG Cowen report on Power Integrations, produced as SGC0106-0123 in the matter *Power Integrations v. Fairchild Semiconductor*, No. 04-1371 JJF (D. Del.);

10.     Attached to this Declaration as Exhibit H is a true and accurate copy of the June 22, 2005 SG Cowen report on Power Integrations, produced as SGC0332-0343 in the matter *Power Integrations v. Fairchild Semiconducto*r, No. 04-1371 JJF (D. Del.);

11.     Attached to this Declaration as Exhibit I are true and accurate copies of selected Power Integrations awards and press releases;

12.     Attached to this Declaration as Exhibit J is a true and accurate copy of D.I. 417, excerpts from the October 3, 2006 trial transcript in the matter *Power Integrations v. Fairchild Semiconductor*, No. 04-1371 JJF (D. Del.);

13.     Attached to this Declaration as Exhibit K is a true and accurate copy of Power Integrations' 2005 Form 10-K;

14.     Attached to this Declaration as Exhibit L are true and accurate copies of D.I. 557 and 558, excerpts from the September 19, 2007 and September 20, 2007 trial transcripts in the matter *Power Integrations v. Fairchild Semiconductor*, No. 04-1371 JJF (D. Del.);

15.     Attached to this Declaration as Exhibit M is a true and accurate copy of a printout of an internet web page entitled "About BCD," available online at http://www.bcdsemi.com/en/News/introduction.aspx?ClassID=4, which I accessed from my computer at Fish & Richardson's Delaware office on Friday, January 25, 2008.

16.     Attached to this Declaration as Exhibit N is a true and accurate copy of a printout of an internet web page entitled "Products & Processes," available online at http://www.bcdsemi.com/en/ProductCenter/product_information.aspx, which I accessed from my computer at Fish & Richardson's Delaware office on Friday, January 25, 2008.

2

17.     Attached to this Declaration as Exhibit O is a true and accurate copy of a printout of an internet web page entitled "Solutions & Applications," available online at http://www.bcdsemi.com/en/ProductCenter/app.aspx, which I accessed from my computer at Fish & Richardson's Delaware office on Friday, January 25, 2008.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 25th day of January, at Wilmington, Delaware.

/s/ *Kyle Wagner Compton*
Kyle Wagner Compton

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2008, I electronically filed the **DECLARATION OF**

**KYLE WAGNER COMPTON IN SUPPORT OF PLAINTIFF POWER**

**INTEGRATIONS' MOTION FOR ENTRY OF PRELIMINARY INJUNCTION** with the

Clerk of Court using CM/ECF which will send notification of such filing(s) to the following,

who was also served via hand delivery:

Steven J. Balick, Esq.                      Attorneys for Defendants
500 Delaware Avenue, 17th Floor             BCD SEMICONDUCTOR
P.O. Box 1150                               CORPORATION and SHANGHAI
Wilmington, DE 19899                        SIM-BCD SEMICONDUCTOR
                                            MANUFACTURING, CO., LTD

      I also certify that on January 25, 2008, I sent the document to the following individuals

via electronic and first class mail:

E. Robert Yoches, Esq.                      Attorneys for Defendants
Finnegan, Henderson, Farabow, Garrett &     BCD SEMICONDUCTOR
Dunner, L.L.P.                              CORPORATION and SHANGHAI
901 New York Avenue, NW                     SIM-BCD SEMICONDUCTOR
Washington, DC 20001-4413                   MANUFACTURING, CO., LTD

Erik R. Puknys, Esq.                        Attorneys for Defendants
Finnegan, Henderson, Farabow, Garrett &     BCD SEMICONDUCTOR
Dunner LLP                                  CORPORATION and SHANGHAI
Stanford Research Park                      SIM-BCD SEMICONDUCTOR
3300 Hillview Avenue                        MANUFACTURING, CO., LTD
Palo Alto, CA 94304-1203

Robert L. Burns, Esq.                       Attorneys for Defendants
Finnegan, Henderson, Farabow, Garrett &     BCD SEMICONDUCTOR
Dunner LLP                                  CORPORATION and SHANGHAI
Two Freedom Drive                           SIM-BCD SEMICONDUCTOR
Reston, VA 20190-5675                       MANUFACTURING, CO., LTD

*/s/ Kyle Wagner Compton*
Kyle Wagner Compton

# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

*Filed in open Court this 21st day*
*of September, 2007  dlk*

POWER INTEGRATIONS, INC., a
Delaware corporation,

        Plaintiff,

    v.

FAIRCHILD SEMICONDUCTOR
INTERNATIONAL, INC., a Delaware
corporation, and FAIRCHILD
SEMICONDUCTOR CORPORATION,  a
Delaware corporation,

        Defendants.

C.A. No. 04-1371 JJF

## SPECIAL VERDICT
## AND INTERROGATORIES TO THE JURY - VALIDITY

We, the jury, unanimously find as follows:


## VALIDITY OF POWER INTEGRATIONS' '075 PATENT

1.  Do you find by clear and convincing evidence that claim 1 of the '075 Patent is anticipated and therefore invalid?  (A "YES" answer is a finding for Fairchild. A "NO" answer to this question is a finding for Power Integrations.)

YES _____  NO __X__


2.  Do you find by clear and convincing evidence that any of the following claims of the '075 Patent would have been obvious to a person of ordinary skill in the art at the time of the invention in view of one or more of the asserted prior art references, and therefore the claim is invalid?  (A "YES" answer is a finding for Fairchild.  A "NO" answer to this question is a finding for Power Integrations.)

Claim 1:  YES _____  NO __X__

Claim 5:  YES _____  NO __X__


### (FORM CONTINUES ON NEXT PAGE)

2

## VALIDITY OF POWER INTEGRATIONS' '876 PATENT

3. Do you find by clear and convincing evidence that Claim 1 of the '876 Patent would have been obvious to a person of ordinary skill in the art at the time of the invention in view of one or more of the asserted prior art references, and therefore the claim is invalid? (A "YES" answer is a finding for Fairchild. A "NO" answer to this question is a finding for Power Integrations.)

YES _____     NO  ╳

## VALIDITY OF POWER INTEGRATIONS' '851 PATENT

4. Do you find by clear and convincing evidence that any of the following claims of the '851 Patent would have been obvious to a person of ordinary skill in the art at the time of the invention in view of one or more of the asserted prior art references, and therefore the claim is invalid? (A "YES" answer is a finding for Fairchild. A "NO" answer to this question is a finding for Power Integrations.)

Claim 1:     YES _____     NO  ╳

Claim 4:     YES _____     NO  ╳

## VALIDITY OF POWER INTEGRATIONS' '366 PATENT

5. Do you find by clear and convincing evidence that claim 9 of the '366 Patent is anticipated and therefore invalid? (A "YES" answer is a finding for Fairchild. A "NO" answer to this question is a finding for Power Integrations.)

Claim 9:     YES _____     NO  ╳

3

6. Do you find by clear and convincing evidence that any of the following claims of the '366 Patent would have been obvious to a person of ordinary skill in the art at the time of the invention in view of one or more of the asserted prior art references, and therefore the claim is invalid? (A "YES" answer is a finding for Fairchild. A "NO" answer to this question is a finding for Power Integrations.)

Claim 9:   YES _____   NO  X

Claim 14:  YES _____   NO  X

You must each sign this Verdict Form:   Dated: *Sept 21, 2007*

REDACTED

4

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC., )  Trial Volume III
                          )
            Plaintiff,    )
                          )  C.A. No. 04-1371-JJF
v.                        )
                          )
FAIRCHILD SEMICONDUCTOR   )
INTERNATIONAL, INC., and  )
FAIRCHILD SEMICONDUCTOR   )
CORPORATION,              )
                          )
            Defendants.   )



                Wednesday, September 19, 2007
                9:05 a.m.
                Courtroom 4B


                844 King Street
                Wilmington, Delaware


BEFORE:   THE HONORABLE JOSEPH J. FARNAN, JR.
          United States District Court Judge




APPEARANCES:


          FISH & RICHARDSON
          BY:  WILLIAM J. MARSDEN, JR., ESQ.
          BY:  FRANK E. SCHERKENBACH, ESQ.
          BY:  HOWARD G. POLLACK, ESQ.
          BY:  MICHAEL R. HEADLEY, ESQ.


                Counsel for the Plaintiff

1    right?

2         A.    The contents as indexed by the

3    counter, correct.

4              Let me say once again, you seem to

5    be harping on this EPROM, which I've removed in

6    my person of skill in the art knowledge.  We can

7    keep going there.  We can keep talking about

8    this and coupled, but it's not what I asserted.

9         Q.    Correct me if I'm wrong, I believe

10   you said you believed that the Martin patent

11   anticipated Claim 1; correct?

12        A.    Are we talking today's testimony?

13        Q.    Yes, today's testimony.

14        A.    I said it either anticipates, or

15   rendered obvious, or both.  But in my particular

16   explanation, I was only talking about obvious,

17   and that's all I am asserting, obviousness.

18        Q.    Okay.  So when you said it

19   anticipates, you didn't mean that you were

20   asserting that today, you are really asserting

21   it's obvious?  I just want to be sure we all

22   understand what your position is?

23        A.    For the purpose of the Court, all

24   I'm asserting is obviousness.  We can go

```
 1      somewhere and fight it out about anticipation,

 2      but that's a separate matter.

 3              Q.   These ladies and gentlemen are

 4      going to need to decide this question of

 5      invalidity.

 6              A.   Obviousness only.

 7              Q.   Obviousness only.

 8              A.   Let me just summarize obviousness

 9      and anticipation.  After all the five claims,

10      only one --

11              Q.   Dr. Horowitz, please, the Court

12      will describe what anticipation and obviousness

13      means.

14              A.   I wasn't going to describe what

15      they mean, I was going to say which ones did

16      which.  The only anticipation is '366 Claim 9,

17      all the rest are obviousness.  I wasn't

18      asserting obviousness in the other claims.

19              Q.   Now, this opinion that the '876

20      Claim 1 is obvious, that was not asserted in

21      your original report in 2005; correct?

22              A.   We want to go back to the

23      original.  Again, I feel that the ordered

24      supplementary is the one that should be of most
```

1    interest. We're doing what, '876? Well, I

2    actually asserted then more anticipate in '876,

3    this is paragraph 135. And I didn't add that,

4    you know, if for some reason it's not found to

5    anticipate that it's still obvious. But I think

6    it's obvious that I intended that.

7    Q. So isn't it true that you said

8    when I asked you that in deposition, I guess I

9    felt at the time it would have been superfluous

10   to add that if it's not found anticipated that

11   it would be obvious. That was your testimony?

12   A. I find most of these reports

13   boringly long, and I wrote this one myself, I

14   wrote every word in it, and apparently I didn't

15   put in sufficient number of those kind of in

16   case it's not this, it's that, but the way I

17   talk about these things, if I assert that it

18   anticipates and some element is found to be

19   lacking, that I would still assert the

20   obviousness if the obviousness were, in fact,

21   true as I believe it is here.

22   Q. Dr. Horowitz --

23   A. In any case the supplemental

24   report does cover that ground.

1          Q.    In talking about the Martin

2     patent, isn't it true that the Martin patent

3     describe the pseudo random code is useful for

4     what he said was an admitted signature?

5          A.    That's what he said.

6          Q.    And you said in your deposition

7     he's quite interested in signature, right,

8     Martin that is?

9          A.    Yes, I think it's what really got

10    him excited about this frequency variation,

11    particularly in the context of his employment.

12    I don't think those statements are inconsistent.

13         Q.    Well, isn't it true that Martin

14    spent a significant amount of time explaining

15    the concept of signature and why his invention

16    reducing signature is important?

17         A.    Yes, I think so, because I think

18    he was aware that EMI reduction by frequency

19    variation was something people did understand.

20    For instance, there is the Harden reference and

21    so on that are in both my records, and what he

22    felt was an important additional contribution in

23    the case of this circuit was that he included

24    also means not only for EMI reduction, but also

1    for signature reduction.  So, of course, he

2    spent the bulk of his time talking about that.

3            Q.    You testified I believe earlier

4    today on direct that if you removed the ROM from

5    what's shown in Martin, the result would have a

6    recognizable signature, correct?

7            A.    Yes.

8            Q.    Now, Dr. Horowitz, even so though

9    he --

10           A.    But as I testified, it would have

11   a reduction of EMI such that one could satisfy

12   FCC 15 regulations.

13           Q.    Dr. Horowitz, even though you only

14   talked about the Martin patent today in

15   asserting invalidity, the '876 patent, you in

16   fact, talked about some other prior art in your

17   reports; right?

18           A.    Yes.  As I explained, there were

19   something like fifty pieces of prior art in the

20   initial report filtered down to seven because

21   the Court specified that there should be no more

22   than seven.  And for purposes of trial today, in

23   the constraints of time I picked what I felt

24   were the clearest and only used those.

1      Q.    Isn't it true, Dr. Horowitz, that

2    every reference that you cite in your reports

3    related to the '876 patent, every one included a

4    ROM in its digital circuit?

5      A.    Which report and would you like me

6    to look?

7      Q.    Well, you only refer to three

8    references in both reports; isn't that right,

9    for the '876 patent?

10      A.    I haven't counted them.  Let me

11    look.  I believe that's a correct statement.

12      Q.    And in each and every one of those

13    references, the digital circuits you pointed to

14    included ROMs; right?

15      A.    Of course.  I'm not asserting

16    anticipation, so the fact that it does not have

17    the ROM removed means it does not -- it does not

18    have every claim element.  And that's why my

19    invalidity analysis is based upon obviousness.

20      Q.    Well, let's turn now to the '366

21    patent.  And looking at the language of Claim 1,

22    I believe you talked about, and I'm going to

23    focus on the soft start circuit because that's

24    really what is in dispute here.

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC., a       :
Delaware corporation,             :
                                  :
            Plaintiff,            :
                                  :
       v.                         :    C.A. No. 04-1371-JJF
                                  :
FAIRCHILD SEMICONDUCTOR           :
INTERNATIONAL, INC., a Delaware:
corporation, and FAIRCHILD        :
SEMICONDUCTOR CORPORATION, a      :
Delaware corporation,             :
                                  :
            Defendants.           :

---

William J. Marsden, Jr., Esquire and Sean P. Hayes, Esquire of
FISH & RICHARDSON P.C., Wilmington, Delaware.
Of Counsel:  Frank E. Scherkenbach, Esquire of FISH & RICHARDSON
P.C., Boston, Massachusetts.
Howard G. Pollack, Esquire and Michael R. Headley, Esquire of
FISH & RICHARDSON P.C., Redwood City, California.
Attorneys for Plaintiff.

Steven J. Balick, Esquire and John G. Day, Esquire of ASHBY &
GEDDES, Wilmington, Delaware.
Of Counsel:  G. Hopkins Guy, III, Esquire; Vickie L. Freeman,
Esquire; Bas de Blank, Esquire and Brian H. VanderZanden, Esquire
of ORRICK, HERRINGTON & SUTCLIFFE LLP, Menlo Park, California.
Attorneys for Defendants.

---

**MEMORANDUM OPINION**

March 31, 2006
Wilmington, Delaware

Farnan, District Judge.

This action was brought by Plaintiff, Power Integrations, Inc. ("Power Integrations") against Defendants Fairchild Semiconductor International, Inc. and Fairchild Semiconductor Corporation (collectively "Fairchild") alleging willful infringement of United States Patent Nos. 4,811,075 (the "'075 patent"), 6,107,851 (the "'851 patent"), 6,229,366 (the "'366 patent"), 6,249,876 (the "'876 patent"). The parties briefed their respective positions on claim construction, and the Court conducted a <u>Markman</u> hearing on the disputed terms in the asserted patents. This Memorandum Opinion presents the Court's construction of the disputed terms.

## BACKGROUND

The patents-in-suit generally relate to integrated circuit devices used in power supplies and can be broken down into two categories. The first type of technology which is exemplified in the '075 patent relates to the physical structure of a high voltage metal-oxide semiconductor ("MOS") transistor device. The MOS transistor device described in the '075 patent incorporates a top layer, referred to as the "p-top" layer," in the "extended drain region" of the device. This technology seeks to provide more efficient high voltage MOS transistors and improved ability to incorporate the high voltage structure into a device having low-voltage circuits on the same integrated circuit chip.

2

According to Power Integrations the technology of the '075 patent created the basis for Power Integrations to form as a company and allowed Power Integrations to provide the first commercially viable, "fully integrated" integrated circuit device for use in controlling switch mode power supplies.

The second type of technology is exemplified in the '366, '851 and '876 patents (collectively referred to as the "circuit patents") and relates to the circuit design associated with the integrated power supply controllers made by Power Integrations. The circuit patents relate to circuit structures within the integrated circuit devices that provide functions which are useful to the overall power supply design into which the chips are incorporated. The circuit patents specifically relate to two types of functions, "frequency jitter" and "integrated soft start." According to Power Integrations, the frequency jitter technology allows power supply designers to reduce peak electromagnetic interference ("EMI") so that electronic products can meet government standards set for EMI using smaller, less complicated and less expensive components than that which was available in the prior art. The integrated soft start technology seeks to solve problems associated with starting up a power supply, including limiting the inrush of currents at start up.

3

DISCUSSION

I.    **The Legal Principles of Claim Construction**

Claim construction is a question of law.  Markman v.

Westview Instruments, Inc., 52 F.3d 967, 977-78 (Fed. Cir. 1995),

aff'd, 517 U.S. 370, 388-90 (1996).  When construing the claims

of a patent, a court considers the literal language of the claim,

the patent specification and the prosecution history.  Markman,

52 F.3d at 979.  Of these sources, the specification is

considered the single best guide for discerning the meaning of a

claim.  Phillips v. AWH Corporation, 415 F.3d 1303, 1312-1317

(Fed. Cir. 2005).

A court may consider extrinsic evidence, including expert

and inventor testimony, dictionaries, and learned treatises, in

order to assist it in understanding the underlying technology,

the meaning of terms to one skilled in the art and how the

invention works.  Phillips, 415 F.3d at 318-319; Markman, 52 F.3d

at 979-80 (citations omitted).  However, extrinsic evidence is

considered less reliable and less useful in claim construction

than the patent and its prosecution history.  Phillips, 415 F.3d

at 318-319 (discussing "flaws" inherent in extrinsic evidence and

noting that extrinsic evidence "is unlikely to result in a

reliable interpretation of a patent claim scope unless considered

in the context of intrinsic evidence").

In addition to these fundamental claim construction principles, a court should also interpret the language in a claim by applying the ordinary and accustomed meaning of the words in the claim. Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 759 (Fed. Cir. 1984). If the patent inventor clearly supplies a different meaning; however, then the claim should be interpreted according to the meaning supplied by the inventor. Markman, 52 F.3d at 980 (noting that patentee is free to be his own lexicographer, but emphasizing that any special definitions given to words must be clearly set forth in patent). If possible, claims should be construed to uphold validity. In re Yamamoto, 740 F.2d 1569, 1571 & n.* (Fed. Cir. 1984) (citations omitted).

**II.    The Meaning Of The Disputed Terms of the Asserted Patents**

   A.    The Disputed Terms In The '075 Patent

All the disputed terms of the '075 patent are contained in independent claim 1 of the '075 patent. In full, claim 1 of the '075 patent recites:

   1.    A high voltage MOS transistor comprising:

      a semiconductor substrate of a first
      conductivity type having a surface;

      a pair of laterally spaced pockets of
      semiconductor material of a second
      conductivity type within the substrate and
      adjoining the substrate surface,

      a source contact connected to one pocket,

      a drain contact connected to the other pocket,

an extended drain region of the second
conductivity type extending laterally each
way from the drain contact pocket to surface-
adjoining positions,

a surface adjoining layer of material of the
first conductivity type on top of an
intermediate portion of the extended drain
region between the drain contact pocket and
the surface adjoining positions,

said top layer of material and said substrate
being subject to application of a reverse-
bias voltage,

an insulating layer on the surface of the
substrate and covering at least that portion
between the source contact pocket and the
nearest surface adjoining position of the
extended drain region, and

a gate electrode on the insulating layer and
electronically isolated form the substrate
region thereunder which forms a channel
laterally between the source contact pocket
and the nearest surface-adjoining position of
the extended drain region, said gate
electrode controlling by field-effect the
flow of current thereunder through the
channel.

('075 patent, col. 6, ll. 54 - col. 7, ll. 12).

1.   **DMOS**

A central part of the parties' dispute focuses on the

meaning of the term "DMOS."  Although this term is not found in

the asserted claims of the '075 patent, Fairchild contends that

the construction of this term is important, because Power

Integrations disclaimed DMOS structures during the prosecution of

the '075 patent.

In its Opening Claim Construction Brief, Fairchild contends that "DMOS" means "double-diffused MOS." In its Answering Claim Construction Brief, Fairchild elaborates that DMOS means "a MOS structure in which the source pocket is formed entirely within a channel region of more heavily doped semiconductor material (commonly referred to as a "body" region) that is formed within the substrate." (D.I. 166 at 5). Fairchild further contends that the term "DMOS" is not restricted to any particular process for making the DMOS structure.

In response, Power Integrations acknowledges the importance of the construction of the term "DMOS" to Fairchild's arguments, but contends that this term should not be defined by the Court in the context of claim construction because the term "DMOS" is not found anywhere in the '075 patent. According to Power Integrations the DMOS issue pertains to equivalence and estoppel arguments. (D.I. 164 at 2). Power Integrations urges the Court to decline from importing a DMOS limitation into the terms of the '075 patent and requests the Court to defer ruling on whether the scope of the disclaimer made by Power Integrations during the prosecution of the patent has any impact on this case.

In the alternative, Power Integrations contends that the Court should construe the term "DMOS" to mean "a device formed by successive diffusions of different materials through the same opening in an insulating or mask layer." (D.I. 152 at 27).

Power Integrations goes on to explain more specifically, that the double diffusion process was used to form the channel and source contact regions of the transistor by successively diffusing material made of different conductivity types. According to Power Integrations, it was important that this diffusing process was done through the same opening in the insulated layer to allow the edges of the different regions to be controlled with precision, a process known as self-aligning. The result of this process is a transistor with a very short channel length which could be accurately controlled. Power Integrations contends that the term "DMOS" has been broadened since the time of the prosecution of the '075 patent to encompass all electrically asymmetrical transistors including those whose characteristics of the channel region are determined by a separate diffusion step. Power Integrations contends that this broad construction should not be adopted by the Court, because it embraces later-developed technology which was not known at the time of the prosecution of the '075 patent. (D.I. 152 at 29; D.I. 164 at 3-5).

As the parties note, the term "DMOS" is not found in the asserted claims of the '075 patent. Because "DMOS" is not a claim term, the Court concludes that its meaning is not properly considered in the context of claim construction. Accordingly, the Court declines to provide a construction for the term "DMOS" in the context of its <u>Markman</u> rulings and will defer construction

of this term until such time as the Court is presented with the
equivalence and/or estoppel issues involving this term.[1]

      2.  **MOS transistor**

    It appears to the Court that the parties agree that the term
"MOS transistor" means "a metal-oxide-semiconductor transistor."
(D.I. 152 at 30; D.I. 156 at 7).  The parties' primary dispute
with respect to this claim is whether the claim's recitation of
an "MOS transistor" excludes a "DMOS" transistor, which in turn
implicates the question of what a "DMOS" transistor encompasses.
Accordingly, the Court will defer commenting on whether the term
"MOS transistor" excludes "DMOS" and define the term "MOS
transistor" for purposes of claim construction as "a metal oxide
transistor."

      3.  **substrate**

    The parties also do not dispute that "substrate" means "the
physical material on which a transistor or microcircuit is
fabricated."  (D.I. 152 at 30; D.I. 156 at 8).  Rather, the
parties' dispute what it means for the "pockets" and "channel" to

---

     [1]    Prosecution history estoppel is a question of law;
however, equivalence is a question of fact.  <u>Festo Corp. v.
Shoketsu Kinzoku Kogyo Kabushiki Co.</u>, 344 F.3d 1359, 1367 (Fed.
Cir. 2003).  As such, it may well be that resolution of the
"DMOS" debate in its entirety will require the Court to have a
complete factual record.  Accordingly, for this additional
reason, the Court declines to rule on the meaning of the term
"DMOS" in the context of the purely legal question of claim
construction.

be "within the substrate."[2]  This debate implicates the DMOS
issue, and therefore, the Court will defer providing a more
specific construction for the term "substrate" than that which
has been agreed to by the parties, until such time as the DMOS
issue is properly before the Court.

    4.   **a pair of laterally spaced pockets of
semiconductor material of a second conductivity
type within the substrate**

It appears to the Court that the parties do not dispute that
the phrase "a pair of laterally spaced pockets of semiconductor
material of a second conductivity type within the substrate"
means "two laterally spaced pockets of semiconductor material of
the opposite conductivity type from the substrate."  (D.I. 152 at
31; D.I. 156 at 10).  However, the parties dispute whether the
phrase "within the substrate" means that the pockets must be
within the un-doped wafer and not within a well-region.  The
parties also dispute whether Power Integrations disclaimed
reading this element on a DMOS transistor.

Based on the parties' claim construction briefing, the Court
understands that both of the aforementioned claim construction
disputes relate to the DMOS coverage issue.  For the reasons
discussed in the context of the other DMOS-related terms, the
Court will defer providing a construction of the disputed phrase

--------

    [2]    References to the "pockets" and "channel" are made in
other portions of claim 1 of the '075 patent discussed _infra_.

beyond that which has been agreed to by the parties.

    5. **a surface adjoining layer of material of the first conductivity type on top of an intermediate portion of the extended drain region between the drain contact pocket and the surface-adjoining positions**

  Fairchild contends that "a surface adjoining layer of material of the first conductivity type on top of an intermediate portion of the extended drain region between the drain contact pocket and the surface-adjoining positions" means "a layer of material the same conductivity as the substrate above a portion of the extended drain region and between the drain contact pocket and each of the surface adjoining positions of the extended drain region.  Power Integrations disclaimed reading this element on a DMOS transistor."  (D.I. 156 at 11).  Fairchild further acknowledges in its Opening Brief, that the parties do not substantially disagree as to how this phrase should be construed, but that their disagreement again centers on whether DMOS has been disclaimed by Power Integrations.

  Power Integrations contends that this phrase does not require construction, because the meaning of its individual words is clear and the image conjured by these words can be easily understood by a jury by referencing Figure 1 of the '075 patent. In the event the Court chooses to construe this phrase, Power Integrations advocates the following construction:  "a layer of material of the same conductivity type as the substrate located

11

on top of a portion of the extended drain region between the drain contact pocket and surface adjoining positions of the extended drain region." (D.I. 152 at 33-34). Power Integrations contends that Fairchild's use of the term "above" is an attempt to introduce an ambiguity into the claim language, and that its construction more closely tracks the claim language. Power Integrations also disagrees with Fairchild that this phrase excludes all applications to devices that may be referred to as DMOS transistors.

Reviewing the claim language in the context of the specification, the Court agrees with Power Integrations that the meaning of this element is clear and further construction by the Court is not warranted. To the extent that the parties dispute whether Power Integrations disclaimed reading this element on a DMOS transistor, the Court will defer resolution of that issue for the reasons discussed above.

### 6.   **said top layer of material**

Power Integrations contends that the meaning of the term "said top layer of material" is clear and that it should not be construed. To the extent that a construction is required, Power Integrations contends that the phrase is appropriately construed by reference to the preceding clause as the "surface adjoining layer." (D.I. 152 at 33; D.I. 164 at 8).

Fairchild contends that the phrase "said top layer of

material" lacks an antecedent basis, and therefore it cannot be construed.  Fairchild contends that Power Integrations' proposed construction is incorrect, because "surface adjoining layer" is already part of the claims.  (D.I. 156 at 13).

The Court disagrees with Fairchild that the terms "said top layer of material" lacks an antecedent basis and cannot be construed.  In the Court's view, it is clear that "said top layer of material" refers to the "surface adjoining layer" discussed in the preceding paragraph.[3]  Accordingly, the Court concludes that construction of this phrase beyond its plain meaning when read in the context of the claim is not required, and therefore, the Court will not provide a construction for this phrase.

## 7. **being subject to application of a reverse-bias voltage**

Fairchild contends that ths phrase "being subject to application of a reverse-bias voltage" means "experiencing a bias voltage applied to a semiconductor junction with polarity that permits little or no current to flow."  (D.I. 156 at 13). Fairchild contends that the specification does not require the "top layer" or the "surface adjoining layer" to be connected to the ground.

---

[3]    Indeed, Fairchild itself refers to the "top layer or "surface adjoining layer" in its argument related to "reverse bias voltage" (D.I. 166 at 19), which further supports the Court's conclusion that the phrase "said top layer of material" is easily understood in the context of the claim language as referring to the "surface adjoining layer."

Power Integrations contends that "reverse bias voltage" means "a voltage applied across a rectifying junction with a polarity that provides a high-resistance path." Power Integrations further contends that a proper construction of this phrase means that "the surface adjoining layer of material and the substrate recited in the claims are connected in some way to 'ground.'" (D.I. 152 at 34). Stated another way, Power Integrations contends that the top layer and the substrate are connected together, and thus grounded.

Reviewing the claim language in light of the specification of the '075 patent, the Court concludes that the term "reverse bias voltage" means "a voltage applied across a rectifying junction with a polarity that provides a high-resistance path." Indeed, it does not appear to the Court that the parties substantially dispute that this defintion of the term is the more technically accurate definition. (D.I. 166 at 19; D.I. 152 at 34). Rather, the parties' disagreement centers on the issue of whether "reverse bias voltage" requires the surface adjoining layer of material and the substrate recited in the claim to be connected to the ground. The specification of the '075 patent clearly states that the "top layer is either connected to the substrate or left floating." '075 patent, col. 2, ll. 61-63. Accordingly, the Court concludes that the patent does not provide for a grounding limitation, and therefore, the Court concludes

that "reverse bias voltage" means "a voltage applied across a rectifying junction with a polarity that provides a high-resistance path."

        8.    **substrate region thereunder which forms a channel**

Fairchild contends that the "substrate region thereunder which forms a channel" means "a channel is formed laterally in the substrate between the source contact pocket and the nearest surface adjoining position of the extended drain region." (D.I. 156 at 12). Fairchild also contends that Power Integrations disclaimed reading this element on a DMOS transistor.

Power Integrations contends that this phrase should be afforded its plain meaning and refers to the physical location of the channel as being formed underneath the gate region. More specifically, Power Integrations contends that "the channel is formed underneath the insulated gate in the substrate which can include, for example, being formed in a well or otherwise doped region located underneath the gate." (D.I. 152 at 35). Power Integrations also states that the "channel" of a transistor is "a well known term that refers to the region in which the electrical charge flows when the transistor is active." (D.I. 152 at 34-35).

Fairchild does not dispute the definition of "channel" provided by Power Integrations; however, the parties do not specifically ask the Court to construe the term "channel" and

their claim construction disputes do not focus on the meaning of the term "channel" itself.  Accordingly, the Court will not provide further construction of the word "channel."  As for the location of the channel, the Court further concludes that the phrase does not require further construction by the Court, as it is clear from the claim language that the channel is between the source contact pocket and the nearest surface adjoining position of the extended drain region.

The parties' primary dispute with respect to this phrase again focuses on whether Power Integrations disclaimed reading this element on a DMOS transistor.  In this regard, it appears to the Court that the DMOS issue is also related to whether the channel is formed in well material or otherwise doped material beneath the insulated gate as argued by Power Integrations.  For the reasons discussed in the context of the other DMOS-related terms, the Court will defer ruling on the question of whether Power Integrations disclaimed reading this claim element on a DMOS transistor.

B.    The Disputed Terms In The '876 Patent

Power Integrations has asserted claims 1, 17 and 19 of the '876 patent against Fairchild.  Accordingly, the Court will proceed to construe the disputed terms found in those claims.

1.    Claim 1

Claim 1 of the '876 patent recites:

1.    A digital frequency jittering circuit for varying
the switching frequency of a power supply, comprising:

> an oscillator for generating a signal having
> a switching frequency, the oscillator having
> a control input for varying the switching
> frequency;
>
> a digital analog converter coupled to the
> control input for varying the switching
> frequency; and
>
> a counter coupled to the output of the
> oscillator and to the digital to analog
> converter, the counter causing the digital to
> analog converter to adjust the control input
> and to vary the switching frequency.

('876 patent, col. 8, ll. 41-52).

a.    **frequency jittering**

Power Integrations contends that the term "frequency

jittering" means "varying the switching frequency of a switch

mode power supply about a target frequency in order to reduce

electromagnetic interference."  (D.I. 152 at 6).  Power

Integrations also contends that the "jittering" or variation in

the frequency signal must be controlled and predetermined.

Stated another way, Power Integrations requests the Court to

construe the term "frequency jittering" to mean "a controlled and

predetermined change or variation in the frequency of a signal."

(D.I. 152 at 8).

17

Fairchild contends that the Court should decline to construe the term "frequency jittering," because it appears in the preamble of the claim and is not a limitation on the claim. (D.I. 166 at 34-35).  Rather, Fairchild contends that the term "frequency jittering" in the preamble only states the purpose of the invention, and gives no meaning to the claim.  However, if the Court chooses to construe the term "frequency jittering," Fairchild contends that the term means "varying the frequency of operation of the pulse width modulated switch by varying the oscillation frequency of the oscillator."  (D.I. 156 at 33). Fairchild contends that the term should not be limited to "controlled and predetermined" changes or variations, because the preferred embodiment should not be used to limit the claim.

Reviewing the disputed term in light of the claim language and the specification[4], the Court concludes that the term "frequency jittering" means "varying the switching frequency of a switch mode power supply about a target frequency in order to reduce electromagnetic interference."  The Court further agrees with Power Integrations that changes or variations in the frequency of the signal must be controlled and predetermined to achieve the purpose of the claimed invention.[5]

---

[4]     The specification of the '851 patent was incorporated by reference into the specification of the '876 patent.

[5]     In concluding that the term "frequency jittering" requires construction, the Court further concludes that while the

18

Fairchild's proposed construction for the term "frequency jittering" is derived from the following sentence in the "Background of the Invention" section of the '851 patent:

> Varying the frequency of operation of the pulse width modulated switch by varying the oscillation frequency of the oscillator is referred to as frequency jitter.

('851 patent, col. 3, l. 28-30). In the context of the invention as a whole, however, the Court reads this sentence to be a generic description of "frequency jitter" and not a definition of the "frequency jittering" described in the '876 patent. The '876 patent specifically describes the purpose of the invention as "deviat[ing] or jitter[ing] the switching frequency of the switched mode power supply oscillator <u>within a narrow range to reduce EMI noise by spreading the energy over a wider frequency range than the bandwidth measured by the EMI test equipment</u>." ('876 patent, Abstract) (emphasis added). As the Court understands the technology, the express purpose of the invention, namely the reduction of EMI noise, cannot be achieved if the jittering is not controlled and predetermined. In this regard, the specification further explains the advantages of the claimed

---

term "frequency jittering" is found in the preamble, it is a term which gives meaning to the claim and defines the invention. The invention is not just a "circuit" but a "digital frequency jittering circuit." Reading the patent as a whole, the Court is persuaded that this language is not mere introductory language, but language which is meant to define the invention and limit the claim. <u>See</u> <u>In re Paulsen</u>, 30 F.3d 1475, 1479 (concluding that term "computer" used in preamble was a claim limitation that gave life and meaning to the claims).

invention in reducing EMI over the prior art are due to the fixed
and controlled manner of the frequency jittering:

> pulse width modulated switch 262 may also have
> frequency jitter functionality.  That is, the switching
> frequency of the pulse width modulated switch 262
> varies according to an internal frequency variation
> signal.  This has an advantage over the frequency
> jitter operation of FIG. 1 [the prior art] in that the
> <u>frequency range of the presently preferred pulse width
> modulated switch 262 is known and fixed</u>, and is not
> subject to the line voltage or load magnitude
> variations.

('851 patent, col. 6, ll. 11-17) (emphasis added).  Accordingly,
the Court concludes that Fairchild's construction is overly broad
and inconsistent with the specification, when it is read in the
context of the claimed invention.

### b.  **coupled**

Fairchild contends that the term "coupled" should be given
its plain and ordinary meaning.  Specifically, Fairchild contends
that "two circuits are coupled when they are configured such that
signals pass from one to the other."  (D.I. 152 at 10).
Fairchild contends that Power Integrations' construction of this
term seeks to imply a requirement that the connection be a direct
connection, or a connection without any intermediate circuit
elements.  Fairchild contends that such a construction is
inappropriate and is driven by Power Integrations' concern that
the claims may be found invalid in light of the prior art.

Power Integrations contends that "two circuits are coupled
when they are connected such that voltage, current, or control

signals pass from one to another." (D.I. 152 at 10; D.I. 164 at 17-18). According to Power Integrations its construction of the term "coupled" does not require a direct connection as Fairchild contends. Rather, Power Integrations contends that its construction reflects more accurately the nature of the coupling recited in the patent, because the recited coupling is present "for the purposes of control (i.e. 'digital to analog converter coupled to the control input for varying the switching frequency' and 'counter coupled to the . . . digital to analog converter, the counter causing the digital to analog converter to adjust . . .'" (D.I. 152 at 10).

Construing the term "coupled" in light of the claim language and specification, the Court concludes that "two circuits are coupled when they are connected such that voltage, current or control signals pass from one to another." In reaching this determination, the Court concludes that Fairchild's construction is overly broad and generic and fails to consider the term "coupled" in the context of the invention. In the Court's view, its construction of the term "coupled" is consistent with the claim language and the context of the specification which describes the purpose for which various parts of the claimed invention are coupled. ('876 patent, claim 1, col. 8, ll. 48-49, 50-52). However, the Court's construction of the term "coupled" should not be read to imply or necessitate a direct connection,

as the Court does not read the patent to require a direct connection or to preclude the use of intermediate circuit elements.

### 2.  Claim 17

Claim 17 of the '876 patent recites:

A method for generating a switching frequency in a power conversion system, comprising:

> generating a primary voltage;
>
> cycling one or more secondary voltage sources to generate a secondary voltage which varies over time; and
>
> combining the secondary voltage with the primary voltage to be received at a control input of a voltage-controlled oscillator for generating a switching frequency which is varied over time.

('876 patent, col. 9, ll. 36-45).

### a.  **primary voltage**

It appears to the Court that both Fairchild and Power Integrations agree that a "primary voltage" means a "base or initial voltage." (D.I. 152 at 11; D.I. 166 at 37). However, Fairchild contends that the primary voltage must, by definition, be generated by the primary voltage source. Fairchild contends that the voltages and voltage sources must be considered together, because the voltage must be generated from some source. Fairchild contends that a construction which ignores the source blurs the distinction between the primary and secondary voltages, because the claim describes the secondary voltage as being

generated from a secondary voltage source.  Thus, Fairchild
maintains that the primary voltage cannot come from the secondary
voltage source as Power Integrations suggests.

Power Integrations contends that any claim limitations with
respect to how the secondary voltage is generated should not be
imported into the meaning of the term "primary voltage."  Power
Integrations contends that nothing in the patent limits the
primary voltage to a voltage generated solely by a primary
voltage source.  (D.I. 152 at 11-12; D.I. 164 at 18-19).

Reviewing the disputed term in light of the claim language
and the specification, the Court concludes that the term "primary
voltage" means "a base or initial voltage" and that the term
should not be defined by reference to the source from which it
may be generated.  Neither the claim language nor the
specification describe how the primary voltage source is
generated, and therefore, the Court declines to construe the term
to require a distinct source.

b.  **secondary voltage**

Fairchild contends that a "secondary voltage" means "a
voltage generated by the secondary voltage source."  (D.I. 156 at
36).  In advancing this claim construction, Fairchild
specifically argues that the "secondary voltage sources are
additional voltage sources which are distinct from the primary
voltage source."

23

In response, Power Integrations contends that a "secondary voltage" means "a subsequent or additional voltage." In advancing this construction, Power Integrations also refers to the definition of secondary voltage source. Power Integrations contends that, in accordance with its plain meaning, a "voltage source" means a "source of voltage," and the term "secondary" means something that comes second or subsequent. Thus, Power Integrations maintains that a "secondary voltage source" means "one or more voltage sources used to generate the secondary voltage," and therefore, secondary voltage means "subsequent or additional voltage." (D.I. 152 at 12-13).

Reviewing the claim language and the specification, the Court concludes that the term secondary voltage means "subsequent or additional voltage." While the claim language does require the secondary voltage to be generated by the secondary voltage source, there is no requirement that the secondary voltage source be distinct from the source of the primary voltage as discussed previously. Further, in the Court's view, identification of the voltage source for the secondary voltage is not a necessary part of defining the claim, because the source of the secondary voltage is clearly recited in the claim language. Accordingly, the Court construes "secondary voltage" to mean "a subsequent or additional voltage."

      c.   **cycling**

Although Power Integrations requests the Court to construe the term "cycling," it appears to the Court that the parties have since reached an agreement that the term cycling means "using in a repeating sequence or a pattern." (D.I. 152 at 13; D.I. 166 at 37, n.19). Accordingly, further construction by the Court of this term is not warranted.

      d.   **combining**

Fairchild contends that the term "combining" should be construed to mean "adding together from two or more different sources." (D.I. 156 at 37-38). Power Integrations contends that this term does not require construction, and should be subject to its plain English-language interpretation. To the extent construction is required, Power Integrations contends that the term "combining" means "adding together" and that different sources are not required as Fairchild contends. (D.I. 152 at 13).

In light of the Court's construction of the terms "primary voltage" and "secondary voltage" the Court agrees with Power Integrations that the term "combining" should not be construed as requiring different sources. Fairchild contends that the plain meaning of this term necessarily requires different sources, however, even the dictionary does not define the term "combine" by reference to a particular source. See <u>Webster's Ninth New</u>

Collegiate Dictionary 262 (9th ed. 1988).  Accordingly, the Court
will construe the term "combining" consistent with its plain
meaning such that the term "combining" means "adding together."

      3.   Claim 19 - **supplemental voltage**

    Claim 19 of the patent depends from claim 17.  Claim 19
recites:

> 19.  The method of claim 17 wherein the primary
> voltage is V and each of the secondary voltage sources
> generates a supplemental voltage lower than V, further
> comprising passing the supplemental voltage to the
> voltage-controlled oscillator.

('876 patent, col. 9, ll. 48-52).

    The only term requiring construction in claim 19 is the term
"supplemental voltage."  Fairchild contends that "supplemental
voltage" means "voltage other than the primary or secondary
voltage."  Fairchild contends that each claim term must have
meaning and therefore, the supplemental voltage must be a third
voltage which is distinct from the primary and secondary
voltages.  (D.I. 156 at 37).

    In response, Power Integrations contends that the term
"supplemental voltage" does not require construction.  Power
Integrations contends that Fairchild's construction is
inconsistent with the language of claim 17 and 19, because
according to the plain language of claim 17, "one or more
secondary voltage sources, together, generate **a** secondary
voltage."  (D.I. 152 at 14) (emphasis in original).  Power

Integrations also contends that the plain language of claim 19 indicates that each secondary source itself generates a supplemental voltage whose magnitude is lower than V, the magnitude of the primary voltage.  Thus, the secondary voltage is the total of the supplemental voltages, each generated by one secondary voltage source.  In this regard, Power Integrations contends that it is incorrect to construe supplemental voltage as something other than secondary voltage, as Fairchild contends. To the extent construction of this phrase is required, Power Integrations contends that the phrase should be construed as "a voltage in addition to the primary voltage."  (D.I. 152 at 14).

Reviewing the disputed term in the context of the claim language and the specification, the Court agrees with the construction proposed by Power Integrations.  Reading claim 17 and 19 together, the Court is persuaded that the secondary voltage is the total of the supplemental voltages which are each generated by one secondary voltage source.  Thus, the Court construes the term "supplemental voltage" to mean "a voltage in addition to the primary voltage."

C.  The Disputed Terms of The '366 Patent and The '851 Patents

1.  Claim 1 of the '366 patent

Claim 1 of the '366 patent provides:

1.  A pulse width modulated switch comprising:

a first terminal;

a second terminal;

a switch comprising a control input, the switch allowing a signal to be transmitted between said first terminal and said second terminal according to a drive signal provided at said control input;

an oscillator that provides a maximum duty cycle signal comprising an on-state and an off-state;

a drive circuit that provides said drive signal according to said maximum duty cycle signal; and

a soft start circuit that provides a signal instructing said drive circuit to disable said drive signal during at least a portion of said on-state of said maximum duty cycle.

('366 patent, col. 12, ll. 23-37).

### a. maximum duty cycle signal comprising an on-state and an off-state

Although Power Integrations requests the Court to construe the phrase "maximum duty cycle signal comprising an on-state and an off-state," it appears to the Court that the parties have since reached a stipulation with respect to the meaning of this phrase. (D.I. 156 at Exh. A). Accordingly, further intervention by the Court with respect to this issue is not warranted.

### b. soft start circuit

The parties' dispute with respect to the term "soft start circuit" is whether the term "soft start circuit" should be construed as a means-plus-function limitation in accordance with 35 U.S.C. § 112, ¶ 6, and if so, what are the appropriate

corresponding structures.  The parties do not dispute that the functions of the various soft start circuits set forth in each of the claims in which the term "soft start circuit" appears should be construed in accordance with their plain language meaning. (D.I. 152 at 17, n.5; D.I. 166 at 32-33).  Accordingly, the Court will limit its discussion to the applicability of Section 112, ¶ 6, and if Section 112, ¶ 6 applies, to the appropriate corresponding structures.

Power Integrations contends that the term "soft start circuit" should be construed as a means-plus-function element. Power Integrations recognizes that the term "means" is not used in the claim, which gives rise to the presumption that the term is not a means-plus-function element.  However, Power Integrations contends that the presumption is overcome in this case, because one skilled in the art would not be able to discern from the claim language which specific structure or class of structures is covered by the claim.  Power Integrations contends that the structures corresponding to the soft start circuit are shown in Figures 3, 6, and 9 of the '366 patent specification and discussed at column 6, lines 7 through 17; column 6, line 35 through column 7, line 18; column 11, lines 40 through 50 and column 12, lines 5 through 10.  (D.I. 152 at 17-20).

Fairchild contends that "soft start circuit" should not be construed as a means-plus-function limitation.  Based on the

Federal Circuit's decision in <u>Linear Tech. Corp. v. Impala Linear Corp.</u>, 379 F.3d 1311, 1320 (Fed. Cir. 2004), Fairchild contends that a circuit is a sufficiently definite structure such that Power Integrations has not overcome the presumption that Section 112, ¶ 6 does not apply.  To the extent the Court chooses to construe "soft start circuit" as a means-plus-function limitation, Fairchild contends that all of the embodiments to the specification should be considered, including soft start capacitor (110), and that Power Integrations' identification of proposed corresponding structures improperly limits the claim to particular embodiments in an attempt to avoid the prior art. (D.I. 166 at 29-33).

When the word "means" is not used in a claim term, a rebuttable presumption arises that Section 112, ¶ 6 does not apply.  This presumption can be rebutted, if the party advancing a means-plus-function construction demonstrates that the claim term fails to recite sufficiently definite structure or recites a function without reciting a sufficient structure for performing that function.  In the Court's view, Power Integrations has overcome this presumption.  Although one skilled in the art would know the functionality of soft start, the Court is not persuaded that such a person would also know the precise structures for a soft start circuit, because the function of a soft start circuit can be achieved in a variety of ways making it unclear what the

specific structures are for performing the recited functions. Fairchild contends that a soft start circuit should be construed as a "circuit that minimizes inrush currents at start up." However, the portion of the specification upon which Fairchild relies does not define "soft start circuit." Rather, the specification defines "soft start functionality," not "soft start circuit," and "soft start functionality" is defined in terms of the prior art depicted in Figure 1. In contrast, the specification uses the term "soft start circuit" to describe the claimed invention, and the term "soft start circuit" is not equated with the prior art's use of the soft start capacitor 110.

Fairchild also contends that a soft start circuit is not a means-plus-function limitation, because the Federal Circuit has recognized in other cases that the term "circuit" identifies a sufficient structure. However, a claim element must be construed in light of the specific claims at issue, and the Court is persuaded that the cases to which Fairchild refers involve a different use of the term "circuit." For example, in <u>Linear</u>, the Federal Circuit concluded that the term "circuit" was sufficiently coupled with a description of the circuit's operation such that "persons of ordinary skill in the art would understand the structural arrangements of circuit components from the term 'circuit' <u>coupled with the qualifying language of claim 1</u> . . ." 379 F.3d at 1320 (emphasis added). Similarly, in <u>Apex</u>

31

Inc. v. Raritan Computer, Inc., the Federal Circuit recognized that "every use of the term 'circuit' in the asserted claims include[d] additional adjectival qualifications further identifying sufficient structure to perform the claimed functions to one of ordinary skill in the art." 325 F.3d 1364, 1374 (Fed. Cir. 2003). In this case, however, the Court is persuaded that one skilled in the art would understand the term "soft start circuit" as encompassing a variety of different possible structures and that those possible structures are not sufficiently identifiable from the claim language. Accordingly, the Court agrees with Power Integrations that the term "soft start circuit" should be construed in accordance with Section 112, ¶ 6.

Having concluded that Section 112, ¶ 6 applies, the Court must next identify the corresponding structures that perform the functions recited in the claims. Based on the teachings of the specification, the Court concludes that the corresponding structures are shown in Figures 3, 6 and 9 of the '366 patent and described in the specification at column 6, lines 7 through 17; column 6, line 35 through column 7, line 18; column 11, lines 40-50 and column 12, lines 5 through 10. Fairchild argues that the corresponding structure must include the soft start capacitor 110 depicted in the prior art. The Court disagrees. "A structure disclosed in the specification qualifies as 'corresponding'

32

structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc., 424 F.3d 1293, 1308-1309 (Fed. Cir. 2005). In the Court's view, the term "soft start circuit" is used to describe the invention which is an internal "soft start circuit." The Court does not read the specification to equate the claimed "soft start circuit" with the soft start capacitor 110. To the contrary, in the Court's view, the specification teaches away from the prior art of soft start capacitor 110, which is an external capacitor. ('366 patent, col. 3, ll. 5-16) (discussing problems with using external capacitor to provide soft start functionality). Moreover, patent claims should be construed, where possible, to uphold their validity, and the Court is not persuaded that Fairchild's construction, which embraces the prior art, is sound, particularly where, as here, the Patent Examiner allowed the claims in the face of prior art that was expressly disclosed, labeled and discussed at length in the patent.

   2.   Claim 1 of the '851 patent

Claim 1 of the '851 patent recites:

1.   A pulse width modulated switch comprising:

      a first terminal;

      a second terminal;

      a switch comprising a control input, said
      switch allowing a signal to be transmitted

between said first terminal and said second
terminal according to a drive signal provided
at said control input;

a frequency variation circuit that provides a
frequency variation signal;

an oscillator that provides an oscillation
signal having a frequency range, said
frequency of said oscillation signal varying
within said frequency range according to said
frequency variation signal, said oscillator
further providing a maximum duty cycle signal
comprising a first state and a second state;
and

a drive circuit that provides said drive
signal when said maximum duty cycle signal is
in said first state and a magnitude of said
oscillation signal is below a viable
threshold level.

('851 patent, col. 12, ll. 15-34).

    a.   **frequency variation circuit that provides a
         frequency variation signal**

    As a threshold matter, the parties agree that the term

"frequency variation circuit" means "a structure that provides

the frequency variation signal."  (D.I. 152 at 21; D.I. 166 at

20, n.12).  Thus, the parties' dispute centers on the meaning of

the "frequency variation signal."

    Fairchild contends that the term "frequency variation

signal" should be construed in accordance with its plain meaning

as "a signal that is used to vary the frequency of the

oscillation signal."  (D.I. 156 at 27).  Fairchild contends that

its construction is consistent with other claim elements like the

oscillator element:

> an oscillator that provides an oscillation signal
> having a frequency range, said frequency of said
> oscillation signal varying within said frequency range
> according to said frequency variation signal . . .

('851 patent, claims 1, col. 6 ll. 25-28 and claim 11, col. 13,

ll. 35-38).

Power Integrations contends that the term "frequency

variation signal" means "an internal signal that cyclically

varies in magnitude during a fixed period of time and is used to

modulate the frequency of the oscillation signal within a

predetermined frequency range." (D.I. 152 at 23). Power

Integrations' proposed construction is derived from a discussion

in the specification of the frequency variation signal which

contrasts such a signal from the known prior art.

Reviewing the disputed claim in the context of the claim

language and the specification, taken as a whole, the Court

concludes that a "frequency variation signal" means "an internal

signal that cyclically varies in magnitude during a fixed period

of time and is used to modulate the frequency of the oscillation

signal within a predetermined frequency range." The Court's

construction is supported by the specification which defines the

frequency variation signal in terms of a known and fixed

frequency range during a fixed period of time. In this regard,

the specification teaches:

> Alternatively, or in addition to soft start
> functionality, pulse width modulated switch 262 may
> also have frequency jitter functionality. That is, the

35

switching frequency of the pulse width modulated switch
262 varies according to an internal frequency variation
signal.  This has an advantage over the frequency
jitter operation of FIG. 1 in that **the frequency range
of the presently preferred pulse width modulated switch
262 is known and fixed**, and is not subject to the line
voltage or load magnitude variations.

('851 patent, col. 6, ll. 10-17).

Referring to FIG. 3, frequency variation signal 400 is
utilized by the pulse width modulated switch 262 to
vary its switching frequency within a frequency range.
The frequency variation signal 400 is provided by
frequency variation circuit 405, which preferably
comprises an oscillator that operates at a lower
frequency than main oscillator 465.  The frequency
variation signal 400, is presently preferred to be a
triangular waveform that preferably oscillates between
four point five (4.5) volts and one point five (1.5)
volts.  Although the presently preferred frequency
variation signal 400 is triangular waveform, **alternate
frequency variation signals such as ramp signals,
counter output signals or other signals that vary in
magnitude during a fixed period of time may be utilized
as the frequency variation signal**.

('851 patent, col. 6, ll. 25-38).

If the frequency variation signal 400 is a ramp signal,
the frequency would linearly rise to a peak and then
immediately fall to its lowest value.  In this way, the
current provided to current source input 485 of PWM
oscillator 480 **is varied in a known fixed range** that
allows for easy and accurate frequency spread of the
high frequency current generated by the pulse width
modulated switch.

('851 patent, col. 7, ll. 43-49).

That is, the switching frequency of the regulation
circuit 850 varies according to **an internal frequency
variation signal**.  This has an advantage over the
frequency jitter operation of FIG. 1 in that **the
frequency range of the presently regulation circuit 850
is known and fixed**, and is not subject to the line
voltage or load magnitude variations.

36

('851 patent, col. 11, ll. 45-50).

Based on the specification taken as a whole, the Court concludes that Fairchild's construction of the term "frequency variation signal" is overly broad. Read in the context of the specification, the Court is persuaded that the definition of the term "frequency variation signal" should include a fixed period of time and a predetermined frequency range. Accordingly, the Court will adopt the construction proposed by Power Integrations for the term "frequency variation signal."

## CONCLUSION

For the reasons discussed, the Court has construed the disputed terms in the '075, '366, '851 and '876 patents as provided herein. An Order consistent with this Memorandum Opinion will be entered setting forth the meaning of the disputed terms in the asserted patents.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC., a          :
Delaware corporation,                :
                                     :
                Plaintiff,           :
                                     :
        v.                           :    C.A. No. 04-1371-JJF
                                     :
FAIRCHILD SEMICONDUCTOR              :
INTERNATIONAL, INC., a Delaware:
corporation, and FAIRCHILD           :
SEMICONDUCTOR CORPORATION, a         :
Delaware corporation,                :
                                     :
                Defendants.          :

## O R D E R

At Wilmington, this $3|$ day of March 2006, for the reasons discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that the following terms and/or phrases in U.S. Patent Nos. 4,811,075 (the "'075 patent"), 6,107,851 (the "'851 patent"), 6,229,366 (the "'366 patent"), 6,249,876 (the "'876 patent") are assigned the following meanings:

1.    The term **"MOS transistor"** means "a metal oxide transistor."

2.    The term **"substrate"** means "the physical material on which a transistor or microcircuit is fabricated."

3.    The phrase **"a pair of laterally spaced pockets of semiconductor material of a second conductivity type within the substrate"** means "two laterally spaced pockets of semiconductor material of the opposite conductivity type from the substrate."

4.   The phrase **"a surface adjoining layer of material of the first conductivity type on top of an intermediate portion of the extended drain region between the drain contact pocket and the surface adjoining positions"** is construed according to its plain meaning, and further construction by the Court is not required.

5.   The phrase **"said top layer of material"** is construed according to its plain meaning when read in the context of the claim, and further construction by the Court is not required.

6.   The term **"reverse bias voltage"** means "a voltage applied across a rectifying junction with a polarity that provides a high-resistance path."

7.   The phrase **"substrate region thereunder which forms a channel"** is construed according to its plain meaning when read in the context of the claim, and further construction by the Court is not required.

8.   The term **"frequency jittering"** means "varying the switching frequency of a switch mode power supply about a target frequency in order to reduce electromagnetic interference."

9.   The term **"coupled"** means that "two circuits are coupled when they are connected such that voltage, current or control signals pass from one to another."

10.   The term **"primary voltage"** means a "base or initial voltage" and the term is not defined by reference to the

source from which it may be generated.

11.  The term **"secondary voltage"** means "a subsequent or additional voltage."

12.  The term **"combining"** means "adding together."

13.  The term **"supplemental voltage"** means "a voltage in addition to the primary voltage."

14.  The term **"soft start circuit"** is a means-plus-function element.  The functions of the various "soft start circuits" are construed in accordance with the plain meaning of the claims setting forth such soft start circuit functions.  The corresponding structures related to the "soft start circuit" are shown in Figures 3, 6 and 9 of the '366 patent and described in the specification of the '366 patent at col. 6, ll. 7-17; col. 6, l. 35-col. 7, l. 18; col. 11, ll. 40-50 and col. 12, ll. 5-10.

15.  The phrase **"frequency variation circuit"** means "a structure that provides the frequency variation signal."

16.  The phrase **"frequency variation signal"** means "an internal signal that cyclically varies in magnitude during a fixed period of time and is used to modulate the frequency of the oscillation signal within a predetermined frequency range."


UNITED STATES DISTRICT JUDGE

# Exhibit D

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC., a        :
Delaware corporation,              :
                                   :
                Plaintiff,         :
                                   :
        v.                         :    C.A. No. 04-1371-JJF
                                   :
FAIRCHILD SEMICONDUCTOR            :
INTERNATIONAL, INC., a Delaware:
corporation, and FAIRCHILD         :
SEMICONDUCTOR CORPORATION, a       :
Delaware corporation,              :
                                   :
                Defendants.        :

**O R D E R**

At Wilmington, this 3̶1̶ day of March 2006, for the reasons

discussed in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that the following terms and/or phrases

in U.S. Patent Nos. 4,811,075 (the "'075 patent"), 6,107,851 (the

"'851 patent"), 6,229,366 (the "'366 patent"), 6,249,876 (the

"'876 patent") are assigned the following meanings:

1.     The term **"MOS transistor"** means "a metal oxide

transistor."

2.     The term **"substrate"** means "the physical material

on which a transistor or microcircuit is fabricated."

3.     The phrase **"a pair of laterally spaced pockets of

semiconductor material of a second conductivity type within the

substrate"** means "two laterally spaced pockets of semiconductor

material of the opposite conductivity type from the substrate."

4.    The phrase **"a surface adjoining layer of material of the first conductivity type on top of an intermediate portion of the extended drain region between the drain contact pocket and the surface adjoining positions"** is construed according to its plain meaning, and further construction by the Court is not required.

5.    The phrase **"said top layer of material"** is construed according to its plain meaning when read in the context of the claim, and further construction by the Court is not required.

6.    The term **"reverse bias voltage"** means "a voltage applied across a rectifying junction with a polarity that provides a high-resistance path."

7.    The phrase **"substrate region thereunder which forms a channel"** is construed according to its plain meaning when read in the context of the claim, and further construction by the Court is not required.

8.    The term **"frequency jittering"** means "varying the switching frequency of a switch mode power supply about a target frequency in order to reduce electromagnetic interference."

9.    The term **"coupled"** means that "two circuits are coupled when they are connected such that voltage, current or control signals pass from one to another."

10.    The term **"primary voltage"** means a "base or initial voltage" and the term is not defined by reference to the

source from which it may be generated.

      11.   The term **"secondary voltage"** means "a subsequent or additional voltage."

      12.   The term **"combining"** means "adding together."

      13.   The term **"supplemental voltage"** means "a voltage in addition to the primary voltage."

      14.   The term **"soft start circuit"** is a means-plus-function element.  The functions of the various "soft start circuits" are construed in accordance with the plain meaning of the claims setting forth such soft start circuit functions.  The corresponding structures related to the "soft start circuit" are shown in Figures 3, 6 and 9 of the '366 patent and described in the specification of the '366 patent at col. 6, ll. 7-17; col. 6, l. 35-col. 7, l. 18; col. 11, ll. 40-50 and col. 12, ll. 5-10.

      15.   The phrase **"frequency variation circuit"** means "a structure that provides the frequency variation signal."

      16.   The phrase **"frequency variation signal"** means "an internal signal that cyclically varies in magnitude during a fixed period of time and is used to modulate the frequency of the oscillation signal within a predetermined frequency range."

_____
UNITED STATES DISTRICT JUDGE

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC.,  )  Trial Volume III
                           )
           Plaintiff,      )
                           )  C.A. No. 04-1371-JJF
v.                         )
                           )
FAIRCHILD SEMICONDUCTOR    )
INTERNATIONAL, INC., and   )
FAIRCHILD SEMICONDUCTOR    )
CORPORATION,               )
                           )
           Defendants.     )



              Wednesday, September 19, 2007
              9:05 a.m.
              Courtroom 4B


              844 King Street
              Wilmington, Delaware


BEFORE:   THE HONORABLE JOSEPH J. FARNAN, JR.
          United States District Court Judge




APPEARANCES:


          FISH & RICHARDSON
          BY:  WILLIAM J. MARSDEN, JR., ESQ.
          BY:  FRANK E. SCHERKENBACH, ESQ.
          BY:  HOWARD G. POLLACK, ESQ.
          BY:  MICHAEL R. HEADLEY, ESQ.


                  Counsel for the Plaintiff

```
1    variation.  But it's all the same.
2                  And that's how this one works.
3             Q.   Now, is the invention of the '851
4    patent used in Power Integrations' products?
5             A.   Yes, it is.
6             Q.   Which products is it used in?
7             A.   It's used in TOPSwitch FX, and
8    TOPSwitch GX.
9             Q.   Can you turn to PX 34 in your
10   book?  What's that exhibit?
11            A.   This is the TOPSwitch FX family of
12   products.  It's a datasheet for this product
13   family.
14            Q.   And what's a datasheet?
15            A.   Datasheet is basically a
16   description of the operation of the product that
17   we provide to our customers to help our
18   customers use our products to build a power
19   supply.
20            Q.   And does the datasheet refer to
21   the integrated frequency jitter invention?
22            A.   Yes, it does.  In fact, right on
23   the top on the front of the datasheet, you can
24   see that under product highlights, it says
```

888

1    frequency jittering reduces EMI and EMI

2    filtering costs.

3        Q.   And does the datasheet describe

4    the frequency jitter feature in more detail?

5        A.   Yes, actually inside the data

6    sheet, we talk more about it.

7            So, for example, here, this is the

8    slow waveform.  That is the frequency variation

9    signal, that's actually changing the frequency

10   of the main oscillator.

11           So when the lines have grouped

12   together, the frequency is higher than when they

13   are stirred apart.  So the frequency, you know,

14   moves from low to high around an average target

15   frequency.  So it goes higher and lower to do

16   this jittering function.

17       Q.   And for the record that's PD 1214,

18   PX 34 at PIF 37-484 and five.

19           Does the data sheet describe the

20   benefits of the frequency jitter feature?

21       A.   Yes, it does.  So to further --

22   because it talks here about the benefits, the

23   frequency jitter feature modulates the switching

24   frequency over the narrow bands as means to --

1  of reducing conducted EMI peaks.

2  So if you look at the EMI without

3  the jitter and compare it to the EMI with the

4  jitter under those same conditions, you can see

5  that the noise is much lower. By the way, these

6  lines are the limits. You have to be under

7  those limits to meet the government regulation.

8  You can see this is much lower in

9  EMI than that figure.

10  Q. Are the TOPSwitch FX and GX

11  products commercially successful?

12  A. Very successful actually.

13  Q. Has the integrated frequency

14  jitter feature contributed to the commercial

15  success of the TOPSwitch products?

16  A. Absolutely.

17  Q. And in what way?

18  A. Well, it reduces the cost of EMI

19  components, and also the size of the power

20  supply. In some cases, you can't even fit the

21  power supply into the enclosure because of the

22  size of the EMI component.

23  Q. Okay. I'd like to turn your

24  attention to the next patent, the '366 patent.

1    That's in 2005. And in 2004, $130 --

2    approximately $137 million.

3              Q.   And has having the integrated

4    SoftStart feature also contributed to the

5    commercial success of Power Integrations'

6    products?

7              A.   Yes.

8              Q.   Last patent, the '876 patent, the

9    one we've called the digital frequency jitter

10   patent.  It's PX 1 in your book.  Are you also a

11   named inventor on this patent?

12             A.   Yes, I am, along with, again, the

13   two other inventors.

14             Q.   And what generally does the '876

15   patent relate to?

16             A.   Well, the '876 is also relating to

17   frequency jittering, but it is a different way

18   to implement it.  In this case, we use a digital

19   technique to implement it.

20             Q.   Okay.  I'll just put a slightly

21   larger version of Figure 1.

22             Can you just describe generally

23   how what's shown in Figure 1 works to do

24   frequency jitter?

 1              A.   So as I said, this uses a digital

 2    method.  And one way to understand digital

 3    versus analog is you can think of analog as a

 4    continuous ramp; whereas digital is, you know, a

 5    step.  So having a continuous ramp.  We have

 6    steps.

 7              So in this case, we have the

 8    oscillator inside this dotted line box.  The

 9    outboard of the oscillator goes into a counter.

10              So the actually toggles the

11    counter.  So the counter counts as the

12    oscillator oscillates.

13              And this is actually a seven-bit

14    counter.  We take four of those bits, and those

15    four bits are connected to the D to A converter.

16    And D to A converter converts these output

17    counts into a current.  It's a changing current,

18    to change the frequency of the oscillator.  Once

19    again, to jitter the frequency around a target

20    frequency.

21              Q.   And is that shown in Figure 2 of

22    the patent?

23              A.   Yes, I believe it is.  See, you

24    can see you have an average frequency.  And as

1    the counter counts up, the frequency varies

2    around the average frequency.

3              And when it reaches the high end

4    of it, it drops back, because a counter counts

5    back to zero, and then starts all over again.

6         Q.   Can you turn to PX 28 in your

7    book?  What is that exhibit?

8         A.   This is a datasheet for TinySwitch

9    Plus.

10        Q.   And does the TinySwitch product

11   use the digital frequency jitter invention?

12        A.   Yes, it does.

13        Q.   And is it described in the

14   datasheets?

15        A.   Yes, it is.

16        Q.   This is PD 1231 from the datasheet

17   PX 28?

18        A.   Yeah.  Once again, right on the

19   top under product highlights, we say a frequency

20   jittering dramatically reduces EMI five to ten

21   DB.

22        Q.   And is it described, frequency

23   jitter described in anymore detail inside the

24   datasheets?

900

1              A.   Yes, it is.

2              Q.   I'm going to show you some more

3     excerpts.  This is PD 1232.  What does this

4     describe?

5              A.   Well, this is another way to show

6     the frequency jitter.  You can actually see --

7     just to give some background here, this is --

8     this is when the switch is on and then the

9     switch is off here.

10              So you can see that this is one

11     cycle, by the way.  This is on and off.  It's on

12     again.

13              If you look at the cycle, it

14     actually jitters.  Can you actually physically

15     see the jitter on the waveform.

16              It's just a different way of

17     showing it.

18              Q.   Is the invention of the '876

19     patent used in any other products?

20              A.   Yes.  It's used in TinySwitch II,

21     TinySwitch III, and most of the LinkSwitch

22     family of products.

23              Q.   And have the Power Integrations

24     TinySwitch and LinkSwitch products been

1  successful in the market?

2           A.   Very successful, actually in fact

3  even more successful than TopSwitch FX and GX.

4           Q.   We're looking back at PX 387.  Is

5  there showing the sales of TinySwitch?

6           A.   This is the same slide we showed

7  earlier except we are highlighting the

8  TinySwitch I or II.  As you can see it's more

9  than fifty percent of our revenue in 2004 and

10  2005.

11          Q.   Has having a digital integrated

12  digital feature contributed to the commercial

13  success of the TinySwitch and the LinkSwitch?

14          A.   Based on the feedback we have

15  gotten, it definitely has.

16          Q.   Mr. Balakrishnan, I would like to

17  ask you a few questions now about some of the

18  earlier Power Integrations products.  But first

19  what I want to ask you is when you filed the

20  circuit patents that are at issue in this case,

21  did you believe that your invention that you

22  were describing there was new and nonobvious?

23          A.   Absolutely.

24          Q.   And has anything you have heard in

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC., ) Trial Volume IV
                          )
            Plaintiff,    )
                          ) C.A. No. 04-1371-JJF
v.                        )
                          )
FAIRCHILD SEMICONDUCTOR   )
INTERNATIONAL, INC., and  )
FAIRCHILD SEMICONDUCTOR   )
CORPORATION,              )
                          )
            Defendants.   )

                Thursday, September 20, 2007
                9:05 a.m.
                Courtroom 4B


                844 King Street
                Wilmington, Delaware


BEFORE:   THE HONORABLE JOSEPH J. FARNAN, JR.
          United States District Court Judge




APPEARANCES:


          FISH & RICHARDSON
          BY:  WILLIAM J. MARSDEN, JR., ESQ.
          BY:  FRANK E. SCHERKENBACH, ESQ.
          BY:  HOWARD G. POLLACK, ESQ.
          BY:  MICHAEL R. HEADLEY, ESQ.


                Counsel for the Plaintiff

```
 1        you tell us what this documents shows?

 2              A.   Well, it's not very well focused,

 3        at least not from my perspective.  These are our

 4        FX datasheet, and it shows highlighted there the

 5        fact that we're stressing the fully integrated

 6        soft start overshoot as well as the EMI savings

 7        and the filtering cost from the digital

 8        frequency jitter -- excuse me, from analog

 9        frequency jitter in this case.

10              Q.   Turning to PX 35 in your notebook

11        and up on the screen.  What does this show?

12              A.   Again this is a standard datasheet

13        we give to all of our customers detailing the

14        features and benefits of our part showing the

15        fact that the soft start and the frequency

16        jitter are key features.

17              Q.   And which product is this?

18              A.   The TOPSwitch GX.

19              Q.   Have the products that use analog

20        and digital jitter been commercially successful?

21              A.   Very much so.

22              Q.   What about the products that use

23        internal SoftStart?

24              A.   It's a key feature for us as well.
```

1         Q.    Okay.

2         A.    Because --

3         Q.    Oh, pardon.  Go ahead.

4         A.    I would just say the SoftStart is

5    one of the ways that simplifies engineering

6    design time and also gives a more reliable

7    system.  What we've also found is that key OEMs

8    require SoftStart because they're aware that a

9    system that just immediately ramps to full --

10   full output upon plug in or turn on is not as

11   reliable as something that's got SoftStart,

12   which takes a nice gentle ramp.

13        Q.    Approximately how many chips has

14   PI sold in its --

15        A.    Billions.  We're starting to sound

16   like McDonald's.

17        Q.    If I could direct your attention

18   to PX 387 in your binder, and I have an excerpt

19   up on the screen.

20             Do you recognize this?

21        A.    Yes, I do.

22        Q.    What does this show?

23        A.    This looks like some data from our

24   annual report in 2005 showing our revenues at

```
 1    143 million -- $143 million.

 2                And it also shows the breakout

 3    between our different families, the TinySwitch,

 4    the TOPSwitch family and the original TOPSwitch

 5    I and II families.

 6         Q.   And those are the same products

 7    that we discussed earlier that incorporate the

 8    analog and digital jitter?

 9         A.   Correct.

10         Q.   Do analog and digital jitter and

11    external SoftStart contribute to the success of

12    these products?

13         A.   Absolutely.

14         Q.   How does external SoftStart drive

15    sales?

16         A.   As I -- well, as I started to

17    mention to you, if you're going to build like a

18    reliable power supply or one that doesn't have

19    an overshoot when you first turn it on, you have

20    to apply some sort of a SoftStart technique.

21    And it's not always obvious how to do this,

22    because we have integrated it into our part.

23                It basically takes that out of the

24    hands of the engineer.  So the keeps it much
```

1    more simple.

2              And as such, our customers

3    appreciate it. So the saves in space, saves

4    components and offers a higher integrated

5    solution.

6         Q.   What about integrated frequency

7    jitter, how does that drive sales?

8         A.   Frequency jitter -- pardon me.

9    Frequency jitter is the granddaddy in my eyes.

10   It saves a tremendous amount of money,

11   especially as you go up in the power curve. As

12   products need more power, like from five watts

13   up to, call it, 40 or 50 watts, the EMI problems

14   become -- become increased.

15             And the fact that we've got a

16   frequency jitter integrated into our part gives

17   our engineers advice and advantages to provide a

18   power supply that costs less. So frequency

19   jitter saves on the filtering cost and the size

20   of the components that are necessary on the

21   secondary part of and the primary part of the

22   power supply.

23        Q.   Okay I'm showing you plaintiff's

24   demonstrative 10006.

# Exhibit F

*Power Integrations, Inc.   v.*
*Fairchild Semiconductor International, Inc.*

---

*Trial Volume 3*
*October 4, 2006*

---

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE  19801*
*(302) 658-6697*

*Original File 100406~1.TXT, 331 Pages*
*Min-U-Script® File ID: 0640525804*

# Word Index included with this Min-U-Script®

Page 644

[1] (Jury entering the courtroom at 9:54
[2] a.m.)
[3]    THE COURT: All right.
[4] Be seated, please. Good morning.
[5]    THE JURY: Good morning.
[6]    THE COURT: I wanted to let you know
[7] that I can still tell time. I know it's not
[8] 9:30, and I apologize to you.
[9]    We were out here going over some
[10] evidentiary questions that will allow the
[11] testimony to move a little more smoothly for you.
[12] So we were working with the lawyers.
[13]    But we apologize for keeping you
[14] back in that room when we told you we would start
[15] up at 9:30. But I think we're ready to go.
[16]    Thank you for your patience.
[17]    MR. MICLEAN: Ladies and gentlemen,
[18] just introducing again Bruce Renouard. Excuse
[19] me.
[20]                **BY MR. MICLEAN:**
[21]    **Q:** Mr. Renouard, we discussed, as you closed
[22] testimony yesterday about Power Integrations and
[23] Fairchild being the only competitors for the
[24] Samsung Wireless business. And I want to kind of

Page 645

[1] shift gears into some questions about some
[2] pricing to customers.
[3]    Does Power Integrations have a
[4] policy about not raising prices to customers?
[5]    **A:** Yes.
[6]    **Q:** And what is that policy?
[7]    **A:** Well, we pretty much have committed to our
[8] customers that we no longer — we've never raised
[9] the prices in the history of the company to any
[10] of our customers.
[11]    And the reason we do that is because
[12] as we reduce the amount of components in a sale,
[13] we sell a selected insurance policy so that the
[14] components that we take out of the system don't
[15] fluctuate in prices anymore.
[16]    So it's basically a way that the
[17] customer can get an added benefit of the PI
[18] value.
[19]    **Q:** Do you have an example that you can give
[20] us?
[21]    **A:** Yeah. I just got back from Taiwan right
[22] before coming to this trial, and we actually sat
[23] down with a customer there, pretty similar to
[24] what you have here.

Page 646

[1]    We met with the customer who had a
[2] competing design, had 72 components in its
[3] competing design. It just so happened that our
[4] design had 45 components. So we saved the
[5] customer 27 components in that — in that
[6] program.
[7]    And specifically he was really
[8] pleased because the prices of the commodities,
[9] the prices of the components that we took away
[10] from the system were — now he doesn't have to
[11] worry about them going up.
[12]    And there have been some shortages
[13] in the industry now, and the price of copper has
[14] gone up. Silicon has gone up. A lot of prices
[15] have gone up.
[16]    So the prices of all these
[17] components, you know, they all have copper legs
[18] to them. They've all got aluminum around them.
[19]    So those prices have actually gone
[20] up in recent months.
[21]    **Q:** So when you sell these devices, you can
[22] take a list of materials for your competitor,
[23] list the materials for them, compare them in
[24] overall to sell your products?

Page 647

[1]    **A:** Correct.
[2]    **Q:** Okay. Let me ask you specifically: Are
[3] Power Integrations' patented technologies
[4] involved in this case helpful in selling these
[5] chips?
[6]    **A:** Yes, very much so.
[7]    **Q:** Why is that?
[8]    **A:** Well, as we've kind of said, touched on in
[9] the past, the — the frequency jitter is a key
[10] benefit for our customers in that it enables us
[11] to do a design with a much smaller footprint and
[12] with less components.
[13]    And in the SoftStart syngenic
[14] feature that our customers appreciate, because it
[15] gives them a more reliable system, and the fact
[16] that we can have integrated a power MOSFET with a
[17] controller using our P-TOP patent, eliminates a
[18] whole other package or the complexity of doing a
[19] hybrid device.
[20]    So we are — so it's very much a key
[21] benefit in the selling of our products.
[22]    **Q:** Are there other players in the market who
[23] do this frequency jitter feature provided by
[24] Power Integrations?

# Exhibit G

United States                                                               Semiconductors



# Power Integrations

## Cowen & Co.

**February 3, 2006**

**Analysts**
**Shawn Slayton**
(415) 646-7285
shawn.slayton@sgcowen.com

**Deepak Sitaraman, CPA**
(415) 646-7304
deepak.sitaraman
@sgcowen.com

## Solid Q4 Results With Outlook Upside; Irresolute CEC Muddies Waters Near-term

**Conclusion:** Yesterday Power Integrations reported in-line CQ4 sales and earnings. The March quarter mid-range sales outlook was above SG Cowen/Street expectations, and earnings guidance exceeded our forecast by a penny. We reiterate our bullish thesis on POWI shares, based on forthcoming worldwide energy efficiency initiatives that spur adoption of POWI's chips, together with an anticipated favorable outcome in the Fairchild lawsuit, where FCS may be forced to exit a large segment of the power supply converter IC market. Owing to steady profit growth, accelerating ROIC, and an attractive analog IC business model, we see 15-20% upside to POWI shares relative to the broader market over the next 12 months.

- **Positives.** 1) Record company revenue in Q4 up 13% y/y 2) Unit shipment growth of 20% y/y implying market share gains 3) Ongoing GM expansion (up 160 bps q/q) owing to improved operating efficiencies; GM now expected to be ~50% throughout 2006 4) Anticipated share gains in mobile phone and cordless phone applications 5) Ongoing sales momentum derived from Linkswitch, Tinyswitch and DPAswitch new product introductions

- **As disruptive as it might be, the California Energy Commission (CEC) is still accepting commentary to amend new energy efficiency requirements.** On Monday, Jan 30th, the CEC held a "workshop" to receive comments on industry concerns regarding recently amended Appliance Efficiency Regulations (AER) for external power supplies and other electronics products. This is extremely perplexing to us, because the 2006 AER are now "on-the-books" law in California (ie-the law of the land). We are unsure if the CEC will cave-in to an 11th-hour plea from certain electronics manufacturers to push-out or amend the new energy efficiency laws.

| POWI (02/02) | $26.16 | **Revenue $MM** | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Mkt cap | $803.1MM | **FY** | **2005** | **2006E** | | | **2007E** | |
| Dil shares out | 30.7MM | **Dec** | **Actual** | **Prior** | **Current** | | **Prior** | **Current** |
| Avg daily vol | 349.1K | Q1 | 34.4 | 36.5 | 38.0 | | — | 44.0 |
| 52-wk range | $18.2-28.3 | Q2 | 35.3 | 38.5 | 39.0 | | — | 46.2 |
| Dividend | Nil | Q3 | 36.5 | — | 45.0 | | — | 47.5 |
| Dividend yield | Nil | Q4 | 37.9 | — | 45.0 | | — | 50.2 |
| BV/sh | $6.81 | Year | **144.1** | **165.0** | **167.0** | | — | **187.9** |
| Net cash/sh | $4.26 | CY | — | — | — | | — | — |
| Debt/cap | NA | EV/S | — | — | — | | — | — |
| ROIC (LTM) | 20.3% | | | | | | | |
| 5-yr fwd EPS | 20.0% | **EPS* $** | | | | | | |
| growth (Norm) | | **FY** | **2005** | **2006E** | | | **2007E** | |
| | | **Dec** | **Actual** | **Prior** | **Current** | | **Prior** | **Current** |
| | | Q1 | 0.15 | 0.15 | 0.16 | | — | 0.25 |
| | | Q2 | 0.16 | 0.16 | 0.18 | | — | 0.27 |
| | | Q3 | 0.18 | 0.27 | 0.26 | | — | 0.28 |
| **S&P 500** | 1270.8 | Q4 | 0.18 | 0.27 | 0.26 | | — | 0.32 |
| | | Year | **0.68** | **0.85** | **0.86** | | — | **1.12** |
| | | CY | — | — | — | | — | — |
| | | P/E | — | — | 30.4x | | — | 23.4x |

*Adjusted EPS excludes amortization of deferred stock comp and intangibles, and other non-recurring gains and losses

---

| Please see addendum of this report for important disclosures. |

www.sgcowen.com



**Power Integrations**

### Power Integrations Prior forecast as compared to updated forecast

| POWI 02-Feb-06 December Year-End ($000s) | Prior Forecast | | | Current Forecast | | |
|---|---|---|---|---|---|---|
| | Q4-E | Q1-E | 2006E | Q4-A | Q1-E | 2006 |
| **REVENUE** | $38,000 | $36,500 | $165,000 | $37,876 | $38,000 | $167,000 |
| *% Change Y/Y* | 13.2% | 6.1% | 14.4% | 12.8% | 10.4% | 15.9% |
| *% Change Q/Q* | 4.0% | -3.9% | NM | 3.6% | 0.3% | |
| TOTAL COGS | $19,000 | $18,615 | 84150 | $18,526 | $18,810 | $83,310 |
| **GROSS PROFIT** | $19,000 | $17,885 | 80850.0 | $19,350 | $19,190 | $83,690 |
| *Gross Margin* | 50.0% | 49.0% | 49% | 51.1% | 50.5% | 50% |
| R&D | $4,200 | $4,200 | $17,400 | $4,048 | $4,200 | $17,400 |
| *% Sales* | 11.1% | 11.5% | 10.5% | 10.7% | 11.1% | 10.4% |
| Sales & marketing | $4,300 | $4,300 | $17,800 | $4,990 | $4,900 | $18,400 |
| *% Sales* | 11.3% | 11.8% | 10.8% | 13.2% | 12.9% | 11.0% |
| G&A | $4,400 | $4,400 | $15,400 | $4,801 | $4,900 | $17,300 |
| *% Sales* | 11.6% | 12.1% | 9.3% | 12.7% | 12.9% | 10.4% |
| TOTAL OPEX | $12,900 | $12,900 | $50,600 | $13,839 | $14,000 | $53,100 |
| **OPERATING PROFIT** | $6,100 | $4,985 | $30,250 | $5,511 | $5,190 | $30,590 |
| *Operating Margin* | 16.1% | 13.7% | 18.3% | 14.6% | 13.7% | 18.3% |
| NET INTEREST | $900 | $1,000 | $4,000 | $1,049 | $1,000 | $4,000 |
| **PRETAX PROFIT** | $7,000 | $5,985 | $34,250 | $6,560 | $6,190 | $34,590 |
| *% Sales* | 18.4% | 16.4% | 20.8% | 17.3% | 16.3% | 20.7% |
| TAX PROVISION | $1,470 | $1,257 | $7,193 | $1,107 | $1,300 | $7,264 |
| *Tax rate* | 21.0% | 21.0% | 21.0% | 16.9% | 21.0% | 21.0% |
| **ADJUSTED NET INCOME** | $5,530 | $4,728 | $27,058 | $5,453 | $4,890 | $27,326 |
| *Net Margin* | 14.6% | 13.0% | 16.4% | 14.4% | 12.9% | 16.4% |
| DILUTED SHARES | 31,000 | 31,400 | 31,750 | 30,654 | 31,000 | 31,625 |
| **EPS, ADJUSTED** [1] | $0.18 | $0.15 | $0.85 | $0.18 | $0.16 | $0.86 |
| **EPS, GAAP** | $0.18 | $0.15 | $0.85 | $0.18 | $0.16 | $0.86 |

Source: SG Cowen & Co.

SGC 0107

**SG** Cowen & Co.

**Power Integrations**

**Power Integrations Owners' Cash Flow and ROIC Profile**



Note: POWI's owner's cash flow in 2003 includes an approximately $30M CAPEX expenditure related to the purchase of the Company's San Jose facility. Absent this expenditure, owner's cash flow in 2003 would have been approximately $13M.

Source: Company Filings, SG Cowen & Co.

SGC 0108

**SG**
Cowen & Co.

Power Integrations

**Adoption of Standards for External Power Supplies is Mounting**



Source: Company

In the U.S. there's an approximate annual market for internal and external power supplies of about 800 million. Of that number we estimate that approximately half of these devices are external linear power supplies. In California, with a 110 million annual power supply market, most new linear power supplies will be outlawed beginning in mid-2006, with tightening specifications beginning in 2008. Although POWI's ICs must always compete with discrete semiconductor power supply solutions, the California lawmaking alone drives an incremental $25 million to POWI's revenue opportunity. Also, as other states follow California's lead (legislative activity is ongoing in Washington State, Rhode Island and Arizona) amid extremely high oil prices, this could add another $180 million in total market opportunity in the U.S. alone. As other countries adopt similar measures (initiatives are gaining traction in Australia, Europe and China, as well as many other nations), the worldwide, incremental, energy efficient chip opportunity exceeds $800 million.

SGC 0109

**SG**
Cowen & Co.

Power Integrations

# We Expect Power Integrations To Grow Market Share Through 2010

From 2005 to 2010, considering worldwide energy efficiency mandates driven by rising energy prices, we believe Power Integrations can grow its overall market penetration from 9.7% to 14.6% on a unit basis. With conservative end-market growth assumptions, we believe this secular market penetration—where Power Integrations' integrated switchers take share away from linear power supplies and discrete solutions—can drive low double digit revenue growth through 2010.

In 2010 we forecast $254 million in company sales—a 12% 5-year revenue CAGR. To achieve this business growth, the company must increase its market penetration in some of the larger end markets by the amounts described below. We think these share gain assumptions are reasonable, especially considering the secular global trend away from linear power supplies. Also owing to die shrinks and packaging cost reductions, we believe Power Integrations' parts are becoming increasingly cost-competitive as compared to discrete switcher solutions, which should further stimulate product uptake.

**2005E-2010E Power Integrations Market Penetration Estimates**

| Market | 2005E Market Penetration (%) | 2010E Market Penetration (%) |
|---|---|---|
| Desktop Computers | 35 | 40 |
| LCD monitors/TVs | 16 | 20 |
| Mobile Phones | 13 | 20 |
| DVD players | 9 | 10 |
| White Goods | 6 | 9 |
| Cordless Phones | 0 | 15 |

Source: SG Cowen & Co.

**Power Integrations' overall growth and share gains by end-market will be driven by:**

- **Desktop Computers**: Owing to existing 1 watt standby power initiatives for PCs, Power Integrations already occupies meaningful share of the worldwide PC market. Because of the mature nature of the market, we expect POWI to grow its share only modestly over the next 5 years.

- **LCD Monitors**: LCD monitors/TVs are taking share from CRTs (where POWI does not play owing to the high switching frequency of the POWI chip), and as LCDs proliferate, POWI's business should benefit. Owing to the requirement for smaller form-factors (think 20-inch and below LCDs), we believe integrated solutions will be preferred over discrete component switching solutions.

- **DVD Players**: Because of the mature market nature of the DVD player market, we don't anticipate much secular growth, and we forecast modest unit growth for the market as a whole. However, as portable players proliferate, this may drive a migration toward switching battery chargers.

- **Mobile Phones**: Because of poor energy-efficiency, coupled with higher weight and larger size, legacy, linear mobile phone chargers are being replaced by electronic switchers. Linear mobile phone chargers will be illegal in California in the months following July (so a migration to switchers is mandatory), and we

February 3, 2006

SGC 0110

**SG**
Cowen & Co.

**Power Integrations**

also expect Power Integrations to regain share at Samsung (100 million units where most already use switchers), when/if the company prevails in the Fairchild lawsuit.

- **White Goods**:  Traditional white goods, such as washers/dryers, dishwashers, and refrigerators are migrating from analog control (remember the clicking timers) to digital interfaces, and this is driving adoption of POWI's ICs.

- **Cordless Phones**:  At present most all cordless phones worldwide are accompanied by large, linear power supplies.  However, we believe cordless phone chargers are in the cross hairs of government mandates in the U.S. and E.U., particularly because of the large unit volumes.  Similar to mobile phones, linear chargers for cordless phones will be illegal in California in 2H06.

**Power Integrations - Bottom-Up Model by End-Market**

| | | | | | | | | CAGR |
|---|---|---|---|---|---|---|---|---|
| **Communications End-Market** | | | | | | | | |
| Units sold (in millions) | 111.5 | 112.1 | 136.3 | 177.4 | 209.2 | 240.7 | 301.1 | 21.8% |
| ASP | $0.38 | $0.36 | $0.34 | $0.33 | $0.32 | $0.32 | $0.28 | |
| Total Revenue (in millions) | $42.36 | $40.36 | $46.33 | $58.55 | $66.96 | $72.21 | $84.31 | 15.8% |
| Yr./Yr. Growth | NA | -5% | 15% | 26% | 14% | 8% | 17% | |
| % of Total Revenue | 31% | 28% | 28% | 31% | 32% | 31% | 33% | |
| **Computer End-Market** | | | | | | | | |
| Units sold (in millions) | 69.9 | 82.9 | 92.3 | 99.4 | 108.7 | 124.2 | 135.9 | 10.4% |
| ASP | $0.43 | $0.40 | $0.38 | $0.36 | $0.34 | $0.32 | $0.30 | |
| Total Revenue (in millions) | $30.06 | $33.15 | $35.07 | $35.80 | $36.94 | $39.76 | $40.77 | 4.0% |
| Yr./Yr. Growth | NA | 10% | 6% | 2% | 3% | 8% | 3% | |
| % of Total Revenue | 22% | 23% | 21% | 19% | 18% | 17% | 16% | |
| **Consumer End-Market** | | | | | | | | |
| Units sold (in millions) | 83.5 | 83.2 | 103.4 | 120.3 | 137.3 | 162.1 | 185.9 | 17.4% |
| ASP | $0.54 | $0.52 | $0.49 | $0.48 | $0.47 | $0.46 | $0.45 | |
| Total Revenue (in millions) | $45.09 | $43.24 | $50.68 | $57.75 | $64.52 | $74.58 | $83.66 | 14.1% |
| Yr./Yr. Growth | NA | -4% | 17% | 14% | 12% | 16% | 12% | |
| % of Total Revenue | 33% | 30% | 30% | 31% | 31% | 32% | 33% | |
| **Industrial End-Market** | | | | | | | | |
| Units sold (in millions) | 19.2 | 26.2 | 31.4 | 35.3 | 41.0 | 45.0 | 46.4 | 12.1% |
| ASP | $0.57 | $0.55 | $0.53 | $0.51 | $0.50 | $0.49 | $0.48 | |
| Total Revenue (in millions) | $10.93 | $14.41 | $16.64 | $17.99 | $20.49 | $22.06 | $22.26 | 9.1% |
| Yr./Yr. Growth | NA | 32% | 15% | 8% | 14% | 8% | 1% | |
| % of Total Revenue | 8% | 10% | 10% | 10% | 10% | 10% | 9% | |
| **Other Misc. End-Markets** | | | | | | | | |
| Units sold (in millions) | 16.1 | 26.5 | 37.3 | 37.9 | 42.2 | 46.8 | 51.7 | 14.3% |
| ASP | $0.51 | $0.49 | $0.48 | $0.47 | $0.46 | $0.45 | $0.44 | |
| Total Revenue (in millions) | $8.20 | $12.97 | $18.27 | $17.79 | $19.40 | $21.06 | $22.75 | 11.8% |
| Yr./Yr. Growth | NA | 58% | 41% | -3% | 9% | 9% | 8% | |
| % of Total Revenue | 6% | 9% | 11% | 9% | 9% | 9% | 9% | |
| **Total Units Sold by POWI (in millions)** | 300.1 | 330.8 | 400.7 | 470.3 | 538.3 | 618.9 | 721.0 | 16.8% |
| Yr./Yr. Growth | NA | 10.2% | 21.1% | 17.4% | 14.5% | 15.0% | 16.5% | |
| **Total Market Oppty. Units (in millions)** | 3,154 | 3,427 | 3,793 | 4,098 | 4,380 | 4,656 | 4,954 | 7.6% |
| Yr./Yr. Growth | NA | 8.7% | 10.7% | 8.1% | 6.9% | 6.3% | 6.4% | |
| **POWI Market Penetration %** | 9.5% | 9.7% | 10.6% | 11.5% | 12.3% | 13.3% | 14.6% | |
| **POWI ASP across end-markets** | $0.46 | $0.44 | $0.42 | $0.40 | $0.39 | $0.37 | $0.35 | |
| Yr./Yr. ASP erosion | NA | -4.3% | -4.3% | -4.1% | -3.1% | -4.1% | -5.2% | |
| **Total POWI Revenue (in millions)** | $136.6 | $144.1 | $167.0 | $187.9 | $208.3 | $229.7 | $253.7 | 11.9% |
| Yr./Yr. Growth | | 5.5% | 15.9% | 12.5% | 10.9% | 10.3% | 10.5% | |

Source:  SG Cowen & Co.

SGC 0111

Power Integrations

**Comparable Company Analysis**

Semiconductor Companies Comparable Valuation Table

| ($ in millions, except per share data) | | Price 2/2/06 | Market Value (1) | Enterprise Value (2) | EV/Rev | | P/E | |
|---|---|---|---|---|---|---|---|---|
| | | | | | CY05E | CY06E | CY05E | CY06E |
| Advanced Analogic Technologies | AATI | $15.13 | $709 | $585 | 8.6x | 6.0x | NM | 34.9x |
| Amis Holdings Inc | AMIS | $10.27 | $905 | $1,146 | 2.3x | 1.9x | 16.8x | 14.3x |
| Cirrus Logic | CRUS | $8.33 | $734 | $505 | 2.8x | 2.5x | 44.3x | 20.9x |
| ESS Technology Inc | ESST | $3.65 | $145 | $38 | 0.2x | 0.2x | NM | NM |
| Genesis Microchip Inc | GNSS | $19.06 | $711 | $536 | 2.0x | 1.7x | 24.8x | 19.6x |
| Linear Technology Corp | LLTC | $36.32 | $11,325 | $9,483 | 9.2x | 8.0x | 26.7x | 25.2x |
| Maxim Integrated Products Inc | MXIM | $40.28 | $13,502 | $11,917 | 7.1x | 5.8x | 26.2x | 21.5x |
| Micrel Semiconductor | MCRL | $14.51 | $1,278 | $1,137 | 4.5x | 3.9x | 40.3x | 27.4x |
| Microsemi Corp | MSCC | $31.01 | $2,095 | $1,982 | 6.4x | 5.6x | 39.6x | 27.8x |
| National Semiconductor | NSM | $27.74 | $10,095 | $9,101 | 4.7x | 4.3x | 28.2x | 25.1x |
| O2Micro International Ltd | OIIM | $12.13 | $490 | $358 | 3.4x | 2.8x | 60.7x | 25.3x |
| PIXELWORKS, Inc. | PXLW | $4.58 | $218 | $220 | 1.3x | 1.0x | NM | NM |
| PortalPlayer, Inc. | PLAY | $28.35 | $730 | $551 | 2.4x | 1.6x | 17.2x | 13.3x |
| **Power Integrations** | **POWI** | **$26.16** | **$802** | **$671** | **4.7x** | **4.0x** | **38.5x** | **30.3x** |
| SigmaTel Inc. | SGTL | $10.50 | $405 | $286 | 0.9x | 1.0x | 8.0x | 42.2x |
| Semtech Corp. | SMTC | $19.55 | $1,494 | $1,237 | 5.2x | 4.7x | 34.5x | 28.5x |
| Silicon Laboratories | SLAB | $47.79 | $2,686 | $2,330 | 5.5x | 5.0x | 39.8x | 33.6x |
| ZILOG | ZILG | $2.41 | $39 | $18 | 0.2x | 0.2x | NM | NM |
| Zoran Corporation | ZRAN | $20.84 | $982 | $844 | 2.1x | 1.8x | 35.8x | 24.5x |
| AVERAGE | | | | | 3.9x | 3.3x | 32.1x | 26.0x |

(1) Market value is defined as the current stock price times the number of fully diluted shares outstanding.
(2) Enterprise value is defined as fully diluted market value plus debt, plus minority interests, plus preferred stock, less cash and cash equivalents.

Except for AMIS, ESST, GNSS, OIIM & PXLW, all ratios are based on SG Cowen estimates.
Source: First Call, Company Filings, SG Cowen & Co.

February 3, 2006

SG Cowen & Co.

SGC 0112



Cowen & Co.

# Power Integrations is Suing Fairchild Semiconductor. We Think POWI Will Prevail.

In 3Q03 Fairchild Semiconductor announced that it had commenced shipping its branded Power Switch ICs into certain battery charger platforms to accompany Samsung mobile handsets. Prior to this, Power Integrations garnered 100% of Samsung's handset charger business (100 million-plus units a year), where most all Samsung chargers are integrated switchers (vs. linear models). In Q404 after extensive diligence, Power Integrations' filed suit against Fairchild claiming patent infringement. We are inclined to think that the Fairchild case is similar in nature to prior litigation that POWI initiated against ON Semiconductor (then MOT) in 1999, wherein POWI was awarded monetary damages of $32 million. The 1999 outcome was also a meaningful boon to POWI's competitive positioning within the industry.

At present, we believe Fairchild's Power Switch likely infringes Power Integrations' IP, and we think that these products currently cause POWI to forego approximately $10 million per year in sales. We expect a favorable jury verdict in 3Q06, with POWI receiving both monetary damages and injunctive relief. As a point of comparison, had the company not lost a large part of the Samsung business to Fairchild, POWI would likely have grown revenue about 13% in 2005, as compared to 6% sales growth.

Power Integrations has two noteworthy intellectual property advantages over its competitors. One is circuit/system specific and the other is device structure specific. We believe that Power Integrations is the only company that can legally produce power supply controller ICs with as few as three terminals (pins), forcing competitors to use less efficient and more expensive "work-arounds" to accomplish similar functionality. Power Integrations' chips also make multiple uses of the same pins, lowering total pin count and packaging costs.

Power Integrations' products integrate a high-voltage MOS field-effect transistor (HVMOSFET) with extensive power supply controller circuitry. While forgoing the engineering explanation, it is desirable to construct an HVMOSFET having a high breakdown voltage and a low "on-state" resistance. To accomplish this, many companies utilize a BCDMOS manufacturing process, which enables a monolithic IC solution (high voltage and low voltage transistors on the same chip). However, monolithic chips employing this method are more expensive to manufacture, and competing ICs require more high voltage transistor silicon area. Here, Power Integrations uses a patented transistor structure founded on buried, multiple lateral conduction layers, which we believe offers an important cost advantage. In essence Power Integrations' IP allows for a more compact HVMOSFET transistor, manufactured using a standard CMOS process. This proprietary device structure, coupled with the ability to employ a standard digital CMOS process (5V one metal, one poly CMOS, using 11 masks at 3 micron) significantly reduces the chip area, which lowers costs by allowing more ICs per wafer. Power Integrations' device structure patents have been successfully upheld, most recently in the context of Infineon.

SGC 0113

**SG**
*Cowen & Co.*

Power Integrations

# Competition Summary

Power Integrations faces competition on three fronts—from linear transformer power supplies, from discrete electronics switched-mode power supplies, and from vertically-integrated competitors seeking to mimic Power Integrations' products.

**Linear power supplies (LPS).** For low-power charger applications, LPS still dominate the worldwide market, due to historically low cost, and the absence of competition from an integrated chip solution. However, the advantages of the LPS have eroded considerably. Recently, the cost of a LPS has risen substantially due to increasing copper and iron prices. Also, the 2002 introduction of Power Integrations' LinkSwitch product offered the first cost-competitive alternative to low power linears. Here, we believe LinkSwitch has "category killer" potential. Due to the inherent size and efficiency benefits of integrated electronic switchers, we believe the secular decline experienced by LPS should accelerate dramatically over the next few years.

**Discrete electronics switched-mode power supplies (SMPS).** Non-integrated, or discrete electronics SMPS, have steadily taken market share from LPS over the past several decades, especially at higher power levels. However, these devices have a high parts count, and are less efficient than power supplies that employ power conversion ICs. In steady fashion, SMPS using power conversion ICs are proliferating. This is largely driven by the rise in discrete semiconductor prices as well as lengthening transistor lead times. In this context, Power Integrations' ICs are generally at price parity with discrete solutions, while offering easier designs and enhanced features.

**(Not so) fast followers.** Power Integrations is experiencing competition from hybrid chips (ICs with separate transistor die and controller die in the same package), as well as monolithic solutions similar to TOPSwitch. Current competitors include ON Semiconductor, ST Microelectronics, Fairchild Semiconductor, Infineon, and Philips. We believe that the most interesting competitors are Fairchild and ST Microelectronics, due to their level of chip integration and growing customer base. It is noteworthy that Fairchild purchased Samsung's Semiconductor Power Device Division in 1999, which enabled the company to gain some traction at Samsung and Samsung's merchant power supply vendors (e.g. Dong Yang).

| Competitor | Product Family |
|---|---|
| Fairchild Semiconductor | Green FPS Family, FSDH0165 chip, hybrid and monolithic solutions, BCDMOS |
| ST Microelectronics | VIPer Family; 12A & 22A chips; monolithic solution |
| ON Semiconductor | GreenLine Family; monolithic solution; |
| Philips | GreenChip controller; requires external MOSFET, BCDMOS |
| Infineon | CoolSET Family; |

SGC 0114

**SG**
Cowen & Co.

Power Integrations

## Power Integrations Annual Adjusted Income Statement

**POWI 02-Feb-06**
**December Year-End**
**($000s)**

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006E | 2007E |
|---|---|---|---|---|---|---|---|
| **REVENUE** | $94,095 | $108,184 | $125,706 | $136,636 | $144,134 | $167,000 | $187,882 |
| *% Change Y/Y* | NA | 15.0% | 16.2% | 8.7% | 5.5% | 15.9% | 12.5% |
| | | | | | | | |
| TOTAL COGS | $51,252 | $60,723 | $62,814 | $71,409 | $72,813 | $83,310 | $95,820 |
| | | | | | | | |
| **GROSS PROFIT** | $42,843 | $47,461 | $62,892 | $65,227 | $71,321 | $83,690 | $92,062 |
| *Gross Margin* | 45.5% | 43.9% | 50.0% | 47.7% | 49.5% | 50.1% | 49.0% |
| R&D | $14,471 | $14,705 | $16,443 | $16,162 | $16,355 | $17,400 | $17,600 |
| *% Sales* | 15.4% | 13.6% | 13.1% | 11.8% | 11.3% | 10.4% | 9.4% |
| Sales & marketing | $14,485 | $14,537 | $15,484 | $15,273 | $17,689 | $18,400 | $18,000 |
| *% Sales* | 15.4% | 13.4% | 12.3% | 11.2% | 12.3% | 11.0% | 9.6% |
| G&A | $5,980 | $6,203 | $6,848 | $8,102 | $14,603 | $17,300 | $14,000 |
| *% Sales* | 6.4% | 5.7% | 5.4% | 5.9% | 10.1% | 10.4% | 7.5% |
| | | | | | | | |
| TOTAL OPEX | $34,936 | $35,445 | $38,775 | $39,537 | $48,647 | $53,100 | $49,600 |
| | | | | | | | |
| **OPERATING PROFIT** | $7,907 | $12,016 | $24,117 | $25,690 | $22,674 | $30,590 | $42,462 |
| *Operating Margin* | 8.4% | 11.1% | 19.2% | 18.8% | 15.7% | 18.3% | 22.6% |
| | | | | | | | |
| NET INTEREST | $1,749 | $1,665 | $1,002 | $1,054 | $3,367 | $4,000 | $4,600 |
| | | | | | | | |
| **PRETAX PROFIT** | $9,656 | $13,681 | $25,119 | $26,744 | $26,041 | $34,590 | $47,062 |
| *% Sales* | 10.3% | 12.6% | 20.0% | 19.6% | 18.1% | 20.7% | 25.0% |
| | | | | | | | |
| TAX PROVISION | $2,930 | $4,103 | $7,033 | $6,377 | $5,141 | $7,264 | $9,883 |
| *Tax rate* | 30.3% | 30.0% | 28.0% | 23.8% | 19.7% | 21.0% | 21.0% |
| | | | | | | | |
| **ADJUSTED NET INCOME** | $6,726 | $9,578 | $18,086 | $20,367 | $20,900 | $27,326 | $37,179 |
| *Net Margin* | 7.1% | 8.9% | 14.4% | 14.9% | 14.5% | 16.4% | 19.8% |
| | | | | | | | |
| AVE. DILUTED SHARES | 28,991 | 29,503 | 31,812 | 32,414 | 30,792 | 31,625 | 33,250 |
| | | | | | | | |
| **EPS, ADJUSTED** [1] | $0.23 | $0.32 | $0.57 | $0.63 | $0.68 | $0.86 | $1.12 |
| **EPS, GAAP** | $0.23 | $0.32 | $0.57 | $0.63 | $0.68 | $0.86 | $1.12 |

(1) Adjusted EPS exclude amortization of deferred stock comp. and intangibles, and non-recurring gains/losses
Source: Company Filings, SG Cowen & Co.

SGC 0115

## Power Integrations Quarterly Adjusted Income Statement

POWI 02-Feb-06
December Year-End
($000s)

| | 2004 | | | | 2005 | | | | 2006E | | | | 2007E | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1-A | Q2-A | Q3-A | Q4-A | Q1-A | Q2-A | Q3-A | Q4-A | Q1-E | Q2-E | Q3-E | Q4-E | Q1-E | Q2-E | Q3-E | Q4-E |
| REVENUE | $34,165 | $35,944 | $32,946 | $33,581 | $34,416 | $35,299 | $36,543 | $37,876 | $38,000 | $39,000 | $45,000 | $45,000 | $44,000 | $46,200 | $47,500 | $50,182 |
| *% Change Y/Y* | 17.4% | 20.6% | -4.6% | 4.0% | 0.7% | -1.8% | 10.9% | 12.8% | 10.4% | 10.5% | 23.1% | 18.8% | 15.8% | 18.5% | 5.6% | 11.5% |
| *% Change Q/Q* | 5.8% | 5.2% | -8.3% | 1.9% | 2.5% | 2.6% | 3.5% | 3.6% | 0.3% | 2.6% | 15.4% | 0.0% | -2.2% | 5.0% | 2.8% | 5.6% |
| TOTAL COGS | $17,473 | $19,392 | $17,188 | $17,356 | $17,779 | $18,045 | $18,463 | $18,526 | $18,810 | $19,500 | $22,500 | $22,500 | $22,440 | $23,562 | $24,225 | $25,593 |
| GROSS PROFIT | $16,692 | $16,552 | $15,758 | $16,225 | $16,637 | $17,254 | $18,080 | $19,350 | $19,190 | $19,500 | $22,500 | $22,500 | $21,560 | $22,638 | $23,275 | $24,589 |
| *Gross Margin* | 48.9% | 46.0% | 47.8% | 48.3% | 48.3% | 48.9% | 49.5% | 51.1% | 50.5% | 50.0% | 50.0% | 50.0% | 49.0% | 49.0% | 49.0% | 49.0% |
| R&D | $4,152 | $4,088 | $4,096 | $3,826 | $4,098 | $4,104 | $4,105 | $4,048 | $4,200 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 | $4,400 |
| *% Sales* | 12.2% | 11.4% | 12.4% | 11.4% | 11.9% | 11.6% | 11.2% | 10.7% | 11.1% | 11.3% | 9.8% | 9.8% | 10.0% | 9.5% | 9.3% | 8.8% |
| Sales & marketing | $4,112 | $3,943 | $3,412 | $3,806 | $4,018 | $4,263 | $4,418 | $4,990 | $4,900 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 | $4,500 |
| *% Sales* | 12.0% | 11.0% | 10.4% | 11.3% | 11.7% | 12.1% | 12.1% | 13.2% | 12.9% | 11.5% | 10.0% | 10.0% | 10.2% | 9.7% | 9.5% | 9.0% |
| G&A | $1,579 | $2,049 | $2,382 | $2,092 | $2,777 | $2,933 | $4,092 | $4,801 | $4,900 | $4,400 | $4,000 | $4,000 | $3,500 | $3,500 | $3,500 | $3,500 |
| *% Sales* | 4.6% | 5.7% | 7.2% | 6.2% | 8.1% | 8.3% | 11.2% | 12.7% | 12.9% | 11.3% | 8.9% | 8.9% | 8.0% | 7.6% | 7.4% | 7.0% |
| TOTAL OPEX | $9,843 | $10,080 | $9,890 | $9,724 | $10,893 | $11,300 | $12,615 | $13,839 | $14,000 | $13,300 | $12,900 | $12,900 | $12,400 | $12,400 | $12,400 | $12,400 |
| *% Sales* | 28.8% | 28.0% | 30.0% | 29.0% | 31.7% | 32.0% | 34.5% | 36.5% | 36.8% | 34.1% | 28.7% | 28.7% | 28.2% | 26.8% | 26.1% | 24.7% |
| *% Change Q/Q* | 6.1% | 2.4% | -1.9% | -1.7% | 12.0% | 3.7% | 11.6% | 9.7% | 1.2% | -5.0% | -3.0% | 0.0% | -3.9% | 0.0% | 0.0% | 0.0% |
| OPERATING PROFIT | $6,849 | $6,472 | $5,868 | $6,501 | $5,744 | $5,954 | $5,465 | $5,511 | $5,190 | $6,200 | $9,600 | $9,600 | $9,160 | $10,238 | $10,875 | $12,189 |
| *Operating Margin* | 20.0% | 18.0% | 17.8% | 19.4% | 16.7% | 16.9% | 15.0% | 14.6% | 13.7% | 15.9% | 21.3% | 21.3% | 20.8% | 22.2% | 22.9% | 24.3% |
| NET INTEREST | $259 | $131 | $339 | $325 | $654 | $725 | $939 | $1,049 | $1,000 | $1,000 | $1,000 | $1,000 | $1,100 | $1,100 | $1,200 | $1,200 |
| PRETAX PROFIT | $7,108 | $6,603 | $6,207 | $6,826 | $6,398 | $6,679 | $6,404 | $6,560 | $6,190 | $7,200 | $10,600 | $10,600 | $10,260 | $11,338 | $12,075 | $13,389 |
| *% Sales* | 20.8% | 18.4% | 18.8% | 20.3% | 18.6% | 18.9% | 17.5% | 17.3% | 16.3% | 18.5% | 23.6% | 23.6% | 23.3% | 24.5% | 25.4% | 26.7% |
| TAX PROVISION | $1,990 | $1,575 | $502 | $2,310 | $1,663 | $1,632 | $739 | $1,107 | $1,300 | $1,512 | $2,226 | $2,226 | $2,155 | $2,381 | $2,536 | $2,812 |
| *Tax rate* | 28.0% | 23.9% | 8.1% | 33.8% | 26.0% | 24.4% | 11.5% | 16.9% | 21.0% | 21.0% | 21.0% | 21.0% | 21.0% | 21.0% | 21.0% | 21.0% |
| ADJUSTED NET INCOME | $5,118 | $5,028 | $5,705 | $4,516 | $4,735 | $5,047 | $5,665 | $5,453 | $4,890 | $5,688 | $8,374 | $8,374 | $8,105 | $8,957 | $9,539 | $10,578 |
| *Net Margin* | 15.0% | 14.0% | 17.3% | 13.4% | 13.8% | 14.3% | 15.5% | 14.4% | 12.9% | 14.6% | 18.6% | 18.6% | 18.4% | 19.4% | 20.1% | 21.1% |
| DILUTED SHARES | 32,757 | 32,598 | 31,994 | 31,865 | 30,907 | 30,876 | 30,731 | 30,654 | 31,000 | 31,500 | 32,000 | 32,000 | 33,000 | 33,000 | 33,500 | 33,500 |
| EPS, ADJUSTED [1] | $0.16 | $0.15 | $0.18 | $0.14 | $0.15 | $0.16 | $0.18 | $0.18 | $0.16 | $0.18 | $0.26 | $0.26 | $0.25 | $0.27 | $0.28 | $0.32 |
| EPS, GAAP | $0.16 | $0.15 | $0.18 | $0.14 | $0.15 | $0.16 | $0.18 | $0.18 | $0.16 | $0.18 | $0.26 | $0.26 | $0.25 | $0.27 | $0.28 | $0.32 |
| ANNUAL VALUES: | | | | 2004 | | | | 2005 | | | | 2006E | | | | 2007E |
| ANNUAL REVENUE | | | | $136,636 | | | | $144,134 | | | | $167,000 | | | | $187,882 |
| GROWTH Y/Y | | | | 8.7% | | | | 5.5% | | | | 15.9% | | | | 12.5% |
| ADJUSTED NET INCOME | | | | $20,367 | | | | $20,900 | | | | $27,326 | | | | $37,179 |
| GROWTH Y/Y | | | | -12.6% | | | | 2.6% | | | | 30.7% | | | | 36.1% |
| EPS, ADJUSTED [1] | | | | $0.63 | | | | $0.68 | | | | $0.86 | | | | $1.12 |
| EPS, GAAP | | | | $0.63 | | | | $0.68 | | | | $0.86 | | | | $1.12 |
| Book Value per share | $6.15 | $6.39 | $6.77 | $6.67 | $6.46 | $6.45 | $6.76 | $6.81 | $6.89 | $6.98 | $7.20 | $7.46 | $7.47 | $7.77 | $7.95 | $8.29 |
| Net Cash Per share | $3.77 | $4.14 | $4.50 | $4.22 | $3.97 | $4.02 | $3.96 | $4.26 | $4.17 | $4.29 | $4.49 | $4.78 | $4.91 | $5.18 | $5.40 | $5.71 |

(1) Adjusted EPS excludes amortization of deferred stock comp and intangibles, and non-recurring gains and losses

Source: Company Filings, SG Cowen & Co.

**Power Integrations**

SG Cowen & Co.

## Power Integrations Reconciliation of Adjusted Net Income to GAAP Net Income

| POWI 02-Feb-06 December/Year-End ($000s) | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | Q1:E | Q2:E | Q3:E | Q4:E | 2006:E | 2007:E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adjusted Net Income (1) | | $6,726 | $9,578 | $18,086 | $20,367 | $20,900 | $4,890 | $5,688 | $8,374 | $8,374 | $27,326 | $37,179 |
| Amortization | | | | | | | | | | | | |
| Gains/losses on investments | | | | | | | | | | | | |
| Other | | | | | | | | | | | | |
| Net Income, GAAP | $19,765 | $6,726 | $9,578 | $18,086 | $20,367 | $20,900 | $4,890 | $5,688 | $8,374 | $8,374 | $27,326 | $37,179 |
| Adjusted share count | | 28,591 | 29,503 | 31,812 | 32,414 | 30,792 | 31,000 | 31,500 | 32,000 | 32,000 | 31,625 | 33,250 |
| GAAP share count | | | | | | | | | | | | |
| EPS, GAAP | $0.69 | $0.23 | $0.32 | $0.57 | $0.63 | $0.68 | $0.16 | $0.18 | $0.26 | $0.26 | $0.86 | $1.12 |

(1) Adjusted net income excludes amortization of deferred stock comp, and intangibles, and non-recurring gains and losses
Source: Company Filings, SG Cowen & Co.

February 3, 2006

13

SGC 0117

**SG** Cowen & Co.                    Power Integrations

## Power Integrations Statement of Cash Flows

POWI 02-Feb-06
December Year-End

| ($000s) | 2001 | 2002 | 2003 | 2004 | 2005E | 2006E | 2007E |
|---|---|---|---|---|---|---|---|
| Net Income (loss) | $6,726 | $9,578 | $18,086 | $20,367 | $20,900 | $27,326 | $37,179 |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | | | | | | |
| Depreciation and amortization | 6,944 | 6,684 | 6,846 | 6,880 | 6,830 | 8,350 | 9,394 |
| Amortization of deferred compensation | 41 | 147 | 135 | - | - | - | - |
| Deferred income taxes | 708 | (718) | 191 | 72 | (10) | - | - |
| Deferred rent | 441 | 284 | (725) | - | - | - | - |
| Provision for A/R and other allowances | 1,119 | 155 | 688 | 456 | 76 | | |
| Tax benefit associated with employee stock plans | 2,232 | 1,654 | 6,841 | 4,082 | 1,007 | - | - |
| Stock compensation to non-employees | - | - | - | 37 | 8 | | |
| Changes in operating assets and liabilities: | | | | | | | |
| Accounts receivable | 2,946 | (3,553) | (2,492) | (2,360) | (1,334) | (7,983) | (2,473) |
| Inventories | (2,023) | 8,594 | (8,085) | (2,241) | 6,913 | (4,372) | (3,136) |
| Deferred Income Taxes | - | - | - | - | 2,927 | (206) | (150) |
| Prepaid expenses and other current assets | 3,092 | (146) | (2,909) | 295 | 495 | (389) | (283) |
| Accounts payables | (2,849) | 3,086 | 191 | 694 | (3,818) | 1,171 | 856 |
| Accrued Payroll and employee benefits | - | - | - | - | 1,869 | 1,138 | 828 |
| Taxes payable and other accrued | (2,380) | 4,849 | 1,773 | 1,336 | 2,060 | 1,717 | 1,249 |
| Deferred income on shipments to distributors | (768) | 920 | (153) | 493 | 421 | 654 | 476 |
| Cash provided by (used in) operating activities | $16,223 | $31,534 | $20,387 | $30,111 | $38,344 | $27,407 | $43,941 |
| | | | | | | | |
| Cash flow from investing activities: | | | | | | | |
| Capital expenditures | (7,629) | (4,510) | (37,787) | (8,135) | (4,504) | (5,010) | (5,636) |
| Purchases of securities | (30,750) | (42,325) | (6,210) | (29,182) | (6,806) | | |
| Sales and maturities of securities | 42,998 | 25,173 | 33,037 | 19,270 | 11,271 | | |
| Note to supplier | - | - | - | - | (10,000) | | |
| Cash provided by (used in) investing activities | $4,619 | ($21,662) | ($10,960) | ($18,047) | ($10,039) | ($5,010) | ($5,636) |
| | | | | | | | |
| Cash flow from financing activities: | | | | | | | |
| Payments related to capital lease | (678) | (441) | (233) | (41) | | | |
| Proceeds receivable from stockholders | 38 | 38 | - | - | | | |
| Proceeds from issuance of common stock | 5,477 | 5,914 | 23,554 | 9,099 | 6,973 | | |
| Repurchase of common stock | - | - | - | (11,797) | (28,305) | | |
| Cash provided by (used in) financing activities | $4,837 | $5,511 | $23,321 | ($2,739) | ($21,332) | $0 | $0 |
| | | | | | | | |
| Net change in cash and cash equivalents | $25,679 | $15,383 | $32,748 | $9,325 | $6,973 | $22,397 | $38,305 |

| SG Cowen Cash Flow Summary And Analysis | 2001 | 2002 | 2003 | 2004 | 2005E | 2006E | 2007E |
|---|---|---|---|---|---|---|---|
| Cash flow from operations | 16,223 | 31,534 | 20,387 | 30,111 | 38,344 | 27,407 | 43,941 |
| minus net capital expenditures equals | (7,629) | (4,510) | (37,787) | (8,135) | (4,504) | (5,010) | (5,636) |
| | | | | | | | |
| Owners' cash flow [1] | $8,594 | $27,024 | ($17,400) | $21,976 | $33,840 | $22,397 | $38,305 |
| | 9.1% | 25.0% | -13.8% | 16.1% | 23.5% | 13.4% | 20.4% |
| Investing adjustments | 12,248 | (17,152) | 26,827 | (9,912) | (5,535) | | |
| Financing adjustments | (7,411) | 22,663 | (3,507) | 7,173 | (332,361) | | |
| | | | | | | | |
| Net change in cash, cash equivalents, and securities | $13,431 | $32,535 | $5,920 | $19,237 | ($4,056) | $22,397 | $38,305 |
| Beginning cash, cash equivalents, and securities | $63,434 | $76,865 | $109,400 | $115,320 | $134,557 | $130,501 | $152,898 |
| Ending cash, cash equivalents, and securities | $76,865 | $109,400 | $115,320 | $134,557 | $130,501 | $152,898 | $191,203 |

(1) Owner's cash flow in 2003 includes an approximately $30M CAPEX expenditure related to the purchase of the Company's San Jose facility. Absent this expenditure, Owner's cash flow in 2003 would have been approximately $13M.
Source: Company Filings, SG Cowen & Co.

SGC 0118

**SG** Cowen & Co.

Power Integrations

## Power Integrations Balance Sheet

POWI 02-Feb-06
December Year-End
($000s)

| | 2001 | 2002 | 2003 | 2004 | 2005 | | | | 2006E | 2007E |
|---|---|---|---|---|---|---|---|---|---|---|
| | Q4 | Q4 | Q4 | Q4 | Q4-A | Q1E | Q2E | Q3E | Q4-E | Q4-E |
| Cash, cash equivalents, and securities | 76,865 | 109,400 | 115,320 | 134,557 | 130,501 | 129,361 | 135,179 | 143,624 | 152,838 | 191,203 |
| Accounts receivable, net | 5,124 | 8,522 | 10,326 | 12,230 | 13,488 | 17,123 | 17,574 | 21,471 | 21,471 | 21,943 |
| Inventories, net | 23,622 | 15,028 | 23,113 | 25,354 | 18,441 | 21,796 | 22,595 | 22,813 | 22,813 | 25,948 |
| Deferred income taxes | 5,346 | 6,064 | 4,275 | 4,205 | 1,095 | 1,099 | 1,127 | 1,301 | 1,301 | 1,451 |
| Prepaid expenses and other current assets | 1,526 | 1,672 | 3,086 | 2,600 | 2,067 | 2,074 | 2,128 | 2,456 | 2,456 | 2,739 |
| **Total current assets** | **112,483** | **140,686** | **156,120** | **178,946** | **165,592** | **171,452** | **178,604** | **191,664** | **200,938** | **245,284** |
| Property, plant and equipment, net | 23,182 | 21,008 | 51,949 | 51,718 | 48,635 | 47,875 | 47,095 | 46,195 | 45,295 | 41,537 |
| Intangible assets | | | 1,598 | 1,596 | | | | | | |
| Deferred tax assets | | | | | 4,274 | 4,274 | 4,274 | 4,274 | 4,274 | 4,274 |
| Other assets, net | | | 1,495 | 3,172 | 14,014 | 14,060 | 14,430 | 16,650 | 16,650 | 18,567 |
| **Total assets** | **135,665** | **161,694** | **211,162** | **235,432** | **232,515** | **237,661** | **244,403** | **258,783** | **267,157** | **309,663** |
| | | | | | | | | | | |
| Accounts payable | 4,641 | 7,727 | 7,918 | 8,612 | 5,059 | 5,208 | 5,399 | 6,230 | 6,230 | 7,086 |
| Accrued salaries and employee benefits | 3,164 | 4,389 | 5,310 | 4,672 | 6,049 | 6,059 | 6,229 | 7,187 | 7,187 | 8,014 |
| Income taxes payable and other accrued | 1,604 | 5,228 | 4,610 | 6,578 | 9,130 | 9,160 | 9,401 | 10,847 | 10,847 | 12,096 |
| Current portion of capitalized lease | 940 | 233 | 51 | | | | | | | |
| Deferred income on shipment to distributors | 1,298 | 2,718 | 2,555 | 3,058 | 3,479 | 3,490 | 3,682 | 4,133 | 4,133 | 4,609 |
| **Total current liabilities** | **11,647** | **20,295** | **20,444** | **22,920** | **23,717** | **23,927** | **24,611** | **28,397** | **28,397** | **31,806** |
| Other liabilities | 716 | 766 | | | | | | | | |
| Capital lease and deferred rent liability | | | | | | | | | | |
| **Total liabilities** | **12,363** | **21,061** | **20,444** | **22,920** | **23,717** | **23,927** | **24,611** | **28,397** | **28,397** | **31,806** |
| Total stockholders' equity | 123,302 | 140,633 | 190,718 | 212,512 | 208,798 | 213,734 | 219,792 | 230,386 | 238,760 | 277,857 |
| **Total liabilities and stockholders' equity** | **135,665** | **161,694** | **211,162** | **235,432** | **232,515** | **237,661** | **244,403** | **258,783** | **267,157** | **309,663** |

Source: Company Filings, SG Cowen & Co.

February 3, 2006

15

 **SG** Cowen & Co.    **Power Integrations**

## Power Integrations ROIC Analysis

POWI 02-Feb-06

| ($000s) | 2001 | 2002 | 2003 | 2004 | 2005 | 2006E | 2007E |
|---|---|---|---|---|---|---|---|
| **Adjusted EBIT:** | $7,907 | $12,016 | $24,117 | $25,690 | $22,674 | $30,590 | $42,462 |
| +Implied interest from operating leases | 1,700 | 2,200 | 1,200 | - | - | - | - |
| +Increase in LIFO reserve | - | - | - | - | - | - | - |
| +Increase in bad debt reserve | - | - | - | - | - | - | - |
| +Increase in net capitalized R&D | - | - | - | - | - | - | - |
| -Amortization (adjusted EBIT excludes amortization) | - | - | - | - | - | - | - |
| **Adjusted Operating Profit Before Taxes** | $9,607 | $14,216 | $25,317 | $25,690 | $22,674 | $30,590 | $42,462 |
| **Income tax expense:** | $2,930 | $4,103 | $7,033 | $6,377 | $5,141 | $7,264 | $9,883 |
| - Increase in deferred tax liabilities | - | - | - | - | - | - | - |
| + Increase in deferred tax assets | - | - | - | - | - | - | - |
| + Tax benefit from interest expense | - | - | - | - | - | - | - |
| -Tax expense from interest income | (612) | (583) | (351) | (369) | (1,178) | (1,400) | (1,610) |
| -Taxes on non-operating income | - | - | - | - | - | - | - |
| + Tax benefits from interest on leases | 595 | 770 | 420 | - | - | - | - |
| **Cash Operating Taxes** | $2,913 | $4,290 | $7,102 | $6,008 | $3,963 | $5,864 | $8,273 |
| **NOPAT** | $6,694 | $9,926 | $18,215 | $19,682 | $18,711 | $24,726 | $34,189 |
| **Book value of common equity** | $123,302 | $140,633 | $190,718 | $212,512 | $208,798 | $238,760 | $277,857 |
| +Preferred stock | - | - | - | - | - | - | - |
| +Minority Interest | - | - | - | - | - | - | - |
| +Deferred tax liabilities | - | - | - | - | - | - | - |
| +LIFO reserve | - | - | - | - | - | - | - |
| +Accumulated amortization expense | - | - | - | - | - | - | - |
| +Interest-bearing short-term debt | - | - | - | - | - | - | - |
| +Long-term debt | - | - | - | - | - | - | - |
| +Capitalized lease obligations | - | - | - | - | - | - | - |
| +PV of operating leases (1) | 24,286 | 31,429 | 17,143 | - | - | - | - |
| -Excess cash, cash equivalents & securities | (56,002) | (101,522) | (96,633) | (114,235) | (116,743) | (130,423) | (165,770) |
| -Deferred tax assets | - | - | - | - | - | - | - |
| **Invested Capital** | $91,586 | $70,540 | $111,228 | $98,277 | $92,055 | $108,337 | $112,087 |
| **Return On Invested Capital** | 7.3% | 14.1% | 16.4% | 20.0% | 20.3% | 22.8% | 30.5% |

Source: SG Cowen & Co.

SGC 0120



**SG**
Cowen & Co.

Power Integrations

## Power Integrations Ratio Analysis

| POWI 02-Feb-06 December Year-End | 2001 | 2002 | 2003 | 2004 | 2005 | 2006E | 2007E |
|---|---|---|---|---|---|---|---|
| **Per Share:** | | | | | | | |
| Cash flow from operations | $0.56 | $1.07 | $0.64 | $0.93 | $1.25 | $0.87 | $1.32 |
| Cash, cash equivalents, and securities | $2.65 | $3.71 | $3.63 | $4.15 | $4.24 | $4.83 | $5.75 |
| Book value | $4.25 | $4.77 | $6.00 | $6.56 | $6.78 | $7.55 | $8.36 |
| Tangible book value | $4.25 | $4.77 | $6.00 | $6.56 | $6.78 | $7.55 | $8.36 |
| **Liquidity Ratios:** | | | | | | | |
| Current ratio | 9.7 | 6.9 | 7.6 | 7.8 | 7.0 | 7.1 | 7.7 |
| Quick ratio | 7.6 | 6.2 | 6.5 | 6.7 | 6.2 | 6.3 | 6.9 |
| **Leverage:** | | | | | | | |
| Cash to equity | 62.3% | 77.8% | 60.5% | 63.3% | 62.5% | 64.0% | 68.8% |
| Assets to equity | 110.0% | 115.0% | 110.7% | 110.8% | 111.4% | 111.9% | 111.4% |
| Assets to equity (excl. cash) | 126.6% | 167.4% | 127.1% | 129.4% | 130.3% | 133.1% | 136.7% |
| **Turnover:** | | | | | | | |
| Asset turnover | 0.7x | 0.7x | 0.6x | 0.6x | 0.6x | 0.6x | 0.6x |
| Asset turnover, excluding cash | 1.6x | 2.1x | 1.3x | 1.4x | 1.4x | 1.5x | 1.6x |
| Accounts receivable turnover | 18.4x | 12.7x | 12.2x | 11.2x | 10.7x | 7.8x | 7.8x |
| Inventory turnover | 2.2x | 4.0x | 2.7x | 2.8x | 3.9x | 3.7x | 3.7x |
| Accounts payable turnover | 11.0x | 7.9x | 7.9x | 8.3x | 14.4x | 13.6x | 13.5x |
| **Cash Conversion Cycle:** | | | | | | | |
| Days sales outstanding | 20 | 29 | 30 | 33 | 34 | 47 | 47 |
| Days inventory | 168 | 90 | 134 | 130 | 92 | 100 | 99 |
| Days payable | 33 | 46 | 46 | 44 | 25 | 27 | 27 |
| Cash conversion cycle (days) | 155 | 73 | 118 | 118 | 101 | 120 | 118 |
| **Pre-Tax Return On Assets:** | | | | | | | |
| Operating margin (EBIT/Sales) | 8.4% | 11.1% | 19.2% | 18.8% | 15.7% | 18.3% | 22.6% |
| x   Asset turnover (Sales/Assets) | 0.7x | 0.7x | 0.6x | 0.6x | 0.6x | 0.6x | 0.6x |
| =   Pre-Tax ROA | 5.8% | 7.4% | 11.4% | 10.9% | 9.8% | 11.5% | 13.7% |
| x   Tax burden (NI/EBT) | 70% | 70% | 72% | 76% | 80% | 79% | 79% |
| =   Return On Assets | 4.1% | 5.2% | 8.2% | 8.3% | 7.8% | 9.0% | 10.8% |
| **Pre-Tax Return On Assets (excl. cash):** | | | | | | | |
| Operating margin (EBIT/Sales) | 8.4% | 11.1% | 19.2% | 18.8% | 15.7% | 18.3% | 22.6% |
| x   Asset turnover (Sales/Assets), excluding cash | 1.6x | 2.1x | 1.3x | 1.4x | 1.4x | 1.5x | 1.6x |
| =   Pre-Tax ROA | 13.4% | 23.0% | 25.2% | 25.5% | 22.2% | 26.8% | 35.8% |
| x   Tax burden (NI/EBT) | 70% | 70% | 72% | 76% | 80% | 79% | 79% |
| =   Return On Assets, excluding cash | 9.4% | 16.1% | 18.1% | 19.4% | 17.8% | 21.2% | 28.3% |
| **Return On Equity:** | | | | | | | |
| x   Operating margin (EBIT/Sales) | 8.4% | 11.1% | 19.2% | 18.8% | 15.7% | 18.3% | 22.6% |
| x   Interest benefit (EBT/EBIT) | 122% | 114% | 104% | 104% | 115% | 113% | 111% |
| x   Tax burden (NI/EBT) | 70% | 70% | 72% | 76% | 80% | 79% | 79% |
| x   Asset turnover (Sales/Assets) | 0.7x | 0.7x | 0.6x | 0.6x | 0.6x | 0.6x | 0.6x |
| x   Leverage (Assets/S.E.) | 110% | 115% | 111% | 111% | 111% | 112% | 111% |
| =   ROE | -5.5% | -6.8% | 9.5% | 9.6% | 10.0% | 11.4% | 13.4% |

Source: SG Cowen & Co.

SGC 0121



**Power Integrations**

# Addendum

## COMPANIES MENTIONED IN THIS REPORT

| Ticker | Company Name |
|--------|--------------|
| POWI | Power Integrations |

## ANALYST CERTIFICATION

Each author of this research report hereby certifies that (i) the views expressed in the research report accurately reflect his or her personal views about any and all of the subject securities or issuers, and (ii) no part of his or her compensation was, is, or will be related, directly or indirectly, to the specific recommendations or views expressed in this report.

## IMPORTANT DISCLOSURES

SG Cowen & Co., LLC. makes a market in POWI securities.

SG Cowen & Co., LLC. compensates research analysts for activities and services intended to benefit the firm's investor clients. Individual compensation determinations for research analysts, including the author(s) of this report, are based on a variety of factors, including the overall profitability of the firm and the total revenue derived from all sources, including revenues from investment banking. SG Cowen & Co., LLC. does not compensate research analysts based on specific investment banking transactions.

SG Cowen & Co., LLC. does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report.

## DISCLAIMER

Further information on any of the above securities may be obtained from our offices. This report is published solely for information purposes, and is not to be construed as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. Other than disclosures relating to SG Cowen & Co., LLC, the information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete statement or summary of the available data. Any opinions expressed herein are statements of our judgment on this date and are subject to change without notice. The contents and appearance of this report are Copyright© and Trademark™ SG Cowen & Co., LLC 2006. Member SIPC. All rights reserved.

**Notice to French Investors:** This publication is issued in France by or through Société Générale ("SG") which is regulated by the AMF (Autorité des Marchés Financiers). As per SG's practice, issuers that receive a copy of research reports prior to publication do so in compliance with AMF regulations (article 321-126 of the AMF General Regulation).

**Notice to UK Investors:** This publication is issued in the United Kingdom by or through Société Générale ("SG"). All materials provided by SG Commodity Research and SG Global Convertible Research are produced in circumstances such that it is not appropriate to characterize them as impartial as referred to in the Financial Services Authority Handbook. However, it must be made clear that all research issued by SG will be fair, clear and not misleading. In the United Kingdom, SG Cowen & Co. is a Trading Name of SG. **SG is a Member of the London Stock Exchange.**

**Notice to Japanese Investors:** This report is distributed in Japan by Société Générale Securities (North Pacific) Ltd., Tokyo Branch, which is regulated by the Financial Services Agency of Japan. The products mentioned in this report may not be eligible for sale in Japan and they may not be suitable for all types of investors.

**Notice to Australian Investors:** Société Générale Australia Branch (ABN 71 092 516 286) (SG) takes responsibility for publishing this document. SG holds an AFSL no. 236651 issued under the Corporations Act 2001 (Cth) ("Act"). The information contained in this newsletter is only directed to recipients who are wholesale clients as defined under the Act.

**SG COWEN & CO., LLC** **New York** (646) 562-1000 **Boston** (617) 946-3700 **San Francisco** (415) 646-7200 **Chicago** (312) 516-4690 **Cleveland** (440) 331-3531 **Denver** (303) 282-3100 **London (affiliate)** 44-207-710-0900 **Geneva** 41-22-707-6900 **Tokyo (affiliate)** 81-35-549-5696

SGC 0122



**Power Integrations**

SG Cowen & Co.

### SG COWEN & CO. RATING DEFINITIONS PRIOR TO 3/1/2004

| Rating | Definition |
|---|---|
| Strong Buy (1) | Stock expected to outperform the S&P 500 by over 25% |
| Outperform (2) | Stock expected to outperform the S&P 500 by 10-25% |
| Market Perform (3) | Stock expected to out/underperform the S&P 500 by +/-10% |
| Underperform (4) | Stock expected to underperform the S&P 500 by at least 10% |

Assumptions: Time horizon is 12 months; S&P 500 is flat over forecast period.

### POWI—SG COWEN & CO. HISTORICAL PRICE CHART AS OF 02/02/2006 (US$)



Initiated on 07/14/04;
SG Cowen & Co., LLC eliminated price targets on 09/09/02;
SG Cowen & Co., LLC eliminated investment ratings on 03/01/04.

February 3, 2006

19

SGC 0123

# Exhibit H



# Power Integrations

## Cowen & Co.

**June 22, 2005**

**Analysts**
Shawn Slayton
(415) 646-7285
shawn.slayton@sgcowen.com

Deepak Sitaraman, CPA
(415) 646-7304
deepak.sitaraman
@sgcowen.com

### Opinion Change

### Adopting a Positive View in Front of 2006 Triggers

**Conclusion:** We are changing our investment opinion of Power Integrations shares, and we'd be buyers at current levels, in anticipation of 20% stock upside relative to the market over the next 12 months. In light of multiple Street downgrades of POWI stock in past weeks, as well as recent positive data points from Asia related to mobile handsets and consumer electronics, we're taking the occasion to articulate a bullish case for POWI shares, as we feel the bear case pays insufficient attention to significant 2006 stock triggers. The out-year catalysts which are most supportive of a long position are (1) a successful litigation settlement with Fairchild Semiconductor and (2) the adoption of broad-based energy efficiency initiatives in the state of California and elsewhere. We believe augmented market recognition of these events can set off meaningful share momentum later this year or early next year, and we are raising our 2006 numbers above consensus, in what we believe will be the first in a series of upward Street revisions over the next several quarters.

| POWI (06/21) | $21.72 |
|---|---|
| Mkt cap | $671.1MM |
| Dil shares out | 30.9MM |
| Avg daily vol | 535.8K |
| 52-wk range | $16.5-25.2 |
| Dividend | Nil |
| Dividend yield | Nil |
| BV/sh | $6.46 |
| Net cash/sh | $3.97 |
| Debt/cap | NA |
| ROIC (LTM) | 20.0% |
| 5-yr fwd EPS growth (Norm) | 20.0% |

**Revenue $MM**

| FY Dec | 2004 Actual | 2005E Prior | 2005E Current | 2006E Prior | 2006E Current |
|---|---|---|---|---|---|
| Q1 | 34.2 | — | 34.4A | — | 37.0 |
| Q2 | 35.9 | — | 34.4 | — | 40.0 |
| Q3 | 32.9 | — | 38.0 | 45.0 | 48.0 |
| Q4 | 33.6 | — | 38.0 | 45.0 | 48.0 |
| Year | 136.6 | — | 144.9 | 167.0 | 173.0 |
| CY | | — | — | — | — |
| EV/S | | — | — | — | — |

**EPS' $**

| FY Dec | 2004 Actual | 2005E Prior | 2005E Current | 2006E Prior | 2006E Current |
|---|---|---|---|---|---|
| Q1 | 0.16 | — | 0.15A | — | 0.15 |
| Q2 | 0.15 | — | 0.14 | — | 0.19 |
| Q3 | 0.18 | — | 0.17 | 0.24 | 0.28 |
| Q4 | 0.14 | — | 0.17 | 0.23 | 0.29 |
| Year | 0.63 | — | 0.64 | 0.81 | 0.90 |
| CY | | — | — | — | — |
| P/E | | — | 33.9x | | 24.1x |

**S&P 500**    1202.2

*Adjusted EPS excludes amortization of deferred stock comp and intangibles, and other non-recurring gains and losses

Please see addendum of this report for important disclosures.

www.sgcowen.com

SGC 0332

We are changing our investment opinion of Power Integrations shares, and we'd be buyers at current levels, in anticipation of 20% stock upside relative to the market over the next 12 months. In light of multiple Street downgrades of POWI stock in past weeks, as well as recent positive data points from Asia related to mobile handsets and consumer electronics, we're taking the occasion to articulate a bullish case for POWI shares, as we feel the bear case pays insufficient attention to significant 2006 stock triggers. The out-year catalysts which are most supportive of a long position are (1) a successful litigation settlement with Fairchild Semiconductor and (2) the adoption of broad-based energy efficiency initiatives in the state of California and elsewhere. We believe augmented market recognition of these events can set off meaningful share momentum later this year or early next year, and we are raising our 2006 numbers above consensus, in what we believe will be the first in a series of upward Street revisions over the next several quarters.

Some background. POWI stock is down about 12% over the past 7 trading sessions, largely stemming from recent Street downgrades. These downgrades focus principally on current valuation; however, we believe the bear case underestimates the positive impact of two important 2006 triggers.

One: The Litigation with Fairchild. In 3Q03 Fairchild announced that it had commenced shipping its branded Power Switch ICs into certain battery charger platforms to accompany Samsung mobile handsets. Prior to this, POWI garnered 100% of Samsung's handset charger business. In Q404 after extensive diligence, POWI filed suit against Fairchild claiming patent infringement. We are inclined to think the Fairchild case is similar in nature to prior litigation that POWI initiated against ON Semiconductor (then MOT) in 1999, wherein POWI was awarded monetary damages of $32 million. The 1999 outcome was also a meaningful boon to POWI's competitive positioning within the industry. At present, we believe Fairchild's Power Switch likely infringes POWI's IP, and we think these products currently cause POWI to forego $6-7 million per year in sales. We expect a favorable jury verdict in 3Q06, with POWI receiving both monetary damages and injunctive relief. The company has likewise spurred an ITC investigation of another competitor in the LCD end-market (System General), however, the impact to POWI revenue in this case is more difficult to quantify.

Two: The CEC initiative: The California Energy Commission has embarked on a new power efficiency initiative which imposes mandatory efficiency requirements on external power supplies. This initiative is intended to reduce energy waste in California, and manufacturers of legacy, linear transformer battery chargers/adaptors, as well as the OEMs that employ these legacy devices, will feel the greatest impact. In the U.S. there's an estimated installed base of 1.3 billion external chargers/adaptors, with 150 million devices currently in use in California. Approximately half of these devices are linear in nature, and will effectively be outlawed in California beginning in mid-2006, with tightening specifications beginning in 2008. Although POWI's ICs must always compete with discrete, multi-chip power supply solutions, in California alone the CEC mandate adds an incremental $35 million to POWI's revenue opportunity. Also, as other states follow California's lead, spurred by nearly $60 a barrel oil prices, this could add another $300 million in market opportunity in the U.S. alone. As other countries adopt similar measures (which is ongoing in Europe and China, as well as many other nations), the worldwide, incremental, energy efficient chip opportunity exceeds $1 billion.

SGC 0333

June 22, 2005

Current year tailwinds. We believe coming off of a choppy 2H04, where inventory overhang hurt sales, that POWI's end-markets have stabilized, and that aggregate demand for the company's converter ICs should demonstrate healthy 2H05 seasonality. In particular, our checks in Asia appear to indicate a healthy 2H ramp for mobile handsets, and POWI will also benefit this year from robust consumer electronics sales. As such we believe this year's numbers are well in-tact, and we expect the company to offer in-line or above full year guidance on the June quarter earnings call.

Valuation. In the context of most small-cap semiconductor companies, we believe POWI shares deserve a premium valuation multiple, owing to the analog-intensive nature of the company's product offerings, coupled with a business model that serves thousands of customers and demonstrates solid diversity amongst industries and end-markets. From early 2002 until present, POWI shares have demonstrated an average forward P/E multiple of 37x, with an accompanying EV/sales multiple of about 5.0x. On average over the same period, the stock has traded at about twice the S&P500 forward earnings multiple. In conjunction with the aforementioned analysis, and underscoring the strong secular story accompanying Power Integrations' business model, we like the shares' risk/reward profile, and we feel at some point the stock price could begin to reflect multiple expansion from current levels.

SGC 0334

**SG**

Cowen & Co.

Power Integrations

SGC 0335


Power Integrations
Cowen & Co.

## Power Integrations - Annual Income Statement

**POWI  21-Jun-05**
**December Year-End**

| ($000s) | 2001 | 2002 | 2003 | 2004 | 2005E | 2006E |
|---|---|---|---|---|---|---|
| **REVENUE** | $94,095 | $108,184 | $125,706 | $136,636 | $144,816 | $173,000 |
| *% Change Y/Y* | NA | 15.0% | 16.2% | 8.7% | 6.0% | 19.5% |
| TOTAL COGS | $51,252 | $60,723 | $62,814 | $71,409 | $74,635 | $89,480 |
| **GROSS PROFIT** | $42,843 | $47,461 | $62,892 | $65,227 | $70,181 | $83,520 |
| *Gross Margin* | 45.5% | 43.9% | 50.0% | 47.7% | 48.5% | 48.3% |
| R&D | $14,471 | $14,705 | $16,443 | $16,162 | $16,598 | $16,800 |
| *% Sales* | 15.4% | 13.6% | 13.1% | 11.8% | 11.5% | 9.7% |
| Sales & marketing | $14,485 | $14,537 | $15,484 | $15,273 | $16,218 | $16,800 |
| *% Sales* | 15.4% | 13.4% | 12.3% | 11.2% | 11.2% | 9.7% |
| G&A | $5,980 | $6,203 | $6,848 | $8,102 | $12,277 | $13,000 |
| *% Sales* | 6.4% | 5.7% | 5.4% | 5.9% | 8.5% | 7.5% |
| TOTAL OPEX | $34,936 | $35,445 | $38,775 | $39,537 | $45,093 | $46,600 |
| **OPERATING PROFIT** | $7,907 | $12,016 | $24,117 | $25,690 | $25,088 | $36,920 |
| *Operating Margin* | 8.4% | 11.1% | 19.2% | 18.8% | 17.3% | 21.3% |
| NET INTEREST | $1,749 | $1,665 | $1,002 | $1,054 | $1,554 | $1,900 |
| **PRETAX PROFIT** | $9,656 | $13,681 | $25,119 | $26,744 | $26,642 | $38,820 |
| *% Sales* | 10.3% | 12.6% | 20.0% | 19.6% | 18.4% | 22.4% |
| TAX PROVISION | $2,930 | $4,103 | $7,033 | $6,377 | $6,926 | $10,093 |
| *Tax rate* | 30.3% | 30.0% | 28.0% | 23.8% | 26.0% | 26.0% |
| **ADJUSTED NET INCOME** | $6,726 | $9,578 | $18,086 | $20,367 | $19,716 | $28,727 |
| *Net Margin* | 7.1% | 8.9% | 14.4% | 14.9% | 13.6% | 16.6% |
| AVE. DILUTED SHARES | 28,991 | 29,503 | 31,812 | 32,414 | 30,914 | 31,700 |
| **EPS, ADJUSTED** [1] | **$0.23** | **$0.32** | **$0.57** | **$0.63** | **$0.64** | **$0.90** |
| **EPS, GAAP** | **$0.23** | **$0.32** | **$0.57** | **$0.63** | **$0.64** | **$0.90** |

(1) Adjusted EPS exclude amortization of deferred stock comp. and intangibles, and non-recurring gains/losses
Source:  Company Filings, SG Cowen & Co.

SGC 0336

**Power Integrations**

**SG Cowen & Co.**

## Power Integrations - Quarterly Income Statement

POWI 21-Jun-05
December Year-End
($000s)

| | 2004 Q1-A | 2004 Q2-A | 2004 Q3-A | 2004 Q4-A | 2005E Q1-A | 2005E Q2-E | 2005E Q3-E | 2005E Q4-E | 2006E Q1-E | 2006E Q2-E | 2006E Q3-E | 2006E Q4-E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUE** | $34,165 | $35,944 | $32,946 | $33,581 | $34,416 | $34,400 | $38,000 | $38,000 | $37,000 | $40,000 | $48,000 | $48,000 |
| % Change Y/Y | 17.4% | 20.6% | -4.6% | 4.0% | 0.7% | -4.3% | 15.3% | 13.2% | 7.5% | 16.3% | 26.3% | 26.3% |
| % Change Q/Q | 5.8% | 5.2% | -8.3% | 1.9% | 2.5% | 0.0% | 10.5% | 0.0% | -2.6% | 8.1% | 20.0% | 0.0% |
| **TOTAL COGS** | $17,473 | $19,392 | $17,188 | $17,356 | $17,779 | $17,716 | $19,570 | $19,570 | $19,240 | $20,800 | $24,720 | $24,720 |
| **GROSS PROFIT** | $16,692 | $16,552 | $15,758 | $16,225 | $16,637 | $16,684 | $18,430 | $18,430 | $17,760 | $19,200 | $23,280 | $23,280 |
| *Gross Margin* | 48.9% | 46.0% | 47.8% | 48.3% | 48.3% | 48.5% | 48.5% | 48.5% | 48.0% | 48.0% | 48.5% | 48.5% |
| **R&D** | $4,152 | $4,088 | $4,096 | $3,826 | $4,098 | $4,100 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 | $4,200 |
| *% Sales* | 12.2% | 11.4% | 12.4% | 11.4% | 11.9% | 11.9% | 11.1% | 11.1% | 11.4% | 10.5% | 8.8% | 8.8% |
| **Sales & marketing** | $4,112 | $3,943 | $3,412 | $3,806 | $4,018 | $4,000 | $4,100 | $4,100 | $4,100 | $4,100 | $4,300 | $4,300 |
| *% Sales* | 12.0% | 11.0% | 10.4% | 11.3% | 11.7% | 11.6% | 10.8% | 10.8% | 11.1% | 10.3% | 9.0% | 9.0% |
| **G&A** | $1,579 | $2,049 | $2,382 | $2,092 | $2,777 | $3,000 | $3,200 | $3,200 | $3,400 | $3,400 | $3,200 | $3,000 |
| *% Sales* | 4.6% | 5.7% | 7.2% | 6.2% | 8.1% | 9.0% | 8.4% | 8.4% | 9.2% | 8.5% | 6.7% | 6.3% |
| **TOTAL OPEX** | $9,843 | $10,080 | $9,890 | $9,724 | $10,893 | $11,200 | $11,500 | $11,500 | $11,700 | $11,700 | $11,700 | $11,500 |
| *% Sales* | 28.8% | 28.0% | 30.0% | 29.0% | 31.7% | 32.6% | 30.3% | 30.3% | 31.6% | 29.3% | 24.4% | 24.0% |
| *% Change Q/Q* | 6.1% | 2.4% | -1.9% | -1.7% | 12.0% | 2.8% | 2.7% | 0.0% | 1.7% | 0.0% | 0.0% | -1.7% |
| **OPERATING PROFIT** | $6,849 | $6,472 | $5,868 | $6,501 | $5,744 | $5,484 | $6,930 | $6,930 | $6,060 | $7,500 | $11,580 | $11,780 |
| *Operating Margin* | 20.0% | 18.0% | 17.8% | 19.4% | 16.7% | 15.9% | 18.2% | 18.2% | 16.4% | 18.8% | 24.1% | 24.5% |
| **NET INTEREST** | $259 | $131 | $339 | $325 | $654 | $300 | $300 | $300 | $400 | $400 | $500 | $600 |
| **PRETAX PROFIT** | $7,108 | $6,603 | $6,207 | $6,826 | $6,398 | $5,784 | $7,230 | $7,230 | $6,460 | $7,900 | $12,080 | $12,380 |
| *% Sales* | 20.8% | 18.4% | 18.8% | 20.3% | 18.6% | 16.8% | 19.0% | 19.0% | 17.5% | 19.8% | 25.2% | 25.8% |
| **TAX PROVISION** | $1,990 | $1,575 | $502 | $2,310 | $1,663 | $1,504 | $1,880 | $1,880 | $1,680 | $2,054 | $3,141 | $3,219 |
| *Tax rate* | 28.0% | 23.9% | 8.1% | 33.8% | 26.0% | 26.0% | 26.0% | 26.0% | 26.0% | 26.0% | 26.0% | 26.0% |
| **ADJUSTED NET INCOME** | $5,118 | $5,028 | $5,705 | $4,516 | $4,735 | $4,280 | $5,350 | $5,350 | $4,780 | $5,846 | $8,939 | $9,161 |
| *Net Margin* | 15.0% | 14.0% | 17.3% | 13.4% | 13.8% | 12.4% | 14.1% | 14.1% | 12.9% | 14.6% | 18.6% | 19.1% |
| **DILUTED SHARES** | 32,757 | 32,598 | 31,994 | 31,865 | 30,907 | 30,750 | 31,000 | 31,000 | 31,400 | 31,600 | 31,800 | 32,000 |
| **EPS, ADJUSTED** (1) | $0.16 | $0.15 | $0.18 | $0.14 | $0.15 | $0.14 | $0.17 | $0.17 | $0.15 | $0.19 | $0.28 | $0.29 |
| **EPS, GAAP** | $0.16 | $0.15 | $0.18 | $0.14 | $0.15 | $0.14 | $0.17 | $0.17 | $0.15 | $0.19 | $0.28 | $0.29 |

**ANNUAL VALUES:**

| | 2004 | 2005E | 2006E |
|---|---|---|---|
| ANNUAL REVENUE | $136,636 | $144,816 | $173,000 |
| GROWTH Y/Y | 8.7% | 6.0% | 19.5% |
| ADJUSTED NET INCOME | $20,367 | $19,716 | $28,727 |
| GROWTH Y/Y | 12.6% | -3.2% | 45.7% |
| EPS, ADJUSTED (1) | $0.63 | $0.64 | $0.90 |
| EPS, GAAP | $0.63 | $0.64 | $0.90 |

| | 2004 Q1-A | 2004 Q2-A | 2004 Q3-A | 2004 Q4-A | 2005E Q1-A | 2005E Q2-E | 2005E Q3-E | 2005E Q4-E | 2006E Q1-E | 2006E Q2-E | 2006E Q3-E | 2006E Q4-E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Book Value per share** | $6.15 | $6.39 | $6.77 | $6.67 | $6.46 | $6.63 | $6.76 | $6.93 | $6.99 | $7.14 | $7.40 | $7.64 |
| **Net Cash Per share** | $3.77 | $4.14 | $4.50 | $4.22 | $3.97 | $4.23 | $4.37 | $4.54 | $4.55 | $4.64 | $4.83 | $5.08 |

(1) Adjusted EPS excludes amortization of deferred stock comp and intangibles, and non-recurring gains and losses

Source: Company Filings, SG Cowen & Co.

June 22, 2005

SGC 0337

**SG** Power Integrations
Cowen & Co.

## Power Integrations – Statement of Cash Flows

POWI 21-Jun-05
December Year-End
($000s)

| | 2001 | 2002 | 2003 | 2004 | 2005E | 2006E |
|---|---|---|---|---|---|---|
| Net Income (loss) | $6,726 | $9,578 | $18,086 | $20,367 | $19,716 | $28,727 |
| Adjustments to reconcile net income (loss) to cash provided by operating activities: | | | | | | |
| Depreciation and amortization | 6,944 | 6,684 | 6,846 | 6,880 | 7,248 | 8,650 |
| Amortization of deferred compensation | 41 | 147 | 135 | - | - | - |
| Deferred income taxes | 708 | (718) | 191 | 72 | (10) | - |
| Deferred rent | 441 | 284 | (725) | - | - | - |
| Provision for A/R and other allowances | 1,119 | 155 | 688 | 456 | 100 | - |
| Tax benefit associated with employee stock plans | 2,232 | 1,654 | 6,841 | 4,082 | 171 | - |
| Stock compensation to non-employees | - | - | - | 37 | 4 | - |
| Changes in operating assets and liabilities: | | | | | | |
| Accounts receivable | 2,946 | (3,553) | (2,492) | (2,360) | (4,992) | (5,779) |
| Inventories | (2,023) | 8,594 | (8,085) | (2,241) | 5,512 | (5,222) |
| Deferred Income Taxes | | | | | (419) | (1,169) |
| Prepaid expenses and other current assets | 3,092 | (146) | (2,909) | 295 | 1,080 | (393) |
| Accounts payables | (2,849) | 3,086 | 191 | 694 | 1,309 | 2,611 |
| Accrued Payroll and employee benefits | | | | | 387 | 1,079 |
| Taxes payable and other accrued | (2,386) | 4,849 | 1,773 | 1,336 | 112 | 2,012 |
| Deferred income on shipments to distributors | (768) | 920 | (153) | 493 | 109 | 833 |
| **Cash provided by (used in) operating activities** | **$16,223** | **$31,534** | **$20,387** | **$30,111** | **$30,326** | **$31,351** |
| | | | | | | |
| **Cash flow from investing activities:** | | | | | | |
| Capital expenditures | (7,629) | (4,510) | (37,787) | (8,135) | (6,373) | (9,420) |
| Purchases of securities | (30,750) | (42,325) | (6,210) | (29,182) | (2,745) | - |
| Sales and maturities of securities | 42,998 | 25,173 | 33,037 | 19,270 | - | - |
| **Cash provided by (used in) investing activities** | **$4,619** | **($21,662)** | **($10,960)** | **($18,047)** | **($9,118)** | **($9,420)** |
| | | | | | | |
| **Cash flow from financing activities:** | | | | | | |
| Payments related to capital lease | (678) | (441) | (233) | (41) | - | - |
| Proceeds receivable from stockholders | 38 | 38 | - | - | - | - |
| Proceeds from issuance of common stock | 5,477 | 5,914 | 23,554 | 9,099 | 2,454 | - |
| Repurchase of common stock | | | | (11,797) | (20,233) | - |
| **Cash provided by (used in) financing activities** | **$4,837** | **$5,511** | **$23,321** | **($2,739)** | **($17,779)** | **$0** |
| | | | | | | |
| **Net change in cash and cash equivalents** | **$25,679** | **$15,383** | **$32,748** | **$9,325** | **$3,429** | **$21,931** |

| SG Cowen Cash Flow Summary And Analysis | 2001 | 2002 | 2003 | 2004 | 2005E | 2006E |
|---|---|---|---|---|---|---|
| Cash flow from operations | 16,223 | 31,534 | 20,387 | 30,111 | 30,326 | 31,351 |
| minus net capital expenditures equals | (7,629) | (4,510) | (37,787) | (8,135) | (6,373) | (9,420) |
| **Owners' cash flow [1]** | **$8,594** | **$27,024** | **($17,400)** | **$21,976** | **$23,953** | **$21,931** |
| | | | | | | |
| Investing adjustments | 12,248 | (17,152) | 26,827 | (9,912) | (2,745) | |
| Financing adjustments | (7,411) | 22,663 | (3,507) | 7,173 | (15,034) | |
| **Net change in cash, cash equivalents, and securities** | **$13,431** | **$32,535** | **$5,920** | **$19,237** | **$6,174** | **$21,931** |
| | | | | | | |
| Beginning cash, cash equivalents, and securities | $63,434 | $76,865 | $109,400 | $115,320 | $134,557 | $140,731 |
| **Ending cash, cash equivalents, and securities** | **$76,865** | **$109,400** | **$115,320** | **$134,557** | **$140,731** | **$162,662** |

(1) Owner's cash flow in 2003 includes an approximately $30M CAPEX expenditure related to the purchase of the Company's San Jose facility. Absent this expenditure, Owner's cash flow in 2003 would have been approximately $13M.

Source: Company Filings, SG Cowen & Co.

**SGC 0338**



**Power Integrations**

## Power Integrations – Balance Sheet

| POWI  21-Jun-05<br>December Year-End | 2001 | 2002 | 2003 | 2004 | 2005E | 2006E |
|---|---|---|---|---|---|---|
| ($000s) | Q4 | Q4 | Q4 | Q4 | Q4-E | Q4-E |
| Cash, cash equivalents, and securities | 76,865 | 109,400 | 115,320 | 134,557 | 140,731 | 162,662 |
| Accounts receivable, net | 5,124 | 8,522 | 10,326 | 12,230 | 17,123 | 22,902 |
| Inventories, net | 23,622 | 15,028 | 23,113 | 25,354 | 19,842 | 25,063 |
| Deferred income taxes | 5,346 | 6,064 | 4,275 | 4,205 | 4,441 | 5,609 |
| Prepaid expenses and other current assets | 1,526 | 1,672 | 3,086 | 2,600 | 1,495 | 1,888 |
| **Total current assets** | **$112,483** | **$140,686** | **$156,120** | **$178,946** | **$183,632** | **$218,125** |
| | | | | | - | - |
| Property, plant and equipment, net | 23,182 | 21,008 | 51,949 | 51,718 | 50,935 | 51,705 |
| Intangible assets | - | - | 1,598 | 1,596 | 1,789 | 1,789 |
| Deferred tax assets | - | - | 1,495 | 3,172 | 3,427 | 4,329 |
| Other assets, net | | | | | | |
| **Total assets** | **$135,665** | **$161,694** | **$211,162** | **$235,432** | **$239,784** | **$275,948** |
| | | | | | | |
| Accounts payable | 4,641 | 7,727 | 7,918 | 8,612 | 9,921 | 12,532 |
| Accrued salaries and employee benefits | 3,164 | 4,389 | 5,310 | 4,672 | 4,102 | 5,181 |
| Income taxes payable and other accrued | 1,604 | 5,228 | 4,610 | 6,578 | 7,647 | 9,660 |
| Current portion of capitalized lease | 440 | 233 | 41 | | | |
| Deferred income on shipments to distributors | 1,798 | 2,718 | 2,565 | 3,058 | 3,167 | 4,000 |
| **Total current liabilities** | **$11,647** | **$20,295** | **$20,444** | **$22,920** | **$24,837** | **$31,373** |
| | | | | | | |
| Other liabilities | - | - | - | | | |
| Capital lease and deferred rent liability | 716 | 766 | | | | |
| **Total liabilities** | **$12,363** | **$21,061** | **$20,444** | **$22,920** | **$24,837** | **$31,373** |
| | | | | | | |
| **Total stockholders' equity** | **$123,302** | **$140,633** | **$190,718** | **$212,512** | **$214,947** | **$244,576** |
| **Total liabilities and stockholders' equity** | **$135,665** | **$161,694** | **$211,162** | **$235,432** | **$239,784** | **$275,948** |

Source:  Company Filings, SG Cowen & Co.

**SGC 0339**

**SG** Cowen & Co.

Power Integrations

## Power Integrations – ROIC Analysis

**POWI 21-Jun-05**
**($000s)**

| | 2001 | 2002 | 2003 | 2004 | 2005E | 2006E |
|---|---|---|---|---|---|---|
| **Adjusted EBIT:** | $7,907 | $12,016 | $24,117 | $25,690 | $25,088 | $36,920 |
| +Implied interest from operating leases | 1,700 | 2,200 | 1,200 | - | - | - |
| +Increase in LIFO reserve | - | - | - | - | - | - |
| +Increase in bad debt reserve | - | - | - | - | - | - |
| +Increase in net capitalized R&D | - | - | - | - | - | - |
| Amortization (adjusted EBIT excludes amortization) | - | - | - | - | - | - |
| **Adjusted Operating Profit Before Taxes** | $9,607 | $14,216 | $25,317 | $25,690 | $25,088 | $36,920 |
| **Income tax expense:** | $2,930 | $4,103 | $7,033 | $6,377 | $6,926 | $10,093 |
| - Increase in deferred tax liabilities | | | | | | |
| + Increase in deferred tax assets | - | - | - | - | - | - |
| + Tax benefit from interest expense | - | - | - | - | - | - |
| -Tax expense from interest income | (612) | (583) | (351) | (369) | (544) | (665) |
| -Taxes on non-operating income | - | - | - | - | - | - |
| + Tax benefits from interest on leases | 595 | 770 | 420 | - | - | - |
| **Cash Operating Taxes** | $2,913 | $4,290 | $7,102 | $6,008 | $6,383 | $9,428 |
| **NOPAT** | $6,694 | $9,926 | $18,215 | $19,682 | $18,705 | $27,492 |
| **Book value of common equity** | $123,302 | $140,633 | $190,718 | $212,512 | $214,947 | $244,576 |
| +Preferred stock | - | - | - | - | - | - |
| +Minority interest | - | - | - | - | - | - |
| +Deferred tax liabilities | - | - | - | - | - | - |
| +LIFO reserve | - | - | - | - | - | - |
| +Accumulated amortization expense | - | - | - | - | - | - |
| +Interest-bearing short-term debt | - | - | - | - | - | - |
| +Long-term debt | - | - | - | - | - | - |
| +Capitalized lease obligations | - | - | - | - | - | - |
| +PV of operating leases (1) | 24,286 | 31,429 | 17,143 | - | - | - |
| -Excess cash, cash equivalents & securities | (56,002) | (101,522) | (96,633) | (114,235) | (123,941) | (140,181) |
| -Deferred tax assets | - | - | - | - | - | - |
| **Invested Capital** | $91,586 | $70,540 | $111,228 | $98,277 | $91,006 | $104,395 |
| **Return On Invested Capital** | 7.3% | 14.1% | 16.4% | 20.0% | 20.6% | 26.3% |
| -Goodwill, net | - | - | - | - | - | - |
| -Intangible assets, net | - | - | - | - | - | - |
| **Return On Invested Capital, ex. GW + Intang.** | 7.3% | 14.1% | 16.4% | 20.0% | 20.6% | 26.3% |

| **Invested Capital:** | 2001 | 2002 | 2003 | 2004 | 2005E | 2006E |
|---|---|---|---|---|---|---|
| Working capital, excl. cash, cash equivalents & securities | 20,863 | 7,878 | 18,687 | 20,322 | 16,790 | 22,481 |
| Cash, cash equivalents & securities | 76,865 | 109,400 | 115,320 | 134,557 | 140,731 | 162,662 |
| **Excess cash, cash equivalents & securities** | $56,002 | $101,522 | $96,633 | $114,235 | $123,941 | $140,181 |

EBIT = Earnings Before Taxes and Interest
NOPAT = Net Operating Profit After Tax
ROIC = Return On Invested Capital

(1) The company purchased its primary facility in 2003, eliminating lease obligations.
Source: SG Cowen & Co.

**SGC 0340**


**SG** Power Integrations
Cowen & Co.

## Power Integrations – Ratio Analysis

**POWI  21-Jun-05**

| December Year-End | 2001 | 2002 | 2003 | 2004 | 2005E | 2006E |
|---|---|---|---|---|---|---|
| **Per Share:** | | | | | | |
| Cash flow from operations | $0.56 | $1.07 | $0.64 | $0.93 | $0.98 | $0.99 |
| Cash, cash equivalents, and securities | $2.65 | $3.71 | $3.63 | $4.15 | $4.55 | $5.13 |
| Book value | $4.25 | $4.77 | $6.00 | $6.56 | $6.95 | $7.72 |
| Tangible book value | $4.25 | $4.77 | $6.00 | $6.56 | $6.95 | $7.72 |
| | | | | | | |
| **Liquidity Ratios:** | | | | | | |
| Current ratio | 9.7 | 6.9 | 7.6 | 7.8 | 7.4 | 7.0 |
| Quick ratio | 7.6 | 6.2 | 6.5 | 6.7 | 6.6 | 6.2 |
| | | | | | | |
| **Leverage:** | | | | | | |
| Cash to equity | 62.3% | 77.8% | 60.5% | 63.3% | 65.5% | 66.5% |
| Assets to equity | 110.0% | 115.0% | 110.7% | 110.8% | 111.6% | 112.8% |
| Assets to equity (excl. cash) | 126.6% | 167.4% | 127.1% | 129.4% | 133.5% | 138.3% |
| | | | | | | |
| **Turnover:** | | | | | | |
| Asset turnover | 0.7x | 0.7x | 0.6x | 0.6x | 0.6x | 0.6x |
| Asset turnover, excluding cash | 1.6x | 2.1x | 1.3x | 1.4x | 1.5x | 1.5x |
| Accounts receivable turnover | 18.4x | 12.7x | 12.2x | 11.2x | 8.5x | 7.6x |
| Inventory turnover | 2.2x | 4.0x | 2.7x | 2.8x | 3.8x | 3.6x |
| Accounts payable turnover | 11.0x | 7.9x | 7.9x | 8.3x | 7.5x | 7.1x |
| | | | | | | |
| **Cash Conversion Cycle:** | | | | | | |
| Days sales outstanding | 20 | 29 | 30 | 33 | 43 | 48 |
| Days inventory | 168 | 90 | 134 | 130 | 97 | 102 |
| Days payable | 33 | 46 | 46 | 44 | 49 | 51 |
| Cash conversion cycle (days) | 155 | 73 | 118 | 118 | 92 | 99 |
| | | | | | | |
| **Pre-Tax Return On Assets:** | | | | | | |
| Operating margin (EBIT/Sales) | 8.4% | 11.1% | 19.2% | 18.8% | 17.3% | 21.3% |
| x   Asset turnover (Sales/Assets) | 0.7x | 0.7x | 0.6x | 0.6x | 0.6x | 0.6x |
| =   **Pre-Tax ROA** | 5.8% | 7.4% | 11.4% | 10.9% | 10.5% | 13.4% |
| x   Tax burden (NI/EBT) | 70% | 70% | 72% | 76% | 74% | 74% |
| =   **Return On Assets** | 4.1% | 5.2% | 8.2% | 8.3% | 7.7% | 9.9% |
| | | | | | | |
| **Pre-Tax Return On Assets (excl. cash):** | | | | | | |
| Operating margin (EBIT/Sales) | 8.4% | 11.1% | 19.2% | 18.8% | 17.3% | 21.3% |
| x   Asset turnover (Sales/Assets), excluding cash | 1.6x | 2.1x | 1.3x | 1.4x | 1.5x | 1.5x |
| =   **Pre-Tax ROA** | 13.4% | 23.0% | 25.2% | 25.5% | 25.3% | 32.6% |
| x   Tax burden (NI/EBT) | 70% | 70% | 72% | 76% | 74% | 74% |
| =   **Return On Assets, excluding cash** | 9.4% | 16.1% | 18.1% | 19.4% | 18.7% | 24.1% |
| | | | | | | |
| **Return On Equity:** | | | | | | |
| Operating margin (EBIT/Sales) | 8.4% | 11.1% | 19.2% | 18.8% | 17.3% | 21.3% |
| x   Interest benefit (EBT/EBIT) | 122% | 114% | 104% | 104% | 106% | 105% |
| x   Tax burden (NI/EBT) | 70% | 70% | 72% | 76% | 74% | 74% |
| x   Asset turnover (Sales/Assets) | 0.7x | 0.7x | 0.6x | 0.6x | 0.6x | 0.6x |
| x   Leverage (Assets/S.E.) | 110% | 115% | 111% | 111% | 112% | 113% |
| =   **ROE** | -5.5% | -6.8% | 9.5% | 9.6% | 9.2% | 11.7% |
| | | | | | | |
| **Return On Equity (excl. cash):** | | | | | | |
| Operating margin (EBIT/Sales) | 8.4% | 11.1% | 19.2% | 18.8% | 17.3% | 21.3% |
| x   Interest benefit (EBT/EBIT) | 122% | 114% | 104% | 104% | 106% | 105% |
| x   Tax burden (NI/EBT) | 70% | 70% | 72% | 76% | 74% | 74% |
| x   Asset turnover (Sales/Assets), excl. cash | 1.6x | 2.1x | 1.3x | 1.4x | 1.5x | 1.5x |
| x   Leverage (Assets/S.E.), excl. cash | 127% | 167% | 127% | 129% | 133% | 138% |
| =   **ROE** | -14.5% | -30.7% | 24.0% | 26.1% | 26.6% | 35.1% |

Source:  SG Cowen & Co.

**SGC 0341**

**SG**
Power Integrations
Cowen & Co.

# Addendum

## ANALYST CERTIFICATION

Each author of this research report hereby certifies that (i) the views expressed in the research report accurately reflect his or her personal views about any and all of the subject securities or issuers, and (ii) no part of his or her compensation was, is, or will be related, directly or indirectly, to the specific recommendations or views expressed in this report.

## IMPORTANT DISCLOSURES

SG Cowen & Co., LLC. makes a market in POWI securities.

SG Cowen & Co., LLC. compensates research analysts for activities and services intended to benefit the firm's investor clients. Individual compensation determinations for research analysts, including the author(s) of this report, are based on a variety of factors, including the overall profitability of the firm and the total revenue derived from all sources, including revenues from investment banking. SG Cowen & Co., LLC. does not compensate research analysts based on specific investment banking transactions.

SG Cowen & Co., LLC. does and seeks to do business with companies covered in its research reports. As a result, investors should be aware that the firm may have a conflict of interest that could affect the objectivity of this report.

## DISCLAIMER

Further information on any of the above securities may be obtained from our offices. This report is published solely for information purposes, and is not to be construed as an offer to sell or the solicitation of an offer to buy any security in any state where such an offer or solicitation would be illegal. The information herein is based on sources we believe to be reliable but is not guaranteed by us and does not purport to be a complete statement or summary of the available data. Any opinions expressed herein are statements of our judgment on this date and are subject to change without notice. SG Cowen & Co., LLC, or one or more of its employees, may have a position in any of the securities discussed herein. The contents and appearance of this report are Copyright© and Trademark™ SG Cowen & Co., LLC 2005. Member SIPC. All rights reserved.

**Notice to French Investors:** This publication is issued in France by or through Société Générale ("SG") which is regulated by the AMF (Autorité des Marchés Financiers). As per SG's practice, issuers that receive a copy of research reports prior to publication do so in compliance with AMF regulations (article 321-126 of the AMF General Regulation).

**Notice to UK Investors:** This publication is issued in the United Kingdom by or through Société Générale ("SG"). All materials provided by SG Commodity Research and SG Global Convertible Research are produced in circumstances such that it is not appropriate to characterize them as impartial as referred to in the Financial Services Authority Handbook. However, it must be made clear that all research issued by SG will be fair, clear and not misleading. In the United Kingdom, SG Cowen & Co. is a Trading Name of SG. **SG is a Member of the London Stock Exchange.**

**Notice to Japanese Investors:** This report is distributed in Japan by Société Générale Securities (North Pacific) Ltd., Tokyo Branch, which is regulated by the Financial Services Agency of Japan. The products mentioned in this report may not be eligible for sale in Japan and they may not be suitable for all types of investors.

**Notice to Australian Investors:** Société Générale Australia Branch (ABN 71 092 516 286) (SG) takes responsibility for publishing this document. SG holds an AFSL no. 236651 issued under the Corporations Act 2001 (Cth) ("Act"). The information contained in this newsletter is only directed to recipients who are wholesale clients as defined under the Act.

**SG COWEN & CO., LLC   New York** (212) 278-4000   **Boston** (617) 946-3700   **San Francisco** (415) 646-7200   **Chicago** (312) 516-4690   **Cleveland** (440) 331-3531   **Denver** (303) 282-3100   **London (affiliate)** 44-207-710-0900   **Geneva** 41-22-707-6900   **Tokyo (affiliate)** 81-35-549-5696

**SGC 0342**

SG
Cowen & Co.

## SG COWEN & CO. RATING DEFINITIONS PRIOR TO 3/1/2004

| Rating | Definition |
|---|---|
| Strong Buy (1) | Stock expected to outperform the S&P 500 by over 25% |
| Outperform (2) | Stock expected to outperform the S&P 500 by 10-25% |
| Market Perform (3) | Stock expected to out/underperform the S&P 500 by +/-10% |
| Underperform (4) | Stock expected to underperform the S&P 500 by at least 10% |

Assumptions: Time horizon is 12 months; S&P 500 is flat over forecast period.

## SG COWEN & CO. RATING DEFINITIONS PRIOR TO 9/9/2002

| Rating | Definition |
|---|---|
| Strong Buy (1) | Analyst expects the stock to outperform the market over the next 6-12 months |
| Buy (2) | Analyst expects the stock to outperform the market over the next 12-18 months |
| Neutral (3) | Analyst expects the stock to perform in line with the market over the next 12 months |
| Underperform (4) | Analyst expects the stock to underperform the market over the next 12 months |

### POWI—SG COWEN & CO. HISTORICAL PRICE CHART AS OF 06/20/2005 (US$)



Initiated on 07/14/04;
SG Cowen & Co., LLC eliminated price targets on 09/09/02;
SG Cowen & Co., LLC eliminated investment ratings on 03/01/04.

SGC 0343

# Exhibit I



## Power Integrations To Receive National Energy-Efficiency Award

*Company to Be Honored for Reducing Energy Waste from Electronic Products*

**SAN JOSE, Calif. – September 12, 2006 – Power Integrations, Inc. (OTC: POWI), the inventor of EcoSmart&amp;reg; energy-efficiency technology, will receive a 2006 Star of Energy Efficiency award from the national Alliance to Save Energy. The only technology company among this year's three corporate honorees, Power Integrations is being recognized for its efforts to reduce electricity waste by improving the efficiency of electronic products. The award will be presented to Balu Balakrishnan, the company's president and CEO, at the Alliance's annual black-tie awards gala tonight in Washington, D.C. The event is being hosted by 50 U.S. Senators and Members of Congress.**

**Power Integrations' integrated circuits (ICs) with EcoSmart technology are used in power supplies, the devices that convert high-voltage AC power from a wall outlet into the low-voltage DC power needed by most electronic products. EcoSmart technology intelligently manages the flow of power through the power supply, dramatically reducing the amount of energy consumed during normal operation and reducing standby power by up to 97 percent.  Standby power, the electricity wasted while electronic products are idle, is estimated to account for up to 10 percent of residential electricity usage.**

**Since 1998, Power Integrations has sold more than 1.1 billion chips with EcoSmart technology, saving consumers and businesses an estimated $1.8 billion on their electricity bills and preventing some 12 million tons of CO2 emissions.  The company's ICs can be found in a wide range of electronic products including consumer electronics, appliances, cellphone chargers, computer equipment and industrial electronics.**

**"The Alliance is delighted to honor Power Integrations with a 2006 Star of Energy Efficiency award," said Alliance President Kateri Callahan. "Power Integrations' EcoSmart technology is generating well over $1 million in energy savings each day without any increase in the cost of consumer products and without any change in consumer behavior. EcoSmart technology is a wonderful example of how innovation can help solve our energy issues."**

**"This award is a tremendous honor for Power Integrations," said Mr. Balakrishnan. "The market success of our EcoSmart technology has proven that energy efficiency can be simple and cost-effective for manufacturers and consumers. We are extremely proud of the benefits that our technology is bringing to consumers and to the environment, and we are very pleased that the Alliance has selected Power Integrations to receive a Star of Energy Efficiency award."**

**About Power Integrations**
**Power Integrations, Inc. (OTC: POWI) is the leading supplier of high-voltage analog integrated circuits used in power conversion. The company's breakthrough technology enables compact, energy-efficient power supplies in a wide range of electronic products, in both AC-DC and DC-DC applications. The company's EcoSmart energy-efficiency technology, which dramatically reduces energy waste, has saved consumers and businesses around the world an estimated $1.8 billion on their electricity bills since its introduction in 1998. For more information, visit the company's website at www.powerint.com. For information on global energy-efficiency standards and EcoSmart solutions, visit the PI Green Room at www.powerint.com/greenroom.**

**# # #**

Alliance to Save Energy - Promoting Energy Efficiency World Wide: N... of Energy Efficiency – Super Nova Award – Power Integrations, Inc.

Case 1:07-cv-00633-JJF-LPS    Document 20-10    Filed 01/25/2008    Page 3 of 30



Search

Home | Topics | Programs | Countries | News | Events | About Us | Contact Us

**Information For:**

Consumers

Educators

Policy Makers

Alliance Associates

Media

Energy Professionals

Contributors

Events

e-FFICIENCY NEWS

→ **Donate Now**

**Email Newsletter Subscription**
Sign up to receive Alliance to Save Energy newsletters!

→ **Act Now!**



**ee GLOBAL**

2007 ENERGY EFFICIENCY GLOBAL FORUM & EXPOSITION

**NOVEMBER 11-14**
WASHINGTON D.C.
CONVENTION CENTER

Home > News > Star of Energy Efficiency – Super Nova Award – Power Integrations, Inc.

## Star of Energy Efficiency – Super Nova Award – Power Integrations, Inc.



*An Evening with the Stars of Energy Efficiency*

GALA DINNER & AWARDS CEREMONY

Tuesday September 12th, 2006, 6 pm to 10 pm
The Great Hall, National Building Museum
411 G Street, NW, Washington, DC

**Star of Energy Efficiency**
**Super Nova Award**
**Power Integrations, Inc.**

For its innovative application of technology to dramatically reduce electricity waste and improve the efficiency of power supplies, Power Integrations will receive the Super Nova Star of Energy Efficiency Award. Power Integrations is a pioneer in the conversion of high-voltage alternating current to low-voltage direct current. The company's integrated circuits (ICs), contained in everything from DVD players, desktop computers, cell phone chargers, adapters and much more, are responsible for an estimated $1.4 billion in energy savings and the reduction of more than 10 million tons of $CO_2$ emissions.

Products using Power Integrations technology typically operate at efficiency levels exceeding 80 percent and consume up to 95 percent less standby power than conventional devices. In fact, the over 1 billion *EcoSmart* ICs currently in the market are accruing energy savings at a rate of more than $1 million per day and rising.

The availability and cost-effectiveness of Power Integrations' *EcoSmart* technology has also encouraged manufacturers to produce energy-efficient power supplies and enabled regulators worldwide to implement energy-efficiency standards without imposing undue burdens on manufacturers. This advanced technology not only makes energy savings cost-effective and practical but functions as a catalyst for future energy-efficiency gains.

Power Integrations is an award winning company with over 200 registered patents and has been recognized repeatedly for its cutting edge energy-efficiency technology. The Super Nova Star of Energy Efficiency Award is presented in recognition of the company's innovation, leadership, and commitment to making electronic products more efficient.

Alliance to Save Energy - Promoting Energy Efficiency World Wide: N... of Energy Efficiency – Super Nova Award – Power Integrations, Inc.

Case 1:07-cv-00633-JJF-LPS     Document 20-10     Filed 01/25/2008     Page 4 of 30

All content © copyright 2005 The Alliance to Save Energy. All rights reserved.
1850 M Street NW | Suite 600 | Washington, DC 20036 | 202-857-0666
The Alliance to Save Energy advocates energy efficiency

privacy statement | feedback | home



# Power Integrations Receives 2006 ENERGY STAR® Award

*PI Is First Analog Semiconductor Company to Be Recognized*

SAN JOSE, Calif. – March 21, 2006 – Power Integrations (Nasdaq: POWI), the leader in high-voltage analog integrated circuits for power conversion, announced today that it has received a 2006 ENERGY STAR award. The award recognizes the company for its EcoSmart&amp;reg; technology, which reduces energy consumption in a wide range of electronic products. Power Integrations is the first analog semiconductor company chosen to receive an ENERGY STAR award. The company will accept the award at a ceremony today in Washington, D.C.

Power Integrations' integrated circuits (ICs) with EcoSmart technology help manufacturers earn the ENERGY STAR label on a wide range of products such as computer equipment, TVs, DVD players, home appliances and AC adapters. The company's ICs are used in power supplies, the devices that convert high-voltage AC power from a wall outlet into the low-voltage DC power needed by most electronic products. EcoSmart technology intelligently manages the flow of power through the power supply, dramatically reducing the amount of energy consumed during normal operation as well as standby and no-load modes.

Since 1998, Power Integrations has sold more than 1.1 billion chips with EcoSmart technology, and has saved consumers and businesses more than an estimated $1.4 billion on their electricity bills, preventing some 10 million tons of carbon dioxide emissions.

"We are honored that Power Integrations has been chosen to receive an ENERGY STAR award," said Balu Balakrishnan, president and CEO of Power Integrations. "Our EcoSmart products support the goals of ENERGY STAR by making energy efficiency easy and cost-effective for both manufacturers and consumers. We have already saved consumers more than $1.4 billion on their energy bills, and a substantial portion of those savings have come from products bearing the ENERGY STAR label."

"This award recognizes Power Integrations for its innovative energy-efficiency technology, which is enabling the power electronics industry to deliver efficient solutions for an increasingly diverse range of products used in everyday life," said Andrew Fanara, ENERGY STAR team leader.

Recognized repeatedly for its contributions to reducing energy waste from electronic products, the company was named Grand Champion of Efficiency Challenge 2004, a power-supply design competition sponsored by the U.S. Environmental Protection Agency and the California Energy Commission.

## About Power Integrations
Power Integrations, Inc. is the leading supplier of high-voltage analog integrated circuits used in power conversion. The company's breakthrough technology enables compact, energy-efficient power supplies in a wide range of electronic products, in both AC-DC and DC-DC applications. The company's EcoSmart energy-efficiency technology, which dramatically reduces energy waste, has saved consumers and businesses around the world more than an estimated $1.4 billion on their electricity bills since its introduction in 1998. For more information, visit the company's website at www.powerint.com. For information on global energy-efficiency standards and EcoSmart solutions, visit the Power Integrations Green Room at www.powerint.com/greenroom.

## About ENERGY STAR
ENERGY STAR was introduced by the U.S. Environmental Protection Agency in 1992 as a voluntary, market-based partnership to reduce greenhouse-gas emissions through increased energy efficiency.  Today, in partnership with the U.S. Department of Energy, the program offers businesses and consumers solutions to save energy, money and help protect the environment for future generations. More than 8,000 organizations are ENERGY STAR partners, committed to improving the energy efficiency of products, homes and businesses. For more information, visit www.energystar.gov.

 **Power Electronics Industry News**

Volume 140 : September 2006

## Power Integrations To Receive National Energy-Efficiency Award

### Company to Be Honored for Reducing Energy Waste from Electronic Products

Power Integrations, Inc. (San Jose, CA; OTC: POWI), the inventor of EcoSmart® energy-efficiency technology, will receive a 2006 Star of Energy Efficiency award from the national Alliance to Save Energy. The only technology company among this year's three corporate honorees, Power Integrations is being recognized for its efforts to reduce electricity waste by improving the efficiency of electronic products. The award will be presented by Balu Balakrishnan, the company's president and CEO, at the Alliance's annual black-tie awards gala tonight in Washington, D.C. The event is being hosted by 50 U.S. Senators and Members of Congress.

Power Integrations' integrated circuits (ICs) with EcoSmart technology are used in power supplies, the devices that convert high-voltage AC power from a wall outlet into the low-voltage DC power needed by most electronic products. EcoSmart technology intelligently manages the flow of power through the power supply, dramatically reducing the amount of energy consumed during normal operation and reducing standby power by up to 97 percent. Standby power, the electricity wasted while electronic products are idle, is estimated to account for up to 10 percent of residential electricity usage.

Since 1998, Power Integrations has sold more than 1.1 billion chips with EcoSmart technology, saving consumers and businesses an estimated $1.8 billion on their electricity bills and preventing some 12 million tons of $CO_2$ emissions. The company's ICs can be found in a wide range of electronic products including consumer electronics, appliances, cellphone chargers, computer equipment and industrial electronics.

"The Alliance is delighted to honor Power Integrations with a 2006 Star of Energy Efficiency award," said Alliance President Kateri Callahan. "Power Integrations' EcoSmart technology is generating well over $1 million in energy savings each day without any increase in the cost of consumer products and without any change in consumer behavior. EcoSmart technology is a wonderful example of how innovation can help solve our energy issues."

"This award is a tremendous honor for Power Integrations," said Mr. Balakrishnan. "The market success of our EcoSmart technology has proven that energy efficiency can be simple and cost-effective for manufacturers and consumers. We are extremely proud of the benefits that our technology is bringing to consumers and to the environment, and we are very pleased that the Alliance has selected Power Integrations to receive a Star of Energy Efficiency award."

For further information, visit: www.powerint.com

## Cherokee International Signs New Age / Kruvand Rep Firm

Cherokee International (Tustin, CA; NASDAQ:CHRK), announced a new representative agreement with New Age / Kruvand of Atlanta, Georgia. New Age / Kruvand will be responsible for selling Cherokee International's power supplies and power consulting services in the southeastern territory of the United States.

Micro-Tech Consultants







Powered by Clickability

# Technology Company To Receive Efficiency Award

Sep 20, 2006 1:21 PM

Power Integrations, the inventor of EcoSmart energy-efficiency technology, has received a 2006 Star of Energy Efficiency award from the national Alliance to Save Energy. The only technology company among this year's three corporate honorees, Power Integrations was recognized for its efforts to reduce electricity waste by improving the efficiency of electronic products.

Power Integrations' integrated circuits (ICs) with EcoSmart technology are used in power supplies. EcoSmart technology intelligently manages the flow of power through the power supply, dramatically reducing the amount of energy consumed during normal operation and reducing standby power by up to 97%. Standby power, the electricity wasted while electronic products are idle, is estimated to account for up to 10% of residential electricity usage.

Since 1998, Power Integrations has sold more than 1.1 billion chips with EcoSmart technology, saving consumers and businesses an estimated $1.8 billion on their electricity bills and preventing some 12 million tons of $CO_2$ emissions.

**Find this article at:**
http://www.powerelectronics.com/power_systems/pi-ecosmart-efficiency-award-092006/index.html

☐ Check the box to include the list of links referenced in the article.

© 2007 Penton Media, Inc. All rights reserved.

## Special Recognition—Excellence in Efficiency Programs



### Fort Collins Utilities
*Fort Collins, Colorado*

For implementing a new residential efficient lighting program built on the ENERGY STAR platform, which combined discounted compact fluorescent light bulbs (CFLs) offered through retailers, torchiere turn-in events, and customer education to promote the benefits of energy-efficient lighting. Although a relatively small municipal utility, Fort Collins Utilities was able to coordinate consumer education, sales training, and buy-down agreements with national chain retailers and manufacturers. Local hardware stores also participated in the CFL portion of the program, offering customers an instant coupon to receive discounts. From October through December 2005, the Fort Collins Utilities program facilitated the sale of 78,000 CFLs.

## Special Recognition—Excellence in Product Innovation



### Power Integrations, Inc.
*San Jose, California*

For significantly advancing power supply energy efficiency by developing a cordless phone adapter with 69-percent efficiency; introducing technologies to cost-effectively replace the most inefficient adapters and chargers currently shipped with millions of consumer products that run on 4 watts or less; and taking a leadership role in developing the ENERGY STAR specification for external power supplies.





## Power Integrations Named One of Top 30 Companies in Power Electronics

***Magazine Recognizes Company's Revolutionary Power Conversion Technologies and Contributions to Fighting Energy Waste***

**SAN JOSE, Calif. – December 20, 2005 – Power Integrations (Nasdaq: POWI), the leader in high-voltage analog integrated circuits for power conversion, has been named one of the top 30 companies in the power electronics industry by Power Electronics Technology magazine. The list, presented in the magazine's recent 30 th anniversary edition, recognizes the 30 companies that have had the greatest impact on the power electronics industry over the past 30 years.**

**Power Integrations also appears twice on the magazine's list of 30 key industry milestones from the past 30 years. Included on the list are the 1994 introduction of *TOPSwitch*&amp;reg; the industry's first monolithic IC for switched-mode power supplies, as well as the 1998 launch of *TinySwitch*&amp;reg; the company's revolutionary switcher IC featuring on/off control. *TOPSwitch* remains the all-time top-selling family of high-voltage power-conversion ICs, with nearly 900 million units sold. *TinySwitch* was the first product family to feature Power Integrations' *EcoSmart*&amp;reg; technology, which dramatically reduces standby energy consumption in electronic products. The company has sold more than one billion *EcoSmart* chips, and has now saved consumers more than an estimated $1.3 billion in electricity costs.**

**"For nearly two decades, Power Integrations has worked to bring the benefits of integrated circuits to the power supply market," said Balu Balakrishnan, president and CEO of Power Integrations. "Thanks to our technology, power supplies are becoming smaller, simpler, and more energy-efficient, which benefits consumers, manufacturers and the environment. We are proud of our contribution to power electronics, and we are honored that PET magazine has recognized us as one of the industry's top 30 companies."**

**About Power Integrations**
**Power Integrations, Inc. is the leader in high-voltage analog integrated circuits for power conversion. The company's breakthrough technology enables compact, energy-efficient power supplies in a wide range of AC-DC and DC-DC applications. For more information, visit Power Integrations' website at <u>www.powerint.com</u>. For information on global energy-efficiency standards and *EcoSmart* solutions, visit the PI Green Room at <u>www.powerint.com/greenroom</u>.**



## Power Integrations Named One of World's Top 20 Sustainable Stocks

### *Company Recognized for Energy Savings and Financial Performance*

**SAN JOSE, Calif. – August 9, 2005 – For the second time in three years, Power Integrations (Nasdaq: POWI), the inventor of EcoSmart&amp;reg; energy-efficiency technology, has been named one of the world's top 20 sustainable stocks by SustainableBusiness.com. The annual list, known as the SB20, recognizes companies from around the world that stand out in terms of financial performance as well as their contributions to the sustainability of society. According to the SB20 judges, Power Integrations was recognized for eliminating energy waste without requiring consumers to change their behavior or pay more for energy-efficient products.**

**Power Integrations' integrated circuits with EcoSmart technology reduce energy waste in a wide range of electronic products, including computers, TVs, DVD players, home appliances, AC adapters and many more. The technology intelligently manages the flow of power into a device, reducing the amount of energy consumed in "standby" mode by as much as 97%, and enabling manufacturers to meet all current and proposed energy-efficiency standards for electronic products.**

**"Since 1998, Power Integrations has sold more than 800 million EcoSmart chips, saving consumers and businesses more than an estimated $1 billion on their electricity bills and preventing the release of more than 6 million tons of carbon dioxide emissions," noted Balu Balakrishnan, president and CEO of Power Integrations. "EcoSmart technology makes products energy-efficient without increasing their cost. This is good for consumers, manufacturers, and the environment, and it has proven to be good for our stockholders as well."**

**First named to the SB20 list in 2003, Power Integrations has been recognized repeatedly for its contributions to reducing energy waste from electronic products. Earlier this year the company was named champion of Efficiency Challenge, a power-supply design competition sponsored by the U.S. Environmental Protection Agency and the California Energy Commission. In 2004, analogZONE awarded the company Product of the Year honors for its highly efficient DAK-32 reference design for power supplies used in DVD players and other consumer electronics. In 1999, the company received the Discover Award for Technological Innovation for the environmental benefits of its EcoSmart technology.**

**About Power Integrations**
**Power Integrations, Inc. is the leading supplier of high-voltage analog integrated circuits used in power conversion. The company's breakthrough integrated-circuit technology enables compact, energy-efficient power supplies in a wide range of electronic products, in both AC-DC and DC-DC applications. The company's EcoSmart energy-efficiency technology, which dramatically reduces energy waste, has saved consumers and businesses around the world more than an estimated $1 billion on their electricity bills since its introduction in 1998. For more information, visit the company's Web site at www.powerint.com. For information on global energy-efficiency standards and EcoSmart solutions, visit the Power Integrations Green Room at www.powerint.com/greenroom.**



# Power Integrations Named Winner of Efficiency Challenge 2004

*U.S. EPA and California Energy Commission Present Top Award for Power Supply Utilizing LinkSwitch&amp;reg; Integrated Circuits with EcoSmart&amp;reg; Technology*

**AUSTIN, Texas – March 7, 2005 – Power Integrations, Inc. (Nasdaq: POWI), the leading supplier of high-voltage analog integrated circuits used in power conversion, today was named Grand Champion in its category of Efficiency Challenge 2004, an international design competition for power supply efficiency. The contest, sponsored by the U.S. Environmental Protection Agency and the California Energy Commission, showcases highly efficient power supply technologies for consumer electronics. The award will be presented to Power Integrations president and CEO Balu Balakrishnan today at the plenary session of the Applied Power Electronics Conference (APEC) in Austin.**
**The winning design, an energy-efficient adapter for a cordless telephone, was judged the top entry in the "market ready" category of the competition, in which practical factors such as cost and packaging were considered in addition to energy efficiency. The design utilizes Power Integrations' LinkSwitch family of integrated circuits, which are ideally suited for use in low-power applications such as cordless phones, cell phones, consumer appliances and many industrial applications.**

**The winning design will enable manufacturers to comply with the recently launched ENERGY STAR Ò specification for cordless phones, as well as the mandatory standards recently placed on external adapters by the California Energy Commission. Complete documentation on the winning design, including application notes, engineering reports and data sheets, can be found on the Reference Designs page of the Power Integrations Web site at <u>www.powerint.com/dak.htm</u> (DAK-16A).**

**"I am delighted that the U.S. Environmental Protection Agency and the California Energy Commission have selected Power Integrations as Grand Champion of Efficiency Challenge 2004," said Balu Balakrishnan, president and CEO of Power Integrations. "It is particularly significant that the winning design is for the cordless phone market, where inefficient linear transformers are still the predominant power supply technology. This award validates the fact that a cost-effective, efficient alternative to these 'energy vampires' is available and ready for market."**

**According to Ecos Consulting, portable telephones are one of the biggest opportunities for external power supply savings in the U.S. market.**

**"Average efficiency levels for conventional products in this category usually range between 30 percent and 55 percent," said Chris Calwell, research and policy director for Ecos Consulting and an Efficiency Challenge judge. "For the Power Integrations team to achieve an average efficiency of 69 percent is quite remarkable. If all U.S. phones had a power supply as efficient as this model, the nation could save 1.5 billion kWh per year. This would prevent the release of a million tons of carbon dioxide into the atmosphere, and save consumers one hundred million dollars on their utility bills. We congratulate Power Integrations for its exemplary power supply design."**

**Power Integrations has been recognized repeatedly for its contributions to improving the energy efficiency of electronic products. The company was awarded the 1999 Discover Award for Technological Innovation for the environmental benefits of its energy-saving TinySwitch family of integrated circuits, the first of the company's products to incorporate EcoSmart technology. In 2001, CEO Balu Balakrishnan demonstrated EcoSmart technology for President Bush and Secretary of Energy Spencer Abraham. In 2003, the company was named one of the top 20 sustainable stocks by SustainableBusiness.com for its standout performance in terms of both sustainability and financial strength.**

**About Power Integrations**
**Power Integrations, Inc. is the leading supplier of high-voltage analog integrated circuits used in power conversion. The company's breakthrough integrated-circuit technology enables compact, energy-efficient power supplies in a wide range of electronic products, in both AC-DC and DC-DC applications. The company's EcoSmart&amp;reg; energy-efficiency technology, which dramatically reduces energy waste, has saved consumers and businesses around the world more than an estimated $900 million on their electricity bills since its introduction in 1998. For more information, visit the company's Web site at <u>www.powerint.com</u>. For information on global energy-efficiency standards and EcoSmart solutions, visit the Power Integrations Green Room at <u>www.powerint.com/greenroom</u>.**

**FOR IMMEDIATE RELEASE**

**Press contacts:**

Vicki Fulbright
Ecos Consulting
(970) 259-6801 x304; cell: (970) 385-4297
vfulbright@ecosconsulting.com

Andrew Fanara
U.S. EPA
(202) 343-9019
fanara.Andrew@epa.gov

Percy Della
California Energy Commission
(916) 654-4989
Pdella@energy.state.ca.us

# Efficient Power Supply Design Competition Winners Announced at APEC

*Power supply manufacturers and university teams respond to
Efficiency Challenge 2004 with exemplary designs*

**Applied Power Electronics Conference (APEC) – Austin, Texas – March 7, 2005 –** The U.S. Environmental Protection Agency (EPA) and the California Energy Commission will announce the winners of Efficiency Challenge 2004, an international design competition for power supply efficiency, at APEC's Monday plenary session. Power Integrations will be awarded Grand Champion in the Market Ready Category and the Hong Kong Polytechnic University will be awarded Grand Champion in the Open Category. The winning entries are more energy efficient, and in many cases radically smaller, than typical power supplies on the market today, demonstrating what is possible in future consumer electronics products.

The *Market Ready Category* covers internal and external designs that can cost-effectively save energy in particular types of consumer electronics products. The *Open Category* showcases the most efficient power supply designs from industry and academia without cost or packaging constraints. Entries were received from companies and universities in the United States, Taiwan and Hong Kong. All winners are listed below along with the product types the units are intended to power.

| Category | Award | Organization | Type of Product Powered |
|----------|-------|--------------|-------------------------|
| Market Ready | Grand Champion | Power Integrations | Cordless phone |
| Market Ready | Best in Class A1 | Power Integrations | Cordless phone |
| Market Ready | Best in Class A | AcBel Polytech, Inc. | Desktop computer |
| Market Ready | Best in Class D2 | AcBel Polytech, Inc. | Laptop Computer |
| Open | Grand Champion | The Hong Kong Polytechnic University | Stand alone battery charger |
| Open | Best in Class A2 | The Hong Kong Polytechnic University | Stand alone battery charger |
| Open | Best in Class A1 | The University of Illinois | Cordless vacuum, stand alone AA battery charger |
| Open | Best in Class B2 | The Hong Kong Polytechnic University | Cordless phone |
| Open | Best in Class C2 | Dartmouth College | Office phone, computer peripheral |
| Open | Best in Class D1 | National Taiwan University of Science and Technology | LCD Monitor |
| Open | Best in Class D2 | Texas A&M Lite-On Technology Corporation | Laptop computer, all-in-one small form factor desktop |
| Open | Honorable Mention | BIAS Power Technology, Inc. | Substitute for car-type charger |

Efficiency Challenge Winners Announced at APEC 2005
-2-

When the contest was first announced at APEC 2004, the intent was to showcase highly efficient technologies and foster their success in the marketplace. Since then, the Energy Commission passed mandatory standards in December 2004 and the EPA's ENERGY STAR® program launched a voluntary labeling specification in January 2005 – both for external power supplies. Most of the winning entries not only meet those programs' requirements, but also go well beyond them, cutting energy bills for the devices they power. More than 3.1 billion power supplies are currently in use in the United States, consuming about 3 percent to 4 percent of the nation's electricity bill. More efficient designs could cut total U.S. electricity use by 1 percent to 2 percent, saving $2.5 billion to $5 billion per year, according to research by Ecos Consulting.

"The vision for Efficiency Challenge was to achieve dramatic improvements in the energy efficiency of the most widely purchased types of power supplies," said Art Rosenfeld, California Energy Commissioner and presiding member of its research and development committee. "We congratulate the winners in the Market Ready Category for leading their industry, and applaud the winners in the Open Category for demonstrating what is possible in the future."

"EPA invested in Efficiency Challenge to encourage power supply innovations that will lead to more energy-efficient ENERGY STAR consumer and office electronic products," said Andrew Fanara of the EPA's ENERGY STAR program, who unveiled the ENERGY STAR specification for energy-efficient external power supplies on Jan. 6. "These more energy-efficient designs will save energy and money while also helping to combat the risk of global warming."

Efficiency Challenge 2004 also marked an unusual collaboration between industry and government. The Power Sources Manufacturers Association (PSMA) endorsed the contest, and several companies from the industry provided key support:

- ON Semiconductor (Nasdaq: ONNN) provided technical assistance and sample parts to university teams submitting entries, as well as financial awards totaling $8,500 for winning submissions (see www.onsemi.com).

- Yokogawa served as the official metering sponsor, providing its WT1600 six-channel digital power meter for testing entries.

- Intel, Sony and Pace Micro served as Industry Champions for the competition, providing suggested form factors, loading guidelines and other market-relevant design constraints for several internal power supply categories.

Efficiency Challenge Winners Announced at APEC 2005
-3-

Power supplies are devices that convert incoming AC (alternating current) power from wall outlets into low voltage DC (direct current) power needed for numerous consumer and office electronic products, such as cellular and cordless phones, computers, televisions, etc. The EPA's ENERGY STAR program and the Energy Commission's Public Interest Energy Research (PIER) program have identified AC-DC power supplies as a major opportunity for reducing global energy consumption and greenhouse gas emissions.

Highly efficient power supplies offer powerful advantages to consumers. They tend to be much smaller and lighter than typical power supplies, increasing portability and convenience. They produce very little waste heat as well, so rarely require noisy cooling fans. EPA estimates that efficient external power supplies alone could save the United States 5 billion kWh per year, equivalent to preventing the emissions of 700,000 cars.

Visit http://www.efficientpowersupplies.org/competition.html for more information on power supply efficiency or to download the complete Efficiency Challenge 2004 press kit. Visit www.energystar.gov/powersupplies for more information about the ENERGY STAR external power supply specification, and http://www.energy.ca.gov/releases/2004_releases/2004-12-15_appliances.html to learn more about the California Energy Commission's external power supply standard.

# # #



**Power Integrations to Participate in Seventh Annual Congressional Renewable Energy and Energy Efficiency Caucus**

**EcoSmart® Technology Now Estimated to Be Reducing Electricity Bills by More Than $1 Million Per Day**

SAN JOSE, Calif. - September 1, 2004 - Power Integrations, Inc. (NASDAQ: POWI), the leading supplier of high-voltage analog integrated circuits used in power conversion and the inventor of EcoSmart® energy-efficiency technology, announced today that it has been selected to participate in the Seventh Annual Congressional Renewable Energy and Energy Efficiency Caucus (EXPO). The event is to be held on Tuesday, September 7, 2004 at the Cannon House Office Building in Washington, D.C. Power Integrations will exhibit its EcoSmart semiconductor technology, which dramatically reduces the amount of electricity consumed by many common household and industrial products.

Many electronic products continue to consume electricity even when turned "off." This so-called "standby" energy waste is due to inefficiency in the power supplies that convert electricity from a wall outlet to the type of power needed by the device. Standby energy waste occurs in such common products as DVD players, TV set-top boxes, cordless phones, home appliances, and battery chargers for portable electronic devices such as cell phones. Lawrence Berkeley National Laboratory estimates that more than 10 percent of residential electricity use is wasted on standby power.

EcoSmart technology virtually eliminates standby power waste by dramatically reducing the flow of electricity into a device when it enters standby mode (such as when a television set is turned off by remote control). Since the introduction of EcoSmart in 1998, manufacturers have built more than a billion electronic devices using power supplies with EcoSmart integrated circuits. As a result, consumers and businesses worldwide are saving at an estimated rate of more than $1 million per day in electricity costs, and carbon dioxide emissions are being reduced by millions of tons per year.

"As the number of power-hungry electronic products continues to grow, it is becoming increasingly important to reduce the amount of energy wasted by outdated, inefficient power supplies," said Balu Balakrishnan, president and CEO of Power Integrations. "Our EcoSmart technology is a simple, cost-effective way for manufacturers to offer advanced, feature-rich electronics while saving consumers and nations the high cost of wasted energy."

Power Integrations was awarded the 1999 Discover Award for Technological Innovation for the environmental benefits of its energy-saving TinySwitch family of integrated circuits, the first of the company's products to incorporate EcoSmart technology.

In June 2001, Balakrishnan demonstrated EcoSmart technology at the White House for President Bush and Secretary of Energy Spencer Abraham. The following month, President Bush issued an executive order requiring all federal government purchases of electronic devices to comply with a one-watt standby requirement. Power Integrations' integrated circuits with EcoSmart allow manufacturers to build products that cost-effectively meet this one-watt requirement and comply with all other current and proposed standards aimed at reducing energy waste.

**Details on the EXPO**

The Seventh Annual Congressional Renewable Energy and Energy Efficiency Caucus will bring together more than 50 companies from across the United States representing more than two-dozen renewable-energy and energy-efficiency technologies. Power Integrations is the only semiconductor company scheduled to participate. The EXPO is co-sponsored by the members of the Sustainable Energy Coalition and the House and Senate Renewable Energy and Energy Efficiency Caucuses. The event was previously scheduled to take place in June, but was postponed due to the death of President Reagan.

The EXPO will be held from 11:00 a.m. to 6:30 p.m. on Tuesday, September 7, 2004 in the Caucus Room - Room 345 of the Cannon House Office Building, U.S. House of Representatives, 1st Street & Independence Avenue, S.E.; Washington, D.C. The EXPO is free-of-charge and open to the public; no reservations or RSVPs are required. For further information on the EXPO, interested parties may contact Ken Bossong, coordinator, Sustainable Energy Coalition, at 202-293-2898, ext.201 or kbossong@hotmail.com.

**About Power Integrations**

Power Integrations, Inc. is the leading supplier of high-voltage analog integrated circuits used in power conversion. The company's breakthrough integrated-circuit technology enables compact, energy-efficient power supplies in a wide range of

electronic products, in both AC-DC and DC-DC applications. The company's EcoSmart® energy-efficiency technology, which dramatically reduces energy waste, has saved consumers and businesses around the world more than an estimated $660 million on their electricity bills since its introduction in 1998. For more information, visit the company's Web site at www.powerint.com. For information on global energy-efficiency standards and EcoSmart solutions, visit the Power Integrations Green Room at www.powerint.com/greenroom.

company snapshot   print   e-mail   link          RSS   Technorati   Blog Search   bookmark it   blog it

**Power Integrations to Participate in Seventh Annual Congressional Renewable Energy and Energy Efficiency Caucus**

EcoSmart(R) Technology Now Estimated to Be Reducing Electricity Bills
by More Than $1 Million Per Day

SAN JOSE, Calif., Sept. 1 /PRNewswire-FirstCall/ -- Power Integrations, Inc. (Nasdaq: POWI), the leading supplier of high-voltage analog integrated circuits used in power conversion and the inventor of EcoSmart(R) energy-efficiency technology, announced today that it has been selected to participate in the Seventh Annual Congressional Renewable Energy and Energy Efficiency Caucus (EXPO).  The event is to be held on Tuesday, September 7, 2004 at the Cannon House Office Building in Washington, D.C.  Power Integrations will exhibit its EcoSmart semiconductor technology, which dramatically reduces the amount of electricity consumed by many common household and industrial products.

Many electronic products continue to consume electricity even when turned "off."  This so-called "standby" energy waste is due to inefficiency in the power supplies that convert electricity from a wall outlet to the type of power needed by the device.  Standby energy waste occurs in such common products as DVD players, TV set-top boxes, cordless phones, home appliances, and battery chargers for portable electronic devices such as cell phones.  Lawrence Berkeley National Laboratory estimates that more than 10 percent of residential electricity use is wasted on standby power.

EcoSmart technology virtually eliminates standby power waste by dramatically reducing the flow of electricity into a device when it enters standby mode (such as when a television set is turned off by remote control).  Since the introduction of EcoSmart in 1998, manufacturers have built more than a billion electronic devices using power supplies with EcoSmart integrated circuits.  As a result, consumers and businesses worldwide are saving at an estimated rate of more than $1 million per day in electricity costs, and carbon dioxide emissions are being reduced by millions of tons per year.

"As the number of power-hungry electronic products continues to grow, it is becoming increasingly important to reduce the amount of energy wasted by outdated, inefficient power supplies," said Balu Balakrishnan, president and CEO of Power Integrations. "Our EcoSmart technology is a simple, cost-effective way for manufacturers to offer advanced, feature-rich electronics while saving consumers and nations the high cost of wasted energy."

Power Integrations was awarded the 1999 Discover Award for Technological Innovation for the environmental benefits of its energy-saving TinySwitch family of integrated circuits, the first of the company's products to incorporate EcoSmart technology.

In June 2001, Balakrishnan demonstrated EcoSmart technology at the White House for President Bush and Secretary of Energy Spencer Abraham.  The following month, President Bush issued an executive order requiring all federal government purchases of electronic devices to comply with a one-watt standby requirement.  Power Integrations' integrated circuits with EcoSmart allow manufacturers to build products that cost-effectively meet this one-watt

requirement and comply with all other current and proposed standards aimed at
reducing energy waste.

    Details on the EXPO
    The Seventh Annual Congressional Renewable Energy and Energy Efficiency
Caucus will bring together more than 50 companies from across the United
States representing more than two-dozen renewable-energy and energy-efficiency
technologies. Power Integrations is the only semiconductor company scheduled
to participate.  The EXPO is co-sponsored by the members of the Sustainable
Energy Coalition and the House and Senate Renewable Energy and Energy
Efficiency Caucuses.  The event was previously scheduled to take place in
June, but was postponed due to the death of President Reagan.
    The EXPO will be held from 11:00 a.m. to 6:30 p.m. on Tuesday, September
7, 2004 in the Caucus Room -- Room 345 of the Cannon House Office Building,
U.S. House of Representatives, 1st Street & Independence Avenue, S.E.;
Washington, D.C.  The EXPO is free-of-charge and open to the public; no
reservations or RSVPs are required. For further information on the EXPO,
interested parties may contact Ken Bossong, coordinator, Sustainable Energy
Coalition, at 202-293-2898, ext. 201 or **kbossong@hotmail.com**.

    About Power Integrations
    Power Integrations, Inc. is the leading supplier of high-voltage analog
integrated circuits used in power conversion.  The company's breakthrough
integrated-circuit technology enables compact, energy-efficient power supplies
in a wide range of electronic products, in both AC-DC and DC-DC applications.
The company's EcoSmart(R) energy-efficiency technology, which dramatically
reduces energy waste, has saved consumers and businesses around the world more
than an estimated $660 million on their electricity bills since its
introduction in 1998.  For more information, visit the company's Web site at
**http://www.powerint.com**.  For information on global energy-efficiency standards and
EcoSmart solutions, visit the Power Integrations Green Room at
**http://www.powerint.com/greenroom**.


SOURCE Power Integrations, Inc.

 **back to top**

**Related links:**
* **http://www.powerint.com**



**Issuers of news releases and not PR Newswire are solely responsible for the accuracy of the content.**
**Terms and conditions, including restrictions on redistribution, apply.**
Copyright © 1996- 2007 PR Newswire Association LLC. All Rights Reserved.
A **United Business Media** company.



# Power Integrations Awarded 'Product of the Year' in 'Green' Technology

**'Best Power Supply Design' Award from analogZONE Recognizes Tool for Speedy Design of 'Green' Power Supplies**

SAN JOSE, Calif. - March 9, 2004 - Power Integrations (NASDAQ: POWI), a pioneer of semiconductors for energy efficient power conversion and the inventor of EcoSmart® technology, announced today that it was awarded 'Product of the Year' honors by the engineering webzine analogZONE. The award named Power Integrations' Design Accelerator Kit (DAK-32) "Best Power Supply Design" and ranked the power supply as "best of the best" for 2003. The DAK-32 is the company's reference design for multiple output 30 watt power supplies with sub-1W standby power consumption.

"Power Integrations impressed me because they combined practical design with environmental responsibility," said analogZONE's Senior Editor Lee Goldberg. "They've created a highly cost-effective product that enables power supplies to dramatically reduce energy waste and meet sub-1 watt standby power requirements. Power Integrations has offered the components to build innovative "green" power supplies for several years, but their new evaluation kit accelerates the design process by offering a functional prototype to work with at the start of the design and evaluation process."

### Best Power Supply Design

Power Integrations' Design Accelerator Kit (DAK-32) is used by designers of power supplies for applications such as DVD players/recorders and set-top boxes. The DAK-32 features a cost effective, energy efficient power supply reference design that easily meets the low one-watt standby input power consumption level sought by an increasing number of manufacturers and delivers enough peak power to start motors and spin up drives found in DVD players and recorders.

The DAK-32 also enables extremely low no-load power consumption for products that are plugged in but not in operation. The DAK-32 is the latest addition to a growing suite of application-oriented power supply design tools from Power Integrations. It contains a tested 20 W (25 W peak) universal input AC-DC power supply, PI Expert™ design software, TOPSwitch®-GX power conversion IC samples, and extensive design collateral. In standby mode, the multiple output supply draws less than one watt of input power at 230 VAC while supplying 0.5 W to its load.

Power Integrations has created a 'Green Room' on its Web Site where designers can easily obtain reference designs and other design assistance to meet all current and proposed energy regulations globally. Power Integrations' EcoSmart integrated circuits have saved consumers nearly $500 million in energy costs to date. The Green Room can be found at www.powerint.com/greenroom.

Paul McGoldrick, editor-in-chief, and Lee Goldberg, senior editor of analogZONE, selected Product of the Year award winners, with emphasis on performance, anticipated market success, and likely contribution to the field of analog engineering and product design. The analogZONE Product of the Year Award Winners, along with the editors' reviews of the winning products, can be viewed at www.analogzone.com.

### About analogZONE

Found online at www.analogzone.com, analogZONE offers timely content tailored to the needs of design engineers specializing in analog applications. Regular weekly features include product reviews, technical notes, guest articles, and news items. The publication has a reputation for incisive product understanding as well as a broad worldwide readership.

### About Power Integrations

Power Integrations is a leading supplier of high-voltage analog integrated circuits for use in AC to DC and DC to DC power conversion. For more information, contact the company at 5245 Hellyer Avenue, San Jose, California 95138, (408) 414-9665 or visit the company's web site at www.powerint.com. For information on meeting energy regulations, visit Power Integrations' Green Room at www.powerint.com/greenroom.

HOME | BECOME A SPONSOR | OUR PHILOSOPHY | SITE POLICIES | WHO WE
ARE | CREDITS | RSS FEEDS | SITE MAP

# greentech ZONE







SEARCH [                    ] GO

analogZONE

acquisitionZONE

audio/videoZONE

highpowerZONE

lowpowerZONE

rlcZONE

wirelessZONE

binaryZONE

dspZONE

programmablelogicZONE

designDEN

connectorZONE

designDEN

toolsZONE

greenZONE

greenpowerZONE

greentechZONE

networkZONE

connectivityZONE

networkZONE

opinionZONE

endZONE

engeniusBLOG

test&measurementZONE

referenceZONES

careerZONE

eventCALENDAR

productARCHIVE

technoteZONE

## greentechZONE Products for the week of November 24, 2003



**Power Integrations Says....**

**Saving The World, One Watt At A Time - Power Integrations DVD/Set-Top Box Power Supply Reference Design Enables 1-Watt Standby**
*No Heatsink Required in New, Low Cost Power Supply Design Built With Company's New 30 Watt Power Conversion IC*



Power Integrations, whose energy efficient EcoSmart ICs enable consumer electronics manufacturers to meet tightening energy efficiency guidelines for standby and no-load operating conditions, announced today the availability of a new Design Accelerator Kit (DAK-32) for applications such as DVD players/recorders and set-top boxes. The DAK-32 features a cost effective, energy efficient 20 W power supply reference design that easily meets a one-watt standby input power consumption and delivers enough peak power to start motors and spin up drives found in DVD players and recorders.

"This is one more step in Power Integrations' ongoing strategy to use our EcoSmart energy efficient technology and our technical design support capability to enable extremely low no-load and standby power consumption," said Dan Selleck, Vice President of Marketing for Power Integrations. "As a result, manufacturers can meet all current and proposed worldwide energy efficiency guidelines for consumer electronic products."

The DAK-32 is the latest addition to a growing suite of application-oriented power supply design tools from the company. It contains a tested 20 W (25 W peak) universal input AC-DC power supply, PI Expert) design software, TOPSwitch-GX power conversion IC samples, and extensive design collateral. In standby mode, the multiple output supply draws less than one watt of input power at 230 VAC while supplying 0.5 W to its load.

The reference design uses a new member of the company's TOPSwitch-GX IC family, the TOP245P, in a 7 pin DIP package capable of delivering up to 30 W of continuous power without requiring a heatsink. By eliminating the heatsink, power supply designers can benefit from a lower system cost and greater reliability. Other high performance features of the TOP245P include a high-voltage power MOSFET with PWM control, fault protection and other control circuitry integrated onto a single CMOS chip, built-in soft-start, 132 kHz switching frequency (automatically reduced at light load), frequency jittering for low EMI, wide maximum duty cycle, and hysteretic thermal shutdown.

**EN-Genius Says...**

Since current estimates place standby power accounting for as much as 8% of domestic electricity consumption (I actually think it's more because

siteARCHIVES

of all the computers and printers) in the average home, we could make a significant dent in our consumption of fossil fuels used to make electricity if all electronic products adopted this technology. Heck -- we could probably come close to meeting the Kyoto Accords for carbon emission reduction with the adoption of this one technology.

But there is a less altruistic reason to take a close look at what Power Integrations has to offer: Sub-1 W standby power requirements about to be imposed by Japan, and many European countries will make it difficult or impossible to sell products that don't have the required power supplies.

But while using power supplies that offer sub-1 W standby consumption makes sense from an environmental perspective, many companies have been slow to adopt the technology. While some of this is attributable to simple inertia, much of the trouble is that traditional switching supplies have great efficiency at their rated loads, but it's really tough to keep them from hogging 10 W or more for themselves when asked to supply the tiny amounts of standby power required to keep your TV's remote control electronics active or to blink the "12:00" on your DVD player.

Now Power Integrations is out to change this with their new reference design that will let you develop a "green" 1-W standby power supply for your next application. They have offered the components (and reference designs) to build innovative "green" power supplies for several years, but their new evaluation kit accelerates your design process by giving you a "live" prototype to work with from the get-go.

From the looks of the development kit, you won't have to be an analog genius or a switching supply guru to quickly spec out and test a power supply that can cut your BOM and take a bite out of Global warming at the same time. The other nice thing is that their design makes it easy to include advanced features such as soft start (to protect delicate ICs from surges), frequency jittering for low EMI, a wide maximum duty cycle, and hysteretic thermal shutdown. Getting rid of the bulky, expensive heat sink found in many conventional supplies may also help you make your product more competitive.

The bottom line is that for 45 bucks and a day or two of time, you can be well on the way to putting a globally-compliant power supply into your next design. Power Integrations is to be congratulated on producing a product that should put green back into your bottom line as well as the planet.

**Data Sheet**

> **Send this page to a Colleague!**

> **Click here for Product Archives**

> **Return to the greentechZONE**



Lee's **Saltshaker Rating**

**HOME** | **BECOME A SPONSOR** | **OUR PHILOSOPHY** | **SITE POLICIES** | **WHO WE ARE** | **CREDITS** | **RSS FEEDS** | **SITE MAP**

**Copyright © EN-Genius Network Ltd. All Rights Reserved**
Reproduction in whole or in part in any form or medium without express written permission is prohibited.



# Power Integrations Selected as One of The World's Top 20 Sustainable Stocks

## Only Silicon Valley Company to Make List

SAN JOSE, Calif. - August 14, 2003 - Power Integrations, Inc. (NASDAQ:POWI), inventor of EcoSmart® technology for energy efficient integrated circuits used in power conversion, announced today that it has been selected as one of SustainableBusiness.com's Top 20 Sustainable Stocks, also know as the "SB20." To choose the 20 companies that make up the list, SustainableBusiness.com asked five leading investment advisors to recommend companies that stand out as world leaders in terms of both sustainability and financial strength.

"Our goal is to create a list that showcases the top companies leading the way to a sustainable society," said Dr. Rona Fried, chief executive officer of SustainableBusiness.com and editor of The Progressive Investor, where the list was announced. "Power Integrations is on our list because its energy-saving products are essential to a sustainable society. Their products reduce power consumption saving huge amounts of energy, thereby reducing the need to build additional power generating facilities, reducing our dependence on oil and reducing pollution."

It is estimated that consumers spend nearly 10 percent of their electric bill on energy wasted by appliances and electronics that are plugged in, but performing little or no useful function. Power Integrations' energy efficient EcoSmart-based integrated circuits, which are used in power supplies that run these products, intelligently monitor the appliance's need for power and can often cut the waste by more than 90 percent.

"The days of the inefficient 'energy-sucking vampire' power supplies are numbered. We are confident that our energy-friendly chips can help lead to a more sustainable future," said Balu Balakrishnan, president and chief executive officer of Power Integrations. "As more appliance and electronics manufacturers select our EcoSmart-based integrated circuits, consumers will save money and we will all benefit from a cleaner environment.

"Our chips meet all current and proposed energy efficiency requirements for power supplies worldwide. We believe that our ability to help manufacturers cost effectively meet these evolving stringent requirements will be an increasing factor in our financial and market success in the coming years," said Balakrishnan.

The judges used three primary criteria to select this year's winners: companies that demonstrate a clear understanding and commitment to sustainable business practices, have an outstanding record of employee and community relations, and create a product line that is integral to the transition to a sustainable society. The companies that made the SB20 list also had to show exceptional leadership and strong financial performance.

The SB20 judges are advisors of leading firms dedicated to socially responsible investing, including Eric Becker, vice president and portfolio manager, Trillium Asset Management; Terry Foecke, principal, Materials Productivity; Carsten Henningsen, co-founder and principal, Portfolio 21; Patrick McVeigh, vice president, investment research, Lowell, Blake & Associates; and Jack Robinson, managing director, Winslow Management Co.

The Progressive Investor is a monthly financial newsletter published by SustainableBusiness.com. Each issue draws on a group of world-class sustainable investment analysts for their insights and opinions on viable investments in the "green" business sector. For more information on the SB20, visit: http://www.sustainablebusiness.com/progressiveinvestor/index.cfm

### About Power Integrations

Power Integrations, Inc. is a leading supplier of high-voltage analog integrated circuits for use in AC to DC and DC to DC power conversion. For more information, visit the company's web site at: www.powerint.com or contact the company at 5245 Hellyer Ave., San Jose, Calif. 95138; (408) 414-9200.

### Safe Harbor Statement

This press release contains forward-looking statements, which reflect management's current forecast of the company's future business and financial performance. These forward-looking statements are based on current information, which we have assessed, but which by its nature, is subject to rapid and even abrupt changes. Forward-looking statements are denoted by the use of such words and phrases as, "expect", "believe" and similar words and phrases that look toward future events or performance. The company's actual results could differ materially from those projected or implied by our forward-looking statements due to risks and uncertainties associated with the company's business. These risks include, but are not limited to, changes and shifts in customer demand away from products that integrate the company's ICs to products that do not; our

ability to maintain and establish strategic relationships; the effects of competition; the risks inherent in the development and delivery of complex technologies; our ability to attract, retain and motivate qualified personnel; the emergence of new markets for our products and services; our ability to compete in those markets based on timeliness, cost and market demand; and our limited financial resources. In addition, new product introductions are subject to the risks and uncertainties that typically accompany development and delivery of complex technologies to the market place, including product development delays and defects. We more fully discuss these and other risk factors in the company's most recent report on Form 10-K filed with the Securities and Exchange Commission on March 21, 2003. The company is under no obligation (and expressly disclaims any obligation) to update or alter its forward-looking statements, whether as a result of new information, future events or otherwise.

Contact:
Dan Selleck
Vice President of Marketing
Power Integrations, Inc.
(408) 414-9601

Ellen Brook or Jim Fanucchi
Stapleton Communications Inc.
(650) 470-0200
ellen@stapleton.com or
jim@stapleton.com

     

**Power Integrations Receives Product of the Year Award From Electronic Products Magazine**

LinkSwitch(R) Power Conversion IC Honored for Achieving Superior
Price/Performance While Reducing Power Supply Size and Energy Waste

SAN JOSE, Calif., Jan. 22 /PRNewswire-FirstCall/ --
Power Integrations, Inc. (Nasdaq: POWI), announced today that the editors of
Electronic Products magazine have chosen the company's LinkSwitch high-voltage
power conversion integrated circuit as a winner in the magazine's 27th Annual
Product of the Year awards. The selection is based on significant advances in
technology or its application, innovative design, or a substantial achievement
in price/performance.

Introduced in September 2002, LinkSwitch is a revolutionary primary side
control switching power supply IC that cost-effectively replaces inefficient
older technology linear transformer designs in adapters and battery chargers
rated at 3 W and below. The product, which derives its name from the phrase
"Linear Killer Switch," is the industry's first highly integrated high-voltage
power conversion IC designed specifically to displace low power linear
transformers by delivering switcher benefits -- smaller size, lighter weight,
superior performance and energy efficiency -- at equal or lower system cost.

With as few as fourteen components, the LNK501 enables a fault protected,
universal input (85 VAC to 265 VAC), constant voltage, constant current
(CV/CC) output switching power supply that meets worldwide energy efficiency
standards. The LNK501 is available in both through-hole and surface mount DIP
packages.  Complete technical information on the LinkSwitch product family,
including a design accelerator kit (DAK-16) with a fully functional power
supply prototype board, can be found at the company's website at
http://www.powerint.com.

Electronic Products magazine is a Hearst Business Communications, Inc.,
publication that highlights new product technology for electronic design
engineers. Their website is http://www.electronicproducts.com.

Power Integrations, Inc. is a leading supplier of high-voltage analog
integrated circuits for use in power conversion.  For more information,
contact the company at 5245 Hellyer Avenue, San Jose, California 95138, PH:
408-414-9200 or visit the company's website at http://www.powerint.com.

Safe Harbor Statement
This press release contains forward-looking statements which reflect
management's current forecast of certain aspects of the Company's future
business. These forward-looking statements are based on current information
which we have assessed, but which by its nature, is subject to rapid and even
abrupt changes. Forward looking statements are denoted by the use of such
words and phrases as "will," "expects," "believe," and similar words and
phrases that look toward future events or performance. The Company's actual
results could differ materially from those projected or implied by our forward
looking statements due to risks and uncertainties associated with the

Company's business. These include, but are not limited to, changes and shifts
in customer demand away from products which integrate the Company's ICs to
products which do not; the lengthy sales cycle for the Company's products
which often results in the Company incurring substantial expenses before the
Company generates significant revenues, if any, from the sale of a new product
or even before a customer, if any, decides to use the new product in any of
its products; and the associated risk that the customer's product in which the
Company's new product is used will not be commercially successful due to a
variety of factors including cost relative to competitive products at the time
the customer's product enters the market.  Other factors include, but are not
limited to, our ability to maintain and establish strategic relationships; the
risks inherent in the development and delivery of complex technologies; our
ability to attract, retain and motivate qualified personnel; the emergence of
new markets for our products and services, and our ability to compete in those
markets based on timeliness, cost and market demand; and our limited financial
resources. We more fully discuss these and other risk factors in the Company's
most recent reports on Form 10-K and Form 10-Q filed with the Securities and
Exchange Commission.

SOURCE Power Integrations, Inc.

 **back to top**

**Related links:**
- **http://www.powerint.com**

 **Blogs Discussing This News Release**

**Issuers of news releases and not PR Newswire are solely responsible for the accuracy of the content.**
**Terms and conditions, including restrictions on redistribution, apply.**
Copyright © 1996- 2007 PR Newswire Association LLC. All Rights Reserved.
A **United Business Media** company.


**HEARST Electronic PRODUCTS**

# 27th Annual
# Product of the Year Awards

*From the thousands of products introduced in 2002, the editors of **Electronic Products** have chosen the most outstanding. The selections are based on significant advances in technology or its application, a decided innovation in design, or a substantial gain in price-performance. As usual, picking winners was made difficult by the many impressive products announced during the year. Here, then, are the 2002 award winners.*



| | | |
|---|---|---|
| **Perspecta spatial 3-D platform**<br>**Actuality Systems**<br>Burlington, MA | **O-Core toroidal transformer core**<br>**Alpha-Core**<br>Bridgeport, CT | **iMEMS ADXRS150 gyroscope IC**<br>**Analog Devices**<br>Wilmington, MA |
| **MIPO In-Circuit Reconfigurable Oscillator**<br>**Cardinal Components**<br>Wayne, NJ | **MegaBright UV LED**<br>**Cree**<br>Durham, NC | **DPLED1602 OLED display**<br>**Densitron**<br>Santa Fe Springs, CA |
| **B75194 and B75196 Series niobium chip capacitors**<br>**EPCOS**<br>Iselin, NJ | **DirectFET MOSFET**<br>**International Rectifier**<br>El Segundo, CA | **Model 6487 picoammeter/ voltage source**<br>**Keithley Instruments**<br>Cleveland, OH |
| **Wire-Free Electricity Base**<br>**MobileWise**<br>Los Altos, CA | **Nitron HC08 Q-Series Microcontrollers**<br>**Motorola Semiconductor**<br>Austin, TX | **LinkSwitch LNK501 AC/DC Converter IC**<br>**Power Integrations**<br>San Jose, CA |

| | | |
|---|---|---|
| **PointCharger SE4100 GPS receiver IC**<br>**SiGe Semiconductor Ottawa, Ontario, Canada** | **SSR05C60 Series SiC power Schottky diodes**<br>**Solid State Devices La Mirada, CA** | **DiamondShield fiberglassenclosures**<br>**Stahlin Belding, MI** |
| **TSL2550 ambient-light sensor**<br>**Texas Advanced Optoelectronic Solutions Plano, TX** | **910D Series niobium capacitors**<br>**Vishay Intertechnology Malvern, PA** | **WISMO Pac GSM/ GPRS module**<br>**Wavecom San Diego, CA** |

# Ac/dc converter IC delivers switcher benefits at linear cost

Used to power portable and handheld electronics of all types, ac adapters--or "wall warts"--have traditionally been based on inexpensive linear transformer-based power supplies. While switching supplies offer significant size, weight, and efficiency advantages over linears in this application, until now they have not been as cost effective.

The LinkSwitch LNK501 high-voltage ac/dc converter IC (see *Electronic Products,* Nov. 2002, p. 53) is designed specifically to replace low-power transformer "bricks" at 0 to 3-W output. Cheap to produce, the universal input part delivers switcher benefits--smallest size, lightest weight, superior performance--at equal or lower system cost.



*Power Integrations'*
*LinkSwitch LNK501 ac/dc converter IC*

The IC's primary high-side placement halves the number of components (requires only 14

components) in a typical switcher by combining the primary clamp, IC supply, and feedback. The chip includes a 700-V MOSFET, PWM controller, start up, current limiting, and thermal shutdown. (From $0.50 ea/10,000--4 weeks ARO.)

**Power Integrations**
**Sunnyvale, CA**
*Steve Miceli 408-414-8821*
*smiceli@powerint.com*
*http://www.powerint.com*

# Picoammeter/voltage-source combo fills
# cost/performance void

There is an expanding need in the life cycle of modern materials and devices for instruments that provide low dc measurement along with stimulation by a voltage source. For example, creating I/V curves for characterization of semiconductors and LEDs, or verifying insulation resistance in pc-board materials requires dedicated scientific instruments.

Electrometers, tera-ohmmeters, and other highly sensitive dedicated instruments offer solutions, but are complex, expensive, and not suitable for industrial environments or fieldwork. In an environment of very low power, super high speed, and closely packed architectures, the Model 6487 picoammeter-voltage source provides a significant cost/performance improvement over separate dedicated instruments.



*Keithley Instruments' Model 6487, picoammeter-voltage source*

Combining current sensitivity near that of an electrometer with the ease of use and pricing comparable to a high-performance DMM, the meter provides voltages as high as 500 V and can measure currents as low as 20 fA. The 5-1/2-digit instrument's voltage burden of less than 200 µV allows for highly accurate measurements in circuits with low source voltages.



## Power Integrations Selected as Finalist in 1999 Discover Awards for Technological Innovation

### TinySwitch(TM) Chosen for Significant Environmental Benefits

SUNNYVALE, CALIF. - April 29, 1999 -- Power Integrations, Inc. (Nasdaq: POWI - news), a leading provider of high-voltage power conversion integrated circuits (ICs), announces that its energy-efficient TinySwitch IC is a finalist in the 1999 Discover Magazine Awards for Technological Innovation. The Discover awards honor inventors whose creativity improves the quality of everyday life.

TinySwitch is one of 27 technologies the selection panel chose as making a revolutionary impact on society. With TinySwitch, popular electronics such as TVs, VCRs, PCs and cellular phones can utilize a new class of lightweight, compact, energy-efficient power supplies. TinySwitch solves the problem of energy leakage which occurs when equipment is not in use yet still continues to draw power.

"TinySwitch provides a unique solution to a global problem that costs billions of dollars annually in energy waste and air pollution," said Howard Earhart, president and CEO of Power Integrations, Inc. "We are delighted that our VP of Engineering and New Business Development, Balu Balakrishnan, has been recognized for developing a product that not only enables a lower cost, higher performance power supply, but also benefits the environment."

### About Power Integrations, Inc.

Power Integrations, Inc. is a leading supplier of high-voltage analog integrated circuits for use in AC to DC power conversion. For more information, visit the company's web site at www.powerint.com or contact the company at 477 North Mathilda Ave., Sunnyvale, Calif. 94086; (408) 523-9200.

### About Discover

Discover is the country's leading general-interest science magazine. Each month, Discover reaches 7 million new-generation thought leaders who want to understand science's ever-broadening impact on all areas of life. For more information, visit Discover's home page at www.discover.com.

The PI logo and TOPSwitch are registered trademarks of Power Integrations, Inc.

ENVIRONMENT

# Energy Drain Plug



**Balu Balakrishnan hunts vampires—not the type skulking in the woods of Transylvania but the kind hiding in your television. He's after energy vampires in cable TV boxes, VCRs, and the like, which suck billions of watts from** wall outlets even when the appliances are off. A trickle of energy keeps them ready for the moment you hit the remote.

Studies at Lawrence Berkeley Laboratory indicate that 5 billion watts of energy—roughly the amount produced by five power plants—leak from appliances in U.S. homes every year. Cable TV boxes are the worst offenders, guzzling about 21 watts of electricity when on—and almost 20 when turned off. TVs consume about 60 watts when on and 5 to 10 watts when off. No-load devices, like a charger base separated from its cordless phone, also waste energy.

Balakrishnan, vice president of engineering at Power Integrations in Sunnyvale, California, and his colleagues have crafted a high-tech wooden stake, called the TinySwitch, to slay these vampires.

The power-supply chip can cut the electricity used by sleeping appliances up to 90 percent. "It's a little change, but it has a big impact on energy efficiency," Balakrishnan says.

He estimates that TinySwitch could cut an average consumer's electric bill by $45 a year and eliminate 18 tons of carbon dioxide produced by generating plants. The TinySwitch, introduced last September, costs power-supply manufacturers less than a dollar each.

**WINNER**

**WINNER: BALU BALAKRISHNAN OF POWER INTEGRATIONS. HIS TINYSWITCH SHOULD LEAD TO BIG SAVINGS IN WASTED ELECTRICITY—AND MONEY.**

1999 DISCOVER AWARDS

FINALISTS

**Automobile Alchemy**
INNOVATOR: NANCY HO, Purdue University

With the mind of a molecular geneticist and the heart of a moonshiner, Nancy Ho has been running stills in her Purdue lab for 15 years, trying to unlock more ethyl alcohol from cornstalks and wood chips. Finally, she hit on a **genetically engineered yeast** that can cheaply ferment nature's leftovers into ethanol.

Ho's modified yeasts have extra genes that enable them to break down xylose, a common plant sugar. The end product is a promising renewable, clean-burning fuel that could someday replace gasoline.

**Acid vs. Asbestos**
INNOVATORS: DAVID MYERS, W. R. Grace & Company; LEON PETRAKIS, Brookhaven National Laboratory

For years the only ways to eliminate asbestos from homes and buildings have been to rip out the carcinogenic material or seal off areas where it had been installed. Chemists led by David Myers and Leon Petrakis found an easier, safer tactic: an **asbestos eater** that neutralizes the fibers in place.

The team sprayed a creamlike foam rich in phosphoric acid and fluoride ions directly onto asbestos fireproofing. The foam seeped into the chrysotile asbestos, breaking down the mineral fibers into harmless globs of magnesium and silica within a couple of days.

Nora Feller

By permission of Discover Magazine, 114 5th Avenue, New York, NY 10011 For subscription information call 800-829-9132
#220290 Reprinted by Reprint Management Services, (717) 399-1900, http://www.rmsreprints.com

# Exhibit J

*Power Integrations, Inc.   v.*
*Fairchild Semiconductor International, Inc.*

---

*Trial Volume 2*
*October 3, 2006*

---

*Hawkins Reporting Service*
*715 N King Street*
*Suite 3*
*Wilmington, DE  19801*
*(302) 658-6697*

*Original File 100306~1.TXT, 327 Pages*
*Min-U-Script® File ID: 0556485286*

# Word Index included with this Min-U-Script®

Page 601

[1]  Q: What occasion would you get involved in
[2] those?
[3]  A: I have made extensive sales calls all over
[4] the world. I have mileage on my face to show it.
[5] I have a policy with my organization that we
[6] require everybody to elevate an opportunity that
[7] is at least $250,000.
[8]    So if there is an opportunity that
[9] is that or bigger and have a chance to lose that
[10] to a competitor like Fairchild, they are supposed
[11] to elevate it to me to see if we, as a company,
[12] can pool our resources as a company to get the
[13] business.
[14]  Q: Can you give me a high level generally as
[15] to the different products you sell?
[16]  A: It is narrowly focused — focused into
[17] power supplies, most in the AC DC market. We
[18] call it a chip in general, but also known as an
[19] integrated PWA MOSFET integration.
[20]  Q: What sort of Power Integrations MOSFET do
[21] you YOOFRJTS?
[22]  A: I get a kick out of walking into friends
[23] houses and saying I'm in that refrigerator, in
[24] that microwave, in that PC — PC, DVD, settop

Page 602

[1] box, cell phone chargers, LCD monitors, anything
[2] that needs AC/DC. Power conversion or has an
[3] LCD, has a PI chip in it.
[4]  Q: What role does it play in the power
[5] supply?
[6]  A: It is the brain of the power supply
[7] electronics. If it is not present, the device
[8] won't work.
[9]  Q: Do you generally have a Power
[10] Integrations' pricing strategy for selling these
[11] chips?
[12]  A: Yes, we do. As everyone on my team knows,
[13] we sell our value. What is different, how we
[14] sell our product line as opposed to our
[15] competitors, we sell the value as opposed to
[16] design. What I mean by that, you can take the
[17] same chip and in one application call it a cell
[18] phone charger, and get a certain amount of
[19] charger for it, value for it.
[20]    But if you put it in a value, you
[21] can get a different price for it. But we sell it
[22] for the same AI stress that we are proud about,
[23] and we need to sell really — pardon. We call
[24] that SPIV.

Page 603

[1]  Q: That stands for?
[2]  A: Stands for selling PI value. It also has
[3] a different term, SPIF. We do an SPIF analysis.
[4]  Q: Referring to PD-5?
[5]  A: I think you have seen this. This is a
[6] power supply, and this is one that has the same.
[7] And this is different than this.
[8]    That's due to our chip being able to
[9] use our intelligence, our frequency jitter, our
[10] SoftStart, our other key features in our chip to
[11] reduce the overall size and cost of the power
[12] supply.
[13]    So most of the customers we work
[14] with, they see the price of our chip and see This
[15] power supply. The way we sell them on the PI
[16] value, we take these materials and the cost of
[17] every single one and compare that list of
[18] materials in our components.
[19]    So the customer can see really the
[20] value that is our chip is bringing to it. We
[21] like to point out to our customers, aside from
[22] reducing these components, we save a ton of money
[23] in our manufacturing costs, because we have to
[24] put down less components. And at the end of the

Page 604

[1] day, this is what we love and enjoy.
[2]    It is faster, cheaper, greener.
[3] That's the business we live in in the Silicon
[4] Valley.
[5]  Q: Have you ever heard the term customer
[6] program?
[7]  A: Certainly.
[8]  Q: What is a customer program?
[9]  A: When we manage our sales, we try to break
[10] it down by which customers are doing an active
[11] project to design a new power supply.
[12]  Q: Who are the buyers at Power Integrations'
[13] chips?
[14]  A: There are really two major classes of
[15] customers that we sell to. One is an OEM, which
[16] are common household names you may have heard:
[17] Sony, Samsung, Dell, HP. And we call them OEMS,
[18] original equipment manufacturers.
[19]    The other class of customers are
[20] merchant accounts. And merchant accounts, you
[21] have probably not heard about them. They are the
[22] Dungyang, Dungwong, Deta, Astech, Phitong. They
[23] are all basically Chinese and Taiwanese accounts,
[24] and some American that focus on building power

# Exhibit K

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX2P 9.6 | PAL jaslv0dc | 04-Mar-2007 22:20 EST | 86507 FS 1 | 1* |
| FORM 10-K | | PAL | | | HTM IFV | 1C |

Page 1 of 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

## FORM 10-K

(Mark One)

☒    Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2005

or

☐    Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the transition period from          to

### Commission File Number 0-23441

# POWER INTEGRATIONS, INC.
(Exact name of registrant as specified in its charter)

| DELAWARE | 94-3065014 |
| **(State or other jurisdiction** | (I.R.S. Employer |
| of Incorporation or organization) | Identification No.) |

| 5245 Hellyer Avenue, San Jose, California | 95138-1002 |
| (Address of principal executive offices) | (Zip code) |

(408) 414-9200
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act: none
Securities registered pursuant to Section 12(g) of the Act:
Common Stock, $0.001 par value
(Title of Class)

Case No. 04-1371-JJF

**PX-387**

Date Entered: _____
By: _____

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   YES ☐   NO ☒

Indicate by check mark if the registrant is not required to file reports pursuant to section 13 or Section 15(d) of the Act.   YES ☐   NO ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   YES ☐   NO ☒

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.  ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of accelerated filer and large accelerated filer in Rule 12b-2 of the Exchange Act:

Large accelerated filer ☐          Accelerated filer ☒          Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   YES ☐   NO ☒

The aggregate market value of registrant's voting and non-voting common stock held by nonaffiliates of registrant on June 30, 2006, the last business day of the registrant's most recently completed second fiscal quarter, was approximately $333,759,321, based upon the closing sale price of the common stock as reported on the Nasdaq National Market. Shares of common stock held by each officer, director and holder of 5% or more of the outstanding common stock have been excluded in that such persons may be deemed

1RG5JJ6SG6F2J2B

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 9.8 | PAL jaslv0dc | 04-Mar-2007 22:20 EST | 86507 FS 1 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 2 of 2 | |

to be affiliates. This determination of affiliate status is not a conclusive determination for other purposes.

Outstanding shares of registrant's common stock, $0.001 par value, as of March 1, 2007: 28,657,897.



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CXP 9.6.18 | PAL jaslv0dc | 04-Mar-2007 23:35 EST | 86507 TX 1 | 2* |
| FORM 10-K | | ■ PAL | | | HTM PMT | 1C |

Page 1 of 1

# TABLE OF CONTENTS

## PART I

| | | Page |
|---|---|---|
| ITEM 1. | BUSINESS | 4 |
| ITEM 1A. | RISK FACTORS | 13 |
| ITEM 1B. | UNRESOLVED STAFF COMMENTS | 19 |
| ITEM 2. | PROPERTIES | 20 |
| ITEM 3. | LEGAL PROCEEDINGS | 20 |
| ITEM 4. | SUBMISSION OF MATTERS TO A VOTE OF SECURITY HOLDERS | 22 |

## PART II

| | | |
|---|---|---|
| ITEM 5. | MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES | 23 |
| ITEM 6. | SELECTED FINANCIAL DATA | 24 |
| ITEM 7. | MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION | 26 |
| ITEM 7A. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 56 |
| ITEM 8. | FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA | 57 |
| ITEM 9. | CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE | 57 |
| ITEM 9A. | CONTROLS AND PROCEDURES | 58 |
| ITEM 9B. | OTHER INFORMATION | 63 |

## PART III

| | | |
|---|---|---|
| ITEM 10. | DIRECTORS AND EXECUTIVE OFFICERS OF THE REGISTRANT | 64 |
| ITEM 11. | EXECUTIVE COMPENSATION | 66 |
| ITEM 12. | SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS | 72 |
| ITEM 13. | CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 75 |
| ITEM 14. | PRINCIPAL ACCOUNTANT FEES AND SERVICES | 77 |

## PART IV

| | | |
|---|---|---|
| ITEM 15. | EXHIBITS AND FINANCIAL STATEMENT SCHEDULES | 79 |
| SIGNATURES | | 125 |

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CXO PAL jaslv0dc | 04-Mar-2007 22:24 EST | 86507 TX 2 | 1* |
|---|---|---|---|---|---|
| FORM 10-K | | PAL | | HTM IFV | 1C |

## EXPLANATORY NOTE REGARDING RESTATEMENT OF OUR CONSOLIDATED FINANCIAL STATEMENTS

This Annual Report on Form 10-K contains the restatement of our consolidated statements of income, stockholders' equity and cash flows for the years ended December 31, 2004 and 2003, consolidated balance sheet as of December 31, 2004, and selected consolidated financial data for the years ended December 31, 2004, 2003, 2002 and 2001, and for each of the seven quarters in the period ended September 30, 2005.

Based upon an investigation and determinations made by a Special Committee of our board of directors and management's undertaking of a separate review of historical stock option activity subsequent to the issuance of our Annual Report on Form 10-K for the fiscal year ended December 31, 2004, we identified errors in our company's accounting related to stock option compensation expenses in prior periods. We determined that corrections to the consolidated financial statements were required to reflect additional material charges for stock-based compensation expenses and related income and payroll tax effects.

Our consolidated retained earnings as of September 30, 2005 incorporates an aggregate of approximately $30.5 million in incremental stock-related compensation charges relating to fiscal years 1998 through the third quarter ended September 30, 2005. This charge is net of a $13.5 million tax benefit related to the restatement adjustments. This additional expense results from our determination, based upon the Special Committee's investigation and our management's subsequent reviews and analyses, that for accounting purposes, the dates initially used to measure compensation expense for various stock option grants (options to purchase an aggregate of 7,988,189 shares) to employees, executive officers and non-employee directors during the period could not be relied upon. We determined that the revised measurement dates for accounting purposes differed from the originally recorded measurement dates due primarily to (1) insufficient or incomplete corporate approvals, (2) grants that were determined to have been cancelled and repriced and (3) grants in which vesting was accelerated. These included annual grants to existing employees and officers, option grants to non-employee directors, and option grants made to new hires. Our board of directors has ratified each of the options granted, and we intend to honor each stock option granted pursuant to the terms of the applicable stock option plan and stock option agreement.

In those cases in which we previously used a measurement date that we determined could no longer be relied upon, we have developed and applied a methodology to remeasure those stock option grants and record the relevant charges. For more information on our restatement, including the methodology we adopted, see Item 7, "Management's Discussion of Financial Condition and Results of Operations—Restatement of Consolidated Financial Statements" and note 3 of notes to our consolidated financial statements appearing in Item 8 of this Annual Report on Form 10-K.

In addition to restatements for stock-based compensation, we recorded adjustments to correct other errors that occurred in the periods ended December 31, 2001 through the third quarter of 2005 which have been reflected in the restated consolidated financial statements. These restatements relate primarily to a correction to reduce our sales return reserve, which should have been recorded in 2001. The restatements, including the nature thereof, are further discussed in note 3 of notes to our accompanying consolidated financial statements appearing in Item 8 of this Annual Report on Form 10-K.

All financial information contained in this Annual Report on Form 10-K gives effect to the restatements of our consolidated financial statements as described above. We have not amended, and we do not intend to amend, our previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for each of the fiscal years and fiscal quarters of 1998 through 2004, and for the first nine months of the fiscal year ended December 31, 2005. Financial information included in reports previously filed or furnished by Power Integrations, Inc. for the periods from January 1, 1998 through September 30, 2005 should not be relied upon and are superseded by the information in this Annual Report on Form 10-K.

Management has determined that we have a material weakness in our internal control over financial reporting relating to the implementation and administration of our stock option program, and the accounting for grants thereunder. As described in more detail in Item 9A of this Annual Report, based upon direction of a Special Committee of the board of directors, we have identified and are implementing several measures designed to remedy this material weakness.

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K includes a number of forward-looking statements that involve many risks and uncertainties. In some cases, forward-looking statements are indicated by the use of such words as "would", "could", "will", "may", "expect", "believe", "should", "anticipate", "outlook", "if", "future", "intend", "plan", "estimate", "predict", "potential", "targets", "seek" or "continue" and similar words and phrases, including the negatives of these terms, or other variations of such terms. These statements reflect our current views with respect to future events and our potential financial performance and are subject to risks and uncertainties that could cause our actual results and financial position to differ materially and adversely from what is projected or implied in any forward-looking statements included in this Form 10-K. These factors include, but are not limited to: our ability to maintain and establish strategic relationships; the risks inherent in the development and delivery of complex technologies; our ability to attract, retain and motivate qualified personnel; the emergence of new markets for our products and services, and our ability to compete in those markets based on timeliness, cost and market demand; and our limited financial resources. We make these forward looking statements based upon information available on the date of this Form 10-K, and we have no obligation (and expressly disclaim any such obligation) to update or alter any forward-looking statements, whether as a result of new information or otherwise. In evaluating these statements, you should specifically consider the risks described under Item 1A of Part I—"Risk Factors," Item 7 of Part II—"Management's Discussion and Analysis of Financial Condition and Results of Operation" and elsewhere in this Annual Report on Form 10-K.

3

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX02 8.6 PAL jaslv0dc | 04-Mar-2007 22:26 EST | | 86507 TX 4 | 1* |
| FORM 10-K | START PAGE | ■ PAL | | | HTM IFV | 1C |

# PART I

*TOPSwitch, TinySwitch, LinkSwitch, DPA-Switch, EcoSmart, and PI-Expert are trademarks of Power Integrations, Inc.*

## Item 1. Business

### Overview

We design, develop, manufacture and market proprietary, high-voltage, analog integrated circuits, commonly referred to as ICs. Our ICs are used in electronic power supplies, also known as switched-mode power supplies or switchers. Power supplies convert electricity from a high-voltage source, such as a wall socket, to the type of power needed by a given electronic device (such as a cellphone or a computer). This conversion entails, among other functions, reducing the voltage and, when necessary, converting alternating current to direct current (AC-DC). Switched-mode power supplies perform these functions using an array of electronic components, often including ICs such as ours. The vast majority of our ICs are used in AC-DC switchers, though we are now also targeting certain direct current to direct current (DC-DC) applications. Our focus is on applications that are sensitive to size, portability, energy efficiency and time-to-market, which are the primary benefits that our ICs provide. We generally target power-supply applications in the following markets for our ICs:

* the communications market;

* the consumer market;

* the computer market; and

* the industrial electronics markets.

We believe our patented TOPSwitch ICs, introduced in 1994, were the first highly integrated power conversion ICs to achieve widespread market acceptance. Since the introduction of TOPSwitch, we have introduced a number of other families of ICs that further improve upon the functionality and cost-effectiveness of TOPSwitch, and enable us to address a wider range of AC-DC applications. In June 2002, we further expanded our addressable market with the introduction of DPA-Switch, a highly integrated high-voltage DC-DC power conversion IC designed specifically for use in distributed power architectures. With our current portfolio of products we can address applications requiring up to 290 watts of power, in AC-DC applications, and up to 100 watts of power in DC-DC applications. Since introducing TOPSwitch in 1994, we have shipped approximately 1.7 billion ICs.

We were incorporated in California on March 25, 1988 and reincorporated in Delaware in December 1997. Our principal executive offices are located at 5245 Hellyer Avenue, San Jose, California 95138-1002, and our telephone number is (408) 414-9200. We maintain a website at *www.powerint.com.*

### Industry Background

Virtually every electronic device that plugs into a wall socket requires a power supply to convert the high-voltage alternating current provided by electric utilities into the low-voltage direct current required by most electronic devices. A power supply may be located inside a device, such as a DVD player or desktop computer, or it may be outside the device as in the case of a cellphone charger or an adapter for a cordless phone.

Until approximately 1970, virtually all AC-DC power supplies were in the form of linear transformers. These devices, consisting primarily of copper wire wound around an iron core, tend to be bulky and heavy, and typically waste a substantial amount of electricity. In the 1970s, the invention of high-voltage discrete semiconductors enabled the development of a new generation of power supplies known as switchers, which operate at much higher frequencies, allowing the use of smaller, more efficient transformers. Discrete switchers tend to be smaller, lighter-weight and more efficient than linear transformers, and are generally more cost-effective in higher-power applications (i.e., applications requiring more than about three watts of power).

4

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 §.§ | PAL jaslv0dc | 04-Mar-2007 22:27 EST | 86507 TX 5 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Although discrete switchers offer advantages over linear transformers, over the years they have not kept pace with the technological advances made in the electronic devices they power. Discrete switchers require numerous components and involve a high level of design and manufacturing complexity, which results in time-to-market and development risks for new products. Further, some discrete switchers lack inherent safety and energy-efficiency features; adding these features may further increase the bill of materials and complexity of the power supply.

Early attempts to replace discrete switchers with IC-based switchers did not achieve widespread acceptance in the marketplace because these integrated switchers were not cost-effective. We addressed this opportunity in 1994 with TOPSwitch, the industry's first cost-effective high-voltage power conversion IC.

## Our Highly Integrated Solution

Our patented ICs integrate onto a single chip many of the functions otherwise performed by numerous discrete electronic components. In particular, our ICs combine a high-voltage power transistor, or MOSFET, with low-voltage control circuitry. Because of this integration, our TOPSwitch, TinySwitch, DPA-Switch and LinkSwitch products enable power supplies to have superior features and functionality at a total cost equal to or lower than that of discrete switchers and linear transformers. Our products offer the following key benefits to power supplies:

- *Fewer Components, Reduced Size and Enhanced Functionality*

  Our highly integrated ICs, used in combination with our patented power-supply design techniques, enable the design and production of switchers that use up to 70% fewer components compared to discrete switchers. For example, our ICs provide safety and reliability features such as thermal and short-circuit protection, while discrete switchers must include additional components (and therefore incur additional cost) to provide these functions. Switchers that incorporate our ICs are also smaller, lighter, and more portable than comparable power supplies built with linear transformers, which are still commonly used in many low-power applications.

- *Improved Efficiency*

  Our patented EcoSmart technology, included in all of our ICs introduced since 1998, improves the energy efficiency of electronic devices during both normal operation and standby modes. Compared to discrete switchers and linear transformers, our technology enables manufacturers to cost-effectively meet the growing demand for energy-efficient products, and to comply with increasingly stringent energy-efficiency requirements.

- *Reduced Time-to-Market*

  Our integrated circuits make power supply designs simpler and more suitable for high-volume manufacturing compared to discrete switchers. We also provide automated design tools and reference designs that reduce time-to-market and product development risk.

- *Wide Power Range and Scalability*

  Products in our current IC families can address a power range up to 290 watts in AC-DC applications, and up to 100 watts in DC-DC applications. Within each of our product families, the designer can scale up or down in power to address a wide range of designs with minimal design effort.

## Energy Efficiency

Linear transformers and many discrete switchers draw significantly more electricity than the amount needed by the devices they power. As a result, billions of dollars worth of electricity is wasted each year, and millions of tons of greenhouse gases are unnecessarily produced. Energy waste occurs during both normal operation of a device and in so-called "standby" mode, when the device is performing little or no useful function. For example,

5

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CXP 9.6 PAL jaslv0dc | 04-Mar-2007 22:28 EST | 86507 TX 6 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

computers and printers waste energy while in standby or "sleep" mode. TVs and DVD players that are turned off by remote control consume energy while awaiting a remote control signal to turn them back on. A cell-phone charger left plugged into a wall socket continues to draw electricity even when not connected to the phone. Many typical household appliances, such as microwave ovens, dishwashers and washing machines, consume power when not in use. One study has estimated that standby power alone amounted to as much as ten percent of residential energy consumption in Organization for Economic Co-operation and Development, or OECD, countries.

As the number of electronic products in service grows, governments are taking action to promote cost-effective ways to conserve energy. For example, the Energy Star program and the European Union Code of Conduct encourage manufacturers of electronic devices such as home appliances, DVD players, computers and TVs to comply with energy-efficiency standards. In late 2004, the California Energy Commission introduced mandatory efficiency standards for external power supplies; similar standards have been adopted in several other U.S. states as well as Europe, China and Australia. In 2001, President Bush issued an executive order requiring that electronic products purchased by the Federal government consume less than one watt in standby mode. Numerous other countries around the world have also instituted energy-efficiency standards affecting a wide range of electronic devices.

Our EcoSmart technology, included in all of our ICs introduced since 1998, dramatically improves the efficiency of electronic devices, reducing waste in both operating and standby modes. We believe our EcoSmart technology allows manufacturers to meet all current and proposed worldwide energy-efficiency regulations.

## Products

Below is a brief description of our products:

*    *TOPSwitch*

TOPSwitch, our first commercially successful product, was introduced in 1994. We introduced the TOPSwitch-II family in 1997. The key benefits that the TOPSwitch family has brought to power supplies, compared to discrete switchers, are fewer components, reduced size, enhanced functionality and lower cost in many applications. Our TOPSwitch products integrate a pulse width modulation, or PWM, controller, a high-voltage MOSFET and a number of other electronic components.

In March 2000 we introduced the TOPSwitch-FX family, which consists of six products. In November 2000 we introduced the TOPSwitch-GX family, consisting of 23 products. These product families incorporate the features offered in earlier TOPSwitch products as well as new features through additional user-configurable pins, which allow a higher level of design flexibility. TOPSwitch-GX utilizes our second-generation silicon technology, which enables devices that are more cost-effective than previous generations. Applications for TOPSwitch-FX and TOPSwitch-GX include set-top boxes, DVD players, desktop computers, LCD monitors, and printers. TOPSwitch-GX can be used in applications requiring up to 290 watts of power.

*    *TinySwitch*

We introduced the TinySwitch family in September 1998. We specifically designed TinySwitch topology to address applications below 10 watts. TinySwitch was the first family of ICs to incorporate our EcoSmart technology, which dramatically reduces energy waste in electronic products. EcoSmart technology has been included in all product families that we have introduced since 1998. In March 2001 we introduced the TinySwitch-II family, which consists of six products. This product line maintains the simplicity of the previous TinySwitch line while providing additional features that enable lower system cost. TinySwitch-II utilizes the same second-generation silicon technology found in TOPSwitch-GX. Applications for TinySwitch-II include adapters for portable equipment such as cell phones, PDAs, digital cameras, computer peripherals, and power tools, as well as power supplies found in PCs, audio/video equipment, home appliances and many other applications.

6

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09.9 PAL jaslv0dc | 04-Mar-2007 22:29 EST | 86507 TX 7 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |
| | | | | Page 1 of 1 |

In February 2006 we introduced the third generation of the TinySwitch line, TinySwitch-III. The TinySwitch-III family consists of seven products and addresses power levels up to 28 watts. TinySwitch-III further improves upon the cost-effectiveness of previous generations, and includes new features that further enhance design flexibility and energy efficiency.

In March 2006 we introduced PeakSwitch, an extension of the TinySwitch family targeted at applications requiring a high peak-to-average power ratio, including printers and audio amplifiers. PeakSwitch supplies momentary bursts of peak power by automatically increasing the switching frequency of the IC's integrated MOSFET for several milliseconds before returning to continuous-mode operation. This approach allows the use of transformers, capacitors and other components sized for the power supply's average continuous power rather than its peak power level.

* *LinkSwitch*

We introduced the LinkSwitch family in September 2002. The LinkSwitch family consists of fifteen products, including the LinkSwitch-TN, LinkSwitch-XT and LinkSwitch-LP family extensions. Deriving its name from the phrase "linear-killer switch", LinkSwitch is the industry's first highly integrated high-voltage power conversion IC designed specifically to displace low-power (0 to 4 watts) linear transformers. Applications for LinkSwitch include low-power adapters and chargers for personal electronics such as cellphones, cordless phones, digital cameras, and MP3 players. LinkSwitch is also used in numerous consumer and industrial applications.

* *DPA-Switch*

The DPA-Switch family, introduced in June 2002, consists of seven products. DPA-Switch is the first monolithic high-voltage power-conversion IC designed specifically for use in DC-DC converters and distributed power architectures. It is capable of supplying output power levels of up to 100 watts. DPA-Switch allows designers to eliminate up to 50 external components from the design of a typical discrete DC-DC converter, resulting in a shorter design cycle, smaller board size and higher reliability. Applications include Power-over-Ethernet devices such as voice-over-IP phones and security cameras, as well as network hubs, line cards, servers, digital PBX phones, DC-DC converter modules and industrial controls.

Revenue mix by product family for the years ended December 31, 2005, 2004 and 2003 was approximately as follows:

| | Years Ended December 31, | | |
| Product Family | 2005 | 2004 | 2003 |
| --- | --- | --- | --- |
| TinySwitch-I and -II | 57% | 54% | 51% |
| TopSwitch-FX and -GX | 27% | 28% | 27% |
| TopSwitch-I and -II | 11% | 15% | 20% |
| LinkSwitch and DPA-Switch | 5% | 3% | 2% |

## Markets and Customers

Our strategy is to target markets that can benefit the most from our highly integrated power conversion ICs. The following chart shows the primary applications of our products in power supplies in several major market categories.

| Market Category | Primary Applications |
| --- | --- |
| • *Communications* | Cell-phone chargers, cordless phones, broadband modems, power-over-Ethernet devices including voice-over-IP phones, other network and telecom gear |
| • *Consumer* | Set-top boxes for cable and satellite services, digital cameras, DVD players, LCD TVs, major appliances, personal care and small appliances, audio amplifiers |

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0<br>SS PAL jaslv0dc | 04-Mar-2007 22:30 EST | | 86507 TX 8 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

| Market Category | Primary Applications |
|---|---|
| • *Computer* | Standby power for desktop PCs and servers, LCD monitors, multimedia audio, printers, removable media, LCD projectors, PDAs |
| • *Industrial Electronics* | Industrial controls, utility meters, motor controls, uninterruptible power supplies, emergency lighting, LED lighting |

Revenue by our end market categories for 2005 was approximately 30 percent consumer, 29 percent communications, 23 percent computer, 11 percent industrial electronics and 7 percent other markets.

## Sales, Distribution and Marketing

We sell our products to original equipment manufacturers, or OEMs, and merchant power supply manufacturers through a direct sales staff and through a worldwide network of independent sales representatives and distributors. We have sales offices in California, Georgia and Illinois, as well as in England, France, Germany, Italy, India, China, Japan, Korea, Singapore and Taiwan. Direct sales to OEMs and merchant power supply manufacturers represented approximately 40%, 44% and 39% of our net product revenues for 2005, 2004 and 2003, respectively, while sales through distributors accounted for approximately 60%, 56% and 61% for 2005, 2004 and 2003, respectively. All distributors are entitled to certain return privileges based on sales revenue and are protected from price reductions affecting their inventories. Our distributors are not subject to minimum purchase requirements and sales representatives and distributors can discontinue marketing any of our products at any time.

Our top ten customers, including distributors that resell to OEMs and merchant power supply manufacturers, accounted for 69%, 71% and 76% of our net revenues for 2005, 2004 and 2003, respectively. For 2005, Avnet (formerly Memec Electronic Components) and Synnex Technologies accounted for 19% and 18% of our net revenues, respectively. For 2004, Memec Electronic Components (now Avnet) and Synnex Technologies each accounted for 19% of our net revenues. In 2003, Memec (now Avnet) and Synnex Technologies accounted for 25% and 20% of our net revenues, respectively. In April 2006, we terminated our distributor relationship with Synnex Technologies. We have replaced this terminated relationship with other distribution relationships, and therefore do not believe that the termination of our distributor relationship with Synnex Technologies will have a material impact on our business. No other customers accounted for more than 10% of net revenues during 2005, 2004 and 2003. In 2005, 2004 and 2003, sales to customers in the United States accounted for approximately 6%, 6% and 5%, respectively, of our net revenues. See Note 2 "Summary of Significant Accounting Policies" to our notes to our consolidated financial statements regarding sales to customers located in foreign countries, and for data regarding long-lived assets in the U.S. and in foreign countries.

Because much of our manufacturing, and most of our customers, are located in foreign jurisdictions, we are subject to additional risks. Risks related to our foreign operations are set forth in Item 1A of this Annual Report on Form 10-K, and include: potential weaker intellectual property rights under foreign laws; the burden of complying with foreign laws; and foreign-currency exchange risk.

## Backlog

Our sales are primarily made pursuant to standard purchase orders. The quantity of products purchased by our customers as well as shipment schedules are subject to revisions that reflect changes in both the customers' requirements and in manufacturing availability. The semiconductor industry is characterized by short lead-time orders and quick delivery schedules. In light of industry practice and experience, we do not believe that backlog at any given time is a meaningful indicator of our ability to achieve any particular level of revenue or financial performance.

8

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.6 PAL jaslv0dc | 04-Mar-2007 22:31 EST | 86507 TX 9 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |
| | | | | Page 1 of 1 | |

## Technology

- *High-Voltage Transistor Structure and Process Technology*—We have developed a patented silicon technology that uses a proprietary high-voltage MOS transistor structure and fabrication process. This technology enables us to integrate high-voltage n-channel transistors and industry-standard CMOS and bipolar control circuitry on the same monolithic IC. Both the IC device structure and the wafer fabrication process contribute to the cost-effectiveness of our high-voltage technology. In 2000, we introduced an improved high-voltage technology that further reduces the silicon area of our devices by using dual-conduction layers. In 2004, we made additional improvements to our integrated high-voltage technology to further shrink the silicon area of our ICs. Our high-voltage ICs are implemented on low-cost silicon wafers using standard 5V CMOS silicon processing techniques with a relatively large feature size of between 1.5 and 3 microns.

- *IC Design and System Technology*—Our IC designs combine complex control circuits and high-voltage transistors on the same monolithic IC. Our IC design technology takes advantage of our high-voltage process to minimize the die size of both the high-voltage device and control circuits and improve the performance of our ICs versus competing integrated technologies. We have also developed extensive expertise in the design of switching power supplies, resulting in innovative circuit topologies and design techniques that reduce component count and system cost, increase system performance, and improve energy efficiency compared to alternative approaches.

## Research and Development

Our research and development efforts are focused on improving our high-voltage device structures, wafer fabrication processes, analog circuit designs and system-level architectures. We seek to introduce new products to expand our addressable markets, further reduce the costs of our products, and improve the cost-effectiveness and functionality of our customers' power supplies. We have assembled a team of highly skilled engineers to meet our research and development goals. These engineers have expertise in high-voltage device structure and process technology, analog design, and power-supply systems architecture.

In 2005, 2004 and 2003, we incurred costs of $17.1 million, $15.4 million and $20.1 million, respectively, on research and development efforts, including expenses related to stock-based compensation (for information on our stock-based compensation expense see note 3 of the notes to consolidated financial statements attached hereto). We expect to continue to invest significant funds in research and development activities.

## Intellectual Property and Other Proprietary Rights

We use a combination of patents, trademarks, copyrights, trade secrets and confidentiality procedures to protect our intellectual property rights. As of December 31, 2005, we held 131 U.S. patents and had generally filed for or received foreign patent protection on these patents resulting in 82 foreign patents. The U.S. patents have expiration dates ranging from 2006 to 2024. We also hold trademarks in the U.S. and various other countries including Taiwan, Korea, Hong Kong, China, Europe, and Japan.

We regard as proprietary certain equipment, processes, information and knowledge that we have developed and used in the design and manufacture of our products. Our trade secrets include a high-volume production process that produces our patented high-voltage ICs. We attempt to protect our trade secrets and other proprietary information through non-disclosure agreements, proprietary information agreements with employees and consultants and other security measures.

We granted a perpetual, non-transferable license to Matsushita Electric Industrial Co, Ltd., or Matsushita, to use our semiconductor patents and other intellectual property for our current high-voltage technology under a Technology License Agreement. This license allows Matsushita to manufacture and design products for internal use and for sale or distribution to other Japanese companies and their subsidiaries in Asia. In exchange for its license rights, Matsushita has paid and will continue to pay royalties on products using the licensed technology during fixed periods.

9

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0PAL jaslv0dc | 04-Mar-2007 22:20 EST | 86507 TX 10 | 1* |
|---|---|---|---|---|---|
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

The Technology License Agreement with Matsushita expired in June 2005 and has not been renewed. As a result, Matsushita's right to use our technology does not include technology developed after June 2005. Matsushita may continue to sell products based on technology covered by the license agreement prior to its expiration, and will continue to pay us royalties on the sale of such products through June 2009. Matsushita may sell products based on technology covered by the Technology License Agreement without payment of royalties after June 2009.

**Manufacturing**

We contract with Matsushita, OKI Electric Industry, or OKI, and ZMD Analog Mixed Signal Services GmbH & CoKG, or ZMD, to manufacture our wafers in foundries located in Japan and Germany. Our products are assembled and packaged by independent subcontractors in China, Malaysia and the Philippines. We perform testing at our facility in San Jose, California, and through our packaging subcontractors in Asia. Our fabless manufacturing model enables us to focus on our engineering and design strengths, minimize fixed costs on capital expenditures and still have access to high-volume manufacturing capacity. Our products do not require leading-edge process geometries for them to be cost-effective, and thus we can use our foundries' older, low-cost facilities for wafer manufacturing. However, because of our highly sensitive process, we must interact closely with our foundries to achieve satisfactory yields. Although we generally utilize standard IC packages for assembly, some materials and aspects of assembly are specific to our products. We require our manufacturers to use a high-voltage molding compound that is difficult to process and is available from only one supplier. This compound and its required processes, together with the other non-standard materials and processes needed to assemble our products, require a more exacting level of process control than normally required for standard packages. As a result, we must be involved with our contractors on an active engineering basis to maintain and improve the process.

Our wafer supply agreements with Matsushita, OKI, and ZMD expire in June 2010, April 2008, and December 2009, respectively. Under the terms of our agreement with Matsushita, we establish, by mutual agreement, minimum production capacity to be made available by Matsushita for the production of our wafers, and we supply Matsushita with monthly orders and rolling six-month forecasts on a monthly basis. We also establish pricing by good faith agreement, subject to our right to most-favored pricing. Under the terms of the OKI agreement, OKI has agreed to reserve a specified amount of production capacity and to sell wafers to us at fixed prices, which are subject to periodic review jointly by OKI and us. Our agreements with both Matsushita and OKI provide for the purchase of wafers in Japanese yen. Both agreements allow for mutual sharing of the impact of the exchange rate fluctuation between Japanese yen and the U.S. dollar. Under the terms of the ZMD agreement, ZMD has agreed to reserve a specified amount of production capacity and to sell wafers to us at fixed prices, which are subject to periodic review jointly by ZMD and us. The agreement with ZMD also requires us to supply ZMD with rolling six-month forecasts on a monthly basis. Our purchases of wafers from ZMD are denominated in U.S. dollars.

Although certain aspects of our relationships with Matsushita, OKI, and ZMD are contractual, many important aspects of these relationships depend on their continued cooperation. We cannot assure that we will continue to work successfully with Matsushita, OKI, or ZMD in the future, that they will continue to provide us with sufficient capacity at their foundries to meet our needs, or that any of them will not seek an early termination of their wafer supply agreement with us. Our operating results would suffer in the event of a supply disruption with OKI, Matsushita, or ZMD and if we were unable to quickly qualify alternative manufacturing sources for existing or new products or if these sources were unable to produce wafers with acceptable manufacturing yields.

We typically receive shipments from our foundries approximately five to seven weeks after placing orders, and lead times for new products can be substantially longer. To provide sufficient time for assembly, testing and finishing, we typically need to receive wafers from Matsushita, OKI and ZMD four to six weeks before the desired ship date to our customers. As a result of these factors and the fact that customers' orders can be made

10

| **POWER INTEGRATIONS,** | RR Donnelley ProFile | LANFBU-MWS-CXP 9.8 PAL jaslv0dc | 04-Mar-2007 22:21 EST | | 86507 TX 11 | 1* |
| **FORM 10-K** | | PAL | | | HTM IFV | 1C |

with little advance notice, we have only a limited ability to react to fluctuations in demand for our products. We carry a substantial amount of wafer and finished goods inventory to help offset these factors to better serve our markets and meet customer demand.

## Competition

Competing alternatives to our high-voltage ICs include other integrated and hybrid (i.e., single-package) products from companies such as Fairchild Semiconductor, STMicroelectronics, Infineon, ON Semiconductor and Sanken Electric Company, as well as discrete components such as PWM controllers and high-voltage bipolar transistors and MOSFETs, produced by a large number of vendors. For some applications, line-frequency transformers are also a competing alternative to designs utilizing our ICs.

We have historically observed highly competitive pricing for discrete components and competing integrated/hybrid products. While the pricing of our ICs is an important factor considered by our customers, we also compete against alternative products based on a variety of other factors. Most importantly, the highly integrated nature of our ICs enables power supply designs that utilize fewer total components than comparable discrete designs or designs using other integrated/hybrid products. This reduced component count provides a cost savings on the bill of materials for a power supply, but also enables power supplies to be designed more quickly and manufactured more efficiently than competing designs.

In addition to enabling a lower component count, we also compete on the basis of product functionality such as safety features and energy-efficiency features, and on the basis of the technical support we provide to our customers. Such support includes hands-on design assistance as well as a range of design tools and documentation such as software and reference designs. We also believe that our record of product quality and history of delivering products to our customers on a timely basis serve as additional competitive advantages.

## Warranty

We generally warrant that our products will substantially conform to the published specifications for 12 months from the date of shipment. Under the terms of our purchase orders, our liability is limited generally to either a credit equal to the purchase price or replacement of the defective part.

## Employees

As of December 31, 2005, we employed 342 full time personnel, consisting of 112 in manufacturing, 78 in research and development, 123 in sales, marketing and applications support, and 29 in finance and administration.

## Investor Information

We make available, free of charge, copies of our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act as soon as reasonably practicable after filing such material electronically or otherwise furnishing it to the SEC. You may obtain a free copy of these reports in the "investor info" section of our website, *www.powerint.com*. Our website address is provided solely for informational purposes. We do not intend, by this reference, that our website should be deemed to be part of this Annual Report. The reports filed with the SEC are also available at *www.sec.gov*. Please see "Explanatory Note Regarding Restatement Of Our Consolidated Financial Statements" above regarding our previous reports not being amended for the restatement of our financial statements, and that the financial information included in reports previously filed or furnished by Power Integrations for prior periods should not be relied upon, and are superseded by the information in this Annual Report on Form 10-K.

11

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P 98 | PAL jaslv0dc | 04-Mar-2007 22:22 EST | | 86507 TX 12 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

Our corporate governance guidelines, the charters of our board committees, and our code of business conduct and ethics (including code of ethics provisions that apply to our principal executive officer, principal financial officer, controller and senior financial officers) are available in the corporate governance section of our website at *www.powerint.com*. These items are also available in print to any stockholder who requests them by calling (408) 414-9200.

## Executive Officers of the Registrant

As of January 1, 2007, our executive officers, who are appointed by and serve at the discretion of the board of directors, were as follows:

| Name | Position With Power Integrations | Age |
|------|-------------------------------|-----|
| Balu Balakrishnan | President and Chief Executive Officer | 52 |
| Derek Bell | Vice President, Engineering | 63 |
| Bruce Renouard | Vice President, Worldwide Sales | 46 |
| John Tomlin | Vice President, Operations | 59 |
| Rafael Torres(1) | Vice President, Finance and Administration, Chief Financial Officer and Secretary | 38 |
| Clifford J. Walker | Vice President, Corporate Development | 55 |

(1)  Rafael Torres joined Power Integrations on July 19, 2006

*Balu Balakrishnan* has served as president and chief executive officer and as a director of Power Integrations since January 2002. He served as president and chief operating officer from April 2001 to January 2002. From January 2000 to April 2001, he was vice president of engineering and strategic marketing. From September 1997 to January 2000, he was vice president of engineering and new business development. From September 1994 to September 1997, Mr. Balakrishnan served as vice president of engineering and marketing.

*Derek Bell* has served as our vice president of engineering and technology since April 2001. Previously Mr. Bell was the chief operations officer at Palmchip Corporation, an integration and software service company from August 2000 to January 2001. Mr. Bell was vice president of engineering for the professional services group at Synopsys, Inc. an electronic design automation company, during 1999 and 2000, vice president of strategic alliances at Cirrus Logic, Inc., a semiconductor company, from 1996 to 1999, vice president and general manager of the application specific product group at National Semiconductor Corporation, Inc. a semiconductor company, from 1995 to 1996 and served as president and chief executive officer of NovaSensor, a manufacturer of silicon sensors from 1990 to 1994. He also held various senior management positions at Signetics, a semiconductor company, from 1972 to 1990, most recently as group vice president.

*Bruce Renouard* has served as our vice president, worldwide sales since February 2002. Mr. Renouard joined our company in January 2002 as a member of the sales organization. From August 1999 to August 2001, he served as vice president, worldwide sales of Zoran Corporation, a provider of digital solutions in the multimedia and consumer electronics markets. Mr. Renouard held the position of director, worldwide market development from June 1997 to August 1999 for IDT/Centaur, an X 86 processor company. From January 1995 to June 1997, he served as national distribution sales manager for Cyrix Corp, a company specializing in Intel compatible processors.

*John Tomlin* has served as our vice president, operations since October 2001. From 1981 to 2001, Mr. Tomlin served in a variety of senior management positions in operations, service, logistics and marketing, most recently as vice president of worldwide operations at Quantum Corporation, a computer storage company.

*Rafael Torres* became our vice president, finance and administration, chief financial officer and secretary on July 19, 2006. From November 2000 to July 2006, Mr. Torres served as chief financial officer of PLX Technology, Inc., a leading supplier of PCI Express and other standard input/output interconnect silicon for the

12



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX02 PAL jaslv0dc | 04-Mar-2007 22:23 EST | 86507 TX 13 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |
| | | | | Page 1 of 1 |

communications, server, storage, embedded-control and consumer industries. From May 1999 to November 2000, he held a senior management position at PLX Technology, Inc., a semiconductor device company. Prior to joining PLX, he served in financial management roles at OnCommand Corporation, a provider of on demand video services, and at Silicon Valley Group, a semiconductor equipment company. Mr. Torres is a Certified Public Accountant, and spent three years working in public accounting to obtain his certification.

*Clifford J. Walker* has served as our vice president, corporate development since June 1995. From September 1994 to June 1995, Mr. Walker served as vice president of Reach Software Corporation, a software company. From December 1993 to September 1994, Mr. Walker served as president of Morgan Walker International, a consulting company.

**Item 1A. Risk Factors**

*In addition to the other information in this report, the following factors should be considered carefully in evaluating our business before purchasing shares of our stock.*

*Our quarterly operating results are volatile and difficult to predict. If we fail to meet the expectations of public market analysts or investors, the market price of our common stock may decrease significantly.* Our net revenues and operating results have varied significantly in the past, are difficult to forecast, are subject to numerous factors both within and outside of our control, and may fluctuate significantly in the future. As a result, our quarterly operating results could fall below the expectations of public market analysts or investors. If that occurs, the price of our stock may decline.

Some of the factors that could affect our operating results include the following:

- the volume and timing of orders received from customers;
- competitive pressures on selling prices;
- the demand for our products declining in the major end markets we serve;
- the inability to adequately protect or enforce our intellectual property rights;
- the volume and timing of orders placed by us with our wafer foundries and assembly subcontractors;
- SEC and U.S Department of Justice investigations and stockholder litigation related to our recent internal investigation of our practices related to stock option grants and the related restatement of our consolidated financial statements;
- continued impact of recently enacted changes in securities laws and regulations, including potential risks resulting from our evaluation of internal controls under the Sarbanes-Oxley Act of 2002;
- expenses we are required to incur in connection with our litigation against Fairchild Semiconductor and System General Corporation;
- fluctuations in exchange rates, particularly the exchange rates between the U.S. dollar and the Japanese yen;
- we are being audited by the Internal Revenue Service which is asserting that we owe additional taxes relating to a number of items;
- the licensing of our intellectual property to one of our wafer foundries;
- the lengthy timing of our sales cycle;
- undetected defects and failures in meeting the exact specifications required by our products;
- reliance on international sales activities for a substantial portion of our net revenues;
- our ability to develop and bring to market new products and technologies on a timely basis;

13

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.6 PAL jaslv0dc | 04-Mar-2007 22:23 EST | 86507 TX 14 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 |

- the ability of our products to penetrate additional markets;

- attraction and retention of qualified personnel in a competitive market;

- changes in environmental laws and regulations; and

- earthquakes, terrorists acts or other disasters.

*We do not have long-term contracts with any of our customers and if they fail to place, or if they cancel or reschedule orders for our products, our operating results and our business may suffer.* Our business is characterized by short-term customer orders and shipment schedules. Our customer base is highly concentrated, and a relatively small number of distributors, OEMs and merchant power supply manufacturers account for a significant portion of our revenues. Our top two customers, both distributors of electronic components, accounted for 37% and our top ten customers, including distributors that resell to OEMs and merchant power supply manufacturers, accounted for 69%, of our revenues for 2005. In April 2006, we terminated our distributor relationship with one of our top two distributors. We have replaced this terminated relationship with other distribution relationships, and therefore do not believe that the termination of this distributor relationship will have a material impact on our business. The ordering patterns of some of our existing large customers have been unpredictable in the past and we expect that customer-ordering patterns will continue to be unpredictable in the future. Not only does the volume of units ordered by particular customers vary substantially from period to period, but also purchase orders received from particular customers often vary substantially from early oral estimates provided by those customers for planning purposes. In addition, customer orders can be canceled or rescheduled without significant penalty to the customer. In the past we have experienced customer cancellations of substantial orders for reasons beyond our control, and significant cancellations could occur again at any time.

*Intense competition in the high-voltage power supply industry may lead to a decrease in the average selling price and reduced sales volume of our products.* The high-voltage power supply industry is intensely competitive and characterized by significant price sensitivity. Our products face competition from alternative technologies, such as linear transformers, discrete switcher power supplies, and other integrated and hybrid solutions. If the price of competing solutions decreases significantly, the cost effectiveness of our products will be adversely affected. If power requirements for applications in which our products are currently utilized go outside the cost-effective range of our products, some of these alternative technologies can be used more cost effectively. We cannot assure that our products will continue to compete favorably or that we will be successful in the face of increasing competition from new products and enhancements introduced by existing competitors or new companies entering this market. We believe our failure to compete successfully in the high-voltage power supply business, including our ability to introduce new products with higher average selling prices, would materially harm our operating results.

*If demand for our products declines in our major end markets, our net revenues will decrease.* Applications of our products in the consumer, communications and computer end markets, such as cellphone chargers, standby power supplies for PCs, and power supplies for home appliances account for a significant percentage of our net revenues. We expect that a significant level of our net revenues and operating results will continue to be dependent upon these applications in the near term. The demand for these products has been highly cyclical and has been impacted by economic downturns in the past. Any economic slowdown in the end markets that we serve could cause a slowdown in demand for our ICs. When our customers are not successful in maintaining high levels of demand for their products, their demand for our ICs decreases, which adversely affects our operating results. Any significant downturn in demand in these markets would cause our net revenues to decline and could cause the price of our stock to fall.

*If we are unable to adequately protect or enforce our intellectual property rights, we could lose market share, incur costly litigation expenses, suffer incremental price erosion or lose valuable assets, any of which could harm our operations and negatively impact our profitability.* Our success depends upon our ability to continue our technological innovation and protect our intellectual property, including patents, trade secrets, copyrights, and know-how. We are currently engaged in litigation to enforce our intellectual property rights, and

14

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX9 PAL jaslv0dc | 04-Mar-2007 22:23 EST | 86507 TX 15 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

associated expenses have been, and are expected to remain, material and have adversely affected our operating results. We cannot assure that the steps we have taken to protect our intellectual property will be adequate to prevent misappropriation, or that others will not develop competitive technologies or products. From time to time we have received, and we may receive in the future, communications alleging possible infringement of patents or other intellectual property rights of others. Costly litigation may be necessary to enforce our intellectual property rights or to defend us against claimed infringement. The failure to obtain necessary licenses and other rights, and/or litigation arising out of infringement claims could cause us to lose market share and harm our business.

Additionally, the laws of some foreign countries in which our technology is or may in the future be licensed may not protect our intellectual property rights to the same extent as the laws of the United States, thus limiting the protections applicable to our technology.

*We depend on third-party suppliers to provide us with wafers for our products and if they fail to provide us sufficient wafers, our business may suffer.* We have supply arrangements for the production of wafers with Matsushita, OKI and ZMD. Our contracts with these suppliers expire in June 2010, April 2008, and December 2009 respectively. Although certain aspects of our relationships with Matsushita, OKI and ZMD are contractual, many important aspects of these relationships depend on their continued cooperation. We cannot assure that we will continue to work successfully with Matsushita, OKI or ZMD in the future, and that the wafer foundries' capacity will meet our needs. Additionally one or more of these wafer foundries could seek an early termination of our wafer supply agreements. Any serious disruption in the supply of wafers from OKI, Matsushita or ZMD could harm our business. We estimate that it would take 9 to 18 months from the time we identified an alternate manufacturing source to produce wafers with acceptable manufacturing yields in sufficient quantities to meet our needs.

Although we provide our foundries with rolling forecasts of our production requirements, their ability to provide wafers to us is ultimately limited by the available capacity of the wafer foundry. Any reduction in wafer foundry capacity available to us could require us to pay amounts in excess of contracted or anticipated amounts for wafer deliveries or require us to make other concessions to meet our customers' requirements. Any of these concessions could harm our business.

If our third-party suppliers and independent subcontractors do not produce our wafers and assemble our finished products at acceptable yields, our net revenues may decline. We depend on independent foundries to produce wafers, and independent subcontractors to assemble and test finished products, at acceptable yields and to deliver them to us in a timely manner. The failure of the foundries to supply us wafers at acceptable yields could prevent us from selling our products to our customers and would likely cause a decline in our net revenues. In addition, our IC assembly process requires our manufacturers to use a high-voltage molding compound that is difficult to process and available from only one vendor. This compound and its required processes, together with the other non-standard materials and processes needed to assemble our products, require a more exacting level of process control than normally required for standard packages. Unavailability of the sole source compound or problems with the assembly process can materially adversely affect yields, timely delivery and cost to manufacture. We may not be able to maintain acceptable yields in the future.

In addition, if prices for commodities used in our products increase significantly, raw materials costs of our suppliers would increase and could result in increased product costs our suppliers charge us. If we are not able to pass these costs on to our customers, this would have an adverse effect on our gross margins.

*We are subject to SEC and U.S. Department of Justice investigations and stockholder litigation related to our recent internal investigation of our practices related to stock option grants and the related restatement of our consolidated financial statements.* The SEC and the U.S. Department of Justice, or DOJ, are both conducting investigations related to our recent internal investigation of our practices related to stock option grants. In addition, three alleged shareholders of the Company have also filed derivative complaints in the United States District Court for the Northern District of California, and two alleged shareholders have filed derivative complaints in Superior Court of California, Santa Clara County, all purportedly on behalf of Power Integrations,

15

| **POWER INTEGRATIONS,** | RR Donnelley ProFile | LANFBU-MWS-CX9<br>9.8 | PAL jaslv0dc | 04-Mar-2007 22:23 EST | | 86507 TX 16 | 1* |
| **FORM 10-K** | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

against certain of our current and former executive officers and directors in connection with our option granting practices alleging, among other things, breaches of fiduciary duties and in the federal court cases violations of Section 10(b) of the Securities Exchange Act of 1934. The shareholder derivative suits are discussed in more detail in Item 3 of this Annual Report on Form 10-K. The ongoing legal fees we are incurring in connection with these actions, and any fines that we may be required to pay in the event that the SEC or DOJ determine, as a result of their investigations, to bring any civil or other actions against us, or any attorneys' fees that we may be required to pay as a result of the derivative suits, would have an adverse effect on our operating results. Further, these actions require a significant amount of our senior management's attention, which detracts from their ability to manage our company's business.

*Our stock has been delisted from The NASDAQ Stock Market and there is no guarantee that we will be successful in relisting it.* Our common stock has been suspended from trading on the Nasdaq Global Market for noncompliance with the Nasdaq listing requirements, and currently trades on the Pink Sheets under the symbol "POWI.PK". Until we file all three of our Quarterly Reports on Form 10-Q for fiscal year 2006, and hold our 2005 annual meeting of stockholders, we will not regain compliance with the Nasdaq listing requirements. Even when we do regain compliance with the Nasdaq listing requirements, our common stock will not automatically begin trading on Nasdaq again. In order to have our common stock resume trading on the Nasdaq Global Market, we will need to reapply to Nasdaq to have our stock listed. The application process can be lengthy, and there is no assurance that Nasdaq will relist our common stock.

*Recently enacted changes in securities laws and regulations, including potential risk resulting from our evaluation of internal controls under the Sarbanes-Oxley Act of 2002 will continue to impact our results.* Complying with the requirements of the Sarbanes-Oxley Act of 2002, and Nasdaq's conditions for continued listing have imposed significant legal and financial compliance costs, and are expected to continue to impose significant costs and management burden on us. These new rules and regulations also may make it more expensive for us to obtain director and officer liability insurance, and we may be required to accept reduced coverage or incur substantially higher costs to obtain coverage. These rules and regulations could also make it more difficult for us to attract and retain qualified executive officers and members of our board of directors, particularly qualified members to serve on our audit committee.

Additionally, we cannot be sure that we will be able to successfully remediate the currently reported material weakness in our system of internal controls. Our efforts to comply with Section 404 of the Sarbanes-Oxley Act and the related regulations regarding our required assessment of our internal controls over financial reporting and our external auditors' audit of the assessment of our internal controls continues to require the commitment of significant financial and managerial resources.

Moreover, because these laws, regulations and standards promulgated by the Sarbanes-Oxley Act are subject to varying interpretations, their application in practice may evolve over time as new guidance becomes available. This evolution may result in continuing uncertainty regarding compliance matters and additional costs necessitated by ongoing revisions to our disclosure and governance practices.

*If we do not prevail in our litigation against Fairchild Semiconductor and System General, we will have expended significant financial resources and not achieved any benefit, and may also suffer the loss of proprietary rights.* We are in patent litigation with each of Fairchild Semiconductor and System General Corp. and the outcome of such litigation is uncertain. The next phase of the Fairchild suit will determine whether or not our patents at issue in the suit are valid. In addition, there is no assurance that we will be successful in obtaining financial damages or an injunction against all System General products that infringe our patents. We have incurred, and expect to continue to incur, significant legal costs in conducting these lawsuits. If we are not successful in these lawsuits, we will have incurred significant legal costs with no benefit, which could have a material adverse effect on our business. Further, if we are not successful in the Fairchild lawsuit, our patents at issue in the suit may be determined invalid and we will not receive any damages, including the $34 million the jury awarded us in October 2006, nor will we have the extent of the intellectual property protection we currently believe is provided by these patents. In addition, these lawsuits are diverting the efforts and attention of our

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 §§ PAL jaslv0dc | 04-Mar-2007 22:24 EST | 86507 TX 17 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

management and technical personnel from normal business operations, which could have a material adverse effect on our business regardless of the outcome of these lawsuits.

*We are being audited by the Internal Revenue Service which is asserting that we owe additional taxes relating to a number of items, and if we are not successful in defending our position we may be obligated to pay additional taxes, as well as penalties and interest, and may also have a higher effective income tax rate in the future.* Our operations are subject to income and transaction taxes in the United States and in multiple foreign jurisdictions and to review or audit by IRS and state, local and foreign tax authorities. In connection with an IRS audit of our United States federal income tax returns for fiscal years 2002 and 2003, the IRS is asserting that we owe additional taxes relating to a number of items, the most significant of which is our research and development cost sharing arrangements with one of our subsidiaries. We disagree with the IRS's position; however, if we are not successful in defending our position, we could be required to pay additional taxes, penalties and interest for 2002 and 2003. In addition, if we are not successful in defending our position, we could incur additional charges in the future, which could be material. Resolution of this matter could take considerable time, possibly years.

We believe the IRS' position with respect to certain items for which it has proposed adjustments is inconsistent with applicable tax laws, and that we have meritorious defenses to our position with respect to these proposed adjustments. Accordingly, we intend to continue to challenge the IRS' position on these matters vigorously. While we believe the IRS' asserted position on these matters is not supported by applicable law, we may be required to make additional payments in order to resolve these matters. If the IRS determines that we owe additional taxes for these matters, our results of operations and financial condition would be materially and adversely affected.

*Fluctuations in exchange rates, particularly the exchange rates between the U.S. dollar and the Japanese yen, may impact our gross margin.* The contract prices to purchase wafers from Matsushita and OKI are denominated in Japanese yen. The agreements with both vendors allow for mutual sharing of the impact of the exchange rate fluctuation between Japanese yen and the U.S. dollar. Nevertheless, changes in the exchange rate between the U.S. dollar and the Japanese yen subject our gross profit and operating results to the potential for material fluctuations.

*Matsushita has licenses to our technology, which it may use to our detriment.* Pursuant to a Technology Agreement with Matsushita, which expired in June 2005, Matsushita has the perpetual right to manufacture and sell products that incorporate our technology to Japanese companies worldwide and to subsidiaries of Japanese companies located in Asia. Matsushita does not have rights to utilize technology developed by us after June 2005, when the agreement expired. According to the expired Technology Agreement, we will continue to receive royalties on Matsushita's sales through June 2009 at a reduced rate. Royalty revenue was less than 2% of total net revenues for the years ended December 31, 2005 and 2004. However, these royalties are substantially lower than the gross profit we receive on direct sales, and we cannot assure that Matsushita will not use the technology rights to continue to develop and market competing products.

*Because the sales cycle for our products can be lengthy, we may incur substantial expenses before we generate significant revenues, if any.* Our products are generally incorporated into a customer's products at the design stage. However, customer decisions to use our products, commonly referred to as design wins, can often require us to expend significant research and development and sales and marketing resources without any assurance of success. These significant research and development and sales and marketing resources often precede volume sales, if any, by a year or more. The value of any design win will largely depend upon the commercial success of the customer's product. We cannot assure that we will continue to achieve design wins or that any design win will result in future revenues. If a customer decides at the design stage not to incorporate our products into its product, we may not have another opportunity for a design win with respect to that product for many months or years.

*Our products must meet exacting specifications, and undetected defects and failures may occur which may cause customers to return or stop buying our products.* Our customers generally establish demanding

17

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX01 9.6 | PAL jaslv0dc | 04-Mar-2007 22:24 EST | 86507 TX 18 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

specifications for quality, performance and reliability, and our products must meet these specifications. ICs as complex as those we sell often encounter development delays and may contain undetected defects or failures when first introduced or after commencement of commercial shipments. We have from time to time in the past experienced product quality, performance or reliability problems. If defects and failures occur in our products, we could experience lost revenue, increased costs, including warranty expense and costs associated with customer support and customer expenses, delays in or cancellations or rescheduling of orders or shipments and product returns or discounts, any of which would harm our operating results.

*Our international sales activities account for a substantial portion of our net revenues, which subjects us to substantial risks.* Sales to customers outside of North America account for, and have accounted for a large portion of our net revenues, including approximately 93%, 92% and 93% of our net revenues for the years ended December 31, 2005, 2004 and 2003, respectively. If our international sales declined and we were unable to increase domestic sales, our revenues would decline and our operating results would be harmed. International sales involve a number of risks to us, including:

- potential insolvency of international distributors and representatives;
- reduced protection for intellectual property rights in some countries;
- the impact of recessionary environments in economies outside the United States;
- tariffs and other trade barriers and restrictions;
- the burdens of complying with a variety of foreign and applicable U.S. Federal and state laws; and
- foreign-currency exchange risk.

Our failure to adequately address these risks could reduce our international sales and materially adversely affect our operating results. Furthermore, because substantially all of our foreign sales are denominated in U.S. dollars, increases in the value of the dollar cause the price of our products in foreign markets to rise, making our products more expensive relative to competing products priced in local currencies.

*If our efforts to enhance existing products and introduce new products are not successful, we may not be able to generate demand for our products.* Our success depends in significant part upon our ability to develop new ICs for high-voltage power conversion for existing and new markets, to introduce these products in a timely manner and to have these products selected for design into products of leading manufacturers. New product introduction schedules are subject to the risks and uncertainties that typically accompany development and delivery of complex technologies to the market place, including product development delays and defects. If we fail to develop and sell new products in a timely manner, our net revenues could decline.

In addition, we cannot be sure that we will be able to adjust to changing market demands as quickly and cost-effectively as necessary to compete successfully. Furthermore, we cannot assure that we will be able to introduce new products in a timely and cost-effective manner or in sufficient quantities to meet customer demand or that these products will achieve market acceptance. Our failure, or our customers' failure, to develop and introduce new products successfully and in a timely manner would harm our business. In addition, customers may defer or return orders for existing products in response to the introduction of new products. Although we maintain reserves for potential customer returns, we cannot assure that these reserves will be adequate.

*If our products do not penetrate additional markets, our business will not grow as we expect.* We believe that our future success depends in part upon our ability to penetrate additional markets for our products. We cannot assure that we will be able to overcome the marketing or technological challenges necessary to penetrate additional markets. To the extent that a competitor penetrates additional markets before we do, or takes market share from us in our existing markets, our net revenues and financial condition could be materially adversely affected.

*We must attract and retain qualified personnel to be successful and competition for qualified personnel is intense in our market.* Our success depends to a significant extent upon the continued service of our executive

18

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 | PAL jaslv0dc | 04-Mar-2007 22:24 EST | 86507 TX 19 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | PAL | | | HTM IFV | 1C |

Page 1 of 1

officers and other key management and technical personnel, and on our ability to continue to attract, retain and motivate qualified personnel, such as experienced analog design engineers and systems applications engineers. The competition for these employees is intense, particularly in Silicon Valley. The loss of the services of one or more of our engineers, executive officers or other key personnel could harm our business. In addition, if one or more of these individuals leaves our employ, and we are unable to quickly and efficiently replace those individuals with qualified personnel who can smoothly transition into their new roles, our business may suffer. We do not have long-term employment contracts with, and we do not have in place key person life insurance policies on, any of our employees.

*Changes in environmental laws and regulations may increase our costs related to obsolete products in our existing inventory.* Changing environmental regulations and the timetable to implement them continue to impact our customers' demand for our products. As a result there could be an increase in our inventory obsolescence costs for products manufactured prior to our customers' adoption of new regulations. Currently we have limited visibility into our customers' strategies to implement these changing environmental regulations into their business. The inability to accurately determine our customer's strategies could increase our inventory costs related to obsolescence.

*In the event of an earthquake, terrorist act or other disaster, our operations may be interrupted and our business would be harmed.* Our principal executive offices and operating facilities situated near San Francisco, California, and most of our major suppliers (wafer foundries and assembly houses), are located in areas that have been subject to severe earthquakes. Many of our suppliers are also susceptible to other disasters such as tropical storms, typhoons or tsunamis. In the event of a disaster, we or one or more of our major suppliers may be temporarily unable to continue operations and may suffer significant property damage. Any such interruption in our ability or that of our major suppliers to continue operations at our facilities could delay the development and shipment of our products.

Like other U.S. companies, our business and operating results are subject to uncertainties arising out of economic consequences of current and potential military actions or terrorist activities and associated political instability, and the impact of heightened security concerns on domestic and international travel and commerce. Such uncertainties could also lead to delays or cancellations of customer orders, a general decrease in corporate spending or our inability to effectively market and sell our products. Any of these results could substantially harm our business and results of operations, causing a decrease in our revenues.

*We have adopted anti-takeover measures which may make it more difficult for a third party to acquire us.* Our board of directors may issue up to 2,925,000 shares of preferred stock and determine the price, rights, preferences and privileges of those preferred shares without any further vote or action by the stockholders. The rights of the holders of common stock will be subject to, and may be adversely affected by, the rights of the holders of any preferred stock that may be issued in the future. The issuance of shares of preferred stock, while potentially providing flexibility in connection with possible acquisitions and for other corporate purposes, could make it more difficult for a third party to acquire a majority of our outstanding voting stock. We have no present intention to issue shares of preferred stock.

In addition, we have entered into a rights agreement, commonly referred to as a "Poison Pill," to guard against abusive hostile takeover tactics. Further, the anti-takeover provisions of Section 203 of the Delaware General Corporations Law apply to us. Our rights agreement and Section 203 of the Delaware General Corporations Law may discourage, delay or prevent a change in control of Power Integrations.

**Item 1B. Unresolved Staff Comments.**

Not applicable.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.6 PAL jaslv0dc | 04-Mar-2007 22:24 EST | 86507 TX 20 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

## Item 2. Properties.

In October 2003, we purchased our principal executive, administrative, manufacturing and technical offices for approximately $30.0 million. These offices are located in San Jose, California in a 118,000 square foot facility. In addition to our facility in San Jose, we also lease sales offices in various countries around the world to accommodate our sales force.

## Item 3. Legal Proceedings.

On June 28, 2004, we filed a complaint for patent infringement in the U.S. District Court, Northern District of California, against System General Corporation, a Taiwanese company, and its U.S. subsidiary. Our complaint alleges that certain integrated circuits produced by System General infringed and continue to infringe certain of our patents. We seek, among other things, an order enjoining System General from infringing our patents and an award for damages resulting from the alleged infringement. On June 10, 2005, in response to the initiation of the ITC investigation, the District Court stayed all proceedings. Subsequent to the completion of the ITC proceedings, the District Court lifted the stay and has scheduled a case management conference. No other schedule has been set for the matter. On December 6, 2006, System General filed a notice of appeal of the ITC decision. In response, and by agreement of the parties, the District Court vacated the scheduled case management conference and, instead, renewed the stay of proceedings pending the outcome of the Federal Circuit appeal of the ITC determination.

On May 9, 2005, we filed a complaint with the U.S. International Trade Commission (ITC) under section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. section 1337, naming System General Corporation of Taiwan as the respondent. We filed a supplement to the complaint on May 24, 2005. We allege infringement by System General of the same patents raised in the action in the Northern District of California. The ITC instituted an investigation on June 8, 2005 in response to our complaint. By our complaint, we seek an order from the ITC excluding certain System General's pulse width modulation (PWM) chips and the products containing them, such as LCD monitors, from importation into the United States. We subsequently and voluntarily narrowed the number of patents and claims in suit, which proceeded to a hearing. The ITC hearing took place in January 2006. Post-hearing briefs were submitted and briefing concluded February 24, 2006. The Administrative Law Judge's (ALJ) initial determination was issued on May 15, 2006. The ALJ found all remaining asserted claims valid and infringed, and recommended the exclusion of the infringing products as well as certain downstream products that contain the infringing products. After further briefing, on June 30, 2006 the Commission decided not to review the initial determination on liability. On August 11, 2006 the Commission issued an order excluding from entry into the United States the infringing System General PWM chips, and any LCD computer monitors, AC printer adapters and sample/demonstration circuit boards containing an infringing System General chip. The order also set a bond of 38 cents per chip or downstream product containing such chips for temporary importation during the Presidential review period. The U.S. Customs Service is authorized to enforce the exclusion order and collect the bond during the review period. On October 11, 2006, the review period expired with no action by the President, and the ITC exclusion order is now in full effect. On December 6, 2006, System General filed a notice of appeal of the ITC decision. The appeal will be heard by the U.S. Court of Appeals for the Federal Circuit with briefing to occur in Q1 2007 and an oral argument thereafter.

On October 20, 2004, we filed a complaint for patent infringement in the U.S. District Court for the District of Delaware, against Fairchild Semiconductor International, Inc., a Delaware corporation, and Fairchild Semiconductor Corporation, a Delaware corporation (collectively, Fairchild). The complaint alleges that Fairchild produces certain integrated circuits that infringed and continue to infringe certain of our patents. We seek, among other things, an order enjoining Fairchild from infringing our patents and an award for damages resulting from the alleged infringement. On October 10, 2006, after a week-long trial, a jury returned a verdict in favor of Power Integrations finding all asserted claims of all four patents-in-suit to be willfully infringed by Fairchild and determining damages in the amount of $33,981,781. No benefits have been recorded in our consolidated financial statements as a result of our award for damages. The court has not yet set a schedule for post-trial motions on these issues. Power Integrations intends to request that the court enhance the damage award in view of the jury's

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 | PAL saruc0pa | 06-Mar-2007 16:55 EST | 86507 TX 21 | 6* |
|---|---|---|---|---|---|---|
| FORM 10-K | | PAL | | | HTM PMT | 1C |

Page 1 of 1

finding on willfulness. Fairchild has raised defenses contending that the asserted patents are invalid or unenforceable and the court has set a second trial on these issues that is scheduled to begin on June 4, 2007.

On April 11, 2006, Fairchild Semiconductor Corporation and Intersil Corporation filed a patent infringement lawsuit against us in the U.S. District Court for the Eastern District of Texas. The complaint asserts that we infringed on an old Intersil patent that Fairchild recently secured exclusive rights to assert against us, but Fairchild has not yet identified any of our specific products it believes infringes the patent. Fairchild's lawsuit is duplicative of a portion of our suit against Fairchild in Delaware, and we therefore believe the case should be transferred to Delaware and filed a motion to that effect. The Texas Court granted our motion to transfer the case to Delaware on March 6, 2007, and the case is in the process of being transferred to Delaware. We believe Fairchild's case should be stayed pending the outcome of the trial against Fairchild later this year, and if the suit is stayed there should not be any significant expense until after resolution of our lawsuit against Fairchild. Either way, we do not expect Fairchild's suit to have any impact on our lawsuit against Fairchild in Delaware.

On April 25, 2006, Kimberly Quaco, an alleged shareholder, filed a derivative complaint in the United States District Court for the Northern District of California, purportedly on behalf of us, against certain of our current and former executives and members of our board of directors relating to our historical stock option practices. On August 1, 2006, Kathryn L. Champlin, another alleged shareholder, filed a similar derivative complaint in the United States District Court for the Northern District of California purportedly on behalf of us. On September 21, 2006, Christopher Deboskey, another alleged shareholder, filed a similar derivative suit in the United States District Court for the Northern District of California purportedly on behalf of us. On November 30, 2006, Ms. Champlin voluntarily dismissed her suit. On December 18, 2006, the Court appointed Ms. Quaco's counsel as lead counsel and ordered that another purported shareholder, Mr. Geoffrey Wren, be substituted in as lead plaintiff. On January 17, 2007, the plaintiffs filed their consolidated complaint. The consolidated complaint alleges, among other things, that the defendants breached their fiduciary duties by improperly backdating stock option grants in violation of our shareholder-approved stock option plans, improperly recording and accounting for the backdated options, improperly taking tax deductions based on the backdated options, and disseminating false financial statements that improperly recorded the backdated option grants. The consolidated complaint asserts claims for, among other things, breach of fiduciary duty, unjust enrichment, and violations of Section 10(b) of the Securities Exchange Act of 1934. On February 9, 2007, the Court extended our response date to April 17, 2007.

On May 26, 2006, Stanley Banko, an alleged shareholder, filed a derivative complaint in the Superior Court of California, Santa Clara County, purportedly on behalf of us, against certain of our current and former executives and members of our board of directors relating to our historical stock option practices. On May 30, 2006, Joan Campbell, also an alleged shareholder, filed a derivative suit in the Superior Court of California, Santa Clara County, making the identical allegations asserted in the Banko lawsuit. On June 30, 2006, pursuant to a stipulation by the parties, the Court consolidated the two cases into a single proceeding and required plaintiffs to file an amended, consolidated complaint. Plaintiffs filed their consolidated complaint on August 14, 2006, in which plaintiffs named additional officers and former officers and KPMG LLP, our former auditor, as new defendants. The consolidated complaint alleges, among other things, that the defendants caused or allowed our executives to manipulate their stock option grant dates, that defendants improperly backdated stock option grants, and that costs associated with the stock option grants were not properly recorded in our financial statements. The complaint asserts claims for, among other things, insider trading, breach of fiduciary duty, gross mismanagement and unjust enrichment. On September 15, 2006, the Court stayed this action until January 19, 2007. On January 11, 2007, pursuant to a stipulation by the parties, the Court extended the stay until March 23, 2007.

On May 23, 2006, the U.S. Attorney's Office for the Northern District of California, or DOJ, issued a grand jury subpoena to us directing that we produce documents relating to the granting of stock options from 1995 through the present. On May 31, 2006, the staff of the Securities and Exchange Commission, or SEC, sent a letter to us directing us to take appropriate actions to preserve certain documents relating to our stock option practices. Since that time, the government has made a number of requests for us to voluntarily produce documents relating

21

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.9 | PAL jaslv0dc | 04-Mar-2007 22:24 EST | 86507 TX 22 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 |

to, among other things, our stock option practices. In addition, the government has been conducting voluntary interviews of certain current and former officers and employees. We are cooperating fully with the SEC and the DOJ and intend to continue to do so.

The Internal Revenue Service ("IRS") is conducting an audit of our 2002 and 2003 tax returns. Throughout the course of 2005, the IRS issued a number of Notices of Proposed Adjustment to such returns. Among other things, the IRS has challenged several aspects of our research and development cost-sharing arrangement, which was put into place on November 1, 2003. While we have agreed to some of the adjustments proposed by the IRS, we dispute other such proposed adjustments. Additionally, we have not received all of the adjustments the IRS intends to propose with respect to our research and development cost-sharing arrangement.

There can be no assurance that we will prevail in our litigation with either System General or Fairchild. This litigation, whether or not determined in our favor or settled, will be costly and will divert the efforts and attention of our management and technical personnel from normal business operations, potentially causing a material adverse effect on our business, financial condition and operating results. In addition, we are unable to predict the outcome of the other legal proceedings described above. Adverse determinations in litigation could result in monetary losses, the loss of our proprietary rights, subject us to significant liabilities, require us to seek licenses from third parties or prevent us from licensing our technology, any of which could have a material adverse effect on our business, financial condition and operating results.

**Item 4. Submission of Matters to a Vote of Security Holders.**

None.


| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX06 9.8 | PAL jaslv0dc | 04-Mar-2007 22:24 EST | | 86507 TX 23 | 1* |
| FORM 10-K | START PAGE | | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

## PART II

### Item 5. Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities.

As of the date of the filing of this Annual Report on Form 10-K, our common stock trades on the Pink Sheets under the symbol "POWI.PK." Prior to August 2, 2006, and from October 30, 2006 to December 18, 2006, our common stock traded on the Nasdaq Global Market (formerly the Nasdaq National Market) under the symbol "POWI." The following table shows the high and low closing sale prices per share of our common stock as reported on the Nasdaq National Market for the periods indicated:

| | Price Range | |
| --- | --- | --- |
| Year Ended December 31, 2005 | High | Low |
| Fourth quarter | $24.06 | $19.13 |
| Third quarter | $23.42 | $21.08 |
| Second quarter | $24.64 | $19.67 |
| First quarter | $21.96 | $16.95 |

| | High | Low |
| --- | --- | --- |
| Year Ended December 31, 2004 | | |
| Fourth quarter | $22.40 | $18.31 |
| Third quarter | $24.16 | $17.37 |
| Second quarter | $32.41 | $24.07 |
| First quarter | $34.90 | $27.22 |

On August 2, 2006, our common stock was suspended from trading on The NASDAQ Stock Market for noncompliance with the Nasdaq listing requirements. From that date until October 30, 2006, the date the suspension of the trading of our common stock was lifted, our common stock was traded on the Pink Sheets under the symbol "POWI.PK". On December 19, 2006, our common stock was again suspended from trading on Nasdaq for noncompliance with the Nasdaq listing requirements, and currently is traded on the Pink Sheets under the symbol "POWI.PK". Until we regain compliance with the Nasdaq listing requirements, we will not be able to reapply to have our common stock listed for trading on Nasdaq.

As of January 1, 2007, there were approximately 78 stockholders of record. Because brokers and other institutions on behalf of stockholders hold many of our shares, we are unable to estimate the total number of stockholders represented by these record holders.

We have not paid any cash dividends on our capital stock and do not anticipate paying any cash dividends in the foreseeable future.

On October 20, 2004, we announced that our board of directors had authorized the repurchase of up to $40.0 million of our common stock. From inception of the stock repurchase program in October 2004 through June 30, 2005, we repurchased 2,033,270 shares for approximately $40.0 million. On October 19, 2005, we announced that our board of directors authorized a second stock repurchase program of up to $25.0 million of our common stock. There is no expiration date of this program. From inception of the second stock repurchase plan to December 31, 2005, we purchased a total of 249,500 shares for a total of approximately $5.3 million.

| Period | Total Number of Shares Purchased | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Dollar Value of Shares that May Yet be Repurchased Under the Plans or Programs ($000) |
| --- | --- | --- | --- | --- |
| October 1 to October 31, 2005 | 10,000 | $ 21.026 | 10,000 | $ 24,790 |
| November 1 to November 30, 2005 | 209,500 | $ 21.133 | 209,500 | $ 20,362 |
| December 1 to December 31, 2005 | 30,000 | $ 23.554 | 30,000 | $ 19,656 |
| Total | 249,500 | | 249,500 | |

23

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 g8 | PAL jaslv0dc | 04-Mar-2007 22:24 EST | | 86507 TX 24 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

## Item 6. Selected Financial Data.

The following selected consolidated financial data should be read in conjunction with ''Management's Discussion and Analysis of Financial Condition and Results of Operation'' and the consolidated financial statements and the notes thereto included elsewhere in this Form 10-K to fully understand factors that may affect the comparability of the information presented below. The information presented in the following tables has been adjusted to reflect the restatement of our consolidated financial results which is more fully described in the "Explanatory Note Regarding Restatement of Our Consolidated Financial Statements" immediately preceding Part I of this Form 10-K and in note 3 "Restatement of Consolidated Financial Statements" in the notes to the consolidated financial statements. We derived the selected consolidated financial data as of December 31, 2005 and 2004 and for the years ended December 31, 2005, 2004 and 2003 from our audited consolidated financial statements, and accompanying notes, in this report on Form 10-K. The consolidated statements of income data for the years ended December 31, 2004 and 2003, and the consolidated balance sheet data as of December 31, 2004 have been restated in connection with the restatements discussed in note 3 of the notes to the consolidated financial statements. The consolidated statements of income data for the years ended December 31, 2002 and 2001, and the consolidated balance sheet data as of December 31, 2003, 2002 and 2001 have been restated below as discussed in footnote 2.

We have not amended our previously filed Annual Reports on Form 10-K or Quarterly Reports on Form 10-Q for the periods affected by the restatement. The financial information that has been previously filed or otherwise reported for these periods is superseded by the information in this Annual Report on Form 10-K, and the financial statements and related financial information contained in those previously filed reports should no longer be relied upon.

| | Year Ended December 31, | | | | |
| | 2005 | 2004 As Restated (1) | 2003 As Restated (1) | 2002 As Restated (2) | 2001 As Restated (2) |
|---|---|---|---|---|---|
| | | (in thousands, except per share data) | | | |
| **Consolidated Statements of Income:** | | | | | |
| Net revenues | $143,071 | $136,653 | $125,682 | $107,468 | $ 96,124 |
| Cost of revenues | 72,979 | 71,856 | 63,496 | 60,877 | 52,807 |
| Gross profit | 70,092 | 64,797 | 62,186 | 46,591 | 43,317 |
| Operating expenses: | | | | | |
| Research and development | 17,111 | 15,440 | 20,107 | 16,764 | 17,652 |
| Sales and marketing | 18,314 | 16,070 | 17,166 | 16,849 | 16,328 |
| General and administrative | 15,665 | 7,969 | 10,868 | 10,153 | 8,781 |
| Total operating expenses | 51,090 | 39,479 | 48,141 | 43,766 | 42,761 |
| Income from operations | 19,002 | 25,318 | 14,045 | 2,825 | 556 |
| Total other income | 3,149 | 1,320 | 903 | 1,558 | 1,618 |
| Income before provision for income taxes | 22,151 | 26,638 | 14,948 | 4,383 | 2,174 |
| Provision for income taxes | 6,453 | 6,138 | 3,511 | 274 | 1,835 |
| Net income | $ 15,698 | $ 20,500 | $ 11,437 | $ 4,109 | $ 339 |
| Earnings per share: | | | | | |
| Basic | $ 0.53 | $ 0.67 | $ 0.39 | $ 0.14 | $ 0.01 |
| Diluted | $ 0.51 | $ 0.64 | $ 0.36 | $ 0.14 | $ 0.01 |
| Shares used in per share calculation: | | | | | |
| Basic | 29,568 | 30,802 | 29,473 | 28,362 | 27,714 |
| Diluted | 30,843 | 32,229 | 31,488 | 29,340 | 28,561 |

24

| | 2005 | 2004 As Restated (1) | December 31, 2003 As Restated (2) (in thousands) | 2002 As Restated (2) | 2001 As Restated (2) |
|---|---|---|---|---|---|
| **Consolidated Balance Sheet Data:** | | | | | |
| Cash, cash equivalents and short-term investments. | $126,079 | $108,645 | $ 97,005 | $109,400 | $ 76,865 |
| Working capital | $132,813 | $127,424 | $115,485 | $118,648 | $100,170 |
| Total assets | $236,921 | $241,016 | $217,438 | $169,525 | $140,507 |
| Long-term liabilities and capitalized lease obligations, net of current portion | $   — | $   — | $   — | $   766 | $   716 |
| Stockholders' equity. | $209,359 | $215,756 | $194,554 | $146,311 | $126,436 |

(1)  See the explanatory note on page 1 of this Form 10-K, "Restatement of Consolidated Financial Statements" in Part II, Item 7, and note 3, "Restatement of Consolidated Financial Statements," of the notes to consolidated financial statements.

(2)  The selected consolidated financial data as of December 31, 2003, 2002 and 2001, and for the years ended December 31, 2002 and 2001 have been adjusted to reflect the restatements described in note 3, "Restatement of Consolidated Financial Statements," of the notes to consolidated financial statements. The cumulative after tax impact of all restatement adjustments related to years prior to 2001 totaled $11.0 million, which is reflected as an adjustment to retained earnings at December 31, 2000.

The table below reflects the impact of the restatement adjustments on our 2002 and 2001 consolidated income statement and 2003, 2002 and 2001 balance sheet data.

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2002 | | | 2001 | | |
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| | | | (in thousands, except per share data) | | | |
| **Consolidated Statements of Income:** | | | | | | |
| Net revenues | $ 108,184 | $ (716) | $107,468 | $ 94,095 | $ 2,029 | $ 96,124 |
| Cost of revenues | 60,723 | 154 | 60,877 | 51,252 | 1,555 | 52,807 |
| Gross profit | 47,461 | (870) | 46,591 | 42,843 | 474 | 43,317 |
| Operating expenses: | | | | | | |
| Research and development | 14,705 | 2,059 | 16,764 | 14,471 | 3,181 | 17,652 |
| Sales and marketing | 14,537 | 2,312 | 16,849 | 14,485 | 1,843 | 16,328 |
| General and administrative | 6,203 | 3,950 | 10,153 | 5,980 | 2,801 | 8,781 |
| Total operating expenses | 35,445 | 8,321 | 43,766 | 34,936 | 7,825 | 42,761 |
| Income from operations | 12,016 | (9,191) | 2,825 | 7,907 | (7,351) | 556 |
| Total other income | 1,666 | (108) | 1,558 | 1,749 | (131) | 1,618 |
| Income before provision for income taxes | 13,682 | (9,299) | 4,383 | 9,656 | (7,482) | 2,174 |
| Provision for income taxes | 4,104 | (3,830) | 274 | 2,930 | (1,095) | 1,835 |
| Net income | $ 9,578 | $ (5,469) | $ 4,109 | $ 6,726 | $ (6,387) | $ 339 |
| Earnings per share: | | | | | | |
| Basic | $ 0.34 | $ (0.20) | $ 0.14 | $ 0.24 | $ (0.23) | $ 0.01 |
| Diluted | $ 0.32 | $ (0.18) | $ 0.14 | $ 0.23 | $ (0.22) | $ 0.01 |
| Shares used in per share calculation: | | | | | | |
| Basic | 28,362 | — | 28,362 | 27,714 | — | 27,714 |
| Diluted | 29,503 | (163) | 29,340 | 28,991 | (430) | 28,561 |

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 96 | PAL jaslv0dc | 04-Mar-2007 22:24 EST | | 86507 TX 26 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

| | December 31, | | | | | |
| | 2003 | | | 2002 | | |
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| | | | (in thousands) | | | |
|---|---|---|---|---|---|---|
| **Consolidated Balance Sheet Data:** | | | | | | |
| Cash, cash equivalents and short-term investments. | $ 115,320 | $ (18,315) | $ 97,005 | $ 109,400 | $ — | $109,400 |
| Working capital | $ 135,676 | $ (20,191) | $115,485 | $ 118,697 | $ (49) | $118,648 |
| Total assets | $ 211,162 | $ 6,276 | $217,438 | $ 161,694 | $ 7,831 | $169,525 |
| Long-term liabilities and capitalized lease obligations, net of current portion | $ — | $ — | $ — | $ 766 | $ — | $ 766 |
| Stockholders' equity. | $ 190,718 | $ 3,836 | $194,554 | $ 140,633 | $ 5,678 | $146,311 |

| | December 31, | | |
| | 2001 | | |
| | As Previously Reported | Adjustments | As Restated |
| | | (in thousands) | |
|---|---|---|---|
| **Consolidated Balance Sheet Data:** | | | |
| Cash, cash equivalents and short-term investments. | $ 76,865 | $ — | $ 76,865 |
| Working capital | $ 100,836 | $ (666) | $100,170 |
| Total assets | $ 135,665 | $ 4,842 | $140,507 |
| Long-term liabilities and capitalized lease obligations, net of current portion | $ 716 | $ — | $ 716 |
| Stockholders' equity. | $ 123,302 | $ 3,134 | $126,436 |

See the impact of the restatement adjustments on our 2004 and 2003 consolidated statements of income and our 2004 consolidated balance sheet data in note 3 of the accompanying notes to consolidated financial statements.

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operation.

*The following discussion and analysis of our financial condition and results of our operations, which gives effect to the restatement discussed in note 3 to the consolidated financial statements, should be read in conjunction with the consolidated financial statements and the notes to those statements included elsewhere in this Annual Report on Form 10-K. This discussion contains forward-looking statements that involve risks and uncertainties. Our actual results could differ materially from those contained in these forward-looking statements due to a number of factors, including those discussed in Part I, Item 1A—"Risk Factors" and elsewhere in this report.*

### Restatement of Consolidated Financial Statements

*Background*

We announced on March 13, 2006 that a Special Committee of the board of directors was conducting an internal investigation of our practices related to stock option grants to officers, directors and employees, and related matters. The Special Committee was comprised of disinterested members of our board of directors and was assisted by independent outside legal counsel and accounting experts.

In a Form 8-K filed on May 9, 2006, we disclosed that the Special Committee had reached a preliminary conclusion that the actual dates of measurement for certain past stock option grants differed from the recorded grant dates for such awards, and that, accordingly, we expected to record additional material non-cash charges for stock-based compensation expenses in prior periods. On the same Form 8-K, we announced that we may need to

26

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX01 9.6 PAL jaslv0dc | 04-Mar-2007 22:25 EST | | 86507 TX 27 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | PAL | | | HTM IFV | 1C |

Page 1 of 1

restate our historical financial statements for each of the fiscal years 1999 through 2004, and for the first three quarters of the fiscal year ended December 31, 2005 and that the Audit Committee of the Board of Directors had concluded that the financial statements for these prior periods and any related reports of its independent registered public accounting firm should no longer be relied upon. In early May 2006, we accepted the resignations of Howard Earhart, our Chairman of the Board and former Chief Executive Officer, and of John Cobb, our Chief Financial Officer.

On May 24, 2006, the Special Committee advised our board of directors of its final conclusion that, among other things, the recorded grant dates for certain option grants should not be relied upon. After receiving the Special Committee's conclusions and consistent with those conclusions, we reviewed stock option grants during the period from 1998 through June 2006. The restated consolidated financial statements contained in this Form 10-K reflect corrections resulting from those reviews.

We have incurred substantial expenses related to our special investigation and subsequent internal investigation, which began in early 2006. In addition, we are the subject of several derivative actions filed against certain of our current and former directors and officers as well as investigations launched by the U.S. Attorney's Office for the Northern District of California and the staff of the Securities and Exchange Commission regarding our past stock option granting practices, as more fully described in Item 3, "Legal Proceedings." We have incurred approximately $11.2 million in costs for legal fees, external audit firm fees, audit committee fees, and external consulting fees in the twelve months ended December 31, 2006, and expect to incur significant additional fees related to the special investigation and financial statement restatements until we are current with all delinquent filings.

In addition to restatements for stock-based compensation charges and the related income and payroll tax effects, we recorded adjustments to correct other errors that occurred in the periods ended December 31, 2001 through the third quarter of 2005, which have been reflected in the restated consolidated financial statements.

*Restatement Adjustments*

Our restated consolidated financial statements contained in this Form 10-K incorporate stock-based compensation expense, payroll tax expense and other accounting adjustments, including the income tax impacts related to the restatement adjustments. The restatement adjustments result in a $30.5 million reduction of retained earnings as of September 30, 2005. This amount includes an increase in our previously reported consolidated net income of approximately $0.1 million for the year ended December 31, 2004, and reductions in our consolidated net income of approximately $6.6 million for the year ended December 31, 2003 and $1.1 million for the three quarters ended September 30, 2005. The total restatement impact for the years ended December 31, 1998 through December 31, 2002, of $22.9 million, has been reflected as a prior period adjustment to retained earnings as of January 1, 2003.

The total unamortized stock-based compensation was approximately $0.7 million at December 31, 2005.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX06 | PAL jaslv0dc | 04-Mar-2007 22:25 EST | | 86507 TX 28 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

The table below presents the (increase) decrease to net income impact of the individual restatement adjustments, and are explained in further detail following the table (in thousands):

| | Nine Months Ended September 30, 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|---|---|---|
| **STOCK COMPENSATION:** | | | | | | | | |
| New hire non-officer stock option grants accounted for as being made prior to the terms being fixed | $ 154 | $ 264 | $ 411 | $ 542 | $ 506 | $ 556 | $ 431 | $ — |
| Stock option grants with insufficient or incomplete corporate approvals | 1,704 | 3,053 | 4,992 | 7,978 | 6,429 | 6,127 | 4,175 | 24 |
| Stock option grants cancelled and repriced | 389 | (2,067) | 4,422 | (107) | 1,418 | | | |
| Accelerated vesting and other matters related to stock-based compensation | 27 | 38 | 63 | (49) | (171) | 171 | 1,567 | — |
| Total stock compensation expense | 2,274 | 1,288 | 9,888 | 8,364 | 8,182 | 6,854 | 6,173 | 24 |
| **PAYROLL TAXES, INTEREST AND PENALTIES** | (226) | (1,289) | 254 | 574 | 172 | 1,468 | 68 | — |
| Total stock compensation related adjustments | 2,048 | (1) | 10,142 | 8,938 | 8,354 | 8,322 | 6,241 | 24 |
| **OTHER MISCELLANEOUS ACCOUNTING ADJUSTMENTS:** | | | | | | | | |
| Correction of sales returns reserve | 520 | (14) | 14 | 348 | (872) | — | — | — |
| Correction of period of charge for cost of wafers used in engineering | (108) | 108 | — | — | — | — | — | — |
| Correction of expected life of tooling for depreciation purposes | (64) | — | — | — | — | — | — | — |
| Record unfunded post-employment health benefits obligation | — | 13 | 14 | 12 | — | — | — | — |
| Total Other Miscellaneous Accounting Adjustments | 348 | 107 | 28 | 360 | (872) | — | — | — |
| Total adjustments to income before income tax | 2,396 | 106 | 10,170 | 9,298 | 7,482 | 8,322 | 6,241 | 24 |
| **INCOME TAX BENEFIT** | 1,301 | 239 | 3,522 | 3,829 | 1,095 | 2,033 | 1,515 | 12 |
| Total decrease (increase) to net income | $ 1,095 | $ (133) | $ 6,648 | $5,469 | $6,387 | $6,289 | $4,726 | $ 12 |
| **(DECREASE) INCREASE IN DILUTED EARNINGS PER SHARE** | $ (0.04) | $ 0.00 | $ (0.21) | $(0.19) | $(0.22) | $ (0.22) | $ (0.17) | $0.00 |

28

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P 9.6 | AL jaslv0dc | 04-Mar-2007 22:25 EST | 86507 TX 29 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

*Stock Compensation*—These adjustments are from our determination, based upon the Special Committee's investigation and our subsequent reviews and analyses, that the initially recorded measurement dates for various categories of option grants could not be relied upon. These categories included the following:

- *New hire non-officer stock option grants accounted for as being made prior to the terms being fixed.* Our practice was to set the exercise price of new hire non-officer awards based upon the fair value of our stock on the employee's hire date or the last day of the month of the employee's first month of employment, whichever was lower. Because this determination was made at the end of the month of hire, the last day of the month of the employee's first month of employment was determined to be the first date when the number of shares and the price of each grant were known with finality. Grants accounted for as being made before the last day of the month of the employee's first month of employment, which represented options to purchase an aggregate of 1,214,550 shares, were accounted for as fixed awards under Accounting Principles Board Opinion (APB) No. 25 Accounting for Stock Issued to Employees, or APB 25.

- *Stock option grants with insufficient or incomplete corporate approvals.* We determined that for certain stock option grants the number of shares and the exercise price were not known with finality at the original measurement date. We determined that the original recorded grant date could not be relied on because there was correspondence or other evidence that indicated that not all required corporate approvals had been obtained, including the finalization of the number of stock options allocated and the related exercise price. We adopted a methodology to remeasure these option grants to a revised measurement date, as described below, and accounted for these grants, which represented options to purchase an aggregate of 6,358,639 shares, as fixed awards under APB 25.

- *Stock option grants determined to have been cancelled and repriced.* We determined that the terms of stock option grants to purchase an aggregate of 415,000 shares may have been communicated to employees and that those terms were subsequently modified. We concluded that such modifications constitute repricings and, therefore, these stock option grants should have been accounted for as variable awards for accounting purposes.

- *Accelerated vesting and other matters related to stock-based compensation.* Accelerated vesting consists primarily of the acceleration of stock option vesting, with respect to options to purchase an aggregate of 341,174 shares, upon termination of a few employees prior to 2001, which resulted in stock-based compensation expense which had not been previously recorded. The other matters relate primarily to the impact of the capitalization in inventory of stock-based compensation in 2001 through 2005.

*Payroll taxes, interest and penalties*—In connection with the stock-based compensation adjustments, we determined that certain options previously classified as Incentive Stock Option, or ISO, grants were determined to have been granted with an exercise price below the fair market value of our stock on the revised measurement date (see discussion under "Accounting Considerations" below). Under U.S. tax regulations, ISOs may not be granted with an exercise price less than the fair market value on the date of grant, and therefore these grants might not qualify for ISO tax treatment. We refer to these stock options as the "Affected ISOs." The potential disqualification of ISO status exposes us to additional payroll related withholding taxes on the exercise of these Affected ISOs granted to U.S. employees, and penalties and interest for failing to properly withhold taxes on exercise of those options. The payroll tax, interest and penalty expenses were recorded in the periods in which the underlying stock options were exercised. Then, in subsequent periods in which the liabilities were legally extinguished due to statutes of limitations, the expenses were reversed, and recognized as a reduction in the related functional expense category in our consolidated statements of income. The fluctuations in the restatement adjustments in the table above are the result of: (1) the timing of stock option exercises, and (2) the reversals of expenses previously recorded due to the expiration of statutes of limitations. The net tax liability at December 31, 2005 for this potential disqualification of ISO tax treatment for option awards totaled $1.1 million.

Management is considering possible ways to address the impact that Section 409A of the Internal Revenue Code may have as a result of the exercise price of stock options being less than the fair market value of our

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 | PAL jaslv0dc | 04-Mar-2007 22:25 EST | 86507 TX 30 | 1* |
| FORM 10-K | | PAL | | | HTM IFV | 1C |

Page 1 of 1

common stock on the revised measurement date. Section 409A imposes significant additional taxes to our employees on stock options granted with an exercise price lower than the fair market value on the date of grant that vest after December 31, 2004. The Internal Revenue Service has issued transition rules under Section 409A that allows for a correction, or cure, for options subject to Section 409A. We have allowed our current and former executive officers to amend their options to effect such a cure. We may offer the other holders of outstanding options the opportunity to effect a cure of all affected stock options. In connection with this cure, we may make cash bonus payments in an aggregate amount of up to $1.0 million in 2008 to our non-officer employees.

*Other miscellaneous accounting adjustments*—In addition to stock-based compensation charges, we recorded adjustments that occurred in the periods ended December 31, 2001 through the third quarter of 2005 that had not been previously reflected in our consolidated financial statements. These restatements relate primarily to a correction of our sales return reserve, which should have been reduced in 2001. In addition, we also corrected the period of charge for certain wafers used in engineering, corrected the expected life of tooling for depreciation purposes and recorded an unfunded post-employment health benefit obligation.

Further, we corrected the classification of the balance of auction rate securities (for which interest rates reset in less than 90 days, but for which the underlying maturity date is longer than 90 days), and callable securities (for which interest rates reset from 90 days to 1 year, but for which the underlying maturity date exceeds 1 year) from cash and cash equivalents or short-term investments to long-term investments, as of December 31, 2004 and 2003. We also corrected the consolidated statements of cash flows for the effects of the aforementioned restatements as well as to correct for the non-cash effects of property and equipment purchases recorded, but not yet paid for, at each period end.

*Income tax benefit*—We reviewed the income tax effect of the stock-based compensation charges, and we believe that the proper income tax accounting for U.S. stock options under generally accepted accounting principles depends, in part, on the tax distinction of the stock options as either ISOs or non-qualified stock options, or NSOs. Although some of the Affected ISOs were originally intended to be ISOs, we noted that, under U.S. tax regulations, ISOs may not be granted with an exercise price less than the fair market value on the date of grant. Because of the potential impact of the measurement date changes on the qualified status of Affected ISOs, we have determined that all Affected ISOs might not be qualified ISOs under the regulations, and therefore should be accounted for as if they were NSOs for income tax accounting purposes.

We have recorded a net income tax benefit of approximately $13.5 million in connection with the stock-based compensation related expense and other restatement adjustments during the period from fiscal year 1998 to September 30, 2005. This tax benefit has resulted in an increase of our deferred tax assets for all U.S. affected stock options prior to the exercise or forfeiture of the related options. We recorded no tax benefit or deferred tax asset for affected stock options granted to non-U.S. employees because we determined that we could not receive tax benefits outside of the U.S. Further, we limited the deferred tax assets recorded for affected stock options granted to certain highly paid officers to reflect estimated limitations on tax deductibility under Internal Revenue Code Section 162(m). Upon exercise or forfeiture of the underlying options, the excess or deficiency in deferred tax assets are written-off to either expense or paid-in capital in the period of exercise or forfeiture.

Partially offsetting the income tax benefit on restatement adjustments described above, we also recorded an income tax expense of approximately $692,000 during fiscal year 2003 to correct for an error in the determination of the effect of a cost sharing arrangement with one of our subsidiaries. The correction of such error was originally recorded by us in the quarter ended June 30, 2005. Accordingly, the restatement also resulted in a reduction of the tax provision for the nine-month period ended September 30, 2005.

Further, we recorded restatements aggregating approximately $1.2 million to record additional indirect tax benefits resulting from the exercise of certain stock options in 2002 and 2003. Although these entries had no impact on our consolidated statements of income, they decreased income taxes payable and increased additional paid-in capital in our consolidated balance sheet as of January 1, 2004.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX06/6 PAL jaslv0dc | 04-Mar-2007 22:25 EST | 86507 TX 31 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

Our board of directors has ratified each of the options granted, and we intend to honor each stock option granted pursuant to the terms of the applicable stock option plan and stock option agreement.

*Accounting Considerations—Stock-Based Compensation*

We originally accounted for all employee, officer and director stock option grants as fixed grants under APB 25, using a measurement date of the recorded grant date. We issued all grants with an exercise price equal to the fair market value of our common stock on the recorded grant date, and therefore originally recorded no stock-based compensation expense.

As a result of the Special Committee findings, and our own further review of our stock option granting practices, we determined that the measurement dates for certain stock option grants differed from the recorded grant dates for such grants. In some instances, we were only able to locate sufficient evidence to identify the measurement date described in APB 25, the first date on which both the number of shares that an individual employee was entitled to receive and the exercise price were known, within a range of possible dates. As a result, we developed a methodology to establish the revised measurement date primarily by using communication dates as our estimate of the first date on which both the number of shares that an individual employee was entitled to receive and the exercise price were known with finality. Using the methodology described below we concluded that it was appropriate to revise the measurement dates for these grants based upon our findings, and we refer to these revised measurement dates as the "Deemed Measurement Dates". We calculated stock-based compensation expense under APB 25 based upon the intrinsic value as of the Deemed Measurement Dates of stock option awards determined to be "fixed" under APB 25 and the vesting provisions of the underlying options. We calculated the intrinsic value on the Deemed Measurement Date as the closing price of our common stock on such date as reported on the Nasdaq National Market, now the Nasdaq Global Market, less the exercise price per share of common stock as stated in the underlying stock option agreement, multiplied by the number of shares subject to such stock option award. We recognize these amounts as compensation expense over the vesting period of the underlying options (generally four years). We also determined that variable accounting treatment was appropriate under APB 25 for certain stock option grants to three officers for which evidence was obtained that the terms of the options may have been communicated to those officers and that those terms were subsequently modified (stock option grants cancelled and repriced). When variable accounting is applied to stock option grants, we remeasure, and report in our consolidated statement of income, the intrinsic value of the options at the end of each reporting period until the options are exercised, cancelled or expire unexercised.

The methodology we used to determine the Deemed Measurement Dates associated with prior stock option grants was as follows:

*New Hire Non-Officer Employee Stock Options*—We determined the Deemed Measurement Date for each of these grants to be the last day of the month of the employee's first month of employment. Our practice was to set the exercise price of these awards at the end of the month of hire, and therefore we determined that the last day of the month of the employee's first month of employment was the first date when the number of shares and the price of each grant were known with finality.

*All Other Stock Options*—We determined the Deemed Measurement Date for each stock option grant, other than grants of new hire non-officer employee options, to be the Approval Date for the stock option, provided the Approval Date criteria set forth below were met. If the criteria for use of the Approval Date were not met, then we used the Communication Date, as defined below, as the Deemed Measurement Date for the stock option.

- "Approval Date"—The Approval Date was the date of approval set forth in executed minutes or a fully-executed consent of the board of directors, compensation committee or stock option committee documenting the grant of the stock option. However, we generally only used the Approval Date as the Deemed Measurement Date if both:

  (1) there was documentary evidence that the allocation of the shares had been finalized, and the written consent, if applicable, was executed, on that date ; and

31

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX01 9.6 PAL jaslv0dc | 04-Mar-2007 22:25 EST | 86507 TX 32 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

(2) the Communication Date for the stock option was within 30 days of the date of approval set forth in the documentary evidence.

- "Communication Date"—We define the "Communication Date" as the date we determined the key terms of the option (both the number of shares and the exercise price) had initially been communicated to the optionee. In the absence of specific documentary evidence of initial communication, we generally determined the Communication Date to be the earliest of:

  (1) the date the employee record of the grant of the stock option was added to the stock option database application, or the latest recordation date in the case of a group of grants, which we refer to as the "Record Add Date";

  (2) the optionee manual signature date on the stock option agreement, or the earliest optionee manual signature date in the case of a group of grants, which we refer to as the "Stock Option Agreement Date"; and

  (3) for officers and directors, the date that a Form 3 or 4 was filed with the SEC with respect to the grant, which we refer to as the "Form 3/4 Date".

However, we did not consider the Record Add Date in our determination if the Stock Option Agreement Date was more than 30 days after the Record Add Date in the case of individual grants and grants to groups of less than five, or more than 10 days after the Record Add Date in the case of grants to groups of five or more. We made the distinction regarding small and large groups because we would expect to see at least one agreement returned to us within 10 days with larger groups of optionees; but with small groups, the probability of seeing an agreement returned to us within 10 days was less likely.

When applying this methodology to groups of grants, we generally determined the Communication Date for the group to be the latest Record Add Date, the earliest Stock Option Agreement Date or Form 3/4 Dates, as we determined that, under our stock option grant process, the terms of stock options were communicated concurrently to each member of a group. We excluded a limited number of options, or "Outliers", from the determination of the latest Record Add Date and the earliest Stock Option Agreement Date for a group of grants when, based upon available evidence, we considered the Outlier dates as not reliable as to the date that the terms of the stock option grants were communicated to the group. This methodology, and the determination of which stock option grants should be considered Outliers, as described above, involves judgment.

As stated above, using this methodology, we recorded an aggregate pre-tax charge for stock compensation related adjustments of $44.1 million relating to fiscal year 1998 to September 30, 2005. If we had consistently used either the latest Record Add Date or the earliest Stock Option Agreement Date as the revised measurement date for all stock option grants other than new hire non-officer employee options (and excluded Outliers, consistent with the application of our methodology), the aggregate pre-tax stock-based compensation charges relating to fiscal year 1998 through September 30, 2005 would have been $38.8 million using the latest Record Add Date, or $44.7 million using the earliest Stock Option Agreement Date Alternatively, for groups of grants, if we would have used the highest or lowest trading prices of our common stock between the last date of documentary evidence (which was otherwise deemed unreliable) before the revised measurement date and the revised measurement date, as a measurement date could have occurred on any date between those two dates, the aggregate pre-tax stock-based compensation charges relating to the same periods would have been $40.9 million if we had used the lowest price and $49.9 million if we had used the highest price.

*Outside Director Automatic Stock Option Grants*

Our 1997 Outside Directors Stock Option Plan provides for the automatic grant of stock options to our outside directors, such that the grants require no independent action of the Board or any committee of the Board. The Outside Directors Plan provides that each outside director is granted a stock option to purchase 30,000 shares of Power Integrations, Inc. common stock upon appointment as a member of the Board, and that each

32

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0PAL jaslv0dc | 04-Mar-2007 22:25 EST | 86507 TX 33 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

outside director is granted a stock option to purchase 10,000 shares of our common stock at each anniversary of the date of appointment or, in the case of outside directors appointed prior to our initial public offering, the anniversary date of the initial public offering. The exercise price of each stock option grant is the fair market value of a share of common stock on the date of grant.

We have determined that, as a result of administrative errors, a total of 16 grants representing options to purchase 180,000 shares under the Outside Directors Plan collectively to three of our outside directors were documented as having been made on dates other than as set forth in the Outside Directors Plan. We have corrected the documentation of these grants to reflect the correct dates and exercise prices, as automatically established under the Outside Directors Plan. Because these actions were corrections of administrative errors in the documentation, rather than changing any of the terms of the stock option grants as automatically granted, we determined that there was no accounting charge to be recognized in connection with these corrections, as the correct measurement date was the date of grant as automatically established by the Outside Directors Plan, and the exercise price was the fair market value of our common stock on the correct measurement date.

Subsequent to the correction of the documentation of these grants, the three outside directors have agreed to increase the exercise prices of certain of such grants to purchase 80,000 shares. Further, the only director who exercised a misdocumented grant has reimbursed us for the difference between the aggregate exercise price as misdocumented and as corrected. A more detailed description of the correction of the administrative errors in these grants is set forth in Item 9B. Other Information, in this Annual Report on Form 10-K.

*Related Proceedings*

Beginning on or about April 25, 2006, several derivative actions were filed against certain of our current and former directors and officers. These derivative lawsuits were filed in: (1) the United States District Court for the Northern District of California, including complaints by alleged shareholders Kimberly Quaco, Kathryn L. Champlin and Christopher Deboskey, and (2) the California Superior Court, Santa Clara County, including complaints by alleged shareholders Stanley Banko and Joan Campbell. The complaints allege that, among other things, the defendants breached their fiduciary duties by improperly backdating grants to our executives in violation of our shareholder-approved stock option plans and improperly recorded and accounted for those options, improperly took tax deductions based on the backdated stock options, and disseminated false financial statements that improperly recorded the backdated option grants. The complaints also assert unjust enrichment, and violations of Section 10(b) of the Securities Exchange Act of 1934. These cases are further discussed in note 9, "Legal Proceedings," of the notes to consolidated financial statements.

On May 23, 2006, the U.S. Attorney's Office for the Northern District of California ("DOJ") issued a grand jury subpoena to us directing that we produce documents relating to the granting of stock options from 1995 through the present. On May 31, 2006, the staff of the Securities & Exchange Commission ("SEC") sent a letter to us directing us to take appropriate actions to preserve certain documents relating to our stock option practices. Since that time, the government has made a number of requests for us to voluntarily produce documents relating to, among other things, our stock option practices. In addition, the government has been conducting voluntary interviews of certain current and former officers and employees. We are cooperating fully with the SEC and the DOJ and intend to continue to do so.

On June 19, 2006, we received a demand letter pursuant to section 16(b) of the Securities Exchange Act of 1934 from an attorney purporting to represent an unnamed shareholder. The letter demands that we bring a lawsuit against certain of our current and former officers and directors to recover short-swing profits allegedly earned by the officers and directors in violation of section 16(b) when they allegedly acquired options to purchase our stock within six months of corresponding sales of our stock at higher prices. The letter states that if we do not take action against the individuals within 60 days, the unnamed shareholder will file a lawsuit.

We are unable to predict the outcome of the legal proceedings described above. If an adverse decision is reached against us in any of these proceedings, it could have a material adverse effect on our financial position or results of operations.

33

*Effect on our Nasdaq Listing*

Our common stock has been suspended from trading on The NASDAQ Stock Market for noncompliance with the Nasdaq listing requirements, and currently trades on the Pink Sheets under the symbol "POWI.PK". Until we file all three of our Quarterly Reports on Form 10-Q for fiscal year 2006, and hold our 2005 annual meeting of stockholders, we will not regain compliance with the Nasdaq listing requirements. Even when we do regain compliance with the Nasdaq listing requirements, we will be required to reapply to have our common stock listed on the Nasdaq Global Market. The application process can be lengthy process, and there is no assurance that Nasdaq will relist our common stock.

## Business Overview

We design, develop, manufacture and market proprietary, high-voltage analog ICs for use primarily in electronic power supplies, also known as switched-mode power supplies or switchers. Our ICs are used in AC-DC and DC-DC power supplies in a wide variety of electronic products, primarily in the consumer, communications, computer and industrial electronics markets. Accelerating the penetration of our ICs into this addressable market is our primary strategic objective.

Our ICs are purchased primarily by merchant power supply manufacturers who sell power supplies to OEMs, and, in some cases, by OEMs who design and build their own power supplies. (In 2005, approximately 60% of our sales to these end customers were made through distributors of electronic components.) Power supplies may be designed with our monolithic ICs, which combine a high-voltage transistor with low-voltage control circuitry, or with a number of competing alternatives. These alternatives include other monolithic and hybrid ICs, PWM controller ICs paired with discrete transistors, and legacy technologies that do not utilize ICs, such as line-frequency transformers and self-oscillating switchers using discrete components.

Our sales process involves significant effort to have our customers design their power supplies to include our ICs as components. Competition for these "design wins" at our end customers is intense, as the power-supply industry is extremely price-sensitive. We attempt to differentiate our offerings from competing alternatives through innovation aimed at helping our customers minimize the total cost of their power supplies while meeting the performance specifications demanded by their end customers. Much of this innovation is embodied in the features and functionality of our ICs, as well as in various power-supply-design techniques developed by us for use by our customers. Further, we attempt to minimize the cost of producing our ICs through continuous improvement of our proprietary manufacturing process as well as seeking other manufacturing efficiencies.

We employ a variety of methods for marketing and selling our products in an effort to accelerate the penetration of our addressable markets. We employ a staff of sales personnel and field applications engineers around the world, and have increased the size of this staff considerably over the past several years. In order to assist our customers in designing power supplies with our ICs, we offer a wide range of technical documentation as well as design-support tools and services. These include PI Expert design software, which we offer free of charge, and our transformer sample service. We also continue to introduce more advanced products that make our solutions more cost-effective and easier for designers to use.

We believe that the increasing importance of energy-efficiency as a design criterion for power supplies could help accelerate the rate of adoption of our technology by the power-supply industry, and represents an important opportunity for us to increase the penetration rate of our products. This trend is predominantly the result of the emergence of energy-efficiency standards that encourage, or in some cases mandate, the design of more energy-efficient electronic products. Power supplies built with legacy technologies such as line frequency transformers are often unable to meet such standards cost-effectively. Most notably, the California Energy Commission has introduced mandatory standards governing the energy efficiency of virtually all external power supplies; these standards are scheduled to take effect in 2007. Other U.S. states, as well as Australia, have adopted virtually identical mandatory standards scheduled to take effect in 2007 and 2008.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0<br>9.8 PAL jaslv0dc | 04-Mar-2007 22:25 EST | 86507 TX 35 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

Our net revenues were $143.1 million, $136.7 million and $125.7 million in 2005, 2004 and 2003, respectively. The growth of revenue in each of these years reflects primarily the increased penetration of our products into our addressable market. However, we believe that our revenue growth in 2004 and 2005 was negatively impacted by unfair competition from products that we believe infringed several of our patents, and that in the absence of the infringing products, we would have grown our revenues more rapidly in each of those years. We have taken action against these allegedly infringing products by undertaking litigation against two of our competitors, Fairchild Semiconductor and System General Corp., as we have described in Part I, Item 3 of this Annual Report.

Our top ten customers, including distributors that resell to OEMs and merchant power supply manufacturers, accounted for 69%, 71% and 76% of our net revenues for 2005, 2004 and 2003, respectively. Our two largest customers, both of which are distributors of electronic components, collectively accounted for 37%, 38% and 45% of our net revenues, respectively for the years 2005, 2004 and 2003. In 2005, 2004 and 2003, international sales comprised 93%, 92% and 93%, respectively, of our net revenues.

Our gross profit, defined as net revenues less cost of revenues, was $70.1 million, or 49.0% of net revenues, in 2005, compared to $64.8 million, or 47.4% of net revenues, in 2004 and $62.2 million, or 49.5% of net revenues, in 2003. Because our industry is intensely price-sensitive, our gross profit margin is subject to change based on the relative pricing of solutions that compete with ours. Also, because we purchase a large percentage of our wafers from foundries located in Japan, our gross margin is influenced by fluctuations in the exchange rate between the U.S. dollar and the Japanese yen. All else being equal, a 10% change in the value of the U.S. dollar compared to the Japanese yen would result in a corresponding change in our gross profit margin of approximately one percentage point.

In recent years we have employed a number of tactics in an effort to maintain or, when possible, improve our gross profit margin. These include reducing the cost of producing our ICs through the implementation of more advanced manufacturing processes, the migration of our testing operations to offshore sub-contractors, and the negotiation of more favorable prices from our suppliers. We also seek to increase the value of our products to our customers through the inclusion of more advanced features and functionality. Finally, we have made an effort to market our products to smaller, less price-sensitive customers. Through this combination of methods, we have generally succeeded in maintaining a relatively stable gross profit margin in the recent past. We expect this trend to continue in 2006, though the implementation of SFAS 123R (as described below in the section entitled "Recently Issued Accounting Pronouncements") will have some negative impact on our gross margin.

Total operating expenses in 2005, 2004 and 2003 were $51.1 million, $39.5 million and $48.1 million, respectively. The increase in operating expenses in 2005 was driven largely by the cost of our patent litigation against Fairchild Semiconductor and System General Corp., by increases in headcount, and by higher stock-based compensation associated with certain stock option grants. For 2006, we expect our operating expenses to increase significantly due to the implementation of SFAS 123R, our internal investigation of our historical practices for granting stock options, the costs associated with the related restatement of our financial statements, and the cost associated with our ongoing patent litigation. We also expect increased expenses for research and development and sales and marketing due to the addition of headcount in those areas.

Our quarterly and annual operating results are volatile and difficult to predict. Our business is characterized by short-term orders and short customer lead times, and a high percentage of our revenue comes from "turns business," or orders booked and shipped within the same period. Customers typically can cancel or reschedule orders without significant penalty. We plan our production and inventory levels based on internal forecasts of customer demand, which is highly unpredictable and can fluctuate substantially. As a result, our quarterly and annual operating results may fluctuate significantly in the future.

**Critical Accounting Policies and Estimates**

The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 9.8 | PAL jaslv0dc | 04-Mar-2007 22:25 EST | | 86507 TX 36 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
Page 1 of 1

affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. On an ongoing basis, we evaluate our estimates, including those listed below. We base our estimates on historical facts and various other assumptions that we believe to be reasonable at the time the estimates are made. Actual results could differ from those estimates.

Our critical accounting policies are as follows:

- revenue recognition;
- stock-based compensation;
- estimating sales returns and allowances;
- estimating distributor pricing credits;
- estimating allowance for doubtful accounts;
- estimating write-downs for excess and obsolete inventory; and
- income taxes.

Our critical accounting policies are both important to the portrayal of our financial condition and results of operations, and require us to make judgments and estimates about matters that are inherently uncertain. A brief description of these critical accounting policies is set forth below. For more information regarding our accounting policies, see note 2 "Summary of Significant Accounting Policies" in the notes to the consolidated financial statements.

### Revenue recognition

Product revenues consist of sales to OEMs, merchant power supply manufacturers and distributors. Shipping terms to our international OEMs and merchant power supply manufacturers from our facility in California are delivered at frontier, which is commonly referred to as DAF. As such, title to the product passes to the customer when the shipment reaches the destination country and revenue is recognized upon the arrival of our product in that country. Beginning in December 2005, shipping terms to our international OEMs and merchant power supply manufacturers shipped from our facility outside of the United States are EX Works (EXW), meaning title to the product transfers to our customer upon shipment from our foreign warehouse. Shipments to North American OEMs and merchant power supply manufacturers are FOB-point of origin, meaning that revenue is recognized upon shipment, which is when title is passed to the customer.

Historically, approximately 50% to 60% of our total sales have been made to distributors pursuant to agreements that allow certain rights of return on our products held by these distributors. As a result, we defer the recognition of revenue and the costs of revenues derived from sales to distributors until such distributors resell our products to their customers. We determine the amounts to defer based on the level of actual inventory on hand at our distributors as well as inventory that is in transit to them. The gross profit that is deferred as a result of this policy is reflected as "deferred income on sales to distributors" in the consolidated balance sheets.

### Stock-based compensation

We have elected to follow Accounting Principles Board Opinion (APB) No. 25, *Accounting for Stock Issued to Employees*, and related interpretations, in accounting for employee stock options rather than the alternative fair value method allowed for by SFAS No. 123, *Accounting for Stock-Based Compensation*. APB No. 25 provides that compensation expense relative to our employee stock options is measured based on the intrinsic value of stock options granted. For grants determined to be "fixed" under APB 25, we recognize compensation expense in our statement of income using the straight-line method over the vesting period based upon the difference between the exercise price of our employee stock option grants and the market price of the underlying common stock on the measurement date of the option. We do not recognize compensation expense in our consolidated income

36

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 S6 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | | 86507 TX 37 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

statement for fixed awards when the exercise price of our employee stock option grants equals the market price of the underlying common stock on the measurement date of the option. The measurement date is the date when the number of shares and exercise price are known with finality. For grants determined to be "variable" under APB 25, we remeasure, and report in our statement of income, the intrinsic value of the options at the end of each reporting period until the options are exercised, cancelled or expire unexercised. As a result of the application of APB 25 and restatement of our consolidated financial statements, as described in "Restatement of Consolidated Financial Statements" above, we have incurred pre-tax stock-based compensation expense of $3.1 million, $1.3 million and $9.9 million, in 2005, 2004 and 2003, respectively. See the explanatory note on page 1 of this Form 10-K, "Restatement of Consolidated Financial Statements" in Part II, Item 7, and note 3, "Restatement of Consolidated Financial Statements," of the notes to consolidated financial statements.

### Estimating sales returns and allowances

Net revenue consists of product revenue reduced by estimated sales returns and allowances. To estimate sales returns and allowances, we analyze, both when we initially establish the reserve, and then each quarter when we review the adequacy of the reserve, the following factors: historical returns, current economic trends, levels of inventories of our products held by our customers, and changes in customer demand and acceptance of our products. This reserve represents a reserve of the gross margin on estimated future returns and is reflected as a reduction to accounts receivable in the consolidated balance sheets. Increases to the reserve are recorded as a reduction to net revenue equal to the expected customer credit memo and a corresponding credit is made to cost of revenues equal to the estimated cost of the product to be returned. The net difference, or gross margin, is recorded as an addition to the reserve. Because the reserve for sales returns and allowances is based on our judgments and estimates, particularly as to future customer demand and acceptance of our products, our reserves may not be adequate to cover actual sales returns and other allowances. If our reserves are not adequate, our future net revenues and cost of revenues could be adversely affected.

### Estimating distributor pricing credits

Historically, approximately 50% to 60% of our total sales have been made to distributors. Frequently, distributors need a cost lower than the standard distribution price to win business. In these circumstances, the distributor submits a request to us for a lower "sell-in" price on a specific end-customer transaction or a series of transactions. After the distributor ships product to its customer under an approved transaction, the distributor submits a "ship & debit" claim to us to adjust its cost from the standard price to the approved lower price. After verification by us, a credit memo is issued to the distributor to adjust the sell-in price from the standard distribution price to the approved lower price. We maintain a reserve for these credits that appears as a reduction to accounts receivable in our consolidated balance sheets. Any increase in the reserve results in a corresponding reduction in our net revenues. To establish the adequacy of our reserves, we analyze historical ship and debit amounts and levels of inventory in the distributor channels. If our reserves are not adequate, our net revenues could be adversely affected.

From time to time we reduce our distribution list prices. We give our distributors protection against these price declines in the form of credits on products they hold in inventory. These credits are referred to as "price protection." Since we do not recognize revenue until the distributor sells the product to its customers, we generally do not need to provide reserves for price protection. However, in rare instances we must consider price protection in the analysis of reserve requirements, as there may be a timing gap between a price decline and the issuance of price protection credits. If a price protection reserve is required, we will maintain a reserve for these credits that appears as a reduction to accounts receivable in our consolidated balance sheets. Any increase in the reserve results in a corresponding reduction in our net revenues. We analyze distribution price declines and levels of inventory in the distributor channels in determining the reserve levels required. If our reserves are not adequate, our net revenues could be adversely affected.

### Estimating allowance for doubtful accounts

We maintain an allowance for losses we may incur as a result of our customers' inability to make required payments. Any increase in the allowance for doubtful accounts results in a corresponding increase in our general and administrative expenses. In establishing this allowance, and in evaluating the adequacy of the allowance each quarter, we analyze historical bad debts, customer concentrations, customer credit-worthiness, current economic trends and changes in our customer payment terms. If the financial condition of one or more of our customers deteriorates, resulting in their inability to make payments, or if we otherwise underestimate the losses we incur as a result of our customers' inability to pay us, we could be required to increase our allowance for doubtful accounts which could adversely affect our operating results.

### Estimating write-downs for excess and obsolete inventory

When evaluating the adequacy of our valuation adjustments for excess and obsolete inventory, we identify excess and obsolete products and also analyze historical usage, forecasted production based on demand forecasts, current economic trends, and historical write-offs. This write-down is reflected as a reduction to inventory in the consolidated balance sheets, and an increase in cost of revenues. If actual market conditions are less favorable than our assumptions, we may be required to take additional write-downs, which could adversely impact our cost of revenues and operating results.

### Income taxes

We recognize Federal, state and foreign current tax liabilities or assets based on our estimate of taxes payable or refundable in the current fiscal year by tax authorities. We also recognize Federal, state and foreign deferred tax liabilities or assets for our estimate of future tax effects attributable to temporary differences and carry-forwards, and we record a valuation allowance to reduce any deferred tax assets by the amount of any tax benefits that, based on available evidence and judgment, are not expected to be realized. We limit the deferred tax assets recognized related to certain of our highly-paid officers to amounts that we estimate will be deductible in future periods based upon the provisions of the Internal Revenue Code Section 162(m). As of December 31, 2005, no valuation allowance had been recorded. We believe it is more likely than not that forecasted income will be sufficient to fully recover our deferred tax assets. In the event that all or part of the net deferred tax assets are determined not to be realizable in the future, a valuation allowance would be recorded in the period such determination is made. In addition, the calculation of tax liabilities involves significant judgment in estimating the impact of uncertainties in the application of complex tax laws. Resolution of these uncertainties in a manner inconsistent with our expectations could have a material impact on our results of operations and financial position.

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152159 9.6.18 | PAL soeus0pa | 05-Mar-2007 20:56 EST | | 86507 TX 39 | 2* |
| FORM 10-K | | | PAL | | | HTM PMT | 1C |
| | | | | | | Page 1 of 1 | |

## Results of Operations

The following table sets forth certain operating data in dollars, as a percentage of total net revenues and increase (decrease) over prior periods for the periods indicated (in thousands).

| | Year Ended December 31 | | | | | | Increase (Decrease) | |
| | Amount | | | Percent of Net Revenues | | | | |
| | 2005 | 2004 As Restated (1) | 2003 As Restated (1) | 2005 | 2004 As Restated (1) | 2003 As Restated (1) | 2005 vs. 2004 | 2004 vs. 2003 As Restated (1) |
|---|---|---|---|---|---|---|---|---|
| Total net revenues | $143,071 | $136,653 | $125,682 | 100.0% | 100.0% | 100.0% | $ 6,418 | $ 10,971 |
| Cost of revenues | 72,979 | 71,856 | 63,496 | 51.0 | 52.6 | 50.5 | 1,123 | 8,360 |
| Gross profit | 70,092 | 64,797 | 62,186 | 49.0 | 47.4 | 49.5 | 5,295 | 2,611 |
| Operating expenses: | | | | | | | | |
|   Research and development | 17,111 | 15,440 | 20,107 | 12.0 | 11.3 | 16.0 | 1,671 | (4,667) |
|   Sales and marketing | 18,314 | 16,070 | 17,166 | 12.8 | 11.8 | 13.7 | 2,244 | (1,096) |
|   General and administrative | 15,665 | 7,969 | 10,868 | 10.9 | 5.8 | 8.6 | 7,696 | (2,899) |
|     Total operating expenses | 51,090 | 39,479 | 48,141 | 35.7 | 28.9 | 38.3 | 11,611 | (8,662) |
| Income from operations | 19,002 | 25,318 | 14,045 | 13.3 | 18.5 | 11.2 | (6,316) | 11,273 |
| Total other income | 3,149 | 1,320 | 903 | 2.2 | 1.0 | 0.7 | 1,829 | 417 |
| Income before provision for income taxes | 22,151 | 26,638 | 14,948 | 15.5 | 19.5 | 11.9 | (4,487) | 11,690 |
| Provision for income taxes | 6,453 | 6,138 | 3,511 | 4.5 | 4.5 | 2.8 | 315 | 2,627 |
| Net income | $ 15,698 | $ 20,500 | $ 11,437 | 11.0% | 15.0% | 9.1% | $(4,802) | $ 9,063 |

(1) See note 3, "Restatement of Consolidated Financial Statements," of the notes to consolidated financial statements for information on our restatement.

### Comparison of Years Ended December 31, 2005 and 2004

*Net revenues.* Net revenues consist of revenues from product sales, which are calculated net of returns and allowances, plus license fees and royalties. Net revenues increased 4.7% to $143.1 million in 2005 compared to $136.7 million in 2004, driven primarily by increased penetration of our products into our end markets. The increase was driven primarily by increased penetration in the industrial market, including such applications as utility meters, external adapters, uninterruptible power supplies and lighting applications. The increase also resulted from increased penetration in the computer market, including applications such as personal digital assistants, LCD monitors and other computer peripherals. Revenues from our other two major end markets, consumer and communications, did not contribute to our growth in 2005 compared to 2004.

Our revenue growth in 2005 was primarily driven by increased sales of our TinySwitch-II, TOPSwitch-GX and LinkSwitch product families, partially offset by lower revenues from legacy products that are generally no longer available for use in new power supply designs.

In the twelve months ended December 31, 2005, our net revenue included an adjustment to deferred income on sales to distributors as a result of a change in estimate, which increased our net revenue by approximately $1.1 million, and increased our net income after tax by approximately $0.4 million, or $0.01 per diluted share.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX08 8.8 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | 86507 TX 40 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

Our net revenue mix by product family and by the end markets that we serve in 2005 and 2004 are as follows:

| | Year Ended December 31, | |
| Product Family | 2005 | 2004 |
|---|---|---|
| TinySwitch-I and -II | 57% | 54% |
| TopSwitch-FX and -GX | 27% | 28% |
| TopSwitch-I and -II | 11% | 15% |
| LinkSwitch and DPA-Switch | 5% | 3% |

| | Year Ended December 31, | |
| End Market | 2005 | 2004 |
|---|---|---|
| Consumer | 30% | 33% |
| Communication | 29% | 31% |
| Computer | 23% | 22% |
| Industrial | 11% | 8% |
| Other | 7% | 6% |

International revenues were $133.6 million in 2005 compared to $125.8 million in 2004, representing approximately 93% and 92% of net revenues in those respective periods. Although the power supplies using our products are designed and distributed worldwide, most of these power supplies are manufactured by our customers in Asia. As a result, sales to this region were 79% and 78% of our net revenues for 2005 and 2004, respectively. We expect international sales to continue to account for a large portion of our net revenues.

Net product revenues for 2005 were divided 60% to distributors and 40% to OEMs and merchant power supply manufacturers, compared to 56% to distributors and 44% to OEMs and merchant power supply manufacturers in 2004. In 2005, two customers, both of whom are distributors, accounted for approximately 19% and 18% of net revenues. In April 2006, we terminated our distributor relationship with our distributor that accounted for 18% of net revenues in 2005. We have replaced this terminated relationship with other distribution relationships, and therefore do not believe that the termination of this distributor relationship will have a material impact to our business. In 2004 the same two customers each accounted for approximately 19% of net revenues each.

Customer demand for our products can change quickly and unexpectedly. Our customers perceive that our products are readily available and typically order only for their short-term needs. Our revenue levels are highly dependent on the amount of new orders that we receive for which product can be delivered by us within the same period. Orders that are booked and shipped within the same period are called "turns business." Because of the uncertainty of customer demand, and the short lead-time environment and high turns business, it is difficult to predict future levels of revenues and profitability.

*Gross profit.* Gross profit is equal to net revenues less cost of revenues. Our cost of revenues consists primarily of costs associated with the purchase of wafers from our contracted foundries, the assembly and packaging of our products by sub-contractors, internal labor and overhead associated with product testing performed in our own facility, and testing of packaged components performed by sub-contractors. Gross profit was $70.1 million, or 49.0% of net revenues, in 2005, compared to $64.8 million, or 47.4% of net revenues, in 2004. The increase in our gross margin percentage was due primarily to cost reductions, mainly in the areas of wafer prices and product improvements. We expect our gross margin to improve in 2006 as a result of further cost reductions, a more favorable pricing environment for our products, and increased penetration into smaller, less price-sensitive customers. We expect these factors to be partially offset by stock-based compensation costs related to the implementation of SFAS No. 123R in the first quarter of 2006.

*Research and development expenses.* Research and development expenses (R&D expenses) consist primarily of employee-related expenses (including stock-based compensation) and expensed material and facility

40

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 5.6 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | 86507 TX 41 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

costs associated with the development of new processes and new products. We also record R&D expenses for prototype wafers related to new products until such products are released to production. R&D expenses were $17.1 million, or 12.0% of net revenues in 2005, compared to $15.4 million, or 11.3% of net revenues, in 2004. The increase was due primarily to higher stock-based compensation expenses driven by the remeasurement of certain stock option grants. Total stock-based compensation and related expenses included in R&D expenses for 2005 was $0.9 million, compared to a benefit of $(0.8) million in 2004. This increase was primarily the result of fluctuations in the value of certain stock options for which variable accounting applies. The value of stock option grants subject to variable accounting varies significantly as a result of changes in the market value of our common stock; see note 3 of the notes to consolidated financial statements for a further explanation. We expect research and development expenses to increase in 2006, primarily as a result of our implementation of SFAS No. 123R in the first quarter of 2006.

*Sales and marketing expenses.* Sales and marketing expenses consist primarily of employee-related expenses (including stock-based compensation), commissions to sales representatives, and facilities expenses, including expenses associated with our regional sales and support offices. Sales and marketing expenses were $18.3 million, or 12.8% of net revenues, in 2005, compared to $16.1 million, or approximately 11.8% of net revenues, in 2004. The increase was primarily due to an increase in headcount in sales and field applications engineering, as we have expanded our sales staff. We expect sales and marketing expenses to increase in 2006 due to growth in marketing and sales headcount as well as advertising and marketing collateral associated with the launch of several new products in 2006. We also expect our sales and marketing expenses to increase due to the implementation of SFAS No. 123R in the first quarter of 2006.

*General and administrative expenses.* General and administrative expenses (G&A expenses) consist primarily of employee-related expenses, including stock-based compensation, for administration, finance, human resources and general management, as well as consulting, professional services, legal and auditing expenses. G&A expenses were $15.7 million, or 10.9% of net revenues, in 2005, compared to $8.0 million, or 5.8% of net revenues, in 2004. The increase was due primarily to an increase in legal fees for patent litigation, higher stock-based compensation expense and higher headcount. Expenses associated with our patent-infringement litigation against Fairchild Semiconductor and System General Corporation, as described in Part I, Item 3 Legal Proceedings, were $5.5 million in 2005 and $400,000 in 2004. Stock-based compensation for 2005 increased to $1.1 million in 2005 compared to a benefit of $(0.1) million in 2004, primarily as a result of fluctuations in the value of certain stock options for which variable accounting applies. We expect G&A expenses to increase in 2006 due to the implementation of SFAS No. 123R in the first quarter of 2006, the costs of our continuing patent litigation, and the costs associated with our internal investigation into our historical stock option granting practices and the related restatement of our financial statements.

*Total other income.* In 2005, total other income was $3.1 million, an increase of $1.8 million over the prior year. Interest income, which consists primarily of income earned on short-term and long-term investments, grew primarily due to an increase in our average interest rate from 2.4% at December 31, 2004 to 4.1% at December 31, 2005.

*Provision for income taxes.* Provision for income taxes for 2005 and 2004 represents Federal, state and foreign taxes. The provision for income taxes was $6.5 million for 2005 compared to $6.1 million for 2004. Our effective tax rate for 2005 was approximately 29% compared to approximately 23% in 2004. The increase in the effective tax rate in 2005 compared to 2004 was primarily due to a change in our estimates of profitability in foreign jurisdictions.

**Comparison of Years Ended December 31, 2004 and 2003**

*Net revenues.* Net revenues were $136.7 million in 2004, an increase of 8.7% compared to $125.7 million in 2003. The increase in our revenues was driven primarily by increased penetration of our ICs into our addressable markets, particularly the consumer and industrial markets. The increase in consumer revenues were driven



| **POWER INTEGRATIONS,** | RR Donnelley ProFile | LANFBU-MWS-CX0 98 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | | 86507 TX 42 | 1* |
| **FORM 10-K** | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

primarily by an increase in sales of our products for home appliances, set-top boxes and DVD players. Revenues from the industrial market grew as we increased our penetration in a variety of applications, including control and metering applications as well as uninterruptible power supplies. Revenues from the computer market contributed modestly to our growth, while communications revenues declined driven primarily by lower revenues related to cellphone chargers. In particular, this decrease was a result of our loss of a portion of Samsung's cellphone charger business.

Our net revenue mix by product family and by the end markets that we serve in 2004 and 2003 are as follows:

| | Year Ended December 31, | |
| --- | --- | --- |
| **Product Family** | **2004** | **2003** |
| TinySwitch-I and -II | 54% | 51% |
| TopSwitch-FX and -GX | 28% | 27% |
| TopSwitch-I and -II | 15% | 20% |
| LinkSwitch and DPA-Switch | 3% | 2% |

| | Year Ended December 31, | |
| --- | --- | --- |
| **End Market** | **2004** | **2003** |
| Consumer | 33% | 28% |
| Communication | 31% | 36% |
| Computer | 22% | 22% |
| Industrial | 8% | 8% |
| Other | 6% | 6% |

Our revenue growth in 2004 was driven primarily by higher sales of our TinySwitch-II and TOPSwitch-GX products, partially offset by lower sales from legacy products such as TOPSwitch-I and -II.

International revenues were $125.8 million in 2004 compared to $117.4 million in 2003, representing approximately 92% and 93% of net revenues in those respective periods. Although the power supplies using our products are designed and distributed worldwide, most of these power supplies are manufactured in Asia. Sales to this region were 78% and 81% of our net revenues for 2004 and 2003, respectively.

Direct revenues for 2004 were divided 56% to distributors and 44% to OEMs and merchant power supply manufacturers, compared to 61% to distributors and 39% to OEMs and merchant power supply manufacturers for 2003. In 2004, two customers, both of whom are distributors, each accounted for approximately 19% of net revenues. In 2003, the same two customers accounted for approximately 25% and 20% of net revenues.

*Gross profit.* Gross profit was $64.8 million, or 47.4% of net revenues, in 2004, compared to $62.2 million, or 49.5% of net revenues, in 2003. The decline in gross margin was due primarily to higher wafer costs caused by the strengthening of the Japanese yen compared to the dollar.

*Research and development expenses.* Research and development expenses (R&D expenses) were $15.4 million, or 11.3% of net revenues, in 2004, compared to $20.1 million, or 16.0% of net revenues, in 2003. The decrease in R&D expenses was primarily due to lower stock-based compensation expenses due to the remeasurement of certain stock option grants. Total stock-based compensation expense for 2004 was a benefit of $(0.8) million compared to an expense of $3.7 million in 2003. The decrease was primarily due to the cancellation of certain fixed option grants in 2004, certain grants becoming fully vested in early 2004 and throughout 2003, the revaluation of certain stock options subject to variable accounting, and payroll-tax reversals on stock-based compensation due to the expiration of a statute of limitations in 2004.

*Sales and marketing expenses.* Sales and marketing expenses were $16.1 million, or 11.8% of net revenues, in 2004, compared to $17.2 million, or 13.7% of net revenues, in 2003. The decrease in sales and marketing

42

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX10 8.8 PAL jaslv0dc | 04-Mar-2007 22:26 EST | 86507 TX 43 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

expenses was primarily due to lower stock-based compensation expense due to the remeasurement of certain stock option grants. Total stock-based compensation expense for 2004 was $0.8 million compared to $1.7 million in 2003. The decrease was primarily due to the cancellation of certain fixed option grants and due to certain option grants becoming fully vested in early 2004 and throughout 2003 (and therefore generating lower expenses in 2004).

*General and administrative expenses.* General and administrative expenses (G&A expenses) were $8.0 million, or 5.8% of net revenues, in 2004, compared to $10.9 million, or 8.6% of net revenues, in 2003. The decrease in G&A expenses was primarily to due to a decrease in stock-based compensation expenses. Total stock-based compensation expense for 2004 was a benefit of $(0.1) million compared to an expense of $4.0 million in 2003. The decrease was primarily due to the cancellation of certain fixed option grants, certain grants becoming fully vested in early 2004 and throughout 2003, and the revaluation of option grants subject to variable accounting. The decrease was partially offset by an increase in consulting and auditing expenses and other costs related to compliance activities resulting from the Sarbanes-Oxley Act of 2002.

*Total other income.* Total other income was $1.3 million in 2004 and $0.9 million in 2003. The increase was due primarily to increases in cash and investments and slightly higher interest rates. The increase was also partially due to the reversal in 2004 of interest expense recorded in prior periods related to payroll tax on stock-based compensation. The reversal was due to the expiration of the statute of limitations.

*Provision for income taxes.* Provision for income taxes for 2004 and 2003 represents Federal, state and foreign taxes. The provision for income taxes was $6.1 million for 2004 compared to $3.5 million for 2003. Our effective tax rate for 2004 and 2003 was approximately 23%. The difference between the statutory rate of 35% and our effective tax rate for 2004 and 2003 was due primarily to the beneficial impact of lower income tax rates on international sales, Federal tax-exempt investments, and in 2004, a benefit of $1.1 million resulting from a reduction in our estimated income-tax liabilities due to the favorable conclusion of certain tax contingencies.

## Liquidity and Capital Resources

Since our initial public offering of common stock in December 1997, our principal source of funding has been cash from our operations.

As of December 31, 2005, we had approximately $130.5 million in cash, cash equivalents, short-term and long-term investments. In addition, under a revolving line of credit agreement with Union Bank of California, which expired on October 1, 2006, we could borrow up to $10.0 million. A portion of this credit line was used to cover advances for commercial letters of credit and standby letters of credit, which we provide to Matsushita prior to their shipment of silicon wafers to us. We have also provided letters of credit to our workers compensation insurance carrier as part of our insurance program. As of December 31, 2005, there were outstanding letters of credit totaling approximately $641,000. The balance of this credit line was unused and available at December 31, 2005. On October 26, 2006, we entered into a security agreement with the Union Bank of California, whereby we agreed to maintain $1.3 million in an interest bearing certificate of deposit with the bank. The purpose of this agreement is to secure commercial letters of credit and standby letters of credit up to the deposit amount. This agreement remains in effect until cancellation of our letters of credit. As of December 31, 2005, we had no outstanding capital equipment leases.

As of December 31, 2005, 2004 and 2003 we had working capital, defined as current assets less current liabilities, of approximately $132.8 million, $127.4 million and $115.5 million, respectively. Our operating activities generated cash of $36.0 million, $30.1 million and $21.8 million in the years ended December 31, 2005, 2004 and 2003, respectively. Cash provided by operating activities in the year ended December 31, 2005 was principally the result of net income of $15.7 million, depreciation and amortization of $6.3 million, a decrease in inventories of $7.5 million due to decreased purchases of raw material components, and an increase in taxes payable and other accrued liabilities of $5.2 million, primarily due to an increase in income taxes related to lower income in lower tax rate foreign jurisdictions. Cash provided by operating activities in the year ended

43

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0<br>9.9 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | 86507 TX 44 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

December 31, 2004 was principally the result of net income in the amount of $20.5 million, depreciation and amortization of $6.9 million and tax benefits associated with employee stock option exercises of $2.1 million. Cash provided by operating activities in the year ended December 31, 2003 was principally the result of net income in the amount of $11.4 million, depreciation and amortization of $6.8 million and stock-based compensation expense of $9.9 million, which resulted from the remeasurement of certain stock option grants, as discussed in this Annual Report. Cash provided by operating activities was partially offset by an increase in inventories totaling $8.1 million. This increase was partially the result of lower-than-expected sales in late 2003 following our loss of a portion of the cellphone-charger business at a major customer.

Our investing activities for the year ended December 31, 2005 resulted in a $7.8 million use of cash, which was driven primarily by the issuance of a $10.0 million promissory note to a supplier, as described in note 11 of our consolidated financial statements, purchases of property and equipment totaling $3.2 million and the acquisition of technology for $1.1 million. These uses of cash were offset in part by net proceeds of $6.5 million from short-term and long-term investments. Investing activities for the year ended December 31, 2004, resulted in a $12.0 million use of cash, driven by purchases of property and equipment totaling $6.4 million, net purchases of investments of $3.9 million, and the acquisition of technology for $1.7 million. Investing activities for the year ended December 31, 2003, resulted in a $30.6 million use of cash, driven by purchases of property and equipment totaling $37.8 million, including the purchase of our San Jose headquarters facilities for approximately $30 million, and the acquisition of technology for $1.4 million, offset in part by net proceeds of $8.6 million of short term and long term investments.

Our financing activities in 2005 resulted in a net use of cash totaling $25.8 million. We used $33.7 million, for the repurchase of approximately 1.7 million shares of our common stock, including fees and commissions. This use of cash was partially offset by receipts of $7.9 million from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan. In 2004 our financing activities resulted in a net use of cash totaling $2.7 million. We used $11.8 million for the repurchase of 590,000 shares of our common stock, including fees and commissions. This use of cash was largely offset by receipts of $9.1 million from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan. In 2003 our financing activities consisted almost exclusively of receipts of $23.6 million from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan.

On October 20, 2004, we announced that our board of directors had authorized the repurchase of up to $40.0 million of our common stock. From inception of the stock repurchase program in October 2004 through June 30, 2005, we repurchased 2,033,270 shares for approximately $40.0 million. On October 19, 2005, we announced that our board of directors had authorized a second stock repurchase program of up to $25.0 million of our common stock. From inception of the second stock repurchase plan through December 31, 2005, we had purchased a total of 249,500 shares for a total of approximately $5.3 million.

During 2005, a significant portion of our cash flow was generated by our operations. If our operating results deteriorate in future periods as a result of a decrease in customer demand or pricing pressures from our customers or our competitors, our ability to generate positive cash flow from operations may be jeopardized. In that case, we may be forced to use our cash, cash equivalents and short-term investments to fund our operations. We believe that cash generated from operations, together with existing sources of liquidity, will satisfy our projected working capital and other cash requirements for at least the next 12 months.

**Off-Balance Sheet Arrangements**

As of December 31, 2005 and 2004, we did not have any off-balance sheet arrangements or relationships with unconsolidated entities or financial partnerships, such as entities often referred to as structured finance or special purposes entities, which are typically established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX9 9.6 PAL jaslv0dc | 04-Mar-2007 22:26 EST | | 86507 TX 45 | 1* |
| FORM 10-K | | PAL | | | HTM IFV | 1C |

Page 1 of 1

## Contractual Obligations

As of December 31, 2005, we had the following contractual obligations and commitments (in thousands):

| | | Payments due by period | | | |
| | Total | Less than 1 Year | 1-3 Years | 4-5 Years | Over 5 Years |
|---|---|---|---|---|---|
| Purchase obligations | $7,919 | $ 7,919 | $— | $— | $ — |
| Operating lease obligations | 1,136 | 433 | 651 | 52 | — |
| Total | $9,055 | $ 8,352 | $651 | $ 52 | $— |

## Recently Issued Accounting Pronouncements

In December 2004, the Financial Accounting Standards Board, or FASB, issued FASB Staff Position (FSP) No. 109-1 (FAS 109-1), *Application of FASB Statement No. 109, Accounting for Income Taxes, to the Tax Deduction on Qualified Production Activities Provided by the American Jobs Creation Act of 2004* (the AJCA). The AJCA introduces a special 9% tax deduction on qualified production activities. FAS 109-1 clarifies that this tax deduction should be accounted for as a special tax deduction in accordance with Statement of Financial Accounting Standards SFAS No. 109. We will not be repatriating foreign earnings for the purpose of applying SFAS No. 109, and therefore the act will not have a material impact on our financial statements.

In December 2004, the FASB issued SFAS No. 123 (revised 2004) *Share-Based Payment* (SFAS 123(R)), which replaces SFAS No. 123 *Accounting for Stock-Based Compensation* (SFAS 123) and supersedes APB Opinion No. 25 *Accounting for Stock Issued to Employees*. The pro forma disclosures previously permitted under SFAS 123 no longer will be permitted. In March 2005, the SEC also issued Staff Accounting Bulletin 107 (SAB 107), *Share-Based Payment*, which expresses views of the SEC staff regarding the application of SFAS No. 123(R). Among other things, SAB 107 provides interpretive guidance related to the interaction between SFAS No. 123(R) and certain SEC rules and regulations, as well as the SEC staff's views regarding the valuation of share-based payment arrangements for public companies. We are required to adopt SFAS 123(R), beginning January 1, 2006. We have elected to use the modified-prospective method to transition to FAS 123(R). Under this method compensation expense shall be recorded for all unvested stock options and restricted stock at the beginning of the first quarter of adoption of SFAS 123(R). We expect to use the Black-Scholes valuation approach to determine fair value and to recognize the corresponding expense using the single option approach. Further we expect that the adoption of SFAS 123(R) will have a material impact on our consolidated results of operations and earnings per share.

In March 2005, the FASB issued FSP No. 46(R)-5, *Implicit Variable Interests under FASB Interpretation No. 46 (revised December 2003), Consolidation of Variable Interest Entities* (FSP 46(R)-5), which provides guidance for a reporting enterprise on whether it holds an implicit variable interest in a variable interest entity (VIE) or potential VIE when specific conditions exist. FSP 46 (R)-5 became applicable for us in the quarter ended June 30, 2005. FSP 46(R) had no impact on our consolidated results of operations and financial condition as of December 31, 2005.

In March 2005, the FASB issued FASB interpretation No. 47 (FIN 47), *Accounting for Conditional Asset Retirement Obligations, an interpretation of FASB Statement No. 143* (FIN 47), which requires an entity to recognize a liability for the fair value of a conditional asset retirement obligation when incurred if the liability's fair value can be reasonably estimated. FIN 47 is effective for fiscal years ending after December 15, 2005. We have adopted FIN 47 in the current year, and the adoption of this standard did not have a material impact on our consolidated results of operations.

In May 2005, the FASB issued SFAS No. 154, *Accounting Changes and Error Corrections* (SFAS 154) that replaces Accounting Principles Board Opinions No. 20 *Accounting Changes* and SFAS No. 3, *Reporting Accounting Changes in Interim Financial Statements—An Amendment of APB Opinion No. 28*. SFAS 154

45

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P 9.6 | PAL jaslv0dc | 04-Mar-2007 22:26 EST | 86507 TX 46 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

provides guidance on the accounting for and reporting of accounting changes and error corrections. It establishes retrospective application, or the latest practicable date, as the required method for reporting a change in accounting principle and the reporting of a correction of an error. We have adopted this pronouncement as of January 1, 2006 for error corrections made on or after the date of adoption, and additional disclosures are included in note 3 of notes to the consolidated financial statements.

In November 2005, the FASB issued FSP FAS 115-1 and FAS 124-1, *The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments* (FSP 115-1), which provides guidance on determining when investments in certain debt and equity securities are considered impaired, whether that impairment is other-than-temporary, and on measuring such impairment loss. FSP 115-1 also includes accounting considerations subsequent to the recognition of an other-than temporary impairment and requires certain disclosures about unrealized losses that have not been recognized as other-than-temporary impairments. FSP 115-1 is required to be adopted by us in the first quarter of fiscal 2006, and such adoption is not anticipated to have a material effect on our consolidated financial statements.

In July 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes—an Interpretation of SFAS 109* (FIN 48). FIN 48 prescribes a comprehensive model for recognizing, measuring, presenting and disclosing in the financial statements tax positions taken or expected to be taken on a tax return, including a decision whether to file or not to file in a particular jurisdiction. FIN 48 is effective for us beginning in the first quarter of 2007. If there are changes in net assets as a result of application of FIN 48, these will be accounted for as an adjustment to retained earnings. We are currently assessing the impact of FIN 48 on our consolidated financial position and results of operations.

In July 2006, the FASB issued EITF Issue No. 06-3, *How Taxes Collected from Customers and Remitted to Governmental Authorities Should be Presented in the Income Statement (that is, Gross versus Net Presentation)* (EITF 06-3). The adoption of EITF 06-3 did not have an impact on our consolidated financial position and results of operations. Our accounting policy has been to present the above-mentioned taxes on a net basis, excluded from revenues.

In September 2006, the SEC issued Staff Accounting Bulletin No. 108 (SAB 108), which provides interpretive guidance on how the effects of the carryover or reversal of prior year misstatements should be considered in quantifying a current year misstatement. The guidance is applicable for our fiscal year 2007. We currently do not believe that the adoption of SAB 108 will have a material impact on our consolidated financial position and results of operation.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157, *Fair Value Measurements* (SFAS 157). SFAS 157 establishes a framework for measuring fair value and expands disclosures about fair value measurements. The changes to current practice resulting from the application of SFAS 157 relate to the definition of fair value, the methods used to measure fair value, and the expanded disclosures about fair value measurements. SFAS 157 is effective for fiscal years beginning after November 15, 2007 and interim periods within those fiscal years. We are currently in the process of evaluating the impact that the adoption of SFAS 157 will have on our consolidated financial position and results of operation.

In September 2006, the FASB issued SFAS No. 158, *Employers Accounting for Defined Benefit Pension and Other Postretirement Plans—an amendment of FASB Statements No. 87, 88, 106, and 132(R)*, (SFAS 158). SFAS 158 requires an employer to recognize the over-funded or under-funded status of a defined benefit postretirement plan (other than a multiemployer plan) as an asset or liability in its statement of financial position to recognize changes in that funded status in the year in which the changes occur through comprehensive income of a business entity or changes in unrestricted net assets of a not-for-profit organization. The provisions of SFAS 158 require an employer with publicly traded equity securities to recognize the funded status of a defined benefit postretirement plan and to provide the required disclosures as of the end of the fiscal year ending after December 15, 2006. We do not believe that the adoption of the provisions of SFAS No. 158 will materially impact our consolidated financial position and results of operation.

46



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.9 | PAL  jaslv0dc | 04-Mar-2007 22:27 EST | | 86507 TX 47 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

**Selected Quarterly Results of Operations**

The following tables set forth certain data from our consolidated statements of income for each of the quarters in the years ended December 31, 2005 and 2004 as well as the percentage of our net revenues represented by each item. This information has been derived from our restated unaudited consolidated financial statements. See note 12 and note 3, "Selected Quarterly Information" and "Restatement of Consolidated Financial Statements," respectively, of the notes to consolidated financial statements for information on our restatement. We will not be amending our previously filed Quarterly Reports on Form 10-Q; however, we are including in this Form 10-K comparative information reflecting the restatement for the three quarters ended March 31, June 30, and September 30, 2005 and the four quarters in the year ended December 31, 2004.

The unaudited quarterly consolidated financial statements have been prepared on the same basis as the audited consolidated financial statements contained herein and include all adjustments that we consider necessary for a fair presentation of such information when read in conjunction with our annual audited consolidated financial statements and notes thereto appearing elsewhere in this report. The operating results for any quarter are not necessarily indicative of the results for any subsequent period or for the entire fiscal year.

| | Three Months Ended | | | | | | | |
| | Dec. 31, 2005 | Sept. 30, 2005 As Restated (1) | June 30, 2005 As Restated (1) | Mar. 31, 2005 As Restated (1) | Dec. 31, 2004 As Restated (1) | Sept. 30, 2004 As Restated (1) | June 30, 2004 As Restated (1) | Mar. 31, 2004 As Restated (1) |
|---|---|---|---|---|---|---|---|---|
| | | | | (unaudited) | | | | |
| | | | (in thousands, except per share data) | | | | | |
| Net revenues | $37,875 | $36,543 | $34,241 | $34,412 | $33,598 | $32,946 | $35,944 | $34,165 |
| Cost of revenues | 18,984 | 18,487 | 17,616 | 17,892 | 17,478 | 17,238 | 19,520 | 17,620 |
| Gross profit | 18,891 | 18,056 | 16,625 | 16,520 | 16,120 | 15,708 | 16,424 | 16,545 |
| Operating expenses: | | | | | | | | |
| Research and development | 4,358 | 4,273 | 4,141 | 4,339 | 4,104 | 3,931 | 3,237 | 4,168 |
| Sales and marketing | 5,125 | 4,573 | 4,403 | 4,213 | 4,014 | 3,634 | 3,992 | 4,430 |
| General and administrative | 5,134 | 4,248 | 3,180 | 3,103 | 2,290 | 2,241 | 1,858 | 1,580 |
| Total operating expenses | 14,617 | 13,094 | 11,724 | 11,655 | 10,408 | 9,806 | 9,087 | 10,178 |
| Income from operations | 4,274 | 4,962 | 4,901 | 4,865 | 5,712 | 5,902 | 7,337 | 6,367 |
| Total other income. | 791 | 924 | 797 | 637 | 310 | 326 | 453 | 231 |
| Income before provision for income taxes. | 5,065 | 5,886 | 5,698 | 5,502 | 6,022 | 6,228 | 7,790 | 6,598 |
| Provision for income taxes. | 3,719 | 616 | 660 | 1,458 | 2,081 | 457 | 1,967 | 1,633 |
| Net income | $ 1,346 | $ 5,270 | $ 5,038 | $ 4,044 | $ 3,941 | $ 5,771 | $ 5,823 | $ 4,965 |
| Earnings per share | | | | | | | | |
| Basic | $ 0.05 | $ 0.18 | $ 0.17 | $ 0.14 | $ 0.13 | $ 0.19 | $ 0.19 | $ 0.16 |
| Diluted | $ 0.04 | $ 0.17 | $ 0.16 | $ 0.13 | $ 0.12 | $ 0.18 | $ 0.18 | $ 0.15 |
| Shares used in per share calculation | | | | | | | | |
| Basic | 29,460 | 29,478 | 29,423 | 29,919 | 30,886 | 30,912 | 30,785 | 30,622 |
| Diluted | 30,760 | 30,849 | 30,835 | 30,966 | 31,934 | 31,972 | 32,372 | 32,481 |

47

**Percentage of Total Net Revenues**

| | Dec. 31, 2005 | Sept. 30, 2005 As Restated (1) | June 30, 2005 As Restated (1) | Mar. 31, 2005 As Restated (1) | Dec. 31, 2004 As Restated (1) | Sept. 30, 2004 As Restated (1) | June 30, 2004 As Restated (1) | Mar. 31, 2004 As Restated (1) |
|---|---|---|---|---|---|---|---|---|
| Net revenues | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| Cost of revenues | 50.1 | 50.6 | 51.4 | 52.0 | 52.0 | 52.3 | 54.3 | 51.6 |
| Gross profit | 49.9 | 49.4 | 48.6 | 48.0 | 48.0 | 47.7 | 45.7 | 48.4 |
| Operating expenses: | | | | | | | | |
| Research and development | 11.5 | 11.7 | 12.1 | 12.6 | 12.2 | 12.0 | 9.0 | 12.2 |
| Sales and marketing | 13.5 | 12.5 | 12.9 | 12.3 | 12.0 | 11.0 | 11.1 | 13.0 |
| General and administrative | 13.6 | 11.6 | 9.3 | 9.0 | 6.8 | 6.8 | 5.2 | 4.6 |
| Total operating expenses | 38.6 | 35.8 | 34.3 | 33.9 | 31.0 | 29.8 | 25.3 | 29.8 |
| Income from operations | 11.3 | 13.6 | 14.3 | 14.1 | 17.0 | 17.9 | 20.4 | 18.6 |
| Total other income | 2.1 | 2.5 | 2.3 | 1.9 | 0.9 | 1.0 | 1.3 | 0.7 |
| Income before provision for income taxes | 13.4 | 16.1 | 16.6 | 16.0 | 17.9 | 18.9 | 21.7 | 19.3 |
| Provision for income taxes | 9.8 | 1.7 | 1.9 | 4.2 | 6.2 | 1.4 | 5.5 | 4.8 |
| Net income. | 3.6% | 14.4% | 14.7% | 11.8% | 11.7% | 17.5% | 16.2% | 14.5% |

(1) See note 12 and note 3, "Selected Quarterly Information" and "Restatement of Consolidated Financial Statements," respectively, of the notes to consolidated financial statements for a detailed analysis of our quarterly comparisons and for information on our restatement.

**Comparison of the Three Months Ended March 31, 2005 and 2004**

*Net revenues.* Net revenues for the three months ended March 31, 2005 were $34.4 million, an increase of 0.7% compared to $34.2 million in the three months ended March 31, 2004. The increase was primarily the result of a change to our method of calculating deferred income on sales to distributors, which caused us to recognize $1.1 million dollars in previously deferred revenue during the three months ended March 31, 2005. The amount of deferred revenue was not material to any of the individual prior periods in which it was earned. The impact of this adjustment was largely offset by lower sales into the communications end market, primarily for cellphone chargers.

Our net revenue mix by product family and by the end markets that we serve are as follows:

Revenue mix by product family for the three months ended March 31, 2005 compared to the three months ended March 31, 2004:

| Product Family | Three Months Ended March 31, 2005 | Three Months Ended March 31, 2004 |
|---|---|---|
| TinySwitch-I and -II | 56% | 53% |
| TopSwitch-FX and -GX | 27% | 27% |
| TopSwitch-I and -II | 13% | 17% |
| LinkSwitch and DPA -Switch | 4% | 3% |

48

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09.8 | PAL jaslv0dc | 04-Mar-2007 22:27 EST | 86507 TX 49 | 1* |
| FORM 10-K | | PAL | | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

Approximate revenue mix by end markets served for the three months ended March 31, 2005 compared to the three months ended March 31, 2004:

| End Market | Three Months Ended March 31, 2005 | Three Months Ended March 31, 2004 |
| --- | --- | --- |
| Consumer | 31% | 31% |
| Communication | 30% | 35% |
| Computer | 24% | 18% |
| Industrial | 9% | 10% |
| Other | 6% | 6% |

International revenues, which are based on "ship to" customer locations, were $32.2 million in the first quarter of 2005 compared to $31.4 million for the same period in 2004, an increase of approximately $800,000. International revenues in the first quarter of 2005 represented 94% of net revenues compared to 92% in the comparable period of 2004. Although the power supplies using our products are designed and distributed to end markets worldwide, most of these power supplies are manufactured in Asia. Sales to this region were 79% and 77% of our net revenues for the three months ended March 31, 2005 and 2004, respectively.

Net product revenues for the first quarter of 2005 were 58% from distributors and 42% from original equipment manufacturers (OEMs) and power supply merchants, compared to 56% to distributors and 44% to OEMs and power supply merchants for the first quarter of 2004. In the three months ended March 31, 2005, two separate customers, both of whom are distributors, accounted for approximately 19% and 16% of net revenues. In the three months ended March 31, 2004, the same two distributors accounted for approximately 22% and 15% of net revenues, and one other customer, an OEM, accounted for approximately 13% of net revenues.

Customer demand for our products can change quickly and unexpectedly. Our customers perceive that our products are readily available and typically order only for their short-term needs. Our revenue levels are highly dependent on the amount of new orders that are received for which product can be delivered by us within the same period. Orders that are booked and shipped within the same period are called "turns business". Because of the uncertainty of customer demand, and the short lead-time environment and high turns business, it is difficult to predict future levels of revenues and profitability.

*Gross profit.* Gross profit was $16.5 million, or 48.0% of net revenues, for the three months ended March 31, 2005, and $16.5 million, or 48.4% of net revenues, for the three months ended March 31, 2004. The impact of declining average selling prices was largely offset by reduced unit costs resulting from our implementation of an improved process technology and from lower test costs resulting from test-time improvements and the ongoing migration of our testing operations to overseas sub-contractors. During the three months ended March 31, 2005 we recognized $0.6 million in previously deferred costs and $0.4 million in previously deferred gross profit as a result of the change in our method for calculating deferred income on sales to distributors.

*Research and development expenses.* Research and development expenses for the first quarter of 2005 were $4.3 million, or 12.6% of net revenues, compared to $4.2 million, or 12.2% of net revenues, for the same period in 2004.

*Sales and marketing expenses.* Sales and marketing expenses were $4.2 million, or 12.3% of net revenues, for the first quarter of 2005, compared to $4.4 million, or 13.0% of net revenues for the same period in 2004.

*General and administrative expenses.* For the quarter ended March 31, 2005, general and administrative expenses were $3.1 million or 9.0%, of our net revenues, compared to $1.6 million, or 4.6% of net revenues for the same period in 2004. The increase was due primarily to increased professional services fees incurred in our

49

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 PAL jaslv0dc | 04-Mar-2007 22:27 EST | 86507 TX 50 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

efforts to comply with the requirements of the Sarbanes-Oxley Act, as well as legal fees related to our patent-infringement lawsuits against System General Corporation and Fairchild Semiconductor, and stock-based compensation expense due to the remeasurement of certain stock option awards for which variable accounting applies.

*Other income, net.* Other income, net, for the first quarter of 2005 was $0.6 million compared to $0.2 million for the same period in 2004. The increase of $406,000 was primarily from increased interest income due to higher interest rates. The weighted average interest rate for our investment portfolio in the three months ended March 31, 2005 was 2.82% compared to 1.41% for the same period in 2004.

*Provision for income taxes.* Provision for income taxes represents federal, state and foreign taxes. The provision for income taxes was $1.5 million for the quarter ended March 31, 2005 compared to $1.6 million for the quarter ended March 31, 2004. Our estimated effective tax rate used for the three months ended March 31, 2005 and 2004 was 26% and 25% respectively. The difference between the statutory rate of 35% and our effective tax rate for the quarter ended March 31, 2005 and 2004 was due primarily to the favorable effects of research and development tax credits and international revenues subject to lower tax rates.

### Liquidity and Capital Resources

As of March 31, 2005, we had approximately $122.7 million in cash, cash equivalents and short-term and long-term investments, a decrease of approximately $11.9 million from December 31, 2004. We had working capital, defined as current assets less current liabilities, of approximately $125.5 million, a decrease of approximately $1.9 million from December 31, 2004.

In addition, under a revolving line of credit with Union Bank of California, we can borrow up to $10.0 million. A portion of the credit line was used to cover advances for commercial letters of credit and standby letters of credit, which we provide to Matsushita, prior to the shipment of wafers to us. We also provide letters of credit to our workers compensation insurance carrier as part of our insurance program. As of March 31, 2005, there were outstanding letters of credit totaling approximately $2.3 million. The balance of this credit line was unused and available as of March 31, 2005. Refer to the year-over-year liquidity section of this MD&A for more information on our line of credit.

Our operating activities generated cash of $6.5 million and $4.6 million in the three months ended March 31, 2005 and 2004, respectively. Cash generated in the first three months of 2005 was principally the result of net income in the amount of $4.0 million, depreciation and amortization of $1.7 million, a decrease in accounts receivable, and prepaid expenses and other current assets of $2.0 million and $1.2 million respectively, partially offset by an increase in inventory of $1.4 million and a decrease in accounts payable of $1.2 million. Cash generated in the first three months of 2004 was principally the result of net income in the amount of $5.0 million, depreciation and amortization of $1.8 million, a decrease in inventory of $1.8 million, partially offset by an increase in accounts receivable of $3.1 million, taxes payable and other accrued liabilities of $1.4 million, and a decrease in accounts payable of $1.7 million.

Our investing activities for the three months ended March 31, 2005 generated cash of $7.8 million. Our investing activities consisted of net proceeds from maturities of investments of $8.5 million and purchases of property and equipment of $0.6 million. Our investing activities for the three months ended March 31, 2004 resulted in $6.9 million use of cash. Our investing activities consisted primarily of a $6.1 million net purchase of investments, and purchases of property and equipment of $0.8 million.

Our financing activities for the three months ended March 31, 2005 was a use of $17.8 million of cash, which included the use of $20.2 million for the repurchase of approximately 1.1 million shares of our common stock, and receipts of $2.5 million from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan. Our cash provided by financing activities in the three months ended March 31, 2004 was $4.4 million, which was primarily receipts from the issuance of common



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 96 | PAL jaslvOdc | 04-Mar-2007 22:27 EST | | 86507 TX 51 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | | Page 1 of 1 |

stock through the exercise of stock options and purchases through our employee stock purchase plan of $4.4 million. On October 20, 2004, we announced that our board of directors had authorized the repurchase of up to $40.0 million of our common stock. From the inception of the stock repurchase program in 2004 to March 31, 2005, a total of 1,660,000 shares were repurchased for approximately $31.9 million. We repurchased approximately 1.1 million shares for approximately $20.2 million during the three months ended March 31, 2005.

**Comparison of the Three Months Ended June 30, 2005 and 2004**

*Net revenues.* Net revenues for the three months ended June 30, 2005 were $34.2 million, a decrease of 4.7% compared to $35.9 million for the three months ended June 30, 2004. The decrease was the result of lower revenues from the communications, consumer and computer markets, partially offset by higher revenues from the industrial market. Higher sales of our TinySwitch-II and TOPSwitch-GX products were more than offset by lower sales from legacy products such as TOPSwitch-I and -II.

Our results for the quarter ended June 30, 2005 have been restated to reflect an adjustment to our reserve for sales returns. This adjustment decreased net revenues by $1.1 million compared to the results previously reported; refer to note 12 of the notes to consolidated financial statements for a detailed analysis of our quarterly comparisons related to our restatement.

Revenue mix by product family for the three months ended June 30, 2005 compared to the three months ended June 30, 2004, was as follows:

| Product Family | Three Months Ended June 30, 2005 | Three Months Ended June 30, 2004 |
|---|---|---|
| TinySwitch-I and -II | 58% | 52% |
| TopSwitch-FX and -GX | 27% | 28% |
| TopSwitch-I and -II | 12% | 17% |
| LinkSwitch and DPA-Switch | 3% | 3% |

Approximate revenue mix by end markets served for the three months ended June 30, 2005 compared to the three months ended June 30, 2004, was as follows:

| End Market | Three Months Ended June 30, 2005 | Three Months Ended June 30, 2004 |
|---|---|---|
| Consumer | 32% | 34% |
| Communication | 30% | 31% |
| Computer | 21% | 21% |
| Industrial | 10% | 8% |
| Other | 7% | 6% |

International revenues were $32.5 million in the second quarter of 2005 compared to $33.2 million for the same period in 2004, a decrease of $0.7 million, or approximately 2%. International sales represented 94.9% of net revenues compared to 92.3% in the three months ended June 30, 2005 and 2004, respectively. Although the power supplies using our products are designed and distributed to end markets worldwide, most of these power supplies are manufactured in Asia. Sales to this region were 79% and 77% of our net revenues for the three months ended June 30, 2005 and 2004, respectively.

For the second quarter of 2005, sales to distributors accounted for 60.7% of net revenues, while sales to OEMs and power supply merchants accounted for 39.3%, compared to 55.0% to distributors and 45.0% to OEMs

51

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.8 PAL jaslv0dc | 04-Mar-2007 22:27 EST | 86507 TX 52 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

and power supply merchants for the second quarter of 2004. In the three months ended June 30, 2005, two separate customers, both of who are distributors, accounted for approximately 20.5% and 18.4% of net revenues. In the three months ended June 30, 2004, the same two distributors accounted for approximately 18.6% and 18.0% of net revenues, and one OEM customer accounted for approximately 11.4% of net revenues.

*Gross profit.* Gross profit was $16.6 million, or 48.6% of net revenues, for the three months ended June 30, 2005, compared to $16.4 million, or 45.7% of net revenues, for the three months ended June 30, 2004. The increase in our gross profit for the three months ended June 30, 2005 was driven primarily by our ability to reduce product costs, principally through price reductions from our foundries, improvements to our manufacturing process, and the increased use of overseas subcontractors for the testing of our ICs. Also, in the second quarter of 2004, our gross profit was reduced as a result of lower unit production in the previous quarter, a step taken by us in order to achieve a desired reduction in our inventories.

*Research and development expenses.* Research and development expenses for the quarter ended June 30, 2005 was $4.1 million, or 12.1% of net revenues, compared to $3.2 million, or 9.0% of net revenues, in the three months ended June 30, 2004. The increase was driven primarily by the remeasurement of our stock-based compensation expense, due to variable accounting for outstanding stock options, which was a negligible amount in the three months ended June 30, 2004 and totaled $0.3 million for the three months ended June 30, 2005.

*Sales and marketing expenses.* Sales and marketing expenses were $4.4 million, or 12.9% of net revenues, for the second quarter of 2005, compared to $4.0 million, or 11.1% of net revenues for the same period in 2004.

*General and administrative expenses.* General and administrative expenses were $3.2 million, or 9.3% of net revenues, for the three months ended June 30, 2005, and $1.9 million, or 5.2% of net revenues, for the three months ended June 30, 2004. The increase was driven primarily by increased audit fees related to our efforts to comply with the Sarbanes-Oxley Act, as well as a significant increase in legal fees due to our patent-infringement litigation against Fairchild Semiconductor and System General Corp. (as described in Part I, Item 3 Legal Proceedings).

*Other income, net.* Other income, net, was $0.8 million for the second quarter of 2005, compared to $0.5 million for the same period in 2004. The increase was due primarily to an increase in our weighted average interest rate, which was 3.17% for the three months ended June 30, 2005 compared to 1.34% for the same period in 2004.

*Provision for income taxes.* The provision for income taxes for the quarter ended June 30, 2005 and 2004 was $0.7 million and $2.0 million, respectively. The difference between the statutory rate of 35% and our effective tax rate for the three months ended June 30, 2005 and 2004 was due primarily to lower tax rates applied to international revenues and the favorable effects of research and development tax credits.

### Liquidity and Capital Resources

As of June 30, 2005, we had approximately $124.2 million in cash, cash equivalents and short-term and long-term investments, a decrease of approximately $10.4 million from December 31, 2004. As of June 30, 2005, we had working capital, defined as current assets less current liabilities, of approximately $126.8 million, a decrease of approximately $0.6 million from December 31, 2004.

In addition, under a revolving line of credit with Union Bank of California, we can borrow up to $10.0 million. A portion of this credit line is used to cover advances for commercial letters of credit and standby letters of credit, which we provide to Matsushita, prior to the shipment of wafers to us, and also to our workers compensation insurance carrier as part of our insurance program. As of June 30, 2005, there were outstanding letters of credit totaling approximately $2.2 million. The balance of this credit line was unused and available as of June 30, 2005. Refer to the year-over-year liquidity section of this MD&A for more information on our line of credit.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX6 PAL jaslv0dc | 04-Mar-2007 22:27 EST | 86507 TX 53 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

Our operating activities generated cash of $15.1 million in the six months ended June 31, 2005. Cash generated in the first six months of 2005 was principally the result of net income in the amount of $9.1 million, depreciation and amortization of $3.2 million, stock-based compensation expense of $1.7 million, and a decrease in inventory of $1.4 million, partially offset by a decrease in accounts payable of $1.8 million. Cash generated in the first six months of 2004 was principally the result of net income in the amount of $10.8 million, depreciation and amortization of $3.5 million, a decrease in inventory of $3.3 million, and the tax benefit associated with employee stock plans of $1.4 million, partially offset by an increase in accounts receivable of $3.1 million.

Our investing activities for the six months ended June 30, 2005 generated cash of $6.8 million. Our investing activities consisted of net proceeds from maturities of investments of $8.5 million, and purchases of property and equipment of $1.7 million. Our investing activities for the six months ended June 30, 2004 resulted in the $19.4 million use of cash. Our investing activities consisted primarily of a $16.7 million net purchase of investments, and purchases of property and equipment of $2.8 million. Our financing activities for the six months ended June 30, 2005 included the use of $28.3 million for the repurchase of approximately 1.4 million shares of our common stock, and net proceeds from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan of $4.5 million. In the six months ended June 30, 2004, our financing activities were primarily receipts from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan of $5.6 million.

On October 20, 2004, we announced that our board of directors had authorized the repurchase of up to $40.0 million of our common stock. The board of directors directed that the repurchases be made pursuant to Rule 10b5-1 of the Exchange Act. From inception of the stock repurchase program in October 2004 through June 30, 2005, we had repurchased 2,033,270 shares for approximately $40.0 million, the total amount authorized by our board of directors. We repurchased 373,270 shares for approximately $8.1 million during the three months ended June 30, 2005. The repurchase program has no expiration date, and may be suspended or discontinued at any time.

**Comparison of the Three Months Ended September 30, 2005 and 2004**

*Net revenues.* Net revenues for the three months ended September 30, 2005 were $36.5 million, an increase of 10.9% compared to $32.9 million for the three months ended September 30, 2004. The increase was driven primarily by increased sales of our products into the computer and industrial markets. Sales of our TinySwitch-II, TOPSwitch-GX and LinkSwitch products all contributed to the year-over-year growth in net revenues.

Revenue mix by product family for the three months ended September 30, 2005 compared to the three months ended September 30, 2004, was as follows:

| Product Family | Three Months Ended Sept 30, 2005 | Three Months Ended Sept 30, 2004 |
| --- | --- | --- |
| TinySwitch-I and -II | 53% | 53% |
| TopSwitch-FX and -GX | 31% | 31% |
| TopSwitch-I and -II | 10% | 14% |
| LinkSwitch and DPA-Switch | 6% | 2% |

Approximate revenue mix by end markets served for the three months ended September 30, 2005 compared to the three months ended September 30, 2004, was as follows:

| End Market | Three Months Ended Sept 30, 2005 | Three Months Ended Sept 30, 2004 |
| --- | --- | --- |
| Consumer | 31% | 34% |
| Communication | 28% | 30% |
| Computer | 23% | 22% |
| Industrial | 11% | 8% |
| Other | 7% | 6% |



International revenues were $34.0 million in the third quarter of 2005 compared to $30.1 million for the same period in 2004, an increase of $3.9 million, or 13%. International sales represented 93% of net revenues compared to 91% in the three months ended September 30, 2005 and 2004, respectively. International revenues for the three months ended September 30, 2005 increased due to increased sales into the computer and industrial markets.

Although the power supplies using our products are distributed to end markets worldwide, most of these power supplies are manufactured in Asia. Sales to this region were 77% and 73% of our revenues for the three months ended September 30, 2005 and 2004, respectively. We expect international revenues to continue to account for a large portion of our net revenues.

Net product revenues for the third quarter of 2005 were divided 61.3% to distributors and 38.7% to OEMs and power supply merchants, compared to 54.4% to distributors and 45.6% to OEMs and power supply merchants for the third quarter of 2004. In the three months ended September 30, 2005, two separate customers, both of who are distributors, accounted for approximately 19.3% and 18.1% of our net revenues, respectively. In the three months ended September 30, 2004, the same two distributors accounted for approximately 15.5% and 17.4% of our net revenues, respectively. No other customers accounted for 10% or more of our net revenues in that period.

*Gross profit.* Gross profit is equal to net revenues less cost of revenues. Our cost of revenues consists primarily of costs associated with the purchase of wafers from our foundries (Matsushita, OKI and ZMD), the assembly and packaging of our products by sub-contractors, internal labor and overhead associated with the testing of both wafers and packaged components and testing of packaged components by sub-contractors. Gross profit was $18.1 million, or 49.4% of net revenues, for the three months ended September 30, 2005, compared to $15.7 million, or 47.7% of net revenues, for the three months ended September 30, 2004. The increase in gross profit percentage for the three months ended September 30, 2005 was driven primarily by our ability to reduce product costs, principally through price reductions from our foundries, improvements to our manufacturing process, and the increased use of overseas subcontractors for the testing of our ICs.

*Research and development expenses.* Research and development expenses for the third quarter of 2005 and 2004 were $4.3 million and $3.9 million, respectively. The third quarter of 2004 was lower than the same period in 2005 due to the reversal of a payroll tax liability, related to our restatement, for which the statute of limitations had expired.

*Sales and marketing expenses.* Sales and marketing expenses were $4.6 million, or 12.5% of net revenues, for the third quarter of 2005, compared to $3.6 million, or 11.0% of net revenues for the same period in 2004. In absolute dollars, sales and marketing expenses increased from the same period in 2004, primarily as a result of expanding our worldwide sales and applications engineering staff.

*General and administrative expenses.* For the quarters ended September 30, 2005 and 2004, general and administrative expenses were $4.2 million and $2.2 million, respectively, which represented 11.6% and 6.8% of our net revenues, respectively. The increase was due to higher legal fees driven by our patent-infringement litigation against Fairchild Semiconductor and System General Corp and due to increased fees for consulting and audit services related to compliance with the requirements of the Sarbanes-Oxley Act.

*Other income, net.* Other income, net, for the third quarter of 2005 was $0.9 million compared to $0.3 million for the same period in 2004. The increase in other income can be attributed to higher interest rates year-over-year.

*Provision for income taxes.* Our effective tax rate for the nine months ended September 30, 2005 was 16%. The decrease in the estimated effective tax rate for 2005 from approximately 19% through June 30, 2005 resulted in an effective tax rate of 10% for the three months ended September 30, 2005, due primarily to lower tax rates applied to international sales and the favorable effects of research and development tax credits. The tax provision

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0⁹⁶ PAL jaslv0dc | 04-Mar-2007 22:27 EST | 86507 TX 55 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

for the three months ended September 30, 2004 was calculated using an annual effective income tax rate of 20%, which was adjusted for the favorable conclusion of certain tax contingencies in the third quarter of 2004, resulting in an effective tax rate of approximately 7% for the three-month period.

*Liquidity and Capital Resources*

As of September 30, 2005, we had approximately $121.8 million in cash, cash equivalents and short-term and long-term investments, a decrease of approximately $12.7 million from December 31, 2004. As of September 30, 2005, we had working capital, defined as current assets less current liabilities, of approximately $127.4 million, which was flat when compared to December 31, 2004.

In addition, under a revolving line of credit with Union Bank of California, we can borrow up to $10.0 million. A portion of the credit line is used to cover advances for commercial letters of credit and standby letters of credit, which we provide to Matsushita, prior to the shipment of wafers by this foundry to us, and also to our workers compensation insurance carrier as part of our insurance program. As of September 30, 2005, there were outstanding letters of credit totaling approximately $2.1 million. The balance of this credit line was unused and available as of September 30, 2005. Refer to the year-over-year liquidity section of this MD&A for more information on our line of credit.

Our operating activities generated cash of $22.3 million in the nine months ended September 30, 2005. Cash generated in the first nine months of 2005 was principally the result of net income in the amount of $14.4 million depreciation and amortization of $4.7 million, and a decrease in inventory of $3.2 million, and stock-based compensation expense of $2.3 million, partially offset by an increase in accounts receivable of $2.4 million and a decrease in accounts payable of $1.9 million. Cash generated in the first nine months of 2004 was principally the result of net income in the amount of $16.6 million plus depreciation and amortization of $5.2 million, and an income tax benefit associated with our employee stock plan of $1.4 million.

Our investing activities for the nine months ended September 30, 2005 resulted in a $9.2 million use of cash, which was driven primarily by the issuance of a $10.0 million promissory note to a supplier (see note 11 of our consolidated financial statements), purchases of property and equipment totaling $2.6 million and the acquisition of technology for $1.1 million. These uses of cash were offset in part by net proceeds of $4.5 million from short-term and long-term investments. Investing activities for the nine months ended September 30, 2004, resulted in a $31.3 million use of cash, driven primarily by net purchases of investments of $26.8 million and purchases of property and equipment totaling $4.1 million.

Our financing activities for the nine months ended September 30, 2005 included the use of $28.3 million for the repurchase of approximately 1.4 million shares of our common stock, offset by net proceeds from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan of $7.0 million. In the nine months ended September 30, 2004, our financing activities were primarily receipts from the issuance of common stock through the exercise of stock options and purchases through our employee stock purchase plan of $7.9 million.

**Comparison of the Three Months Ended December 31, 2005 and 2004**

*Net revenues.* Net revenues for the three months ended December 31, 2005 totaled $37.9 million, an increase of 13% from the same quarter of the prior year. Revenue growth was driven primarily by increased sales of our products to customers in the industrial and communications end markets.

*Sales and marketing expenses.* Sales and marketing expenses for the three months ended December 31, 2005 increased when compared to all prior quarters in 2005 and 2004. Sales and Marketing expenses increased due primarily to increased stock-based compensation expenses.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.6 PAL jaslv0dc | 04-Mar-2007 22:28 EST | 86507 TX 56 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |
| | | | | Page 1 of 1 | |

*General and administrative expenses.* General and administrative expenses for the quarter ended December 30, 2005 increased when compared to all prior quarters in 2005 and 2004. The increase was due to higher legal fees driven by our patent-infringement litigation against Fairchild Semiconductor and System General Corp, and due to stock-based compensation expenses.

*Provision for income taxes.* Provision for income taxes in the quarter ended December 31, 2005 increased 155% when compared to the same quarter of the prior year. The increase in income tax related primarily to a change in our estimates of historical profitability in foreign jurisdictions.

### Item 7A. Quantitative and Qualitative Disclosures About Market Risk.

*Interest Rate Risk.* Our exposure to market risk for changes in interest rates relate primarily to our investment portfolio. We consider cash invested in highly liquid financial instruments with a remaining maturity of three months or less at date of purchase to be cash equivalents. Investments in highly liquid financial instruments with maturities greater than three months but not longer than twelve months from the balance sheet date are classified as short-term investments. Investments in highly liquid financial instruments with maturities greater than twelve months from the balance sheet date are classified as long-term investments. We do not use derivative financial instruments in our investment portfolio to manage our interest rate risk, foreign currency risk, or for any other purpose. We invest in high-credit quality issuers and, by policy, limit the amount of credit exposure to any one issuer. As stated in our policy, we ensure the safety and preservation of our invested principal funds by limiting default risk, market risk and reinvestment risk. We mitigate default risk by investing in safe and high-credit quality securities and by constantly positioning our portfolio to respond appropriately to a significant reduction in a credit rating of any investment issuer, guarantor or depository. The portfolio includes only marketable securities with active secondary or resale markets to ensure portfolio liquidity. We do not hold any instruments for trading purposes. At December 31, 2005 we held primarily cash equivalents and short-term investments, with maturity dates of less than twelve months, and fixed interest rates. In the year ended December 31, 2004, we held cash equivalents, short-term investments and long-term investments. Our investments in 2004 has similar characteristics to the investments held at the end of the current year, and differed primarily as a result of our classification of auction rate securities as long-term in 2004. Auction rate securities usually have interest rate resets of less than 90 days, but for which the underlying maturity date is longer than 90 days. We held no auction rate securities at December 31, 2005.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX01 98 PAL jaslv0dc | 04-Mar-2007 22:28 EST | 86507 TX 57 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |
Page 1 of 1

The table below presents the carrying value and related weighted average interest rates for our investment portfolio at December 31, 2005 and 2004. Carrying value approximates fair market value at December 31, 2005 and 2004 (in thousands, except weighted average interest rates).

|  | December 31, 2005 | | December 31, 2004 | |
|  | Carrying Value | Weighted Average Interest Rate | Carrying Value As restated | Weighted Average Interest Rate As restated |
|---|---|---|---|---|
| **Investment Securities Classified as Cash Equivalents:** | | | | |
| Taxable securities | $ 86,037 | 4.37% | $ 89,408 | 2.42% |
| Tax exempt securities | 6 | 0.00% | — | 0.00% |
| Total | 86,043 | 4.37% | 89,408 | 2.42% |
| **Investment Securities Classified as Short-term Investments:** | | | | |
| U.S. government securities | 14,530 | 3.11% | 1,000 | 1.24% |
| U.S. corporate securities | 1,670 | 2.28% | 249 | 1.91% |
| Total | 16,200 | 3.03% | 1,249 | 1.37% |
| **Investment Securities Classified as Long-term Investments:** | | | | |
| U.S. corporate securities | — | — | 6,421 | 2.40% |
| U.S. government securities | 4,422 | 3.91% | 19,490 | 2.20% |
| Total | 4,422 | 3.91% | 25,911 | 2.35% |
| Total investment securities | $106,665 | 4.15% | $116,568 | 2.39% |

These securities are subject to market interest rate risk and will vary in value as market interest rates fluctuate. To minimize market risk as of December 31, 2005, our investments subject to market risk mature in less than one year, and therefore if market interest rates were to increase or decline by 10% from interest rates as of December 31, 2005, the increase or decline in the fair market value of our portfolio would not be material.

*Foreign Currency Exchange Risk.* We transact business in various foreign countries. Our primary foreign currency cash flows are in Asia and Western Europe. Currently, we do not employ a foreign currency hedge program utilizing foreign currency forward exchange contracts; however, the contract prices to purchase wafers from Matsushita and OKI are denominated in Japanese yen and both agreements allow for mutual sharing of the impact of the exchange rate fluctuation between Japanese yen and the U.S. dollar. Nevertheless, changes in the exchange rate between the U.S. dollar and the Japanese yen subject our gross profit and operating results to the potential for material fluctuations. We maintain a Japanese yen account with a U.S. bank for payments to our wafer suppliers in Japan.

## Item 8. Financial Statements and Supplementary Data.

The Financial Statements and Supplementary Data required by this item are set forth at the pages indicated at Item 15(a).

## Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure.

On June 16, 2005, we dismissed KPMG LLP as our independent registered public accountants. The decision to dismiss KPMG LLP was approved by the audit committee of our board of directors. On the same day, we engaged Deloitte & Touche LLP as independent registered public accountants to audit our financial statements. The decision to engage Deloitte & Touche LLP was approved by the audit committee of our board of directors. We did not, nor did anyone on our behalf, consult Deloitte & Touche LLP during our two most recent fiscal years and during the subsequent interim period prior to our engagement of Deloitte & Touche LLP regarding the



| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 9.8 | PAL jaslv0dc | 04-Mar-2007 22:28 EST | 86507 TX 58 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

application of accounting principles to a specified transaction (completed or proposed), the type of audit opinion that might be rendered on our financial statements, any matter being the subject of disagreement or "reportable event" or any other matter described in Item 304(a)(2) of Regulation S-K.

During the two fiscal years ended December 31, 2004, and the subsequent interim period through June 16, 2005, there were: (1) no disagreements with KPMG on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedures, which disagreements if not resolved to their satisfaction would have caused them to make reference in connection with their opinion to the subject matter of the disagreement, and (2) no reportable events. The audit reports of KPMG on the consolidated financial statements of Power Integrations, Inc. and subsidiaries as of and for the years ended December 31, 2004 and 2003 did not contain an adverse opinion or disclaimer of opinion, and were not qualified or modified as to uncertainty, audit scope or accounting principles. The audit report of KPMG on management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of internal control over financial reporting as of December 31, 2004 did not contain an adverse opinion or disclaimer of opinion, and was not qualified or modified as to uncertainty, audit scope or accounting principles. For a further discussion on this matter, see our Form 8-K filed with the SEC on June 22, 2005.

## Item 9A. Controls and Procedures.

### Conclusion Regarding the Effectiveness of Disclosure Controls and Procedures

Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of our disclosure controls and procedures, as such term is defined in Rules 13a-15(e) and 15d-15 (e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). Disclosure controls and procedures under the Exchange Act mean the controls and other procedures that are designed to provide reasonable assurance that the information required to be disclosed by Power Integrations) in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time period specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to provide reasonable assurance that information required to be disclosed by Power Integrations in the reports that it files or submits under the Exchange Act is accumulated and communicated to Power Integrations' management, including its chief executive officer and chief financial officer, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

Based on this evaluation, our chief executive officer and chief financial officer concluded that our disclosure controls and procedures were not effective as of December 31, 2005, as a result of a material weakness that existed in our internal control over financial reporting as discussed below.

### Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as such term is defined in Exchange Act Rule 13a-15(f) and 15d-15(f). Under the supervision and with the participation of our management, including our chief executive officer and chief financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

It should be noted that any control system, no matter how well designed and operated, can provide only reasonable assurance to the tested objectives. The design of any control system is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions, regardless of how remote. The inherent limitations in any control system include the realities that judgments related to decision-making can be faulty, and that reduced effectiveness in controls can occur because of simple errors or mistakes. Due to the inherent limitations in a cost-effective control system, misstatements due to error may occur and may not be detected.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 8.6 | PAL jaslv0dc | 04-Mar-2007 22:28 EST | 86507 TX 59 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

Based on our evaluation under the framework in *Internal Control—Integrated Framework*, our Chief Executive Officer and Chief Financial Officer concluded that our internal control over financial reporting was not effective as of December 31, 2005. A material weakness (described in the following paragraph) existed in our internal control over financial reporting, and therefore our internal control over financial reporting was not operating effectively as of such date, for the reasons discussed below. A material weakness is defined as a control deficiency, or combination of control deficiencies, that result in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected.

As of December 31, 2005, we did not have sufficient controls and procedures in place to prevent or detect a material misstatement in the consolidated financial statements and related disclosures from the application of Accounting Principles Board Opinion (APB) No. 25 *Accounting for Stock Issued to Employees* ("APB 25") and Financial Accounting Standard 123, *Accounting for Stock-Based Compensation,* as amended ("SFAS 123").

Specifically, in the course of our investigation of our stock option granting practices we determined that our controls were not adequate in ensuring that our stock option grants had a correctly recorded grant date, the first date on which the number of shares that an individual employee was entitled to receive and the exercise price were both known with finality. This included not having sufficient controls in place to ensure that option grants received the required corporate approvals. Moreover, we did not have sufficient controls in place to properly account for stock option grants that had modifications in key terms. This lack of internal controls and procedures led to an incorrect application of APB 25, which provides that compensation expense relative to our employee stock options should be measured based on the intrinsic value of stock options granted. We concluded that original measurement dates on certain stock option grants could not be relied upon for accounting purposes and that the appropriate charges for such stock option grants and for stock option grants where key terms were potentially modified had not been properly recorded. As a result we did not correctly account for stock-based compensation expense for certain stock option grants in our previously-issued consolidated financial statements. In connection with errors that resulted from this material weakness, we have recorded non-cash charges for stock-based compensation and the related payroll and income tax effects in prior periods, and we have restated our historical consolidated financial statements for each of the fiscal years ended 1998 through 2004, for each of the first three quarters of the year ended December 31, 2005, and for each of the four quarters of the year ended December 31, 2004. Additionally, subsequent to the filing of our Annual report on Form 10-K for the year ended December 31, 2004, we determined that, due to errors, certain changes in the assumptions used to calculate pro forma net income, and footnote disclosures under the provisions of SFAS 123 were required. Accordingly, we determined that our controls were not adequate to ensure that the assumptions were accurate. Those changes have been made and the resulting impact on our pro forma net income and footnote disclosures have been reflected in our consolidated financial statements as part of our restatement.

Our management's assessment of the effectiveness of our internal control over financial reporting as of December 31, 2005 has been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report which is included herein.

**Change in Internal Control Over Financial Reporting**

There has been no change in our internal control over financial reporting during the quarter ended December 31, 2005 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting; however, subsequent to December 31, 2005, we have taken several steps to strengthen our disclosure controls and procedures and internal control over financial reporting. These subsequent steps were taken to strengthen our processes related to granting stock options. Specifically, we have implemented the following internal control improvements:

- Improvements in disclosure controls and internal control over financial reporting

  - We held internal training sessions with our executives, finance, and human resources personnel to roll out the revised stock option granting policy and increase competency levels related to stock option granting.

59

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 9.8 | PAL jaslv0dc | 04-Mar-2007 22:28 EST | | 86507 TX 60 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

- Improvements in our stock option granting process and related controls to ensure our stock option grants have a correctly recorded grant date, the first day on which the number of shares and exercise price are known with finality

    - Our compensation committee refined and limited delegation of authority to a subcommittee to grant stock options, and eliminated the use of written consents by the compensation committee for the purpose of granting options to help avoid issues regarding timing of receipt of written consents.

    - We now require that all evergreen, new hire, promotional and retention stock options be granted either (i) by our stock option committee on a predetermined schedule, (ii) by our board of directors or (iii) at a meeting of our compensation committee.

    - In addition, all stock option grants to the executive staff must be made by the board of directors or our compensation committee.

    - We worked with our attorneys and board of directors to review and update our stock option granting policy, which included requirements for the timing of the authorization, pricing and vesting of stock option grants. In addition, we worked with a cross functional team including finance, human resources, and our external legal counsel to implement controls related to the revised stock option granting policy. This included the timing of the authorization, pricing and vesting of stock option grants.

Management is in the process of remediating this material weakness, and has taken steps to help ensure that all individuals involved in administering the process are now aware of the revised controls. Although these design changes have been implemented, management has not had the opportunity to evaluate the operating effectiveness of these revised controls.

60

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 PAL jaslv0dc | 04-Mar-2007 22:28 EST | 86507 TX 61 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

### REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of Power Integrations, Inc.:

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that Power Integrations, Inc. and subsidiaries (collectively the "Company") did not maintain effective internal control over financial reporting as of December 31, 2005, because of the effect of the material weakness identified in management's assessment, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the Company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinions.

A company's internal control over financial reporting is a process designed by, or under the supervision of, the company's principal executive and principal financial officers, or persons performing similar functions, and effected by the company's board of directors, management, and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may not be prevented or detected on a timely basis. Also, projections of any evaluation of the effectiveness of the internal control over financial reporting to future periods are subject to the risk that the controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

A material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected. The following material weakness has been identified and included in management's assessment: as of December 31, 2005, the Company did not have sufficient controls and procedures in place to prevent or detect a material misstatement in the consolidated financial statements and related disclosures from the application of Accounting Principles Board Opinion No. 25, "*Accounting for Stock Issued to Employees*" ("APB 25") and Statement of Financial Accounting Standards No. 123 "*Accounting for Stock-Based Compensation*", as amended ("SFAS 123"). These design deficiencies led to the incorrect application of APB 25 and SFAS 123 and resulted in material misstatements to the Company's consolidated financial statements which required correction. This material weakness was considered in determining the nature, timing, and extent of audit

61

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUDSK141049 PAL garcm0pa 9.6.18 | 06-Mar-2007 13:36 EST | 86507 TX 62 | 2* |
| FORM 10-K | | PAL | | HTM PMT | 1C |

Page 1 of 1

tests applied in our audit of the consolidated financial statements and consolidated financial statement schedule as of and for the year ended December 31, 2005, of the Company and this report does not affect our report on such consolidated financial statements and consolidated financial statement schedule.

In our opinion, management's assessment that the Company did not maintain effective internal control over financial reporting as of December 31, 2005, is fairly stated, in all material respects, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission. Also in our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2005, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated financial statements and consolidated financial statement schedule as of and for the year ended December 31, 2005, of the Company and our report dated March 6, 2007, expressed an unqualified opinion on those consolidated financial statements and consolidated financial statement schedule.

*/s/ DELOITTE & TOUCHE LLP*

San Jose, California
March 6, 2007

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX03 9.8 | PAL jaslv0dc | 04-Mar-2007 22:28 EST | | 86507 TX 63 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

**Item 9B. Other Information.**

Outside Director Stock Options

The Power Integrations, Inc. 1997 Outside Directors Stock Option Plan (the "Plan") provides for the automatic grant of stock options to Power Integrations' outside directors, such that the grants require no independent action of the Board or any committee of the Board. The Plan provides that each outside director is granted a stock option to purchase 30,000 shares of Power Integrations common stock upon appointment as a member of the Board, and that each outside director is granted a stock option to purchase 10,000 shares of Power Integrations common stock at each anniversary of the date of appointment or, in the case of outside directors appointed prior to Power Integrations' initial public offering on December 12, 1997, the anniversary date of the initial public offering. The exercise price of each stock option grant is the fair market value of a share of common stock on the date of grant.

Power Integrations has determined that, as a result of administrative errors, certain grants under the Plan (referred to as the "Misdocumented Grants") to three of its outside directors, Messrs. Alan Bickell, Nicholas Brathwaite and Scott Brown, were documented as having been made on dates other than as set forth in the Plan. In nearly every case, the Misdocumented Grants were documented as having been made on the anniversary date of the initial public offering rather than the anniversary date of the appointment of each of the three directors, each of whom was appointed after the initial public offering. As a result in the error in the grant date, the erroneous documentation of these grants reflects higher exercise prices for eight of the affected grants, and lower exercise prices for the eight other affected grants, than the correct exercise prices of the grants made pursuant to the terms of the Plan. Because the grants made under the Plan are automatic, Power Integrations has corrected the administrative errors in these documents so that they reflect the correct date of grant and the correct exercise price of the options as automatically granted pursuant to the Plan.

Although these corrections simply ensure that the documentation of these option grants now accurately reflect the terms of the Plan, each of Messrs. Bickell, Brathwaite and Brown believe it is important that they not be in a better position, or be perceived to be in a better position, as a result of the administrative errors or corrections. As a result, each of these directors agreed to amend the exercise price of those grants in which the corrected exercise price was lower than the exercise price as reflected in the erroneous documentation, so that, after the amendments to the options, each of the grants has an exercise price equal to the greater of the exercise price in the erroneous documentation and the corrected exercise price. Specifically, on February 20, 2007, each of Messrs. Bickell, Brathwaite and Brown entered into an option amendment increasing the exercise prices of the following options:

| Director | Date of Option | Number of Shares | Exercise Price in Erroneous Documentation | Correct Exercise Price | Amended Exercise Price |
|---|---|---|---|---|---|
| Alan Bickell | April 21, 2000 | 10,000 | $ 43.875 | $21.375 | $43.875 |
| | April 21, 2002 | 10,000 | $ 24.590 | $19.200 | $24.590 |
| | April 21, 2004 | 10,000 | $ 33.850 | $31.700 | $33.850 |
| Nicholas Brathwaite | January 31, 2002 | 10,000 | $ 24.590 | $18.100 | $24.590 |
| | January 31, 2004 | 10,000 | $ 33.850 | $29.500 | $33.850 |
| Scott Brown | July 15, 2000 | 10,000 | $ 43.875 | $24.500 | $43.875 |
| | July 15, 2002 | 10,000 | $ 24.590 | $17.790 | $24.590 |
| | July 15, 2004 | 10,000 | $ 33.850 | $22.740 | $33.850 |

In addition, on February 20, 2007, each of Messrs. Bickell, Brathwaite and Brown executed an Acknowledgement and Waiver confirming that the original documentation relating to the Misdocumented Grants has been superseded by the corrected agreements and amendments described above.

Only one of the directors who received Misdocumented Grants, Mr. Brathwaite, has exercised any of these grants. Mr. Brathwaite has delivered to Power Integrations the difference between: (a) the total exercise price, as corrected, of the Misdocumented Grants he exercised; and (b) the total exercise price reflected in the erroneous documentation, which he had previously paid to Power Integrations. The total amount of Mr. Brathwaite's additional payment to the Power Integrations was $78,290.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX01 6.6 | PAL jaslv0dc | 04-Mar-2007 22:28 EST | 86507 TX 64 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

# PART III

## Item 10. Directors and Executive Officers of Power Integrations.

The information required by this Item related to our executive officers is incorporated by reference to information set forth in Part I, Item 1 of this report under the heading "Executive Officers of the Registrant." As of January 1, 2007, our board of directors was as follows:

| Name | Position With Power Integrations | Director Since | Age |
| --- | --- | --- | --- |
| Alan D. Bickell(1)(2) | Director | 1999 | 70 |
| Balakrishnan S. Iyer(2)(3)(4) | Director | 2004 | 50 |
| R. Scott Brown(1) | Director | 1999 | 65 |
| Dr. James Fiebiger(3)(4) | Director | 2006 | 65 |
| Steven J. Sharp(3) | Director and Chairman of the Board | 1988 | 65 |
| Balu Balakrishnan | Director, President and Chief Executive Officer | 2002 | 52 |
| Nicholas E. Brathwaite(3) | Director | 2000 | 48 |
| E. Floyd Kvamme(1)(2) | Director | 1989 | 69 |

(1)    Member of the compensation committee
(2)    Member of the audit committee
(3)    Member of the nominating and corporate governance committee
(4)    Member of the special committee

*Alan D. Bickell* has served as a member of the board of directors since April 1999. Mr. Bickell spent more than 30 years with Hewlett-Packard Company, a computer-hardware company, serving as corporate senior vice president and managing director of geographic operations from 1992 until his retirement in 1996. Mr. Bickell is a member of the Board of Trustees of Menlo College and serves on the board of directors of the Peking University Educational Foundation (USA).

*Balakrishnan S. Iyer* has served as a member of the board of directors since February 2004. From October 1998 to June 2003, Mr. Iyer served as senior vice president and chief financial officer for Conexant Systems, Inc., a designer, developer and seller of semiconductor systems solutions for communications applications. From January 1997 to September 1998, Mr. Iyer served as senior vice president and chief financial officer for VLSI Technology, Inc., a semiconductor company. Mr. Iyer also serves on the board of directors of Conexant Systems, Inc., a semiconductor system solutions company, Invitrogen Corporation, a life science technology company, Qlogic Corporation, a storage networking solutions company, Skyworks Solutions, Inc., a wireless semiconductor company, and IHS Inc., a global provider of technical information, decision-support tools and related services.

*R. Scott Brown* has served as member of the board of directors since July 1999. Mr. Brown has been retired since May 1, 1999. From 1985 to May 1999, Mr. Brown served as senior vice president of worldwide sales and support for Xilinx, Inc., a designer and developer of complete programmable logic solutions for use by electronic equipment manufacturers.

*Dr. James Fiebiger* became a member of the board of directors in March 2006. Dr. Fiebiger is currently a consultant to the semiconductor and the electronic design automation industries. From December 1999 to October 2004, he served as chairman and chief executive officer of Lovoltech Inc., a fabless semiconductor company. Dr. Fiebiger served as vice chairman of GateField Corporation, a fabless semiconductor company, from February 1999 until the company was sold to Actel Corporation in November 2000. He served as GateField Corporation's president and chief executive officer from June 1996 until February 1999. From October 1993 to June 1996, he was chairman and managing director of Thunderbird Technologies, Inc., a semiconductor technology licensing company. From December 1987 to September 1993 he was president and chief operating officer at VLSI Technology, Inc., a semiconductor company. From August 1981 to August 1985 he was senior corporate vice president and assistant general manager of Motorola, Inc. Semiconductor Products Sector, the

semiconductor business of Motorola, a wireless and broadband communications company. Dr. Fiebiger is a member of the board of directors of Qlogic Corporation, an electronics company, Mentor Graphics Corporation, an electronic design automation company, Actel Corporation, a semiconductor company, and Pixelworks, Inc., a fabless semiconductor company.

Steven J. Sharp has served as a member of the board of directors since our inception in 1988, and was elected non-executive chairman of the board in May 2006. Mr. Sharp has served as chairman of the board of directors of TriQuint Semiconductor, Inc., a manufacturer of electronic components for the communications industry, since 1992. He joined TriQuint Semiconductor, Inc. as president, chief executive officer and director in September 1991. Mr. Sharp served as president and chief executive officer of TriQuint Semiconductor, Inc. until July 2002. Prior to TriQuint Semiconductor, Inc., Mr. Sharp was associated with various venture capital and startup semiconductor firms. He helped start Crystal Semiconductor (now Cirrus Logic, Inc.), Gazelle Microcircuits, Inc. (now TriQuint Semiconductor, Inc.), Megatest Corporation (now Teradyne, Inc.) and Volterra Semiconductor Corporation. He also founded Silicon Architects (now Synopsys, Inc.). Mr. Sharp also serves on the boards of several private companies and charitable organizations.

Balu Balakrishnan has served as president and chief executive officer and as a director of Power Integrations since January 2002. He served as president and chief operating officer from April 2001 to January 2002. From January 2000 to April 2001, he was vice president of engineering and strategic marketing. From September 1997 to January 2000, he was vice president of engineering and new business development. From September 1994 to September 1997, Mr. Balakrishnan served as vice president of engineering and marketing.

Nicholas E. Brathwaite has served as a member of the board of directors since January 2000. Mr. Brathwaite has served as chief technology officer of Flextronics International Ltd., an electronics company, since 2000. In 1995 Flextronics International Ltd. acquired nChip, Inc., a multi-chip module company, where Mr. Brathwaite held the position of vice president and general manager of operations from 1992 to 1996. As a founding member of nChip, Inc., Mr. Brathwaite was responsible for all manufacturing and operational activities including wafer test, and module assembly. Before joining nChip, Inc., Mr. Brathwaite spent six years with Intel Corporation, a microprocessor company, in various engineering management positions in technology development and manufacturing. He is also a member of the board of directors of Photon Dynamics, Inc., a yield management solutions company for the flat panel display market.

E. Floyd Kvamme has served as a member of the board of directors since September 1989. Mr. Kvamme is partner emeritus of Kleiner Perkins Caufield & Byers, a venture capital company. Mr. Kvamme also serves on the boards of National Semiconductor Corporation, a semiconductor company, Harmonic Inc., a broadband optical networking and digital video systems company, and two private companies.

The board of directors has determined that, other than Balu Balakrishnan, our president and chief executive officer, each member of the board of directors is an "independent director" as defined in the listing standards for The NASDAQ Stock Market, Inc. and applicable SEC rules.

*Audit Committee*

Since April 19, 2004, the members of the audit committee of the board of directors have been Alan D. Bickell, Balakrishnan S. Iyer and E. Floyd Kvamme. Each member of the audit committee is "independent" for purposes of The NASDAQ Stock Market, Inc. and SEC rules as they apply to audit committee members. The board of directors has determined that Mr. Alan D. Bickell is an audit committee financial expert, as defined in the SEC rules.

*Policy on Stockholder Recommendations of Directors Nominees*

The nominating and corporate governance committee will consider director candidates recommended by stockholders. The nominating and corporate governance committee does not intend to alter the manner in which it evaluates candidates based on whether the candidate was recommended by a stockholder or not.

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152159 9.6.18 | PAL soeus0pa | 05-Mar-2007 19:26 EST | | 86507 TX 66 | 2* |
| FORM 10-K | | | PAL | | | HTM PMT | 1C |

Page 1 of 1

Stockholders who wish to recommend individuals for consideration by the nominating and corporate governance committee to become nominees for election to the Board may do so by delivering a written recommendation to the nominating and corporate governance committee at the following address: 5245 Hellyer Avenue, San Jose, CA 95038 by January 1 of the year in which such director is to be elected. Submissions must include the full name of the proposed nominee, a description of the proposed nominee's business experience for at least the previous five years, complete biographical information, a description of the proposed nominee's qualifications as a director and a representation that the nominating stockholder is a beneficial or record owner of our stock. Any such submission must be accompanied by the written consent of the proposed nominee to be named as a nominee and to serve as a director if elected.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Securities Exchange Act of 1934 requires our executive officers, directors and persons who beneficially own more than 10% of our common stock to file initial reports of ownership and reports of changes in ownership with the SEC. These persons are required by SEC regulations to furnish us with copies of all Section 16(a) forms that they file.

Based solely on review of the forms furnished to us, we believe that all filing requirements applicable to the executive officers, directors and persons who beneficially own more than 10% of our common stock were complied with in 2005, except as follows: one report covering one transaction by Mr. Balakrishnan was filed late, and one report was filed late with an error in it by Mr. Brown, and the error was later corrected.

### Code of Business Conduct and Ethics

The board of directors has adopted a code of business conduct and ethics and a policy for reporting violations and complaints, both of which apply to all of our employees, officers and directors. Any substantive amendment or waiver of the code of business conduct and ethics may be made only by our board of directors upon the recommendation of the audit committee, and will be disclosed on our website. In addition, disclosure of any waiver of the code of business conduct and ethics for directors and executive officers will also be made by the filing of a Form 8-K with the SEC. The code of business conduct and ethics is available on our website at www.powerint.com. Copies will also be provided without charge upon request. Requests should be directed in writing to Power Integrations, Inc. 5245 Hellyer Avenue, San Jose, California 95138; Attention: Investor Relations.

### Item 11. Executive Compensation.

#### Compensation of Directors

Each of our board members, in 2005, with the exception of our one employee director, Balu Balakrishnan, received $5,000 per quarter to serve as a member of our board of directors. In addition, the chairman of our audit committee, compensation committee and nominating committee received $5,000, $1,875, and $1,250 per quarter respectively, to serve as chairpersons of these committees. Our non-employee board members received compensation to attend board meetings via phone or in person of $750 and $1,500 respectively. The members of our audit, compensation and nominating committees received additional compensation for committee meeting attendance via phone or in person of $500 and $1,000 respectively. Non-employee directors are reimbursed for all reasonable travel and related expenses incurred in connection with attending board and committee meetings.

Additionally, directors who are not employees of Power Integrations each receive options to purchase shares of common stock under the 1997 Outside Directors Stock Option Plan (the "Directors Plan"). The Directors Plan provides for the automatic grant of nonstatutory stock options to our nonemployee directors over their period of service on the board of directors. The Directors Plan provides that each future nonemployee director of Power Integrations will be granted an option to purchase 30,000 shares of common stock on the date on which such individual first becomes a nonemployee director of Power Integrations (the "Initial Grant"). Thereafter, each

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0<br>9.6 PAL jaslv0dc | 04-Mar-2007 22:29 EST | 86507 TX 67 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

nonemployee director who has served on the board of directors continuously for 12 months will be granted an additional option to purchase 10,000 shares of common stock (an "Annual Grant"). Subject to an optionee's continuous service with Power Integrations, approximately 1/3rd of an Initial Grant will become exercisable one year after the date of grant and 1/36th of the Initial Grant will become exercisable monthly thereafter. Each Annual Grant will become exercisable in twelve equal monthly installments beginning in the 25th month after the date of grant, subject to the optionee's continuous service. The exercise price per share of all options granted under the Directors Plan is equal to the fair market value of a share of common stock on the date of grant. Options granted under the Directors Plan have a maximum term of ten years after the date of grant, subject to earlier termination upon an optionee's cessation of service. In the event of certain changes in control of Power Integrations, all options outstanding under the Directors Plan will become immediately vested and exercisable in full.

Mr. Earhart, who left the board of directors as of May of 2006, waived his right to receive a fee and grant of stock options as compensation for his services in 2005 as a director. Mr. Balakrishnan, our chief executive officer and president, is not separately compensated for his services as a member of the board of directors.

*Executive Compensation*

The following table presents summary information for the years ended December 31, 2005, 2004 and 2003, concerning the compensation earned by our chief executive officer and the other four most highly compensated executive officers during 2005.

### Summary Compensation Table

| Name and principal position | Year | Salary | Bonus | Other Annual Compensation[3] | No. of securities underlying options | All other Compensation[1] |
|---|---|---|---|---|---|---|
| Balu Balakrishnan | 2005 | $347,500 | $217,332(2) | $  3,000 | 200,000 | $  5,963 |
| President and Chief Executive Officer | 2004 | $339,769 | $110,833(2) | $  3,000 | 200,000 | $  6,830 |
| | 2003 | $324,846 | $273,333(2) | $  3,000 | 300,000 | $  1,380 |
| Derek Bell | 2005 | $242,500 | $ 86,000 | $  3,000 | 45,000 | $  1,683 |
| Vice President, Engineering | 2004 | $234,885 | $ 40,000 | $  3,000 | 45,000 | $  1,260 |
| | 2003 | $227,423 | $100,000 | $  3,000 | 45,000 | $  1,242 |
| Bruce Renouard | 2005 | $232,500 | $ 86,000 | $ 35,117 | 45,000 | $  1,618 |
| Vice President, Worldwide Sales | 2004 | $224,885 | $ 40,000 | $  3,000 | 45,000 | $  1,205 |
| | 2003 | $217,423 | $100,000 | $  3,000 | 45,000 | $  1,187 |
| John Tomlin | 2005 | $242,500 | $ 86,000 | $  3,000 | 45,000 | $  1,683 |
| Vice President, Operations | 2004 | $232,288 | $ 40,000 | $  3,000 | 50,000 | $  1,260 |
| | 2003 | $227,423 | $100,000 | $  3,000 | 45,000 | $  1,242 |
| Clifford J. Walker | 2005 | $226,250 | $ 86,000 | $  3,000 | 50,000 | $  6,237 |
| Vice President, Corporate Development | 2004 | $214,885 | $ 40,000 | $  3,000 | 45,000 | $ 11,991 |
| | 2003 | $207,423 | $100,000 | $  3,000 | 45,000 | $    883 |

(1)   Represents premiums for life insurance for all executives, fees related to tax preparation services for Mr. Balakrishnan for 2004 and 2005, and vacation cash out hours in 2004 and 2005 for Mr. Walker, allowed by Power Integrations for all employees in January.

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUDSK141049PAL garcm0pa | 05-Mar-2007 19:26 EST | 86507 TX 68 | 2* |
| FORM 10-K | | PAL | | HTM PMT | 1C |
| | | | | Page 1 of 1 | |

(2)  Includes $2,332 that was paid to Mr. Balakrishnan in 2005 with respect to his work on patents that were assigned to Power Integrations in 2005, $10,833 that was paid to Mr. Balakrishnan in 2004 with respect to his work on patents that were assigned to Power Integrations in 2004, and $23,333 in 2003 with respect to his work on patents that were assigned to Power Integrations in 2003.

(3)  Includes 401(k) employer contribution for all executives and reimbursement to Mr. Renouard for taxes paid to a foreign country in 2005.

*Option Grants in Last Fiscal Year*

The following table provides certain information concerning options to purchase our common stock granted during the year ended December 31, 2005 to the persons named in the Summary Compensation Table:

| Name | Number of Securities Underlying Options Granted[1] (#) | % of Total Options Granted to Employees in Fiscal Year[2] (%) | Exercise Price Per Share[3] ($) | Expiration Date | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term[4] ($) | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | | 5% | 10% |
| Balu Balakrishnan | 200,000 | 13.44% | $ 17.18 | 1/23/2015 | $2,160,882 | $5,476,099 |
| Derek Bell | 45,000 | 3.02% | $ 17.18 | 1/23/2015 | $ 486,198 | $1,232,122 |
| Bruce Renouard | 45,000 | 3.02% | $ 17.18 | 1/23/2015 | $ 486,198 | $1,232,122 |
| John Tomlin | 45,000 | 3.02% | $ 17.18 | 1/23/2015 | $ 486,198 | $1,232,122 |
| Clifford J. Walker | 50,000 | 3.36% | $ 17.18 | 1/23/2015 | $ 540,220 | $1,369,025 |

(1)  Options granted in 2005 are immediately exercisable and vest fully within four years from the grant date subject to the optionee's continued employment or service with Power Integrations. Such options vest at the rate of 1/8 on the six-month anniversary of the date of grant and 1/48 monthly thereafter. Power Integrations has a right to repurchase shares issued upon the exercise of unvested options until such shares become vested. Under the terms of the 1997 Stock Option Plan, the administrator retains the discretion, subject to the 1997 Stock Option Plan limits, to modify the terms of outstanding options and to reprice outstanding options. The options generally have a maximum term of 10 years, subject to earlier termination in certain situations related to cessation of employment or service.

(2)  Based on options to purchase an aggregate of 1,487,849 shares that were granted to employees in 2005.

(3)  All options were granted at an exercise price equal to the fair market value of our stock on the date of grant, which was the closing price of our common stock as reported on the Nasdaq National Market (now the Nasdaq Global Market) on January 24, 2005.

(4)  Potential realizable values are net of exercise price, but before taxes associated with exercise. Amounts represent hypothetical gains that could be achieved for the respective options if exercised at the end of the option term. The assumed 5% and 10% rates of stock price appreciation are provided in accordance with rules of the SEC and do not represent our estimate or projection of the future common stock price. Actual gains, if any, on stock option exercises are dependent on the future performance of the common stock, overall market conditions and the option holders' continued employment through the vesting period. This table does not take into account any appreciation in the price of the common stock from the date of grant to date. The amounts reflected in this table may not necessarily be achieved.

68

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUDSK141049 9.6.18 PAL garcm0pa | 05-Mar-2007 19:27 EST | 86507 TX 69 | 2* |
| FORM 10-K | | PAL | | HTM PMT | 1C |
| | | | | Page 1 of 1 | |

The following table provides certain information concerning exercises of options to purchase our common stock during the year ended December 31, 2005, and unexercised options held as of December 31, 2005, by the persons named in the Summary Compensation Table above:

### Aggregated Option Exercises In Fiscal 2005 And Fiscal 2005 Year—End Values

| Name | Shares Acquired on Exercise (#) | Value Realized[2] ($) | Number of Securities Underlying Unexercised Options at 12/31/05 (#) Exercisable[3] | Value of Unexercised in-the-Money Options at 12/31/05[1] ($) Exercisable[3] |
|---|---|---|---|---|
| Balu Balakrishnan | — | — | 1,333,000 | $ 9,663,134 |
| Derek Bell | 5,000 | $ 47,007 | 267,000 | $ 2,007,970 |
| Bruce Renouard | — | — | 235,000 | $ 1,470,050 |
| John Tomlin | 22,800 | $164,035 | 265,450 | $ 1,233,813 |
| Clifford J. Walker | — | — | 270,000 | $ 1,860,825 |

(1) Calculated on the basis of the fair market value of the underlying securities as of December 31, 2005 of $23.81 per share, as reported as the closing price on the Nasdaq National Market, minus the aggregate exercise price.

(2) Based on (a) the fair market value of our common stock at the time each option was exercised and the underlying stock was sold, less (b) the aggregate exercise price.

(3) The options in the table above were immediately exercisable in full as of December 31, 2005, but shares purchased on exercise of unvested options are subject to a repurchase right in favor of Power Integrations lapsing ratably over 50 months for the 1998 Nonstatutory Stock Option Plan or 48 months for the 1997 Stock Option Plan and entitles Power Integrations to repurchase unvested shares at their original issuance price.

*Employment Contracts and Termination of Employment and Change of Control Arrangements*

*Chief Executive Officer Benefits Agreement.* As of April 25, 2002, Power Integrations entered into a chief executive officer benefits agreement with Balu Balakrishnan (the "CEO Benefits Agreement"). The form of the agreement was approved by the compensation committee on April 18, 2002. The CEO Benefits Agreement provides for certain benefits, including:

- acceleration of vesting upon a change of control of Power Integrations,

- severance benefits in the event of termination of employment by Power Integrations without cause on or within 18 months after a change of control or resignation by the chief executive officer for good reason within 18 months after a change of control,

- severance benefits in the event of termination of employment by Power Integrations without cause or resignation by the chief executive officer for good reason, and

- retirement benefits.

A change of control is defined in the CEO Benefits Agreement as an acquisition by any person of a beneficial ownership of 50% or more of Power Integrations' voting stock, certain mergers or other business combinations involving Power Integrations, the sale of more than 50% of Power Integrations' assets, liquidation of Power Integrations, or a change in the majority of the incumbent members of the board of directors (except changes in the board of directors' composition approved by a majority of the directors).

Upon a change of control, 50% of Mr. Balakrishnan's then-unvested shares will vest, but if an acquiring company does not assume the options, 100% of Mr. Balakrishnan's then-unvested shares will vest.

69

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9/6 | PAL jaslv0dc | 04-Mar-2007 22:29 EST | 86507 TX 70 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

Mr. Balakrishnan is entitled to severance benefits in the event that he is terminated without cause on or within 18 months after a change of control or in the event that he resigns for good reason within 18 months after a change of control. "Cause" includes, among other acts, a material act of theft, dishonesty, fraud, falsification of records, improper disclosure of confidential information, or an intentional act by an executive causing harm to the reputation of Power Integrations, and "good reason" includes, among other acts, a material decrease in an executive's compensation or benefits following a change of control, a demotion or material reduction in responsibility level, or relocation of more than 50 miles from executive's current work place or a material adverse change in working conditions or established working hours which persist for a period of six months.

Such severance benefits include a lump-sum cash payment equal to twelve months of his highest annual salary plus targeted annual incentive bonus, acceleration of 100% of all his then-outstanding stock options, extension of the post-termination stock option exercise period to one year, and continued medical and dental coverage under the Power Integrations health plans for twelve months at Power Integrations' expense.

In addition, Mr. Balakrishnan is entitled to severance benefits in the event of termination of employment by Power Integrations without cause or resignation by Mr. Balakrishnan for good reason. Such severance benefits include a lump-sum cash payment equal to twelve months of his highest annual salary plus targeted annual incentive bonus, acceleration of 50% of all his then-unvested stock options, and continued medical and dental coverage under the Power Integrations health plans for twelve months at Power Integrations' expense.

Mr. Balakrishnan is entitled to retirement benefits if he has served Power Integrations for 15 years, and has achieved an age of 50, or has served Power Integrations for 10 years and has achieved an age of 55, and is not employed elsewhere, full time, or otherwise engaged in competition with Power Integrations. Mr. Balakrishnan is entitled to the extension of his post-termination stock option exercise period for vested options for the term of the option and medical and dental benefits for his dependents at Power Integrations' expense until he achieves the age of 65; thereafter, participation in the health plans would be at Mr. Balakrishnan's expense. These retirement benefits will also become available if Mr. Balakrishnan's employment terminates due to death or disability.

The post-termination exercise period for Mr. Balakrishnan's vested stock options will be extended only if such extension does not require Power Integrations to incur a compensation expense for financial statement purposes.

If any of the payments and benefits provided under the CEO Benefits Agreement in connection with a change of control (the "Payments") would result in a "parachute payment" under Section 280G of the Internal Revenue Code of 1986, as amended, the amount of such Payments will be either (i) the full amount of the Payments or (ii) a reduced amount which would result in no portion of the Payments being subject to excise tax (as defined in the CEO Benefits Agreement), whichever amount provides the greatest amount of benefit to the chief executive officer.

*Executive Officer Benefits Agreements.* As of April 25, 2002, Power Integrations entered into executive officer benefits agreements with Derek Bell, vice president, engineering, Bruce Renouard, vice president, worldwide sales, John Tomlin, vice president, operations, and Clifford J. Walker, vice president, corporate development (the "Executive Officer Benefits Agreements"). The form of executive officer benefits agreement was approved by the compensation committee on April 18, 2002. The Executive Officer Benefits Agreements provide for certain benefits, including:

- acceleration of vesting upon a change of control of Power Integrations,

- severance benefits in the event of termination of employment by Power Integrations without cause on or within 18 months after a change of control or resignation by the executive officer for good reason within 18 months after a change of control,

- severance benefits in the event of termination of employment by Power Integrations without cause or resignation by the executive officer for good reason, and

- retirement benefits.

70

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 8.8 PAL jaslv0dc | 04-Mar-2007 22:29 EST | 86507 TX 71 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

A change of control is defined in the Executive Officer Benefits Agreements as an acquisition by any person of a beneficial ownership of 50% or more of Power Integrations' voting stock, certain mergers or other business combinations involving Power Integrations, the sale of more than 50% of Power Integrations' assets, liquidation of Power Integrations, or a change in the majority of the incumbent members of the board of directors (except changes in the board of directors' composition approved by a majority of the directors).

Upon a change of control, 25% of the executive officer's then-unvested shares will vest, but if an acquiring company does not assume the options, 50% of the executive 's then-unvested shares will vest.

Each executive officer is entitled to severance benefits in the event that he is terminated without cause on or within 18 months after a change of control or in the event that he resigns for good reason within 18 months after a change of control. "Cause" includes, among other acts, a material act of theft, dishonesty, fraud, falsification of records, improper disclosure of confidential information, or an intentional act by an executive causing harm to the reputation of Power Integrations, and "good reason" includes, among other acts, a material decrease in an executive's compensation or benefits following a change of control, a demotion or material reduction in responsibility level, or relocation of more than 50 miles from executive's current work place or a material adverse change in working conditions or established working hours which persist for a period of six months.

Such severance benefits include a lump-sum cash payment equal to six months of the executive officer's highest annual salary plus 50% of the executive officer's targeted annual incentive bonus, vesting of 50% of his then-unvested shares, extension of the post-termination stock option exercise period to one year, and continued medical and dental coverage under the Power Integrations health plans for six months at Power Integrations' expense.

In addition, each executive officer is entitled to severance benefits in the event of termination of employment by Power Integrations without cause or resignation by such executive officer for good reason. Such severance benefits include a lump-sum cash payment equal to six months of the executive officer's highest annual salary plus 50% of the executive officer's targeted annual incentive bonus, and continued medical and dental coverage under the Power Integrations health plans for six months at Power Integrations' expense.

Each executive officer is entitled to retirement benefits if he has served Power Integrations for 15 years, and has achieved an age of 50, or has served Power Integrations for 10 years and has achieved an age of 55, and is not employed elsewhere, full time, or otherwise engaged in competition with Power Integrations. The executive officer is entitled to the extension of his post-termination stock option exercise period for vested options for the earlier of the term of the option and five years and medical and dental benefits for his dependents at Power Integrations' expense until he achieves the age of 65; thereafter, participation in the health plans would be at the executive officer's expense. These retirement benefits will also become available if the executive officer was eligible for such benefits and his employment terminates due to death or disability.

The post-termination exercise period for an executive officer's vested stock options will be extended only if such extension does not require Power Integrations to incur a compensation expense for financial statement purposes.

If any of the payments and benefits provided under the Executive Officer Benefits Agreements in connection with a change of control (the "Payments") would result in a "parachute payment" under Section 280G of the Internal Revenue Code of 1986, as amended, the amount of such Payments will be either (i) the full amount of the Payments or (ii) a reduced amount which would result in no portion of the Payments being subject to excise tax (as defined in the Executive Officer Benefits Agreements), whichever amount provides the greatest amount of benefit to the executive officer.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 PAL jaslv0dc | 04-Mar-2007 22:29 EST | 86507 TX 72 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

*Stock option agreements.* On January 24, 2005, the compensation and equity award committee granted Mr. Balakrishnan options to purchase 200,000 shares of common stock, each of Messrs. Bell, Renouard and Tomlin options to purchase 45,000 shares of common stock and Mr. Walker options to purchase 50,000 shares of common stock. Each grant is subject to a stock option agreement with terms pertaining to acceleration of vesting and extension of post termination exercise periods as described in the CEO Benefits Agreement and the Executive Officer Benefits Agreements described above.

*Compensation Committee Interlocks and Insider Participation*

During 2005, Power Integrations' compensation committee consisted of Mr. Kvamme, Mr. Brown and Mr. Bickell. None of the current members of the compensation committee is or was an officer or employee of Power Integrations or its subsidiaries. None of Power Integrations' executive officers serves as a member of the board of directors or compensation committee of any entity that has one or more executive officers serving as a member of Power Integrations' board of directors or compensation committee.

## Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.

The following table sets forth certain information, as of December 31, 2006, with respect to the beneficial ownership of Power Integrations' common stock by:

- each person known by Power Integrations to be the beneficial owner of more than 5% of Power Integrations common stock,

- each executive officer named in the Summary Compensation Table,

- each director and director nominee of Power Integrations, and

- all executive officers and directors of Power Integrations as a group.

The address for each executive officer, director and director nominee named below is Power Integrations principal executive offices located at 5245 Hellyer Avenue, San Jose, California, 95138.

| | Beneficial Ownership | |
| | Number of Shares[2] | Percent of Total[3] |
| Beneficial Owners[1] | | |
|---|---|---|
| **5% Stockholders** | | |
| Wasatch Advisors, Inc.[4]<br>150 Social Hall Avenue Suite 400<br>Salt Lake City, UT 84111 | 4,041,376 | 14.10% |
| Franklin Resources, Inc. and affiliates[5]<br>One Franklin Parkway<br>San Mateo, CA 94403 | 2,536,049 | 8.85% |
| Lord, Abbett & Co. LLC[6]<br>90 Hudson Street<br>Jersey City, NJ 07302 | 1,817,315 | 6.34% |
| FMR Corp.[7]<br>82 Devonshire Street<br>Boston, MA 02109 | 2,370,000 | 8.27% |

| Beneficial Owners (1) | Number of Shares[2] | Percent of Total[3] |
|---|---|---|
| **Executive officers and directors** | | |
| Balu Balakrishnan[8] | 1,701,848 | 5.65% |
| Derek Bell[9] | 297,292 | 1.03% |
| Bruce Renouard[10] | 254,347 | * |
| John Tomlin[11] | 294,642 | 1.02% |
| Clifford J. Walker[12] | 302,961 | 1.05% |
| Alan D. Bickell[13] | 94,333 | * |
| Nicholas E. Brathwaite[14] | 60,833 | * |
| R. Scott Brown[15] | 95,833 | * |
| Balakrishnan S. Iyer[16] | 30,000 | * |
| E. Floyd Kvamme[17] | 239,306 | * |
| Steven J. Sharp[18] | 76,666 | * |
| Dr. James Fiebiger | — | * |
| All executive officers and directors as a group (13 persons)[19] | 3,598,061 | 11.30% |

\* Less than 1%

(1) Power Integrations believes that the persons named in the table have sole voting and dispositive power with respect to all shares of common stock shown as beneficially owned by them, subject to community property laws (where applicable) and to the information contained in the footnotes to this table.

(2) A person is deemed to be the beneficial owner of securities that can be acquired by such person within 60 days upon the exercise of options to purchase common stock. Options to purchase common stock of Power Integrations held by executive officers and directors are immediately exercisable but are subject to vesting. Options to purchase common stock that are exercised prior to full vesting are subject to repurchase by us until the common stock so purchased becomes fully vested. Options to purchase common stock granted to our directors are not immediately exercisable.

(3) Percentages are based on 28,657,897 shares of common stock outstanding on December 31, 2006, provided that any additional shares of common stock that a stockholder has the right to acquire within 60 days after December 31, 2006, or March 1, 2007, are deemed to be outstanding for the purposes of calculating that stockholder's percentage of beneficial ownership.

(4) Based on a Form 13F filed with the SEC on February 14, 2007, as of December 31, 2006, Wasatch Advisors, Inc. held 4,041,376 shares.

(5) Based on a Form 13G filed with the SEC on February 5, 2007, as of December 31, 2006, covering ownership by Franklin Advisers, Inc., Franklin Templeton Portfolio Advisors, Inc. and Franklin Templeton Investments (Asia) Limited, Franklin Advisers, Inc. had sole power to dispose of (or direct the disposition of) 1,583,800 shares and vote (or direct the vote of) 1,545,400 shares, Franklin Templeton Portfolio Advisors, Inc. had sole power to dispose of (or direct the disposition of) and vote (or direct the vote of) 951,719 shares and Franklin Templeton Investments (Asia) Limited had sole power to dispose of (or direct the disposition of) and vote (or direct the vote of) 530 shares.

(6) Based on a Form 13G filed with the SEC on February 14, 2007, as of December 29, 2006, Lord, Abbett & Co. LLC had sole power to dispose of (or direct the disposition of) 1,817,315 shares and vote (or direct the vote of) 1,530,715 shares.

(7) Based on a Form 13G filed with the SEC on February 14, 2007, as of December 31, 2006, the reported shares are beneficially owned by Fidelity Management and Research Company ("Fidelity"), a wholly owned subsidiary of FMR Corp. and an investment advisor, as a result of acting as investment advisor to various investment companies. Edward C. Johnson 3d and FMR Corp., through FMR's control of Fidelity and the funds, each had the sole power to dispose (or direct the disposition of) 2,370,000 shares and the sole power to vote (or direct the vote of) 0 shares.

(8) Consists of 237,104 shares held by the Balu and Mohini Balakrishnan Family Trust Dated 6-9-1993, of which Mr. Balakrishnan is a trustee, and 1,464,744 shares of common stock issuable upon exercise of options, of which 280,834 shares are unvested as of March 1, 2007 (see footnote 2).

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUDSK141049 9.8.18 PAL garcm0pa | 05-Mar-2007 19:32 EST | 86507 TX 74 | 2* |
| FORM 10-K | | PAL | | HTM PMT | 1C |
| | | | | Page 1 of 1 | |

(9) Includes 292,483 shares of common stock issuable upon exercise of options, of which 62,813 shares are unvested as of March 1, 2007 (see footnote 2).

(10) Includes 253,032 shares of common stock issuable upon exercise of options, of which 62,813 shares are unvested as of March 1, 2007 (see footnote 2).

(11) Consists of 7,192 shares held by Mr. Tomlin and his spouse in a joint account and 287,450 shares of common stock issuable upon exercise of options, of which 64,063 shares are unvested as of March 1, 2007 (see footnote 2).

(12) Includes 293,009 shares of common stock issuable upon exercise of options, of which 65,209 shares are unvested as of March 1, 2007 (see footnote 2).

(13) Includes 93,333 shares of common stock issuable upon exercise of options exercisable within 60 days after December 31, 2006.

(14) Includes 56,667 shares of common stock issuable upon exercise of options exercisable within 60 days after December 31, 2006.

(15) Includes 90,833 shares of common stock issuable upon exercise of options exercisable within 60 days after December 31, 2006.

(16) Consists of 30,000 shares of common stock issuable upon exercise of options exercisable within 60 days after December 31, 2006.

(17) Includes 106,666 shares of common stock issuable upon exercise of options exercisable within 60 days after December 31, 2006.

(18) Consists of 76,666 shares of common stock issuable upon exercise of options exercisable within 60 days after December 31, 2006.

(19) Consists of (i) shares held by Messrs. Balakrishnan, Bell, Renouard, Tomlin, Walker, Bickell, Brathwaite, Brown, Iyer, Kvamme and Sharp and Dr. Fiebiger, including the shares described in notes 8 through 18 above, and (ii) 150,000 shares of common stock issuable upon the exercise of options held by Mr. Rafael Torres, an executive officer who is not named in the Summary Compensation Table, 128,125 of which options are unvested as of March 1, 2007.

*Equity Compensation Plan Information*

The following table provides information about Power Integrations' common stock that may be issued upon the exercise of options and rights under all of the existing equity compensation plans as of December 31, 2005, including the Power Integrations 1988 Stock Option Plan, the Power Integrations 1997 Stock Option Plan, the Power Integrations 1997 Outside Directors Stock Option Plan, the Power Integrations 1997 Employee Stock Purchase Plan and the Power Integrations 1998 Nonstatutory Stock Option Plan.

| Plan category | Number Of Securities To Be Issued Upon Exercise Of Outstanding Options And Rights[a] (#) | Weighted Average Exercise Price Of Outstanding Options And Rights[b] ($) | Number Of Securities Remaining Available For Future Issuance Under Equity Compensation Plans (Excluding Securities Reflected In Column[a])[c] (#) |
|---|---|---|---|
| Equity compensation plans approved by security holders | 28,211[1] | $ 0.76 | — |
| | 6,767,538[2] | $ 18.78 | 3,571,875 |
| | 475,834[3] | $ 23.43 | 226,668 |
| | N/A[4] | $ N/A | 473,092 |
| Equity compensation plans not approved by security holders | 298,271[5] | $ 19.33 | — |
| Total | 7,569,854 | $ 19.02 | 4,271,635 |

(1) Issued under the Power Integrations 1988 Stock Option Plan.

(2) Issued under the Power Integrations 1997 Stock Option Plan. The number of shares reserved for issuance under the 1997 Stock Option Plan is subject to an automatic increase on January 1, 2007 by a number of shares equal to 3.5% of the issued and outstanding common stock on December 31, 2006.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CXP 9.6 | PAL jaslv0dc | 04-Mar-2007 22:30 EST | 86507 TX 75 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

(3)    Issued under the Power Integrations 1997 Outside Directors Stock Option Plan.
(4)    Issued under the Power Integrations 1997 Employee Stock Purchase Plan.
(5)    Issued under the Power Integrations 1998 Nonstatutory Stock Option Plan.

Although the principal features of the 1998 Nonstatutory Stock Option Plan, also referred to as the 1998 Plan, are summarized below, the summary is qualified in its entirety by the full text of the 1998 Plan. Stockholder approval of the 1998 Plan was not required. A copy of the 1998 Plan can be found as filed on May 12, 2003 with the Securities and Exchange Commission in our Quarterly Report on Form 10–Q.

*Material Features of the 1998 Plan*

We have reserved a maximum of 1,000,000 shares of Common Stock for issuance under the 1998 Plan. The 1998 Plan permits the grant of nonstatutory stock options to employees and consultants with exercise prices equal to no less than 85% of the fair market value of our Common Stock on the date of grant. Options granted under the 1998 Plan generally vest at the rate of 1/4 of the shares on the first anniversary of the date of grant and 1/48 of the shares monthly thereafter. In general, the maximum term of options is 10 years, subject early termination upon an optionee's cessation of employment or service. An option will generally remain exercisable for three months following termination for any reason other than death or disability, and six months if termination is due to death or disability. The board of directors may amend or terminate the 1998 Plan at any time.

## Item 13. Certain Relationships and Related Transactions.

*Director Option Amendments*

Certain grants to three of our outside directors, Messrs. Alan Bickell, Nicholas Brathwaite and Scott Brown, were misdocumented with an original grant date and an exercise price that differed from the terms of the original grants (the "Misdocumented Grants"). The directors have agreed with us to modify several of the Misdocumented Grants to increase the exercise price of those grants. These grants were misdocumented with a higher exercise price than originally granted, and we have corrected this misdocumentation. However, these three directors believe that it is important that they not be in a better position, or be perceived to be in a better position, as a result of the administrative errors or corrections, and have agreed to amend those options which had a higher misdocumented exercise price so that the higher misdocumented exercise price will be the actual exercise price. These amendments are described in further detail in Item 9B. Other Information, which description is incorporated by reference here.

Only one of the directors who received Misdocumented Grants, Mr. Brathwaite, has exercised any of these grants. Mr. Brathwaite has delivered to Power Integrations the difference between: (a) the total exercise price, as corrected, of the Misdocumented Grants he exercised; and (b) the total exercise price reflected in the erroneous documentation, which he had previously paid to Power Integrations. The total amount of Mr. Brathwaite's additional payment to the Power Integrations was $78,290.

*Officer Stock Option Amendments for Section 409A Cure*

Section 409A of the Internal Revenue Code imposes significant additional taxes on stock options granted with an exercise price lower than the fair market value on the date of grant, which we refer to as "discounted options," that vest after December 31, 2004. As a result of the revision in the measurement date of the grant of stock options, as described in Item 7 of Part II—"Management's Discussion and Analysis of Financial Condition and Results of Operation—Restatement of Consolidated Financial Statements" in December 2006, Power Integrations has offered to its current and former officers to amend their stock options to effect a cure permissible under Section 409A. This cure can be effected either by increasing the exercise price to the revised measurement date, or by limiting the time period in which exercises can be made to a specific calendar year.

In December 2006, the following executive officers of Power Integrations agreed to amend some of the outstanding unexercised stock options held by them that have vested or will vest after December 31, 2004 by

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.8 | PAL jaslv0dc | 04-Mar-2007 22:30 EST | | 86507 TX 76 | 1* |
| FORM 10-K | | PAL | | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

increasing the options' exercise prices as set forth below. Modified exercise prices are equal to the closing price on the Nasdaq Global Market of our common stock on the date determined to be the revised measurement date under our methodology used for restating our financial statements. These option amendments are as follows:

| Optionee | Number of Unexercised Shares | Original Exercise Price | Modified Exercise Price |
|---|---|---|---|
| Balu Balakrishnan | 156,251 | $ 17.75 | $ 18.95 |
| Derek Bell | 23,438 | $ 17.75 | $ 18.95 |
| Bruce Renouard | 23,438 | $ 17.75 | $ 18.95 |
| John Tomlin | 19,401 | $ 17.75 | $ 18.95 |
| Clifford Walker | 23,438 | $ 17.75 | $ 18.95 |

In December 2006, the following executive officers of Power Integrations have agreed to amend certain outstanding unexercised stock options held by them by modifying such options' exercise period. These option amendments are as follows:

| Optionee | Number of Unexercised Shares | Exercise Price | Calendar Year Elected for Exercise Period |
|---|---|---|---|
| Balu Balakrishnan | 15,861 | $ 12.10 | 2007 |
| Balu Balakrishnan | 15,390 | $ 12.10 | 2008 |
| Balu Balakrishnan | 26,968 | $ 14.82 | 2007 |
| Balu Balakrishnan | 31,366 | $ 14.82 | 2008 |
| Derek Bell | 8,685 | $ 12.10 | 2007 |
| Derek Bell | 8,684 | $ 12.10 | 2008 |
| Derek Bell | 5,834 | $ 14.82 | 2007 |
| Derek Bell | 5,833 | $ 14.82 | 2008 |
| Bruce Renouard | 21,782 | $ 14.82 | 2007 |
| Bruce Renouard | 20,000 | $ 14.82 | 2008 |
| Bruce Renouard | 1,968 | $ 14.82 | 2009 |
| John Tomlin | 5,811 | $ 14.82 | 2007 |
| John Tomlin | 18,459 | $ 18.60 | 2007 |
| John Tomlin | 18,000 | $ 18.60 | 2008 |
| Clifford Walker | 3,646 | $ 12.10 | 2007 |
| Clifford Walker | 1,968 | $ 14.82 | 2007 |
| Clifford Walker | 6,991 | $ 14.82 | 2008 |
| Clifford Walker | 10,000 | $ 14.82 | 2009 |

*Other Matters*

We have entered into indemnification agreements with each of our executive officers and directors. Such indemnification agreements require us to indemnify these individuals to the fullest extent permitted by law. We also intend to execute these agreements with our future directors and officers.

During the fiscal years ended December 31, 2005 and 2004, there was not, nor is there currently proposed any reportable transaction or series of reportable transactions involving any executive officer, director, director nominee, holder of more than 5% of any class of voting securities of Power Integrations or any immediate family member of the foregoing and Power Integrations, except as discussed above.

Information regarding executive officer benefits agreements with certain executive officers and the chief executive officer benefits agreement is set forth in Item 11 of Part III under the heading "Employment Contracts and Termination of Employment and Change of Control Agreements."

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX98 PAL jaslv0dc | 04-Mar-2007 22:30 EST | 86507 TX 77 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

## Item 14. Principal Accountant Fees and Services.

On June 16, 2005, Deloitte & Touche LLP, was appointed as our independent registered public accounting firm. The following table sets forth the aggregate fees billed to Power Integrations for the fiscal years ended December 31, 2005 and 2004, by Deloitte & Touche LLP, the member firms of Deloitte Touche Tohmatsu, and their respective affiliates, or Deloitte, our current independent registered public accounting firm.

| | Fiscal 2005 | Fiscal 2004 |
|---|---|---|
| Audit Fees[1] | $ 654,000 | $ — |
| Audit–Related Fees[2] | 1,959,000 | — |
| Tax Fees | — | — |
| All Other Fees | — | — |

(1)  Audit fees consist of fees billed for professional services rendered for the audit of our consolidated annual financial statements and review of the interim consolidated financial statements included in quarterly reports and services that are normally provided by Deloitte & Touche LLP in connection with statutory and regulatory filings or engagements. Audit fees for 2005 and 2004 include fees for professional services rendered for the audits of (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.
(2)  Audit-related fees are primarily related to the restatement of our consolidated financial statements.

We did not engage Deloitte to provide advice regarding financial information systems design and implementation during 2005 and 2004.

## Termination of KPMG LLP

On June 16, 2005, Power Integrations terminated KPMG LLP (KPMG) as our independent registered public accountants. The decision to terminate KPMG was approved by the audit committee of our board of directors. This event was disclosed in our Form 8-K filed on June 22, 2005.

The following table sets forth the aggregate fees billed to Power Integrations for the fiscal years ended December 31, 2005 and 2004 by KPMG LLP, our former independent registered public accounting firm.

| | Fiscal 2005 | Fiscal 2004 |
|---|---|---|
| Audit Fees[1] | $ 65,000 | $790,000 |
| Audit–Related Fees[2] | 550,000 | — |
| Tax Fees | — | — |
| All Other Fees | — | — |

(1)  Audit Fees consist of fees billed for professional services rendered for the audit of our consolidated annual financial statements and review of the interim consolidated financial statements included in quarterly reports and services that are normally provided by KPMG LLP in connection with statutory and regulatory filings or engagements. Audit fees for 2004 include fees for professional services rendered for the audits of (i) management's assessment of the effectiveness of internal control over financial reporting and (ii) the effectiveness of internal control over financial reporting.
(2)  Audit-related fees are primarily related to the restatement of our consolidated financial statements.

We did not engage KPMG LLP to provide advice regarding financial information systems design and implementation during 2005 or 2004.

## Pre-Approval Policies and Procedures

All the fees for 2005 and 2004 described above were pre-approved by the Audit Committee.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 §6 | PAL jaslv0dc | 04-Mar-2007 22:30 EST | | 86507 TX 78 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

The audit committee has a policy to approve in advance the engagement of the independent registered public accounting firm for all audit services and non-audit services, based on independence, qualifications and, if applicable, performance, and approve the fees and other terms of any such engagement; provided, however, that the audit committee may establish pre-approval policies and procedures for any engagement to render such services, provided that such polices and procedures (a) are detailed as to particular services, (b) do not involve delegation to management of the audit committee's responsibilities and (c) provide that, at its next scheduled meeting, the audit committee is informed as to each such service for which the independent auditor is engaged pursuant to such policies and procedures. In addition, the audit committee may delegate to one or more members of the committee the authority to grant pre-approvals for such audit and non-audit services, provided that (1) the decisions of such member(s) to grant any such pre-approval shall be presented to the audit committee at its next scheduled meeting and (2) the audit committee has established policies and procedures for such pre-approval of services consistent with the requirements of clauses (a) and (b) above.

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152159 9.6.18 | PAL soeusOpa | 05-Mar-2007 20:50 EST | 86507 TX 79 | 2* |
| FORM 10-K | START PAGE | | PAL | | HTM PMT | 1C |

Page 1 of 1

## PART IV

**Item 15. Exhibits and Financial Statement Schedules.**

(a) The following documents are filed as part of this Form:

1. Financial Statements

|  | Page |
| --- | --- |
| Report of Independent Registered Public Accounting Firm—Deloitte & Touche LLP | 80 |
| Report of Independent Registered Public Accounting Firm—KPMG LLP | 81 |
| Consolidated Balance Sheets | 82 |
| Consolidated Statements of Income | 83 |
| Consolidated Statements of Stockholders' Equity | 84 |
| Consolidated Statements of Cash Flows | 85 |
| Notes to Consolidated Financial Statements | 86 |

2. Financial Statement Schedules

All other schedules, except Schedule II, Valuation and Qualifying Accounts, are omitted because they are not applicable or the required information is shown in the Consolidated Financial Statements or Notes thereto.

3. Exhibits

See Index to Exhibits at the end of this Report, which is incorporated by reference here. The Exhibits listed in the accompanying Index to Exhibits are filed as part of this report.

79

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUDSK141049 PAL garcm0pa | 06-Mar-2007 13:37 EST | 86507 TX 80 | 2* |
|---|---|---|---|---|---|
| FORM 10-K | | PAL | | HTM PMT | 1C |

Page 1 of 1

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

To the Board of Directors and Stockholders of Power Integrations, Inc.:

We have audited the accompanying consolidated balance sheet of Power Integrations, Inc. and its subsidiaries (collectively the "Company") as of December 31, 2005, and the related consolidated statements of income, stockholders' equity, and cash flows for the year then ended. Our audit also included the consolidated financial statement schedule for the year ended December 31, 2005 listed in Item 15(a)(2). These consolidated financial statements and consolidated financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on the consolidated financial statements and consolidated financial statement schedule based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, such 2005 consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2005 and the results of its operations and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such consolidated financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of December 31, 2005, based on the criteria established in *Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated March 6, 2007 expressed an unqualified opinion on management's assessment of the effectiveness of the Company's internal control over financial reporting and an adverse opinion on the effectiveness of the Company's internal control over financial reporting because of a material weakness.

*/s/ DELOITTE & TOUCHE LLP*

San Jose, California
March 6, 2007

80

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 08-Mar-2007 15:11 EST | | 86507 TX 81 | 5* |
|---|---|---|---|---|---|---|---|
| FORM 10-K | | | PAL | | | HTM PMT | 1C |
| | | | | | | Page 1 of 1 | |

## REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The Board of Directors and Stockholders
Power Integrations, Inc.:

We have audited the accompanying consolidated balance sheet of Power Integrations, Inc. and subsidiaries (the Company) as of December 31, 2004, and the related consolidated statements of income, stockholders' equity and cash flows for each of the years in the two-year period ended December 31, 2004. In connection with our audits of the consolidated financial statements, we have also audited the financial statement schedule for the two years ended December 31, 2004 as listed in the index of Item 15. These consolidated financial statements and financial statement schedule are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements and financial statement schedule based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Power Integrations, Inc. and subsidiaries as of December 31, 2004, and the results of their operations and their cash flows for each of the years in the two-year period ended December 31, 2004, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in Note 3 to the accompanying consolidated financial statements, the consolidated balance sheet as of December 31, 2004 and the related consolidated statements of income, stockholders' equity and cash flows for each of the years in the two-year period ended December 31, 2004 have been restated.


/s/ KPMG LLP

Mountain View, California
March 15, 2005, except as to Note 3,
     which is as of March 8, 2007.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX02 PAL jaslv0dc | 04-Mar-2007 22:31 EST | 86507 TX 82 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 |

# POWER INTEGRATIONS, INC.
## CONSOLIDATED BALANCE SHEETS
### (In thousands, except share and par value amounts)

| | December 31, | |
| | 2005 | 2004 As restated (1) |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash and cash equivalents | $109,879 | $107,396 |
| Short-term investments | 16,200 | 1,249 |
| Accounts receivable, net of allowances of $469 and $382, respectively | 13,488 | 12,750 |
| Inventories | 17,929 | 25,473 |
| Deferred tax assets | 1,551 | 3,216 |
| Prepaid expenses and other current assets | 1,328 | 2,600 |
| Total current assets | 160,375 | 152,684 |
| PROPERTY AND EQUIPMENT, net | 48,890 | 51,718 |
| INVESTMENTS | 4,422 | 25,911 |
| DEFERRED TAX ASSETS | 9,221 | 7,530 |
| OTHER ASSETS | 14,013 | 3,173 |
| | $236,921 | $241,016 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable | $ 5,410 | $ 8,744 |
| Accrued payroll and related expenses | 7,038 | 5,824 |
| Taxes payable | 10,277 | 6,643 |
| Deferred income on sales to distributors | 3,479 | 3,058 |
| Other accrued liabilities | 1,358 | 991 |
| Total current liabilities | 27,562 | 25,260 |
| COMMITMENTS AND CONTINGENCIES (NOTES 5 and 9) | | |
| **STOCKHOLDERS' EQUITY:** | | |
| Preferred Stock, $0.001 par value | | |
| Authorized—3,000,000 shares | | |
| Outstanding—None | — | — |
| Common Stock, $0.001 par value | | |
| Authorized—140,000,000 shares | | |
| Outstanding—29,366,720 and 30,491,967, respectively | 29 | 30 |
| Additional paid-in capital | 134,196 | 158,613 |
| Deferred compensation | (746) | (3,076) |
| Accumulated translation adjustment | (121) | (114) |
| Retained earnings | 76,001 | 60,303 |
| Total stockholders' equity | 209,359 | 215,756 |
| | $236,921 | $241,016 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," of the accompanying notes to consolidated financial statements.

See accompanying notes to consolidated financial statements.

82

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX06 PAL jaslv0dc | 04-Mar-2007 22:31 EST | 86507 TX 83 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

POWER INTEGRATIONS, INC.

**CONSOLIDATED STATEMENTS OF INCOME**

(In thousands, except per share amounts)

| | Year Ended December 31, | | |
| | 2005 | 2004 As restated (1) | 2003 As restated (1) |
|---|---|---|---|
| NET REVENUES | $143,071 | $136,653 | $125,682 |
| COST OF REVENUES | 72,979 | 71,856 | 63,496 |
| GROSS PROFIT | 70,092 | 64,797 | 62,186 |
| OPERATING EXPENSES: | | | |
| Research and development | 17,111 | 15,440 | 20,107 |
| Sales and marketing | 18,314 | 16,070 | 17,166 |
| General and administrative | 15,665 | 7,969 | 10,868 |
| Total operating expenses | 51,090 | 39,479 | 48,141 |
| INCOME FROM OPERATIONS | 19,002 | 25,318 | 14,045 |
| OTHER INCOME (EXPENSE): | | | |
| Interest income | 3,820 | 1,809 | 1,520 |
| Interest expense | (218) | 265 | (106) |
| Other, net | (453) | (754) | (511) |
| Total other income | 3,149 | 1,320 | 903 |
| INCOME BEFORE PROVISION FOR INCOME TAXES | 22,151 | 26,638 | 14,948 |
| PROVISION FOR INCOME TAXES | 6,453 | 6,138 | 3,511 |
| NET INCOME | $ 15,698 | $ 20,500 | $ 11,437 |
| EARNINGS PER SHARE: | | | |
| Basic | $ 0.53 | $ 0.67 | $ 0.39 |
| Diluted | $ 0.51 | $ 0.64 | $ 0.36 |
| SHARES USED IN PER SHARE CALCULATION: | | | |
| Basic | 29,568 | 30,802 | 29,473 |
| Diluted | 30,843 | 32,229 | 31,488 |

(1)  See Note 3, "Restatement of Consolidated Financial Statements," of the accompanying notes to consolidated financial statements.

See accompanying notes to consolidated financial statements.

POWER INTEGRATIONS,    RR Donnelley ProFile    LANFBU-MWS-CX09 / 96    PAL jaslv0dc    04-Mar-2007 22:31 EST    86507 TX 84    1*
FORM 10-K    PAL    HTM IFV    1C
Page 1 of 1

## POWER INTEGRATIONS, INC.
### CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY
### (In thousands)

| | Common Stock | | Additional Paid-In Capital | Deferred Compensation | Accumulated Translation Adjustment | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Shares | Amount | | | | | |
| BALANCE AT DECEMBER 31, 2002 | | | | | | | |
| As reported | 28,628 | $ 28 | $ 89,473 | $ — | $ (117) | $ 51,249 | $ 140,633 |
| Adjustment to opening stockholders' equity (1) | — | — | 40,062 | (11,501) | — | (22,883) | 5,678 |
| BALANCE AT DECEMBER 31, 2002 | | | | | | | |
| As Restated (1) | 28,628 | 28 | 129,535 | (11,501) | (117) | 28,366 | 146,311 |
| Issuance of common stock under employee stock option plan | 1,621 | 2 | 21,601 | — | — | — | 21,603 |
| Issuance of common stock under employee stock purchase plan | 159 | — | 1,949 | — | — | — | 1,949 |
| Excess income tax benefits from employee stock option exercises (1) | — | — | 3,297 | — | — | — | 3,297 |
| Stock-based compensation expense for variable awards (1) | — | — | 4,554 | (132) | — | — | 4,422 |
| Stock-based compensation expense for fixed awards (1) | — | — | 907 | (772) | — | — | 135 |
| Amortization of deferred stock-based compensation (1) | — | — | — | 5,404 | — | — | 5,404 |
| Translation adjustment | — | — | — | — | (4) | — | (4) |
| Net income, as restated (1) | — | — | — | — | — | 11,437 | 11,437 |
| BALANCE AT DECEMBER 31, 2003 | | | | | | | |
| As Restated (1) | 30,408 | 30 | 161,843 | (7,001) | (121) | 39,803 | 194,554 |
| Issuance of common stock under employee stock option plan | 492 | — | 6,805 | — | — | — | 6,805 |
| Repurchase of common stock | (590) | — | (11,799) | — | — | — | (11,799) |
| Issuance of common stock under employee stock purchase plan | 182 | — | 2,294 | — | — | — | 2,294 |
| Excess income tax benefits from employee stock option exercises (1) | — | — | 2,108 | — | — | — | 2,108 |
| Stock-based compensation expense for variable awards (1) | — | — | (2,558) | 491 | — | — | (2,067) |
| Stock-based compensation expense for fixed awards (1) | — | — | (80) | 117 | — | — | 37 |
| Amortization of deferred stock-based compensation (1) | — | — | — | 3,317 | — | — | 3,317 |
| Translation adjustment | — | — | — | — | 7 | — | 7 |
| Net income, as restated (1) | — | — | — | — | — | 20,500 | 20,500 |
| BALANCE AT DECEMBER 31, 2004 | | | | | | | |
| As Restated (1) | 30,492 | 30 | 158,613 | (3,076) | (114) | 60,303 | 215,756 |
| Issuance of common stock under employee stock option plan | 414 | — | 5,467 | — | — | — | 5,467 |
| Repurchase of common stock | (1,692) | (1) | (33,661) | — | — | — | (33,662) |
| Issuance of common stock under employee stock purchase plan | 153 | — | 2,407 | — | — | — | 2,407 |
| Excess income tax benefits from employee stock option exercises | — | — | 646 | — | — | — | 646 |
| Stock-based compensation expense for variable awards | — | — | 744 | 16 | — | — | 760 |
| Stock-based compensation expense for fixed awards | — | — | (20) | 27 | — | — | 7 |
| Amortization of deferred stock-based compensation | — | — | — | 2,287 | — | — | 2,287 |
| Translation adjustment | — | — | — | — | (7) | — | (7) |
| Net income | — | — | — | — | — | 15,698 | 15,698 |
| BALANCE AT DECEMBER 31, 2005 | 29,367 | $ 29 | $ 134,196 | $ (746) | $ (121) | $ 76,001 | $ 209,359 |

(1)  See Note 3, "Restatement of Consolidated Financial Statements," of the accompanying notes to consolidated financial statements.

See accompanying notes to consolidated financial statements.

POWER INTEGRATIONS,    RR Donnelley ProFile    LANFBU-MWS-CX0  PAL jaslv0dc    04-Mar-2007 22:31 EST    86507 TX 85    1*
FORM 10-K                                                PAL                                HTM IFV    1C
Page 1 of 1

POWER INTEGRATIONS, INC.

CONSOLIDATED STATEMENTS OF CASH FLOWS

(In thousands)

| | Year Ended December 31, | | |
| --- | ---: | ---: | ---: |
| | 2005 | 2004<br>As restated<br>(1) | 2003<br>As restated<br>(1) |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | |
| Net income | $ 15,698 | $ 20,500 | $ 11,437 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Depreciation and amortization | 6,264 | 6,880 | 6,846 |
| Stock-based compensation expense | 3,118 | 1,288 | 9,888 |
| Deferred income taxes | (24) | 737 | 1,664 |
| Deferred rent | — | — | (725) |
| Provision for accounts receivable and other allowances | 593 | 445 | 704 |
| Tax benefit associated with employee stock plans | 646 | 2,108 | 3,297 |
| Stock compensation to non-employees | 7 | 37 | 135 |
| Change in operating assets and liabilities: | | | |
| Accounts receivable | (1,331) | (2,360) | (2,492) |
| Inventories | 7,473 | (2,241) | (8,085) |
| Prepaid expenses and other assets | 1,121 | 295 | (2,909) |
| Accounts payable | (3,170) | 396 | 1,719 |
| Taxes payable and other accrued liabilities | 5,208 | 1,501 | 507 |
| Deferred income on sales to distributors | 421 | 493 | (153) |
| Net cash provided by operating activities | 36,024 | 30,079 | 21,833 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | |
| Purchases of property and equipment | (3,190) | (6,363) | (37,815) |
| Acquisition of technology patents/licenses | (1,101) | (1,740) | (1,419) |
| Note to supplier | (10,000) | — | — |
| Purchases of available-for-sale investments | — | (45,775) | (18,765) |
| Proceeds from sales of available-for-sale investments | 11,200 | 52,890 | 450 |
| Purchases of held-to-maturity investments | (7,806) | (30,183) | (6,210) |
| Proceeds from sales of held-to-maturity investments | 3,144 | 19,182 | 33,126 |
| Net cash used in investing activities | (7,753) | (11,989) | (30,633) |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | |
| Net proceeds from issuance of common stock | 7,874 | 9,101 | 23,554 |
| Repurchase of common stock | (33,662) | (11,799) | — |
| Principal payments under capitalized lease obligations | — | (41) | (233) |
| Net cash (used in) provided by financing activities | (25,788) | (2,739) | 23,321 |
| NET INCREASE IN CASH AND CASH EQUIVALENTS | 2,483 | 15,351 | 14,521 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD | 107,396 | 92,045 | 77,524 |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $109,879 | $107,396 | $ 92,045 |
| SUPPLEMENTAL DISCLOSURE OF NON-CASH INVESTING AND FINANCING ACTIVITIES: | | | |
| Unpaid property and equipment | $ (165) | $ 32 | $ (1,447) |
| Deferred stock compensation | $ 717 | $ (2,677) | $ 5,325 |
| SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION: | | | |
| Cash paid for interest | $ — | $ — | $ 7 |
| Cash paid for income taxes, net | $ 1,385 | $ (157) | $ 406 |

(1) See Note 3, "Restatement of Consolidated Financial Statements," of the accompanying notes to consolidated financial statements.

See accompanying notes to consolidated financial statements.

85

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CXP SS PAL jaslv0dc | 04-Mar-2007 22:31 EST | | 86507 TX 86 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
### DECEMBER 31, 2005

## 1. THE COMPANY:

Power Integrations, Inc. (the "Company"), which was incorporated in California on March 25, 1988 and reincorporated in Delaware in December 1997, designs, develops, manufactures and markets proprietary, high-voltage, analog integrated circuits for use primarily in AC-DC and DC-DC power conversion in the following major markets: consumer, communications, computer and industrial electronics.

The Company is subject to a number of risks including, among others, the volume and timing of orders received from customers, competitive pressures on selling prices, the demand for its products declining in the major end markets it serves, SEC and U.S Department of Justice investigations and stockholder litigation related to the Company's recent internal investigation (see notes 3 and 9), recently enacted changes in securities laws and regulations, including the Sarbanes-Oxley Act of 2002, the inability to adequately protect or enforce its intellectual property rights, expenses it is required to incur in connection with its litigation against Fairchild Semiconductor and System General Corporation, the volume and timing of orders placed by it with its wafer foundries and assembly subcontractors, fluctuations in the exchange rate between the U.S. dollar and the Japanese yen, the licensing of its intellectual property to one of its wafer foundries, the lengthy timing of its sales cycle, undetected defects and failures in meeting the exact specifications required by its products, reliance on its international sales activities which account for a substantial portion of net revenues, its ability to develop and bring to market new products and technologies on a timely basis, the ability of its products to penetrate additional markets, attraction and retention of qualified personnel in a competitive market, changes in environmental laws and regulations, the adoption of anti-takeover measures, the volatility of the future trading price of its common stock and earthquakes, terrorist acts or other disasters.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES:

*Principles of Consolidation*

The consolidated financial statements include the accounts of the Company and its wholly owned subsidiaries after elimination of all intercompany transactions and balances.

*Reclassifications*

In the accompanying consolidated balance sheet as of December 31, 2004, the Company has reclassified the balance of auction rate securities (for which interest rates reset in less than 90 days, but for which the underlying maturity date is longer than 90 days) and callable securities (for which interest rates reset between 90 days and 1 year, but for which the underlying maturity date exceeds 1 year) from cash and cash equivalents or short-term investments to long-term investments. For details on this reclassification See Note 3, "Restatement of Consolidated Financial Statements," The Company had no auction rate securities at December 31, 2005.

*Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates. On an ongoing basis, the Company evaluates its estimates, including those related to revenue recognition and allowances for receivables and inventories. These estimates are based on historical facts and various other assumptions that the Company believes to be reasonable at the time the estimates are made.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX06 96 | PAL jaslv0dc | 04-Mar-2007 22:31 EST | 86507 TX 87 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*Foreign Currency Translation*

The functional currencies of the Company's subsidiaries are the local currencies. Accordingly, all assets and liabilities are translated into U.S. dollars at the current exchange rates as of the applicable balance sheet date. Revenues and expenses are translated at the average exchange rate prevailing during the period. Cumulative gains and losses from the translation of the foreign subsidiaries' financial statements have been included in stockholders' equity.

*Cash and Cash Equivalents and Investments*

The Company considers cash invested in highly liquid financial instruments with a remaining maturity of three months or less at date of purchase to be cash equivalents. Investments in highly liquid financial instruments with maturities greater than three months but not longer than twelve months from the balance sheet date are classified as short-term investments. Investments in highly liquid financial instruments with maturities greater than twelve months from the balance sheet date are classified as long-term investments. As of December 31, 2005 and 2004, the Company's short-term and long-term investments consisted of U.S. government backed securities, municipal bonds, corporate commercial paper and other high quality commercial securities, which were valued using the amortized cost method, which approximates fair market value. All investments were classified as held-to-maturity, except auction rate securities which were classified as available-for-sale.

The table below summarizes the carrying value of the Company's investments by major security type (in thousands):

| | December 31, | |
| | 2005 | 2004 |
| --- | ---: | ---: |
| | | As restated |
| Cash Equivalents: | | |
| Taxable securities | $ 86,037 | $ 89,408 |
| Tax-exempt securities | 6 | — |
| Total cash equivalents | 86,043 | 89,408 |
| Short-term Investments: | | |
| U.S. corporate securities | 1,670 | 249 |
| U.S. government securities | 14,530 | 1,000 |
| Total short-term investments | 16,200 | 1,249 |
| Investments, matures in excess of 1 year | 4,422 | 25,911 |
| Total investment securities | $106,665 | $116,568 |

*Inventories*

Inventories (which consist of costs associated with the purchases of wafers from offshore foundries and of packaged components from several offshore assembly manufacturers, as well as internal labor and overhead associated with the testing of both wafers and packaged components) are stated at the lower of cost (first in, first-out) or market. Provisions, when required, are made to reduce excess and obsolete inventories to their estimated net realizable values. Inventories consist of the following (in thousands):

| | December 31, | |
| | 2005 | 2004 |
| --- | ---: | ---: |
| | | As restated |
| Raw materials | $ 1,683 | $ 1,391 |
| Work-in-process | 6,431 | 7,288 |
| Finished goods | 9,815 | 16,794 |
| | $17,929 | $ 25,473 |

87

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CXP 9.6 | PAL jaslv0dc | 04-Mar-2007 22:31 EST | 86507 TX 88 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*Property and Equipment*

Property and equipment consist of the following (in thousands):

| | December 31, | |
| | 2005 | 2004 |
| | | As restated |
|---|---|---|
| Land | $ 16,453 | $ 16,453 |
| Building and improvements | 25,049 | 24,872 |
| Machinery and equipment | 41,130 | 38,833 |
| Office furniture and equipment | 13,249 | 13,012 |
| | 95,881 | 93,170 |
| Accumulated depreciation | (46,991) | (41,452) |
| | $ 48,890 | $ 51,718 |

Depreciation and amortization of property and equipment are provided using the straight-line method over the following useful lives:

| | |
|---|---|
| Building and improvements | 4-40 years or life of lease agreement, if shorter |
| Machinery and equipment | 2-5 years |
| Office furniture and equipment | 4 years |

Total fixed assets located in the United States at December 31, 2005, 2004 and 2003 was approximately 85%, 87% and 91%, of total long-lived assets, respectively. Of the total long-lived assets located in foreign countries, there was no specific country that held a material amount.

*Impairment of Long-Lived Assets*

In accordance with Statement of Financial Accounting Standards No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets, long-lived assets, such as property and equipment, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to estimate undiscounted future cash flows expected to be generated by the asset. If the carrying amount of an asset exceeds its estimated future cash flows, an impairment charge is recognized by the amount by which the carrying amount of the asset exceeds the fair value of the asset. Assets to be disposed of would be separately presented in the balance sheet and reported at the lower of the carrying amount or fair value less costs to sell, and would no longer be depreciated. The assets and liabilities of a disposed group classified as held for sale would be presented separately in the appropriate asset and liability sections of the balance sheet. Currently the Company has no impairment of long-lived assets nor any assets held for disposal.

*Earnings Per Share*

Basic earnings per share are calculated by dividing net income by the weighted average shares of common stock outstanding during the period. Diluted earnings per share are calculated by dividing net income by the weighted average shares of common stock and dilutive common equivalent shares outstanding during the period. Dilutive common equivalent shares included in the diluted calculation consist of dilutive shares issuable upon the exercise of outstanding common stock options and warrants computed using the treasury stock method.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.6 | PAL jaslv0dc | 04-Mar-2007 22:31 EST | | 86507 TX 89 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

A summary of the earnings per share calculation is as follows (in thousands, except per share amounts):

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2005 | 2004 As restated | 2003 As restated |
| Basic earnings per share: | | | |
| Net income | $15,698 | $ 20,500 | $ 11,437 |
| Weighted average common shares | 29,568 | 30,802 | 29,473 |
| Basic earnings per share | $   0.53 | $   0.67 | $   0.39 |
| Diluted earnings per share: | | | |
| Net income | $15,698 | $ 20,500 | $ 11,437 |
| Weighted average common shares | 29,568 | 30,802 | 29,473 |
| Effect of dilutive securities: | | | |
| Stock options | 1,264 | 1,386 | 1,962 |
| Employee stock purchase plan | 11 | 41 | 53 |
| Diluted weighted average common shares | 30,843 | 32,229 | 31,488 |
| Diluted earnings per share | $   0.51 | $   0.64 | $   0.36 |

Options to purchase 1,969,496, 1,639,142 and 314,619 shares of Company's common stock outstanding for the years ended December 31, 2005, 2004 and 2003, respectively, were not included in the computation of diluted earnings per share. This was due to the exercise prices of the options to purchase shares of the Company's common stock being greater than the average market price of the Company's common stock during those periods, and therefore, their effect would have been antidilutive.

*Comprehensive Income*

Comprehensive income for the Company consists of net income plus the effect of foreign currency translation adjustments and unrealized gains / losses on available for sale securities, net of income taxes, which is not material for each of the three years ended December 31, 2005. Accordingly, comprehensive income closely approximates actual net income.

*Segment Reporting*

The Company is organized and operates as one business segment, the design, development, manufacture and marketing of proprietary, high-voltage, analog integrated circuits for use primarily in the AC-DC and DC-DC power conversion markets. The Company's chief operating decision maker, the Chief Executive Officer, reviews financial information presented on a consolidated basis for purposes of making operating decisions and assessing financial performance.

*Revenue Recognition, Significant Customers*

Product revenues consist of sales to OEMs, merchant power supply manufacturers and distributors. Shipping terms to international OEMs and merchant power supply manufacturers from the Company's facility in California are delivered at frontier, which is commonly referred to as DAF. As such, title to the product passes to the customer when the shipment reaches the destination country, and revenue is recognized upon the arrival of the Company's product in that country. Beginning in December 2005, shipping terms to the Company's

89

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX9 9.8 | PAL jaslv0dc | 04-Mar-2007 22:32 EST | | 86507 TX 90 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

international OEMs and merchant power supply manufacturers shipped from the Company's facility outside of the United States are EX Works (EXW), meaning that title to the product transfers to the customer upon shipment from the Company's foreign warehouse. Shipments to North American OEMs and merchant power supply manufacturers are FOB-point of origin meaning revenue is recognized upon shipment, when the title is passed to the customer.

Sales to distributors are made under terms allowing certain rights of return and protection against subsequent price declines on the Company's products held by the distributors. As a result of these rights, the Company defers the recognition of revenue and the costs of revenues derived from sales to distributors until such distributors resell the Company's products to their customers. The Company determines the amounts to defer based on the level of actual inventory on hand at its distributors as well as inventory that is in transit to its distributors. The gross profit that is deferred as a result of this policy is reflected as "deferred income on sales to distributors" in the accompanying consolidated balance sheets.

Net revenue is reduced by estimated sales returns and allowances. The Company analyzes the following factors: historical returns, current economic trends, levels of inventories of the Company's products held by its customers, and changes in customer demand and acceptance of the Company's products and uses this information to review and determine the adequacy of the reserve. This reserve represents a reserve of the gross margin on estimated future returns and is reflected as a reduction to accounts receivable in the accompanying consolidated balance sheets. Increases to the reserve are recorded as a reduction to net revenue equal to the expected customer credit memo and a corresponding credit is made to cost of revenues equal to the estimated cost of the returned product. The net difference, or gross margin, is recorded as an addition to the reserve.

Approximately 50% to 60% of the Company's sales are made to distributors. Frequently, distributors need to sell at a price lower than the standard distribution price in order to win business. In these circumstances, the distributor submits a request to the Company for a lower "sell-in" price on a specific end-customer transaction or a series of transactions. After the distributor ships product to its customer under an approved transaction, the distributor submits a "ship & debit" claim to the Company to adjust its cost from the standard price to the approved lower price. After verification by the Company, a credit memo is issued to the distributor to adjust the sell-in price from the standard distribution price to the approved lower price. The Company maintains a reserve for these credits that appears as a reduction to accounts receivable in the Company's accompanying consolidated balance sheets. Any increase in the reserve results in a corresponding reduction in the Company's net revenues. To establish the adequacy of its reserves, the Company analyzes historical ship and debit payments and levels of inventory in the distributor channels.

From time to time the Company will reduce the distribution list price. As a result, the Company gives distributors protection, in the form of credits, against price declines on products they hold. The credits are referred to as "price protection." Since the Company does not recognize revenue until the distributor sells the product to its customers, the Company generally does not need to provide reserves for price protection. However, in rare instances the Company must consider price protection in the analysis of reserve requirements, as there may be a timing gap between a price decline and the issuance of price protection credits. If a price protection reserve is required, the Company will maintain a reserve for these credits that appears as a reduction to accounts receivable in the Company's accompanying consolidated balance sheets. Any increase in the reserve results in a corresponding reduction in the Company's net revenues. The Company analyzes distribution price declines and levels of inventory in the distributor channels in determining the reserve levels required.

For the years ended December 31, 2005, 2004 and 2003, the Company's top ten customers, including distributors that resell to OEMs and merchant power supply manufacturers, accounted for approximately 69%, 71% and 76% of net revenues, respectively.

90

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152159 9.6.18 | PAL soeus0pa | 06-Mar-2007 21:39 EST | 86507 TX 91 | 2* |
| FORM 10-K | | ■ | PAL | | HTM PMT | 1C |
| | | | | | | Page 1 of 1 |

## POWER INTEGRATIONS, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The following distribution customers accounted for more than 10% of total net revenues:

| | Year Ended December 31, | | |
| Customer | 2005 | 2004 | 2003 |
|---|---|---|---|
| Avnet (formerly Memec) | 19% | 19% | 25% |
| Synnex Technologies | 18% | 19% | 20% |

### Export Sales

The Company markets its products in North America and in foreign countries through its sales personnel and a worldwide network of independent sales representatives and distributors. As a percentage of total net revenues, export sales, which consist of domestic and foreign sales to distributors and direct customers in foreign countries, are comprised of the following:

| | Year Ended December 31, | | |
| | 2005 | 2004 As restated | 2003 As restated |
|---|---|---|---|
| Taiwan | 27% | 25% | 26% |
| Hong Kong/China | 24% | 26% | 30% |
| Korea | 20% | 19% | 19% |
| Western Europe | 10% | 9% | 7% |
| Germany | 4% | 5% | 5% |
| Japan | 5% | 4% | 3% |
| Singapore | 3% | 2% | 2% |
| Other | — % | 2% | 1% |
| Total export sales | 93% | 92% | 93% |

The remainder of the Company's sales are primarily to customers within North America.

### Product Sales

Sales of TOPSwitch and TinySwitch products accounted for 95%, 97% and 98% of total net revenues in 2005, 2004 and 2003, respectively. TOPSwitch products include TOPSwitch, TOPSwitch II, TOPSwitch-FX, and TOPSwitch-GX. TinySwitch products include TinySwitch and TinySwitch II.

Revenue mix by product family is comprised of the following:

| | Year Ended December 31, | | |
| Product Family | 2005 | 2004 | 2003 |
|---|---|---|---|
| TinySwitch-I and-II | 57% | 54% | 51% |
| TopSwitch-FX and-GX | 27% | 28% | 27% |
| TopSwitch-I and-II | 11% | 15% | 20% |
| LinkSwitch and DPA-Switch | 5% | 3% | 2% |

91

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Revenue mix by end markets served is comprised of the following:

| End Market | Year Ended December 31, | | |
|---|---|---|---|
|  | 2005 | 2004 | 2003 |
| Consumer | 30% | 33% | 28% |
| Communications | 29% | 31% | 36% |
| Computer | 23% | 22% | 22% |
| Industrial | 11% | 8% | 8% |
| Other | 7% | 6% | 6% |

### Foreign Currency Risk

The Company does not currently employ a foreign currency hedge program utilizing foreign currency forward exchange contracts. The Company maintains a Japanese yen bank account with a U.S. bank for payments to suppliers and for cash receipts from Japanese suppliers and customers denominated in yen. For the years ended December 31, 2005, 2004 and 2003, the Company realized a foreign exchange transaction loss of approximately $167,000, $336,000 and $194,000, respectively. These amounts are included in "other income (expense)" in the accompanying consolidated statements of income.

### Warranty

The Company generally warrants that its products will substantially conform to the published specifications for 12 months from the date of shipment. The Company's liability is limited to either a credit equal to the purchase price or replacement of the defective part. Returns under warranty have historically been immaterial, and as a result, the Company does not record a specific warranty reserve. Actual future returns could be different than the returns allowance established.

### Advertising

Advertising costs are expensed as incurred. Advertising costs amounted to $0.8 million, $0.6 million, and $0.6 million, in 2005, 2004 and 2003, respectively.

### Research and Development

Research and development costs are expensed as incurred.

### Income Taxes

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P6.9.6 | PAL jaslv0dc | 04-Mar-2007 22:32 EST | 86507 TX 93 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

# POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*Stock-Based Compensation*

The Company has elected to follow Accounting Principles Board Opinion (APB) No. 25, *Accounting for Stock Issued to Employees*, and related interpretations, in accounting for employee stock options rather than the alternative fair value method allowed by SFAS No. 123, *Accounting for Stock-Based Compensation*. APB No. 25 provides that compensation expense relative to the Company's employee stock options is measured based on the intrinsic value of stock options granted. For grants determined to be "fixed" under APB 25, the Company recognizes compensation expense in its statement of income using the straight-line method over the vesting period based upon the difference between the exercise price of the Company's employee stock option grants and the market price of the underlying common stock on the measurement date of the option. No compensation expense is recognized in the Company's consolidated income statement for fixed awards when the exercise price of the Company's employee stock option grants equals the market price of the underlying common stock on the measurement date of the option. The measurement date is the date when the number of shares and exercise price are known with finality. For grants determined to be "variable" under APB 25, the Company remeasures, and reports in its statement of income, the intrinsic value of the options at the end of each reporting period until the options are exercised, cancelled or expire unexercised.

Under SFAS No. 123, the fair value of stock options at the date of grant is recognized in earnings over the vesting period of the options. Had compensation expense been determined under a fair value method consistent with SFAS No. 123 and related interpretations, the Company's net income would have been decreased to the following pro forma amounts (in thousands, except per share information).

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2005** | **2004**<br>As restated<br>(1) | **2003**<br>As restated<br>(1) |
| Net income, as reported | $ 15,698 | $ 20,500 | $ 11,437 |
| Add stock-based employee compensation expense included in reported net income, net of tax | 2,383 | 619 | 5,732 |
| Deduct total stock-based employee compensation expense determined under fair-value-based method for all awards, net of tax | (18,487) | (20,119) | (20,843) |
| Pro forma net income (loss) | $ (406) | $ 999 | $ (3,674) |
| Basic earnings per share: | | | |
| As reported | $ 0.53 | $ 0.67 | $ 0.39 |
| Pro forma | $ (0.01) | $ 0.03 | $ (0.12) |
| Diluted earnings per share: | | | |
| As reported | $ 0.51 | $ 0.64 | $ 0.36 |
| Pro forma | $ (0.01) | $ 0.03 | $ (0.12) |

(1) The pro forma amounts in the years ended December 31, 2004 and 2003 have been restated to reflect a correction in the assumptions regarding the Company's expected life of stock options. The expected life of 5.2 years and 4.9 years previously reported in 2004 and 2003, respectively, is now 6.03 years for both 2004 and 2003. In relation to the correction of the expected life the Company made corresponding changes to the weighted average volatility and the risk-free interest rates. In addition, the Company has corrected the measurement date of some of its option grants as a result of its special investigation. See Note 3, "Restatement of Consolidated Financial Statements."

93

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 98 | PAL jaslv0dc | 04-Mar-2007 22:32 EST | | 86507 TX 94 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

# POWER INTEGRATIONS, INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The fair value of stock options granted is established on the date of the grant using the Black-Scholes option-pricing model with the following weighted average assumptions:

| | Year Ended December 31, | | |
| | 2005 | 2004 | 2003 |
| --- | --- | --- | --- |
| | | As restated | As restated |
| Risk-free interest rates | 2.98%-4.49% | 1.20%-4.39% | 1.13%-4.18% |
| Expected volatility rates | 59%-85% | 77%-92% | 89%-97% |
| Expected dividend yield As reported | — | — | — |
| Expected life of stock options (years) | 6.03 | 6.03 | 6.03 |
| Weighted-average grant date fair value of options granted | $13.17 | $19.29 | $15.77 |

The fair value of employees' stock purchase rights under the Company's employee stock purchase plan was estimated using the Black-Scholes model with the following weighted average assumptions:

| | Year Ended December 31, | | |
| | 2005 | 2004 | 2003 |
| --- | --- | --- | --- |
| | | As restated | As restated |
| Risk-free interest rates | 3.19% | 2.14% | 1.32% |
| Expected volatility rates | 47% | 53% | 74% |
| Expected dividend yield | — | — | — |
| Expected life (years) | 1.0 | 1.0 | 1.0 |
| Weighted-average estimated fair value of purchase rights | $8.94 | $ 8.33 | $ 11.66 |

### Fair Value of Financial Instruments

The estimated fair value of the Company's note to its supplier was approximately $9.9 million at December 31, 2005. The fair value was estimated using a pricing model incorporating current market rates. The note had a carrying cost of $10.0 million at December 31, 2005.

The carrying value of cash, cash equivalents, investments (excluding the Company's note to its supplier), accounts receivable, accounts payable and accrued liabilities approximate their fair values as of December 31, 2005 and 2004, because of the relatively short maturity of these instruments.

### Concentration of Credit Risk

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash investments and trade receivables. The Company has cash investment policies that limit cash investments to low risk investments. With respect to trade receivables, the Company performs ongoing credit evaluations of its customers' financial condition and requires letters of credit whenever deemed necessary. Additionally, the Company establishes an allowance for doubtful accounts based upon factors surrounding the credit risk of specific customers, historical trends related to past losses and other relevant information. Account balances are charged off against the allowance after all means of collection have been exhausted and the potential for recovery is considered remote. The Company does not have any off-balance sheet credit exposure related to its customers. As of December 31, 2005 and 2004, approximately 69% and 82% of accounts receivable, respectively, were concentrated with ten customers. The Company had two distribution customers that represented 18% and 11% of accounts receivable as of December 31, 2005, and the same two customers represented 26% and 29% of accounts receivable as of December 31, 2004.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.8 PAL jaslv0dc | 04-Mar-2007 22:32 EST | 86507 TX 95 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

# POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*Concentration in the Available Sources of Supply of High-Voltage Molding Compound*

The integrated circuit assembly process requires the Company's manufacturers to use a high-voltage molding compound available from only one vendor, which is difficult to process. This compound and its required processes, together with the other non-standard materials and processes needed to assemble its products, require a more exacting level of process control than normally required for standard packages. Unavailability of the sole source compound or problems with the assembly process can materially adversely affect yields and cost to manufacture.

*Indemnifications*

The Company sells products to its distributors under contracts, collectively referred to as Distributor Sales Agreements (DSA). Each DSA contains the relevant terms of the contractual arrangement with the distributor, and generally includes certain provisions for indemnifying the distributor against losses, expenses, and liabilities from damages that may be awarded against the distributor in the event the Company's hardware is found to infringe upon a patent, copyright, trademark, or other proprietary right of a third party (Customer Indemnification). The DSA generally limits the scope of and remedies for the Customer Indemnification obligations in a variety of industry-standard respects, including, but not limited to, limitations based on time and geography, and a right to replace an infringing product. The Company also, from time to time, has granted a specific indemnification to individual customers.

The Company believes its internal development processes and other policies and practices limit its exposure related to such indemnifications. In addition, the Company requires its employees to sign a proprietary information and inventions agreement, which assigns the rights to its employees' development work to the Company. To date, the Company has not had to reimburse any of its distributors or customers for any losses related to these indemnifications and no material claims were outstanding as of December 31, 2005. For several reasons, including the lack of prior indemnification claims and the lack of a monetary liability limit for certain infringement cases, the Company cannot determine the maximum amount of potential future payments, if any, related to such indemnifications.

*Recently Issued Accounting Pronouncements*

In December 2004, the Financial Accounting Standards Board, or FASB, issued FASB Staff Position (FSP) No.109-1 (FAS 109-1), *Application of FASB Statement No.109, Accounting for Income Taxes, to the Tax Deduction on Qualified Production Activities Provided by the American Jobs Creation Act of 2004* (the AJCA). The AJCA introduces a special 9% tax deduction on qualified production activities. FAS 109-1 clarifies that this tax deduction should be accounted for as a special tax deduction in accordance with SFAS 109. The Company will not be repatriating foreign earnings for the purpose of applying SFAS No. 109, *Accounting for Income Taxes*, and therefore the act will not have a material impact on its consolidated financial statements.

In December 2004, the FASB issued SFAS No. 123 (revised 2004) *Share-Based Payment* (SFAS 123(R)), which replaces SFAS No. 123 *Accounting for Stock-Based Compensation* (SFAS 123) and supersedes APB Opinion No. 25 *Accounting for Stock Issued to Employees*. The pro forma disclosures previously permitted under SFAS 123 no longer will be permitted. In March 2005, the SEC also issued Staff Accounting Bulletin 107 (SAB 107), *Share-Based Payment*, which expresses views of the SEC staff regarding the application of SFAS No. 123(R). Among other things, SAB 107 provides interpretive guidance related to the interaction between SFAS No. 123(R) and certain SEC rules and regulations, as well as the SEC staff's views regarding the valuation of share-based payment arrangements for public companies. The Company is required to adopt SFAS 123(R), beginning January 1, 2006. The Company has elected to use the modified-prospective method to transition to

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX9 9.8 | PAL jaslv0dc | 04-Mar-2007 22:32 EST | | 86507 TX 96 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

# POWER INTEGRATIONS, INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

SFAS 123(R). Under this method compensation expense shall be recorded for all unvested stock options and restricted stock at the beginning of the first quarter of adoption of SFAS 123(R). The Company expects to use the Black-Scholes valuation approach to determine fair value and to recognize the corresponding expense using the single option approach. Further, the Company expects that the adoption of SFAS 123(R) will have a material impact on its consolidated results of operations and earnings per share.

In March 2005, the FASB issued FSP No. 46(R)-5, *Implicit Variable Interests under FASB Interpretation No. 46 (revised December 2003), Consolidation of Variable Interest Entities* (FSP 46(R)-5), which provides guidance for a reporting enterprise on whether it holds an implicit variable interest in a variable interest entity (VIE) or potential VIE when specific conditions exist. FSP 46 (R)-5 became applicable to the Company in the quarter ended June 30, 2005. FSP 46(R) had no impact on the Company's consolidated results of operations and financial condition as of December 31, 2005.

In March 2005, the FASB issued FIN 47, *Accounting for Conditional Asset Retirement Obligations, an interpretation of FASB Statement No. 143* (FIN 47), which requires an entity to recognize a liability for the fair value of a conditional asset retirement obligation when incurred if the liability's fair value can be reasonably estimated. FIN 47 is effective for fiscal years ending after December 15, 2005. The Company has adopted FIN 47 in the current year, and the adoption of this standard did not have a material impact on the Company.

In May 2005, the FASB issued SFAS No. 154, *Accounting Changes and Error Corrections* (SFAS 154) that replaces Accounting Principles Board Opinions No. 20 *Accounting Changes* and SFAS No. 3, *Reporting Accounting Changes in Interim Financial Statements—An Amendment of APB Opinion No. 28*. SFAS 154 provides guidance on the accounting for and reporting of accounting changes and error corrections. It establishes retrospective application, or the latest practicable date, as the required method for reporting a change in accounting principle and the reporting of a correction of an error. The Company has adopted this pronouncement as of January 1, 2006 for error corrections made on or after the date of adoption, and additional disclosures are included in note 3 of notes to the consolidated financial statements.

In November 2005, the FASB issued FSP FAS 115-1 and FAS 124-1, *The Meaning of Other-Than-Temporary Impairment and Its Application to Certain Investments* (FSP 115-1), which provides guidance on determining when investments in certain debt and equity securities are considered impaired, whether that impairment is other-than-temporary, and on measuring such impairment loss. FSP 115-1 also includes accounting considerations subsequent to the recognition of an other-than temporary impairment and requires certain disclosures about unrealized losses that have not been recognized as other-than-temporary impairments. FSP 115-1 is required to be adopted by the Company in the first quarter of fiscal 2006, and such adoption is not anticipated to have a material effect on the Company's consolidated financial statements.

In July 2006, the FASB issued FASB Interpretation No. 48, *Accounting for Uncertainty in Income Taxes – an interpretation of SFAS 109* (FIN 48). FIN 48 prescribes a comprehensive model for recognizing, measuring, presenting and disclosing in the financial statements tax positions taken or expected to be taken on a tax return, including a decision whether to file or not to file in a particular jurisdiction. FIN 48 is effective for the Company beginning in the first quarter of 2007. If there are changes in net assets as a result of application of FIN 48, these will be accounted for as an adjustment to retained earnings. The Company is currently assessing the impact of FIN 48 on its consolidated financial position and results of operations.

In July 2006, the FASB issued EITF Issue No. 06-3, *How Taxes Collected from Customers and Remitted to Governmental Authorities Should be Presented in the Income Statement (that is, Gross versus Net Presentation)* (EITF 06-3). The adoption of EITF 06-3 did not have an impact on the Company's consolidated financial position and results of operations. The Company's accounting policy has been to present the above-mentioned taxes on a net basis, excluded from revenues.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX12 PAL jaslv0dc | 04-Mar-2007 22:32 EST | 86507 TX 97 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

# POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

In September 2006, the SEC issued Staff Accounting Bulletin No. 108 (SAB 108), which provides interpretive guidance on how the effects of the carryover or reversal of prior year misstatements should be considered in quantifying a current year misstatement. The guidance is applicable for the Company's fiscal year 2006. The Company currently does not believe that the adoption of SAB 108 will have a material impact on its consolidated financial position and results of operation.

In September 2006, the FASB issued Statement of Financial Accounting Standards No. 157, *Fair Value Measurements* (SFAS 157). SFAS 157 establishes a framework for measuring fair value and expands disclosures about fair value measurements. The changes to current practice resulting from the application of SFAS 157 relate to the definition of fair value, the methods used to measure fair value, and the expanded disclosures about fair value measurements. SFAS 157 is effective for fiscal years beginning after November 15, 2007 and interim periods within those fiscal years. The Company is currently in the process of evaluating the impact that the adoption of SFAS 157 will have on its consolidated financial position and results of operation.

In September 2006, the FASB issued SFAS No. 158, *Employers Accounting for Defined Benefit Pension and Other Postretirement Plans—an amendment of FASB Statements No. 87, 88, 106, and 132(R), (SFAS 158)*. SFAS 158 requires an employer to recognize the over-funded or under-funded status of a defined benefit postretirement plan (other than a multiemployer plan) as an asset or liability in its statement of financial position to recognize changes in that funded status in the year in which the changes occur through comprehensive income of a business entity or changes in unrestricted net assets of a not-for-profit organization. The provisions of SFAS 158 require an employer with publicly traded equity securities to recognize the funded status of a defined benefit postretirement plan and to provide the required disclosures as of the end of the fiscal year ending after December 15, 2006. The Company does not believe that the adoption of the provisions of SFAS No. 158 will materially impact its consolidated financial position and results of operation.

## 3. RESTATEMENT OF CONSOLIDATED FINANCIAL STATEMENTS:

*Background*

Based upon an investigation and determinations made by a Special Committee of the board of directors and management's undertaking of a separate review of historical stock option activity subsequent to the issuance of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2004, the Company identified errors in its accounting related to stock option compensation expense in prior periods.

The Company announced on March 13, 2006 that a Special Committee of the board of directors was conducting an internal investigation of its practices related to stock option grants to officers, directors and employees, and related matters. The Special Committee was comprised of disinterested members of the Company's board of directors and was assisted by independent outside legal counsel and accounting experts.

On May 24, 2006, the Special Committee advised the board of directors of its final conclusion that, among other things, the recorded grant dates for certain option grants should not be relied upon. After receiving the Special Committee's conclusions and consistent with those conclusions, the Company reviewed stock option grants during the period from 1998 through June 2006. The Company developed and applied certain methodologies in determining the revised measurement dates for option grants during the periods from 1998 through 2005.

In addition to restatements for stock-based compensation charges and the related income and payroll tax effects, the Company recorded adjustments to correct other errors that occurred in the periods ended December 31, 2001 through the third quarter of 2005, which have been reflected in the accompanying restated consolidated financial statements.

97

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX01 PAL jaslv0dc | 04-Mar-2007 22:32 EST | 86507 TX 98 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*Restatement Adjustments*

The Company's restated consolidated financial statements incorporate stock-based compensation expense, payroll tax expense, and other accounting adjustments, including the income tax impacts of the restatement adjustments. The restatement adjustments result in a $29.4 million reduction of retained earnings as of December 31, 2004. This amount includes an increase in the Company's previously reported consolidated net income of approximately $0.1 million for the year ended December 31, 2004, and a reduction in the Company's previously reported consolidated net income of approximately $6.6 million for the year ended December 31, 2003. The total restatement impact for the years ended December 31, 1998 through December 31, 2002, of $22.9 million, has been reflected as a prior period adjustment to beginning retained earnings as of January 1, 2003. The Company also recorded restatement adjustments to its condensed consolidated financial statements for the three quarters ended September 30, 2005. See Note 12 "Selected Quarterly Information, as Restated" of the Company's notes to consolidated financial statements for more information on the Company's quarterly information. The following table summarizes the impact of the restatement adjustments on beginning retained earnings as of January 1, 2003, and net income for the years ended December 31, 2004 and 2003 (in thousands):

| | Net Income Year Ended December 31, | | Retained Earnings As Of Jan. 1, |
| | 2004 | 2003 | 2003 |
|---|---|---|---|
| As previously reported | $20,367 | $18,085 | $ 51,249 |
| Adjustments: | | | |
|     Stock compensation expense | (1,288) | (9,888) | (29,597) |
|     Payroll taxes, interest and penalties | 1,289 | (254) | (2,282) |
|     Other miscellaneous accounting adjustments | (107) | (28) | 512 |
|     Income tax benefit (provision) | 239 | 3,522 | 8,484 |
|     Total adjustments | 133 | (6,648) | (22,883) |
| As adjusted | $20,500 | $11,437 | $ 28,366 |

The table below presents the impact of the individual restatement adjustments, and are explained in further detail following the table (in thousands):

| | Year Ended December 31, | | | | | | |
| | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 |
|---|---|---|---|---|---|---|---|
| **STOCK COMPENSATION:** | | | | | | | |
| New hire non-officer stock option grants accounted for as being made prior to the terms being fixed | $ 264 | $ 411 | $ 542 | $ 506 | $ 556 | $ 431 | $ |
| Stock option grants with insufficient or incomplete corporate approvals | 3,053 | 4,992 | 7,978 | 6,429 | 6,127 | 4,175 | 24 |
| Stock option grants cancelled and repriced | (2,067) | 4,422 | (107) | 1,418 | — | — | — |
| Accelerated vesting and other matters related to stock-based compensation | 38 | 63 | (49) | (171) | 171 | 1,567 | — |
| Total stock compensation expense | 1,288 | 9,888 | 8,364 | 8,182 | 6,854 | 6,173 | 24 |
| PAYROLL TAXES, INTEREST AND PENALTIES | (1,289) | 254 | 574 | 172 | 1,468 | 68 | — |
|     Total stock compensation related adjustments | (1) | 10,142 | 8,938 | 8,354 | 8,322 | 6,241 | 24 |

98

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.6 | PAL jaslv0dc | 04-Mar-2007 22:32 EST | 86507 TX 99 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

| | Year Ended December 31, | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 |
| OTHER MISCELLANEOUS ACCOUNTING ADJUSTMENTS: | | | | | | | |
| Correction of sales returns reserve | $ (14) | $ 14 | $ 348 | $ (872) | $ — | $ — | $ — |
| Correction of period of charge for cost of wafers used in engineering | 108 | — | — | — | — | — | — |
| Record unfunded post-employment health benefit obligation | 13 | 14 | 12 | — | — | — | — |
| Total other miscellaneous accounting adjustments | 107 | 28 | 360 | (872) | — | — | — |
| Total adjustments to income before income tax | 106 | 10,170 | 9,298 | 7,482 | 8,322 | 6,241 | 24 |
| INCOME TAX BENEFIT | 239 | 3,522 | 3,829 | 1,095 | 2,033 | 1,515 | 12 |
| Total (increase) decrease to net income | $(133) | $ 6,648 | $5,469 | $6,387 | $6,289 | $4,726 | $ 12 |
| (DECREASE) INCREASE IN DILUTED EARNINGS PER SHARE | $0.00 | $ (0.21) | $(0.19) | $(0.22) | $(0.22) | $(0.17) | $0.00 |

*Stock Compensation*—These adjustments are from the Company's determination, based upon the Special Committee's investigation and the Company's subsequent reviews and analyses, that the initially recorded measurement dates for various categories of option grants could not be relied upon. These categories included the following:

- *New hire non-officer stock option grants accounted for as being made prior to the terms being fixed.* The Company's practice was to set the exercise price of new hire non-officer awards based upon the fair value of its stock on the employee's hire date or the last day of the month of the employee's first month of employment, whichever was lower. Because this determination was made at the end of the month of hire, the last day of the month of the employee's first month of employment was determined to be the first date when the number of shares and the price of each grant were known with finality. Grants accounted for as being made before the last day of the month of the employee's first month of employment (options to purchase an aggregate of 1,214,550 shares) were accounted for as fixed awards under Accounting Principles Board Opinion (APB) No. 25 *Accounting for Stock Issued to Employees*, or APB 25.

- *Stock option grants with insufficient or incomplete corporate approvals.* The Company determined that for certain stock option grants the number of shares and the exercise price were not known with finality at the original measurement date. The Company determined that the original recorded grant date could not be relied on because there was correspondence or other evidence that indicated that not all required corporate approvals had been obtained, including the finalization of the number of stock options allocated and the related exercise price. The Company adopted a methodology to remeasure these option grants to a revised measurement date, as described below, and accounted for these grants (options to purchase an aggregate of 6,358,639 shares) as fixed awards under APB 25.

- *Stock option grants determined to have been cancelled and repriced.* The Company determined that the terms of certain stock option grants (options to purchase an aggregate of 415,000 shares) may have been communicated to employees and that those terms were subsequently modified. The Company concluded that such modifications constitute repricings, and therefore, these stock option grants should have been accounted for as variable awards for accounting purposes.

99

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX9 9.6 PAL jaslv0dc | 04-Mar-2007 22:20 EST | 86507 TX 100 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

- *Accelerated vesting and other matters related to stock-based compensation.* Accelerated vesting consists primarily of the acceleration of stock option vesting (options to purchase an aggregate of 341,174 shares) upon termination of a few employees prior to 2001, which resulted in stock-based compensation expense which had not previously been recorded. The other matters relate primarily to the impact of the capitalization in inventory of stock-based compensation in 2001 through 2005.

*Payroll taxes, interest and penalties*—In connection with the stock-based compensation adjustments, the Company determined that certain options previously classified as Incentive Stock Option, or ISO, grants were determined to have been granted with an exercise price below the fair market value of the Company's stock on the revised measurement date (see discussion under "Accounting Considerations" below). Under U.S. tax regulations, ISOs may not be granted with an exercise price less than the fair market value on the date of grant, and therefore these grants might not qualify for ISO tax treatment. The Company refers to these stock options as the "Affected ISOs." The potential disqualification of ISO status exposes the Company to additional payroll related withholding taxes on the exercise of these Affected ISOs granted to U.S. employees, and penalties and interest for failing to properly withhold taxes on exercise of those options. The payroll taxes, interest and penalties were recorded as expenses in the periods in which the underlying stock options were exercised. Then, in subsequent periods in which the liabilities were legally extinguished due to statutes of limitations, the payroll taxes, interest and penalties were reversed, and recognized as a reduction in the related functional expense category in the Company's consolidated statements of income. The fluctuations in the restatement adjustments in the table above are the result of: (1) the timing of stock option exercises, and (2) the reversals of expenses previously recorded due to the expiration of statutes of limitations. The net tax liability at December 31, 2005 for this potential disqualification of ISO tax treatment for option awards totaled $1.1 million.

*Other miscellaneous accounting adjustments*—In addition to stock-based compensation charges, the Company recorded adjustments that occurred in the periods ended December 31, 2001 through the third quarter of 2005 that had not been previously reflected in its restated consolidated financial statements. These restatements relate primarily to a correction of the Company's sales return reserve, which should have been reduced in 2001. In addition, the Company also corrected the period of charge for certain wafers used in engineering and recorded an unfunded post-employment health benefit obligation.

Further, the Company corrected the classification of the balance of auction rate securities (for which interest rates reset in less than 90 days, but for which the underlying maturity date is longer than 90 days), and callable securities (for which interest rates reset between 90 days and 1 year, but for which the underlying maturity date exceeds 1 year) from cash and cash equivalents or short-term investments to long-term investments, as of December 31, 2004 and 2003. The consolidated statements of cash flows were also corrected for the effects of the aforementioned restatements as well as to correct for the non-cash effects of property and equipment purchases recorded, but not yet paid for, at each period end.

*Income tax benefit*—The Company reviewed the income tax effect of the stock-based compensation charges, and the Company believes that the proper income tax accounting for U.S. stock options under generally accepted accounting principles depends, in part, on the tax distinction of the stock options as either ISOs or non-qualified stock options, or NSO's. Although some of the Affected ISOs were originally intended to be ISOs, the Company noted that, under U.S. tax regulations, ISOs may not be granted with an exercise price less than the fair market value on the date of grant. Because of the potential impact of the measurement date changes on the qualified status of Affected ISOs, the Company has determined that all Affected ISOs might not be qualified ISOs under the tax regulations, and therefore should be accounted for as if they were NSO's for income tax accounting purposes.

100

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.6 | PAL jaslv0dc | 04-Mar-2007 22:20 EST | 86507 TX 101 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

# POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The Company has recorded a net income tax benefit of approximately $12.2 million in connection with the stock-based compensation related expense and other restatement adjustments during the period from fiscal year 1998 to December 31, 2004, net of estimated limitations under IRC §162(m). This tax benefit has resulted in an increase of the Company's deferred tax assets for all U.S. affected stock options prior to the exercise or forfeiture of the related options. The Company recorded no tax benefit or deferred tax asset for affected stock options granted to non-U.S. employees because the Company determined that it could not receive tax benefits outside of the U.S. Further, the Company limited the deferred tax assets recorded for affected stock options granted to certain highly paid officers to reflect estimated limitations on tax deductibility under Internal Revenue Code Section 162(m). Upon exercise or forfeiture of the underlying options, the excess or deficiency in deferred tax assets are written-off to either expense or paid-in capital in the period of exercise or forfeiture.

Partially offsetting the income tax benefit on the restatement adjustments described above, the Company also recorded an income tax expense of approximately $692,000 during fiscal year 2003 to correct for an error in the determination of the effect of a cost sharing arrangement with one of its subsidiaries.

Further, the Company recorded restatements aggregating approximately $1.2 million to record additional indirect tax benefits resulting from the exercise of certain stock options in 2002 and 2003. Although these entries had no impact on the Company's consolidated statements of income, they decreased income taxes payable and increased additional paid-in capital in its consolidated balance sheet as of January 1, 2004.

The Company's board of directors has ratified each of the options granted, and the Company intends to honor each stock option granted pursuant to the terms of the applicable stock option plan and stock option agreement.

*Accounting Considerations—Stock-Based Compensation*

The Company originally accounted for all employee, officer and director stock option grants as fixed grants under APB 25, using a measurement date of the recorded grant date. The Company issued all grants with an exercise price equal to the fair market value of its common stock on the recorded grant date, and therefore originally recorded no stock-based compensation expense.

As a result of the Special Committee findings, and the Company's own further review of its stock option granting practices, the Company determined that the measurement dates for certain stock option grants differed from the recorded grant dates for such grants. In some instances, the Company was only able to locate sufficient evidence to identify the measurement date described in APB 25, the first date on which both the number of shares that an individual employee was entitled to receive and the exercise price were known, within a possible range of dates. As a result, the Company developed a methodology to establish the revised measurement date primarily by using communication dates as its estimate of the first date on which both the number of shares that an individual employee was entitled to receive and the exercise price were known with finality. Using the methodology described below the Company concluded that it was appropriate to revise the measurement dates for these grants based upon its findings, and the Company refers to these revised measurement dates as the "*Deemed Measurement Dates*". The Company calculated stock-based compensation expense under APB 25 based upon the intrinsic value as of the Deemed Measurement Dates of stock option awards determined to be "fixed" under APB 25 and the vesting provisions of the underlying options. The Company calculated the intrinsic value on the Deemed Measurement Date as the closing price of its common stock on such date as reported on the Nasdaq National Market, now the Nasdaq Global Market, less the exercise price per share of common stock as stated in the underlying stock option agreement, multiplied by the number of shares subject to such stock option award. The Company recognizes these amounts as compensation expense over the vesting period of the

101

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANF6U-MWS-CX0 8 6 | PAL jaslv0dc | 04-Mar-2007 22:21 EST | 86507 TX 102 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

# POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

underlying options (generally four years). The Company also determined that variable accounting treatment was appropriate under APB 25 for certain stock option grants to three officers for which evidence was obtained that the terms of the options may have been communicated to those officers and that those terms were subsequently modified (stock options cancelled and repriced). When variable accounting is applied to stock option grants, the Company remeasures, and reports in its consolidated statement of income, the intrinsic value of the options at the end of each reporting period until the options are exercised, cancelled or expire unexercised.

The methodology the Company used to determine the Deemed Measurement Dates associated with prior stock option grants was as follows:

*New Hire Non-Officer Employee Stock Options*—The Company determined the Deemed Measurement Date for each of these grants to be the last day of the month of the employee's first month of employment. The Company's practice was to set the exercise price of these awards at the end of the month of hire, and therefore the Company determined that the last day of the month of the employee's first month of employment was the first date when the number of shares and the price of each grant were known with finality.

*All Other Stock Options*—The Company determined the Deemed Measurement Date for each stock option grant, other than grants of new hire non-officer employee options, to be the Approval Date for the stock option, provided the Approval Date criteria set forth below were met. If the criteria for use of the Approval Date were not met, then the Company used the Communication Date, as defined below, as the Deemed Measurement Date for the stock option.

- "Approval Date"—The Approval Date was the date of approval set forth in executed minutes or a fully-executed consent of the board of directors, compensation committee or stock option committee documenting the grant of the stock option. However, the Company generally only used the Approval Date as the Deemed Measurement Date if both:

  (1) there was documentary evidence that the allocation of the shares had been finalized, and the written consent, if applicable, was executed, on that date ; and

  (2) the Communication Date for the stock option was within 30 days of the date of approval set forth in the documentary evidence.

- "Communication Date"—The Company defines the "Communication Date" as the date the Company determined the key terms of the option (both the number of shares and the exercise price) had initially been communicated to the optionee. In the absence of specific documentary evidence of initial communication, the Company generally determined the Communication Date to be the earliest of:

  (1) the date the employee record of the grant of the stock option was added to the stock option database application, or the latest recordation date in the case of a group of grants (the "Record Add Date");

  (2) the optionee manual signature date on the stock option agreement, or the earliest optionee manual signature date in the case of a group of grants (the "Stock Option Agreement Date"); and

  (3) for officers and directors, the date that a Form 3 or 4 was filed with the SEC with respect to the grant (the "Form 3/4 Date").

However, the Company did not consider the Record Add Date in its determination if the Stock Option Agreement Date was more than 30 days after the Record Add Date in the case of individual grants and grants to groups of less than five, or more than 10 days after the Record Add Date in the case of grants to groups of five or more The Company made the distinction regarding small and large groups because the

POWER INTEGRATIONS,    RR Donnelley ProFile    LANFBU-MWS-CXP PAL jaslv0dc    04-Mar-2007 22:21 EST    86507 TX 103    1*
FORM 10-K    PAL    HTM IFV    1C
Page 1 of 1

# POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

Company would expect to see at least one agreement returned to the Company within 10 days with larger groups of optionees; but with small groups, the probability of seeing an agreement returned to the Company within 10 days was less likely.

When applying this methodology to groups of grants, the Company generally determined the Communication Date for the group to be the latest Record Add Date, the earliest Stock Option Agreement Date, or Form 3/4 Dates as the Company determined that, under the Company's stock option grant process, the terms of stock options were communicated concurrently to each member of a group. The Company excluded a limited number of options, or "Outliers", from the determination of the latest Record Add Date and the earliest Stock Option Agreement Date for a group of grants when, based upon available evidence, it considered the Outlier dates as not reliable as to the date that the terms of the stock option grants were communicated to the group.

*Outside Director Automatic Stock Option Grants*

The Company has determined that, as a result of administrative errors, a total of 16 grants representing options to purchase 180,000 shares under the Outside Directors Plan collectively to three of its outside directors were documented as having been made on dates other than as set forth in the Outside Directors Plan. The Company has corrected the documentation of these grants to reflect the correct dates and exercise prices, as automatically established under the Outside Directors Plan. Because these actions were corrections of administrative errors in the documentation, rather than changing any of the terms of the stock option grants as automatically granted, the Company determined that there was no accounting charge to be recognized in connection with these corrections, as the correct measurement date was the date of grant as automatically established by the Outside Directors Plan, and the exercise price was the fair market value of the Company's common stock on the correct measurement date.

Subsequent to the correction of the documentation of these grants, the three outside directors have agreed to increase the exercise prices of certain of such misdocumented grants to purchase 80,000 shares. Further, the only director who exercised a misdocumented grant has reimbursed the Company $78,290 for the difference between the aggregate exercise price as misdocumented and as corrected.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX9 96 PAL jaslv0dc | 04-Mar-2007 22:21 EST | 86507 TX 104 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |
| | | | | Page 1 of 1 | |

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

*Impact of the Restatement Adjustments on our Consolidated Financial Statements*

The following table presents the impact of the financial statement restatement adjustments on the Company's previously reported consolidated statements of income for the years ended December 31, 2004 and 2003 (in thousands).

| | Year Ended December 31, 2004 | | | Year Ended December 31, 2003 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| NET REVENUES | $ 136,636 | $ 17[B] | $136,653 | 125,706 | $ (24)[B] | $125,682 |
| COST OF REVENUES | 71,409 | 447[A,B] | 71,856 | 62,814 | 682[A,B] | 63,496 |
| GROSS PROFIT | 65,227 | (430) | 64,797 | 62,892 | (706) | 62,186 |
| OPERATING EXPENSES: | | | | | | |
| Research and development | 16,162 | (722)[A,C] | 15,440 | 16,443 | 3,664[A] | 20,107 |
| Sales and marketing | 15,273 | 797[A] | 16,070 | 15,484 | 1,682[A] | 17,166 |
| General and administrative | 8,102 | (133)[A,D] | 7,969 | 6,848 | 4,020[A,D] | 10,868 |
| Total operating expenses | 39,537 | (58) | 39,479 | 38,775 | 9,366 | 48,141 |
| INCOME FROM OPERATIONS | 25,690 | (372) | 25,318 | 24,117 | (10,072) | 14,045 |
| OTHER INCOME (EXPENSE): | | | | | | |
| Interest income | 1,808 | 1[A] | 1,809 | 1519 | 1[A] | 1,520 |
| Interest expense | — | 265[A] | 265 | (7) | (99)[A] | (106) |
| Other, net | (754) | — | (754) | (511) | — | (511) |
| Total other income | 1,054 | 266 | 1,320 | 1,001 | (98) | 903 |
| INCOME BEFORE PROVISION FOR INCOME TAXES | 26,744 | (106) | 26,638 | 25,118 | (10,170) | 14,948 |
| PROVISION FOR INCOME TAXES | 6,377 | (239)[A] | 6,138 | 7,033 | (3,522)[A,E] | 3,511 |
| NET INCOME | $ 20,367 | $ 133 | $ 20,500 | $ 18,085 | $ (6,648) | $ 11,437 |
| EARNINGS PER SHARE: | | | | | | |
| Basic | $ 0.66 | $ 0.01 | $ 0.67 | $ 0.61 | $ (0.22) | $ 0.39 |
| Diluted | $ 0.63 | $ 0.01 | $ 0.64 | $ 0.57 | $ (0.21) | $ 0.36 |
| SHARES USED IN PER SHARE CALCULATION: | | | | | | |
| Basic | 30,802 | — | 30,802 | 29,473 | — | 29,473 |
| Diluted | 32,414 | (185) | 32,229 | 31,812 | (324) | 31,488 |

A. Adjustment for stock-based compensation expense pursuant to APB No. 25 and the associated payroll taxes, interest, penalties and income tax benefit.
B. Adjustment to correct the sales return reserve.
C. Adjustment to correct for the period of charge for engineering wafers.
D. Adjustment to record unfunded post-employment health benefit obligation.
E. Adjustment to correct for an error in the calculation under a cost sharing agreement with a subsidiary company.

# POWER INTEGRATIONS, INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The following table presents the impact of the restatement adjustments on the Company's previously reported consolidated balance sheet as of December 31, 2004 (in thousands).

| | December 31, 2004 | | |
|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated |
| **ASSETS** | | | |
| CURRENT ASSETS: | | | |
| Cash and cash equivalents | $119,596 | $ (12,200)[D] | $107,396 |
| Short-term investments | 2,750 | (1,501)[D] | 1,249 |
| Accounts receivable, net of allowances of $469 and $382, respectively | 12,230 | 520[B] | 12,750 |
| Inventories | 25,354 | 119[A,C] | 25,473 |
| Deferred tax assets | 3,878 | (662)[A] | 3,216 |
| Prepaid expenses and other current assets | 2,600 | — | 2,600 |
| Total current assets | 166,408 | (13,724) | 152,684 |
| PROPERTY AND EQUIPMENT, net | 51,718 | — | 51,718 |
| INVESTMENTS | 12,211 | 13,700[D] | 25,911 |
| DEFERRED TAX ASSETS | 1,923 | 5,607[A] | 7,530 |
| OTHER ASSETS | 3,172 | 1[A] | 3,173 |
| | $235,432 | $ 5,584 | $241,016 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| CURRENT LIABILITIES: | | | |
| Accounts payable | $ 8,612 | $ 132[A] | $ 8,744 |
| Accrued payroll and related expenses | 4,672 | 1,152[A,E] | 5,824 |
| Taxes payable | 5,696 | 947[A,F,G] | 6,643 |
| Deferred income on sales to distributors | 3,058 | — | 3,058 |
| Other accrued liabilities | 882 | 109[A] | 991 |
| Total current liabilities | 22,920 | 2,340 | 25,260 |
| STOCKHOLDERS' EQUITY: | | | |
| Common stock | 30 | — | 30 |
| Additional paid-in capital | 122,895 | 35,718[A,G] | 158,613 |
| Deferred compensation | — | (3,076)[A] | (3,076) |
| Accumulated translation adjustment | (114) | — | (114) |
| Retained earnings | 89,701 | (29,398) | 60,303 |
| Total stockholders' equity | 212,512 | 3,244 | 215,756 |
| | $235,432 | $ 5,584 | $241,016 |

A. Adjustment for stock-based compensation expense pursuant to APB No. 25 and the associated payroll taxes, interest, penalties and income tax benefit.
B. Adjustment to correct the sales return reserve.
C. Adjustment to correct for the period of charge for engineering wafers.
D. Reclassification of auction rate securities.
E. Adjustment to record unfunded post-employment health benefit obligation.
F. Adjustment to correct for an error in the calculation under a cost sharing agreement with a subsidiary company.
G. Adjustment to record additional indirect tax benefits resulting from the exercise of certain stock options in 2001 and 2002.

The above restatements impacted the statements of cash flows. Operating activities and investing activities were also impacted due to a reclassification from purchases of property and equipment to accounts payable, to reflect property and equipment not paid for at December 31, 2004 and 2003.

POWER INTEGRATIONS,    RR Donnelley ProFile    LANFBU-MWS-CX08  PAL jaslv0dc    04-Mar-2007 22:21 EST    86507 TX 106    1*
FORM 10-K    PAL    HTM IFV    1C
Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The following table shows the effect of the restatements to previously reported cash flow amounts for the years ended December 31, 2004 and 2003 (in thousands).

| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|---|---|---|
| | | 2004 | | | 2003 | |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | | | |
| Net income | $ 20,367 | $ 133 | $ 20,500 | $ 18,085 | $ (6,648) | $ 11,437 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | | |
| Depreciation and amortization | 6,880 | — | 6,880 | 6,846 | — | 6,846 |
| Stock-based compensation expense | — | 1,288[A] | 1,288 | — | 9,888[A] | 9,888 |
| Deferred income taxes | 72 | 665[A] | 737 | 191 | 1,473[A] | 1,664 |
| Deferred rent | — | — | — | (725) | — | (725) |
| Provision for accounts receivable and other allowances | 456 | (11)[B] | 445 | 688 | 16[B] | 704 |
| Tax benefit associated with employee stock plans | 4,082 | (1,974)[A] | 2,108 | 6,841 | (3,544)[A] | 3,297 |
| Stock compensation to non-employees | 37 | — | 37 | 135 | — | 135 |
| Change in operating assets and liabilities: | | | | | | |
| Accounts receivable | (2,360) | — | (2,360) | (2,492) | — | (2,492) |
| Inventories | (2,241) | — | (2,241) | (8,085) | — | (8,085) |
| Prepaid expenses and other assets | 295 | — | 295 | (2,909) | — | (2,909) |
| Accounts payable | 694 | (298)[A,C,D] | 396 | 191 | 1,528[A,D] | 1,719 |
| Taxes payable and other accrued liabilities | 1,336 | 165[A,F,G] | 1,501 | 1,773 | (1,266)[A,F,G] | 507 |
| Deferred income on sales to distributors | 493 | — | 493 | (153) | — | (153) |
| Net cash provided by operating activities | 30,111 | (32) | 30,079 | 20,386 | 1,447 | 21,833 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | | | | |
| Purchases of property and equipment | (6,395) | 32[D] | (6,363) | (36,368) | (1,447)[D] | (37,815) |
| Acquisition of technology patents/ licenses | (1,740) | — | (1,740) | (1,419) | — | (1,419) |
| Purchases of available-for-sale investments | — | (45,775)[E] | (45,775) | — | (18,765)[E] | (18,765) |
| Proceeds from available-for-sale investments | — | 52,890[E] | 52,890 | — | 450[E] | 450 |
| Purchases of investments, held-to-maturity | (29,182) | (1,001)[E] | (30,183) | (6,210) | —[E] | (6,210) |
| Proceeds from maturities of investments | 19,270 | (88)[E] | 19,182 | 33,037 | 89[E] | 33,126 |
| Net cash used in investing activities | (18,047) | 6,058 | (11,989) | (10,960) | (19,673) | (30,633) |

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P AL jaslv0dc | 04-Mar-2007 22:21 EST | | 86507 TX 107 | 1* |
| FORM 10-K | | PAL | | | HTM IFV | 1C |

Page 1 of 1

# POWER INTEGRATIONS, INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

| | Year ended December 31, | | | | | |
| | 2004 | | | 2003 | | |
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|---|---|---|
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | | | | |
| Net proceeds from issuance of common stock | $ 9,099 | $ 2 | $ 9,101 | $ 23,554 | $ — | $23,554 |
| Repurchase of common stock | (11,797) | (2) | (11,799) | — | — | — |
| Principal payments under capitalized lease obligations | (41) | — | (41) | (233) | — | (233) |
| Net cash (used in) provided by financing activities | (2,739) | — | (2,739) | 23,321 | — | 23,321 |
| NET INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 9,325 | 6,026 | 15,351 | 32,747 | (18,226) | 14,521 |
| CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD | 110,271 | (18,226) | 92,045 | 77,524 | — | 77,524 |
| CASH AND CASH EQUIVALENTS AT END OF PERIOD | $119,596 | $ (12,200) | $107,396 | $110,271 | $ (18,226) | $92,045 |

A. Adjustment for stock-based compensation expense pursuant to APB No. 25 and the associated payroll taxes, interest, penalties and income tax benefit.
B. Adjustment to correct the sales return reserve.
C. Adjustment to correct for the period of charge for engineering wafers.
D. Adjustment for unpaid property and equipment purchases at December 31, 2004 and 2003
E. Reclassification of auction rate securities.
F. Adjustment to record unfunded post-employment health benefit obligation.
G. Adjustment to correct for an error in the calculation under a cost sharing agreement with a subsidiary company.

The restatement also impacted footnotes 2, 7, 8, and 12.

## 4. BANK LINE OF CREDIT:

The Company had a $10.0 million revolving line of credit agreement with Union Bank of California, which expired on October 1, 2006, and restricted the Company from entering into certain transactions, paying or declaring dividends without the bank's prior consent and contained certain financial covenants. As of December 31, 2005 and 2004, there were no amounts due under the bank line of credit. A portion of the credit line was used to cover advances for commercial letters of credit and standby letters of credit, used primarily for the shipment of wafers from wafer supply manufactures to the Company, and also to its workers compensation insurance carrier as part of its insurance program. As of December 31, 2005, there were outstanding letters of credit totaling approximately $641,000, and as of December 31, 2004, there were outstanding letters of credit totaling approximately $5.3 million. On October 26, 2006, the Company entered into a security agreement with Union Bank of California, whereby it agreed to maintain $1.3 million in an interest bearing certificate of deposit with the bank. The purpose of this agreement is to secure the commercial letters of credit and standby letters of credit. This agreement remains in effect until cancellation of the Company's letters of credit.

## 5. COMMITMENTS AND CONTINGENCIES:

*Customer Claims*—From time to time in the ordinary course of business the Company becomes involved in lawsuits, or customers and distributors may make claims against the Company. During 2004, a small number of

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P6 | PAL jaslv0dc | 04-Mar-2007 22:21 EST | 86507 TX 108 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | | PAL | | HTM IFV | 1C |

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

product lots of one of the Company's products were not built to design specifications because of a foundry process defect. As a result of this manufacturing defect, there were a limited number of product failures and the Company replaced all of the parts that had not yet been installed in end-customer products. Several customers made requests for reimbursement of costs and expenses in excess of the Company's contractual warranty liability. In accordance with SFAS No. 5, *Accounting for Contingencies*, the Company makes a provision for a liability when it is both probable that a liability has been incurred and the amount of the loss can be reasonably estimated. After further discussions with its customers, the Company determined that it was appropriate to accrue approximately $481,000 during 2005, related to this manufacturing defect, for customer costs and expenses in excess of the Company's contractual warranty liability. The Company expects that there will be no additional charges related to this matter.

*Facilities*—In October 2003 the Company completed the purchase of an 118,000 square foot facility, located in San Jose, California, for approximately $30.0 million in cash. The Company previously leased this same facility, which houses the Company's main executive, administrative, manufacturing and technical offices.

The Company had no capital leasing arrangements as of December 31, 2005. At December 31, 2005 the Company had $7.9 million of non-cancelable purchase obligations.

Future minimum lease payments under all non-cancelable operating lease agreements as of December 31, 2005 are as follows (in thousands):

| Fiscal Year | |
|---|---|
| 2006 | $ 433 |
| 2007 | 309 |
| 2008 | 229 |
| 2009 | 113 |
| 2010 | 52 |
| Total minimum lease payments | $1,136 |

Total rent expense amounted to $400,000, $400,000 and $1.2million in the years ended December 31, 2005, December 31, 2004 and December 31, 2003, respectively.

## 6. PREFERRED STOCK PURCHASE RIGHTS PLAN:

In February 1999, the Company adopted a Preferred Stock Purchase Rights Plan (the Plan) designed to enable all stockholders to realize the full value of their investment and to provide for fair and equal treatment for all stockholders in the event that an unsolicited attempt is made to acquire the Company. Under the Plan, stockholders received one right to purchase one one-thousandth of a share of a new series of preferred stock for each outstanding share of common stock held at $150.00 per right, when someone acquires 15 percent or more of the Company's common stock or announces a tender offer which could result in such person owning 15 percent or more of the common stock. Each one one-thousandth of a share of the new preferred stock has terms designed to make it substantially the economic equivalent of one share of common stock. Prior to someone acquiring 15 percent, the rights can be redeemed for $0.001 each by action of the board of directors. Under certain circumstances, if someone acquires 15 percent or more of the common stock, the rights permit the stockholders, other than the acquirer, to purchase the Company's common stock having a market value of twice the exercise price of the rights, in lieu of the preferred stock. Alternatively, when the rights become exercisable, the board of directors may authorize the issuance of one share of common stock in exchange for each right that is then exercisable. The Company's Board of Directors may, in its discretion, permit a stockholder to increase its

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0<br>S8 | PAL jaslv0dc | 04-Mar-2007 22:21 EST | | 86507 TX 109 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

# POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

ownership percentage in excess of 15 percent without triggering the provisions of the Plan, and has done so with respect to one investor, allowing that investor to acquire up to 20 percent of the Company's common stock without triggering the provisions of the Plan. In addition, in the event of certain business combinations, the rights permit the purchase of the common stock of an acquirer at a 50 percent discount. Rights held by the acquirer will become null and void in both cases. The rights expire on February 23, 2009.

## 7. STOCKHOLDERS' EQUITY:

### Preferred Stock

The Company is authorized to issue 3,000,000 shares of $0.001 par value preferred stock, none of which was issued or outstanding during each of the three years ended December 31, 2005.

### Common Stock

As of December 31, 2005, the Company was authorized to issue 140,000,000 shares of $0.001 par value common stock.

On October 20, 2004, the Company announced that its board of directors had authorized the repurchase of up to $40.0 million of the Company's common stock. The board directed that the repurchases be made pursuant to Rule 10b5-1 of the Exchange Act. From inception of the stock repurchase program in October 2004 through June 30, 2005, the Company repurchased 2,033,270 shares for approximately $40.0 million. On October 19, 2005, the Company announced that its board of directors had authorized a second stock repurchase program of up to $25.0 million of the Company's common stock, with the repurchases again to be made pursuant to Rule 10b5-1 of the Exchange Act. From inception of the second stock repurchase plan to December 31, 2005, the Company purchased a total of 249,500 shares for a total of approximately $5.3 million. There is no expiration date for this plan, and share repurchases will take place from time to time on the open market.

### 1988 Stock Option Plan

In June 1988, the board of directors adopted the 1988 Stock Option Plan (the "1988 Plan"), whereby the board of directors may grant incentive stock options and non-qualified stock options to key employees, directors and consultants to purchase the Company's common stock. The exercise price of incentive stock options may not be less than 100% of the fair market value of the Company's common stock on the date of grant. The exercise price of non-qualified stock options may not be less than 85% of the fair market value of the Company's common stock on the date of grant. Options generally have a maximum term of ten years after the date of grant (five years if an incentive stock option is granted to a ten percent owner optionee), subject to earlier termination upon an optionee's cessation of employment or service. Effective July 1997, the board of directors determined that no further options would be granted under the 1988 Plan, but all outstanding options would continue to be governed and remain outstanding in accordance with their existing terms.

### 1997 Stock Option Plan

In June 1997, the board of directors adopted the 1997 Stock Option Plan (the "1997 Plan"), whereby the board of directors may grant incentive stock options and non-qualified stock options to key employees, directors and consultants to purchase the Company's common stock. The exercise price of incentive stock options may not be less than 100% of the fair market value of the Company's common stock on the date of grant. The exercise price of non-qualified stock options may not be less than 85% of the fair market value of the Company's

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P₆ PAL jaslv0dc | 04-Mar-2007 22:21 EST | 86507 TX 110 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 |

# POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

common stock on the date of grant. The 1997 Plan originally provided that the number of shares reserved for issuance automatically increased on each January 1st, from January 1, 1999 through January 1, 2007, by 5% of the total number of shares of common stock issued and outstanding on the last day of the preceding fiscal year. In January 2005, the board of directors amended the 1997 Plan to reduce the annual increase from 5% to 3.5%, so that the number of shares reserved for issuance automatically increase on each January 1st, from January 1, 2006 through January 1, 2007, by 3.5% of the total number of shares of common stock issued and outstanding on the last day of the preceding fiscal year. As of December 31, 2005, the maximum number of shares that may be issued under the 1997 Plan was 14,085,792 shares, which was comprised of (i) 11,142,828 shares (new shares allocated to the 1997 Plan) and (ii) 2,942,964 shares granted pursuant to the 1988 Plan (the "1988 Plan Options"). In general, options vest over 48 months. Options generally expire no later than ten years after the date of grant (five years if an incentive stock option is granted to a ten percent owner optionee), subject to earlier termination upon an optionee's cessation of employment or service.

### 1997 Outside Directors Stock Option Plan

In September 1997, the board of directors adopted the 1997 Outside Directors Stock Option Plan (the "Directors Plan"). A total of 800,000 shares of common stock have been reserved for issuance under the Directors Plan. The Directors Plan is designed to work automatically without administration; however, to the extent administration is necessary, it will be performed by the board of directors. The Directors Plan provides for the automatic grant of nonstatutory stock options to nonemployee directors of the Company over their period of service on the board of directors. The Directors Plan provides that each future nonemployee director of the Company will be granted an option to purchase 30,000 shares of common stock on the date on which such individual first becomes a nonemployee director of the Company (the "Initial Grant"). Thereafter, each nonemployee director who has served on the board of directors continuously for 12 months will be granted an additional option to purchase 10,000 shares of common stock (an "Annual Grant"). Subject to an optionee's continuous service with the Company, approximately 1/3rd of an Initial Grant will become exercisable one year after the date of grant and 1/36th of the Initial Grant will become exercisable monthly thereafter. Each Annual Grant will become exercisable in twelve equal monthly installments beginning in the 25th month after the date of grant, subject to the optionee's continuous service. The exercise price per share of all options granted under the Directors Plan is equal to the fair market value of a share of common stock on the date of grant. Options granted under the Directors Plan have a maximum term of ten years after the date of grant, subject to earlier termination upon an optionee's cessation of service. In the event of certain changes in control of the Company, all options outstanding under the Directors Plan will become immediately vested and exercisable in full.

### 1998 Nonstatutory Stock Option Plan

In July 1998, the board of directors adopted the 1998 Nonstatutory Stock Option Plan (the "1998 Plan"), whereby the board of directors may grant nonstatutory stock options to employees and consultants, but only to the extent that such options do not require approval of the Company's stockholders. The 1998 Plan has not been approved by the Company's stockholders. The exercise price of nonstatutory stock options may not be less than 85% of the fair market value of the Company's common stock on the date of grant. As of December 31, 2005, the maximum number of shares that may be issued under the 1998 Plan was 1,000,000 shares. In general, options vest over 48 months. Options generally have a maximum term of ten years after the date of grant, subject to earlier termination upon an optionee's cessation of employment or service.

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152159 9.6.18 | PAL soeus0pa | 06-Mar-2007 21:43 EST | 86507 TX 111 | 2* |
| FORM 10-K | | | PAL | | HTM PMT | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The following table presents the functional allocation of all stock-based compensation and related expenses included in the Company's consolidated financial statements (in thousands):

| | Year ended December 31, | | |
| | 2005 | 2004 As restated | 2003 As restated |
|---|---|---|---|
| Cost of sales | $ 405 | $ 512 | $ 641 |
| Research and development | 994 | (130) | 3,599 |
| Sales and marketing | 655 | 969 | 1,652 |
| General and administrative | 1,064 | (63) | 3,996 |
| Total | $3,118 | $ 1,288 | $ 9,888 |

The following table summarizes option activity under the Company's option plans (prices are weighted average prices):

| | Year Ended December 31, | | | | | |
| | 2005 | | 2004 As restated | | 2003 As restated | |
| | Shares | Price | Shares | Price | Shares | Price |
|---|---|---|---|---|---|---|
| Options outstanding, Beginning of year | 6,689,279 | $18.99 | 5,752,100 | $16.62 | 5,951,573 | $15.02 |
| Granted: | | | | | | |
|     Below fair market value | 138,668 | $21.08 | 242,000 | $21.64 | 1,345,763 | $18.54 |
|     At fair market value | 1,409,181 | $18.14 | 1,467,037 | $26.27 | 175,599 | $29.38 |
|     Above fair market value | — | — | — | — | 3,000 | $20.88 |
|     Total Granted | 1,547,849 | $18.40 | 1,709,037 | $25.62 | 1,524,362 | $19.79 |
| Exercised | (414,070) | $13.29 | (491,812) | $13.76 | (1,621,218) | $13.38 |
| Cancelled | (253,204) | $21.79 | (280,046) | $19.98 | (102,617) | $22.39 |
| Options outstanding, end of year | 7,569,854 | $19.09 | 6,689,279 | $18.99 | 5,752,100 | $16.62 |
| Vested and exercisable, end of year | 4,950,914 | $17.97 | 3,870,840 | $17.14 | 2,850,311 | $16.22 |
| Weighted average fair value per option granted below fair market value | | $15.77 | | $17.41 | | $14.89 |
| Weighted average fair value per option granted at fair market value | | $12.91 | | $19.60 | | $22.45 |
| Weighted average fair value per option granted above fair market value | | $ — | | $ — | | $15.66 |

Options issued under the 1988, 1997 and 1998 plans may be exercised at any time prior to their expiration. The Company has a repurchase right that lapses over time, under which it has the right, upon termination of an optionholder's employment or service with the Company, at its discretion, to repurchase any unvested shares issued under the 1988, 1997 and 1998 plans at the original purchase price. Under the terms of the option plans, an option holder may not sell shares obtained upon the exercise of an option until the option has vested as to those shares. As of December 31, 2005, 2004 and 2003, there were no shares of common stock issued under the 1988, 1997 and 1998 plans that are subject to repurchase by the Company. Options issued under the Directors Plan are exercisable upon vesting

111

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 PAL jaslv0dc | 04-Mar-2007 22:21 EST | 86507 TX 112 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The following table summarizes the stock options outstanding at December 31, 2005:

| | Options Outstanding | | | | Options Vested and Exercisable | |
| Exercise Price | Number Outstanding | Weighted Average Remaining Life | Weighted Average Exercise Price | | Number Vested | Weighted Average Exercise Price |
|---|---|---|---|---|---|---|
| $ 0.68—$ 4.38 | 154,445 | 2.08 | $ 3.44 | | 154,445 | $ 3.44 |
| $ 4.42—$12.10 | 946,582 | 5.35 | $ 11.96 | | 944,359 | $ 11.96 |
| $12.13—$16.81 | 1,514,389 | 5.24 | $ 14.77 | | 1,456,990 | $ 14.78 |
| $17.00—$20.51 | 2,695,724 | 8.02 | $ 17.93 | | 1,233,701 | $ 17.99 |
| $20.55—$24.64 | 667,262 | 7.93 | $ 22.57 | | 278,795 | $ 23.08 |
| $24.90—$28.55 | 1,180,029 | 7.87 | $ 27.19 | | 579,373 | $ 27.14 |
| $28.81—$29.50 | 46,594 | 6.27 | $ 29.28 | | 31,889 | $ 29.24 |
| $31.50—$36.56 | 282,243 | 6.08 | $ 34.87 | | 188,776 | $ 35.57 |
| $36.88—$43.88 | 65,311 | 4.04 | $ 42.81 | | 65,311 | $ 42.81 |
| $44.75—$51.50 | 17,275 | 4.13 | $ 45.60 | | 17,275 | $ 45.60 |
| $ 0.68—$51.50 | 7,569,854 | 6.85 | $ 19.09 | | 4,950,914 | $ 17.97 |

*1997 Employee Stock Purchase Plan*

Under the 1997 Employee Stock Purchase Plan (the "Purchase Plan"), eligible employees may apply accumulated payroll deductions, which may not exceed 15% of an employee's compensation, to the purchase of shares of the Company's common stock at periodic intervals. The purchase price of stock under the Purchase Plan is equal to 85% of the lower of (i) the fair market value of the Company's common stock on the first day of each two-year offering period, or (ii) the fair market value of the Company's common stock on the semi-annual purchase date. If the fair market value of the Company's common stock on any semi-annual purchase date within a two-year offering period is less than the fair market value per share on the first day of such offering period, then immediately following purchase of shares of the Company's common stock on that semi-annual purchase date, participants will be automatically withdrawn from the offering period and enrolled in a new two-year offering period beginning immediately thereafter. An aggregate of 2,000,000 shares of common stock is reserved for issuance to employees under the Purchase Plan. As of December 31, 2005, 1,526,908 shares had been purchased and 473,092 shares were reserved for future issuance.

*Non-employee Stock Options*

In 2005, the Company granted no non-employee options. In 2004 and 2003, the Company granted to non-employees options to acquire 1,000 shares of common stock for each of the two years, respectively, under the 1997 Plan, at weighted average exercise prices of $27.22 and $17.75 per share respectively. As of December 31, 2005 there were no non-employee options outstanding.

*Shares Reserved*

As of December 31, 2005, the Company had 4,271,635 shares of common stock reserved for future issuance under stock option and stock purchase plans.

*Shares Accounted for Using Variable Accounting*

As of December 31, 2005 the Company accounted for 415,000 shares using variable accounting. The value of vested shares is remeasured at each balance sheet date based upon the market value of the Company's common stock, with the corresponding changes being charged to stock-based compensation.

112

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0P 9.6 | PAL jaslv0dc | 04-Mar-2007 22:21 EST | | 86507 TX 113 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

POWER INTEGRATIONS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

## 8. TAXES:

*Payroll taxes*

Recorded in connection with the stock-based compensation charges included in the restatement as disclosed in note 3, the Company determined that certain options previously classified as Incentive Stock Option, ISO, grants were determined to have been granted with an exercise price below the fair market value of its stock on the revised measurement date. Under U.S. tax regulations, ISOs may not be granted with an exercise price less than the fair market value on the date of grant, and therefore might not qualify for ISO tax treatment. The Company refers to these stock options as the "Affected ISOs." The potential disqualification of ISO status exposes the Company to additional payroll related withholding taxes on the exercise of options granted to U.S. employees, and penalties and interest for failing to properly withhold taxes on exercise of those options. The Company recorded a net tax liability of approximately $1.1 million in connection with the potential disqualification of such ISO tax treatment. The tax, interest and penalty expenses were recorded in the periods in which the underlying stock options were exercised. Then, in periods in which the liabilities were legally extinguished due to statutes of limitations, the expenses were subsequently reversed.

*Income Taxes*

U.S. and foreign components of income (loss) before income taxes were (in thousands):

| | Year Ended December 31, | | |
| | 2005 | 2004 As restated | 2003 As restated |
|---|---|---|---|
| U.S. operations | $ 6,945 | $ 12,010 | $ 14,821 |
| Foreign operations | 15,206 | 14,628 | 127 |
| Total pretax income | $22,151 | $ 26,638 | $ 14,948 |

Undistributed earnings of the Company's foreign subsidiaries of approximately $22.2 million at December 31, 2005, are considered to be indefinitely reinvested and, accordingly, no provision for Federal income taxes have been provided thereon. Upon distribution of those earnings in the form of dividends or otherwise, the Company would be subject to both U.S. income taxes (subject to an adjustment for foreign tax credits) and withholding taxes payable to various foreign countries.

The American Jobs Creation Act of 2004 (the Jobs Act), enacted on October 22, 2004, provides for a temporary 85% dividends received deduction on certain foreign earnings repatriated during a one-year period. The deduction would result in an approximate 5.25% Federal tax rate on the repatriated earnings. To qualify for the deduction, the earnings must be reinvested in the United States pursuant to a domestic reinvestment plan established by a company's chief executive officer and approved by the Company's board of directors. Certain other criteria in the Jobs Act must be satisfied as well.

The Company did not apply the above provision to qualifying earnings repatriations in fiscal year 2005.

113

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANF8U-MWS-CX06 PAL jaslv0dc | 04-Mar-2007 22:22 EST | 86507 TX 114 | 1* |
| FORM 10-K | | ■ PAL | | HTM IFV | 1C |
Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The components of the provision for income taxes are as follows (in thousands):

| | Year Ended December 31, | | |
| | 2005 | 2004 As restated | 2003 As restated |
|---|---|---|---|
| Current provision: | | | |
| Federal | $ 6,798 | $ 4,674 | $ 1,583 |
| State | 199 | 244 | 2 |
| Foreign | 556 | 485 | 286 |
| | 7,553 | 5,403 | 1,871 |
| Deferred provision (benefit): | | | |
| Federal | (942) | 1,256 | 2,037 |
| State | (158) | (521) | (397) |
| | (1,100) | 735 | 1,640 |
| | $ 6,453 | $ 6,138 | $ 3,511 |

The Company is entitled to a deduction for Federal and state tax purposes with respect to employees' stock option activity. The net reduction in taxes otherwise payable in excess of any amount credited to income tax benefit has been credited to additional paid-in capital. For 2005, 2004 and 2003, the benefit arising from employee stock option activity that resulted in a credit to additional paid in capital was approximately $0.6 million, $2.1 million and $3.3 million, respectively.

The provision for income taxes differs from the amount, which would result by applying the applicable Federal income tax rate to income before provision for income taxes as follows:

| | Year Ended December 31, | | |
| | 2005 | 2004 As restated | 2003 As restated |
|---|---|---|---|
| Provision computed at Federal statutory rate | 35.0% | 35.0% | 35.0% |
| State tax provision, net of Federal benefit | 1.21 | 2.97 | 2.98 |
| Research and development credits | (3.65) | (1.86) | (7.56) |
| Extraterritorial income exclusion | — | — | (6.75) |
| Deferred compensation | 1.74 | (0.95) | (3.30) |
| Foreign income taxed at different rate | (4.56) | (8.57) | 4.63 |
| Release of reserve for tax contingency | — | (4.17) | — |
| Other | (0.61) | 0.62 | (1.51) |
| | 29.13% | 23.04% | 23.49% |

114

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CXIP<br>SS | PAL jaslv0dc | 04-Mar-2007 22:22 EST | 86507 TX 115 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 |

## POWER INTEGRATIONS, INC.

### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The components of the net deferred income tax asset were as follows (in thousands):

| | December 31, | |
| | 2005 | 2004<br>As restated |
| --- | ---: | ---: |
| Deferred Tax Assets | | |
|     Tax credit carry-forwards | $ 3,353 | $ 4,506 |
|     Inventory reserves | 838 | 1,066 |
|     Other reserves and accruals | 1,180 | 196 |
|     Stock compensation | 5,403 | 4,978 |
| | 10,774 | 10,746 |
| Deferred Tax Liability | | |
|     Depreciation | (2) | — |
| Net deferred tax asset | $10,772 | $ 10,746 |

In assessing the realizability of deferred tax assets, management considers whether it is more likely than not that some portion or all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which those temporary differences become deductible. Management considers the scheduled reversal of deferred tax liabilities and projected future taxable income. The Company limits the deferred tax assets recognized related to certain highly-paid officers of the Company to amounts that it estimates will be deductible in future periods based upon the provisions of the Internal Revenue Code Section 162(m). Based upon the level of historical taxable income and projections for future taxable income over the periods in which the temporary differences are deductible, management believes it is more likely than not that the Company will realize the benefits of these deductible differences.

As of December 31, 2005, the Company had California research and development tax credit carryforwards of approximately $5.2 million. There is no expiration of research and development tax credit carryforwards for the State of California. The Company had no Federal research and development tax credit carryforwards as of December 31, 2005.

### 9. LEGAL PROCEEDINGS:

On June 28, 2004, the Company filed a complaint for patent infringement in the U.S. District Court, Northern District of California, against System General Corporation, a Taiwanese company, and its U.S. subsidiary. The Company's complaint alleges that certain integrated circuits produced by System General infringed and continue to infringe certain of its patents. The Company seeks, among other things, an order enjoining System General from infringing its patents and an award for damages resulting from the alleged infringement. On June 10, 2005, in response to the initiation of the International Trade Commission (ITC) investigation, the District Court stayed all proceedings. Subsequent to the completion of the ITC proceedings, the District Court lifted the stay and has scheduled a case management conference. No other schedule has been set for the matter. On December 6, 2006, System General filed a notice of appeal of the ITC decision as discussed below. In response, and by agreement of the parties, the District Court vacated the scheduled case management conference and, instead, renewed the stay of proceedings pending the outcome of the Federal Circuit appeal of the ITC determination.

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUDSK141049 9.9.18 PAL garcm0pa | 06-Mar-2007 17:55 EST | 86507 TX 116 | 6* |
| FORM 10-K | | PAL | | HTM PMT | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

On May 9, 2005, the Company filed a complaint with the U.S. International Trade Commission (ITC) under section 337 of the Tariff Act of 1930, as amended, 19 U.S.C. section 1337, naming System General Corporation of Taiwan as the respondent. The Company filed a supplement to the complaint on May 24, 2005. The Company alleges infringement by System General of the same patents raised in the action in the Northern District of California. The ITC instituted an investigation on June 8, 2005 in response to the Company's complaint. By the Company's complaint, it seeks an order from the ITC excluding certain System General's pulse width modulation (PWM) chips and the products containing them, such as LCD monitors, from importation into the United States. The Company subsequently and voluntarily narrowed the number of patents and claims in suit, which proceeded to a hearing. The ITC hearing took place in January 2006. Post-hearing briefs were submitted and briefing concluded February 24, 2006. The Administrative Law Judge's (ALJ) initial determination was issued on May 15, 2006. The ALJ found all remaining asserted claims valid and infringed, and recommended the exclusion of the infringing products as well as certain downstream products that contain the infringing products. After further briefing, on June 30, 2006 the Commission decided not to review the initial determination on liability. On August 11, 2006 the Commission issued an order excluding from entry into the United States the infringing System General PWM chips, and any LCD computer monitors, AC printer adapters and sample/demonstration circuit boards containing an infringing System General chip. The order also set a bond of 38 cents per chip or downstream product containing such chips for temporary importation during the Presidential review period. The U.S. Customs Service is authorized to enforce the exclusion order and collect the bond during the review period. On October 11, 2006, the review period expired with no action by the President, and the ITC exclusion order is now in full effect. On December 6, 2006, System General filed a notice of appeal of the ITC decision. The appeal will be heard by the U.S. Court of Appeals for the Federal Circuit with briefing to occur in the first quarter of 2007 and an oral argument thereafter.

On October 20, 2004, the Company filed a complaint for patent infringement in the U.S. District Court for the District of Delaware, against Fairchild Semiconductor International, Inc., a Delaware corporation, and Fairchild Semiconductor Corporation, a Delaware corporation (collectively, Fairchild). The complaint alleges that Fairchild produces certain integrated circuits that infringed and continue to infringe certain of the Company's patents. The Company seeks, among other things, an order enjoining Fairchild from infringing its patents and an award for damages resulting from the alleged infringement. On October 10, 2006, after a week-long trial, a jury returned a verdict in favor of the Company finding all asserted claims of all four patents-in-suit to be willfully infringed by Fairchild and determining damages in the amount of $33,981,781. No benefits have been recorded in its consolidated financial statements as a result of its award for damages. The court has not yet set a schedule for post-trial motions on these issues. The Company intends to request that the court enhance the damage award in view of the jury's finding on willfulness. Fairchild has raised defenses contending that the asserted patents are invalid or unenforceable and the court has set a second trial on these issues that is scheduled to begin on June 4, 2007.

On April 11, 2006, Fairchild Semiconductor Corporation and Intersil Corporation filed a patent infringement lawsuit against the Company in the U.S. District Court for the Eastern District of Texas. The complaint asserts that the Company infringed on an old Intersil patent that Fairchild recently secured exclusive rights to assert against the Company, but Fairchild has not yet identified any of the Company's specific products it believes infringes the patent. Fairchild's lawsuit is duplicative of a portion of the Company's suit against Fairchild in Delaware, and the Company therefore believes the case should be transferred to Delaware and filed a motion to that effect. The Texas Court granted the Company's motion to transfer the case to Delaware on March 6, 2007, and the case is in the process of being transferred to Delaware. The Company believes Fairchild's case should be stayed pending the outcome of the trial against Fairchild later this year. Either way, the Company does not expect Fairchild's suit to have any impact on its lawsuit against Fairchild in Delaware.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CXQ PAL jaslv0dc | 04-Mar-2007 22:22 EST | 86507 TX 117 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

On April 25, 2006, Kimberly Quaco, an alleged shareholder, filed a derivative complaint in the United States District Court for the Northern District of California, purportedly on behalf of the Company, against certain of the Company's current and former executives and members of the Company's board of directors relating to its historical stock option practices. On August 1, 2006, Kathryn L. Champlin, another alleged shareholder, filed a similar derivative complaint in the United States District Court for the Northern District of California purportedly on behalf of the Company. On September 21, 2006, Christopher Deboskey, another alleged shareholder, filed a similar derivative suit in the United States District Court for the Northern District of California purportedly on behalf of the Company. On November 30, 2006, Ms. Champlin voluntarily dismissed her suit. On December 18, 2006, the Court appointed Ms. Quaco's counsel as lead counsel and ordered that another purported shareholder, Mr. Geoffrey Wren, be substituted in as lead plaintiff. On January 17, 2007, the plaintiffs filed their consolidated complaint. The consolidated complaint alleges, among other things, that the defendants breached their fiduciary duties by improperly backdating stock option grants in violation of the Company's shareholder-approved stock option plans, improperly recording and accounting for the backdated options, improperly taking tax deductions based on the backdated options, and disseminating false financial statements that improperly recorded the backdated option grants. The consolidated complaint asserts claims for, among other things, breach of fiduciary duty, unjust enrichment, and violations of Section 10(b) of the Securities Exchange Act of 1934. On February 9, 2007, the Court extended the Company's response date to April 17, 2007.

On May 26, 2006, Stanley Banko, an alleged shareholder, filed a derivative complaint in the Superior Court of California, Santa Clara County, purportedly on behalf of the Company, against certain of its current and former executives and members of the Company's board of directors relating to its historical stock option practices. On May 30, 2006, Joan Campbell, also an alleged shareholder, filed a derivative suit in the Superior Court of California, Santa Clara County, making the identical allegations asserted in the Banko lawsuit. On June 30, 2006, pursuant to a stipulation by the parties, the Court consolidated the two cases into a single proceeding and required plaintiffs to file an amended, consolidated complaint. Plaintiffs filed their consolidated complaint on August 14, 2006, in which plaintiffs named additional officers and former officers and KPMG LLP, the Company's former auditor, as new defendants. The consolidated complaint alleges, among other things, that the defendants caused or allowed the Company's executives to manipulate their stock option grant dates, that defendants improperly backdated stock option grants, and that costs associated with the stock option grants were not properly recorded in the Company's financial statements. The complaint asserts claims for, among other things, insider trading, breach of fiduciary duty, gross mismanagement and unjust enrichment. On September 15, 2006, the Court stayed this action until January 19, 2007. On January 11, 2007, pursuant to a stipulation by the parties, the Court extended the stay until March 23, 2007.

On May 23, 2006, the U.S. Attorney's Office for the Northern District of California, or DOJ, issued a grand jury subpoena to the Company directing that it produce documents relating to the granting of stock options from 1995 through the present. On May 31, 2006, the staff of the Securities and Exchange Commission, or SEC, sent a letter to the Company directing it to take appropriate actions to preserve certain documents relating to its stock option practices. Since that time, the government has made a number of requests for the Company to voluntarily produce documents relating to, among other things, its stock option practices. In addition, the government has been conducting voluntary interviews of certain current and former officers and employees. The Company is cooperating fully with the SEC and the DOJ and intends to continue to do so.

On June 19, 2006, the Company received a demand letter pursuant to section 16(b) of the Securities Exchange Act of 1934 from an attorney purporting to represent an unnamed shareholder. The letter demands that the Company bring a lawsuit against certain of our current and former officers and directors to recover short-swing profits allegedly earned by the officers and directors in violation of section 16(b) when they allegedly acquired options to purchase the Company's stock within six months of corresponding sales of the stock at higher prices. The letter states that if the Company does not take action against the individuals within 60 days, the unnamed shareholder will file a lawsuit.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.6 | PAL jaslv0dc | 04-Mar-2007 22:22 EST | 86507 TX 118 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The Internal Revenue Service ("IRS") is conducting an audit of the Company's 2002 and 2003 tax returns. Throughout the course of 2005, the IRS issued a number of Notices of Proposed Adjustment to such returns. Among other things, the IRS has challenged several aspects of the Company's research and development cost-sharing arrangement, which was put into place on November 1, 2003. While the Company has agreed to some of the adjustments proposed by the IRS, it disputes other such proposed adjustments. Additionally, the Company has not received all of the adjustments the IRS intends to propose with respect to the Company's research and development cost-sharing arrangement.

There can be no assurance that the Company will prevail in its litigation with either System General or Fairchild. This litigation, whether or not determined in the Company's favor or settled, will be costly and will divert the efforts and attention of the Company's management and technical personnel from normal business operations, potentially causing a material adverse effect on its business, financial condition and operating results. In addition, the Company is unable to predict the outcome of the other legal proceedings described above. Adverse determinations in litigation could result in monetary losses, the loss of the Company's proprietary rights, subject the Company to significant liabilities, require the Company to seek licenses from third parties or prevent the Company from licensing its technology, any of which could have a material adverse effect on the Company's business, financial condition and operating results.

## 10. CHANGE IN ESTIMATE TO DEFERRED INCOME ON SALES TO DISTRIBUTORS

The Company made a change to its estimation of deferred income on sales to distributors in the first quarter of 2005. This change of estimate resulted in the recognition of $1.1 million in previously deferred revenue, the recognition of $0.6 million of previously deferred costs, and an increase in net income after tax of approximately $0.4 million, which represented diluted earnings per share of approximately $0.01 for the year ended December 31, 2005. The impact of this change in estimate was not material to any of the Company's prior period financial statements.

## 11. LOAN TO SUPPLIER

On August 30, 2005, the Company entered into a loan agreement with one of its suppliers to fund the implementation of new technology. The principal amount of the loan was $10.0 million. The unpaid principal and interest is due on December 31, 2009. The loan is convertible into equity of the supplier upon certain conditions at the discretion of the Company. The interest rate will follow the one-year Treasury bill rate, and be reset at each anniversary of the closing date of the loan agreement. The loan principal is reflected in "other assets" in the accompanying consolidated balance sheet.

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 9.6 | PAL jaslv0dc | 04-Mar-2007 22:22 EST | 86507 TX 119 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

# POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### 12. SELECTED QUARTERLY INFORMATION (Unaudited), AS RESTATED

The following table presents selected quarterly information for the three quarters ended September 30, 2005 and for the four quarters ended December 31, 2004 as restated from previously reported information filed on the Company's Form 10-Q's and Form 10-K, as a result of the restatement of its financial results discussed in Note 3, "Restatement of Consolidated Financial Statements".

| | As previously reported Quarter ended (in thousands, except per share amounts) | | | | | | |
| | Sept. 30, 2005 | Jun. 30, 2005 | Mar. 31, 2005 | Dec. 31, 2004 | Sept. 30, 2004 | Jun. 30, 2004 | Mar. 31, 2004 |
|---|---|---|---|---|---|---|---|
| Net revenues | $36,543 | $35,299 | $34,416 | $33,581 | $32,946 | $35,944 | $34,165 |
| Cost of revenues | 18,463 | 18,045 | 17,779 | 17,356 | 17,188 | 19,392 | 17,473 |
| Gross profit | 18,080 | 17,254 | 16,637 | 16,225 | 15,758 | 16,552 | 16,692 |
| Operating Expenses: | | | | | | | |
|    Research and development | 4,105 | 4,104 | 4,098 | 3,826 | 4,096 | 4,088 | 4,152 |
|    Sales and marketing | 4,418 | 4,263 | 4,018 | 3,806 | 3,412 | 3,943 | 4,112 |
|    General and administrative | 4,092 | 2,933 | 2,777 | 2,092 | 2,382 | 2,049 | 1,579 |
|       Total operating expenses | 12,615 | 11,300 | 10,893 | 9,724 | 9,890 | 10,080 | 9,843 |
| Income from operations | 5,465 | 5,954 | 5,744 | 6,501 | 5,868 | 6,472 | 6,849 |
| Interest and other income, net | 939 | 725 | 654 | 325 | 339 | 131 | 259 |
| Income before provision for income taxes | 6,404 | 6,679 | 6,398 | 6,826 | 6,207 | 6,603 | 7,108 |
| Provision for income taxes | 739 | 1,632 | 1,663 | 2,310 | 502 | 1,575 | 1,990 |
| Net income | $ 5,665 | $ 5,047 | $ 4,735 | $ 4,516 | $ 5,705 | $ 5,028 | $ 5,118 |
| Per share amounts: | | | | | | | |
|    Basic | $ 0.19 | $ 0.17 | $ 0.16 | $ 0.15 | $ 0.18 | $ 0.16 | $ 0.17 |
|    Diluted | $ 0.18 | $ 0.16 | $ 0.15 | $ 0.14 | $ 0.18 | $ 0.15 | $ 0.16 |
| Shares used in computing per share amounts: | | | | | | | |
|    Basic | 29,478 | 29,423 | 29,919 | 30,886 | 30,912 | 30,785 | 30,622 |
|    Diluted | 30,732 | 30,876 | 30,907 | 31,934 | 31,994 | 32,598 | 32,757 |

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CXP | PAL jaslv0dc | 04-Mar-2007 22:22 EST | | 86507 TX 120 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**Adjustments**
Quarter ended (in thousands, except per share amounts)

| | Sept. 30, 2005 | Jun. 30, 2005 | Mar. 31, 2005 | Dec. 31, 2004 | Sept 30, 2004 | Jun.30, 2004 | Mar. 31, 2004 |
|---|---|---|---|---|---|---|---|
| Net revenues | $ — | $ (1,058) | $ (4) | $ 17 | $ — | $ — | $ — |
| Cost of revenues | 24 | (429) | 113 | 122 | 50 | 128 | 147 |
| Gross profit | (24) | (629) | (117) | (105) | (50) | (128) | (147) |
| Operating expenses: | | | | | | | |
|    Research and development | 168 | 37 | 241 | 278 | (165) | (851) | 16 |
|    Sales and marketing | 155 | 140 | 195 | 208 | 222 | 49 | 318 |
|    General and administrative | 156 | 247 | 326 | 198 | (141) | (191) | 1 |
|       Total operating expenses | 479 | 424 | 762 | 684 | (84) | (993) | 335 |
| Income from operations | (503) | (1,053) | (879) | (789) | 34 | 865 | (482) |
| Interest and other income, net | (15) | 72 | (17) | (15) | (13) | 322 | (28) |
| Income before provision for income taxes | (518) | (981) | (896) | (804) | 21 | 1,187 | (510) |
| Provision for income taxes | (123) | (972) | (205) | (229) | (45) | 392 | (357) |
| Net income | $ (395) | $ (9) | $ (691) | $ (575) | $ 66 | $ 795 | $ (153) |
| Per share amounts: | | | | | | | |
|    Basic | $ (0.01) | $ — | $ (0.02) | $ (0.02) | $ 0.01 | $ 0.03 | $ (0.01) |
|    Diluted | $ (0.01) | $ — | $ (0.02) | $ (0.02) | $ — | $ 0.03 | $ (0.01) |

**As restated**
Quarter ended (in thousands, except per share amounts)

| | Sept. 30, 2005 | Jun. 30, 2005 | Mar. 31, 2005 | Dec. 31, 2004 | Sept. 30, 2004 | Jun. 30, 2004 | Mar. 31, 2004 |
|---|---|---|---|---|---|---|---|
| Net revenues | $36,543 | $34,241 | $34,412 | $33,598 | $32,946 | $35,944 | $34,165 |
| Cost of revenues | 18,487 | 17,616 | 17,892 | 17,478 | 17,238 | 19,520 | 17,620 |
| Gross profit | 18,056 | 16,625 | 16,520 | 16,120 | 15,708 | 16,424 | 16,545 |
| Operating expenses: | | | | | | | |
|    Research and development | 4,273 | 4,141 | 4,339 | 4,104 | 3,931 | 3,237 | 4,168 |
|    Sales and marketing | 4,573 | 4,403 | 4,213 | 4,014 | 3,634 | 3,992 | 4,430 |
|    General and administrative | 4,248 | 3,180 | 3,103 | 2,290 | 2,241 | 1,858 | 1,580 |
|       Total operating expenses | 13,094 | 11,724 | 11,655 | 10,408 | 9,806 | 9,087 | 10,178 |
| Income from operations | 4,962 | 4,901 | 4,865 | 5,712 | 5,902 | 7,337 | 6,367 |
| Interest and other income, net | 924 | 797 | 637 | 310 | 326 | 453 | 231 |
| Income before provision for income taxes | 5,886 | 5,698 | 5,502 | 6,022 | 6,228 | 7,790 | 6,598 |
| Provision for income taxes | 616 | 660 | 1,458 | 2,081 | 457 | 1,967 | 1,633 |
| Net income | $ 5,270 | $ 5,038 | $ 4,044 | $ 3,941 | $ 5,771 | $ 5,823 | $ 4,965 |
| Per share amounts: | | | | | | | |
|    Basic | $ 0.18 | $ 0.17 | $ 0.14 | $ 0.13 | $ 0.19 | $ 0.19 | $ 0.16 |
|    Diluted | $ 0.17 | $ 0.16 | $ 0.13 | $ 0.12 | $ 0.18 | $ 0.18 | $ 0.15 |
| Shares used in computing per share amounts: | | | | | | | |
|    Basic | 29,478 | 29,423 | 29,919 | 30,886 | 30,912 | 30,785 | 30,622 |
|    Diluted | 30,849 | 30,835 | 30,966 | 31,934 | 31,972 | 32,372 | 32,481 |

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152158 9.8.18 | PAL soeus0pa | 05-Mar-2007 20:51 EST | | 86507 TX 121 | 2* |
| FORM 10-K | | | PAL | | | HTM PMT | 1C |
| | | | | | | Page 1 of 1 | |

# POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

The following table presents balance sheet information as of September 30, June 30 and March 31, 2005 and 2004 respectively, as restated from previously reported information filed in the Company's Form 10-Q's, as a result of the restatement of its financial results discussed in Note 3, "Restatement of Consolidated Financial Statements" (in thousands).

| | September 30, 2005 | | | June 30, 2005 | | | March 31, 2005 | | |
|---|---|---|---|---|---|---|---|---|---|
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
| **ASSETS** | | | | | | | | | |
| CURRENT ASSETS: | | | | | | | | | |
| Cash and cash equivalents | $ 100,143 | $ (1,000) | $ 99,143 | $ 106,496 | $ (1,000) | $105,496 | $ 104,985 | $ (1,000) | $103,985 |
| Short-term investments | 14,738 | (3,497) | 11,241 | 7,210 | (2,500) | 4,710 | 6,410 | (2,500) | 3,910 |
| Accounts receivable | 14,749 | — | 14,749 | 11,929 | — | 11,929 | 10,156 | 517 | 10,673 |
| Inventories | 22,300 | (35) | 22,265 | 24,093 | (36) | 24,057 | 26,773 | 53 | 26,826 |
| Deferred tax assets | 4,022 | (2,494) | 1,528 | 4,022 | (2,501) | 1,521 | 4,022 | (2,521) | 1,501 |
| Prepaid expenses and other current assets | 1,264 | — | 1,264 | 1,549 | 1 | 1,550 | 1,354 | — | 1,354 |
| Total current assets | 157,216 | (7,026) | 150,190 | 155,299 | (6,036) | 149,263 | 153,700 | (5,451) | 148,249 |
| PROPERTY AND EQUIPMENT, NET | 49,615 | 192 | 49,807 | 50,143 | 127 | 50,270 | 50,591 | 64 | 50,655 |
| INVESTMENTS | 6,958 | 4,497 | 11,455 | 10,468 | 3,500 | 13,968 | 11,296 | 3,501 | 14,797 |
| DEFERRED TAX ASSETS | 1,789 | 7,295 | 9,084 | 1,789 | 7,256 | 9,045 | 1,789 | 7,134 | 8,923 |
| OTHER ASSETS | 14,012 | (1) | 14,011 | 3,067 | — | 3,067 | 3,104 | (1) | 3,103 |
| | $ 229,590 | $ 4,957 | $234,547 | $ 220,766 | $ 4,847 | $225,613 | $ 220,480 | $ 5,247 | $225,727 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | | | | |
| CURRENT LIABILITIES: | | | | | | | | | |
| Accounts payable | 6,635 | 93 | 6,728 | 6,758 | 78 | 6,836 | 7,328 | 150 | 7,478 |
| Accrued payroll and related expenses | 4,180 | 967 | 5,147 | 4,507 | 954 | 5,461 | 3,715 | 1,198 | 4,913 |
| Taxes payable | 5,459 | (186) | 5,273 | 5,234 | (187) | 5,047 | 5,647 | 516 | 6,163 |
| Deferred income on sales to distributors | 3,002 | — | 3,002 | 2,992 | — | 2,992 | 2,868 | — | 2,868 |
| Other accrued liabilities | 2,672 | — | 2,672 | 2,122 | — | 2,122 | 1,279 | — | 1,279 |
| Total current liabilities | 21,948 | 874 | 22,822 | 21,613 | 845 | 22,458 | 20,837 | 1,864 | 22,701 |
| STOCKHOLDERS' EQUITY: | | | | | | | | | |
| Common stock | 30 | — | 30 | 29 | — | 29 | 30 | — | 30 |
| Additional paid-in capital | 102,578 | 35,800 | 138,378 | 99,754 | 35,846 | 135,600 | 105,291 | 35,829 | 141,120 |
| Deferred compensation | — | (1,224) | (1,224) | — | (1,745) | (1,745) | — | (2,356) | (2,356) |
| Accumulated translation adjustment | (114) | — | (114) | (114) | — | (114) | (114) | — | (114) |
| Retained earnings | 105,148 | (30,493) | 74,655 | 99,484 | (30,099) | 69,385 | 94,436 | (30,090) | 64,346 |
| Total stockholders' equity | 207,642 | 4,083 | 211,725 | 199,153 | 4,002 | 203,155 | 199,643 | 3,383 | 203,026 |
| | $ 229,590 | $ 4,957 | $234,547 | $ 220,766 | $ 4,847 | $225,613 | $ 220,480 | $ 5,247 | $225,727 |

121

POWER INTEGRATIONS,    RR Donnelley ProFile    LANFBU-MWS-CXI96    PAL jaslv0dc    04-Mar-2007 22:22 EST    86507 TX 122    1*
FORM 10-K    PAL    HTM IFV    1C
Page 1 of 1

## POWER INTEGRATIONS, INC.
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

| | September 30, 2004 | | | June 30, 2004 | | | March 31, 2004 | | |
| | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated | As Previously Reported | Adjustments | As Restated |
|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | |
| **CURRENT ASSETS:** | | | | | | | | | |
| Cash and cash equivalents | $ 129,969 | $ (36,275) | $ 93,694 | $ 119,001 | $ (24,080) | $ 94,921 | $ 111,048 | $ (16,931) | $ 94,117 |
| Short-term investments | 9,000 | (9,000) | — | 11,055 | (9,335) | 1,720 | 7,594 | (5,384) | 2,210 |
| Accounts receivable, net of allowances | 9,617 | 509 | 10,126 | 13,052 | 509 | 13,561 | 13,290 | 509 | 13,799 |
| Inventories | 22,219 | 119 | 22,338 | 19,785 | 52 | 19,837 | 21,320 | 134 | 21,454 |
| Deferred tax assets | 4,275 | (1,071) | 3,204 | 4,275 | (996) | 3,279 | 4,275 | (842) | 3,433 |
| Prepaid expenses and other current assets | 3,454 | (1) | 3,453 | 3,620 | — | 3,620 | 3,017 | — | 3,017 |
| Total current assets | 178,534 | (45,719) | 132,815 | 170,788 | (33,850) | 136,938 | 160,544 | (22,514) | 138,030 |
| PROPERTY AND EQUIPMENT, NET | 51,688 | — | 51,688 | 51,509 | — | 51,509 | 51,600 | — | 51,600 |
| INVESTMENTS | 5,044 | 45,275 | 50,319 | 4,810 | 33,415 | 38,225 | 4,810 | 22,315 | 27,125 |
| DEFERRED TAX ASSETS | 1,598 | 5,905 | 7,503 | 1,598 | 6,082 | 7,680 | 1,598 | 6,443 | 8,041 |
| OTHER ASSETS | 1,775 | 1 | 1,776 | 1,679 | — | 1,679 | 1,735 | — | 1,735 |
| | $ 238,639 | $ 5,462 | $244,101 | $ 230,384 | $ 5,647 | $236,031 | $ 220,287 | $ 6,244 | $226,531 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | | | | |
| **CURRENT LIABILITIES:** | | | | | | | | | |
| Accounts payable | 7,982 | 118 | 8,100 | 8,385 | 106 | 8,491 | 6,687 | 426 | 7,113 |
| Accrued payroll and related expenses | 4,150 | 1,122 | 5,272 | 4,312 | 1,106 | 5,418 | 3,518 | 2,230 | 5,748 |
| Taxes payable | 5,213 | (168) | 5,045 | 5,210 | (192) | 5,018 | 4,190 | (150) | 4,040 |
| Deferred income on sales to distributors | 3,580 | — | 3,580 | 3,448 | — | 3,448 | 3,473 | — | 3,473 |
| Other accrued liabilities | 1,073 | — | 1,073 | 719 | — | 719 | 805 | — | 805 |
| Total current liabilities | 21,998 | 1,072 | 23,070 | 22,074 | 1,020 | 23,094 | 18,673 | 2,506 | 21,179 |
| **STOCKHOLDERS' EQUITY:** | | | | | | | | | |
| Common stock | 31 | — | 31 | 30 | — | 30 | 30 | — | 30 |
| Additional paid-in capital | 131,549 | 37,060 | 168,609 | 128,921 | 38,304 | 167,225 | 127,252 | 39,200 | 166,452 |
| Deferred compensation | — | (3,846) | (3,846) | — | (4,787) | (4,787) | — | (5,778) | (5,778) |
| Accumulated translation adjustment | (124) | — | (124) | (121) | — | (121) | (120) | — | (120) |
| Retained earnings | 85,185 | (28,824) | 56,361 | 79,480 | (28,890) | 50,590 | 74,452 | (29,684) | 44,768 |
| Total stockholders' equity | 216,641 | 4,390 | 221,031 | 208,310 | 4,627 | 212,937 | 201,614 | 3,738 | 205,352 |
| | $ 238,639 | $ 5,462 | $244,101 | $ 230,384 | $ 5,647 | $236,031 | $ 220,287 | $ 6,244 | $226,531 |

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX08 9.6 PAL jaslv0dc | 04-Mar-2007 22:22 EST | 86507 TX 123 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |
Page 1 of 1

## POWER INTEGRATIONS, INC.
### NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

### 13. SUBSEQUENT EVENTS

*Stock Option Investigation and Regulatory Proceedings*

As described in Note 3, "Restatement of Consolidated Financial Statements," on March 13, 2006, the Company announced that its Board of Directors established a Special Committee to conduct an investigation of the Company's practices related to stock option grants to officers and directors, and related matters. As a result of this investigation, the Company delayed filing its 2005 Form 10-K, which was due on March 16, 2006.

On May 9, 2006, the Company announced that based upon the Special Committee's preliminary determinations, its previously issued financial statements for the years ended December 31, 2004 and 2003, which were included in its 2004 Form 10-K, and the Forms 10-Q for each of the three quarters in 2005 and 2004, should no longer be relied upon and would be restated.

On May 23, the U.S. Attorney's Office for the Northern District of California ("DOJ") issued a grand jury subpoena to the Company directing the Company to produce documents relating to the granting of stock options from 1995 through the present. On May 31, 2006, the staff of the Securities & Exchange Commission ("SEC") sent a letter to the Company directing it to take appropriate actions to preserve certain documents relating to its stock option practices. Since that time, the government has made a number of requests for the Company to voluntarily produce documents relating to, among other things, its stock option practices. In addition, the government is conducting voluntary interviews of certain current and former officers and employees. The Company is cooperating fully with the SEC and the DOJ and intends to continue to do so.

If the Company is subject to adverse findings resulting from the above investigations, it could be required to pay significant damages or penalties or have other remedies imposed upon it.

*Nasdaq Delisting*

In 2006, the Company received two Nasdaq Staff Determinations stating that the Company was not in compliance with Marketplace Rule 4310(c)(14) because the Company has not timely filed its Form 10-K for the year ended December 31, 2005 and Form 10-Q for the quarter ended March 31, 2006 and therefore, the Company's securities were subject to delisting from The NASDAQ Stock Market.

On May 2, 2006, and June 10, 2006, the Company received exceptions to the filing requirements and extensions to filing the required SEC filings by August 2, 2006. The Company formally notified Nasdaq on July 31, 2006 that it would not be able to meet their deadline for filings with the SEC. Accordingly, the Company was delisted on August 2, 2006 and its shares then began trading on the Pink Sheets under the symbol "POWI.PK".

On October 30, 2006, the suspension of the trading of the Company's shares on Nasdaq was lifted and in order to be in compliance with the listing requirements, the Company must file the 2005 Form 10-K and Forms 10-Q for the quarters ended March 31, June 30 and September 30, 2006 by December 18, 2006. The Company did not meet this deadline, and the Company's shares have been delisted and resumed trading on the Pink Sheets under the symbol "POWI.PK".

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX09 9.6 | PAL jaslv0dc | 04-Mar-2007 22:23 EST | | 86507 TX 124 | 1* |
| FORM 10-K | START PAGE | | PAL | | | HTM IFV | 1C |

Page 1 of 1

# POWER INTEGRATIONS, INC.

## SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS
### (In thousands)

| Classification | Balance at Beginning of Period | Charged to Costs and Expenses | Deductions(1) | Balance at End of Period |
|---|---|---|---|---|
| **Allowances for doubtful accounts:** | | | | |
| Year ended December 31, 2003 | $ 377 | $ (17) | $ 0 | $ 360 |
| Year ended December 31, 2004 | $ 360 | $ (84) | $ 5 | $ 281 |
| Year ended December 31, 2005 | $ 281 | $ 67 | $ (7) | $ 341 |

| Classification | Balance at Beginning of Period | Charged to Costs and Expenses | Deductions(1) | Balance at End of Period |
|---|---|---|---|---|
| **Allowances for customer returns:** | | | | |
| Year ended December 31, 2003,(2) | $ 88 | $ 720 | $ (708) | $ 100 |
| Year ended December 31, 2004,(2) | $ 100 | $ 645 | $ (644) | $ 101 |
| Year ended December 31, 2005 | $ 101 | $ 525 | $ (498) | $ 128 |

| Classification | Balance at Beginning of Period | Charged to Costs and Expenses | Deductions(1) | Balance at End of Period |
|---|---|---|---|---|
| **Allowances for ship and debit credits:** | | | | |
| Year ended December 31, 2003 | $ 1,483 | $ 12,384 | $ (11,967) | $ 1,900 |
| Year ended December 31, 2004 | $ 1,900 | $ 17,401 | $ (16,809) | $ 2,492 |
| Year ended December 31, 2005 | $ 2,492 | $ 20,006 | $ (18,762) | $ 3,736 |

(1) Deductions relate to amounts written off against the allowances for doubtful accounts, customer returns and ship and debit credits.

(2) The allowance for customer returns in the years ended December 31, 2004 and 2003 was $101,000 and $100,000. This amount was restated as a result of miscellaneous accounting adjustments. The previously reported allowance for customer returns was $621,000 and $609,000 as of December 31, 2004 and 2003, respectively. See Note 3, "Restatement of Consolidated Financial Statements," of the Notes to Consolidated Financial Statements.

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 06-Mar-2007 13:36 EST | | 86507 TX 125 | 2* |
| FORM 10-K | START PAGE | | PAL | | | HTM PMT | 1C |

Page 1 of 1

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this Report to be signed on its behalf by the undersigned, thereunto duly authorized.

POWER INTEGRATIONS, INC.

Dated: March 6, 2007                    By:    _____ /s/  RAFAEL TORRES _____
                                                        Rafael Torres
                                                        Chief Financial Officer

125

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUDSK141049 PAL garcm0pa | 06-Mar-2007 13:38 EST | 86507 TX 126 | 2* |
|---|---|---|---|---|---|
| FORM 10-K | START PAGE | PAL | | HTM PMT | 1C |
| | | | | Page 1 of 1 | |

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Balu Balakrishnan and Rafael Torres his true and lawful attorney-in-fact and agent, with full power of substitution and, for him and in his name, place and stead, in any and all capacities to sign any and all amendments to this Report on Form 10-K, and to file the same, with all exhibits thereto and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorney-in-fact and agent full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorney-in-fact and agent, or his substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

PURSUANT TO THE REQUIREMENTS OF THE SECURITIES EXCHANGE ACT OF 1934, THIS REPORT HAS BEEN SIGNED BY THE FOLLOWING PERSONS ON BEHALF OF THE REGISTRANT AND IN THE CAPACITIES AND ON THE DATES INDICATED.

Dated: March 6, 2007     By:     /s/ BALU BALAKRISHNAN
Balu Balakrishnan President, Chief Executive Officer
(Principal Executive Officer)

Dated: March 6, 2007     By:     /s/ RAFAEL TORRES
Rafael Torres
Chief Financial Officer
(Principal Financial and Principal
Accounting Officer)

Dated: March 1, 2007     By:     /s/ ALAN D. BICKELL
Alan D. Bickell
Director

Dated: March 6, 2007     By:     /s/ NICHOLAS E. BRATHWAITE
Nicholas E. Brathwaite
Director

Dated: March 5, 2007     By:     /s/ R. SCOTT BROWN
R. Scott Brown
Director

Dated: March 1, 2007     By:     /s/ E. FLOYD KVAMME
E. Floyd Kvamme
Director

Dated: March 1, 2007     By:     /s/ STEVEN J. SHARP
Steven J. Sharp
Director and Chairman of the Board

Dated: March 1, 2007     By:     /s/ BALAKRISHNAN S. IYER
Balakrishnan S. Iyer
Director

Dated: March 1, 2007     By:     /s/ JAMES FIEBIGER
James Fiebiger
Director

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX01 9.6 PAL jaslv0dc | 04-Mar-2007 22:23 EST | 86507 TX 127 | 1* |
| FORM 10-K | START PAGE | ■ PAL | | HTM IFV | 1C |

Page 1 of 1

## POWER INTEGRATIONS, INC.
### INDEX TO EXHIBITS
### TO
### FORM 10-K ANNUAL REPORT

**For the Year Ended**
**December 31, 2005**

| EXHIBIT NUMBER | DESCRIPTION |
| --- | --- |
| 3.1 | Restated Certificate of Incorporation. (As filed with the SEC as Exhibit 3.1 to our Annual Report on Form 10-K on March 16, 1999, SEC File No. 000-23441.) |
| 3.2 | Certificate of Amendment to Restated Certificate of Incorporation. (As filed with the SEC as Exhibit 3.3 to our Annual Report on Form 10-K on March 22, 2002, SEC File No. 000-23441.) |
| 3.3 | Form of Certificate of Designation, Preferences and Rights of the Terms of the Series A Preferred Stock filed as Exhibit A to the Form of Rights Agreement between us and BankBoston N.A., dated February 24, 1999. (As filed with the SEC as Exhibit 1 to our Current Report on Form 8-K on March 12, 1999, SEC File No. 000-23441.) |
| 3.4 | Amended and Restated Bylaws. (As filed with the SEC as Exhibit 3.1 to our Current Report on Form 8-K on April 22, 2005, SEC File No. 000-23441.) |
| 4.1 | Reference is made to Exhibits 3.1 to 3.5. |
| 4.2 | Fifth Amended and Restated Rights Agreement by and among us and certain of our investors, dated April 27, 1995. (As filed with the SEC as Exhibit 4.1 to our Registration Statement on Form S-1 on September 11, 1997, SEC File No. 000-23441.) |
| 4.3 | Investor's Rights Agreement between us and Hambrecht & Quist Transition Capital, LLC, dated as of May 22, 1996. (As filed with the SEC as Exhibit 4.2 to our Registration Statement on Form S-1 on September 11, 1997, SEC File No. 000-23441.) |
| 4.3 | Rights Agreement between us and BankBoston N.A., dated as of February 24, 1999 (As filed with the SEC as Exhibit 1 to our Current Report on Form 8-K on March 12, 1999, SEC File No. 000-23441.) |
| 4.4 | Amendment to Rights Agreement between us and BankBoston N.A., dated as of October 9, 2001 (As filed with the SEC as Exhibit 4.3 to our Quarterly Report on Form 10-Q on November 9, 2001, SEC File No. 000-23441.) |
| 10.1 | Form of Indemnification Agreement for directors and officers. (As filed with the SEC as Exhibit 10.1 to our Registration Statement on Form S-1 on September 11, 1997, SEC File No. 000-23441.)* |
| 10.2 | 1988 Stock Option Plan and forms of agreements thereunder. (As filed with the SEC as Exhibit 10.2 to our Registration Statement on Form S-1 on September 11, 1997, SEC File No. 000-23441.)* |
| 10.3 | 1997 Stock Option Plan (as amended through January 25, 2005) (as filed with the SEC as Exhibit 10.5 to our Quarterly Report on Form 10-Q on May 6, 2005) and forms of agreements thereunder (as filed with the SEC as Exhibit 10.3 to our Registration Statement on Form S-1 on September 11, 1997, SEC File No. 000-23441).* |
| 10.4 | 1997 Outside Directors Stock Option Plan (as amended through June 6, 2000) (as filed with the SEC as Annex C to our Proxy Statement on April 27, 2000) and forms of agreements thereunder-as filed with the SEC as Exhibit 10.4 to our Registration Statement on Form S-1 on September 11, 1997, SEC File No. 000-23441).* |

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX01 5.6 PAL jaslv0dc | 04-Mar-2007 22:23 EST | 86507 TX 128 | 1* |
| FORM 10-K | | PAL | | HTM IFV | 1C |

Page 1 of 1

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 10.5 | 1997 Employee Stock Purchase Plan (as amended through June 6, 2000) (as filed with the SEC as Annex C to our Proxy Statement on April 27, 2000) and forms of agreements thereunder (as filed with the SEC as Exhibit 10.5 to our Registration Statement on Form S-1 on September 11, 1997, SEC File No. 000-23441).* |
| 10.6 | 1998 Nonstatutory Stock Option Plan. (As filed with the SEC as Exhibit 10.30 to our Quarterly Report on Form 10-Q on May 12, 2003, SEC File No. 000-23441.)* |
| 10.7 | Chief Executive Officer Benefits Agreement between us and Balu Balakrishnan, dated April 25, 2002. (As filed with the SEC as Exhibit 10.14 to our Quarterly Report on Form 10-Q on May 10, 2002, SEC File No. 000-23441.)* |
| 10.8 | Executive Officer Benefits Agreement between us and Derek Bell, dated April 25, 2002. (As filed with the SEC as Exhibit 10.15 to our Quarterly Report on Form 10-Q on May 10, 2002, SEC File No. 000-23441.)* |
| 10.9 | Executive Officer Benefits Agreement between us and Bruce Renouard, dated April 25, 2002. (As filed with the SEC as Exhibit 10.17 to our Quarterly Report on Form 10-Q on May 10, 2002, SEC File No. 000-23441.)* |
| 10.10 | Executive Officer Benefits Agreement between us and John Tomlin, dated April 25, 2002. (As filed with the SEC as Exhibit 10.19 to our Quarterly Report on Form 10-Q on May 10, 2002, SEC File No. 000-23441.)* |
| 10.11 | Executive Officer Benefits Agreement between us and Clifford J. Walker, dated April 25, 2002. (As filed with the SEC as Exhibit 10.20 to our Quarterly Report on Form 10-Q on May 10, 2002, SEC File No. 000-23441.)* |
| 10.12 | Loan Agreement between us and Union Bank of California, N.A., dated as of October 16, 1998. (As filed with the SEC as Exhibit 10.23 to our Annual Report on Form 10-K on March 16, 1999, SEC File No. 000-23441.) |
| 10.13 | First Amendment to Loan Agreement dated October 16, 1998 between us and Union Bank of California, N.A., dated August 1, 2000. (As filed with the SEC as Exhibit 10.29 to our Quarterly Report on Form 10-Q on November 14, 2000, SEC File No. 000-23441.) |
| 10.14 | Wafer Supply Agreement among us and Matsushita Electronics Corporation and Matsushita Electric Industry Co., Ltd., dated as of June 29, 2000. (As filed with the SEC as Exhibit 10.27 to our Quarterly Report on Form 10-Q on November 14, 2000, SEC File No. 000-23441.) |
| 10.15 | Technology License Agreement between us and Matsushita Electronics Corporation, dated as of June 29, 2000. (As filed with the SEC as Exhibit 10.28 to our Quarterly Report on Form 10-Q on November 14, 2000, SEC File No. 000-23441.) |
| 10.16 | Purchase Agreement among us, SPI HO II Associates, L.P., SPI/TSA Arrowhead, LLC, SPI/TSA Chula Vista L.P. and SPI/Braintree Unit 5 Limited Partnership, dated as of April 21, 2003. (As filed with the SEC as Exhibit 10.33 to our Quarterly Report on Form 10-Q on August 7, 2003, SEC File No. 000-23441.) |
| 10.17 | Amended and Restated Wafer Supply Agreement between us and OKI Electric Industry Co., Ltd., dated as of April 1, 2003. (As filed with the SEC as Exhibit 10.31 to our Quarterly Report on Form 10-Q on August 7, 2003, SEC File No. 000-23441.)† |
| 10.18 | Wafer Supply Agreement between us and ZMD Analog Mixed Signal Services GmbH & CoKG, dated as of May 23, 2003. (As filed with the SEC as Exhibit 10.32 to our Quarterly Report on Form 10-Q on August 7, 2003, SEC File No. 000-23441.)† |

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152159 9.6.18 | PAL soeus0pa | 06-Mar-2007 23:16 EST | 86507 TX 129 | 2* |
| FORM 10-K | | | PAL | | HTM PMT | 1C |

Page 1 of 1

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| 10.19 | Wafer Supply Agreement between us and Matsushita Electric Industrial Co., Ltd., effective as of June 29, 2005. (As filed with the SEC as Exhibit 10.21 to our Current Report on Form 8-K on July 26, 2005, SEC File No. 000-23441.)† |
| 10.20 | 2005 Bonuses; 2006 Bonus Plan, Salaries and Option Grants. (As filed with the SEC in our Current Report on Form 8-K on February 21, 2006, SEC File No. 000-23441.)* |
| 10.21 | Agreement to make a one-time payment of $25,000 to members of the Special Committee. (As filed with the SEC in our Current Report on Form 8-K on March 27, 2006, SEC File No. 000-23441.)* |
| 10.22 | Cash Compensation for Non-Employee Directors* |
| 10.23 | Amendment Number One to the Amended and Restated Wafer Supply Agreement between us and OKI Electric Industry Co., Ltd., effective as of August 11, 2004. (As filed with the SEC as Exhibit 10.22 to our Current Report on Form 8-K on April 18, 2006, SEC File No. 000-23441.)† |
| 10.24 | Confidential Resignation Agreement and General Release of Claims between us and John Cobb, dated June 15, 2006. (As filed with the SEC as Exhibit 10.1 to our Current Report on Form 8-K on June 20, 2006, SEC File No. 000-23441.)* |
| 10.25 | Offer Letter, dated June 30, 2006, between us and Rafael Torres. (As filed with the SEC as Exhibit 10.1 to our Current Report on Form 8-K on July 17, 2006, SEC File No. 000-23441.)* |
| 10.26 | Amendment to Offer Letter, dated July 6, 2006, between us and Rafael Torres. (As filed with the SEC as Exhibit 10.2 to our Current Report on Form 8-K on July 17, 2006, SEC File No. 000-23441.)* |
| 10.27 | Letter Agreement and accompanying election form regarding officer stock option amendments in connection with Section 409A cure, executed December 15, 2006, between us and Balu Balakrishnan.* |
| 10.28 | Letter Agreement and accompanying election form regarding officer stock option amendments in connection with Section 409A cure, executed December 18, 2006, between us and Derek Bell.* |
| 10.29 | Letter Agreement and accompanying election form regarding officer stock option amendments in connection with Section 409A cure, executed December 22, 2006, between us and Bruce Renouard.* |
| 10.30 | Letter Agreement and accompanying election form regarding officer stock option amendments in connection with Section 409A cure, executed December 21, 2006, between us and John Tomlin.* |
| 10.31 | Letter Agreement and accompanying election form regarding officer stock option amendments in connection with Section 409A cure, executed December 21, 2006, between us and Clifford J. Walker.* |
| 10.32 | Acknowledgment and Waiver regarding stock option agreements, dated February 20, 2007, between us and Alan Bickell.* |
| 10.33 | Acknowledgment and Waiver regarding stock option agreements, dated February 20, 2007, between us and Nicholas Brathwaite.* |
| 10.34 | Acknowledgment and Waiver regarding stock option agreements, dated February 20, 2007, between us and R. Scott Brown.* |
| 10.35 | Amendment No. 1 to Nonstatutory Stock Option Agreements for Outside Directors, dated February 20, 2007, between us and Alan Bickell.* |
| 10.36 | Amendment No. 1 to Nonstatutory Stock Option Agreements for Outside Directors, dated February 20, 2007, between us and Nicholas Brathwaite.* |

| POWER INTEGRATIONS, | RR Donnelley ProFile | LANFBU-MWS-CX0 SS | PAL jaslv0dc | 04-Mar-2007 22:23 EST | 86507 TX 130 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

| EXHIBIT NUMBER | DESCRIPTION |
| --- | --- |
| 10.37 | Amendment No. 1 to Nonstatutory Stock Option Agreements for Outside Directors, dated February 20, 2007, between us and R. Scott Brown.* |
| 10.38 | 2006 Bonuses to Executive Officers (As filed with the SEC in our Current Report on Form 8-K on February 9, 2007, SEC File No. 000-23441.)* |
| 21.1 | List of subsidiaries. |
| 24.1 | Power of Attorney (See signature page). |
| 31.1 | Certification of Chief Executive Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 31.2 | Certification of Chief Financial Officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002. |
| 32.1 | Certification of Chief Executive Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.** |
| 32.2 | Certification of Chief Financial Officer pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.** |

†   This Exhibit has been filed separately with the Commission pursuant to an application for confidential treatment. The confidential portions of this Exhibit have been omitted and are marked by an asterisk.

*   Indicates a management contract or compensatory plan or arrangement.

**  The certifications attached as Exhibits 32.1 and 32.2 accompany this Annual Report on Form 10-K, are not deemed filed with the SEC, and are not to be incorporated by reference into an filing of Power Integrations, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, whether made before or after the date of this Form 10-K, irrespective of any general incorporation language contained in such filing.

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 06-Mar-2007 16:58 EST | | 86507 EX10_22 1 | 2* |
| FORM 10-K | START PAGE | | PAL | | | HTM ESS | 1C |

Page 1 of 1

**Exhibit 10.22**

## Cash Compensation for Non-Employee Directors

Power Integrations non-employee board members shall receive the following cash compensation for the services performed, which cash compensation is cumulative:

Retainers:

| | |
|---|---|
| Service as a non-employee director: | $ 5,000 per quarter |
| Service as chairman of the audit committee: | $ 5,000 per quarter |
| Service as chairman of the compensation committee: | $ 1,875 per quarter |
| Service as chairman of the nominating committee: | $ 1,250 per quarter |

Meeting attendance fees:

| | |
|---|---|
| Board meeting in person: | $ 1,500 |
| Board meeting telephonically: | $ 750 |
| Audit, Compensation, or Nominating Committee meeting in person: | $ 1,000 |
| Audit, Compensation, or Nominating Committee meeting telephonically: | $ 500 |
| One-time Special Committee fees (Messrs. Iyer and Fiebiger): | $25,000 |

In addition, non-employee directors shall be reimbursed for all reasonable travel and related expenses incurred in connection with attending board and committee meetings.

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 05-Mar-2007 16:23 EST | | 86507 EX10_27 1 | 4* |
| FORM 10-K | START PAGE | | PAL | | image001 | HTM ESS | 1C |

Page 1 of 1

Exhibit 10.27



December 8, 2006

Balu Balakrishnan

Dear Mr. Balakrishnan

Power Integrations, Inc. (the "**Company**") has previously granted you the stock options set forth on the attached <u>Exhibit A</u> (the "**Options**") to purchase shares of the Company's common stock.

## I.    INTRODUCTION

The Company has determined that the grant dates of the Options for federal income tax purposes may have been dates other than the grant dates set forth in the documentation you received in connection with the Options. It is possible, therefore, that the Options were issued with an exercise price that is or may be less than 100% of the fair market value of the stock on the grant date for federal income tax purposes and therefore may be subject to adverse tax consequences under Section 409A of the Internal Revenue Code of 1986, as amended ("**Section 409A**"). These adverse tax consequences likely include, at a minimum, (i) ordinary income tax plus (ii) an additional 20% tax on the intrinsic value of the Option prior to and regardless of whether the Options are ever exercised plus (iii) an additional tax in the nature of interest. These adverse tax consequences apply to the extent that the Options (a) vested after December 31, 2004 and (b) were not exercised or otherwise cancelled on or before December 31, 2005. If a portion of one of your Options was vested as of December 31, 2004, only the unvested portion of such date is potentially subject to Section 409A. <u>Exhibit A</u> indicates the shares subject to each of your Options that the Company believes are at risk for adverse tax consequences under Section 409A (the "**At Risk Options**").

Based on the currently available guidance and proposed regulations issued in connection with Section 409A, we believe that it is possible to avoid or minimize the potential adverse tax consequences that may apply under Section 409A in respect of your At Risk Options by amending the At Risk Options as to that part of the At Risk Options that remains outstanding and unexercised[1] (the "**Curable Options**")) using either (a) the Amended Exercise Price Approach as described in Section II.A, below or the Amended Exercise Schedule Approach as described in Section II.B, below. We refer to those Curable Options (or portions thereof) that you elect to amend as "**Amended Options**."

---

[1]    Note that to the extent that your At Risk Option is deemed to be beneficially owned by another person (e.g., pursuant to a qualified domestic relations order in favor of your former spouse), you must provide evidence satisfactory to the Company that you have the right to make an election to amend the Curable Options.

1

| POWER INTEGRATIONS, | RR Donnelley ProFile | caldoc gfe | PAL delol0ma | 01-Mar-2007 07:14 EST | 86507 EX10_27 2 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

You may also leave your Curable Options unchanged; however, if you elect to leave your Curable Options unchanged, the Company currently intends to treat such options as subject to Section 409A. In addition, the Company intends to treat as subject to Section 409A any portion of your At Risk Options that is not a Curable Option, and make the appropriate filings and tax withholdings on your At Risk Options as required by Section 409A. If you do not return a properly completed election form to the Company on or before December 29, 2006 (the "**Expiration Date**"), you will be deemed to have elected to leave your Curable Options unchanged.

II.    DESCRIPTION OF THE AVAILABLE AMENDMENT ALTERNATIVES

    A.    THE AMENDED EXERCISE PRICE APPROACH

If you select the Amended Exercise Price Approach for a Curable Option, you are agreeing to increase the exercise price of the Curable Option to be equal to 100% of the fair market value of the Company's common stock on the date the Company is using as the measurement date for such Curable Option for the purposes of preparing its financial statements (the "**Amended Exercise Price**"). Such Amended Exercise Price is shown on <u>Exhibit A</u>. All other terms and conditions of the Curable Option will remain the same.[2]

    B.    THE AMENDED EXERCISE SCHEDULE APPROACH

      1. If you select the Amended Exercise Schedule Approach, you are agreeing to change the exercise (but not the vesting) schedule applicable to the Curable Options to provide that the At Risk Option may not be exercised as to the Curable Options prior to the earliest to occur of:

    (i) the termination of your service with the Company for any reason,

    (ii) your death,

    (iii) your suffering a "disability" (as defined under Section 409A),

    (iv) a "change in control" of the Company (as defined under Section 409A), or

    (v) January 1 of one or more calendar years specified by you (with such year(s) not earlier than 2007 and not later than the year in which your At Risk Option will expire) (collectively such specified calendar years, the "**Selected Years,**" and each a "**Selected Year**") (this amendment alternative, the "**Amended Exercise Schedule**").[3] For each Curable Option, you may elect more than one Selected Year, making such

---

[2]    It should be noted that all At Risk Options will be deemed to be nonqualified stock options whether or not the option is amended pursuant to this offer and whether or not the option originally purported to be an incentive stock option.

[3]    The Compensation Committee of our Board of Directors will determine whether and when any of the events set forth in (i) through (iv) has occurred.

2

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc<br>%% | PAL delol0ma | 01-Mar-2007 07:14 EST | | 86507 EX10_27 3 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

option exercisable pursuant to a schedule adopted now. For example, assuming you had a fully vested Curable Option, you could elect an Amended Exercise Schedule making 50% of the Curable Option Exercisable in 2007 and 50% exercisable in 2008.

    2.    If you elect to amend a Curable Option to reflect an Amended Exercise Schedule:

    (i) The Amended Exercise Schedule does not change the vesting schedule for your Curable Options. If a Curable Option is not fully vested at the time of your election and you choose more than one Selected Year, then shares will be allocated among the Selected Years based on vesting status to the greatest extent possible, with currently vested shares being allocated to the earliest Selected Year(s) and unvested shares allocated to the latest Selected Year(s). For example, if the Curable Option that you tender covers 400 shares, and is currently vested as to 100 shares, and you wish to select 2007 as the Selected Year as to 50 shares, 2008 as the Selected Year as to 100 shares, and 2009 as the Selected Year as to the remaining 250 shares, your Amended Option covering 50 shares will be fully vested as of the date your Curable Option is amended pursuant to the terms described herein, your Amended Option covering 100 shares will be 50% vested as of the Amendment Date, and your Amended Option covering 250 shares will be completely unvested as of the Amendment Date, and any future vesting will be deemed to occur as to the 100 share portion of the option prior to the 250 share portion of the option.

    (ii) The exercise price of the Amended Option will not change. Instead, the Amended Option will no longer be exercisable (to the extent currently exercisable), and generally will only become exercisable again, if at all, on the date of the earliest to occur of the events described above under the Amended Exercise Schedule.

    (iii) If your Amended Option becomes exercisable as a result of an event under the Amended Exercise Schedule other than the start of your Selected Year(s), your Amended Option generally will be exercisable only until the earlier of (a) the date the underlying Curable Option would cease to be exercisable in accordance with its terms (including upon the expiration of the three month post-termination exercise period applicable the underlying Curable Option) or (b) the later of (x) December 31 of the year in which the event occurs or (y) the 15th day of the third calendar month following the date on which the event occurs. However, you should be aware that if the event that triggers the right to exercise your Amended Option is a change in control of the Company, then, subject to the terms of the stock plan under which the underlying Curable Option was granted, the transaction agreement between the Company and the acquiring entity may provide for the termination of your Amended Option upon the consummation of the change in control (notwithstanding the terms of your Amended Exercise Schedule).

    (iv) If the first event to occur is January 1 of your only Selected Year, your Amended Option generally will expire not later than December 31 of the Selected Year. If your Amended Exercise Schedule includes more than one Selected Year, then your Amended Option generally will expire in traunches pursuant to your Amended Exercise Schedule, not later than December 31 of each of the Selected Years. In all cases, if you

<div align="center">3</div>

| POWER INTEGRATIONS, | RR Donnelley ProFile | gsldoc | PAL delol0ma | 01-Mar-2007 07:14 EST | 86507 EX10_27 4 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

select the last calendar year of the current term of the underlying Curable Option as your Selected Year, you will not have the full calendar year to exercise your Amended Option, as you will remain subject to the existing expiration date of the underlying Curable Option.[4]

(v) If you incur a termination of your service with the Company and you are a member of senior management who is determined to be a "specified employee" (as defined under Section 409A) at the time of the termination, Section 409A generally requires us to implement a six month delay in the exercisability of your Amended Option. Therefore, to the extent reasonably necessary to comply with Section 409A, you may only exercise your Amended Option during the three-month period commencing on the first business day that is more than six months after your termination date. The Company will advise you at the time of your termination of service with the Company as to the period of time during which you may exercise your Amended Option.

(vi) Except as provided in Section II.B.2(v) above, an election to amend a Curable Option to reflect an Amended Exercise Schedule will not extend the period in which you may exercise the Amended Option. Except as provided in Section II.B.2(v) above, such election will have the sole effect of limiting the period(s) during which you may exercise the Amended Option.

3. Except as set forth in this Section II.B and Section III below, the remaining terms and conditions of your At Risk Options, including the portions that are Amended Options, will remain the same.[5]

## III.  PROVISIONS APPLICABLE REGARDLESS OF THE APPROACH SELECTED

You will receive no compensatory payments in connection with the amendment of any Curable Options.

You do not have to agree to amend any of your Curable Options. If you elect to amend more than one of your Curable Options, you may elect to amend one (or more) option(s) to reflect the Amended Exercise Price and one (or more) option(s) to reflect the Amended Exercise Schedule.

If you accept this offer to amend one or more of your Curable Options, such amendment will be effective as of the date on which you accepted this offer. The Company will issue you an amended option agreement for each Amended Option reflecting the amended terms and conditions. The amendment of your At Risk Options as to the Curable Options

---

[4]    You should be aware that a termination of employment in the last year of an option may result in the option not being exercisable for 6 months. If such termination were to occur less than six months prior to the termination date for the option, you may not be permitted to exercise such option and the option might expire unexercised. See Section II.B.2(v).

[5]    It should be noted that all At Risk Options will be deemed to be nonqualified stock options whether or not the option is amended pursuant to this offer and whether or not the option originally purported to be an incentive stock option.

4

| POWER INTEGRATIONS, | RR Donnelley ProFile | ᵍˢ\ᵈᵒᶜ | PAL delol0ma | 01-Mar-2007 07:14 EST | 86507 EX10_27 5 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

will not materially affect the terms and conditions of the other option shares subject to the At Risk Options. This letter, and any amendment of your Curable Options, does not modify the at will nature of your service with the Company.

Please note that even if you accept this offer to amend your Curable Options, and regardless of the alternative that you choose, your ability to exercise your Amended Options will remain subject to compliance with applicable laws and requirements (including any legal limitations, requirements or restrictions arising from the Company's legal situation in relation to its equity compensation practices) and the Company's policies on trading in Company securities. In addition, in no event may you exercise your Options as to unvested shares.

Whether or not you choose to accept this offer, your Options will be deemed to be nonqualified stock options for federal income tax purposes and not incentive stock options.

Finally, while we believe that the acceptance of this offer should result in the avoidance of the potential adverse tax consequences under Section 409A with respect to the Amended Options, such interpretation is not free from doubt. Certain states have adopted tax laws that are similar in effect to Section 409A and we make no representations as to the effect of this offer under federal tax laws or such state tax provisions. In all cases, you will be solely responsible for any taxes, penalties, or interest payable under Section 409A (and any state laws of similar effect) in connection with your Options. Before deciding whether to accept our offer to amend your Curable Options, you are strongly encouraged to consult with your personal tax, financial and legal advisors.

## IV.    PROCEDURE TO ACCEPT OFFER

If you wish to accept this offer, you must complete the Election Form attached to this letter as <u>Exhibit B</u> and return it to Rafael Torres on or before the Expiration Date.

## V.    CIRCULAR 230 DISCLAIMER.

The following disclaimer is provided in accordance with the Internal Revenue Service's Circular 230 (21 CFR Part 10). This advice is not intended or written to be used, and it cannot be used, by you for the purpose of avoiding any penalties that may be imposed on you. This advice was written to support the promotion or marketing of amending your Curable Options as set forth in this letter. You should seek advice based on your particular circumstances from an independent tax advisor.

Sincerely,

/s/ Rafael Torres
Rafael Torres
Chief Financial Officer and
Vice President, Finance and Administration

5

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 05-Mar-2007 16:24 EST | | 86507 EX10_27 6 | 2* |
| FORM 10-K | | PAL | | | | HTM ESS | 1C |
| | | | | | | Page 1 of 1 |

## EXHIBIT A

### OPTIONS

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | AMENDED EXERCISE PRICE | EXPIRATION DATE (ORIGINAL) | TOTAL SHARES UNDER OPTION | CURABLE OPTIONS |
|---|---|---|---|---|---|
| 1246 | $12.10 | $16.00 | 5/30/11 | 8,264 | 861 |
| 1247 | $12.10 | $16.00 | 5/30/11 | 291,736 | 30,390 |
| 2077 | $14.82 | $21.20 | 2/20/12 | 6,747 | 1,968 |
| 2078 | $14.82 | $21.20 | 2/20/12 | 193,253 | 56,366 |
| 2170 | $17.75 | $18.95 | 1/7/13 | 5,633 | 2,934 |
| 2171 | $17.75 | $18.95 | 1/7/13 | 294,367 | 153,317 |

6

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc §§ | PAL delol0ma | 01-Mar-2007 07:14 EST | 86507 EX10_27 7 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

## EXHIBIT B

### ELECTION FORM

I elect to amend the following At Risk Options to increase the current exercise price to the Amended Exercise Price as to all of the Curable Options subject to these At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | AMENDED EXERCISE PRICE |
| --- | --- | --- |
| 2170 | $17.75 | $18.95 |
| 2171 | $17.75 | $18.95 |

I elect to amend the following At Risk Options to reflect an Amended Exercise Schedule as to all of the Curable Options subject to these At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | SELECTED YEAR | NUMBER OF CURABLE OPTIONS TO BE EXERCISABLE IN SELECTED YEAR* |
| --- | --- | --- | --- |
| 1246 | $12.10 | 2007 | 861 |
| 1247 | $12.10 | 2007 | 15,000 |
| 1247 | $12.10 | 2008 | 15,390 |
| 2077 | $14.82 | 2007 | 1,968 |
| 2078 | $14.82 | 2007 | 25,000 |
| 2078 | $14.82 | 2008 | 31,366 |

\* If you choose to have an At Risk Option fully exercisable within a single calendar year, then this column should be equal to the number of "Curable Options" for that At Risk Option. If you choose to amend an At Risk Option such that its exercise schedule is split among two or more years, the sum of the entries in this column should be equal to the number of Curable Options for each At Risk Option.

7

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc §g | PAL delol0ma | 01-Mar-2007 07:14 EST | | 86507 EX10_27 8 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

I decline the amendment of the following At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | EXPIRATION DATE (ORIGINAL) | SHARES UNDER AT RISK OPTION | CURABLE OPTIONS |
|---|---|---|---|---|
| | | | | |

I understand the amendment of my At Risk Options as indicated on this Election Form (a) is subject to the terms and conditions set forth in the letter to me from the Company dated December 8, 2006 to which this Election Form is attached and (b) is irrevocable. I agree to execute such additional documentation as reasonably requested by the Company in connection with the amendment of my At Risk Options, including amended stock option agreements in respect of the At Risk Options that contain terms consistent with the terms of this Election Form.

I acknowledge that I am not required to accept the offer to amend my At Risk Options. I further acknowledge and agree that if I do not accept the offer as to any of my At Risk Options, such At Risk Options will remain outstanding on the terms granted to me. I understand that the Company is not providing me with any compensatory payments in connection with my election.

I understand that regardless of my election, I will be solely responsible for any adverse tax consequences that arise as a result of Section 409A in respect of my At Risk Options. I further acknowledge that the Company has not and is not providing me with any financial, legal or tax advice and has directed me to seek independent financial, legal and tax advice regarding my election. I have done so, or knowingly declined to do so.

/s/ Balu Balakrishnan
_____

Print Name: Balu Balakrishnan
Date:          December 15, 2006

8

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 05-Mar-2007 16:25 EST | | 86507 EX10_28 1 | 4* |
| FORM 10-K | | START PAGE | PAL | | image001 | HTM ESS | 1C |

Page 1 of 1

Exhibit 10.28



December 8, 2006

Mr. Derek Bell

Dear Mr. Bell:

Power Integrations, Inc. (the "**Company**") has previously granted you the stock options set forth on the attached <u>Exhibit A</u> (the "**Options**") to purchase shares of the Company's common stock.

## I.     INTRODUCTION

The Company has determined that the grant dates of the Options for federal income tax purposes may have been dates other than the grant dates set forth in the documentation you received in connection with the Options. It is possible, therefore, that the Options were issued with an exercise price that is or may be less than 100% of the fair market value of the stock on the grant date for federal income tax purposes and therefore may be subject to adverse tax consequences under Section 409A of the Internal Revenue Code of 1986, as amended ("**Section 409A**"). These adverse tax consequences likely include, at a minimum, (i) ordinary income tax plus (ii) an additional 20% tax on the intrinsic value of the Option prior to and regardless of whether the Options are ever exercised plus (iii) an additional tax in the nature of interest. These adverse tax consequences apply to the extent that the Options (a) vested after December 31, 2004 and (b) were not exercised or otherwise cancelled on or before December 31, 2005. If a portion of one of your Options was vested as of December 31, 2004, only the unvested portion as of such date is potentially subject to Section 409A. <u>Exhibit A</u> indicates the shares subject to each of your Options that the Company believes are at risk for adverse tax consequences under Section 409A (the "**At Risk Options**").

Based on the currently available guidance and proposed regulations issued in connection with Section 409A, we believe that it is possible to avoid or minimize the potential adverse tax consequences that may apply under Section 409A in respect of your At Risk Options by amending the At Risk Options as to that part of the At Risk Options that remains outstanding and unexercised[1] (the "**Curable Options**")) using either (a) the

---

[1]     Note that to the extent that your At Risk Option is deemed to be beneficially owned by another person (e.g., pursuant to a qualified domestic relations order in favor of your former spouse), you must provide evidence satisfactory to the Company that you have the right to make an election to amend the Curable Options.

1

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc 8.8 | PAL delol0ma | 01-Mar-2007 07:14 EST | 86507 EX10_28 2 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

Amended Exercise Price Approach as described in Section II.A, below or the Amended Exercise Schedule Approach as described in Section II.B, below. We refer to those Curable Options (or portions thereof) that you elect to amend as "**Amended Options.**"

You may also leave your Curable Options unchanged; however, if you elect to leave your Curable Options unchanged, the Company currently intends to treat such options as subject to Section 409A. In addition, the Company intends to treat as subject to Section 409A any portion of your At Risk Options that is not a Curable Option, and make the appropriate filings and tax withholdings on your At Risk Options as required by Section 409A. If you do not return a properly completed election form to the Company on or before December 29, 2006 (the "**Expiration Date**"), you will be deemed to have elected to leave your Curable Options unchanged.

II.    DESCRIPTION OF THE AVAILABLE AMENDMENT ALTERNATIVES

    A.    THE AMENDED EXERCISE PRICE APPROACH

If you select the Amended Exercise Price Approach for a Curable Option, you are agreeing to increase the exercise price of the Curable Option to be equal to 100% of the fair market value of the Company's common stock on the date the Company is using as the measurement date for such Curable Option for the purposes of preparing its financial statements (the "**Amended Exercise Price**"). Such Amended Exercise Price is shown on Exhibit A. All other terms and conditions of the Curable Option will remain the same.[2]

    B.    THE AMENDED EXERCISE SCHEDULE APPROACH

        1. If you select the Amended Exercise Schedule Approach, you are agreeing to change the exercise (but not the vesting) schedule applicable to the Curable Options to provide that the At Risk Option may not be exercised as to the Curable Options prior to the earliest to occur of:

    (i) the termination of your service with the Company for any reason,

    (ii) your death,

    (iii) your suffering a "disability" (as defined under Section 409A),

    (iv) a "change in control" of the Company (as defined under Section 409A), or

    (v) January 1 of one or more calendar years specified by you (with such year(s) not earlier than 2007 and not later than the year in which your At Risk Option will expire) (collectively such specified calendar years, the "**Selected Years,**" and each a "**Selected Year**") (this amendment alternative, the "**Amended Exercise Schedule**").[3]

---

[2]    It should be noted that all At Risk Options will be deemed to be nonqualified stock options whether or not the option is amended pursuant to this offer and whether or not the option originally purported to be an incentive stock option.

[3]    The Compensation Committee of our Board of Directors will determine whether and when any of the events set forth in (i) through (iv) has occurred.

2

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc | PAL delol0ma | 01-Mar-2007 07:14 EST | 86507 EX10_28 3 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

For each Curable Option, you may elect more than one Selected Year, making such option exercisable pursuant to a schedule adopted now. For example, assuming you had a fully vested Curable Option, you could elect an Amended Exercise Schedule making 50% of the Curable Option Exercisable in 2007 and 50% exercisable in 2008.

2. If you elect to amend a Curable Option to reflect an Amended Exercise Schedule:

(i) The Amended Exercise Schedule does not change the vesting schedule for your Curable Options. If a Curable Option is not fully vested at the time of your election and you choose more than one Selected Year, then shares will be allocated among the Selected Years based on vesting status to the greatest extent possible, with currently vested shares being allocated to the earliest Selected Year(s) and unvested shares allocated to the latest Selected Year(s). For example, if the Curable Option that you tender covers 400 shares, and is currently vested as to 100 shares, and you wish to select 2007 as the Selected Year as to 50 shares, 2008 as the Selected Year as to 100 shares, and 2009 as the Selected Year as to the remaining 250 shares, your Amended Option covering 50 shares will be fully vested as of the date your Curable Option is amended pursuant to the terms described herein, your Amended Option covering 100 shares will be 50% vested as of the Amendment Date, and your Amended Option covering 250 shares will be completely unvested as of the Amendment Date, and any future vesting will be deemed to occur as to the 100 share portion of the option prior to the 250 share portion of the option.

(ii) The exercise price of the Amended Option will not change. Instead, the Amended Option will no longer be exercisable (to the extent currently exercisable), and generally will only become exercisable again, if at all, on the date of the earliest to occur of the events described above under the Amended Exercise Schedule.

(iii) If your Amended Option becomes exercisable as a result of an event under the Amended Exercise Schedule other than the start of your Selected Year(s), your Amended Option generally will be exercisable only until the earlier of (a) the date the underlying Curable Option would cease to be exercisable in accordance with its terms (including upon the expiration of the three month post-termination exercise period applicable the underlying Curable Option) or (b) the later of (x) December 31 of the year in which the event occurs or (y) the 15th day of the third calendar month following the date on which the event occurs. However, you should be aware that if the event that triggers the right to exercise your Amended Option is a change in control of the Company, then, subject to the terms of the stock plan under which the underlying Curable Option was granted, the transaction agreement between the Company and the acquiring entity may provide for the termination of your Amended Option upon the consummation of the change in control (notwithstanding the terms of your Amended Exercise Schedule).

(iv) If the first event to occur is January 1 of your only Selected Year, your Amended Option generally will expire not later than December 31 of the Selected Year. If your Amended Exercise Schedule includes more than one Selected Year, then your Amended Option generally will expire in traunches pursuant to your Amended Exercise

3

| POWER INTEGRATIONS, | RR Donnelley ProFile | gsldoc gsb | PAL delol0ma | 01-Mar-2007 07:14 EST | 86507 EX10_28 4 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

Schedule, not later than December 31 of each of the Selected Years. In all cases, if you select the last calendar year of the current term of the underlying Curable Option as your Selected Year, you will not have the full calendar year to exercise your Amended Option, as you will remain subject to the existing expiration date of the underlying Curable Option.[4]

(v) If you incur a termination of your service with the Company and you are a member of senior management who is determined to be a "specified employee" (as defined under Section 409A) at the time of the termination, Section 409A generally requires us to implement a six month delay in the exercisability of your Amended Option. Therefore, to the extent reasonably necessary to comply with Section 409A, you may only exercise your Amended Option during the three-month period commencing on the first business day that is more than six months after your termination date. The Company will advise you at the time of your termination of service with the Company as to the period of time during which you may exercise your Amended Option.

(vi) Except as provided in Section II.B.2(v) above, an election to amend a Curable Option to reflect an Amended Exercise Schedule will not extend the period in which you may exercise the Amended Option. Except as provided in Section II.B.2(v) above, such election will have the sole effect of limiting the period(s) during which you may exercise the Amended Option.

3. Except as set forth in this Section II.B and Section III below, the remaining terms and conditions of your At Risk Options, including the portions that are Amended Options, will remain the same.[5]

## III.  PROVISIONS APPLICABLE REGARDLESS OF THE APPROACH SELECTED

You will receive no compensatory payments in connection with the amendment of any Curable Options.

You do not have to agree to amend any of your Curable Options. If you elect to amend more than one of your Curable Options, you may elect to amend one (or more) option(s) to reflect the Amended Exercise Price and one (or more) option(s) to reflect the Amended Exercise Schedule.

If you accept this offer to amend one or more of your Curable Options, such amendment will be effective as of the date on which you accepted this offer. The Company will issue you an amended option agreement for each Amended Option reflecting the amended

---

[4]   You should be aware that a termination of employment in the last year of an option may result in the option not being exercisable for 6 months. If such termination were to occur less than six months prior to the termination date for the option, you may not be permitted to exercise such option and the option might expire unexercised. See Section II.B.2(v).

[5]   It should be noted that all At Risk Options will be deemed to be nonqualified stock options whether or not the option is amended pursuant to this offer and whether or not the option originally purported to be an incentive stock option.

4

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc g/g | PAL delol0ma | 01-Mar-2007 07:14 EST | | 86507 EX10_28 5 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

terms and conditions. The amendment of your At Risk Options as to the Curable Options will not materially affect the terms and conditions of the other option shares subject to the At Risk Options. This letter, and any amendment of your Curable Options, does not modify the at will nature of your service with the Company.

Please note that even if you accept this offer to amend your Curable Options, and regardless of the alternative that you choose, your ability to exercise your Amended Options will remain subject to compliance with applicable laws and requirements (including any legal limitations, requirements or restrictions arising from the Company's legal situation in relation to its equity compensation practices) and the Company's policies on trading in Company securities. In addition, in no event may you exercise your Options as to unvested shares.

Whether or not you choose to accept this offer, your Options will be deemed to be nonqualified stock options for federal income tax purposes and not incentive stock options.

Finally, while we believe that the acceptance of this offer should result in the avoidance of the potential adverse tax consequences under Section 409A with respect to the Amended Options, such interpretation is not free from doubt. Certain states have adopted tax laws that are similar in effect to Section 409A and we make no representations as to the effect of this offer under federal tax laws or such state tax provisions. In all cases, you will be solely responsible for any taxes, penalties, or interest payable under Section 409A (and any state laws of similar effect) in connection with your Options. Before deciding whether to accept our offer to amend your Curable Options, you are strongly encouraged to consult with your personal tax, financial and legal advisors.

## IV.  PROCEDURE TO ACCEPT OFFER

If you wish to accept this offer, you must complete the Election Form attached to this letter as <u>Exhibit B</u> and return it to Rafael Torres on or before the Expiration Date.

## V.   CIRCULAR 230 DISCLAIMER.

The following disclaimer is provided in accordance with the Internal Revenue Service's Circular 230 (21 CFR Part 10). This advice is not intended or written to be used, and it cannot be used, by you for the purpose of avoiding any penalties that may be imposed on you. This advice was written to support the promotion or marketing of amending your Curable Options as set forth in this letter. You should seek advice based on your particular circumstances from an independent tax advisor.

Sincerely,

/s/ Rafael Torres
_____
Rafael Torres
Chief Financial Officer and
Vice President, Finance and Administration

| POWER INTEGRATIONS, | RR Donnelley ProFile | paldoc 9.6 | PAL delol0ma | 01-Mar-2007 07:14 EST | | 86507 EX10_28 6 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

## EXHIBIT A

### OPTIONS

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | AMENDED EXERCISE PRICE | EXPIRATION DATE (ORIGINAL) | TOTAL SHARES UNDER OPTION | CURABLE OPTIONS |
|---|---|---|---|---|---|
| 1231 | $12.10 | $16.83 | 5/30/11 | 166,736 | 17,369 |
| 2069 | $14.82 | $21.20 | 2/20/12 | 6,747 | 1,968 |
| 2070 | $14.82 | $21.20 | 2/20/12 | 33,253 | 9,699 |
| 2172 | $17.75 | $18.95 | 1/7/13 | 5,633 | 2,934 |
| 2173 | $17.75 | $18.95 | 1/7/13 | 39,367 | 20,504 |

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 05-Mar-2007 16:26 EST | | 86507 EX10_28 7 | 3* |
| FORM 10-K | | | PAL | | | HTM ESS | 1C |
| | | | | | | Page 1 of 1 |

**EXHIBIT B**

**ELECTION FORM**

I elect to amend the following At Risk Options to increase the current exercise price to the Amended Exercise Price as to all of the Curable Options subject to these At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | AMENDED EXERCISE PRICE |
|---|---|---|
| 2172 | $17.75 | $18.95 |
| 2173 | $17.75 | $18.95 |

I elect to amend the following At Risk Options to reflect an Amended Exercise Schedule as to all of the Curable Options subject to these At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | SELECTED YEAR | NUMBER OF CURABLE OPTIONS TO BE EXERCISABLE IN SELECTED YEAR* |
|---|---|---|---|
| 1231 | $12.10 | 2007 | 8,685 |
| 2069 | $14.82 | 2007 | 984 |
| 2070 | $14.82 | 2007 | 4,850 |
| 1231 | $12.10 | 2008 | 8,684 |
| 2069 | $14.82 | 2008 | 984 |
| 2070 | $14.82 | 2008 | 4,849 |

* If you choose to have an At Risk Option fully exercisable within a single calendar year, then this column should be equal to the number of "Curable Options" for that At Risk Option. If you choose to amend an At Risk Option such that its exercise schedule is split among two or more years, the sum of the entries in this column should be equal to the number of Curable Options for each At Risk Option.

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc 8.8 | PAL delol0ma | 01-Mar-2007 07:15 EST | | 86507 EX10_28 8 | 1* |
|---|---|---|---|---|---|---|---|
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

I decline the amendment of the following At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | EXPIRATION DATE (ORIGINAL) | SHARES UNDER AT RISK OPTION | CURABLE OPTIONS |
|---|---|---|---|---|
| | | | | |

I understand the amendment of my At Risk Options as indicated on this Election Form (a) is subject to the terms and conditions set forth in the letter to me from the Company dated December 8, 2006 to which this Election Form is attached and (b) is irrevocable. I agree to execute such additional documentation as reasonably requested by the Company in connection with the amendment of my At Risk Options, including amended stock option agreements in respect of the At Risk Options that contain terms consistent with the terms of this Election Form.

I acknowledge that I am not required to accept the offer to amend my At Risk Options. I further acknowledge and agree that if I do not accept the offer as to any of my At Risk Options, such At Risk Options will remain outstanding on the terms granted to me. I understand that the Company is not providing me with any compensatory payments in connection with my election.

I understand that regardless of my election, I will be solely responsible for any adverse tax consequences that arise as a result of Section 409A in respect of my At Risk Options. I further acknowledge that the Company has not and is not providing me with any financial, legal or tax advice and has directed me to seek independent financial, legal and tax advice regarding my election. I have done so, or knowingly declined to do so.

/s/ Derek J. Bell
Print Name: Derek Bell
Date:        December 18, 2006

8

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 06-Mar-2007 16:57 EST | | 86507 EX10_29 1 | 5* |
|---|---|---|---|---|---|---|---|
| FORM 10-K | START PAGE | | PAL | | image001 | HTM ESS | 1C |

Page 1 of 1

Exhibit 10.29



December 8, 2006

Mr. Bruce Renouard

Dear Mr. Renouard:

Power Integrations, Inc. (the "**Company**") has previously granted you the stock options set forth on the attached <u>Exhibit A</u> (the "**Options**") to purchase shares of the Company's common stock.

## I.    INTRODUCTION

The Company has determined that the grant dates of the Options for federal income tax purposes may have been dates other than the grant dates set forth in the documentation you received in connection with the Options. It is possible, therefore, that the Options were issued with an exercise price that is or may be less than 100% of the fair market value of the stock on the grant date for federal income tax purposes and therefore may be subject to adverse tax consequences under Section 409A of the Internal Revenue Code of 1986, as amended ("**Section 409A**"). These adverse tax consequences likely include, at a minimum, (i) ordinary income tax plus (ii) an additional 20% tax on the intrinsic value of the Option prior to and regardless of whether the Options are ever exercised plus (iii) an additional tax in the nature of interest. These adverse tax consequences apply to the extent that the Options (a) vested after December 31, 2004 and (b) were not exercised or otherwise cancelled on or before December 31, 2005. If a portion of one of your Options was vested as of December 31, 2004, only the unvested portion as of such date is potentially subject to Section 409A. <u>Exhibit A</u> indicates the shares subject to each of your Options that the Company believes are at risk for adverse tax consequences under Section 409A (the "**At Risk Options**").

Based on the currently available guidance and proposed regulations issued in connection with Section 409A, we believe that it is possible to avoid or minimize the potential adverse tax consequences that may apply under Section 409A in respect of your At Risk Options by amending the At Risk Options as to that part of the At Risk Options that remains outstanding and unexercised[1] (the "**Curable Options**")) using either (a) the Amended Exercise Price Approach as described in Section II.A, below or the Amended Exercise Schedule Approach as described in Section II.B, below. We refer to those Curable Options (or portions thereof) that you elect to amend as "**Amended Options**."

---

[1]    Note that to the extent that your At Risk Option is deemed to be beneficially owned by another person (e.g., pursuant to a qualified domestic relations order in favor of your former spouse), you must provide evidence satisfactory to the Company that you have the right to make an election to amend the Curable Options.

1

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc §§ | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_29 2 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

You may also leave your Curable Options unchanged; however, if you elect to leave your Curable Options unchanged, the Company currently intends to treat such options as subject to Section 409A. In addition, the Company intends to treat as subject to Section 409A any portion of your At Risk Options that is not a Curable Option, and make the appropriate filings and tax withholdings on your At Risk Options as required by Section 409A. If you do not return a properly completed election form to the Company on or before December 29, 2006 (the "**Expiration Date**"), you will be deemed to have elected to leave your Curable Options unchanged.

II.    DESCRIPTION OF THE AVAILABLE AMENDMENT ALTERNATIVES

A.    THE AMENDED EXERCISE PRICE APPROACH

If you select the Amended Exercise Price Approach for a Curable Option, you are agreeing to increase the exercise price of the Curable Option to be equal to 100% of the fair market value of the Company's common stock on the date the Company is using as the measurement date for such Curable Option for the purposes of preparing its financial statements (the "**Amended Exercise Price**"). Such Amended Exercise Price is shown on Exhibit A. All other terms and conditions of the Curable Option will remain the same.[2]

B.    THE AMENDED EXERCISE SCHEDULE APPROACH

1. If you select the Amended Exercise Schedule Approach, you are agreeing to change the exercise (but not the vesting) schedule applicable to the Curable Options to provide that the At Risk Option may not be exercised as to the Curable Options prior to the earliest to occur of:

(i) the termination of your service with the Company for any reason,

(ii) your death,

(iii) your suffering a "disability" (as defined under Section 409A),

(iv) a "change in control" of the Company (as defined under Section 409A), or

(v) January 1 of one or more calendar years specified by you (with such year(s) not earlier than 2007 and not later than the year in which your At Risk Option will expire) (collectively such specified calendar years, the "**Selected Years,**" and each a "**Selected Year**") (this amendment alternative, the "**Amended Exercise Schedule**").[3] For each Curable Option, you may elect more than one Selected Year, making such

---

[2]    It should be noted that all At Risk Options will be deemed to be nonqualified stock options whether or not the option is amended pursuant to this offer and whether or not the option originally purported to be an incentive stock option.

[3]    The Compensation Committee of our Board of Directors will determine whether and when any of the events set forth in (i) through (iv) has occurred.

2

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc §§ | PAL delol0ma | 01-Mar-2007 07:15 EST | | 86507 EX10_29 3 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

option exercisable pursuant to a schedule adopted now. For example, assuming you had a fully vested Curable Option, you could elect an Amended Exercise Schedule making 50% of the Curable Option Exercisable in 2007 and 50% exercisable in 2008.

2. If you elect to amend a Curable Option to reflect an Amended Exercise Schedule:

(i) The Amended Exercise Schedule does not change the vesting schedule for your Curable Options. If a Curable Option is not fully vested at the time of your election and you choose more than one Selected Year, then shares will be allocated among the Selected Years based on vesting status to the greatest extent possible, with currently vested shares being allocated to the earliest Selected Year(s) and unvested shares allocated to the latest Selected Year(s). For example, if the Curable Option that you tender covers 400 shares, and is currently vested as to 100 shares, and you wish to select 2007 as the Selected Year as to 50 shares, 2008 as the Selected Year as to 100 shares, and 2009 as the Selected Year as to the remaining 250 shares, your Amended Option covering 50 shares will be fully vested as of the date your Curable Option is amended pursuant to the terms described herein, your Amended Option covering 100 shares will be 50% vested as of the Amendment Date, and your Amended Option covering 250 shares will be completely unvested as of the Amendment Date, and any future vesting will be deemed to occur as to the 100 share portion of the option prior to the 250 share portion of the option.

(ii) The exercise price of the Amended Option will not change. Instead, the Amended Option will no longer be exercisable (to the extent currently exercisable), and generally will only become exercisable again, if at all, on the date of the earliest to occur of the events described above under the Amended Exercise Schedule.

(iii) If your Amended Option becomes exercisable as a result of an event under the Amended Exercise Schedule other than the start of your Selected Year(s), your Amended Option generally will be exercisable only until the earlier of (a) the date the underlying Curable Option would cease to be exercisable in accordance with its terms (including upon the expiration of the three month post-termination exercise period applicable the underlying Curable Option) or (b) the later of (x) December 31 of the year in which the event occurs or (y) the 15th day of the third calendar month following the date on which the event occurs. However, you should be aware that if the event that triggers the right to exercise your Amended Option is a change in control of the Company, then, subject to the terms of the stock plan under which the underlying Curable Option was granted, the transaction agreement between the Company and the acquiring entity may provide for the termination of your Amended Option upon the consummation of the change in control (notwithstanding the terms of your Amended Exercise Schedule).

(iv) If the first event to occur is January 1 of your only Selected Year, your Amended Option generally will expire not later than December 31 of the Selected Year. If your Amended Exercise Schedule includes more than one Selected Year, then your Amended Option generally will expire in traunches pursuant to your Amended Exercise Schedule, not later than December 31 of each of the Selected Years. In all cases, if you

select the last calendar year of the current term of the underlying Curable Option as your Selected Year, you will not have the full calendar year to exercise your Amended Option, as you will remain subject to the existing expiration date of the underlying Curable Option.[4]

(v) If you incur a termination of your service with the Company and you are a member of senior management who is determined to be a "specified employee" (as defined under Section 409A) at the time of the termination, Section 409A generally requires us to implement a six month delay in the exercisability of your Amended Option. Therefore, to the extent reasonably necessary to comply with Section 409A, you may only exercise your Amended Option during the three-month period commencing on the first business day that is more than six months after your termination date. The Company will advise you at the time of your termination of service with the Company as to the period of time during which you may exercise your Amended Option.

(vi) Except as provided in Section II.B.2(v) above, an election to amend a Curable Option to reflect an Amended Exercise Schedule will not extend the period in which you may exercise the Amended Option. Except as provided in Section II.B.2(v) above, such election will have the sole effect of limiting the period(s) during which you may exercise the Amended Option.

3. Except as set forth in this Section II.B and Section III below, the remaining terms and conditions of your At Risk Options, including the portions that are Amended Options, will remain the same.[5]

## III.    PROVISIONS APPLICABLE REGARDLESS OF THE APPROACH SELECTED

You will receive no compensatory payments in connection with the amendment of any Curable Options.

You do not have to agree to amend any of your Curable Options. If you elect to amend more than one of your Curable Options, you may elect to amend one (or more) option(s) to reflect the Amended Exercise Price and one (or more) option(s) to reflect the Amended Exercise Schedule.

If you accept this offer to amend one or more of your Curable Options, such amendment will be effective as of the date on which you accepted this offer. The Company will issue you an amended option agreement for each Amended Option reflecting the amended terms and conditions. The amendment of your At Risk Options as to the Curable Options

---

[4]    You should be aware that a termination of employment in the last year of an option may result in the option not being exercisable for 6 months. If such termination were to occur less than six months prior to the termination date for the option, you may not be permitted to exercise such option and the option might expire unexercised. See Section II.B.2(v).

[5]    It should be noted that all At Risk Options will be deemed to be nonqualified stock options whether or not the option is amended pursuant to this offer and whether or not the option originally purported to be an incentive stock option.

4

| POWER INTEGRATIONS, | RR Donnelley ProFile | estdoc §§ | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_29 5 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 |

will not materially affect the terms and conditions of the other option shares subject to the At Risk Options. This letter, and any amendment of your Curable Options, does not modify the at will nature of your service with the Company.

Please note that even if you accept this offer to amend your Curable Options, and regardless of the alternative that you choose, your ability to exercise your Amended Options will remain subject to compliance with applicable laws and requirements (including any legal limitations, requirements or restrictions arising from the Company's legal situation in relation to its equity compensation practices) and the Company's policies on trading in Company securities. In addition, in no event may you exercise your Options as to unvested shares.

Whether or not you choose to accept this offer, your Options will be deemed to be nonqualified stock options for federal income tax purposes and not incentive stock options.

Finally, while we believe that the acceptance of this offer should result in the avoidance of the potential adverse tax consequences under Section 409A with respect to the Amended Options, such interpretation is not free from doubt. Certain states have adopted tax laws that are similar in effect to Section 409A and we make no representations as to the effect of this offer under federal tax laws or such state tax provisions. In all cases, you will be solely responsible for any taxes, penalties, or interest payable under Section 409A (and any state laws of similar effect) in connection with your Options. Before deciding whether to accept our offer to amend your Curable Options, you are strongly encouraged to consult with your personal tax, financial and legal advisors.

## IV.    PROCEDURE TO ACCEPT OFFER

If you wish to accept this offer, you must complete the Election Form attached to this letter as <u>Exhibit B</u> and return it to Rafael Torres on or before the Expiration Date.

## V.    CIRCULAR 230 DISCLAIMER.

The following disclaimer is provided in accordance with the Internal Revenue Service's Circular 230 (21 CFR Part 10). This advice is not intended or written to be used, and it cannot be used, by you for the purpose of avoiding any penalties that may be imposed on you. This advice was written to support the promotion or marketing of amending your Curable Options as set forth in this letter. You should seek advice based on your particular circumstances from an independent tax advisor.

Sincerely,

/s/ Rafael Torres
Rafael Torres
Chief Financial Officer and
Vice President, Finance and Administration

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_29 6 | 1* |
| FORM 10-K | | ■ PAL | | | HTM IFV | 1C |

Page 1 of 1

## EXHIBIT A

### OPTIONS

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | AMENDED EXERCISE PRICE | EXPIRATION DATE (ORIGINAL) | TOTAL SHARES UNDER OPTION | CURABLE OPTIONS |
|---|---|---|---|---|---|
| 1812 | $14.82 | $21.20 | 2/20/12 | 143,253 | 41,782 |
| 1813 | $14.82 | $21.20 | 2/20/12 | 6,747 | 1,968 |
| 2178 | $17.75 | $18.95 | 1/7/13 | 5,633 | 2,934 |
| 2179 | $17.75 | $18.95 | 1/7/13 | 39,367 | 20,504 |

## EXHIBIT B

### ELECTION FORM

I elect to amend the following At Risk Options to increase the current exercise price to the Amended Exercise Price as to all of the Curable Options subject to these At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | AMENDED EXERCISE PRICE |
|:---:|:---:|:---:|
| 2178 | $17.75 | $18.95 |
| 2179 | $17.75 | $18.95 |

I elect to amend the following At Risk Options to reflect an Amended Exercise Schedule as to all of the Curable Options subject to these At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | SELECTED YEAR | NUMBER OF CURABLE OPTIONS TO BE EXERCISABLE IN SELECTED YEAR* |
|:---:|:---:|:---:|:---:|
| 1812 | $14.82 | 2007 | 21,782 |
| 1812 | $14.82 | 2008 | 20,000 |
| 1813 | $14.82 | 2009 | 1,968 |

\* If you choose to have an At Risk Option fully exercisable within a single calendar year, then this column should be equal to the number of "Curable Options" for that At Risk Option. If you choose to amend an At Risk Option such that its exercise schedule is split among two or more years, the sum of the entries in this column should be equal to the number of Curable Options for each At Risk Option.

7

| POWER INTEGRATIONS, | RR Donnelley ProFile | geldoc §§ | PAL delol0ma | 01-Mar-2007 07:15 EST | | 86507 EX10_29 8 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

I decline the amendment of the following At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | EXPIRATION DATE (ORIGINAL) | SHARES UNDER AT RISK OPTION | CURABLE OPTIONS |
| --- | --- | --- | --- | --- |

I understand the amendment of my At Risk Options as indicated on this Election Form (a) is subject to the terms and conditions set forth in the letter to me from the Company dated December 8, 2006 to which this Election Form is attached and (b) is irrevocable. I agree to execute such additional documentation as reasonably requested by the Company in connection with the amendment of my At Risk Options, including amended stock option agreements in respect of the At Risk Options that contain terms consistent with the terms of this Election Form.

I acknowledge that I am not required to accept the offer to amend my At Risk Options. I further acknowledge and agree that if I do not accept the offer as to any of my At Risk Options, such At Risk Options will remain outstanding on the terms granted to me. I understand that the Company is not providing me with any compensatory payments in connection with my election.

I understand that regardless of my election, I will be solely responsible for any adverse tax consequences that arise as a result of Section 409A in respect of my At Risk Options. I further acknowledge that the Company has not and is not providing me with any financial, legal or tax advice and has directed me to seek independent financial, legal and tax advice regarding my election. I have done so, or knowingly declined to do so.

/s/ Bruce T. Renouard
Print Name: Bruce T. Renouard
Date:        December 22, 2006

8

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 05-Mar-2007 16:28 EST | 86507 EX10_30 1 | 4* |
| FORM 10-K | START PAGE | | ■ PAL | image001 | HTM ESS | 1C |

Exhibit 10.30



December 8, 2006

Mr. John Tomlin

Dear Mr. Tomlin:

Power Integrations, Inc. (the "**Company**") has previously granted you the stock options set forth on the attached <u>Exhibit A</u> (the "**Options**") to purchase shares of the Company's common stock.

## I.    INTRODUCTION

The Company has determined that the grant dates of the Options for federal income tax purposes may have been dates other than the grant dates set forth in the documentation you received in connection with the Options. It is possible, therefore, that the Options were issued with an exercise price that is or may be less than 100% of the fair market value of the stock on the grant date for federal income tax purposes and therefore may be subject to adverse tax consequences under Section 409A of the Internal Revenue Code of 1986, as amended ("**Section 409A**"). These adverse tax consequences likely include, at a minimum, (i) ordinary income tax plus (ii) an additional 20% tax on the intrinsic value of the Option prior to and regardless of whether the Options are ever exercised plus (iii) an additional tax in the nature of interest. These adverse tax consequences apply to the extent that the Options (a) vested after December 31, 2004 and (b) were not exercised or otherwise cancelled on or before December 31, 2005. If a portion of one of your Options was vested as of December 31, 2004, only the unvested portion as of such date is potentially subject to Section 409A. <u>Exhibit A</u> indicates the shares subject to each of your Options that the Company believes are at risk for adverse tax consequences under Section 409A (the "**At Risk Options**").

Based on the currently available guidance and proposed regulations issued in connection with Section 409A, we believe that it is possible to avoid or minimize the potential adverse tax consequences that may apply under Section 409A in respect of your At Risk Options by amending the At Risk Options as to that part of the At Risk Options that remains outstanding and unexercised[1] (the "**Curable Options**")) using either (a) the Amended Exercise Price Approach as described in Section II.A, below or the Amended Exercise Schedule Approach as described in Section II.B, below. We refer to those Curable Options (or portions thereof) that you elect to amend as "**Amended Options**."

---

[1]    Note that to the extent that your At Risk Option is deemed to be beneficially owned by another person (e.g., pursuant to a qualified domestic relations order in favor of your former spouse), you must provide evidence satisfactory to the Company that you have the right to make an election to amend the Curable Options.

1

You may also leave your Curable Options unchanged; however, if you elect to leave your Curable Options unchanged, the Company currently intends to treat such options as subject to Section 409A. In addition, the Company intends to treat as subject to Section 409A any portion of your At Risk Options that is not a Curable Option, and make the appropriate filings and tax withholdings on your At Risk Options as required by Section 409A. If you do not return a properly completed election form to the Company on or before December 29, 2006 (the "**Expiration Date**"), you will be deemed to have elected to leave your Curable Options unchanged.

II.    DESCRIPTION OF THE AVAILABLE AMENDMENT ALTERNATIVES

    A.    THE AMENDED EXERCISE PRICE APPROACH

If you select the Amended Exercise Price Approach for a Curable Option, you are agreeing to increase the exercise price of the Curable Option to be equal to 100% of the fair market value of the Company's common stock on the date the Company is using as the measurement date for such Curable Option for the purposes of preparing its financial statements (the "**Amended Exercise Price**"). Such Amended Exercise Price is shown on Exhibit A. All other terms and conditions of the Curable Option will remain the same.[2]

    B.    THE AMENDED EXERCISE SCHEDULE APPROACH

      1. If you select the Amended Exercise Schedule Approach, you are agreeing to change the exercise (but not the vesting) schedule applicable to the Curable Options to provide that the At Risk Option may not be exercised as to the Curable Options prior to the earliest to occur of:

      (i) the termination of your service with the Company for any reason,

      (ii) your death,

      (iii) your suffering a "disability" (as defined under Section 409A),

      (iv) a "change in control" of the Company (as defined under Section 409A), or

      (v) January 1 of one or more calendar years specified by you (with such year(s) not earlier than 2007 and not later than the year in which your At Risk Option will expire) (collectively such specified calendar years, the "**Selected Years,**" and each a "**Selected Year**") (this amendment alternative, the "**Amended Exercise Schedule**").[3] For each Curable Option, you may elect more than one Selected Year, making such

---

[2]    It should be noted that all At Risk Options will be deemed to be nonqualified stock options whether or not the option is amended pursuant to this offer and whether or not the option originally purported to be an incentive stock option.

[3]    The Compensation Committee of our Board of Directors will determine whether and when any of the events set forth in (i) through (iv) has occurred.



| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc<br>§§ | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_30 3 | 1* |
| FORM 10-K | | ■ | PAL | | HTM IFV | 1C |

Page 1 of 1

option exercisable pursuant to a schedule adopted now. For example, assuming you had a fully vested Curable Option, you could elect an Amended Exercise Schedule making 50% of the Curable Option Exercisable in 2007 and 50% exercisable in 2008.

    2. If you elect to amend a Curable Option to reflect an Amended Exercise Schedule:

    (i) The Amended Exercise Schedule does not change the vesting schedule for your Curable Options. If a Curable Option is not fully vested at the time of your election and you choose more than one Selected Year, then shares will be allocated among the Selected Years based on vesting status to the greatest extent possible, with currently vested shares being allocated to the earliest Selected Year(s) and unvested shares allocated to the latest Selected Year(s). For example, if the Curable Option that you tender covers 400 shares, and is currently vested as to 100 shares, and you wish to select 2007 as the Selected Year as to 50 shares, 2008 as the Selected Year as to 100 shares, and 2009 as the Selected Year as to the remaining 250 shares, your Amended Option covering 50 shares will be fully vested as of the date your Curable Option is amended pursuant to the terms described herein, your Amended Option covering 100 shares will be 50% vested as of the Amendment Date, and your Amended Option covering 250 shares will be completely unvested as of the Amendment Date, and any future vesting will be deemed to occur as to the 100 share portion of the option prior to the 250 share portion of the option.

    (ii) The exercise price of the Amended Option will not change. Instead, the Amended Option will no longer be exercisable (to the extent currently exercisable), and generally will only become exercisable again, if at all, on the date of the earliest to occur of the events described above under the Amended Exercise Schedule.

    (iii) If your Amended Option becomes exercisable as a result of an event under the Amended Exercise Schedule other than the start of your Selected Year(s), your Amended Option generally will be exercisable only until the earlier of (a) the date the underlying Curable Option would cease to be exercisable in accordance with its terms (including upon the expiration of the three month post-termination exercise period applicable the underlying Curable Option) or (b) the later of (x) December 31 of the year in which the event occurs or (y) the 15th day of the third calendar month following the date on which the event occurs. However, you should be aware that if the event that triggers the right to exercise your Amended Option is a change in control of the Company, then, subject to the terms of the stock plan under which the underlying Curable Option was granted, the transaction agreement between the Company and the acquiring entity may provide for the termination of your Amended Option upon the consummation of the change in control (notwithstanding the terms of your Amended Exercise Schedule).

    (iv) If the first event to occur is January 1 of your only Selected Year, your Amended Option generally will expire not later than December 31 of the Selected Year. If your Amended Exercise Schedule includes more than one Selected Year, then your Amended Option generally will expire in traunches pursuant to your Amended Exercise Schedule, not later than December 31 of each of the Selected Years. In all cases, if you

<div align="center">3</div>

| POWER INTEGRATIONS, | RR Donnelley ProFile | geldoc | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_30 4 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

select the last calendar year of the current term of the underlying Curable Option as your Selected Year, you will not have the full calendar year to exercise your Amended Option, as you will remain subject to the existing expiration date of the underlying Curable Option.[4]

(v) If you incur a termination of your service with the Company and you are a member of senior management who is determined to be a "specified employee" (as defined under Section 409A) at the time of the termination, Section 409A generally requires us to implement a six month delay in the exercisability of your Amended Option. Therefore, to the extent reasonably necessary to comply with Section 409A, you may only exercise your Amended Option during the three-month period commencing on the first business day that is more than six months after your termination date. The Company will advise you at the time of your termination of service with the Company as to the period of time during which you may exercise your Amended Option.

(vi) Except as provided in Section II.B.2(v) above, an election to amend a Curable Option to reflect an Amended Exercise Schedule will not extend the period in which you may exercise the Amended Option. Except as provided in Section II.B.2(v) above, such election will have the sole effect of limiting the period(s) during which you may exercise the Amended Option.

3. Except as set forth in this Section II.B and Section III below, the remaining terms and conditions of your At Risk Options, including the portions that are Amended Options, will remain the same.[5]

## III.    PROVISIONS APPLICABLE REGARDLESS OF THE APPROACH SELECTED

You will receive no compensatory payments in connection with the amendment of any Curable Options.

You do not have to agree to amend any of your Curable Options. If you elect to amend more than one of your Curable Options, you may elect to amend one (or more) option(s) to reflect the Amended Exercise Price and one (or more) option(s) to reflect the Amended Exercise Schedule.

If you accept this offer to amend one or more of your Curable Options, such amendment will be effective as of the date on which you accepted this offer. The Company will issue you an amended option agreement for each Amended Option reflecting the amended terms and conditions. The amendment of your At Risk Options as to the Curable Options

---

[4]    You should be aware that a termination of employment in the last year of an option may result in the option not being exercisable for 6 months. If such termination were to occur less than six months prior to the termination date for the option, you may not be permitted to exercise such option and the option might expire unexercised. See Section II.B.2(v).

[5]    It should be noted that all At Risk Options will be deemed to be nonqualified stock options whether or not the option is amended pursuant to this offer and whether or not the option originally purported to be an incentive stock option.

| POWER INTEGRATIONS, | RR Donnelley ProFile | psldoc §§ | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_30 5 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
Page 1 of 1

will not materially affect the terms and conditions of the other option shares subject to the At Risk Options. This letter, and any amendment of your Curable Options, does not modify the at will nature of your service with the Company.

Please note that even if you accept this offer to amend your Curable Options, and regardless of the alternative that you choose, your ability to exercise your Amended Options will remain subject to compliance with applicable laws and requirements (including any legal limitations, requirements or restrictions arising from the Company's legal situation in relation to its equity compensation practices) and the Company's policies on trading in Company securities. In addition, in no event may you exercise your Options as to unvested shares.

Whether or not you choose to accept this offer, your Options will be deemed to be nonqualified stock options for federal income tax purposes and not incentive stock options.

Finally, while we believe that the acceptance of this offer should result in the avoidance of the potential adverse tax consequences under Section 409A with respect to the Amended Options, such interpretation is not free from doubt. Certain states have adopted tax laws that are similar in effect to Section 409A and we make no representations as to the effect of this offer under federal tax laws or such state tax provisions. In all cases, you will be solely responsible for any taxes, penalties, or interest payable under Section 409A (and any state laws of similar effect) in connection with your Options. Before deciding whether to accept our offer to amend your Curable Options, you are strongly encouraged to consult with your personal tax, financial and legal advisors.

## IV.   PROCEDURE TO ACCEPT OFFER

If you wish to accept this offer, you must complete the Election Form attached to this letter as <u>Exhibit B</u> and return it to Rafael Torres on or before the Expiration Date.

## V.   CIRCULAR 230 DISCLAIMER.

The following disclaimer is provided in accordance with the Internal Revenue Service's Circular 230 (21 CFR Part 10). This advice is not intended or written to be used, and it cannot be used, by you for the purpose of avoiding any penalties that may be imposed on you. This advice was written to support the promotion or marketing of amending your Curable Options as set forth in this letter. You should seek advice based on your particular circumstances from an independent tax advisor.

Sincerely,

/s/ Rafael Torres
Rafael Torres
Chief Financial Officer and
Vice President, Finance and Administration

5

| POWER INTEGRATIONS, | RR Donnelley ProFile | psldoc §ø | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_30 6 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

## EXHIBIT A

### OPTIONS

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | AMENDED EXERCISE PRICE | EXPIRATION DATE (ORIGINAL) | TOTAL SHARES UNDER OPTION | CURABLE OPTIONS |
|---|---|---|---|---|---|
| 1797 | $18.60 | $22.30 | 10/9/11 | 175,000 | 36,459 |
| 2067 | $14.82 | $21.20 | 2/20/12 | 6,747 | 1,968 |
| 2068 | $14.82 | $21.20 | 2/20/12 | 18,253 | 3,843 |
| 2182 | $17.75 | $18.95 | 1/7/13 | 5,633 | 2,934 |
| 2183 | $17.75 | $18.95 | 1/7/13 | 39,367 | 16,467 |

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc §6 | PAL delol0ma | 01-Mar-2007 07:15 EST | | 86507 EX10_30 7 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

## EXHIBIT B

### ELECTION FORM

I elect to amend the following At Risk Options to increase the current exercise price to the Amended Exercise Price as to all of the Curable Options subject to these At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | AMENDED EXERCISE PRICE |
|---|---|---|
| 2182 | $17.75 | $18.95 |
| 2183 | $17.75 | $18.95 |

I elect to amend the following At Risk Options to reflect an Amended Exercise Schedule as to all of the Curable Options subject to these At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | SELECTED YEAR | NUMBER OF CURABLE OPTIONS TO BE EXERCISABLE IN SELECTED YEAR* |
|---|---|---|---|
| 2067 | $14.82 | 2007 | 1,968 |
| 2068 | $14.82 | 2007 | 3,843 |
| 1797 | $18.60 | 2007 | 18,459 |
| 1797 | $18.60 | 2008 | 18,000 |

* If you choose to have an At Risk Option fully exercisable within a single calendar year, then this column should be equal to the number of "Curable Options" for that At Risk Option. If you choose to amend an At Risk Option such that its exercise schedule is split among two or more years, the sum of the entries in this column should be equal to the number of Curable Options for each At Risk Option.

7

| POWER INTEGRATIONS, | RR Donnelley ProFile | geldoc | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_30 8 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

I decline the amendment of the following At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | EXPIRATION DATE (ORIGINAL) | SHARES UNDER AT RISK OPTION | CURABLE OPTIONS |
|---|---|---|---|---|
| | | | | |

I understand the amendment of my At Risk Options as indicated on this Election Form (a) is subject to the terms and conditions set forth in the letter to me from the Company dated December 8, 2006 to which this Election Form is attached and (b) is irrevocable. I agree to execute such additional documentation as reasonably requested by the Company in connection with the amendment of my At Risk Options, including amended stock option agreements in respect of the At Risk Options that contain terms consistent with the terms of this Election Form.

I acknowledge that I am not required to accept the offer to amend my At Risk Options. I further acknowledge and agree that if I do not accept the offer as to any of my At Risk Options, such At Risk Options will remain outstanding on the terms granted to me. I understand that the Company is not providing me with any compensatory payments in connection with my election.

I understand that regardless of my election, I will be solely responsible for any adverse tax consequences that arise as a result of Section 409A in respect of my At Risk Options. I further acknowledge that the Company has not and is not providing me with any financial, legal or tax advice and has directed me to seek independent financial, legal and tax advice regarding my election. I have done so, or knowingly declined to do so.

/s/ John Tomlin
_____
Print Name: John Tomlin
Date:        December 21, 2006

8

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 05-Mar-2007 16:28 EST | | 86507 EX10_31 1 | 3* |
| FORM 10-K | START PAGE | | PAL | | image001 | HTM ESS | 1C |

Page 1 of 1

Exhibit 10.31



December 8, 2006

Mr. Clifford J. Walker

Dear Mr. Walker:

Power Integrations, Inc. (the "**Company**") has previously granted you the stock options set forth on the attached <u>Exhibit A</u> (the "**Options**") to purchase shares of the Company's common stock.

## I.    INTRODUCTION

The Company has determined that the grant dates of the Options for federal income tax purposes may have been dates other than the grant dates set forth in the documentation you received in connection with the Options. It is possible, therefore, that the Options were issued with an exercise price that is or may be less than 100% of the fair market value of the stock on the grant date for federal income tax purposes and therefore may be subject to adverse tax consequences under Section 409A of the Internal Revenue Code of 1986, as amended ("**Section 409A**"). These adverse tax consequences likely include, at a minimum, (i) ordinary income tax plus (ii) an additional 20% tax on the intrinsic value of the Option prior to and regardless of whether the Options are ever exercised plus (iii) an additional tax in the nature of interest. These adverse tax consequences apply to the extent that the Options (a) vested after December 31, 2004 and (b) were not exercised or otherwise cancelled on or before December 31, 2005. If a portion of one of your Options was vested as of December 31, 2004, only the unvested portion as of such date is potentially subject to Section 409A. <u>Exhibit A</u> indicates the shares subject to each of your Options that the Company believes are at risk for adverse tax consequences under Section 409A (the "**At Risk Options**").

Based on the currently available guidance and proposed regulations issued in connection with Section 409A, we believe that it is possible to avoid or minimize the potential adverse tax consequences that may apply under Section 409A in respect of your At Risk Options by amending the At Risk Options as to that part of the At Risk Options that remains outstanding and unexercised[1] (the "**Curable Options**")) using either (a) the Amended Exercise Price Approach as described in Section II.A, below or the Amended Exercise Schedule Approach as described in Section II.B, below. We refer to those Curable Options (or portions thereof) that you elect to amend as "**Amended Options**."

---

[1]    Note that to the extent that your At Risk Option is deemed to be beneficially owned by another person (e.g., pursuant to a qualified domestic relations order in favor of your former spouse), you must provide evidence satisfactory to the Company that you have the right to make an election to amend the Curable Options.

1

| POWER INTEGRATIONS, | RR Donnelley ProFile | gsldoc gg | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_31 2 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

You may also leave your Curable Options unchanged; however, if you elect to leave your Curable Options unchanged, the Company currently intends to treat such options as subject to Section 409A. In addition, the Company intends to treat as subject to Section 409A any portion of your At Risk Options that is not a Curable Option, and make the appropriate filings and tax withholdings on your At Risk Options as required by Section 409A. If you do not return a properly completed election form to the Company on or before December 29, 2006 (the "**Expiration Date**"), you will be deemed to have elected to leave your Curable Options unchanged.

II.    DESCRIPTION OF THE AVAILABLE AMENDMENT ALTERNATIVES

A.    THE AMENDED EXERCISE PRICE APPROACH

If you select the Amended Exercise Price Approach for a Curable Option, you are agreeing to increase the exercise price of the Curable Option to be equal to 100% of the fair market value of the Company's common stock on the date the Company is using as the measurement date for such Curable Option for the purposes of preparing its financial statements (the "**Amended Exercise Price**"). Such Amended Exercise Price is shown on <u>Exhibit A</u>. All other terms and conditions of the Curable Option will remain the same.[2]

B.    THE AMENDED EXERCISE SCHEDULE APPROACH

1. If you select the Amended Exercise Schedule Approach, you are agreeing to change the exercise (but not the vesting) schedule applicable to the Curable Options to provide that the At Risk Option may not be exercised as to the Curable Options prior to the earliest to occur of:

(i) the termination of your service with the Company for any reason,

(ii) your death,

(iii) your suffering a "disability" (as defined under Section 409A),

(iv) a "change in control" of the Company (as defined under Section 409A), or

(v) January 1 of one or more calendar years specified by you (with such year(s) not earlier than 2007 and not later than the year in which your At Risk Option will expire) (collectively such specified calendar years, the "**Selected Years,**" and each a "**Selected Year**") (this amendment alternative, the "**Amended Exercise Schedule**").[3] For each Curable Option, you may elect more than one Selected Year, making such

---

[2]    It should be noted that all At Risk Options will be deemed to be nonqualified stock options whether or not the option is amended pursuant to this offer and whether or not the option originally purported to be an incentive stock option.

[3]    The Compensation Committee of our Board of Directors will determine whether and when any of the events set forth in (i) through (iv) has occurred.

2

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc gg | PAL delol0ma | 01-Mar-2007 07:15 EST | | 86507 EX10_31 3 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

Page 1 of 1

option exercisable pursuant to a schedule adopted now. For example, assuming you had a fully vested Curable Option, you could elect an Amended Exercise Schedule making 50% of the Curable Option Exercisable in 2007 and 50% exercisable in 2008.

2. If you elect to amend a Curable Option to reflect an Amended Exercise Schedule:

(i) The Amended Exercise Schedule does not change the vesting schedule for your Curable Options. If a Curable Option is not fully vested at the time of your election and you choose more than one Selected Year, then shares will be allocated among the Selected Years based on vesting status to the greatest extent possible, with currently vested shares being allocated to the earliest Selected Year(s) and unvested shares allocated to the latest Selected Year(s). For example, if the Curable Option that you tender covers 400 shares, and is currently vested as to 100 shares, and you wish to select 2007 as the Selected Year as to 50 shares, 2008 as the Selected Year as to 100 shares, and 2009 as the Selected Year as to the remaining 250 shares, your Amended Option covering 50 shares will be fully vested as of the date your Curable Option is amended pursuant to the terms described herein, your Amended Option covering 100 shares will be 50% vested as of the Amendment Date, and your Amended Option covering 250 shares will be completely unvested as of the Amendment Date, and any future vesting will be deemed to occur as to the 100 share portion of the option prior to the 250 share portion of the option.

(ii) The exercise price of the Amended Option will not change. Instead, the Amended Option will no longer be exercisable (to the extent currently exercisable), and generally will only become exercisable again, if at all, on the date of the earliest to occur of the events described above under the Amended Exercise Schedule.

(iii) If your Amended Option becomes exercisable as a result of an event under the Amended Exercise Schedule other than the start of your Selected Year(s), your Amended Option generally will be exercisable only until the earlier of (a) the date the underlying Curable Option would cease to be exercisable in accordance with its terms (including upon the expiration of the three month post-termination exercise period applicable the underlying Curable Option) or (b) the later of (x) December 31 of the year in which the event occurs or (y) the 15th day of the third calendar month following the date on which the event occurs. However, you should be aware that if the event that triggers the right to exercise your Amended Option is a change in control of the Company, then, subject to the terms of the stock plan under which the underlying Curable Option was granted, the transaction agreement between the Company and the acquiring entity may provide for the termination of your Amended Option upon the consummation of the change in control (notwithstanding the terms of your Amended Exercise Schedule).

(iv) If the first event to occur is January 1 of your only Selected Year, your Amended Option generally will expire not later than December 31 of the Selected Year. If your Amended Exercise Schedule includes more than one Selected Year, then your Amended Option generally will expire in traunches pursuant to your Amended Exercise Schedule, not later than December 31 of each of the Selected Years. In all cases, if you

3

| POWER INTEGRATIONS, | RR Donnelley ProFile | gpldoc | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_31 4 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
|  |  |  |  |  | Page 1 of 1 | |

select the last calendar year of the current term of the underlying Curable Option as your Selected Year, you will not have the full calendar year to exercise your Amended Option, as you will remain subject to the existing expiration date of the underlying Curable Option.[4]

(v) If you incur a termination of your service with the Company and you are a member of senior management who is determined to be a "specified employee" (as defined under Section 409A) at the time of the termination, Section 409A generally requires us to implement a six month delay in the exercisability of your Amended Option. Therefore, to the extent reasonably necessary to comply with Section 409A, you may only exercise your Amended Option during the three-month period commencing on the first business day that is more than six months after your termination date. The Company will advise you at the time of your termination of service with the Company as to the period of time during which you may exercise your Amended Option.

(vi) Except as provided in Section II.B.2(v) above, an election to amend a Curable Option to reflect an Amended Exercise Schedule will not extend the period in which you may exercise the Amended Option. Except as provided in Section II.B.2(v) above, such election will have the sole effect of limiting the period(s) during which you may exercise the Amended Option.

3. Except as set forth in this Section II.B and Section III below, the remaining terms and conditions of your At Risk Options, including the portions that are Amended Options, will remain the same.[5]

## III.   PROVISIONS APPLICABLE REGARDLESS OF THE APPROACH SELECTED

You will receive no compensatory payments in connection with the amendment of any Curable Options.

You do not have to agree to amend any of your Curable Options. If you elect to amend more than one of your Curable Options, you may elect to amend one (or more) option(s) to reflect the Amended Exercise Price and one (or more) option(s) to reflect the Amended Exercise Schedule.

If you accept this offer to amend one or more of your Curable Options, such amendment will be effective as of the date on which you accepted this offer. The Company will issue you an amended option agreement for each Amended Option reflecting the amended terms and conditions. The amendment of your At Risk Options as to the Curable Options

---

[4]   You should be aware that a termination of employment in the last year of an option may result in the option not being exercisable for 6 months. If such termination were to occur less than six months prior to the termination date for the option, you may not be permitted to exercise such option and the option might expire unexercised. See Section II.B.2(v).

[5]   It should be noted that all At Risk Options will be deemed to be nonqualified stock options whether or not the option is amended pursuant to this offer and whether or not the option originally purported to be an incentive stock option.

4

| POWER INTEGRATIONS, | RR Donnelley ProFile | gg!doc | PAL delol0ma | 01-Mar-2007 07:15 EST | | 86507 EX10_31 5 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |
| | | | | | | Page 1 of 1 | |

will not materially affect the terms and conditions of the other option shares subject to the At Risk Options. This letter, and any amendment of your Curable Options, does not modify the at will nature of your service with the Company.

Please note that even if you accept this offer to amend your Curable Options, and regardless of the alternative that you choose, your ability to exercise your Amended Options will remain subject to compliance with applicable laws and requirements (including any legal limitations, requirements or restrictions arising from the Company's legal situation in relation to its equity compensation practices) and the Company's policies on trading in Company securities. In addition, in no event may you exercise your Options as to unvested shares.

Whether or not you choose to accept this offer, your Options will be deemed to be nonqualified stock options for federal income tax purposes and not incentive stock options.

Finally, while we believe that the acceptance of this offer should result in the avoidance of the potential adverse tax consequences under Section 409A with respect to the Amended Options, such interpretation is not free from doubt. Certain states have adopted tax laws that are similar in effect to Section 409A and we make no representations as to the effect of this offer under federal tax laws or such state tax provisions. In all cases, you will be solely responsible for any taxes, penalties, or interest payable under Section 409A (and any state laws of similar effect) in connection with your Options. Before deciding whether to accept our offer to amend your Curable Options, you are strongly encouraged to consult with your personal tax, financial and legal advisors.

## IV.    PROCEDURE TO ACCEPT OFFER

If you wish to accept this offer, you must complete the Election Form attached to this letter as <u>Exhibit B</u> and return it to Rafael Torres on or before the Expiration Date.

## V.    CIRCULAR 230 DISCLAIMER.

The following disclaimer is provided in accordance with the Internal Revenue Service's Circular 230 (21 CFR Part 10). This advice is not intended or written to be used, and it cannot be used, by you for the purpose of avoiding any penalties that may be imposed on you. This advice was written to support the promotion or marketing of amending your Curable Options as set forth in this letter. You should seek advice based on your particular circumstances from an independent tax advisor.

Sincerely,

/s/ Rafael Torres
Rafael Torres
Chief Financial Officer and
Vice President, Finance and Administration

5

| POWER INTEGRATIONS, | RR Donnelley ProFile | caldoc | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_31 6 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

## EXHIBIT A

### OPTIONS

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | AMENDED EXERCISE PRICE | EXPIRATION DATE (ORIGINAL) | TOTAL SHARES UNDER OPTION | CURABLE OPTIONS |
|---|---|---|---|---|---|
| 1274 | $12.10 | $16.00 | 5/30/11 | 8,264 | 861 |
| 1275 | $12.10 | $16.00 | 5/30/11 | 26,736 | 2,785 |
| 2075 | $14.82 | $21.20 | 2/20/12 | 6,747 | 1,968 |
| 2076 | $14.82 | $21.20 | 2/20/12 | 58,253 | 16,991 |
| 2184 | $17.75 | $18.95 | 1/7/13 | 5,633 | 2,934 |
| 2185 | $17.75 | $18.95 | 1/7/13 | 39,367 | 20,504 |

6

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc §6 | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_31 7 | 1* |
| FORM 10-K | | ▮ | PAL | | HTM IFV | 1C |

Page 1 of 1

**EXHIBIT B**

ELECTION FORM

I elect to amend the following At Risk Options to increase the current exercise price to the Amended Exercise Price as to all of the Curable Options subject to these At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | AMENDED EXERCISE PRICE |
| --- | --- | --- |
| 2184 | $17.75 | $18.95 |
| 2185 | $17.75 | $18.95 |

I elect to amend the following At Risk Options to reflect an Amended Exercise Schedule as to all of the Curable Options subject to these At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | SELECTED YEAR | NUMBER OF CURABLE OPTIONS TO BE EXERCISABLE IN SELECTED YEAR* |
| --- | --- | --- | --- |
| 1274 | $12.10 | 2007 | 861 |
| 1275 | $12.10 | 2007 | 2,785 |
| 2075 | $14.82 | 2007 | 1,968 |
| 2076 | $14.82 | 2008 | 6,991 |
| 2076 | $14.82 | 2009 | 10,000 |

* If you choose to have an At Risk Option fully exercisable within a single calendar year, then this column should be equal to the number of "Curable Options" for that At Risk Option. If you choose to amend an At Risk Option such that its exercise schedule is split among two or more years, the sum of the entries in this column should be equal to the number of Curable Options for each At Risk Option.

7

| POWER INTEGRATIONS, | RR Donnelley ProFile | ggⁱᵈᵒᶜ | PAL delol0ma | 01-Mar-2007 07:15 EST | | 86507 EX10_31 8 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

I decline the amendment of the following At Risk Options:

| GRANT NUMBER | OPTION PRICE (ORIGINAL) | EXPIRATION DATE (ORIGINAL) | SHARES UNDER AT RISK OPTION | CURABLE OPTIONS |
|---|---|---|---|---|
| | | | | |

I understand the amendment of my At Risk Options as indicated on this Election Form (a) is subject to the terms and conditions set forth in the letter to me from the Company dated December 8, 2006 to which this Election Form is attached and (b) is irrevocable. I agree to execute such additional documentation as reasonably requested by the Company in connection with the amendment of my At Risk Options, including amended stock option agreements in respect of the At Risk Options that contain terms consistent with the terms of this Election Form.

I acknowledge that I am not required to accept the offer to amend my At Risk Options. I further acknowledge and agree that if I do not accept the offer as to any of my At Risk Options, such At Risk Options will remain outstanding on the terms granted to me. I understand that the Company is not providing me with any compensatory payments in connection with my election.

I understand that regardless of my election, I will be solely responsible for any adverse tax consequences that arise as a result of Section 409A in respect of my At Risk Options. I further acknowledge that the Company has not and is not providing me with any financial, legal or tax advice and has directed me to seek independent financial, legal and tax advice regarding my election. I have done so, or knowingly declined to do so.

/s/ Clifford J. Walker
_____
Print Name: Clifford J. Walker
Date:          December 21, 2006

| POWER INTEGRATIONS, | RR Donnelley ProFile | gs/doc | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_32 1 | 1* |
| FORM 10-K | START PAGE | | PAL | | HTM IFV | 1C |

Exhibit 10.32

### ACKNOWLEDGMENT AND WAIVER

THIS ACKNOWLEDGMENT AND WAIVER is made as of February 20, 2007, by and between POWER INTEGRATIONS, INC., a Delaware corporation, (the "*Company*") and ALAN BICKELL ("*Director*").

### RECITALS

WHEREAS, the Company has determined that certain of the option agreements previously executed by Director, which correspond to the option grant numbers listed on Exhibit A (the "*Noncompliant Option Agreements*"), do not correctly reflect the date of grant and exercise price of the options granted to Director pursuant to the 1997 Outside Directors Stock Option Plan (the "*Directors Plan*"); and

WHEREAS, Director has executed appropriate option agreements reflecting the correct dates of grant and exercise prices prescribed by the Directors Plan as set forth on Exhibit A (the "*Appropriate Option Agreements*");

NOW, THEREFORE, in consideration of the mutual agreements, covenants and considerations contained herein, the undersigned hereby agree and acknowledge as follows:

**1.** Director and the Company acknowledge and agree that the Noncompliant Option Agreements contained administrative errors and were not the appropriate option agreements relating to the options that Director was automatically granted under the Directors Plan;

**2.** Director and the Company further acknowledge and agree that the Appropriate Option Agreements supersede the Noncompliant Option Agreements and constitute the exclusive agreements between the parties with respect to the subject options. Director and the Company hereby waive any rights each may respectively have had in connection with or arising out of the Noncompliant Option Agreements.

**3.** Director and Company further acknowledge and agree that, with respect to any option exercised in whole or in part by Director pursuant to a Noncompliant Option Agreement, Director shall provide to the Company, with respect to each share of Common Stock acquired upon exercise of such option, the amount by which the correct exercise price of such option exceeds the exercise price paid by Director at the time of the exercise of such option.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

1

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_32 2 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

IN WITNESS WHEREOF, the undersigned have executed this ACKNOWLEDGEMENT AND WAIVER as of the day and year first set forth above.

COMPANY:                                    POWER INTEGRATIONS, INC.

                                            By:    /s/ Rafael Torres
                                            Name:  Rafael Torres
                                            Title: CFO


DIRECTOR:                                   /s/ Alan Bickell
                                            Alan Bickell

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_32 3 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

## EXHIBIT A

### OUTSIDE DIRECTOR OPTIONS

| Director | Option Grant No. | Number of Shares | Date of Option Grant Set Forth in the Noncompliant Option Agreement | Exercise Price ($) Set Forth in the Noncompliant Option Agreement | Correct Date of Option Grant | Correct Exercise Price ($) |
|---|---|---|---|---|---|---|
| A. Bickell | 000885 | 10,000 | Dec. 13, 1999 | 43.875 | April 21, 2000 | 21.375* |
| A. Bickell | 001193 | 10,000 | Dec. 12, 2000 | 15.500 | April 21, 2001 | 21.050* |
| A. Bickell | 001800 | 10,000 | Dec. 12, 2001 | 24.590 | April 21, 2002 | 19.200* |
| A. Bickell | 002162 | 10,000 | Dec. 12, 2002 | 19.020 | April 21, 2003 | 22.120 |
| A. Bickell | 002502 | 10,000 | Dec. 12, 2003 | 33.850 | April 21, 2004 | 31.700 |

\* Closing price on the last trading day prior to the Anniversary Date, as the Anniversary Date was not a trading day.

| POWER INTEGRATIONS, | RR Donnelley ProFile | ₉gᵃˡᵈᵒᶜ₉ᵇ | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_33 1 | 1* |
| FORM 10-K | START PAGE | | PAL | | HTM IFV | 1C |

Exhibit 10.33

### ACKNOWLEDGMENT AND WAIVER

THIS ACKNOWLEDGMENT AND WAIVER is made as of February 20, 2007, by and between POWER INTEGRATIONS, INC., a Delaware corporation, (the "*Company*") and NICHOLAS BRATHWAITE ("*Director*").

### RECITALS

WHEREAS, the Company has determined that certain of the option agreements previously executed by Director, which correspond to the option grant numbers listed on Exhibit A (the "*Noncompliant Option Agreements*"), do not correctly reflect the date of grant and exercise price of the options granted to Director pursuant to the 1997 Outside Directors Stock Option Plan (the "*Directors Plan*"); and

WHEREAS, Director has executed appropriate option agreements reflecting the correct dates of grant and exercise prices prescribed by the Directors Plan as set forth on Exhibit A (the "*Appropriate Option Agreements*");

NOW, THEREFORE, in consideration of the mutual agreements, covenants and considerations contained herein, the undersigned hereby agree and acknowledge as follows:

**1.** Director and the Company acknowledge and agree that the Noncompliant Option Agreements contained administrative errors and were not the appropriate option agreements relating to the options that Director was automatically granted under the Directors Plan;

**2.** Director and the Company further acknowledge and agree that the Appropriate Option Agreements supersede the Noncompliant Option Agreements and constitute the exclusive agreements between the parties with respect to the subject options. Director and the Company hereby waive any rights each may respectively have had in connection with or arising out of the Noncompliant Option Agreements.

**3.** Director and Company further acknowledge and agree that, with respect to any option exercised in whole or in part by Director pursuant to a Noncompliant Option Agreement, Director shall provide to the Company, with respect to each share of Common Stock acquired upon exercise of such option, the amount by which the correct exercise price of such option exceeds the exercise price paid by Director at the time of the exercise of such option.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

1

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_33 2 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |
| | | | | | Page 1 of 1 | |

IN WITNESS WHEREOF, the undersigned have executed this ACKNOWLEDGEMENT AND WAIVER as of the day and year first set forth above.

COMPANY:                          POWER INTEGRATIONS, INC.

                                  By:     /s/ Rafael Torres
                                  Name:   Rafael Torres
                                  Title:  CFO

DIRECTOR:                                 /s/ Nicholas Brathwaite
                                          Nicholas Brathwaite

## EXHIBIT A

### OUTSIDE DIRECTOR OPTIONS

| Director | Option Grant No. | Number of Shares | Date of Option Grant Set Forth in the Noncompliant Option Agreement | Exercise Price ($) Set Forth in the Noncompliant Option Agreement | Correct Date of Option Grant | Correct Exercise Price ($) |
|---|---|---|---|---|---|---|
| N. Brathwaite | 001194 | 10,000 | Dec. 12, 2000 | 15.500 | Jan. 31, 2001 | 22.250 |
| N. Brathwaite | 001801 | 10,000 | Dec. 12, 2001 | 24.590 | Jan. 31, 2002 | 18.100 |
| N. Brathwaite | 002166 | 10,000 | Dec. 12, 2002 | 19.020 | Jan. 31, 2003 | 21.610 |
| N. Brathwaite | 002503 | 10,000 | Dec. 12, 2003 | 33.850 | Jan. 31, 2004 | 29.500* |

\* Closing price on the last trading day prior to the Anniversary Date, as the Anniversary Date was not a trading day.

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc 9.6 | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_34 1 | 1* |
|---|---|---|---|---|---|---|
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

Exhibit 10.34

### ACKNOWLEDGMENT AND WAIVER

THIS ACKNOWLEDGMENT AND WAIVER is made as of February 20, 2007, by and between POWER INTEGRATIONS, INC., a Delaware corporation, (the "*Company*") and R. SCOTT BROWN ("*Director*").

### RECITALS

WHEREAS, the Company has determined that certain of the option agreements previously executed by Director, which correspond to the option grant numbers listed on Exhibit A (the "*Noncompliant Option Agreements*"), do not correctly reflect the date of grant and exercise price of the options granted to Director pursuant to the 1997 Outside Directors Stock Option Plan (the "*Directors Plan*"); and

WHEREAS, Director has executed appropriate option agreements reflecting the correct dates of grant and exercise prices prescribed by the Directors Plan as set forth on Exhibit A (the "*Appropriate Option Agreements*");

NOW, THEREFORE, in consideration of the mutual agreements, covenants and considerations contained herein, the undersigned hereby agree and acknowledge as follows:

1. Director and the Company acknowledge and agree that the Noncompliant Option Agreements contained administrative errors and were not the appropriate option agreements relating to the options that Director was automatically granted under the Directors Plan;

2. Director and the Company further acknowledge and agree that the Appropriate Option Agreements supersede the Noncompliant Option Agreements and constitute the exclusive agreements between the parties with respect to the subject options. Director and the Company hereby waive any rights each may respectively have had in connection with or arising out of the Noncompliant Option Agreements.

3. Director and Company further acknowledge and agree that, with respect to any option exercised in whole or in part by Director pursuant to a Noncompliant Option Agreement, Director shall provide to the Company, with respect to each share of Common Stock acquired upon exercise of such option, the amount by which the correct exercise price of such option exceeds the exercise price paid by Director at the time of the exercise of such option.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

1

| POWER INTEGRATIONS, | RR Donnelley ProFile | | PAL delol0ma | 01-Mar-2007 07:15 EST | | 86507 EX10_34 2 | 1* |
| FORM 10-K | | | PAL | | | HTM IFV | 1C |

IN WITNESS WHEREOF, the undersigned have executed this ACKNOWLEDGEMENT AND WAIVER as of the day and year first set forth above.

COMPANY:                          POWER INTEGRATIONS, INC.

                                  By:    /s/ Rafael Torres
                                  Name:  Rafael Torres
                                  Title: CFO

DIRECTOR:                         /s/ R. Scott Brown
                                  R. Scott Brown

| POWER INTEGRATIONS, | RR Donnelley ProFile | galdoc | PAL delol0ma | 01-Mar-2007 07:15 EST | 86507 EX10_34 3 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

## EXHIBIT A

### OUTSIDE DIRECTOR OPTIONS

| Director | Option Grant No. | Number of Shares | Date of Option Grant Set Forth in the Noncompliant Option Agreement | Exercise Price ($) Set Forth in the Noncompliant Option Agreement | Correct Date of Option Grant | Correct Exercise Price ($) |
|---|---|---|---|---|---|---|
| S. Brown | 000722 | 30,000 | July 23, 1999 | 25.969** | July 15, 1999 | 35.875** |
| S. Brown | 000886 | 10,000 | Dec. 13, 1999 | 43.875 | July 15, 2000 | 24.500* |
| S. Brown | 001195 | 10,000 | Dec. 12, 2000 | 15.500 | July 15, 2001 | 17.000* |
| S. Brown | 001802 | 10,000 | Dec. 12, 2001 | 24.590 | July 15, 2002 | 17.790 |
| S. Brown | 002163 | 10,000 | Dec. 12, 2002 | 19.020 | July 15, 2003 | 27.300 |
| S. Brown | 002504 | 10,000 | Dec. 12, 2003 | 33.850 | July 15, 2004 | 22.740 |
| S. Brown | 003237 | 10,000 | July 25, 2005 | 22.440 | July 15, 2005 | 23.220 |

\*     Closing price on the last trading day prior to the Anniversary Date, as the Anniversary Date was not a trading day.

\*\*    Reflects 2-for-1 stock split on November 22, 1999.

| POWER INTEGRATIONS, | RR Donnelley ProFile | gsldoc | PAL delol0ma | 01-Mar-2007 07:16 EST | 86507 EX10_35 1 | 1* |
| FORM 10-K | START PAGE | | PAL | | HTM IFV | 1C |

Page 1 of 1

**Exhibit 10.35**

## POWER INTEGRATIONS, INC.

### AMENDMENT NO. 1 TO
### NONSTATUTORY STOCK OPTION AGREEMENTS FOR OUTSIDE DIRECTORS

This Amendment No. 1 (the "*Amendment*") to those certain Nonstatutory Stock Option Agreements for Outside Directors between Power Integrations, Inc. (the "*Company*") and Alan Bickell (the "*Optionee*") relating to option grant numbers 000885, 001800 and 002502 (collectively, the "*Options*") and each dated February 20, 2007 (collectively, the "*Option Agreements*"), is made and entered into as of February 20, 2007, by and between the Company and Optionee pursuant to Section 13 of the Option Agreements.

### RECITALS

WHEREAS, the Company and Optionee have determined that the option agreements initially executed by the Company and the Optionee relating to Options (the "*Noncompliant Option Agreements*") did not correctly reflect the dates of grant and exercise prices of the Options, as automatically granted to the Optionee pursuant to the 1997 Outside Directors Stock Option Plan (the "*Directors Plan*"), due to administrative error;

WHEREAS, the Noncompliant Option Agreements have been superseded by the Option Agreements, which reflect the correct dates of grant and exercise prices prescribed by the Directors Plan;

WHEREAS, the exercise prices set forth in the Option Agreements, which reflect the correct exercise prices prescribed by the Directors Plan, are lower than the erroneous exercise prices set forth in the Noncompliant Option Agreements; and

WHEREAS, the Optionee desires to increase the exercise prices set forth in the Option Agreements so as to ensure that Optionee does not receive any benefit from the correction of the Noncompliant Option Agreements.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual agreements and considerations contained herein, the receipt of which are hereby acknowledged, the undersigned hereby agree as follows:

1. Section 1.1(c) of the Option Agreement:

(a) with respect to the Option with the Grant Number 000885 is hereby amended in its entirety to read as follows: "*Exercise Price*" means $43.875 per share of Stock (which reflects the 2-for-1 stock split on November 22, 1999), as adjusted from time to time pursuant to Section 9;

**(b)** with respect to the Option with the Grant Number 001800 is hereby amended in its entirety to read as follows: "*Exercise Price*" means $24.590 per share of Stock (which reflects the 2-for-1 stock split on November 22, 1999), as adjusted from time to time pursuant to Section 9; and

**(c)** with respect to the Option with the Grant Number 002502 is hereby amended in its entirety to read as follows: "*Exercise Price*" means $33.850 per share of Stock (which reflects the 2-for-1 stock split on November 22, 1999), as adjusted from time to time pursuant to Section 9.

**2.** Except as set forth in this Amendment, the Option Agreements shall remain in full force and effect.

**3.** This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto executed this AMENDMENT as of the date first written above.

COMPANY:                                          POWER INTEGRATIONS, INC.

                                                  By:    /s/ Rafael Torres
                                                  Name:  Rafael Torres
                                                  Title: CFO

OPTIONEE:                                         /s/ Alan Bickell
                                                  Alan Bickell

| POWER INTEGRATIONS, | RR Donnelley ProFile | CHWFBU-MWS-CX06.18 | PAL delol0ma | 01-Mar-2007 08:45 EST | | 86507 EX10_36 1 | 3* |
| FORM 10-K | | | PAL | | | HTM ESS | 1C |

Page 1 of 1

**Exhibit 10.36**

## POWER INTEGRATIONS, INC.

### AMENDMENT NO. 1 TO
### NONSTATUTORY STOCK OPTION AGREEMENTS FOR OUTSIDE DIRECTORS

This Amendment No. 1 (the "*Amendment*") to those certain Nonstatutory Stock Option Agreements for Outside Directors between Power Integrations, Inc. (the "*Company*") and Nicholas Brathwaite (the "*Optionee*") relating to option grant numbers 001801 and 002503 (collectively, the "*Options*") and each dated February 20, 2007 (collectively, the "*Option Agreements*"), is made and entered into as of February 20, 2007, by and between the Company and Optionee pursuant to Section 13 of the Option Agreements.

### RECITALS

WHEREAS, the Company and Optionee have determined that the option agreements initially executed by the Company and the Optionee relating to Options (the "*Noncompliant Option Agreements*") did not correctly reflect the dates of grant and exercise prices of the Options, as automatically granted to the Optionee pursuant to the 1997 Outside Directors Stock Option Plan (the "*Directors Plan*"), due to administrative error;

WHEREAS, the Noncompliant Option Agreements have been superseded by the Option Agreements, which reflect the correct dates of grant and exercise prices prescribed by the Directors Plan;

WHEREAS, the exercise prices set forth in the Option Agreements, which reflect the correct exercise prices prescribed by the Directors Plan, are lower than the erroneous exercise prices set forth in the Noncompliant Option Agreements; and

WHEREAS, the Optionee desires to increase the exercise prices set forth in the Option Agreements so as to ensure that Optionee does not receive any benefit from the correction of the Noncompliant Option Agreements.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual agreements and considerations contained herein, the receipt of which are hereby acknowledged, the undersigned hereby agree as follows:

1. Section 1.1(c) of the Option Agreement:

(a) with respect to the Option with the Grant Number 001801 is hereby amended in its entirety to read as follows: "*Exercise Price*" means $24.590 per share of Stock (which reflects the 2-for-1 stock split on November 22, 1999), as adjusted from time to time pursuant to Section 9; and

(b) with respect to the Option with the Grant Number 002503 is hereby amended in its entirety to read as follows: "*Exercise Price*" means $33.850 per share of Stock (which reflects the 2-for-1 stock split on November 22, 1999), as adjusted from time to time pursuant to Section 9.

2. Except as set forth in this Amendment, the Option Agreements shall remain in full force and effect.

3. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto executed this AMENDMENT as of the date first written above.

COMPANY:                                    POWER INTEGRATIONS, INC.

                                            By:    /s/ Rafael Torres
                                            Name: Rafael Torres
                                            Title:  CFO

OPTIONEE:                                   /s/ Nicholas Brathwaite
                                            Nicholas Brathwaite

| POWER INTEGRATIONS, | RR Donnelley ProFile | geldoc gg | PAL delol0ma | 01-Mar-2007 07:16 EST | 86507 EX10_37 1 | 1* |
| FORM 10-K | | | PAL | | HTM IFV | 1C |

Page 1 of 1

**Exhibit 10.37**

## POWER INTEGRATIONS, INC.

### AMENDMENT NO. 1 TO
### NONSTATUTORY STOCK OPTION AGREEMENTS FOR OUTSIDE DIRECTORS

This Amendment No. 1 (the "*Amendment*") to those certain Nonstatutory Stock Option Agreements for Outside Directors between Power Integrations, Inc. (the "*Company*") and Scott Brown (the "*Optionee*") relating to option grant numbers 000886, 001802 and 002504 (collectively, the "*Options*") and each dated February 20, 2007 (collectively, the "*Option Agreements*"), is made and entered into as of February 20, 2007, by and between the Company and Optionee pursuant to Section 13 of the Option Agreements.

### RECITALS

WHEREAS, the Company and Optionee have determined that the option agreements initially executed by the Company and the Optionee relating to Options (the "*Noncompliant Option Agreements*") did not correctly reflect the dates of grant and exercise prices of the Options, as automatically granted to the Optionee pursuant to the 1997 Outside Directors Stock Option Plan (the "*Directors Plan*"), due to administrative error;

WHEREAS, the Noncompliant Option Agreements have been superseded by the Option Agreements, which reflect the correct dates of grant and exercise prices prescribed by the Directors Plan;

WHEREAS, the exercise prices set forth in the Option Agreements, which reflect the correct exercise prices prescribed by the Directors Plan, are lower than the erroneous exercise prices set forth in the Noncompliant Option Agreements; and

WHEREAS, the Optionee desires to increase the exercise prices set forth in the Option Agreements so as to ensure that Optionee does not receive any benefit from the correction of the Noncompliant Option Agreements.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual agreements and considerations contained herein, the receipt of which are hereby acknowledged, the undersigned hereby agree as follows:

1. Section 1.1(c) of the Option Agreement:

(a) with respect to the Option with the Grant Number 000886 is hereby amended in its entirety to read as follows: "*Exercise Price*" means $43.875 per share of Stock (which reflects the 2-for-1 stock split on November 22, 1999), as adjusted from time to time pursuant to Section 9;

**(b)** with respect to the Option with the Grant Number 001802 is hereby amended in its entirety to read as follows: "*Exercise Price*" means $24.590 per share of Stock (which reflects the 2-for-1 stock split on November 22, 1999), as adjusted from time to time pursuant to Section 9; and

**(c)** with respect to the Option with the Grant Number 002504 is hereby amended in its entirety to read as follows: "*Exercise Price*" means $33.850 per share of Stock (which reflects the 2-for-1 stock split on November 22, 1999), as adjusted from time to time pursuant to Section 9.

**2.** Except as set forth in this Amendment, the Option Agreements shall remain in full force and effect.

**3.** This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto executed this AMENDMENT as of the date first written above.

COMPANY:                                     POWER INTEGRATIONS, INC.

                                             By:    /s/ Rafael Torres
                                             Name:  Rafael Torres
                                             Title: CFO

OPTIONEE:                                    /s/ R. Scott Brown
                                             Scott Brown

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 08-Mar-2007 16:06 EST | 86507 EX21_1 1 | 2* |
| FORM 10-K | START PAGE | | ■ PAL | | HTM PMT | 1C |

Page 1 of 1

**Exhibit 21.1**

| LIST OF SUBSIDIARIES | JURISDICTION OF INCORPORATION |
| --- | --- |
| Power Integrations KK | Japan |
| Power Integrations Limited | Cayman Islands |
| Power Integrations International Limited | Cayman Islands |
| Power Integrations Singapore Pte. Limited | Singapore |
| Power Integrations Netherlands B.V. | Netherlands |
| Power Integrations GmbH | Germany |
| Power Integrations Italy S.r.l | Italy |
| Power Integrations (Europe) Limited | United Kingdom |
| Power Integrations India Private Limited | India |

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUDSK141063 9.6.18 PAL hecknOpa | 08-Mar-2007 16:06 EST | 86507 EX31_1 1 | 3* |
|---|---|---|---|---|---|
| FORM 10-K | START PAGE | ■ PAL | | HTM PMT | 1C |

Page 1 of 1

**Exhibit 31.1**

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER

I, Balu Balakrishnan, Chief Executive Officer of the registrant, certify that:

1. I have reviewed this annual report on Form 10-K of Power Integrations, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: March 6, 2007          By:           /s/   BALU BALAKRISHNAN

                                                   **Balu Balakrishnan**
                                             **Chief Executive Officer**

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 08-Mar-2007 16:04 EST | | 86507 EX31_2 1 | 3* |
| FORM 10-K | START PAGE | | PAL | | | HTM PMT | 1C |

Page 1 of 1

**Exhibit 31.2**

## CERTIFICATION OF CHIEF FINANCIAL OFFICER

I, Rafael Torres, Chief Financial Officer of the registrant, certify that:

1. I have reviewed this annual report on Form 10-K of Power Integrations, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Dated: March 6, 2007                     By:    _____/s/    RAFAEL TORRES_____
                                                                    **Rafael Torres**
                                                                    **Chief Financial Officer**

| POWER INTEGRATIONS, | RR Donnelley ProFile | PALFBUAC152160 9.6.18 | PAL sarucOpa | 08-Mar-2007 16:05 EST | 86507 EX32_1 1 | 3* |
| FORM 10-K | | ■ | PAL | | HTM PMT | 1C |
| | | | | | Page 1 of 1 | |

**Exhibit 32.1**

## CERTIFICATION OF CHIEF EXECUTIVE OFFICER

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), Balu Balakrishnan, Chief Executive Officer of Power Integrations, Inc. (the "Company"), hereby certifies that, to the best of his knowledge:

1. The Company's Annual Report on Form 10-K for the period ended December 31, 2005, to which this Certification is attached as Exhibit 32.1 (the "Annual Report") fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

2. The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**In Witness Whereof,** the undersigned has set his hand hereto as of the 6th day of March, 2007.

By:      /s/   BALU BALAKRISHNAN
Balu Balakrishnan
Chief Executive Officer

*A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to the Registrant and will be retained by the Registrant and furnished to the Securities and Exchange Commission or its staff upon request.*

This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Power Integrations, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.

Page 1 of 1

**Exhibit 32.2**

## CERTIFICATION OF CHIEF FINANCIAL OFFICER

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), Rafael Torres, Chief Financial Officer of Power Integrations, Inc. (the "Company"), hereby certifies that, to the best of his knowledge:

1.  The Company's Annual Report on Form 10-K for the period ended December 31, 2005, to which this Certification is attached as Exhibit 32.1 (the "Annual Report") fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

2.  The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**In Witness Whereof**, the undersigned has set his hand hereto as of the 6th day of March, 2007.

By: _____ /s/ RAFAEL TORRES _____

Rafael Torres
Chief Financial Officer

*A signed original of this written statement required by Section 906, or other document authenticating, acknowledging, or otherwise adopting the signature that appears in typed form within the electronic version of this written statement required by Section 906, has been provided to the Registrant and will be retained by the Registrant and furnished to the Securities and Exchange Commission or its staff upon request.*

This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Power Integrations, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.

# Exhibit L

```
          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF DELAWARE


POWER INTEGRATIONS, INC., ) Trial Volume III
                          )
          Plaintiff,      )
                          ) C.A. No. 04-1371-JJF
v.                        )
                          )
FAIRCHILD SEMICONDUCTOR   )
INTERNATIONAL, INC., and  )
FAIRCHILD SEMICONDUCTOR   )
CORPORATION,              )
                          )
          Defendants.     )
```



```
               Wednesday, September 19, 2007
               9:05 a.m.
               Courtroom 4B


               844 King Street
               Wilmington, Delaware


   BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
            United States District Court Judge




   APPEARANCES:


            FISH & RICHARDSON
            BY:  WILLIAM J. MARSDEN, JR., ESQ.
            BY:  FRANK E. SCHERKENBACH, ESQ.
            BY:  HOWARD G. POLLACK, ESQ.
            BY:  MICHAEL R. HEADLEY, ESQ.


                 Counsel for the Plaintiff
```

1           A.   Yes, I do.  I went to UCLA.  I got

2       a master degrees in electrical engineering from

3       UCLA.  I also took some courses from Stanford

4       and UC Berkley, engineering courses.

5           Q.   Have you received any patents for

6       your work at Power Integrations?

7           A.   Yes, I have.  To date I have

8       ninety-seven issued U.S. patents and I have a

9       number of others pending.

10          Q.   And are you an inventor on some of

11      the patents that we've been talking about in

12      this case?

13          A.   Yes, I am.  I am named as the

14      inventor on three of the four patents in this

15      case.

16          Q.   And which patents are those?

17          A.   Those are the three circuit

18      patents, the '851, '366, and '876.

19          Q.   Before we get into the details of

20      the patents, I would like to touch on the

21      business of Power Integrations.

22               What kind of products does Power

23      Integrations make?

24          A.   We make a semiconductor ICE that's

1    used in building power supplies.

2         Q.  We have talked generally about

3    what power supplies are.  Is there something

4    special about Power Integrations products?

5         A.  Yes, they make the power supplies

6    much smaller, lighter, very reliable because it

7    has fewer components, energy efficient.  And

8    they also make the power supply easier to design

9    and manufacture.

10         Q.  What generally, what kind of

11    products for the ladies and gentlemen of the

12    jury, what kind of products would have Power

13    Integrations chips in them?

14         A.  Well, it could be any electronic

15    product that is plugged into the wall, it could

16    be a cell phone, your, you know, cordless phone,

17    PC, and so on and so forth.

18         Q.  If you turn to what's marked PX

19    324 in your book there.  What is PX 324?

20         A.  This is a presentation that is

21    made to a customer, in this particular case it

22    looks like Siltron.

23         Q.  I'm going to put up a page for

24    that, this is ED 1201.  What is this showing us?

1    A.   This is a standard presentation

2    that we make to customers.  It just shows some

3    examples of products that our chip or IC would

4    go into.  For example, you have IPod, you have a

5    charger for the IPod, charger for a cell phone,

6    monitor, a standby power supply for a PC, TV

7    standby power supply, industrial, refrigerators.

8    All of them need a power supply and a chip to go

9    into them.

10    Q.   Are there PI based power supplies

11   of a particular kind or class?

12    A.   They're called switched mode power

13   supplies.  I think we have talked about it a

14   little bit this week.

15    Q.   Are there other kinds of power

16   supplies?

17    A.   Yes, there is a power supply that

18   I'm sure all of us have come across which is

19   called a linear power supply.  And this is a

20   very, very old technology.

21    Q.   If you would turn to PX 62 in your

22   book.  What is that?

23    A.   This is a fact sheet from your

24   website.

```
 1              Q.   What is this showing us?

 2              A.   Well this shows the linear power

 3    supply on the top, it's also known as bricks.

 4    And we would see them all around the house, you

 5    know, they are plugged into the wall outlet.

 6    They are very heavy, and they are very energy

 7    inefficient.

 8              And at the bottom, we have the

 9    electronic power supply which is also known as

10    the switched mode power supply.  So this

11    particular one uses our Power Integrations chip

12    which makes it smaller, lighter, and energy

13    efficient.

14              Q.   Have you heard of something called

15    a discrete power supply?

16              A.   Yes.

17              Q.   What is a discrete power supply?

18              A.   Discrete power supply is also an

19    electric power supply on a switch to mode power

20    supply, but instead of using an integrated

21    solution, it uses a lot of individual components

22    that make the power supply, of course, a lot

23    more complex and bigger.

24              Q.   So if you turn back to the
```

1    previous exhibit, PX 324, does that show an

2    example of what you mean about a discrete power

3    supply?

4          A.  Yes, it does.

5          Q.  I'm going to put up a page from

6    that.  This is PD 1203 from PX 324.  What is

7    this showing us?

8          A.  This is showing an example of a

9    discrete power supply which shows all the

10   components.  And you can see that there is a

11   high voltage transistor, which we have talked

12   about.  The PWM controller, many other

13   functionality, like oscillator, feedback,

14   start-up, and so on.  They're all done using a

15   lot of different components.

16         Q.  And does the presentation compare

17   this to a PI solution?

18         A.  Yes.  What our chip does, it takes

19   everything inside this yellow box and it puts it

20   into a chip.

21         Q.  Is that shown here on the next

22   slide, PD 1204?

23         A.  That's right.  This is the

24   TOPSwitch device and it eliminates 20 to 50

|    |                                                  |
|----|--------------------------------------------------|
|  1 | components depending on the application.          |
|  2 | Q.   Did Power Integrations invent               |
|  3 | switch mode power supplies?                       |
|  4 | A.   No, we didn't.                               |
|  5 | Q.   So how would you describe Power              |
|  6 | Integrations' contribution to the field of       |
|  7 | switch mode power supplies?                       |
|  8 | A.   It's really in two areas.  One is           |
|  9 | the company came up, actually specifically       |
| 10 | Dr. Eklund who's going to talk later, came up    |
| 11 | with this high voltage technology that allows us |
| 12 | to combine the high voltage transistor along     |
| 13 | with the low voltage components, very cost       |
| 14 | effectively, on one chip.                        |
| 15 | The second aspect is the features.               |
| 16 | We have come up with some really innovative      |
| 17 | features that not only increase the -- improve   |
| 18 | the performance of the product, but also makes   |
| 19 | it very cost effective by eliminating a number   |
| 20 | of components out, as I said, and also reducing  |
| 21 | the cost of remaining components.                |
| 22 | Q.   Has Power Integrations received             |
| 23 | any awards for its innovations?                  |
| 24 | A.   Yes, numerous awards.                       |

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697   FAX (302) 658-8418

1    Q.  Does Power Integrations use this

2    integration and its benefits as a way of

3    distinguishing itself in the marketplace?

4        A.  Yes, we do.  In fact, our

5    salespeople call it the PI value.  This is the

6    value we bring to the market that our

7    competitors don't offer.

8        Q.  Are the three circuit patents at

9    issue in this case examples of Power

10   Integrations' integration of circuit?

11       A.  Yes.  These are features.

12           Some of them are known features.

13   Some of them are uncommon features.

14           But we've found ways of

15   integrating them, so that they're very cost

16   effective.

17       Q.  If you would turn to PX 2 in your

18   book.  What is that exhibit?

19       A.  This is the '851 patent.

20       Q.  And are you one of the named

21   inventors of the '851 patent?

22       A.  Yes, I am, along with two other

23   engineers from the company.

24       Q.  I'm just going to show some

1    variation. But it's all the same.

2                    And that's how this one works.

3            Q. Now, is the invention of the '851

4    patent used in Power Integrations' products?

5            A. Yes, it is.

6            Q. Which products is it used in?

7            A. It's used in TOPSwitch FX, and

8    TOPSwitch GX.

9            Q. Can you turn to PX 34 in your

10   book? What's that exhibit?

11           A. This is the TOPSwitch FX family of

12   products. It's a datasheet for this product

13   family.

14           Q. And what's a datasheet?

15           A. Datasheet is basically a

16   description of the operation of the product that

17   we provide to our customers to help our

18   customers use our products to build a power

19   supply.

20           Q. And does the datasheet refer to

21   the integrated frequency jitter invention?

22           A. Yes, it does. In fact, right on

23   the top on the front of the datasheet, you can

24   see that under product highlights, it says

1    frequency jittering reduces EMI and EMI

2    filtering costs.

3         Q.   And does the datasheet describe

4    the frequency jitter feature in more detail?

5         A.   Yes, actually inside the data

6    sheet, we talk more about it.

7              So, for example, here, this is the

8    slow waveform.  That is the frequency variation

9    signal, that's actually changing the frequency

10   of the main oscillator.

11             So when the lines have grouped

12   together, the frequency is higher than when they

13   are stirred apart.  So the frequency, you know,

14   moves from low to high around an average target

15   frequency.  So it goes higher and lower to do

16   this jittering function.

17        Q.   And for the record that's PD 1214,

18   PX 34 at PIF 37-484 and five.

19             Does the data sheet describe the

20   benefits of the frequency jitter feature?

21        A.   Yes, it does.  So to further --

22   because it talks here about the benefits, the

23   frequency jitter feature modulates the switching

24   frequency over the narrow bands as means to --

1    of reducing conducted EMI peaks.

2                    So if you look at the EMI without

3    the jitter and compare it to the EMI with the

4    jitter under those same conditions, you can see

5    that the noise is much lower. By the way, these

6    lines are the limits. You have to be under

7    those limits to meet the government regulation.

8                    You can see this is much lower in

9    EMI than that figure.

10          Q.   Are the TOPSwitch FX and GX

11   products commercially successful?

12          A.   Very successful actually.

13          Q.   Has the integrated frequency

14   jitter feature contributed to the commercial

15   success of the TOPSwitch products?

16          A.   Absolutely.

17          Q.   And in what way?

18          A.   Well, it reduces the cost of EMI

19   components, and also the size of the power

20   supply. In some cases, you can't even fit the

21   power supply into the enclosure because of the

22   size of the EMI component.

23          Q.   Okay. I'd like to turn your

24   attention to the next patent, the '366 patent.

1    That's in 2005.   And in 2004, $130 --

2    approximately $137 million.

3            Q.   And has having the integrated

4    SoftStart feature also contributed to the

5    commercial success of Power Integrations'

6    products?

7            A.   Yes.

8            Q.   Last patent, the '876 patent, the

9    one we've called the digital frequency jitter

10   patent.   It's PX 1 in your book.   Are you also a

11   named inventor on this patent?

12           A.   Yes, I am, along with, again, the

13   two other inventors.

14           Q.   And what generally does the '876

15   patent relate to?

16           A.   Well, the '876 is also relating to

17   frequency jittering, but it is a different way

18   to implement it.   In this case, we use a digital

19   technique to implement it.

20           Q.   Okay.   I'll just put a slightly

21   larger version of Figure 1.

22           Can you just describe generally

23   how what's shown in Figure 1 works to do

24   frequency jitter?

1        A.   So as I said, this uses a digital

2    method.   And one way to understand digital

3    versus analog is you can think of analog as a

4    continuous ramp; whereas digital is, you know, a

5    step.   So having a continuous ramp.   We have

6    steps.

7            So in this case, we have the

8    oscillator inside this dotted line box.   The

9    outboard of the oscillator goes into a counter.

10           So the actually toggles the

11   counter.   So the counter counts as the

12   oscillator oscillates.

13           And this is actually a seven-bit

14   counter.   We take four of those bits, and those

15   four bits are connected to the D to A converter.

16   And D to A converter converts these output

17   counts into a current.   It's a changing current,

18   to change the frequency of the oscillator.   Once

19   again, to jitter the frequency around a target

20   frequency.

21        Q.   And is that shown in Figure 2 of

22   the patent?

23        A.   Yes, I believe it is.   See, you

24   can see you have an average frequency.   And as

1    the counter counts up, the frequency varies

2    around the average frequency.

3                And when it reaches the high end

4    of it, it drops back, because a counter counts

5    back to zero, and then starts all over again.

6         Q.    Can you turn to PX 28 in your

7    book?  What is that exhibit?

8         A.    This is a datasheet for TinySwitch

9    Plus.

10        Q.    And does the TinySwitch product

11   use the digital frequency jitter invention?

12        A.    Yes, it does.

13        Q.    And is it described in the

14   datasheets?

15        A.    Yes, it is.

16        Q.    This is PD 1231 from the datasheet

17   PX 28?

18        A.    Yeah.  Once again, right on the

19   top under product highlights, we say a frequency

20   jittering dramatically reduces EMI five to ten

21   DB.

22        Q.    And is it described, frequency

23   jitter described in anymore detail inside the

24   datasheets?

1          A.    Yes, it is.

2          Q.    I'm going to show you some more

3   excerpts.  This is PD 1232.  What does this

4   describe?

5          A.    Well, this is another way to show

6   the frequency jitter.  You can actually see --

7   just to give some background here, this is --

8   this is when the switch is on and then the

9   switch is off here.

10         So you can see that this is one

11  cycle, by the way.  This is on and off.  It's on

12  again.

13         If you look at the cycle, it

14  actually jitters.  Can you actually physically

15  see the jitter on the waveform.

16         It's just a different way of

17  showing it.

18         Q.    Is the invention of the '876

19  patent used in any other products?

20         A.    Yes.  It's used in TinySwitch II,

21  TinySwitch III, and most of the LinkSwitch

22  family of products.

23         Q.    And have the Power Integrations

24  TinySwitch and LinkSwitch products been

1    successful in the market?

2              A.   Very successful, actually in fact

3    even more successful than TopSwitch FX and GX.

4         Q.   We're looking back at PX 387.  Is

5    there showing the sales of TinySwitch?

6              A.   This is the same slide we showed

7    earlier except we are highlighting the

8    TinySwitch I or II.  As you can see it's more

9    than fifty percent of our revenue in 2004 and

10   2005.

11        Q.   Has having a digital integrated

12   digital feature contributed to the commercial

13   success of the TinySwitch and the LinkSwitch?

14             A.   Based on the feedback we have

15   gotten, it definitely has.

16        Q.   Mr. Balakrishnan, I would like to

17   ask you a few questions now about some of the

18   earlier Power Integrations products.  But first

19   what I want to ask you is when you filed the

20   circuit patents that are at issue in this case,

21   did you believe that your invention that you

22   were describing there was new and nonobvious?

23             A.   Absolutely.

24        Q.   And has anything you have heard in

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

POWER INTEGRATIONS, INC., ) Trial Volume IV
                          )
          Plaintiff,      )
                          ) C.A. No. 04-1371-JJF
v.                        )
                          )
FAIRCHILD SEMICONDUCTOR   )
INTERNATIONAL, INC., and  )
FAIRCHILD SEMICONDUCTOR   )
CORPORATION,              )
                          )
          Defendants.     )


              Thursday, September 20, 2007
              9:05 a.m.
              Courtroom 4B


              844 King Street
              Wilmington, Delaware


BEFORE:   THE HONORABLE JOSEPH J. FARNAN, JR.
          United States District Court Judge




APPEARANCES:


          FISH & RICHARDSON
          BY:  WILLIAM J. MARSDEN, JR., ESQ.
          BY:  FRANK E. SCHERKENBACH, ESQ.
          BY:  HOWARD G. POLLACK, ESQ.
          BY:  MICHAEL R. HEADLEY, ESQ.


                   Counsel for the Plaintiff

1    worldwide sales.

2              Q.   And how long have you held that

3    position?

4              A.   Since February 2002.

5              Q.   How many years have you worked in

6    sales in the semiconductor industry?

7              A.   All my career, twenty-four years.

8              Q.   Okay.  Turning to Power

9    Integrations, what are your responsibilities as

10   vice-president of worldwide sales at PI?

11             A.   Well, I'm supposed to grow the

12   sales revenue and make sure that we gain market

13   share in the market that we serve.

14             Q.   How old big is your worldwide

15   sales organization at PI?

16             A.   I have got a hundred people on my

17   team.

18             Q.   I would like to talk to you a bit

19   about the sale of Power Integrations' products.

20   First of all, could you describe for us Power

21   Integrations' products at a high level?

22             A.   Yes.  I'm sure everyone knows by

23   now, but it's what we call integrated circuit or

24   chip that includes a power MOSFET and it also

1    includes -- which is a high voltage transistor.

2    It also includes a controller.

3            Q.   And what kind of products are your

4    chips put into?

5            A.   One of my favorite things to do is

6    to walk to my friend's house and say I'm in

7    their DVD player or that LC monitor or the

8    Whirlpool refrigerator or the settop box or the

9    personal computer, so we're in anything that

10   needs AC/DC below 290 watts.

11           Q.   What type of electronic devices?

12           A.   They go into AC/DC power

13   conversions where it converts power from the

14   mains or the plugs in the wall to digital

15   electronics which is what pretty much everything

16   in this world runs in.

17           Q.   Okay.  If you could turn to PX 324

18   in your binder.

19           A.   Yes.

20           Q.   I'm showing you one of the pages,

21   that's page PIF 94800.  Is this part of the

22   presentation from Power Integrations?  And I

23   have it on the screen.

24           A.   Yes.

1    you tell us what this documents shows?

2          A.    Well, it's not very well focused,

3    at least not from my perspective.  These are our

4    FX datasheet, and it shows highlighted there the

5    fact that we're stressing the fully integrated

6    soft start overshoot as well as the EMI savings

7    and the filtering cost from the digital

8    frequency jitter -- excuse me, from analog

9    frequency jitter in this case.

10         Q.    Turning to PX 35 in your notebook

11   and up on the screen.  What does this show?

12         A.    Again this is a standard datasheet

13   we give to all of our customers detailing the

14   features and benefits of our part showing the

15   fact that the soft start and the frequency

16   jitter are key features.

17         Q.    And which product is this?

18         A.    The TOPSwitch GX.

19         Q.    Have the products that use analog

20   and digital jitter been commercially successful?

21         A.    Very much so.

22         Q.    What about the products that use

23   internal SoftStart?

24         A.    It's a key feature for us as well.

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697   FAX (302) 658-8418

1          Q.   Okay.

2          A.   Because --

3          Q.   Oh, pardon.  Go ahead.

4          A.   I would just say the SoftStart is

5    one of the ways that simplifies engineering

6    design time and also gives a more reliable

7    system.  What we've also found is that key OEMs

8    require SoftStart because they're aware that a

9    system that just immediately ramps to full --

10   full output upon plug in or turn on is not as

11   reliable as something that's got SoftStart,

12   which takes a nice gentle ramp.

13         Q.   Approximately how many chips has

14   PI sold in its --

15         A.   Billions.  We're starting to sound

16   like McDonald's.

17         Q.   If I could direct your attention

18   to PX 387 in your binder, and I have an excerpt

19   up on the screen.

20              Do you recognize this?

21         A.   Yes, I do.

22         Q.   What does this show?

23         A.   This looks like some data from our

24   annual report in 2005 showing our revenues at

1    143 million -- $143 million.

2              And it also shows the breakout

3    between our different families, the TinySwitch,

4    the TOPSwitch family and the original TOPSwitch

5    I and II families.

6              Q.   And those are the same products

7    that we discussed earlier that incorporate the

8    analog and digital jitter?

9              A.   Correct.

10             Q.   Do analog and digital jitter and

11   external SoftStart contribute to the success of

12   these products?

13             A.   Absolutely.

14             Q.   How does external SoftStart drive

15   sales?

16             A.   As I -- well, as I started to

17   mention to you, if you're going to build like a

18   reliable power supply or one that doesn't have

19   an overshoot when you first turn it on, you have

20   to apply some sort of a SoftStart technique.

21   And it's not always obvious how to do this,

22   because we have integrated it into our part.

23             It basically takes that out of the

24   hands of the engineer.  So the keeps it much

1    more simple.

2                    And as such, our customers

3    appreciate it.  So the saves in space, saves

4    components and offers a higher integrated

5    solution.

6         Q.   What about integrated frequency

7    jitter, how does that drive sales?

8         A.   Frequency jitter -- pardon me.

9    Frequency jitter is the granddaddy in my eyes.

10   It saves a tremendous amount of money,

11   especially as you go up in the power curve.  As

12   products need more power, like from five watts

13   up to, call it, 40 or 50 watts, the EMI problems

14   become -- become increased.

15                   And the fact that we've got a

16   frequency jitter integrated into our part gives

17   our engineers advice and advantages to provide a

18   power supply that costs less.  So frequency

19   jitter saves on the filtering cost and the size

20   of the components that are necessary on the

21   secondary part of and the primary part of the

22   power supply.

23        Q.   Okay I'm showing you plaintiff's

24   demonstrative 10006.

# Exhibit M

体中文     繁体中文     English     Site Map

**BCD** SEMICONDUCTOR MANUFACTURING LIMITED

PRODUCT SEARCH

| Products & Processes | Solutions & Applications | Quality & Environment | About BCD | Contact Us | Home |

About BCD

Analog ICs and Power Management Solutions Provider

Home > 关于BCD >Introduction

**Introduction**

Milestone/History

Core Culture

BCD Semiconductor Manufacturing Limited (BCD Semi) is a leading analog integrated device manufacturer, or IDM, based in Greater China, specializing in the design, manufacture and sale of power management integrated circuits, or ICs. The company's broad portfolio of power management ICs primarily targets rapidly growing, high volume markets such as mobile phones, portable media players, LCD televisions and monitors, personal computers, adapters and chargers and other electronics products. As an IDM, BCD Semi integrates product design and process technology to optimize product performance and cost. The company offer system-level solutions with the quality, performance and reliability required by our customers. Our Greater China-based operations provide proximity to the rapidly growing electronics industry in Asia, enabling us to align our product development effort with customers and market trends and to provide timely and effective technical support.

The company currently employs 1000 full-time staff, including more than 150 in IC design, technology development and product engineering. The BCD Semi 6" fab has a clean-room floor area of over 4000m² for wafer processing. BCD Semi provides system customers with superior products that are developed with first-class analog IC design and R&D, and manufactured with advanced process technologies such as Bipolar, CMOS, BiCMOS and BCDMOS, etc. The company has sales offices in Shenzhen, Taiwan and USA and has established distribution channels world-wide. In January 2008, the BCD headquarters has moved to a new campus in Shanghai Zizhu Science-based Industrial Park; right next to Intel and Mircrosoft.

BCD Semi has long held the motto of "Customer First - Quality First." The company has successfully been accredited



with ISO9001/2000, ISO14001 and TS16949 quality certificates and has also recently obtained Sony GP Green Partner certificate, passed audits from international companies like Samsung, LG, Asustek, Delta, Foxconn, Changhong, and so on. The company has adopted an advanced electronic ordering system (E-Order) to provide customers with efficient communication platforms and E-services.

BCD Semi strives to become a world leading analog/mixed-signal IC solution provider. The company is devoted to provide all customers in the global market with most reliable products of the highest quality/price ratio.

Investor Relation│Careers│Feedback

Legal Notice |   BCD Semiconductor Manufacturing Limited © 2007 All rights reserved

# Exhibit N



BCD SEMICONDUCTOR MANUFACTURING LIMITED

•体中文    •繁体中文    •English    •Site Map

🔍 PRODUCT SEARCH

| Products & Processes | Solutions & Applications | Quality & Environment | About BCD | Contact Us | Home |

**Products & Processes**



Analog ICs and Power Management Solutions Provider

Home > Products & Process

**IC Products** -

AC-DC Converter |

DC-DC Converter |

Linear Regulator |

Standard Linear |

Audio Power Amplifier |

Motor Driver |

Hall IC/Fan Motor Driver |

Discrete Devices -

Package Types -

Foundry Services -

Production Process -

SGS Reports -

Download Center -

## Products & Processes

### [IC Products]

AC-DC Converter       DC-DC Converter       Linear Regulator

Standard Linear       Audio Power Amplifier       Motor Driver

Hall IC/Fan Motor Driver

### [Discrete Devices]

Wafers       Products

· Small Signal Transistors(6" wafers)       · Power Transistors

· High Frenquncy Transistors(6" wafers)       · SB Schottky Barrier Rectifiers

· Power Transistors(6" wafers)       · MOSFET

· SB Schottky Barrier Rectifiers(6" wafers)

### [Package Type]

Discrete Devices     ICs

**【Foundry Services】**

Wafer Foundry Service

· Bipolar Process

· BiCMOS Process

**【Production Process】**
**【SGS Report】**
**【Download Center】**



Investor Relation｜Careers｜Feedback

Legal Notice |   BCD Semiconductor Manufacturing Limited © 2007 All rights reserved

# Exhibit O





【Power Supply –Mobile Phone Charger

【Power Supply – NB ADP】

BCD



| Feedback/protection Controller |
| --- |
| AZ431 |

| PWM Controller |
| --- |
| AP3101 |
| AP384XG |

| PFC Controller |
| --- |
| AP1661 |

Investor Relation │ Careers │ Feedback

Legal Notice |   BCD Semiconductor Manufacturing Limited © 2007 All rights reserved