## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| POWER INTEGRATIONS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 07-633-JJF-LPS |
| | : | |
| BCD SEMICONDUCTOR | : | |
| CORPORATION and SHANGHAI | : | |
| SIM-BCD SEMICONDUCTOR | : | |
| MANUFACTURING CO., LTD. | : | |
| | : | |
| Defendants. | : | |

## ORDER

At Wilmington this 11th day of April, 2008, the Court having considered the parties'

briefing and supplemental briefing on Defendants' motion to dismiss for lack of personal

jurisdiction (D.I.10-11, 31, 43, 53, 58), and for the reasons set forth in the Memorandum Opinion

issued this same date,

IT IS HEREBY ORDERED THAT Defendants are to produce to Plaintiff the following

discovery:

1. Copies of BCD's agreements with its distributors to the extent such agreements relate to the accused products (AP3700, AP3700A, AP3700E, AP3710).

2. All documents relating to the design or testing of BCD power supply chips, or Samsung products incorporating BCD power supply chips, for compliance with U.S. regulatory standards for safety (e.g. UL), EMI (e.g. FCC) or energy efficiency (e.g. Energy Star).

3. All documents relating to BCD's efforts to analyze the U.S. market for its power supply chips or any end product incorporating its power supply chips.

4.   Documents related to BCD's efforts to solicit sales of its power supply chips to U.S. companies.

5.   Any records or logs of communications relating to the accused products or products incorporating power supply chips between BCD and U.S. residents, including in Delaware, through BCD's website or electronic mail.

6.   Any evidence that BCD intended to exclude Delaware or a region including Delaware from its efforts to market, distribute, or sell power supply chips in the U.S.

7.   Deposition(s) of a knowledgeable person or persons pursuant to FRCP 30(b)(6) on the foregoing topics.

IT IS HEREBY FURTHER ORDERED that the Court will conduct a teleconference with

the parties to discuss the timing for Defendants to provide the foregoing discovery, and the

impact, if any, of this Order on the previously-issued schedule for resolving Plaintiff's pending

motion for a preliminary injunction, on Tuesday, April 15, 2008 at 1:00 p.m. Plaintiff shall

initiate the teleconference at **(302) 573-4573**.

IT IS HEREBY FURTHER ORDERED that the parties shall confer and in good faith

attempt to reach agreement on the issues the Court will address during the teleconference.

Honorable Leonard P. Stark
United States Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| POWER INTEGRATIONS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 07-633-JJF-LPS |
| | : | |
| BCD SEMICONDUCTOR | : | |
| CORPORATION and SHANGHAI | : | |
| SIM-BCD SEMICONDUCTOR | : | |
| MANUFACTURING CO., LTD. | : | |
| | : | |
| Defendants. | : | |

William J. Marsden, Jr., Kyle Wagner Compton, FISH & RICHARDSON P.C.,Wilmington, DE;
Frank E. Scherkenbach, FISH & RICHARDSON P.C., Boston, MA; Howard G. Pollack,
Michael R. Headley, FISH & RICHARDSON P.C., Redwood City, CA, Attorneys for Plaintiff.

Steven Balick, John G. Day, Tiffany Geyer Lydon, ASHBY & GEDDES, Wilmington, DE; E.
Robert Yoches, Joyce Craig, FINNEGAN, HENDERSON, FARABOW, GARRETT &
DUNNER, L.L.P., Washington DC; Robert L. Burns, FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P., Reston, VA; Eric R. Puknys, FINNEGAN, HENDERSON,
FARABOW, GARRETT & DUNNER, L.L.P., Palo Alto, CA, Attorneys for Defendant.

**MEMORANDUM OPINION**

April 11, 2008
Wilmington, Delaware

*Leane P. Ot*

**STARK, U.S. Magistrate Judge:**

Plaintiff Power Integrations, Inc. ("PI") is a Delaware corporation and maker of power supply chips incorporated into electronic devices such as cellular telephone chargers. PI owns several patents on its power supply chips, including U.S. Patent Nos. 6,249,876; 6,107,851; and 5,313,381. Defendant BCD California and Defendant SIM-BCD (collectively, "BCD" or "Defendants") are based in California and China, respectively. Defendants also manufacture power supply chips, including the AP3700, AP3700A, AP3700E, and AP3710 (the "accused products" or "accused chips"). PI claims that Defendants' chips infringe one or more of PI's patents.

In June 2007, PI filed suit for patent infringement against BCD in the Northern District of California. On October 15, 2007, PI dismissed its California suit and, on the same day, filed its action in this Court. On January 18, 2008, Defendants filed suit in the Northern District of California against PI, seeking a declaratory judgment of noninfringement.

Presently before me is Defendants' motion to dismiss PI's action due to a purported lack of personal jurisdiction. Defendants contend that they do not have sufficient contacts with Delaware to allow this Court to exercise jurisdiction over them. After reviewing the parties' briefs, as well as supplemental briefs I ordered, I find that the record is insufficiently developed to permit me to determine whether jurisdiction lies in this Court. Because PI has articulated theories which, if supported by evidence, would establish jurisdiction, I will order limited jurisdictional discovery.

1

## JURISDICTIONAL BACKGROUND

SIM-BCD is a Chinese company that has no physical presence in the United States. Its affiliate, BCD, maintains a two-person office in California. Neither of the Defendants have any offices, employees, or property in Delaware. Neither of them hold bank accounts in Delaware nor are registered to do business here. Nor is there any evidence in the record before me that either of the Defendants has ever directly transacted business or sold products in Delaware. To the contrary, Defendants have put before me declarations attesting that they "have not shipped or sold, directly or through a distributor or licensee, any BCD product into Delaware; have not given warranties to any Delaware customers; have not visited Delaware to meet with buyers of the accused products; have not solicited sales of the accused products from buyers in Delaware; and have had no continuing involvement in the manufacture, distribution, regulation, or use of any products shipped into Delaware." (D.I. 58 at 4 n.3 (citing Wang and Chan declarations))

Much of this PI concedes. PI asserts, nonetheless, that this Court has jurisdiction over Defendants under a "stream of commerce" theory. This argument is predicated on the undisputed fact that the Defendants' accused chips are readily available for sale in Delaware by virtue of their presence as components in cell phone chargers sold here by Samsung. In this way, according to PI, Defendants have an established distribution channel into Delaware for the accused chips. From this, PI insists, I should conclude that Defendants intend to serve the U.S. market, including Delaware, giving this Court jurisdiction.

PI has made a number of specific factual allegations, most of which are uncontested. These allegations, and Defendants' responses to them, are summarized below.

2

• *It is undisputed that, prior and subsequent to the filing of the complaint, Defendants' accused chips were and remain in Delaware as components in Samsung chargers.* PI estimates that tens of thousands of Samsung chargers containing BCD's accused chips have been shipped into Delaware through established sales channels and that approximately 17,000 of these chargers were sold in the State in the third quarter of 2007 alone. Defendants do not dispute these estimates. They emphasize, however, that no BCD chips have been offered for sale or sold in Delaware *as chips*; the chips are here solely as components in Samsung products, products Defendants had nothing to do with marketing or distributing. Defendants further observe that they sell the accused chips for less than $.06 each, so even accepting PI's sales estimates the revenue generated for Defendants from Samsung chargers sold in Delaware in one quarter was only about $1,000. This amounts to less than .0033% of SIM-BCD's revenues. (D.I. 43 at 5)

• *BCD has "established distribution channels" in the U.S., but has not used them to ship the accused products.* While attempting to raise $75 million for a proposed initial public offering (IPO) early in 2008, BCD told potential investors that it had a sales office and "established distribution channels" in the United States.[1] BCD has an agreement with Future Electronics, a Canadian company, to distribute its products throughout North America, including the United States and Delaware. Defendants explain, however, that they do not use any channels to distribute the accused products in the U.S. Moreover, "Future Electronics did not supply Samsung any accused product. . . . [T]o Defendants' knowledge, Future Electronics has not sold, offered for sale, or shipped *any* BCD product

---

[1]It appears that the IPO has not yet been completed.

3

into Delaware, and neither has BCD . . . ."  (D.I. 58 at 6)

- *BCD has "close relationships" with end users of its products who regularly conduct business in the U.S., including in Delaware.*  BCD's F-1 Registration Statement, filed in connection with the planned IPO, states that BCD "maintains close, direct relationships with key market-leading end users of our products," including Samsung.  A video of BCD's road show presentation for the IPO also apparently features BCD touting its sales to Samsung.[2]  Similarly, BCD's "Company Profile" notes that BCD has been "closely engaging with end-user applications" and "engaging custom ICs [Integrated Circuits] business with market leading companies."  While Defendants do not (and cannot) deny these statements, they point out that none of their customers that happen to be Delaware corporations use the accused chips.

- *BCD's website is accessible throughout the U.S., including in Delaware.*  Defendants assert, however, that one cannot purchase the accused chips on BCD's website.  Nor does the record contain any evidence of how much, if at all, the site has been accessed by computers located in Delaware.

- *BCD attempted to raise large amounts of capital throughout the U.S. in connection with its planned IPO.*  However, these financing efforts began in January 2008, months after PI filed its complaint in this action.

Vigorously disputed by the parties is whether Defendants knew and intended that their accused chips would end up in Delaware.  PI insists that Defendants' accused chips "predictably

---

[2]This video seems to have been removed from the website the parties directed me to and I was unable to view it.

4

and intentionally . . . make their way to Delaware as a result of [BCD's] overall business plan."
(D.I. 53 at 9) To PI, there "is no question" that BCD knew and intended that the accused chips
would be sold in Delaware. *Id.* In addition to the evidence cited above, PI explains that BCD
dispatched an attorney to Delaware to watch an earlier patent infringement trial (D. Del. C.A. No.
04-1371-JJF) in which PI was involved against Fairchild Semiconductor; Fairchild was
Samsung's principal supplier of power supply chips until a Delaware jury found Fairchild was
infringing PI's patents.

Defendants reply that BCD sells the accused chips to three Korean distributors, who in
turn sell them to five Korean manufacturers, who then make chargers for Samsung phones. BCD
acknowledges it believed that the Korean manufacturers sold the chargers containing BCD chips
to Samsung in Korea, but BCD disclaims any knowledge as to how these chargers ended up in
the U.S. The record contains sworn declarations of BCD officers to the effect that, prior to the
filing of this lawsuit, BCD did not know the accused chips were incorporated into any products
sold in Delaware. PI responds that "BCD's purported ignorance is simply not credible." (D.I. 53
at 6)

## LEGAL STANDARDS FOR CHALLENGES TO PERSONAL JURISDICTION

Determining the existence of personal jurisdiction requires a two-part analysis. First, the
Court must consider whether a defendant's actions come within any of the provisions of
Delaware's long-arm statute. *See Intel v. Broadcom,* 167 F. Supp.2d 692, 700 (D. Del. 2001).
Next, the Court must determine whether exercising jurisdiction over the defendant in this state
comports with the Due Process Clause of the Constitution. *See id.* Due Process is satisfied if the

5

Court finds the existence of "minimum contacts" between the non-resident defendant and the forum state, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

With respect to the first-step statutory inquiry, the Court applies the law of the state in which the district court is located. *See Intel*, 167 F. Supp.2d at 700. For the second-step Due Process analysis, the Court applies the law of the Federal Circuit. *See Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564 (Fed Cir. 1994).

When a defendant moves to dismiss a lawsuit for lack of personal jurisdiction, the plaintiff bears the burden of showing the basis for this Court's jurisdiction. *See Greenly v. Davis,* 486 A.2d 669, 670 (Del. Supr. 1984). To satisfy this burden, the plaintiff must make a prima facie showing that personal jurisdiction is conferred by statute. *See Harmon v. Eudaily*, 407 A.2d 232, 233 (Del. Super. Ct. 1979), *aff'd,* 420 A.2d 1175 (Del. Supr. 1980). All factual inferences must be viewed in the light most favorable to the plaintiff. *See Wright v. American Home Products Corp.*, 768 A.2d 518, 526 (Del. Super. Ct. 2000).

If a plaintiff fails to meet its burden of proof, but makes "factual allegations [that] suggest the possible existence of requisite contacts between the defendant and the forum state with 'reasonable particularity,'" the Court should order jurisdictional discovery. *Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1323 (Fed. Cir. 2005). However, "[a]fter discovery has begun, the plaintiff must sustain [its] burden by establishing jurisdictional facts through sworn affidavits or other competent evidence." *Philips Electronics North America Corp. v. Contec Corp.*, 2004 WL 503602, at *3 (D. Del. Mar. 11, 2004) (citing

6

*Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 n.9 (3d Cir. 1984)).

## DELAWARE'S LONG-ARM STATUTE

Delaware's long-arm statute, 10 Del. Code § 3104(c) (2004), provides in pertinent part:

A Delaware court has personal jurisdiction over a non-resident defendant only when that non-resident defendant, either in person or through an agent:

(1) Transacts any business or performs any character of work or service in the State;

(2) Contracts to supply services or things in this State;

(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;

(5) Has an interest in, uses or possesses real property in the State; or

(6) Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation or agreement located, executed or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

Delaware's courts have construed Delaware's long-arm statute "liberally so as to provide jurisdiction to the maximum extent possible. In fact, the only limit placed on § 3104 is that it remain within the constraints of the Due Process Clause." *Boone v. Oy Partek*, 724 A.2d 1150, 1157 (Del. Super. Ct. 1997) (internal citations omitted), *aff'd*, 707 A.2d 765 (Del. Supr. 1998) (table); *see also Hercules, Inc. v. Leu Trust and Banking (Bahamas) Ltd.*, 611 A.2d 476, 480

7

(Del. Supr. 1992).[3]

All parties here agree that subsections (c)(2), (c)(3), (c)(5), and (c)(6) have no application to the facts of this case. PI asserts that this Court has jurisdiction over BCD pursuant to (c)(1), (c)(4), and a combination of both. (D.I. 31 at 18)

Subsection (c)(1) of the Delaware long-arm statute confers "specific" jurisdiction over a non-resident defendant; subsection (c)(4) confers "general" jurisdiction. *See, e.g., LaNuova D &B, S.p.A. v. Bowe Co.,* 513 A.2d 764, 768 (Del. Supr. 1986); *Jeffreys v. Exten,* 784 F. Supp. 146, 151 (D. Del. 1992). "'Specific' jurisdiction refers to the situation in which the cause of action arises out of or relates to the defendant's contacts with the forum. It contrasts with 'general' jurisdiction, in which the defendant's contacts have no necessary relationship to the cause of action." *Beverly Hills Fan,* 21 F.3d at 1562 n.10 (internal citations omitted); *see also Boone,* 724 A.2d at 1155.

## "STREAM OF COMMERCE" AND "DUAL JURISDICTION"

As already noted, PI asserts three bases for jurisdiction under Delaware's long-arm statute: (c)(1), (c)(4), and "dual jurisdiction" arising from at least partial satisfaction of (c)(1) and

---

[3]There are statements in Delaware decisions that might seem to question whether Delaware's long-arm statute is to be interpreted to the fullest extent the Constitution allows. *See, e.g., Red Sail Easter Partners v. Radio City Music Hall Productions,* 1991 WL 129174, at *3 (Del. Ch. July 10, 1991). Consequently, the Federal Circuit has written, "Delaware law is . . . unclear as to whether or not the long arm statute is coextensive with the due process clause." *Chi Mei,* 395 F.3d at 1322. It appears to me, however, that the Delaware courts do view the statute as reaching the full limits of the Due Process Clause – though the courts also emphasize that, nevertheless, the jurisdictional analysis must not be collapsed into a single constitutional inquiry. *See Wright,* 768 A.2d at 527 (describing "independence" of statutory and constitutional inquiries); *Hercules,* 611 A.2d at 483.

8

(c)(4). The Delaware courts have developed the concept of dual jurisdiction as they have grappled with application of the long-arm statute to situations where jurisdiction is claimed to be based on the "stream of commerce."

The "stream of commerce" theory is premised on the idea that a non-resident that places its product in the marketplace may, under certain circumstances, be found to have sufficient contacts for jurisdictional purposes with any state in which its product ends up. As a theory of personal jurisdiction, it has been recognized and endorsed (subject to certain limitations) by the Supreme Court and the Federal Circuit, as well as the Third Circuit (among other courts of appeals). *See Asahi Metal Industry Co. v Superior Court of California*, 480 U.S. 102, 112 (1987); *Beverly Hills Fan*, 21 F.3d at 1564; *Renner v. Lanard Toys Limited*, 33 F.3d 277, 280 (3d Cir. 1994).

Delaware state courts have likewise held that a stream of commerce theory of jurisdiction may satisfy Delaware's long-arm statute. *See, e.g.*, *Boone*, 724 A.2d at 1157-58. However, the stream of commerce theory does not fit comfortably within any particular provision of Delaware's statute. This is because stream of commerce is a theory of specific jurisdiction. *See Renner*, 33 F.3d at 280. But it does not fit within subsection (c)(1) – the only potentially applicable specific jurisdiction provision – because (c)(1) "requires that some act on the part of the defendant . . . have occurred in Delaware," *Boone*, 724 A.2d at 1156, yet stream of commerce jurisdiction does not. *See also id.* ("When a manufacturer passes title to goods to a third party outside of Delaware, it is not deemed to have performed an act in this State."). Neither, however, does the stream of commerce theory fit within subsection (c)(4), since (c)(4) provides general – and not specific – jurisdiction.

9

The Delaware Supreme Court first confronted this dilemma in *LaNuova* stating, in dicta:

It is conceivable that a tort claim could enjoy a dual jurisdictional basis under (c)(1) and (c)(4) if the indicia of activity set forth under (c)(4) were sufficiently extensive to reach the transactional level of (c)(1) and there was a nexus between the tort claim and the transaction of business or performance of work.

513 A.2d at 768 n.3. While *LaNuova* recognized the potential viability of the concept of dual jurisdiction, it did not need to rely on it, as the non-resident manufacturer opposing jurisdiction in that case satisfied the requirements of § 3104(c)(4) through its marketing efforts, including delivery of warranties upon installation of its roofing materials by third-party contractors in Delaware. *Id.* at 769-70.

The *La Nuova* dual jurisdiction analysis was expounded upon in *Boone*. There, the Delaware Superior Court found that it had jurisdiction over a Finnish asbestos manufacturer that engaged a distributor to sell its asbestos to Delaware customers, even though the defendant's actions did not establish jurisdiction under (c)(1). Recognizing that the stream of commerce theory of personal jurisdiction had been determined to be consistent with Due Process by the United States Supreme Court, and relying on Delaware's policy of extending jurisdiction to the limits of Due Process, the *Boone* Court applied the *La Nuova* concept of dual jurisdiction. *See* 724 A.2d at 1156-58. Dual jurisdiction, *Boone* stated, "best encompasses all of the intricacies of the stream of the stream of commerce theory, taking into account the relationship between the manufacturer and the forum and the relationship between the controversy and the forum." *Id.* at 1157-58.

*Boone* went on to reconcile stream of commerce theory with the Delaware statutory framework, explaining:

10

[O]ne must take great care not to overemphasize §§ 3104(c)(1) or (c)(4) under this analysis. It is not important that the indicia of activity under § 3104(c)(4) rise to a level of "general presence" as usually required. Instead, the enumerated activities in this section should be analyzed to determine whether there is an intent or purpose on the part of the manufacturer to serve the Delaware market with its product. Likewise, when analyzing § 3104(c)(1) it is not important that the manufacturer itself act in Delaware. Instead, if the intent or purpose on behalf of the manufacturer to serve the Delaware market results in the introduction of the product to this State and plaintiff's cause of action arises from injuries caused by that product, this section is satisfied.

*Id.*

Under *Boone*, the touchstone of the dual jurisdiction analysis is intent and purpose to serve the Delaware market. *See id.* at 1158. Applying this concept to the facts presented in *Boone*, the Superior Court found the manufacturer's intent and purpose to serve Delaware implicit in its intent to serve the United States as a whole through its distributor. *See id.* It further found indicia of activity relevant to § 3104(c)(4) in the actual shipment of asbestos through distribution channels into Delaware, and in evidence that the manufacturer derived substantial revenue from Delaware. *See id.* Because the indicia of activity under (c)(4) were sufficient to reach the transactional level of (c)(1), and a nexus existed between the tort claim and the manufacturer's product (the claim was for injury from exposure to the asbestos), *Boone* found a proper basis for exercise of personal jurisdiction. *Id.* The Delaware Supreme Court affirmed the Superior Court's jurisdictional analysis.[4]

The Delaware Superior Court revisited the concept of dual jurisdiction in *Wright*, 768

_____

[4]The Delaware Supreme Court's short affirmance order only references subsection (c)(4), but I read this as an affirmance of *Boone*'s adoption and application of the concept of dual jurisdiction. The Supreme Court's order praises the "well-reasoned" decision of the Superior Court. 707 A.2d at 765. That decision, as explained above, found jurisdiction based on dual jurisdiction.

11

A.2d at 518, with a similar result. The French defendants who challenged jurisdiction in *Wright* licensed various U.S. entities to manufacture and sell diet pills throughout this country. *See id.* at 529. Finding a "clear pattern of repeated activity" in Delaware, evidenced by substantial sales in Delaware, the *Wright* Court found it had jurisdiction over the French defendants pursuant to subsections (c)(1) and (c)(4) under a dual jurisdictional analysis. *See id.* at 530. As in *Boone*, in *Wright* the Superior Court found the French defendants' intent and purpose to serve Delaware implicit in their interactions with third parties who in turn served the Delaware market. *Id.* at 531.

Based on these precedents, I believe that Delaware law requires me to consider the potential application of Delaware's concept of dual jurisdiction.

Arguing against this conclusion, BCD observes that no court has yet applied Delaware's concept of dual jurisdiction to a patent case. (D.I. 58 at 1, 6) In making this argument, Defendants rely on two precedents of this Court. In *Siemens Aktiengellschaft v. LG Semicon Co.*, 69 F. Supp.2d 622, 623 (D. Del. 1999), this Court held that it lacked jurisdiction over Korean subcomponent manufacturer LG Semicon, whose "DRAM chips" were sold to original equipment manufacturers through sales representatives and an independent national distributor, eventually ending up in electronic devices sold in Delaware. In *M & M Technologies, Inc. v. Gurtler Chemicals, Inc.*, 2005 WL 293509 (D. Del. Feb. 8, 2005), this Court ruled that it lacked jurisdiction over a non-resident chemical subcomponent manufacturer. BCD is correct that neither of these prior decisions, nor any others of this Court of which I am aware, expressly applied Delaware's concept of dual jurisdiction. However, it is also true that no prior decision of

12

this Court has ever explicitly discussed – much less rejected – its application in a patent case.[5]

I see no reason to believe that dual jurisdiction should not apply in a patent case. The injury imposed by patent infringement is analogous to the injury imposed in the more traditional type of tort action in which the Delaware courts have developed the concept of dual jurisdiction. *See generally Beverly Hills Fan*, 21 F.3d at 1563 (explaining that patent infringement involves infliction of injury upon victim, just as in personal injury tort matters); *id.* at 1571 ("[T]he situs of the injury is the location, or locations, at which the infringing activity directly impacts on the interests of the patentee . . . ."); *Chi Mei*, 395 F.3d at 1318 ("Our cases make clear that the tortious injury caused by patent infringement occurs within the state where the allegedly infringing sales are made."). The cases within this District that have analyzed issues of personal jurisdiction in patent cases have regularly relied on *LaNuova*, *Boone*, and *Wright*, the very cases in which the concept of dual jurisdiction was developed.

Finally, it must be noted that a non-resident firm's intent to serve the United States market is sufficient to establish an intent to serve the Delaware market, unless there is evidence that the firm intended to exclude from its marketing and distribution efforts some portion of the country that includes Delaware. *See Tobin v Astra Pharmaceutical Prod., Inc.*, 993 F.2d 528, 544 (6th Cir. 1993); *Barone v. Rich Bros. Interstate Display Fireworks Co.*, 25 F.3d 610, 614-15 (8th Cir. 1994). Delaware's courts do not require evidence that Delaware itself was specifically targeted (which, given the size of this state, would presumably exist rarely if ever). *See Wright*,

---

[5]In *ICT Pharms, Inc. v. Boehringer Ingelheim Pharms., Inc.*, 147 F. Supp.2d 268, 271-72 & n.4 (D. Del. 2001), this Court applied the stream of commerce theory to a patent case. In doing so, the Court considered the possibility of finding jurisdiction even after concluding that none of the long-arm statute's individual subsections were satisfied. *See id.* This is consistent with what I have held here.

13

768 A.2d at 530 (explaining that engagement of exclusive distributor to serve U.S. market evidences intent and purpose to serve Delaware market, since "[i]mplicit in this agreement is the fact that [Defendant sought to] solicit business from the Country as a whole, including Delaware"); *Boone*, 724 A.2d at 1160-61 ("[N]umerous courts have concluded that a manufacturer who distributes their product through a national or regional distributor have established minimum contacts with the forum state. [The] argument that the distribution agreement was national in scope and cannot confer personal jurisdiction in Delaware must fail.").

## APPLICATION OF DELAWARE'S LONG-ARM STATUTE TO THIS CASE

No one provision of the Delaware long-arm statute captures the facts of this case. Subsection (c)(1) is not satisfied because no act related to the accused product has been taken by Defendants within the State of Delaware, as that provision requires. *See Boone*, 724 A.2d at 1156.

Neither is subsection (c)(4) satisfied. A defendant need only meet one of several criteria (c)(4) lists disjunctively: do or solicit business in the State, engage in any other persistent course of conduct in the State, or derive substantial revenue from services or things used or consumed here. *See LaNuova*, 513 A.2d at 769. But none of these have been demonstrated to be present here. Though BCD has touted its "established distribution channels" and "close, direct relationships" with end users such as Samsung, the record does not at this point demonstrate that Defendants have done or solicited business or taken any other persistent course of conduct in Delaware. Furthermore, while it is not clear what amount of revenue is needed to satisfy the "substantial revenue" standard, the dollar figures alleged here do not, on their own, establish the

14

type of continuous and substantial presence this provision is aimed at identifying. *Compare M & M Technologies*, 2005 WL 293509, at \*5 ("[W]hen a defendant's sales to customers in Delaware constitute less than one percent of total revenue, it is not substantial enough to warrant an exercise of jurisdiction.").

Having concluded that neither (c)(1) nor (c)(4) are satisfied on the record before me, Defendants would have me end the analysis and recommend dismissal of this action for lack of personal jurisdiction. However, I believe it is necessary in the instant case to proceed further and determine whether this Court can exercise jurisdiction pursuant to Delaware's concept of dual jurisdiction. For dual jurisdiction to be satisfied, there must be "an intent or purpose on the part of the manufacturer [here, BCD] to serve the Delaware market with its product." *Boone*, 724 A.2d at 1158. This does not mean, however, that the record must show a specific reference to the State of Delaware on the part of BCD; it is enough if, based on ongoing relationships with others in the stream of commerce, "it was reasonably foreseeable that [BCD's] accused [products] . . . would make their way into the Delaware market." *Philips*, 2004 WL 503602, at \*4. While PI has insisted that BCD had an intent and business plan to see its accused chips end up throughout the United States, BCD's declarations contradict this assertion. As yet, PI has not made a record to back up its claims.

## DUE PROCESS

Even if the present record established that BCD comes within the reach of Delaware's long-arm statute, it would still be necessary to determine whether exercising jurisdiction over BCD would comport with Due Process. The Supreme Court has held that satisfying due process

15

requires the existence of "certain minimum contacts" between the defendant and the forum State, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316. These "minimum contacts" must be "purposeful." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). The purposefulness requirement "helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum." *Beverly Hills Fan*, 21 F.3d at 1565.

The Supreme Court has not decided on the appropriate test for determining when "minimum contacts" are present in a stream of commerce case. In a 4-4 split decision in *Asahi*, 480 U.S. at 107, the Court set out two tests, neither of which attracted a majority of the justices. The first of these tests, proposed by Justice O'Connor, requires placement of the product into the stream of commerce plus "an act of the [non-resident] defendant purposefully directed toward the forum State." *Id.* at 112. Such additional conduct is important because it "may indicate an intent or purpose to serve the market in the forum State." *Id.* (emphasis added). Justice O'Connor listed several examples of "additional conduct" sufficient to demonstrate a defendant's intent to serve a forum State: "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.* The second test, proposed by Justice Brennan, requires only that a non-resident defendant be "aware that the final product is being marketed in the forum State" through established distribution channels, with no finding of "additional conduct" necessary. *Id.* at 117. The Federal Circuit has yet to decide "whether Justice Brennan's standard is sufficient to satisfy due process, because [it has] yet to be presented with facts that do not meet the more rigorous

16

Case 1:07-cv-00633-JJF-LPS    Document 67-3    Filed 04/11/2008    Page 18 of 22

standard adopted by Justice O'Connor." *Chi Mei*, 395 F.3d at 1322 n.7.

The analysis required to determine whether personal jurisdiction exists under Delaware's concept of "dual jurisdiction" pursuant to Delaware's long-arm statute is functionally equivalent to Justice O'Connor's test for determining whether an exercise of jurisdiction comports with Due Process in a stream of commerce case. *See Boone*, 724 A.2d at 1159 n.4 (describing dual jurisdiction analysis as analogous to Justice O'Connor's plurality opinion in *Asahi*); *see also Mayhall v. Nempco, Inc.*, 1994 WL 465545, at *5 (Del. Super. Ct. July 29, 1994) (adopting O'Connor's view). *But see Chi Mei*, 395 F.3d at 1322 ("Delaware law is unclear as to whether the proper interpretation of the long arm statute accords with Justice O'Connor's or Justice Brennan's view as expressed in *Asahi*."). Both the O'Connor test and the concept of "dual jurisdiction" look to the non-resident defendant's "intent or purpose" to serve the Delaware market.

## JURISDICTIONAL DISCOVERY

In *Chi Mei*, the Federal Circuit vacated a decision of this Court that had found no jurisdiction over Chi Mei, a Taiwanese manufacturer of LCD modules that were incorporated into other companies' products and sold in Delaware. 395 F.3d at 1315. The chain from the alleged infringer to the Delaware consumer had one fewer link than in the instant case: Chi Mei sold the accused LCDs to original equipment manufacturers who used them and then shipped their product to brand name computer manufacturers, who then shipped to retail outlets. *See id.* at 1317. In moving to dismiss, Chi Mei did not submit any evidence to contradict plaintiff's allegation that it derived substantial revenue from Delaware or that its products, once

incorporated into other companies' computer monitors, were likely to reach Delaware. *See id.* at 1318. This Court granted the motion, rejecting the argument that various subsections of Delaware's long-arm statute, including (c)(1) and (c)(4), conferred jurisdiction.

The Federal Circuit found that the district court imposed too high a burden of proof on the plaintiff, which – based on its own evidence and Chi Mei's failure to rebut the factual inference that incorporating products were sold in Delaware – had demonstrated that substantial revenue could have been earned by Chi Mei here, perhaps sufficient to meet the standard for general jurisdiction under (c)(4). *See id.* at 1320. Having set forth "factual allegations [that] suggest the possible existence of requisite contacts between the defendant and the forum State with 'reasonable particularity,'" the Federal Circuit remanded the case with orders to allow the plaintiff to take jurisdictional discovery. *Id.* at 1323.[6] The Court listed examples of pertinent discovery, including inquiries into Chi Mei's ongoing relationships with Delaware retailers, knowledge that its products were being shipped to Delaware, design and marketing efforts directed to the U.S. market (necessarily including Delaware), and a "demonstration that [Chi Mei's] website serves as a channel for providing regular advice to customers in the forum State." *Id.*

Here, PI insists that BCD's protestations that it did not know its accused products would end up in Delaware are "simply not credible." (D.I. 53 at 6; *see also id.* at 9 (asserting, without evidence, that BCD's products "predictably and intentionally . . . make their way to Delaware as

_____

[6]The Federal Circuit observed that "the scope of the stream of commerce theory under Delaware law is not clear, and the issue has yet to be directly addressed by the Delaware Supreme Court." *Chi Mei*, 395 F.3d at 1320. This lack of clarity may have been another factor inclining the Federal Circuit to remand for jurisdictional discovery, to ensure that the jurisdictional issue would be resolved on an adequate record.

18

a result of [BCD's] overall business plan")) That may well be. *See generally In re Elonex Phase II Power Mgmt. Litig.,* 2003 WL 21026758, at *2 (D. Del. May 6, 2003) (finding jurisdiction over manufacturer of monitor incorporated as component in computers, stating that manufacturer's extensive reseller networks in Delaware and on internet meant it could not "credibly claim it had no inkling that some of its monitors would make their way into Delaware via well-established distribution channels"). Unfortunately for PI, its conclusory statements are not evidence.

I am left with two options: dismiss for lack of jurisdiction, or order limited discovery targeted to evaluating the credibility of BCD's asserted lack of knowledge and intent. In light of the Federal Circuit's guidance in *Chi Mei*, I believe I must take the latter course.

PI has made out a prima facie case for jurisdictional discovery. Its factual allegations at least suggest, with reasonable particularity, the possible existence of requisite contacts between Defendants and Delaware. If Defendants knew that their accused chips would be incorporated into Samsung's products, and if Defendants further knew that Samsung would distribute these products throughout the United States, a finding of an intent and purpose to serve the United States market, including Delaware, may well be justified. BCD's representations in its financial documents touting its "established distribution channels" in the U.S., as well as its "close relationships" with end users having extensive marketing and sales operations throughout this country (including Samsung), make it plausible to believe that BCD may have had an intent that the accused chips end up in Delaware. But I cannot premise jurisdiction on conjecture. PI must come forward with evidence.

After I ordered supplemental briefing, PI set out eight specific discovery requests relating

19

to personal jurisdiction. (D.I. 53 at 10) Several of these requests are overly broad, seeking evidence that has nothing to do with the accused products. The outstanding, dispositive issue is quite narrow: is there evidence of BCD's intent and purpose to serve the Delaware market, as part of the United States market, with the accused chips? Such an intent and purpose may be shown by actual knowledge that the established distribution channels of others in the stream of commerce would predictably and regularly result in the entry of BCD's chips into Delaware (either as stand-alone products or as components of other products).

I will order jurisdictional discovery limited to the following:

1.      Copies of BCD's agreements with its distributors to the extent such agreements relate to the accused products (AP3700, AP3700A, AP3700E, AP3710).

2.      All documents relating to the design or testing of BCD power supply chips, or Samsung products incorporating BCD power supply chips, for compliance with U.S. regulatory standards for safety (e.g. UL), EMI (e.g. FCC) or energy efficiency (e.g. Energy Star).

3.      All documents relating to BCD's efforts to analyze the U.S. market for its power supply chips or any end product incorporating its power supply chips.

4.      Documents related to BCD's efforts to solicit sales of its power supply chips to U.S. companies.[7]

5.      Any records or logs of communications relating to the accused products or products incorporating power supply chips between BCD and U.S. residents, including in Delaware, through BCD's website or electronic mail.

6.      Any evidence that BCD intended to exclude Delaware or a region including Delaware from its efforts to market, distribute, or sell power supply chips in the U.S.

_____

[7]For reasons explained earlier in this opinion, I reject BCD's contention (D.I. 58 at 9-10) that discovery relating to the U.S. market generally would not show actions purposefully directed to Delaware. Any evidence that Defendants use Future Electronics (or any other distributor) to deliver the accused chips to the United States, from which they might enter Delaware, may constitute evidence supporting a finding of intent to serve the Delaware market.

7.    Deposition(s) of a knowledgeable person or persons pursuant to FRCP 30(b)(6) on the foregoing topics.

## **CONCLUSION**

I will discuss with the parties in the coming days the timing of the discovery I have

ordered and the impact of this ruling on the previously-issued schedule for briefing and arguing

PI's pending preliminary injunction motion.  An appropriate order follows.