IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| POWER INTEGRATIONS, INC., | ) | **REDACTED** |
| | ) | **PUBLIC VERSION** |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-633-JJF-LPS |
| | ) | |
| BCD SEMICONDUCTOR | ) | |
| CORPORATION and SHANGHAI | ) | |
| SIM-BCD SEMICONDUCTOR | ) | |
| MANUFACTURING CO., LTD., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' ANSWERING SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

*Of Counsel*:

E. Robert Yoches
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

Robert L. Burns
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
11955 Freedom Drive
Reston, VA 20190
(571) 203-2700

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
3300 Hillview Avenue
Palo Alto, CA 94304
(650) 849-6600

Dated: June 16, 2008

ASHBY & GEDDES
Steven Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*
BCD SEMICONDUCTOR
CORPORATION and SHANGHAI
SIM-BCD SEMICONDUCTOR
MANUFACTURING, CO., LTD.

{00223711;v1}

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

I.      INTRODUCTION .................................................................................................1

II.     BACKGROUND ...................................................................................................2

III.    ANALYSIS.............................................................................................................2

        A.      BCD Has No Contacts with Delaware...................................................2

        B.      There Is No Evidence BCD Intended for Samsung to Distribute Chargers
                Containing the AP3700 IC Throughout the United States.......................5

        C.      PI's Remaining Evidence Fails to Show That BCD Directed Any Activity
                Towards the United States That Resulted in Any Accused Product Being
                Sold in Delaware....................................................................................10

        D.      The Court Should Disregard PI's Unsupported Speculation Regarding the
                Number of AP3700 ICs in Delaware. ....................................................14

IV.     Conclusion ..........................................................................................................15

## TABLE OF AUTHORITIES

### Cases

*American Bio Medica Corp. v. Peninsula Drug Analysis Co.*,
No. Civ.A. 99-218, 1999 WL 615175 (D. Del. Aug. 3, 1999) ........................................ 4

*Asahi Metal Industry Co. v. Superior Court of California*,
480 U.S. 102 (1987) ........................................................................ 3, 5, 6, 10

*Boone v. Oy Partek Ab*,
724 A.2d 1150 (Del. Super. Ct. 1997) ...................................................... 4, 9

*Commissariat a L'Energie Atomique v. Chi Mei Optoelectronics Corp.*,
395 F.3d 1315, 1321-22 (Fed. Cir. 2005) ...................................................... 6

*Energy Transportation Group, Inc. v. William Demant Holdings A/S*,
No. C.A. 05-422, 2008 WL 78748 (D. Del. Jan. 4, 2008) ................................ 4

*ICT Pharmaceuticals, Inc. v. Boehringer Ingelheim Pharmaceuticals, Inc.*,
147 F. Supp. 2d 268 (D. Del. 2001) ........................................................... 3

*In re Elonex Phase II Power Management Litigation*,
No. 01-082, 2003 WL 21026758 (D. Del. May 6, 2003) ................................ 4

*Intel Corp. v. Silicon Storage Tech., Inc.*,
20 F. Supp. 2d 690 (D. Del. 1998) ...................................................... 4, 10

*LaNuova D&B, S.p.A. v. Bowe Co.*,
513 A.2d 764 (Del. 1986) ........................................................................ 4

*LG.Philips LCD Co. v. Chi Mei Optoelectronics, Corp.*,
Nos. 06-726-JJF, 07-357 JJF, 2008 WL 1897687 (D. Del. Apr. 29, 2008) ................ 4, 5

*M&M Techs., Inc. v. Gurtler Chems., Inc.*,
No. Civ.A. 03-994, 2005 WL 293509 (D. Del. Feb. 8, 2005) ........................... 4

*MEMC Electronic Materials, Inc. v. Mitsubishi Materials Silicon Corp.*,
420 F.3d 1369, 1376 (Fed. Cir. 2005) ........................................................ 9

*Metabolite Laboratories, Inc. v. Laboratory Corp. of America Holdings*,
370 F.3d 1354, 1364 (Fed. Cir. 2004) ........................................................ 9

*Motorola, Inc. v. PC-Tel, Inc.*,
58 F. Supp. 2d 349 (D. Del. 1999) ............................................................. 4

*Padcom, Inc. v. NetMotion Wireless, Inc.*,
No. Civ 03-983, 2004 WL 1192641 (D. Del. May 24, 2004) ........................... 4

*Philips Electronics North America Corp. v. Contec Corp.*,
No. Civ.A. 02-123, 2004 WL 503602 (D. Del. Mar. 11, 2004) ........................ 4

*Siemens Aktiengesellschaft v. LG Semicon Co.*,
69 F. Supp. 2d 622 (D. Del. 1999) ............................................................. 4

*Tobin v. Astra Pharmaceutical Products, Inc.*,
    993 F.2d 528, 544 (6th Cir. 1993) ................................................................. 8

*Wright v. American Home Products Corp.*,
    768 A.2d 518 (Del. Super. Ct. 2000) ............................................................ 4

## Statutes

Del. Code Ann. tit. 10, § 3104(c)(1) (2004) ................................................................ 2

Del. Code Ann. tit. 10, § 3104(c)(4) (2004) ................................................... 2, 4, 5, 14

## Rules

Fed. R. Evid. 1006 .................................................................................................. 15

## I.    INTRODUCTION

Defendant Shanghai SIM-BCD Semiconductor Manufacturing Co., Ltd. (BCD) is located in China and sells the accused device, the AP3700 integrated circuit (IC), to Korean distributors who then sell it to Korean manufacturers of cell-phone chargers.[1]  These Korean manufacturers sell their chargers to Samsung, and Samsung ships them, presumably with cell phones, to its customers (typically service providers such as AT&T and Verizon) around the world. Samsung's U.S. customers then ship the chargers (with cell phones) to their stores in the United States.  Thus, for any AP3700 IC in a Samsung charger sold in Delaware, at least four companies independent of BCD are responsible for the final destination of that IC after it leaves BCD's control in China.   No court has ever found personal jurisdiction in Delaware from such attenuated contacts, and doing so here would not only conflict with Delaware's long-arm statute and the United States Constitution, but also conflict with cases that found no jurisdiction in the presence of stronger contacts.

In its April 11, 2008 Memorandum Opinion (D.I. 67), this Court found that Power Integrations, Inc. (PI) had not provided sufficient evidence to satisfy either Delaware's long-arm statute or the Due Process Clause of the United States Constitution.  (*Id.* at 19.)  Instead of dismissing the case, the Court allowed PI to take jurisdictional discovery and gave it one more chance to show that "Defendants knew that their accused chips would be incorporated into Samsung's products, and . . . knew that Samsung would distribute these products throughout the United States."  (*Id.*)  If PI could prove both elements, the Court concluded, "a finding of intent and purpose to serve the United States market, including Delaware, may well be justified."  (*Id.*)

---

[1]        **REDACTED**                                              Ex. 1 (Wang Dep.) at 45:22-46:3.

Even after extensive discovery, however, PI has failed to prove both elements. Although BCD has never denied knowing that the AP3700 ICs would be incorporated into certain Samsung chargers, the evidence fails to show that, prior to this lawsuit, BCD knew "Samsung would distribute such products throughout the United States." The only evidence PI advanced to show this second prong concerns projects that did not result in the manufacture of any products at all. They involved either (1) a

**REDACTED**

or (2)

unsuccessful efforts to sell products to other companies. The evidence actually shows that BCD believed Samsung would not sell chargers with the accused AP3700 ICs in the United States. Accordingly, the Court should dismiss this case.

## II.    BACKGROUND

On January 21, 2008, BCD moved to dismiss this action for lack of personal jurisdiction. (D.I. 10.) Upon the completion of initial and supplemental briefing, the Court found "[n]o one provision of the Delaware long-arm statute captures the facts of this case." (D.I. 67 (Mem. Op.) at 14.) Despite finding no evidence to support jurisdiction under 10 Del. Code § (c)(1) or (c)(4), the Court allowed limited discovery to resolve the issues of jurisdiction over BCD under the theory of "dual jurisdiction." (*Id.* at 19.) The Court determined that the "concept of 'dual jurisdiction' pursuant to Delaware's long-arm statute is functionally equivalent to Justice O'Connor's test" (*id.* at 17), so the question now before the Court is whether PI has shown the exercise of jurisdiction over BCD comports with due process under the O'Connor standard.

## III.    ANALYSIS

### A.    BCD Has No Contacts with Delaware.

"[T]he constitutional touchstone of the determination whether an exercise of personal jurisdiction comports with due process remains whether the defendant *purposefully established*

2

'minimum contacts' in the forum State." *Asahi Metal Indus. Co. v. Superior Court of Ca.,* 480 U.S. 102, 108-09 (1987) (emphasis added) (internal quotation marks omitted). Even PI does not allege that BCD has established direct contacts with Delaware or with any in-state actors. This Court has recognized that in such situations, there is no jurisdiction because the cases finding jurisdiction in the absence of direct contacts with Delaware have *at least* required direct contacts between the nonresident defendant and the alleged in-state infringers. *See ICT Pharms., Inc. v. Boehringer Ingelheim Pharms., Inc.,* 147 F. Supp. 2d 268, 273 (D. Del. 2001) ("[I]n the absence of a direct contact between the nonresident defendant and the forum State, the courts have at least demanded a direct contact between the resident and nonresident defendants.").

PI asserts specific jurisdiction from the sale in Delaware of Samsung chargers by wireless service providers (e.g., AT&T, Verizon, and Sprint). (*See* D.I. 18 (Hauck Decl.) ¶¶ 2-5.) The chain of events that might bring an accused product into Delaware is undisputed, and involves at least four independent actors after the AP3700 ICs leave BCD: BCD sells the AP3700 ICs to one of its Korean distributors (1), who then sells the ICs to a Korean charger manufacturer (2), who then sells chargers to Samsung (3) in Korea. (D.I. 43 (BCD Reply Br.), Ex. 1 (Wang Decl.) ¶ 5.)

**REDACTED**

*See* Ex. 2 (AT&T Dep.) at 26:6-28:6; *see also* (D.I. 18 ¶ 4). The in-state actors-at-issue here are either the wireless service providers (e.g., AT&T) or their customers. There is no dispute that BCD has no contact with the wireless service providers or their customers.

The presence of all these intervening entities distinguishes this case from all the Delaware cases PI cited that found jurisdiction. In each of those cases—*LaNuova*, *Boone*, *Wright*, *Philips*, *In re Elonex*, *Motorola*, *Energy Transportation Group*, and *Padcom*[2]—the defendant engaged a distributor who sold the accused product to customers in Delaware, creating sufficient minimum contacts with the forum state. (*See* D.I. 43 (BCD Reply Br.) at 7-9; D.I. 58 (BCD Suppl. Br.) at 2.) On the other hand, in the cases finding no jurisdiction—*Siemens*, *Silicon Storage Technology*, *M&M Technologies*, *American Bio Medica*[3]—the defendant, like BCD, sold a component to a manufacturer who incorporated it into another product distributed in Delaware through a channel the defendant did not create, control, or employ. (*See* D.I. 43 at 15; D.I. 58 at 7.) Any connection between the defendants in the latter cases and Delaware was too attenuated to form the minimum contacts necessary for jurisdiction. BCD's connection with Delaware is even more tenuous. (*See* D.I. 43 at 10-11; D.I. 58 at 7-8.) Accordingly, exercising jurisdiction over BCD would effectively overrule each of those cases.

PI cites a recent case, *LG.Philips LCD Co. v. Chi Mei Optoelectronics, Corp.*, Nos. 06-726-JJF, 07-357-JJF, 2008 WL 1897687 (D. Del. Apr. 29, 2008), to support its assertion of jurisdiction, but that case involved a finding of general jurisdiction under subsection (c)(4). *Id.*

---

[2] *LaNuova D&B, S.p.A. v. Bowe Co.*, 513 A.2d 764 (Del. 1986); *Boone v. Oy Partek Ab*, 724 A.2d 1150 (Del. Super. Ct. 1997); *Wright v. Am. Home Prods. Corp.*, 768 A.2d 518 (Del. Super. Ct. 2000); *Philips Elecs. N. Am. Corp. v. Contec Corp.*, No. Civ.A. 02-123, 2004 WL 503602 (D. Del. Mar. 11, 2004); *In re Elonex Phase II Power Mgmt. Litig.*, No. 01-082, 2003 WL 21026758 (D. Del. May 6, 2003); *Motorola, Inc. v. PC-Tel, Inc.*, 58 F. Supp. 2d 349 (D. Del. 1999); *Energy Transp. Group, Inc. v. William Demant Holdings A/S*, No. C.A. 05-422, 2008 WL 78748 (D. Del. Jan. 4, 2008); *Padcom, Inc. v. NetMotion Wireless, Inc.*, No. Civ. 03-983, 2004 WL 1192641 (D. Del. May 24, 2004).

[3] *Siemens Aktiengesellschaft v. LG Semicon Co.*, 69 F. Supp. 2d 622 (D. Del. 1999); *Intel Corp. v. Silicon Storage Tech., Inc.*, 20 F. Supp. 2d 690 (D. Del. 1998); *M&M Techs., Inc. v. Gurtler Chems., Inc.*, No. C03-994, 2005 WL 293509 (D. Del. Feb. 8, 2005); *Am. Bio Medica Corp. v. Peninsula Drug Analysis Co.*, No. C99-218, 1999 WL 615175 (D. Del. Aug. 3, 1999).

4

at *4.  Central to the decision was the "substantial revenue" Chi Mei Optoelectronics (CMO) generated from product sales in Delaware. *Id.* at *5.  In addition, CMO had 100% ownership in CMO USA, a Delaware corporation, and CMO's joint venture iZ3D was also incorporated in Delaware. *Id.* LG.Philips noted the purpose of CMO owning these Delaware corporations was "to market and sell CMO products in the U.S.," and CMO shipped substantial quantities of its products directly into the United States, knowing and intending they be sold there. *Id.* at *3. The Court also found that CMO "acted in consort" with the companies that actually shipped the LCD panels into Delaware. *Id.* at *5.  None of these connections exist here.

The Court has already determined that the evidence PI previously offered was insufficient for general jurisdiction under (c)(4) (D.I. 67 at 14), and PI has presented no new evidence to show otherwise.  Even using PI's inflated numbers, which assume that all Samsung chargers in Delaware incorporate the AP3700, the revenues derived from the sale of those chargers amount to few hundred dollars per month (*see* D.I. 58 (BCD Suppl. Br.) at 5)—which clearly is insufficient to support a finding of general jurisdiction.  It is undisputed that BCD does not ship substantial quantities of the AP3700 to the United States.  Furthermore, BCD did not "act in consort" with the U.S. wireless service providers or their customers to place cell-phone chargers on Delaware store shelves.  Indeed, BCD did not even know chargers using the AP3700 were in Delaware prior to this lawsuit. (*See infra* § III.B.)  Thus, *LG.Philips* is inapposite.

### B.    There Is No Evidence BCD Intended for Samsung to Distribute Chargers Containing the AP3700 IC Throughout the United States.

PI spends much of its brief attempting to show that BCD knew or should have known its products were entering the United States.  The Supreme Court of California took the same position in *Asahi* and was reversed. *See Asahi*, 480 U.S. at 108 ("The [California] court considered Asahi's intentional act of placing its components into the stream of commerce—that

is, by delivering the components to Cheng Shin in Taiwan—coupled with Asahi's awareness that some of the components would eventually find their way into California, sufficient to form the basis for state court jurisdiction under the Due Process Clause. We granted certiorari, and now reverse." (citation omitted)). Justice O'Connor rejected the "mere foreseeability or awareness" standard, stating that "a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *Id.* at 112.

In addition, the Federal Circuit has stated that there is no jurisdiction under the O'Connor standard if the evidence showed only (as it does here) that a foreign defendant's component was incorporated into final products sold in the forum, even if the flow of those products into Delaware was "regular and anticipated." *Commissariat a L'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395 F.3d 1315, 1321-22 (Fed. Cir. 2005). Moreover, even should the Court give some weight to mere awareness or foreseeability, the evidence shows that, before PI filed this action, BCD was not aware that Samsung was shipping chargers using the AP3700 into Delaware, nor was that destination reasonably foreseeable.

PI's brief suggests that because "BCD knows Samsung sells its cell phones in the United States" BCD also must have known that chargers with the AP3700 were sold in Delaware. (D.I. 102 (PI Br.) at 5.) PI's own documents, though, disprove this argument. For example, even though

**REDACTED**

(D.I. 17 (Renouard Decl.), Ex. A, at 4       **REDACTED**

6

**REDACTED**

Further, Samsung never consulted BCD about the countries in which chargers with BCD parts were to be sold. (D.I. 43, Ex. 1 (Wang Decl.), ¶ 7.) Although PI disputes this fact, (*see* D.I. 102 (PI Br.), Ex. 43, at 1), the evidence PI cites proves BCD's point. First, the evidence shows that, prior to this lawsuit, BCD understood its products were destined for non-U.S. markets.[4] (D.I. 43, Ex. 1, ¶ 7.) To the extent that Samsung planned to sell the 3.5-Watt charger containing the AP3700 IC in the United States, it never told BCD about its plans, which would have **REDACTED**

*See* Ex. 1 (Wang Dep.) at 31:5-24.[5]

Second, the evidence PI cites to show that BCD directed Samsung to the U.S. market consists solely of documents referring to **REDACTED** not a 3.5- or 3.6-Watt charger. (*See*

---

[4] Samsung chargers incorporating the AP3700 have a power rating of 3.5-3.6 Watts, *see* Ex. 3 (Oct. 2007 AP3700 Presentation), at BCDS0087803 (showing the Samsung 3.6W charger); *see*

**REDACTED**

[5] Therefore, there is no basis for PI's allegation that BCD has misled the Court in saying that Samsung has not consulted with BCD concerning the destination of its chargers. (D.I. 102 (PI Br.), Ex. 43, at 1.)

D.I. 102 (PI Br.) at 4-5 (citing D.I. 102, Exs. 6, 8-11)[6].)  This evidence is irrelevant, since

**REDACTED**

Ex. 1 (Wang Dep.) at 30:22-32:17; 95:7-15.  Any evidence concerning the  **REDACTED**

cannot satisfy this Court's requirement that PI show BCD "knew that Samsung

would distribute these products [i.e., the 3.5W chargers] throughout the United States."

Moreover, cases applying Justice O'Connor's due process test have relied only on

activities that actually contributed to the plaintiff's claim to show that the defendant intended to

serve the jurisdiction.  For example, in its Order permitting PI to take additional discovery, the

Court cited *Tobin v. Astra Pharmaceutical Products, Inc.*, 993 F.2d 528 (6th Cir. 1993).  (D.I. 67

at 13.)  In that case, the plaintiff alleged that she was harmed in Kentucky by a drug (ritodrine)

manufactured by a co-defendant, Duphar B.V.  *Tobin*, 993 F.2d at 531-32.  In applying Justice

O'Connor's due process analysis, the Sixth Circuit found that Duphar had intended to serve the

U.S. market based on Duphar's efforts to seek and maintain FDA approval for ritodrine as well

as its agreement allowing another co-defendant to distribute ritodrine throughout the United

States.  *Id.* at 543.  In finding that Duphar was subject to jurisdiction in Kentucky, the Court

specifically discussed the causal relationship between these acts and the plaintiff's injury.  *Id.* at

543-44 ("Duphar cannot deny that by licensing Astra to distribute ritodrine in all fifty states it

employed the distribution system that brought ritodrine to Kentucky" where it caused plaintiff's

injury.)

---

[6] Exhibit 10 refers to

**REDACTED**

*See, e.g.,* Ex. 7,
BCDS0028904, BCDS0028906, and BCDS0028908, and the e-mails cited *supra* at page 7 n.4.

Likewise, the Delaware cases applying Delaware's "dual jurisdiction" theory require a causal connection between the acts showing the defendant intended to serve Delaware and the plaintiff's cause of action.  *See, e.g.*, *Boone*, 724 A.2d at 1157 (explaining that Delaware's long-arm statute is satisfied where "the intent or purpose on behalf of the manufacturer to serve the Delaware market *results in the introduction of the product to this State and plaintiff's cause of action arises from injuries caused by that product*" (emphasis added)); (D.I. 58 (BCD Suppl. Br.) at 2-3).  Since Samsung never **REDACTED** , BCD's activities with respect to that design could not have contributed to the allegedly infringing acts that PI claims to have occurred in Delaware.[7]  As a result, the activities PI cites concerning the **REDACTED** cannot be used by PI to support its jurisdictional arguments.

The only other exhibits PI cited to show intent by BCD (D.I. 102 (PI Br.), Exs. 5, 12) concern charger projects designed for **REDACTED** a Taiwanese company, and **REDACTED** located in Turkey.  Neither company has purchased any of the accused products.[8]  *See* Ex. 1 (Wang Dep.) at 67:16-22; 68:13-25; 90:17-92:8 **REDACTED** *id.* at 38:1-39:9 **REDACTED** *id.* 45:22-46:4 (stating

---

[7] Nor can evidence concerning the **REDACTED** be used to show that BCD has somehow induced Samsung to infringe.  (*See* D.I. 91 (PI's Reply Br. in Supp. of Prelim. Inj.) at 18 (citing D.I. 91, Exs. CC-FF).)  Samsung never made a **REDACTED** and there can be no induced infringement without direct infringement.  *See Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings*, 370 F.3d 1354, 1364 (Fed. Cir. 2004).

[8] PI also alleges that the evidence concerning **REDACTED** contradicts BCD's statement that **REDACTED** (*See* D.I. 102 (PI Br.), Ex. 43, at 2.)  That statement, however, obviously concerned **REDACTED** (D.I. 43 (BCD Reply Br.) at 4.)  As explained above, **REDACTED** is located in Turkey.  Ex. 6 (Chan Dep.) at 118:23-25.  Moreover, simply providing a sample to a customer does not constitute an offer for sale.  *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1376 (Fed. Cir. 2005) ("We have defined liability for an 'offer to sell' under section 271(a) according to the norms of traditional contractual analysis.").

that the          REDACTED

Thus, those projects are as irrelevant as the          REDACTED

C.    **PI's Remaining Evidence Fails to Show That BCD Directed Any Activity Towards the United States That Resulted in Any Accused Product Being Sold in Delaware.**

After rejecting the "mere foreseeability or awareness" standard, Justice O'Connor set

forth what a plaintiff must show for a court to exercise jurisdiction:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, [1] designing the product for the market in the forum State, [2] advertising in the forum State, [3] establishing channels for providing regular advice to customers in the forum State, or [4] marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.

*Asahi*, 408 U.S. at 112 (numbering added).  PI only addresses the first and fourth of Justice

O'Connor's examples, but has no evidence for either.  For example, PI alleges that because some

companies considering the accused products wanted chargers with those products to comply with

certain U.S. standards, BCD designed its products specifically for use in the U.S. market.  (D.I.

102 (PI Br.) at 3, 6-9.)  PI's logic fails for several reasons.  First, the evidence PI cites regarding

compliance with U.S. standards is dated *after* BCD designed the AP3700 and even after PI filed

its Delaware complaint.  (*See* D.I. 102, Exs. 5 (Nov. 12, 2007), 7 (Nov. 16, 2007), 15 (Oct. 22,

2007), 16 (Nov. 19, 2007), 17 (Nov. 29, 2007), 18 (Dec. 6, 2007), 19 (Jan. 29, 2008), 20 (Jan.

23, 2008).)  Therefore, it has no relevance to jurisdiction.  *See Intel Corp.*, 20 F. Supp. 2d at 697.

Second, most of the U.S. standards are standards for much of the world, so a

manufacturer saying it intends to meet certain U.S. standards does not necessarily intend to sell

its products here.  (Ex. 1 (Wang Dep.) at 123:14-124:17.)  PI's own website confirms this.  For

example, PI spends most of its argument on the Energy Star standard (*see* D.I. 102 at 6-7), but

PI's website announces that the "Energy Star Program is mutually recognized in many countries." Ex. 8, Energy Star - International, *at* http://www.powerint.com/greenroom/reg_intlenergystar.htm; *see also* Ex. 9, Energy Star International Partners (Australia, Canada, European Union, Japan, New Zealand, and Taiwan), *available at* http://www.energystar.gov. Similarly, although PI cites a document showing that one of BCD's potential customers, Phihong, wanted to meet the CEC (California Energy Commission) standard to show an intent to serve the United States (D.I. 102 (PI Br.) at 3), PI itself has announced that China has harmonized its own standards with both the CEC and Energy Star standards. Ex. 10, June 14, 2005 PI Press Release); *see also* Ex. 11, Zacks Equity Research ("Australia not only adopted the CEC standards, but made compliance mandatory by April 2006."), *at* http://www.zacks.com/pfp/index.php?arc=20060324. Likewise, the UL and FCC standards PI cited (D.I. 102 at 7-8) are models for similar standards around the world.[9]

With regard to the fourth of Justice O'Connor's examples, "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State," PI repeats the same arguments it raised previously concerning Future Electronics ("Future"). Future, however, is a worldwide distributor of BCD products and manages its U.S. sales and distribution

---

[9] *See, e.g.*, Ex. 12, ("As UL's standards continue to be used as a basis for harmonization with other international standards, they increasingly will be used for markets around the world."), *at* http://www.astm.org/SNEWS/NOVEMBER_2003/bbp_nov03.html; Ex. 13, ("Each year, more than 14 billion UL Marks are applied to products worldwide . . . ."), *at* http://findarticles.com/p/articles/mi_m0EIN/is_1999_Sept_2/ai_55649944; Ex. 14, ("EMC requirements vary from country to country, however most countries have requirements on radiated emissions similar to the FCC requirements."), *at* http://emclab.mst.edu/emcproc.html); Ex. 15, at 8 ("The regulation of EMC in Canada is similar to that in the US.") and 14 ("Many PRC [People's Republic of China] standards are identical to international, FCC or ETSI standards."), *at* http://www.ieee.li/pdf/guide_to_global_emc_requirements_2007.pdf; Ex. 16, (discussing the European standard, "CISPR22" and noting that "[t]he FCC has similar standards in the USA"), *at* http://power-topics.blogspot.com/2007/11/guide-to-emc-standards-for-power.html.

activities out of Canada. Ex. 6 (Chan Dep.) at 39:24-25; 42:12-25. It has never offered the accused products for sale in the United States, and .          **REDACTED**

*See id.* at 43:8-24. Further, the Court has already found that Future's worldwide representation of BCD is not a sufficient contact with Delaware. (*See* D.I. 67 (Mem. Op.) at 3, 14-15.) Moreover, as PI learned in discovery but did not advise this Court, BCD has sales representatives in the United States responsible for the Western, Midwestern, Southern, and Southeastern regions of the United States, but not the Northeast and Mid-Atlantic regions (including Delaware). Ex. 6 (Chan Dep.) at 70:20-75:12.[10]

PI then cites BCD's indemnification agreements as evidence that BCD intended to service the United States market. (D.I. 102 (PI Br.) at 9-10.) None of these agreements is between BCD and a company located in the United States, and, with one exception, none of them even specifically mentions the United States. (*See* D.I. 102, Exs. 13 (at 15), 22, 25.) The one exception is Exhibit 39 to PI's brief (D.I. 102), which is a June 2006 agreement that pre-dates the release of the AP3700 IC. *See* Ex. 6 (Chan Dep.) at 76:9-12. PI also characterizes Mr. Wang's testimony as alleging that indemnifying infringement of U.S. patents is a standard term in all of BCD's agreements. All Mr. Wang said is that he "would think this is standard format" but he has not "seen most of the actual agreements between BCD and the distributors." Ex. 1 (Wang Dep.) at 59:8-60:9. One need only look at Exhibits 22 and 25 of PI's brief (D.I. 102) to see that indemnification of U.S. patent infringement is not a standard term. PI cites no case law

---

[10]    Accordingly, PI's allegation that BCD has misrepresented the facts concerning the lack of distributors in Delaware (D.I. 102 (PI Br.), Ex. 43, at 3) lacks merit.

that an indemnification for worldwide patent infringement constitutes purposeful action directed toward Delaware.[11]

PI's final attempt to show that BCD directed its efforts at Delaware concerns its marketing efforts to large American companies like     **REDACTED**     (D.I. 102 (PI Br.) at 10-11 (citing D.I. 102, Exs. 28-30).) None of these communications involved any person located in Delaware and, contrary to PI's representations, none mentions the accused products. PI knows, but does not inform the Court, that the person in charge of BCD's U.S. sales has never "talked to anyone at   **REDACTED**   about the 3700 or 3710" (Ex. 6 (Chan Dep.) at 144:12-14), and has

**REDACTED**

(*id.* at 42:12-50:17; 51:9-55:16).[12] The only U.S. activity PI cites as involving the

---

[11] PI baselessly asserts that these indemnification agreements contradict BCD's earlier statements that BCD has not "insured any person, property, or risk in Delaware." Indemnification is not insurance. Further, the Court has already rejected the idea that using Future as a worldwide distributor shows an intent to distribute to Delaware (*see supra* page 12). Thus, there is no basis for PI's assertion that a worldwide indemnification agreement is directed towards Delaware.

[12] Although neither party has relied on BCD's answers to PI's requests for admission concerning these companies, PI has cited them in its Exhibit 43 as being inconsistent with information BCD provided in discovery. In attempting to create this inconsistency, however, PI fails to inform the Court that BCD's denials were based on its objection to the term "conducts business," which PI did not define in propounding its requests. (*See* D.I. 102 (PI Br.), Ex. 42 at 2-5; *see also* Ex. 17, March 14 letter from Puknys to Headley, at 2 ("As to request Nos. 1, 3-7, you request that we explain our objection to the phrase 'conducts business.' It is not defined and is especially ambiguous given that BCD utilizes several distributors to resell BCD products to non-party manufacturers, as disclosed in the various declarations filed with BCD's motion to dismiss and related papers.").)

Rather than reformulating its requests, PI dropped the issue and chose to depose Mr. Chan about the relationships BCD had with these and other companies. Consistent with BCD's objection, Mr. Chan explained during his deposition that BCD's interactions with these large American companies "is a very complex question to answer" because these interactions typically involve BCD's independent distributors and the companies' independent contract manufacturers. (Ex. 6 (Chan Dep.) at 131:11-24; 140:17-141:1; 142:9-13; *see also* Ex. 1 (Wang Dep.) at 84:25-85:4.)

(continued on next page)

13

REDACTED

accused products involves a few samples provided to                U.S. subsidiary in California.

(D.I. 102 (PI Br.) at 11.)        REDACTED            Ex. 6 (Chan Dep.) at 38:12-39:3.

### D.    The Court Should Disregard PI's Unsupported Speculation Regarding the Number of AP3700 ICs in Delaware.

Although not invited to do so by the Court, PI attempted to "better estimate the volume of infringing BCD power supply chips that have been sold in the United States." (D.I. 102 at 13-14.)  The Court should reject this untimely attempt to have the Court reconsider its earlier finding that "the dollar figures alleged here do not, on their own, establish the kind of continuous and substantial presence [(c)(4)] is aimed at identifying." (D.I. 67 at 14-15.)

In addition, PI's analysis is faulty on several grounds.  PI's revised figures assume all 30 million Samsung charges sold in the United States from January 2007 to April 2008 contain the AP3700 IC.  PI's own witness, Bruce Renouard, contradicts this assumption, as he testified that BCD

REDACTED

(D.I. 17 (Renouard Decl.) at 2.)

REDACTED

[13]  Moreover, Mr. Renouard's documents show that

REDACTED

See supra pages 6-7.  Mr. Renouard also testified

REDACTED

---

(continued from previous page)
Reasonable minds might differ over whether these indirect interactions constitute BCD "conducting business" with these companies.  PI, however, cannot legitimately allege that BCD's responses, or its witnesses' deposition responses, were misleading.

[13]        REDACTED

.  (D.I. 43 (Wang Decl.) ¶ 4.)

REDACTED                                                    (D.I. 17

(Renouard Decl.) at 2.)                    REDACTED

Further, PI's estimates depend on summaries provided by AT&T (D.I. 102 (PI Br.), Ex.

34) and Verizon (D.I. 102, Ex. 35). In neither instance has PI "made available for examination

or copying" the underlying documentation that was used to create the summaries. Ex. 2 (AT&T

Dep.) at 28:12-29:25. As such, they are inadmissible. *See* Fed. R. Evid. 1006.

PI's figures also assume Samsung phones make up the same percentage of the sales of all

of the American wireless carriers as they do for Verizon's and AT&T's. There is no evidence to

support that assumption. Finally, PI's argument that a high percentage of Delaware residents

own mobile phones (D.I. 102 (PI Br.) at 11) is meaningless, especially when PI's own Exhibit 36

shows that Delaware accounts for about 1/3 of one-percent of all U.S. cell-phone users.

## IV.    Conclusion

For the reasons set forth in this brief and the other papers BCD filed in support of its

motion to dismiss, Defendants respectfully request the Court dismiss this action.

ASHBY & GEDDES

*/s/ John G. Day*
_____
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE  19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Defendants*
BCD SEMICONDUCTOR
CORPORATION and SHANGHAI
SIM-BCD SEMICONDUCTOR
MANUFACTURING, CO., LTD.

*Of Counsel*:

E. Robert Yoches
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
901 New York Avenue, NW
Washington, DC 20001
(202) 408-4000

Robert L. Burns
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER, L.L.P.
11955 Freedom Drive
Reston, VA 20190
(571) 203-2700

Erik R. Puknys
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, L.L.P.
3300 Hillview Avenue
Palo Alto, CA 94304
(650) 849-6600

Dated: June 16, 2008

**EXHIBIT 1**
**(Deposition  of Li-Jen Wang dated May 28, 2008 -**
*Highly Confidential - Attorneys Eyes Only*
*Filed Under Seal***)**

# EXHIBIT REDACTED

**EXHIBIT 2**
**(Deposition Transcript of Ellen Watson of AT&T**
**dated June 6, 2008)**

# EXHIBIT REDACTED

**EXHIBIT 3**
**(Oct. 2007 AP3700 Presentation**
**BCDS0087778-0087808**
*Highly Confidential - Attorneys Eyes Only*
*Filed Under Seal*)

# EXHIBIT REDACTED

**EXHIBIT 4**
**(Email dated 6/7/2007**
**BCDS0028593-0028596**
*Highly Confidential - Attorneys Eyes Only*
*Filed Under Seal***)**

# EXHIBIT REDACTED

**EXHIBIT 5**
**(Email dated 5/9/2007**
**BCDS0075853-0075854**
*Highly Confidential - Attorneys Eyes Only*
*Filed Under Seal*)

# EXHIBIT REDACTED

**EXHIBIT 6**
**(Deposition Transcript of Kang Chan dated April 15, 2008**
*Highly Confidential - Attorneys Eyes Only*
*Filed Under Seal*)

# EXHIBIT REDACTED

**EXHIBIT 7**
**(BCDS0028901-0028909**
*Highly Confidential - Attorneys Eyes Only*
*Filed Under Seal***)**

# EXHIBIT REDACTED

**EXHIBIT 8
(http://www.powerint.com/greenroom/
reg_intlenergystar.htm)**

Power Integrations



 Search

Applications | Products | Design Support | Green Solutions | Sales Info | Company Info

## Green Room

▸ **Regulations**
Design Help
Energy FAQs
Research




Technical Support Search
Parametric Search

### Energy Star - International

**Countries:** Australia, Canada, European Union, Japan, Taiwan

**Type:** Voluntary Label

**Links:** **Energy Star International Page**
**Energy Star Australia**
**Energy Star Canada**
**Energy Star EU**
**Energy Star Japan**
**Energy Star Taiwan**

**Search for Regulations**

| By Agency | ▾ |
|---|---|

| By Application | ▾ |
|---|---|

| By Location | ▾ |
|---|---|

The Energy Star Program is mutually recognized in many countries. Participation thus far:

Australia - office equipment and consumer electronics
Canada - most products
European Union - office equipment
Japan - office equipment
Taiwan - office equipment
Mexico - interested in air conditioners, refrigerators, & office equipment
China & Brazil - Working on harmonization with Energy Star levels

| PRODUCT | MAX STANDBY |
|---|---|
| External Power Supplies | **Table 1: Energy-Efficiency Criteria for Active Mode** <br> Nameplate Output Power ($P_{no}$): 0 to ≤ 1 watt — Minimum Average Efficiency in Active Mode (expressed as a decimal): $\geq 0.49 * P_{no}$ <br> > 1 to ≤ 49 watts — $\geq [0.09 * Ln (P_{no})] + 0.49$ <br> > 49 watts — $\geq 0.84$ <br> **Table 3: Energy Consumption Criteria for No Load** <br> Nameplate Output Power ($P_{no}$): 0 to < 10 watts — Maximum Power in No-Load: ≤ 0.5 watts <br> ≥ 10 to ≤ 250 watts — ≤ 0.75 watts |
| Cordless Phones Combination Units Additional Handsets | 3.3 W (w/SST 3.6 W) <br> 4 W (w/SST 5.1 W) <br> 1.5 W |
| DVD Players | 1 W |
| Televisions | 1 W - 15 W depending on type. View details. |
| VCRs | 4 W |
| DVD Players | 1 W |
| TV/VCR and TV/DVD Combination Units | TV/VCR Combo Units: 6 W <br> TV/DVD, VCR/DVD, TV/VCR/DVD Combo Units: 4 W |
| Set Top Boxes | 3 - 20 W depending on type. View details. |
| Home Audio | 1 W |
| Computers | 15 - 30 W, depends on power rating. View details. |
| Copiers | 5 - 20 W, depends on copier speed. View details. |
| Monitors | 15 - 30 W, depends on power consumption. View details. |
| Printers | 10 - 100 W, depends on print speed. View details. |
| Fax Machines | 10 - 100 W, depends on print speed. View details. |
| Scanners | 12 W |
| Multifunction Devices | 5 - 105 W, depends on print speed. View details. |
| Dishwashers | Standby included in overall energy calculation. See eligibility criteria. |

*Source: Energy Star, 2004. Please check source for latest information.

Copyright 2004 Power Integrations. All rights reserved. Contact Webmaster | Terms of Use | Privacy Policy | Chinese | Japanese | Korean

**EXHIBIT 9**
**(www.energystar.gov)**



# Who's Working With ENERGY STAR?
# International Partners

Agreements to promote certain ENERGY STAR qualified products were established with government agencies in various countries. These partnerships are intended to unify voluntary energy-efficiency labeling programs in major global markets and make it easier for partners to participate by providing a single set of energy-efficiency qualifications, instead of a patchwork of varying country-specific requirements.

- Australia
- Canada
- European Union
- European Free Trade Association
- Japan
- New Zealand
- Taiwan

## Australia  EXIT ⟵
The Australian Greenhouse Office is currently implementing ENERGY STAR for office equipment and consumer electronics products.

Contact: Charles Edlington, energy.star@greenhouse.gov.au

## Canada  EXIT ⟵
Natural Resources Canada (NRCan) is implementing ENERGY STAR in Canada for a broad range of products including office equipment, consumer electronics, heating and cooling equipment, home appliances, lighting and signage, distribution transformers, commercial solid door refrigerators and freezers, and windows.

Contact: Ms. Anne Wilkins, equipment@nrcan.gc.ca

## European Union  EXIT ⟵
The European Commission (EC) is implementing ENERGY STAR in the European Union (EU).

Contact: EC Directorate General for Transportation and Energy, ENERGYSTAR-EU@cec.eu.int

## European Free Trade Association
The European Free Trade Association (EFTA) is implementing ENERGY STAR in Norway, Iceland, and Liechtenstein.

EFTA Contact: Ms. Birgitte Andersen, birgitte.andersen@efta.int

Norwegian Contact: Ms. Tone Wroldsen, tone.wroldsen@oed.dep.no

Icelandic Contact: Larus M. K. Olafsson, Larus.Olafsson@ivr.stjr.is

Liechtenstein Contact: Silvan Kieber, Silvan.Kieber@avw.llv.li

## Japan EXIT ⤴

The Energy Conservation Centre, Japan (ECCJ) is implementing ENERGY STAR for office equipment on behalf of the Ministry of Economy, Trade, and Industry.

Contact: Dr. Kotaro Ohkuni, k.ohkuni@eccj.or.jp

## New Zealand EXIT ⤴

The Energy Efficiency and Conservation Authority (EECA) has implemented ENERGY STAR for office equipment, consumer electronics products, heat pumps/air conditioners and dishwashers.

Contact: Nicola Boughtwood, info@energystar.govt.nz

## Taiwan EXIT ⤴

The Environment and Development Foundation (EDF) is implementing ENERGY STAR for office equipment on behalf of the Environmental Protection Administration of Taiwan.

Contact Dr. Ning Yu, ningyu@edf.org.tw or Mr. Brown Lo, brown@edf.org.tw

# International Labeling Requirements for ENERGY STAR Qualified Office Equipment

Labeling of ENERGY STAR qualified office equipment is mandatory in some ENERGY STAR international partner countries and strongly encouraged in others. Use of the ENERGY STAR mark includes placement on the top or front of the qualified products, on product packaging, in product literature and box inserts, and on manufacturer Web sites. Regardless of where a product is manufactured, sold, and/or promoted, any use of the ENERGY STAR mark must comply with the ENERGY STAR Identity Guidelines. As part of its ENERGY STAR agreement, each country is required to monitor use of the ENERGY STAR mark.

Within the United States, labeling of qualified models and associated materials is a requirement for ENERGY STAR participation. The specific requirements for each product category are outlined in the product-specific Partner Commitments, which are available on the ENERGY STAR Web site. Only manufacturers with qualified models who have otherwise met their partnership obligations (from labeling to submittal of annual unit shipment data) are displayed/promoted on the ENERGY STAR Web site. EPA and DOE undertake substantial efforts to monitor the application and use of the ENERGY STAR trademark and to ensure that partners are fulfilling the participation requirements. These efforts include monitoring print advertisements, Web sites and domain names, in-store use, and print article content. Failure to comply with any of the ENERGY STAR requirements may result in suspension or termination of an organization's ENERGY STAR Partnership Agreement.

Labeling Requirements by Country/Region 🔁 (87KB)

# International ENERGY STAR Activities:

## The US and the People's Republic of China Agree to Promote Harmonization of Efficiency Standards

China has announced a goal of reducing energy intensity 20 percent by 2010. In support of this goal, EPA and the China Standard Certification Center (CSC) EXIT ⤴ have agreed to begin voluntary work toward harmonizing energy-efficiency standards for a variety of products, including consumer electronics and office equipment.

EPA Press Release

Contact: Kong Chiu, chiu.kong@epa.gov

## Power Integrations, Inc.

Power Integrations, Inc. has designed a Web site which provides information on changing international energy efficiency regulations. Visit the Power Integrations Green Room EXIT ⤴ to search for regulations by regulation-setting agency, product

application, or location.

Power Integrations is a supplier of high-voltage analog integrated circuits, which when integrated in energy-efficient power supplies that are used with finished products, help end-use product manufacturers to meet energy-efficiency programs the world over.

## 2005 ENERGY STAR International Stakeholders Meetings

On March 14, 2005, international country partners for ENERGY STAR met in Washington, DC to present a status update on the implementation of ENERGY STAR for product labeling in each country. In addition, presentations were made on the status of a centralized database to house all qualified product information for ENERGY STAR and on international coordination regarding CFLs and related new technologies. The meeting agenda, list of participants, and presentations can be downloaded below.

- Meeting Agenda 📄 (28KB)
- List of Attendees 📄 (39KB)

### Country Updates
- Australia 📄 (598KB)
- Canada 📄 (1.01MB)
- European Union 📄 (3.69MB)
- Japan 📄 (465KB)
- Taiwan 📄 (805KB)
- United States 📄 (3.70MB)

### Other Presentations
- Presentation on the Online Product Information (OPI) System 📄 (788KB)
- Presentation on International Coordination for CFLs and New Technologies (Presentation 1) 📄 (98KB)
- Presentation on International Harmonization of CFL Standards (Presentation 2) 📄 (95KB)

Notes and presentations from the March 15, 2005 Computer Industry Meeting

Notes and presentations from the March 16, 2005 Imaging Equipment Industry Meeting

## 2002 ENERGY STAR International Stakeholders Meetings

In May of 2002, the international ENERGY STAR partners met to review the status of ENERGY STAR in each country, discuss progress on a centralized database and communication tool, and provide information on progress toward revising the ENERGY STAR specification for computer monitors. The meeting agenda, list of participants, summary, and presentations can be viewed via the following links

- Meeting agenda 📄 (62KB)
- Meeting summary 📄 (94KB
- List of participants 📄 (74KB)
- Long-term vision for database 📄 (39KB)

### Country Updates in PowerPoint Format
- Australia 📄
- Canada 📄
- European Commission 📄
- Japan 📄
- Taiwan 📄
- United States 📄

International Partners : ENERGY STAR

Presentation on the database and communication tool 🔳

Presentation on revising the ENERGY STAR specification for computer monitors 🔳

 Email This Page

Products | Home Improvement | New Homes | Buildings & Plants | Partner Resources | Kids
Publications | News Room | FAQs | Contact Us | Privacy | Site Index | Recursos en Español
PDF Viewer | Excel Viewer

 EPA Home
EPA Search

DOE Home
DOE Search

**EXHIBIT 10**
**("Power Integrations Enables Compliance with**
**New Energy Standards in China" - Power**
**Integrations Press Release dated 6/14/2005)**



🖶 Print  ✉ Email  📄 Download PDF  📑 Add to Briefcase
« Previous Release | Next Release »

# Power Integrations Enables Compliance with New Energy Standards in China

### Cost-Effective EcoSmart&reg; ICs Offer Unique Combination of Energy Efficiency and Embedded Safety Features

SAN JOSE, Calif. – June 14, 2005 – Power Integrations, Inc., the inventor of EcoSmart energy-efficiency technology, today noted that its high-voltage integrated circuits enable manufacturers to comply with energy-efficiency standards issued recently by the China Certification Center for Energy Conservation Products (CECP). The new standards address the energy consumption of external power supplies - the chargers and adapters that power cell phones, portable music players, digital cameras, cordless phones, portable games and many other devices.

The CECP standards are harmonized with standards implemented in recent months by the California Energy Commission (CEC), Energy Star and the European Union. Like Energy Star, the CECP conducts a voluntary program offering manufacturers incentives to produce environmentally friendly products. The standards include minimum operating-efficiency requirements at various levels of output power, and impose a maximum level of "no-load" power consumption. The standards effectively rule out the use of linear transformers, the highly inefficient copper-and-iron power supplies commonly sold as external adapters with many electronic devices.

"The effort to rid the world of the wasteful power supplies known as 'energy vampires' has gained considerable momentum in recent months," noted Balu Balakrishnan, president and CEO of Power Integrations. "Policy makers in many of the world's largest markets, including China, have coalesced around a common set of efficiency standards that essentially rule out the use of linear transformers in external power supplies."

"Power Integrations' LinkSwitch ICs are specifically tailored for the replacement of low-power linear transformers," continued Balakrishnan. "No other solution offers the same combination of cost-effectiveness, ease of design and integrated safety features such as hysteretic thermal shutdown and over-voltage protection."

Copy-ready reference designs for energy-efficient external power supplies, as well as complete information on global energy-efficiency standards, can be found in the Power Integrations Green Room at www.powerint.com/greenroom.

### About Power Integrations
Power Integrations, Inc. is the leading supplier of high-voltage analog integrated circuits used in power conversion. The company's breakthrough integrated-circuit technology enables compact, energy-efficient power supplies in a wide range of electronic products, in both AC-DC and DC-DC applications. The company's EcoSmart&reg; energy-efficiency technology, which dramatically reduces energy waste, has saved consumers and businesses around the world more than an estimated $1 billion on their electricity bills since its introduction in 1998. For more information, visit the company's Web site at www.powerint.com. For information on global energy-efficiency standards and EcoSmart solutions, visit the Power Integrations Green Room at www.powerint.com/greenroom.

Close window | Back to top

**EXHIBIT 11
(http://www.zacks.com/pfp/
index.php?arc=20060324)**



## 31 Stocks that Doubled!

How many of your stocks doubled this year? Since David & Tom Gardner launched *Motley Fool Stock Advisor* in April 2002, a full 31 of their picks have doubled in value or more. In a free report, The Motley Fool co-founders each reveal their No. 1 stock idea for 2008. Another double? Find out now. **Click here for "The Motley Fool's 2 Top Picks!"**

*Results as of 5/13/08

HOME  ZACKS RESEARCH  PORTFOLIO  COMMUNITY  BROKER RESEARCH  **MARKETS**  SCREENING  EDUCATION  PRODUCTS

Earnings    EPS Surprises    Mutual Funds    Options    My Account    Help

## ▲ ZACKS
### INVESTMENT RESEARCH
*Proven Ratings, Research & Recommendations*

Free Stock Screener
Find winning stocks with our new and improved Stock Screener. Now more powerful, easier to use, but still free. Try it now!

[  ] GO ▶  🔍 Search for Ticker          Login                    [          ] GO ▶

**Adjust your Losing Trades into Winners**        ✛ Sponsored Links ✛        **96% Winning Trades in 2007**

---

**PROFIT FROM THE PROS**

Profit from the Pros

Get Zacks' free daily email with profitable stock picks and timely market advice!

Email:
[                    ]

☑ Also receive special offers

[ SIGN UP! ]

Privacy Policy

### Top Zacks Features

Free Membership
Zacks Rank
Equity Research
My Portfolio
Stock Screener
Profit Tracks
Mutual Funds
Options
Zacks Audio
RSS Feed [RSS]
Profit from the Pros



POWER
E*TRADE
**100** FREE TRADES

### Products & Services

Method for Trading
Breakout Trader
Champion Trader
Chart Patterns Trader
Momentum Trader
Options Trader

---

### TODAY'S TOPICS

**1. ZACKS EQUITY RESEARCH:** With worldwide energy standards becoming more stringent, we are optimistic about the prospects of power technology. Read the Analyst Interview and get our Bull and Bear Stocks of the Day.

**2. PROFIT TRACKS – DISCOUNTED FUNDAMENTAL STRENGTH:** Discover stocks with strong underlying fundamentals and low valuations.

**3. ZACKS RANK BUY STOCKS:** Today we highlight four new Zacks #1 Ranked Stocks; WESCO Int'l (WCC), UBS AG (UBS), Digital River (DRIV), and Laclede Group (LG). Get these stories below.

**4. FEATURED EXPERTS:** Richard Rhodes explains that lower prices may be forthcoming. Learn why and check out some of his holdings.

- - - - - - - - - - - - - - - - -

In November, a tiny $0.38 company from California joined the ranks of IBM, Apple, Sony and Toyota by winning the 2005 World Technology Award.

Its stock hit $1.50 in February, over $2.00 in March, and is about to soar

---

# ZACKS.COM PROFIT from the PROS
## Tactics that Work in Good Markets and Bad

Friday - March 24, 2006

Want to view the archive of past issues? Go to: http://at.zacks.com/?id=2283.

Manage Profit from the Pros subscription:
* Free Subscription: http://at.zacks.com/?id=2284
* Change of address: http://at.zacks.com/?id=2285
* Unsubscribe: http://at.zacks.com/?id=2286

### 1. ZACKS EQUITY RESEARCH

Back to top

As we have taken to focus more closely on sectors within our analysts' coverages lately, we asked senior semiconductors analyst Ken Nagy what would be a good sub-sector to hone in on. When he mentioned that power semiconductors was an interesting group, we asked him a few questions about it.

What exactly do these power semiconductors do?

Utilities transport electrical energy using an alternating current (AC) scheme, which minimizes energy loss. Semiconductor ICs require direct current (DC) power sources in order to operate, thus the AC power must be converted or transformed into DC. Power semiconductors' product lines of ICs control, condition or convert electrical energy into a form that can be used to power various devices. The ICs are then utilized by other OEMs in alternating current (AC) to direct current (DC) converters, and, more recently, in DC-to-DC converters. Power Integrations (POWI) was a pioneer in the development of a cost effective high-voltage integrated switcher product line that replaced the legacy discrete switchers in the 1990's.

More. . .

---

**Did you get into Taser before it jumped 25%?
We did! Learn how to get into the right stocks at the right time.**

Take our free webinar and start making money in the market. You will learn:

■ Proven methods for picking the right stock

Zacks.com - Profit from the Pros - Home

Surprise Trader
Value Trader
Invest with Zacks
Partner Newsletters
Special Reports
Top 10 Stocks
Research Wizard
Zacks Premium
Zacks Elite
All Products



ZACKS
STOCK
PICKING
CHAMP

MAULS THE

MARKET

BY NEARLY

15 TIMES

CLICK HERE

POWER
E✱TRADE

even higher when its products first hit the market next month. But there's still a chance for you to capitalize on this rare opportunity before the general public even knows about it - and rack up 1,566% in the next three months.

- How to adjust your trades from losers to winners
- How to make money if your stock jumps 25% or drops 50%

Take control of your earning ability. Click here.

Back to top

## Zacks Equity Research continued...

Companies such as POWI are meeting customer demand for more fully integrated power supplies. This company's patented integrated structure and cheaper manufacturing process combine low-voltage and high-voltage circuits on the same silicon chip. This lowers the overall power conversion cost of the end product and shrinks the footprint, or size.

What is the catalyst for power semiconductors at this time?

With worldwide energy standards becoming more stringent, we are optimistic about power technology. In particular, several new government standards are being enacted that will force new products to adopt newer technologies, displacing the inefficient legacy linear transformers.

The standards imposed by the California Energy Commission (CEC) will become mandatory for all external power supplies by January 2007. This is a critical event given that California is the seventh largest economy in the world and usually the pioneer in leading edge legislation that many other states usually adopt later. For instance, in January of 2005, the CEC standards were adopted by the U.S. EPA for the Energy Star program. The voluntary Energy Star program is attempting to modify consumer behavior, and is hopefully encouraging consumers to economically support energy efficient products. Qualifying products must comply with the program standards in order to earn an Energy Star.

Washington State and Arizona have both since adopted the same California standard. China recently announced a new voluntary program similar to the Energy Star program, and has also adopted the California standards. The European Commission has set European standards for energy-efficient external AC/DC power supplies that are even more stringent than the CEC standards, although it is initially on a voluntary basis. Australia not only adopted the CEC standards, but made compliance mandatory by April 2006.

The current worldwide energy situation has created greater sensitivity to the burgeoning problem. POWI's integrated power products conform to these new standards. As customers begin to design-in integrated power ICs that are in conformance with these new energy efficiency standards, POWI should be able to capitalize on the conversion.

Are there any specific developments worth citing?

Well, the California Energy Commission recently pushed out an industry mandate that would have created an earnings catalyst. The CEC conducted a hearing the first week of February as OEMs requested a delay in the implementation of the external power supply standard. On Wednesday, February 15, the CEC delayed the mandate until January 1st 2007. This is a little disappointing for investors, but it just means earnings (say $0.03-0.05 in POWI's case) will be pushed off for about six months. Also, there is some question whether or not other states follow California's lead in delaying this standard. At this point, it still remains to be seen.

How do you see the power semiconductor segment performing in 2006?

Before the mandate I just mentioned was pushed back, I felt the power semiconductor segment would outperform the semiconductor universe in 2006. Now that this highly symbolic mandate is effective January 1st of 2007, I feel 2007 will be the year "Power Semi" outperforms. My outlook for 2006 is in-line with the broad semiconductor universe. Which, if you look at the Zacks industry outlook, is positive for 2006.

Keep in mind that these chips are not simply used in electronic gadgets, but in white goods such as washing machines and refrigerators. With the cost of power rising anywhere from 5-15% in the last year, any product that reduces energy needs is a natural to outperform.

As far as advice I'd give investors on how to play this group, I would say the best policy would be to continue gathering knowledge on this technology. Also, they should be on the lookout to see if other states, countries and corporations are continuing to adopt these standards.

*Ken Nagy is a senior Zacks analyst covering the semiconductor sector of the information technology industry.*

Back to top

## MORE FROM ZACKS EQUITY RESEARCH...

**Analyst Blog - NEW!**

**Get real-time market insights** from Zacks Equity Research Analysts. To see the latest posts, click here.

### BULL OF THE DAY

**Eli Lilly (LLY)** - Excellent Pipeline. For full Zacks research report, click here.

### BEAR OF THE DAY

**Tele Centro Oeste (TRO)** - Weak Fourth Quarter. For full Zacks research report, click here.

### ZACKS INDUSTRY OUTLOOK

**Zacks Industry Rank for the Week of Mar 20**

When external factors affect one industry group, other related groups are also often affected. More...

### EARNINGS TRENDS

**Estimate Revisions Positive for both 2006 and 2007**

Director of Research Dirk Van Dijk says analysts have been raising more earnings estimates for both 2006 and 2007 than they have been cutting. More...

---

**Learn More about Zacks Equity Research at http://at.zacks.com/?id=2287.**

Full access to Zacks Equity Research reports is only available with a subscription to the Zacks Advisor. Besides the articles noted above you will also discover:

- 1150 In-Depth Company Research Reports with Recommendations
- Economic Outlook & Market Strategy Reports
- Zacks Focus List (stocks for the long term)
- Zacks Timely Buys List (stocks for the short term)

To learn more about ZacksAdvisor.com and the free trial offer, click here.

---

### 2. PROFIT TRACKS

Back to top

Zacks.com is proud to share with you some of the best trading strategies that truly allow you to Profit from the Pros. Today we highlight...

## Profit Tracks: Discounted Fundamental Strength

Fundamental strength is often a key criterion for many investors. A strong balance sheet and a history of profitability indicate that a company has the ability to meet its obligations and the flexibility to pursue opportunities for growth. Therefore, such stocks are often perceived as having a lower level of risk.

The lower level of risk often results in higher valuations. Occasionally, however, the markets undervalue a stock relative to its company's fundamental strength. When this occurs, opportunities for profits are created. This Profit Track identifies such opportunities.

Backtesting results show just how successful this Profit Track has been. Double-digit returns have been achieved during each of the past four years. In 2005, this strategy continued to handedly beat the S&P 500.

**Here are four stocks that make the grade for the Discounted Fundamental Strength Profit Track:**

**Avnet, Inc. (AVT)** is one of the world's largest industrial distributors of electronic components and computer products and a Zacks #1 Rank (Strong Buy) company. AVT reported fiscal second-quarter earnings of 50 cents per share, excluding charges, in late January. The result surpassed the consensus estimate by nearly 22% and topped the previous year's performance. Avnet, Inc. offers a debt/equity level of 0.39 and a PEG Ratio of 0.90. Continue your research on AVT at: http://at.zacks.com/?id=2290.

**Celadon Group, Inc. (CLDN)** released fiscal second-quarter financial results in mid-January. The company stated that it produced record revenue, net income, and earnings per diluted share on strong operating results across nearly all measures. CLDN has low levels of debt as evidenced by its debt/equity level of 0.06. The company's shares offer a PEG ratio of 0.61 and price/sales multiple of 0.75. Continue your research on CLDN at: http://at.zacks.com/?id=2291.

**Quanex Corp. (NX)** is an industry-leading manufacturer of value-added engineered materials and components for the vehicular products and building products markets. In late February, the company announced fiscal first-quarter earnings that outperformed analysts' expectations. NX noted that overall housing and remodeling activity was seasonally strong during the quarter, in part, due to mild weather conditions across the Midwest and Northeast. NX sports current ratio of 1.66 and a debt/equity level of 0.20. Continue your research on NX at: http://at.zacks.com/?id=2292.

**P.A.M. Transportation Services, Inc. (PTSI)** is an irregular route, common and contract motor carrier authorized to transport general commodities and another Zacks #1 Rank (Strong Buy) name. In early February, PTSI reported fourth-quarter earnings of 41 cents per share, improving on last year's 16 cents and jumping ahead of the consensus estimate by almost 52%. PTSI, meets the criteria of this Profit Track with its current ratio of 2.29 and a debt/equity level of 0.24. Continue your research on PTSI at: http://at.zacks.com/?id=2293.

To see the full list of stocks that currently pass this winning screen, go to: http://at.zacks.com/?id=2294.

All the Profit Track strategies were created and backtested using the Research Wizard software from Zacks Investment Research. If you like this screening strategy, but want to narrow down the list of stocks and even improve the performance, then you should start a free trial to this powerful stock picking tool. Learn more about the Research Wizard free trial offer and our new special report "Top 10 Stock Screening Strategies" at: http://at.zacks.com/?id=2295.

**SCREEN OF THE WEEK**

**A Strategy for a Return on Your Investment**

Kevin Matras shows how a good stock screener can be your best tool for picking options: http://at.zacks.com/?id=2289.

## 3. ZACKS RANK BUY STOCKS

Back to top

Every day on Zacks.com we highlight four Zacks Rank Buy stocks. Each individual stock is chosen based on how well they match the criteria for the four main schools of investing: Aggressive Growth, Momentum, Growth & Income and Value.

**Aggressive Growth – WESCO International, Inc. (WCC)**

WESCO International, Inc. (WCC) has exceeded earnings estimates for 12 consecutive quarters, with year-over-year growth exceeding 100% several times. All seven analysts covering the stock have increased their numbers for 2006. Over the past 90 days, 2006 estimates have increased 15.1% to $3.28 per share. The stock is attractively valued at 15.9x next year's estimates of $3.84, below the long-term growth rate of 17.33%, giving the stock a PEG ratio of 0.92. Read the full analysis on WCC at: http://at.zacks.com/?id=2505.

**Growth & Income – UBS AG (UBS)**

UBS AG (UBS), one of Europe's largest banks, reported that its fourth-quarter profits more than tripled. The

company remains optimistic heading into 2006, as deal pipelines are promising. Earnings per share have grown 39.3% over the past five years and are forecasted to grow 17.1% over the next 3-5 years. The company is currently yielding 2.3% and has a five-year average dividend yield of 1.9%. Read the full analysis on UBS at: http://at.zacks.com/?id=2506.

More...

---

### How is Ben Zacks Going To Invest His PRIVATE CLIENTS in 2006?

Over the last 10 years, Ben Zacks is BEATING THE S&P 500 BY 82%. Many people may not realize that Ben Zacks invests assets for a group of Private Clients. These investors receive highly personalized consultative attention for their investments based on Ben's personal selection of securities. He utilizes strategies and a team of professionals that ARE NOT AVAILABLE ON ANY WEBSITE. We would like to offer you a FREE KIT detailing Ben's complete track record along with a brochure that describes the time tested philosophy of the Zacks Wealth Management Program.

Click here to receive BEN ZACKS' PRIVATE CLIENT TRACK RECORD.

---

Back to top

## Zacks Rank continued...

### Momentum -- Digital River (DRIV)

Digital River (DRIV) already up 46% this year. Is it headed higher? The company provides comprehensive electronic commerce outsourcing solutions. They are an application service provider that enables its clients to access their proprietary electronic commerce system over the Internet. They have developed a technology platform that allows them to provide a suite of electronic commerce services. The company also provides analytical marketing and merchandising services. They provide an outsourcing solution that allows its clients to promote their own brands while leveraging the company's investment in infrastructure and technology. Read the full analysis on DRIV at: http://at.zacks.com/?id=2507.

### Value - The Laclede Group, Inc. (LG)

Profits spiked in the first quarter of fiscal 2006 for The Laclede Group, Inc. (LG), a Zacks #1 Rank stock. Analysts' earnings estimates for the company's current fiscal year have been trending higher as a result. The Board of Directors raised its quarterly dividend to 35.5 cents per share. LG currently yields 4.3%. The company has a price-to-book (P/B) multiple of 1.8. ad the full analysis on LG at: http://at.zacks.com/?id=2508.

### Zacks Rank Resources

- View All Zacks #1 Rank stocks: Go to: http://at.zacks.com/?id=2297.

- Free Zacks Rank Guide: Learn how to use the Zacks Rank to pick more profitable stocks. Get the guide: http://at.zacks.com/?id=2553.

- Zacks Advisor: Discover Ben Zacks' hand picked #1 Rank stocks on his Timely Buys list at: http://at.zacks.com/?id=2554.

- Zacks Wealth Management: Own all the Zacks #1 Ranked stocks in a portfolio managed by Zacks. Learn more at: http://at.zacks.com/?id=2555.

## 4. FEATURED EXPERTS

Back to top

Here we cast the spotlight on a timely Featured Expert commentary that recently appeared on Zacks.com. Following the article you will find previews of other profitable commentaries with insights and recommendations from leading investment experts.

## a) Richard Rhodes, Editor of The Rhodes Report

Case 1:07-cv-00633-JJF-LPS    Document 108-2    Filed 06/23/2008    Page 30 of 44
Zacks.com - Profit from the Pros - Home
Page 6 of 8

Back to top

Tuesday's trading session reminded Richard Rhodes and his of the very old game where a mole raises its head out of one of a number of holes and you must use a mallet to knock it back down before it comes up once again in another hole. After the S&P 500 and Russell 2000 poked "their heads" out to new highs above resistance at 1310 and 748 respectively, they were emphatically rejected and were "whacked down" in a very material manner to 1297 and 736. The key tell for Rhodes and his team during the probe to new highs were the fact that prices rallied off their early morning lows with advance/decline breadth figures skewed towards the negative. This rally was destined to fail from the outset, which has been the character of this entire rally off the early-March lows.

From a technical perspective, this "failure" has led to Rhodes and his team's favorite reversal pattern – the "outside reversal day" or "key reversal". In essence, the move to new highs "failed" and closed below the previous day's low, which increases the probability a tradable high has formed, and lower prices are forthcoming. Moreover, volume picked up on the decline, thereby confirming its validity.

Therefore, further downside movement is expected, which over the next several days fits in perfectly with the post-March expiration weakness before month-end strength is seen. Time will tell, but Rhodes and his team's "gut" tells them we won't see these highs again for quite some time in the future. Normally Rhodes and his team don't see a "bell."

### Holdings in the "Paid-to-Play" Portfolio include:

Kohl's (KSS) operates family oriented, specialty department stores primarily in the Midwest, Mid-Atlantic and Northeast areas of the United States that feature quality, national brand merchandise priced to provide exceptional value to customers. The company's stores sell moderately priced apparel, shoes, accessories and home products targeted to middle-income customers shopping for their families and homes. Kohl's stores feature easily accessible locations, well laid out stores, central checkout and good in-stock.

Hershey's (HSY) is a leading snack food company and the largest North American manufacturer of quality chocolate and non-chocolate confectionery products. Hershey markets such well-known brands as Hershey's, Reese's, Hershey's Kisses, Kit Kat, Almond Joy, Mounds, York, Jolly Rancher, Twizzlers, and Ice Breakers as well as innovative new products such as Swoops and Hershey's S'mores. Hershey also offers a variety of snack products to consumers, including Hershey's Cookies, Mauna Loa macadamia nuts, and Hershey's Snack Barz.

CNS Inc. (CNXS) develops and markets consumer health care products, including the Breathe Right nasal strip. The Breathe Right nasal strip improves breathing by reducing nasal airflow resistance. It can be effective in providing temporary relief for nasal congestion, reducing snoring and reducing breathing difficulties due to a deviated nasal septum. The company is exploring possibilities for acquiring new consumer health care products or companies that have established consumer brands. They are also considering opportunities for licensing new products and technologies.

Zebra Technologies (ZBRA) and its wholly-owned subsidiaries design, manufacture and support a broad range of direct thermal and thermal transfer bar code label printers, receipt printers, instant-issuance plastic card printers and secure identification printing systems, related accessories, and support software. The company markets its products worldwide principally to manufacturing and service organizations for use in automatic identification, data collection, and personal identification systems.

Georgia Gulf (GGC) is a leading North American manufacturer and international marketer of two highly integrated product lines, chlorovinyls and aromatics. The manufacturing processes also generate caustic soda and acetone. The primary products the company sells externally include PVC resins, PVC compounds and caustic soda in the chlorovinyls business and phenol and acetone in the aromatics business.

### About Richard Rhodes' The Rhodes Report newsletter:

The Rhodes Report offers unique and insightful daily perspectives into the US capital markets. At times, our assertions and recommendations are bold and out of consensus – which is very different from today's brokerage house research. In fact, many of our clients don't necessarily agree with everything in our reports, but they find the services stimulating as a source of ideas and useful as a confirmation or critique of their own viewpoints. http://at.zacks.com/?id=2330.

-------------------------------------------------------------------------

Back to top

## MORE FEATURED EXPERTS...

### b) Calling Bottom

Nadine Wong explains that Genzyme has been beaten up, despite its positioning for long-term growth. More...

**c) Two Recommendations**

David Fried provides two buy recommendations. Learn about an insurer and an energy holding company. More...

## OTHER TOOLS FROM ZACKS

Back to top

At the heart of Zacks Investment Research is the Zacks Rank investment philosophy that continues to vastly outperform the market. Our Zacks #1 Ranked (Strong Buys) have produced the following results for investors:

- +32.5% average annual return since 1988 versus +11.8% for S&P 500
- Outperformed S&P 500 in 17 of the last 18 years
- +43.8% total return from 2000 to 2002 - the worst bear market in over 60 years.
- +18% in 2005

And just as importantly, the Zacks #5 Rank stocks (Strong Sell) List has alerted investors as to which stocks to dump from Their portfolios to avoid unnecessary losses.

To truly take advantage of the Zacks Rank, you need to first understand how it works. That's why we created the free special report: "Zacks Rank Guide: Harnessing the Power of Earnings Estimate Revisions". Download a free copy now to prosper in the years to come, by visiting: http://at.zacks.com/?id=2296.

Or view the full list of Zacks #1 Ranked stocks at: http://at.zacks.com/?id=2297.

FREE PORTFOLIO TRACKER

Do you believe that these events affect stock prices?

- Broker Recommendation changes
- Earning Estimate revisions
- Earnings Announcements
- Zacks Rank changes

If you answered yes, then how are you staying on top of these changes for your stocks? If you are one of the 45,000 investors who wake up every morning to the Daily Portfolio Updates emails from Zacks.com, then you are all set. If not, then sign up now to get this vital information sent to you daily to help take definitive action to improve your portfolio's performance. Did we mention it's free? Get started now!

We hope you enjoyed this issue of "Profit from the Pros", And we look forward to visiting with you again next week.

REFER-A-FRIEND

If you enjoy this e-mail newsletter, then please pass it along to a friend. Simply forward them the link below to sign up for their own free subscription. If you're reading a forwarded copy, sign up for your own, so you get this wealth of information every week. Just click here. THANKS!

Regards and Happy Investing,

Charles Rotblut, CFA

Senior Market Analyst
Zacks.com

p.s. What is the mission for Zacks Profit from the Pros? Click here to find out how we will help you become a more successful investor.

The Zacks Performance Rank performance is the total return of equal weighted simulated portfolios consisting of those stocks with the indicated Zacks Rank net of fees. Results reflect the reinvestment of dividends and other earnings. Simulated results do not represent actual trading and may not reflect the impact that economic and market factors might have had on decision-making if an adviser were actually managing a client's money.

Zacks.com - Profit from the Pros - Home                              Page 8 of 8

The S&P 500 Index is a well-known, unmanaged index of the prices of 500 large-company common stocks, mainly blue-chip stocks, selected by Standard & Poor's. The S&P 500 Index assumes reinvestment of dividends but does not reflect advisory fees. An investor cannot invest directly in an index.

**Disclaimer:** Past performance does not guarantee future results. Investors should always research companies and securities before making any investments. Nothing herein should be construed as an offer or solicitation to buy or sell any security.

To contact us by mail:

Zacks Investment Research
Attn: Profit from the Pros
155 N. Wacker Drive, 6th Floor
Chicago, IL 60606

To unsubscribe from receiving "Profit from the Pros" e-mail newsletter, click here.

## ZACKS MARKETPLACE

**Free Forex Practice Account with GFT**
Learn Forex Trading Online with Free Training & Practice Account.
www.GFTforex.com

**3.950% Yield*, 1-Year CD**
Auctioned by Zions Direct, 6-13-08. Bid for Higher CD Yields Today.
www.zionsdirectauctions.com

**Diversify Your Portfolio With Commodities - Free Investor's Kit**
Don't be held captive to a slugish stock market. Diversify into commodities and energize returns.
www.commodityfundinvestor.com

**Pick Stocks That Win**
Top Market Timer Bernie Schaeffer shows you how with his Master Portfolio. Try it now for FREE.
www.schaeffersresearch.com

**Compare Life Insurance Rates**
Protection As Low as $17 a month. Get the lowest rate by comparing rates online. No Medical Exam.
Choose-Insurance.com

**How to Find Stocks that Will Make You Money**
Screen for stocks based on the criteria you specify. Get stock picks from our proven profitable strategies. Backtest it all to see how successful it is. Learn how you can try Zacks Research Wizard for free.
www.zacks.com

About Zacks | Invest with Zacks | Advertise | Media | Careers | Contact Us | Help
Disclaimer | Privacy Policy | Sitemap
NYSE and AMEX data is at least 20 minutes delayed.  NASDAQ data is at least 15 minutes delayed.
**Copyright 2008 Zacks Investment Research**

**EXHIBIT 12
(http://www.astm.org/SNEWS/NOVEMBER_2003/
bbp_nov03.html)**



TRANSPORT FUELS


View Cart



NOVEMBER 2003

**ASTM Home**    **SN Contents**

Standardizations
[navigation menu]

## Feature



**Underwriters Laboratories: Setting Safety Standards for 100 Years**

by Sonya Bird, Sarah Brooks, and Deborah Prince

While Underwriters Laboratories Inc. is respected as an independent, non-profit organization providing global testing and certification services, it is also a world leader in standards development. Through more than a century of involvement in standards and conformity assessment, UL is recognized for its unrivaled technical expertise in the areas in which it develops standards. UL's safety standards are used throughout the world to evaluate and certify products and systems for the U.S. market. As UL's standards continue to be used as a basis for harmonization with other international standards, they increasingly will be used for markets around the world.

UL's standards are consensus documents used by many parties:

• Manufacturers, which use the standards to design products and systems that meet requirements for certification;
• Regulatory authorities, which reference the standards for products and systems used in their jurisdictions;
• Code development organizations, such as the National Fire Protection Association and International Code Council, and government agencies, such as the Occupational Safety and Health Administration, which adopt and reference UL safety standards; and
• Certification organizations, which apply UL requirements for product evaluations.

Although deeply rooted in its public safety mission, UL has recently updated its process for standards development and maintenance to facilitate a broader range of participants and to reflect the changing needs of the standards community. UL continues this outreach through its support for internationally harmonized standards. UL has also committed numerous resources to making the standards development process more streamlined, establishing dedicated technical leadership positions, and working toward the latest Web-

Standards Search/ Store
Technical Committees/ Membership
News & Info
Site Map
ASTM Contacts
SN Archive
Artículos escogidos en Español

Standardization News Search
[ ] GO



based technology to develop and distribute standards.

## UL's Standards Development Process

The UL standards development process is based on the essential elements of the American National Standards Institute's standards development criteria. The process incorporates the following concepts:

• Continuous maintenance and open participation: UL continually monitors input from various users of UL standards and other interested groups addressing particular issues. Input is provided by industry, consumer groups, insurance representatives, and government agencies as well as by regulatory authorities, trade associations, and advisory groups. Anyone materially affected by a UL standard is encouraged to submit proposals. Standards Technical Panel meetings that result from proposals or are otherwise convened by UL are open.
• Consensus body review and ballot: Proposals to develop or revise a standard are balloted by the STP, the consensus body. Proposals must reach consensus — approval by two-thirds of returned votes — before UL publishes the requirements.
• Public review: UL provides public notice of, and the opportunity to comment on, all proposals.
• Comment resolution and circulation of substantive changes: All comments received on proposals are given due consideration. The disposition of comments is shared with participants, and substantive revisions to proposals resulting from the comments, along with continuing objections, are circulated. Consensus is verified during this phase.
• Opportunity for appeal: STP and public review participants with continuing objections have the right to appeal UL's intention to publish proposals that have completed the consensus process.
• Publication of revisions to the standard: UL notifies STP members and provides public notice of this phase of the process.

## Recent Enhancements to UL's Standards Development Process

UL continually strives to improve and streamline its methods of developing, maintaining, and publishing standards. UL has recently identified key process and technology improvements in standards development methods.

• The establishment of dedicated full-time STP chairs and primary designated engineers, who will devote their time solely to technical standards development activities and focus on larger standards issues such as harmonization, will improve the process.
• Conversion of UL standards documents to SGML (standard generalized markup language) has enabled UL to provide documents in a wide variety of media in addition to traditional printed standards.

## UL as a Standards Developer in the Future

The future of UL as a standards developer will require it to keep pace with emerging technology, anticipate new challenges and market demands, respond with flexible and efficient processes for developing standards, and remain committed to its historic mission of public safety. UL addresses these factors through two key



initiatives: international harmonization and electronic standards development.

## International Harmonization

A key ingredient in UL's future outlook is its commitment to international harmonization. Historically, UL has developed standards independently of other standards development organizations. This independent approach was sufficient when the only market that the manufacturers wanted to reach was that of the United States.

However, the market has become more global. Many manufacturers sell products in Canada, Mexico, Europe, and other nations around the world. Similarly, products manufactured in other countries are being made available in the United States. This means that the products must meet the requirements of multiple countries. The promulgation of multiple standards has resulted in redundant testing, and, in some cases, the need to manufacture different products as a result of conflicting or mutually exclusive requirements.

UL has recognized the manufacturers' dilemma and has initiated or supported harmonization efforts in an effort to minimize redundant standards.

UL's primary focus with respect to harmonization is international harmonization. Typically, international harmonization implies the adoption of an IEC (International Electrotechnical Commission) or ISO (International Organization for Standardization) standard, with a minimum of national differences. International harmonization could also mean the propagation of a UL standard as a proposed IEC or ISO standard, where none existed previously.

UL works with its STPs and other parties interested to identify IEC standards for possible adoption. Additionally, UL places importance on the need to reduce national differences in existing IEC-based UL standards, by either identifying and removing those national differences that are not critical to the U.S. standards system, or by proposing revisions to the IEC standard, thereby eliminating the need for the national difference in the U.S. version.

The process for developing and publishing an IEC-based UL standard consists of the following basic steps:

• Identification of an IEC standard of interest.
• Determining STP and industry support for the harmonization effort.
• Securing the rights to the IEC standard in the United States. (Note: This particular step can be problematic, as the U.S. Technical Advisory Group administrator must release these rights to UL before UL can publish the text from the IEC standard. This permission is not automatic.)
• Identifying those national differences that must be retained. National differences are typically based on U.S. code requirements, U.S. component requirements, and the U.S. safety system.
• Proposing the IEC standard and the national differences as the UL standard, and continuing with UL's normal standards development process.

Many of these steps can be conducted with the help of a harmonization committee or working group.





UL also demonstrates commitment to international standardization by actively participating in international standards development. UL continues to focus on its public safety mission by participating in more than 200 international committees, serving in leadership positions in many of those in an effort to actively pursue harmonization of UL standards with international standards. These activities seek to provide an avenue for safe products to the global marketplace and provide global market access for UL's customers.

In addition to its harmonization efforts internationally, UL also works on a regional basis with other standards developers. UL has co-published standards with ANCE (Mexico's Asociación Nacional de Normalización y Certificación del Sector Eléctrico), CSA (the Canadian Standards Association), UL Canada, and other standards developers in the United States, including ISA (The Instrumentation, Systems, and Automation Society). UL remains open to new harmonization opportunities in an effort to combine standards resources and reduce standards redundancy.

**Electronic Standards Development**

UL's standards development system has progressed from a set of requirements developed in-house for a domestic audience to a dynamic process that relies on input from a diversified global audience. UL's current system for processing standards proposals and revisions is paper-based, and very costly to all participants in terms of time and resources spent.

Therefore, UL has been actively developing an online collaborative system to be used by everyone involved in the development of UL standards. The Collaborative Standards Development System (CSDS) will provide for electronic publication, review, and comment resolution. The standards-development process will be even more open than UL's current system, providing for access globally 24 hours a day, seven days a week.

The pending implementation of CSDS will basically put UL's standards development process on the Internet. This system will make it easier for anyone who is interested in participating in the standards development process to do so no matter where they are located. It will allow for more international and consumer participation where travel costs have been prohibitive as well as provide a cost savings for current participants in the standards development process. In addition, the implementation of CSDS should dramatically reduce the staff time required to administer the process.

Basic concepts of CSDS include:

• All requests to change a standard are processed online;
• All balloting is conducted online;
• All commenting and comment resolution occurs online;
• Meeting information, including announcements, agendas and reports, are processed online;
• E-mail notifications are sent to appropriate recipients each time a new document is posted; and
• Any group associated with UL standards development can use the collaboration process to collaborate on any standards document, including a new standard, a piece of a standard, a meeting agenda or report, a proposal, a presentation, etc.

UL anticipates announcing the implementation of the CSDS system by mid-2004. The CSDS development and implementation represents one way that UL is taking advantage of technology to simplify and improve upon the UL standards development process.

**UL Standards – A Century of Safety Standards**

Millions of products and their components have been tested to UL safety standards, which increase user confidence in the UL Mark on a product and provides a safer environment. Safety standards remain a key ingredient in the U.S. safety system and, increasingly, the safety system of the world. UL looks forward to the next 100 years of excellence in safety standards development. //

Copyright 2003, ASTM



**EXHIBIT 13**
**(http://findarticles.com/p/**
**articles/mi_m0EIN/is_1999_Sept_2/ai_55649944)**

Case 1:07-cv-00633-JJF-LPS    Document 108-2    Filed 06/23/2008    Page 40 of 44

EOS Corp. Approved to Conduct Pre-Testing for Underwriters Laboratories Safety Certifications...   Page 1 of 5

▼ Ad Feedback



On CNET: Party efficiently with Google Maps

- **BNET Business Network:**
- BNET |
- TechRepublic |
- ZDNet



- All Bnet
- Articles
- Library
- Stocks
- Dictionary

Find business answers    Search

Advanced Search    Find Articles    in    free and premium articles    Search

- Login
- Newsletters
- My BNET

- Today
- Management
- Strategy
- Work Life
- Insight
- Industries
- Business Library
- Video



Find Articles in:
all
Business
Reference
Technology
News
Sports
Health
Autos
Arts
Home & Garden

Case 1:07-cv-00633-JJF-LPS   Document 108-2   Filed 06/23/2008   Page 41 of 44

EOS Corp. Approved to Conduct Pre-Testing for Underwriters Laboratories Safety Certifications...   Page 2 of 5

**Sponsored Links**

## Power Supply Controllers

Power supply product info & more. technical
articles & pricing avail.
www.analogdevices.com

## High Voltage Power Supply

Need High Voltage Power Supplies? See High
Voltage Power Supply.
motherearthnews.com

## Switching Power Supplies

Check availability, pricing & specs Order
Configurable Power Supplies!
www.digikey.com

## CE & Transmitter Testing

UL and CE testing, ITE and Medical FCC and
ETSI Standards testing
www.emctesting.com

## Ac Power Supplies Guide

The Top Industrial Resource. Find Ac Power
Supplies Quickly.
acpowersupplies.industrial101.com

## UL, TUV, CE Certification

Speed Up Med, IVD Safety Approvals Helping
manufacturers over 25 years
obcompman.com

(about)

▼ Ad Feedback



Microsoft Dynamics

Everyone gets it.



Content provided in partnership with

GALE
CENGAGE Learning

**Business Services Industry**

# EOS Corp. Approved to Conduct Pre-Testing for Underwriters Laboratories Safety Certifications

## Business Wire,  Sept 2, 1999

Case 1:07-cv-00633-JJF-LPS    Document 108-2    Filed 06/23/2008    Page 42 of 44

EOS Corp. Approved to Conduct Pre-Testing for Underwriters Laboratories Safety Certifications...    Page 3 of 5

- E-mail
- Print
- Link

CAMARILLO, Calif.--(BUSINESS WIRE)--Sept. 2, 1999--

Participation In the UL Client Test Data Program Can

Shorten Development Cycle Times for EOS Corp.'s

Ultra-Miniature, High-Efficiency Power Supplies

EOS Corp., the leading seller of ultra-miniature, high-efficiency power supplies, has been qualified to participate in the Underwriters Laboratories Inc. (UL) Client Test Data Program, EOS announced Thursday.

This allows EOS to pre-test its power supplies for product safety and submit the results to UL for evaluation, which should significantly reduce certification turnaround time and thus new product development cycles.

Most Popular Articles in Business

Research and Markets : Tesco Plc - SWOT Framework Analysis
Do Us a Flavor - Ben & Jerry's Issues a Call for Euphoric New Flavors
eBay made easy: ready to start an eBay business? These 5 simple steps will ...
Katrina's lawsuit surge: a legal battle to force insurers to pay for flood ...
Wal-Mart's newest distribution center opened last month near the southwest ...
**More** »

▼ Ad Feedback

Case 1:07-cv-00633-JJF-LPS    Document 108-2    Filed 06/23/2008    Page 43 of 44

EOS Corp. Approved to Conduct Pre-Testing for Underwriters Laboratories Safety Certifications...   Page 4 of 5



CLICK SWABIZ

Start managing your own corporate travel today and save.

SOUTHWEST SWABIZ
swabiz.com

The UL Mark has become the de facto mark of safety in the power supply industry. Standard certification procedures require product manufacturers to submit samples for detailed UL testing.

These procedures and subsequent certifications can generally take four or more weeks to complete. As a certified Client Test Data Program (CTDP) vendor, EOS is able to reduce that certification time to a shorter period.

"Time to market is of the essence in any high-tech industry, but it has become increasingly more so for power supplies," said James B. Schultz, executive vice president, marketing and sales for EOS. "In order to be competitive, we have to produce what the customers want quickly and in the most cost effective way. Being qualified to participate in UL's CTDP has enhanced our ability to accomplish both of these objectives."

Cycle design time is particularly critical for open-frame switching power supplies as these are often the last components to be designed into a product. The product design engineer oftentimes does not know until the final stages of development how much power will be required nor how much room is available for the power supply.

For this reason, EOS offers a competitive advantage because its open-frame switchers are the smallest and most efficient in the world. The addition of reduced cycle times further increases EOS' competitive advantage by allowing rapid response to the design engineer's requirements at the critical final development stage.

About Underwriters Laboratories Inc.

Underwriters Laboratories Inc. (UL), founded in 1894, is an independent, not-for-profit product safety testing and certification organization. Each year, more than 14 billion UL Marks are applied to products worldwide and UL has an undisputed reputation as the leader in U.S. product safety and certification.

UL has five testing laboratories in the United States and subsidiaries in Mexico, Denmark, England, Italy, India, Singapore, Taiwan, Hong Kong and Japan. UL also has numerous international, affiliate and representative offices, as well as field representatives located throughout the world. For further information visit www.ul.com.

About EOS Corp.

EOS is the leading seller of ultra-miniature, high-efficiency power supplies to electronic Original Equipment Manufacturers (OEMs) worldwide.

Founded in 1991, EOS is a privately held company that designs, manufactures and markets the most technologically advanced, densely packaged, and efficient external power adapters and internal and external multi-output and single-output power systems available.

Named in 1998 and 1999 by top accounting firm Deloitte and Touche to its list of the 50 fastest growing high-technology companies in Southern California, EOS supplies power systems to some of the world's leading and top brand electronic companies. EOS is an ISO9001 registered company.

For more information on EOS, contact the company via e-mail at info@eoscorp.com, at the company's home page at www.eoscorp.com, or call 800/293-9998.

COPYRIGHT 1999 Business Wire
COPYRIGHT 2000 Gale Group

- 1
- 2
- Next »

**Sponsored Links**

# Custom Power Supplies
Linear & Switching up to 900W Overmolding, assembly and more
www.peigenesispower.com

# Ac Dc Power Supply
Searching for ac dc power supply? Visit our online guide.
singularpurpose.com

# Buy Dc To Dc Power Supply
Looking For Dc To Dc Power Supply New Dc To Dc Power Supply Online!
dctodcpowersupply.cluesnideas.com

# Power Supplies at Newegg
PC Power Supplies on Sale now with Free Shipping Deals!
www.newegg.com

(about)

Find Featured Titles for: Sports

| ▼    CLICK TO VIEW    ▼ | Most Popular Publications in Business |

| ▼    CLICK TO VIEW    ▼ |

BNET
Site Help & Feedback

About CNET Networks
Jobs
Advertise
Partnerships
Site Map
RSS Site Map

Most Popular Articles in Business

| ▼    CLICK TO VIEW    ▼ |

Find Research Guides for:

| ▼    CLICK TO VIEW    ▼ |

Visit other CNET Networks sites: Select Site ▼ Go

Copyright © 2008 CNET Networks, Inc. All Rights Reserved. Privacy Policy | Terms of Use

**EXHIBIT 14**
**(http://emclab.mst.edu/emcproc.html)**

Missouri University of Science and Technology, Electromagnetic Compatibility Laboratory    Page 1 of 2



# EMC Regulations

**Commercial Products Marketed in the USA**

The FCC Rules and Regulations, Title 47, Part 15, Subpart B regulates "unintentional radio-frequency devices". Products regulated include *any unintentional radiator (device or system) that generates and uses timing pulses at a rate in excess of 9000 pulses (cycles) per second and uses digital techniques.* This includes almost every product that employs a microprocessor including workstations, personal computers, point-of-sale terminals, printers, modems, and many electronic games. It is illegal to sell or advertise for sale any products regulated under Part 15, Subpart B until their radiated and conducted emissions have been measured and found to be in compliance.

Most products regulated by Part 15, Subpart B fall into one of two categories. Class A devices are those that are marketed for use in a commercial, industrial or business environment. Class B devices are those that are marketed for use in the home. Class B limits are more stringent than Class A limits and the Class B *certification* process is administratively more rigorous than the Class A *verification* process. The radiated and conducted EMI test procedures are defined in the ANSI Standard C63.4. FCC Rules and Regulations, Part 15, only regulates radio frequency emissions. Currently there are no FCC regulations pertaining to product *immunity* to electromagnetic fields.

---

**Military Products Marketed in the USA**

EMC requirements for products that are marketed for use by the US military are contained in a document titled MIL-STD-461. This standard can be applied to a wide range of systems including everything from power tools to workstations. Unlike the FCC Regulations, MIL-STD-461 includes limits for radiated and conducted immunity as well as radiated and conducted emissions. Different sections of MIL-STD-461 describe independent tests.

You can obtain MIL-STD-461E here. M461E.pdf (970 kB)

This and other U.S. Military Standards can be obtained from the US The Department of Defense Single Stock Point for Military Specifications, Standards and Related Publications.

---

**Commercial Products Marketed Outside the United States**

EMC requirements vary from country to country, however most countries have requirements on radiated emissions similar to the FCC requirements. Countries in the European Economic Community (EEC) and many other countries have adopted a radiated emissions standards based on a document called CISPR 22. CISPR is a committee of the International Electrotechnical Commission (IEC), which promulgates standards in order to facilitate trade between countries. The CISPR 22 standard categorizes products as Class A or Class B and specifies a test procedure and emission limits that resemble (but are not exactly the same as) the Part 15 Subpart B requirements. Notable differences between the FCC and CISPR requirements are the lower frequency limit for conducted emissions tests and the radiated emission test distances. Also, CISPR 22 specifies both *quasi-peak* and *average* limits for conducted emissions test. FCC limits are all specified as *quasi-peak* levels.

Many countries have adopted EMC requirements based on IEC standards. The IEC has published a guide titled "EMC: The Role and Contribution of IEC Standards" (pdf 331kB), which provides a good overview of EMC standardization efforts.

Missouri University of Science and Technology, Electromagnetic Compatibility Laboratory       Page 2 of 2

**Want to find a particular EMC standard?**

Try this web page, NSSN, A National Resource for Global Standards.

Other Standards Sites:

- American National Standards Institute (ANSI)
- Canadian Standards Association
- Electronic Industries Association (EIA)
- European Telecommunications Standards Institute (ETSI)
- Federal Communications Commission (FCC)
- Finnish Standards Associations SFS
- IEEE Standards Association
- International Electrotechnical Commission (IEC)
- International Organization for Standardization (ISO)
- National Institute of Standards and Technology
- Society of Automotive Engineers
- Standards Australia
- VCCI (Japanese EMC Regulation and Certification)
- Verband Deutscher Elektrotechniker e.V. (VDE)

**EXHIBIT 15**
**( http://www.ieee.li/**
**pdf/guide_to_global_emc_requirements_2007.pd**
**f)**




# The Engineer's Guide To Global EMC Requirements: 2007 Edition



**Written by: Roland Gubisch, Chief EMC Engineer and
Bill Holz, GMAP Program Manager, Intertek**

Intertek Testing Services NA, Inc
70 Codman Hill Road, Boxborough, MA 01719

icenter@intertek.com    800-WORLDLAB    www.intertek-etlsemko.com



Engineer's Guide to Global FMC Requirements

## Table of Contents

Introduction.................................................................2

Background.................................................................2

EMC as a mandatory compliance requirement.............................3

Regulatory compliance procedures.........................................4

Regulatory compliance frameworks.........................................4

Authority Having Jurisdiction over EMC.....................................6

    Americas...............................................................6

        US.................................................................7

        Canada..........................................................8

        Brazil............................................................9

    Europe...............................................................10

        EU................................................................10

        Russia.........................................................11

    Far East.............................................................12

        Japan...........................................................12

        China (PRC)....................................................14

        Chinese Taipei.................................................15

    Conclusion..........................................................16



## Introduction

Engineers everywhere would like to test their products only once for electromagnetic compatibility (EMC), using a single set of standards and placing a single mark on the products to allow them to be sold around the world. Unfortunately, that aspiration will not become reality any time soon. If anything, it is becoming even more elusive as companies pursue new global sales opportunities further afield. The challenges are no longer technical; increasingly, they are raised by regulators in government offices many time zones away.

The task of EMC testing for global markets is challenging indeed. Each country or region retains its right to determine:

- If EMC is a mandatory compliance aspect that must be met prior to placing products on the market
- Identification of the authority that will have jurisdiction over regulating EMC
- Determination of the technical requirements that must be met - whether emissions only (EMI), or both emissions and immunity (EMC)
- Identification of the standards required
- Compliance procedures and filings
- Determination of what test reports will be accepted
- Specification of any marks that must be applied.

This paper will review the regulatory issues of EMC compliance in selected regions around the world.

## Background

EMC issues have been around since the early days of telegraphy and radio. Interference from solar activity caused "phantom telegraph operators" – telegraph output with no telegraph input – on long parallel transmission wires. The cure for this condition was occasional twists in the wires, which led directly to today's high-speed twisted-pair LAN wiring.

With the increasing popularity of broadcasting, and then with the use of electronic equipment in commercial and military applications, rules to prevent radio interference and equipment malfunctions became necessary. The result has been a succession of EMC standards and regulatory procedures worldwide. Some of the milestones are:

|  |  |
|---|---|
| 1844 | Morse: telegraph |
| 1892 | Law of telegraph in Germany (EMC) |
| 1895 | Marconi: first radio transmission |
| 1927 | German Hochfrequenzgerätegesetz (High frequency device laws) |
| 1933 | CISPR founded as a special committee of the IEC, dealing with interference |



Engineer's Guide to Global EMC Requirements

| | |
|---|---|
| 1934 | US Communications Act; FCC is established |
| 1972 | Altair 8800: first personal computer (PC) |
| 1979 | FCC Part 15, subpart J (digital devices) |
| 1985 | IEC CISPR 22 (Information Technology Equipment - ITE) |
| 1989 | EMC Directive, EU; mandatory 1-1-1996. |

Personal computers and other microprocessor-based devices have triggered similar emissions standards around the world:

| | |
|---|---|
| 1979 | FCC Part 15, subpart J |
| 1985 | IEC CISPR 22 |
| 1985 | VCCI rules in Japan |
| 1988 | Canada Radio Act |
| 1996 | Australian EMC Framework |
| 1997 | Taiwan ITE EMI |
| 1998 | Korea ITE EMC |
| 2000 | Singapore EMI for telecom equipment |

## EMC as a mandatory compliance requirement

The first task is to identify the countries in which your company's products are to be sold. Then you need to determine what EMC compliance requirements (if any) must be met before the products can be marketed in those countries.

The overall scope of your efforts will be determined by the number of countries in which you wish to sell your products, of course. However, to keep this paper manageable – while providing a flavor of the issues to be encountered - we will limit the list to the following regions:

**Americas:**
- United States (US)
- Canada
- Brazil

**Europe**
- European Union (EU)
- Russia

**Far East**
- Japan
- Chinese Taipei (Taiwan)
- People's Republic of China.

Let's assume that with all of its products, your company always carries out complete EMC testing for the US and EU. Is that enough to allow you to place products everywhere in the



world? Unfortunately, it is not. Many countries that require EMC compliance also impose additional hurdles to market entry in terms of deviations to international standards, in-country testing or country presence. Fortunately, there are also simplifying arrangements and agreements that can leverage your EMC testing to cover larger geographical or market areas. They are found under the broad umbrella term MRA (Mutual Recognition Agreements or Arrangements).

## Regulatory compliance procedures

Countries or regions that regulate product EMC will typically employ one or more of three procedures to determine compliance with national or regional requirements. The particular procedure may depend on product type.

- **Verification** – the product is tested to the applicable EMC standard(s) and brought to market bearing appropriate regulatory marks and/or statements under the vendor's or importer's authority (the "responsible party").

- **Declaration of Conformity** – the vendor or other responsible party declares conformity of the product to the relevant standard(s). Some jurisdictions require accredited testing (US) while others do not. The product may then need to be registered with the regulator (Australia, for example) or not (US for EMC). Regulatory marking and user information are a part of the process.

- **Certification** - the test report from an accredited or recognized laboratory, along with other technical information about the product, is presented to an independent third party for examination against the requirements. If the product complies, it is certified and listed with the regulator. The product may bear the certifier's mark. Product surveillance may also be a part of the certification process.

It's not always easy for the regulatory compliance engineer or manager to determine the applicable standards, compliance procedures and contact information for each target country or region. Fortunately, there are simplifying frameworks to lighten the burden .

## Regulatory compliance frameworks

Mutual Recognition Agreements or Arrangements (MRAs) are multilateral agreements among countries or regions which facilitate market access for signatory members. MRAs can cover the mutual recognition of product testing, certification or both.

However, the existence of an MRA does not imply harmonization of the standards among the participants. For example, the interpretation of appropriate Class A or Class B emission limits in a commercial environment can differ between the US and the EU, as reflected in their respective standards and illustrated below:



|  | USA | EU |
|---|---|---|
| **Class A** | non-residential | industrial |
| **Class B** | residential | residential, commercial, light industrial |

Emissions ← → Immunity disturbances

Some of the terms common to existing MRAs include:

**Agreement:**  Binding on participating parties

**Arrangement:**  Voluntary participation

**CAB:**  Conformity Assessment Body. A CAB can be *either* a tester or a certifier or both. In the case of US Telecommunication Certified Bodies (TCBs) and Canadian Certification Bodies, the certifier must also be an accredited test lab. The accreditation criterion for testers is ISO 17025 and for certifiers it is ISO Guide 65.

**Phase I:**  The MRA partners agree to recognize each other's test reports

**Phase II:**  The MRA partners agree to recognize each other's test reports and certifications (where needed).

One of the better-known MRAs is the agreement between the European Union and the US covering EMC, radio, telecom and several other product sectors. It has become a model for subsequent MRAs. Other MRAs in operation or pending that cover EMC and telecom include:

**Canada:**  With EU
In APEC Tel
In CITEL
With Switzerland
With Korea

**US:**  With EU
With EEA EFTA (Iceland, Norway, Liechtenstein)
With Japan
In APEC Tel
In CITEL

 Engineer's Guide to Global EMC Requirements

**European Union:** With US
With Canada
With Australia
With New Zealand.

Participating members of CITEL include Argentina, Brazil, Dominican Republic, Guatemala, Ecuador, Honduras, Mexico, and Paraguay. Participants in the APEC Tel MRA include Australia, Canada, Chinese Taipei (BSMI), Chinese Taipei (NCC, formerly DGT), Singapore, Korea, and Hong Kong.

MRAs are allowing testing and certification by CABs in one region or country to be accepted in another region or country – facilitating market access without additional testing. Regarding EMC, this is especially important when the destination country requires certification as a regulatory requirement.

## Authority Having Jurisdiction over EMC

As you investigate each country to determine which agency has the EMC authority for your products, you should also be able to determine what those requirements are. Around the world, RF emissions or EMI is regarded as a potential threat to broadcast reception and to sensitive services such as radio navigation and radio astronomy. Therefore the spectrum or radio regulator in each country or region is usually charged with the widest responsibility for controlling EMI. Immunity, on the other hand, may be reserved as a performance issue for critical applications such as medical or military – and the regulator may differ in each case. The combination of EMI and immunity as EMC may also be used as a means to establish uniform trade rules across a region, as it is in the EU. The following is a brief overview of what you need to consider as you investigate the requirements for each country. We will use the US as a detailed example.

## AMERICAS

<u>US</u>

- The Federal Communications Commission (FCC) establishes the compliance regulations for radios, digital devices and other unintentional radiators. It does not regulate immunity, except in a few special cases. Typical emissions standards are Parts 15 (RF devices) and 18 (ISM equipment). Some applications of digital devices are exempted from the FCC's technical standards, as is the case with test equipment, transportation vehicles, appliances, utilities or industrial plants. In many cases, such exempted equipment comes under the jurisdiction of other authorities, as noted below.
  **Approval procedures:** Verification for most unintentional radiators. No lab accreditation required. Some devices require Declaration of Conformity (DoC) and testing by an accredited lab in the US or MRA partner country. Some unintentional



Engineer's Guide to Global EMC Requirements

radiators may be optionally certified by TCBs. For certification testing, the lab must be accredited and listed with the FCC either separately or through an accreditor.

- The Food and Drug Administration (FDA) Center for Devices and Radiological Health (**CDRH**), designates consensus device standards for medical devices. Typical EMC standards include: IEC 60601-1-2:2001+A1:2004 (general medical EMC); FDA MDS-201-0004 (1979) (*EMC for medical devices*); and ANSI / RESNA WC/Vol. 2-1998, Section 21, (*Requirements and test methods for electromagnetic compatibility of powered wheelchairs and motorized scooters*).
  **Approval procedures:** EMC report is submitted as part of device 510(k) filing, to FDA or an FDA-accredited person.

- Department of Defense (DoD), for military EMC. A common EMC standard is MIL-STD-461E (1999) *Requirements for the control of electromagnetic interference; characteristics of subsystems and equipment.*
  **Approval procedure:** EMC testing can be witnessed by DoD inspector; lab accreditation is helpful.

- Telecom network EMC varies by telecom network operator (ATT, Verizon, etc.), but most EMC requirements are based on GR-1089-CORE (2002) *Electromagnetic compatibility and electrical safety – generic criteria for network telecommunications equipment.*
  **Approval procedure:** EMC accreditation to GR-1089-CORE sections 2-4; network operator witnesses or accredits; equipment vendor submits test report to network operator.

- RTCA, for aircraft and equipment EMC. The standard RTCA DO160D *Environmental conditions and test procedures for airborne equipment* includes both EMC and environmental requirements. This standard is harmonized with the European EUROCAE ED-14D.
  **Approval procedure:** EMC report is submitted to FAA (Federal Aviation Authority); lab accreditation is helpful.

- SAE (Society of Automotive Engineers) EMC standard series J551/x, J1113/x is a start. However, the individual auto manufacturers (Ford, GM, DaimlerChrysler, Toyota, etc.) have their own EMC standards that differ from the SAE's standards.
  **Approval procedure:** EMC report is submitted by device vendor to auto manufacturer; lab accreditation is important.

This presents a fairly complex picture of regulations and regulatory authorities for EMC in the US. The table below summarizes some of this EMC information in a convenient format for comparison with other jurisdictions.

| Jurisdiction | United States - EMC |
| --- | --- |



Engineer's Guide to Global EMC Requirements

| Product type | ITE | Radio | Appliance | Medical |
|---|---|---|---|---|
| Authority | FCC | FCC | FCC exempt | FDA/CDRH |
| Approval Procedures | EMI only: Verification DoC: accredited Cert: accredited | Certification | N/A | Certification |
| In-country testing required? | No | No | N/A | No |
| MRA with US? | N/A | N/A | N/A | N/A |
| Marks | For DoC only: FCC logo | None | N/A | N/A |

### Canada

- The regulation of EMC in Canada is similar to that in the US. Industry Canada (IC) establishes the compliance regulations for radios, digital devices and other unintentional radiators. Typical emissions standards are ICES-003 (ITE) and ICES-001 (ISM equipment). Some applications of digital devices are exempted from IC technical standards, in a manner similar to the FCC. In many cases, such exempted equipment falls under the jurisdiction of other authorities, as noted below. **Approval procedures:** Verification for all unintentional radiators. No lab accreditation required.

- Health Canada (HC) designates consensus device standards for medical devices. It recognizes IEC 60601-1-2:2001+A1:2004 (general medical EMC). **Approval procedures:** EMC report is submitted as part of license application to HC. Class I device manufacturers require an establishment license; Class II, III and IV devices require a medical device license.

| Jurisdiction | Canada - EMC | | | |
|---|---|---|---|---|
| Product type | ITE | Radio | Appliance | Medical |
| Authority | Industry Canada | Industry Canada | IC exempt | Health Canada |
| Approval Procedures | EMI only: Verification | Certification | N/A | Licensing |
| In-country testing required? | No | No | N/A | No |
| MRA with | Yes, Phase I | Yes, Phases I & II | N/A | No |



Engineer's Guide to Global EMC Requirements

| US? | | | | |
|---|---|---|---|---|
| **Marks** | Label info only | Label info only | N/A | N/A |

### Brazil

- The National Institute of Metrology, Standardization and Industrial Quality (INMETRO) is the authority with jurisdiction over the general safety of products as well as EMC. There are very few general products that require safety for INMETRO certification and none that require EMC at this time.

- Radio and telecom products are certified and homologated (an administrative approval) by the National Telecom Agency (ANATEL) and EMC is a factor in the approval. Both emissions and immunity compliance are required for telecom equipment; the standards reference IEC. Many but not all of the rules for short-range radio devices are identical to FCC rules.

- The National Health Surveillance Agency (ANVISA) is the authority for medical equipment; EMC is also required.

| Jurisdiction | Brazil - EMC | | | |
|---|---|---|---|---|
| **Product type** | **ITE** | **Radio** | **Appliance** | **Medical** |
| **Authority** | INMETRO | ANATEL | INMETRO | ANVISA |
| **Approval Procedures** | N/A | Certification and Homologation | N/A | Registration |
| **In-country testing required?** | N/A | Yes | N/A | No |
| **MRA with US?** | Pending | Pending | N/A | N/A |
| **Marks** | no | no | N/A | N/A |

## EUROPE

### EU

With 27 member states, the population and economy of the EU exceeds that of the US. The EU has simplified the process of access considerably by identifying the "essential requirements" for almost everything that is placed on the market in the EU. The authorities having jurisdiction vary by product type, and each country has a Competent Authority for each product type or directive. For example, the Competent Authority for EMC in the UK is the Department of Trade and Industry (DTI). The specific "essential requirements" for your products will be listed in the directives that apply to your product. In most cases, the



directives will be "New Approach" directives for which CE marking signifies compliance and the applicable standards have been published in the *Official Journal of the European Union*. A good place to start for guidance on directives and standards is http://www.newapproach.org. The CE marking indicates that the equipment bearing the marking complies with *all* of the applicable "New Approach" directives.

- Most electrical/electronic products must comply with both emission and immunity requirements, according to both the current EMC Directive 89/336/EC and the new EMC Directive replacing it, 2004/108/EC. This includes appliances and many devices exempted from EMI regulation in the US and Canada. In addition, the safety standards for household appliances now require compliance with limits to the surrounding low-frequency electromagnetic fields according to EN 50366. This is a safety standard, not an EMC standard.

- The "essential requirements" for radio and telecom equipment under the R&TTE Directive 1999/5/EC include electrical safety according to the Low Voltage Directive (but with no lower voltage limit), RF exposure for radio transmitters and EMC according to the EMC Directive. For telecom terminal equipment, there are no more requirements. Radio transmitters must also comply with requirements for efficient use of the spectrum. Both spectrum and EMC standards for radio equipment are published by ETSI, the European Telecommunications Standards Institute.

- Medical devices are approved according to a classification scheme originating with the Medical Device Directive 93/42/EC and used as the prototype for other medical device regulations around the world, including Canada. The basic medical EMC standard is EN 60601-1-2:2001. The EMC requirements are modified by specific standards EN 60601-2-x to define particular test setups or higher or lower limits for particular EMC phenomena. EMC is also a factor for *in vitro* diagnostic medical devices (Directive 98/79/EC) and active implantable medical devices (Directive 90/385/EEC).

| Jurisdiction | European Union – EMC | | | |
|---|---|---|---|---|
| Product type | ITE | Radio | Appliance | Medical |
| Authority | EMC Competent Authority | Spectrum Competent Authority | EMC Competent Authority | Medical Competent Authority |
| Approval Procedures | Verification. Notified Body opinion may be obtained | Verification. Notified Body opinion may be rendered. | Verification | Verification, DoC, Type Examination, Notified Body approval |
| In-country testing | No | No | No | No |



Engineer's Guide to Global EMC Requirements

| required? | | | | |
|---|---|---|---|---|
| **MRA with US?** | Yes, Phases I & II | Yes, Phases I & II | Yes, Phases I & II | Yes, Phases I & II |
| **Marks** | CE | CE, possibly Notified Body number, alert mark | CE | CE and Notified Body number where applicable |

### Russia

- The authority having jurisdiction for general product types is GOST, short for Gosstandart (State Committee for Quality Control and Standardization). It is the national standardization body in Russia. More then 60 EMC standards have become mandatory. Basic standards are harmonized with IEC and CISPR standards. The Harmonized Tariff Code (HTC) is the determining factor if EMC applies to your products. If your product requires EMC compliance, testing can be done in Russia or at accredited labs located outside of Russia.  It is also possible (based on agreements) to utilize EMC test reports to the EU standards from accredited labs. If your product requires the GOST mark, both safety and EMC are included under the single mark. You will also need to determine whether any special warning statements need to be included in the user manual and on the packaging, along with any specific language requirements.

- The authority for radio equipment in Russia is Glavgossvyaznadzor (Main Inspectorate in Communications). The application (with a detailed list of telecommunications equipment) should be submitted to the Certification Department of Goskomsvyaz (State Committee on Telecommunications and Information of the Russian Federation). The Department carries out a preliminary analysis to determine whether the equipment is compatible with the telecommunications technology currently used in Russia. After this technical review, two designated certification laboratories (of the 43 located across the country) will test the equipment "on type" and also for quality assurance. This will involve testing in the field and at the manufacturer's site. If the test results are successful, a Goskomsvyaz Certificate is issued and is valid for up to three years. Radio equipment sellers must obtain an additional permit from Gossvyaznadzor (The Russian Federation State Telecommunications Control) of the State Commission on Radio Frequencies (GKRCh) to use the radio spectrum and specific equipment on a specific frequency band in a specific area of Russia prior to the certification process.

- The Federal Service for Control over Healthcare and Social Development (Roszdravnadzor) is the main government agency responsible for registration of medical equipment, including foreign-made equipment. Applications for registration can include certificates of compliance obtained from other jurisdictions, such as:



- o ISO 9001, ISO 9002, ISO 13485, and ISO 13488 certificates which should be notarized in the country of origin.
- o Certificates of registration of medical equipment issued by a respective government agency in the country of origin, such as FDA certificates, EC Certificates (CE Mark) and Declaration of Conformity. All such certificates should be notarized in the country of origin.
- o Electrical safety and EMC (electromagnetic compatibility) certificates, The Russian EMC standard corresponding to IEC 60601-1-2 is GOST R 50267.0.2.

| Jurisdiction | Russia - EMC | | | |
|---|---|---|---|---|
| **Product type** | **ITE** | **Radio** | **Appliance** | **Medical** |
| **Authority** | GOST | Glavgossvyaznadzor | GOST | Roszdravnadzor |
| **Approval Procedures** | Certification | Certification, licensing | Verification | Registration |
| **In-country testing required?** | No | Yes | No | Yes |
| **MRA with US?** | No | No | No | No |
| **Marks** | GOST-R | No | GOST-R | No |

## FAR EAST

### Japan

- The Ministry of Economy, Trade and Industry (METI) is responsible for appliance safety, including RF emissions (EMI). Immunity is not required. In 1999, the Electrical Appliance and Material Control Law was revised to become the Electrical Appliance and Material Safety Law (current law), which was implemented on April 1, 2001. Products subject to regulation are mandated to be labeled with the PSE mark. A wide range of products can be self-verified to the requirements and carry no regulatory marking. The RF emissions limits established for appliances are similar to corresponding CISPR standards, although deviations exist.

- EMI from Information Technology and Telecom equipment has been handled by a private, non-governmental, membership-based Voluntary Control Council for Interference by Information Technology Equipment (VCCI). The VCCI labeling has become so well accepted in some domestic markets that it has become a *de facto* regulatory gateway. With the new US/Japan Telecom MRA signed in February 2007, access to VCCI labeling will be available through either the membership route or by local accreditation to the VCCI standards based largely on CISPR 22.



Engineer's Guide to Global EMC Requirements

- The authority for radio regulation in Japan is the Ministry of Internal Affairs and Communications (MIC). The technical requirements are contained in Radio Equipment Regulations dating from 1950 and have been updated numerous times since. Radio rules published by private certification bodies such as TELEC, or by industry associations such as ARIB (Association of Radio Industries and Businesses), are not to be confused with the official MIC technical requirements, although they may all seem very similar. The MIC radio rules are similar to corresponding FCC rules but there are many differences, especially with regard to frequency allocations.

- Medical products in Japan are regulated under the authority of the Ministry of Health, Labor and Welfare (MHLW). EMC requirements have been phased in over several years, with the last transition period for existing products just ended in March 2007 for Class I devices. The applicable EMC standard JIS T 0601-1-2:2002 corresponds to IEC 60601-1-2 first edition. This is soon being superseded by IEC 60601-1-2 2nd edition; the 2nd edition may be used currently with justification.

| Jurisdiction | Japan - EMC | | | |
|---|---|---|---|---|
| Product type | ITE | Radio | Appliance | Medical |
| Authority | | MIC | METI | MHLW |
| Approval Procedures | Registration | Certification, SDoC | Certification, verification | Licensing |
| In-country testing required? | No | No | No | No |
| MRA with US? | Yes, 2007 | Yes, 2007 | No | No |
| Marks | Class B: VCCI mark<br>Class A: Kanjii text | Technical Conformity Mark | PSE or none | None |

## China (PRC)

- The People's Republic of China (PRC) has enforced EMC regulations since 1999, largely emissions only. Under the Compulsory Product Certification System (CPCS) implemented in 2002 and under the authority of the Certification and Accreditation Administration of the PRC (CNCA), a number of listed product categories must carry the CCC certification mark. The CCC mark includes provisions for indicating safety ("S") or EMC ("EMC") or both ("S&E"). The implementation rules for compulsory product certification specify the applicable procedures and standards by product



type, in a numbering format: CNCA-nnC-mmm:year. Examples are given in the table below.

- Radio approvals are under the overall authority of the Ministry of Information Industry (MII). The State Radio Regulation Committee (SRRC) Certification Center, under the MII, is directly involved in the approvals. Mobile terminals, including cellular base stations and handsets, are classified as terminal equipment and are so regulated. Quality assurance is also part of the certification process. PRC radio standards are drawn from FCC, TIA and ETSI, including EMC requirements.

- Many PRC standards are identical to international, FCC or ETSI standards. For example, the PRC standard GB4343 is equivalent to CISPR 14, and GB9254 mirrors CISPR 22. The IEC standards IEC 61000-3-2, -3-3 and 61000-4-x are references. Unfortunately, only in-country testing is permitted at this time.

- Medical devices fall under the authority of the State Food and Drug Administration (SFDA) and optionally the Ministry of Health (MOH). Medical devices are classified according to risk (I = lowest, III = highest) as with many other medical regulatory regimes. Implementation rules for medical products reference many IEC-particular medical electrical standards (IEC 60601-2-x). The SFDA requires type testing and factory audits.

| Jurisdiction | People's Republic of China - EMC | | | |
|---|---|---|---|---|
| Product type | ITE | Radio | Appliance | Medical |
| Authority | CNCA | CNCA | CNCA | SFDA, MOH |
| Approval Procedures | Certification; see: CNCA-01C-020 | Certification; see: CNCA-07C-031 for examples | Certification; see: CNCA-01C-016 | Certification; see CNCA-08C-032 to 043 for examples; also Registration |
| In-country testing required? | Yes | Yes | Yes | Yes |
| MRA with US? | No | No | No | No |
| Marks | CCC | CCC | CCC | CCC |

### Chinese Taipei (Taiwan)
- The authority for safety and EMC for a wide variety of appliances and equipment in Taiwan is the Bureau of Standards, Metrology and Inspection (BSMI). RF emissions



Engineer's Guide to Global EMC Requirements

(EMI) are regulated. Safety and EMC standards are derived from the IEC. For example, the limits in CNS 13438 are equivalent to CISPR 22.

- The National Communications Commission (NCC, formerly DGT) has authority over radio equipment. Many technical standards, especially for short range devices, are identical to FCC rules.

- Taiwan's Department of Health (DOH) regulates the importation of medical equipment.
  To market a medical device in Taiwan, the DOH pre-marketing registration approval must be obtained before the Board of Foreign Trade (BOFT) of the Ministry of Economic
  Affairs (MOEA) will issue an import license. The DOH, following many other economies, has grouped medical devices into three classes: I, II, III. EMC is required according to IEC 60601-1-2:2001, corresponding to the standard DOH-00003.

| Jurisdiction | Chinese Taipei - EMC | | | |
|---|---|---|---|---|
| Product type | ITE | Radio | Appliance | Medical |
| Authority | BSMI | NCC | BSMI | DOH |
| Approval Procedures | DoC and certification | Certification | Certification, registration | Licensing |
| In-country testing required? | No | No | No | No |
| MRA with US? | Yes, Phase I | Yes, Phase I | No | No |
| Marks | Commodity inspection mark | NCC | Commodity inspection mark | No |

## Conclusion

This paper has provided a quick overview of what is required to ensure that EMC requirements are legally met for the countries in which you want to market your products. Although it is necessarily brief, it serves as a guide with which you can develop your own list of country requirements.

As you expand your list, you will be able to weigh the challenge of meeting compliance criteria and procedures for several nations simultaneously. Compliance has to be taken very seriously; the penalties for not complying vary from simple quarantine of your products at customs to severe measures such as monetary fines and even imprisonment.



Engineer's Guide to Global EMC Requirements

If global EMC compliance issues are a recent challenge for your company, or if your current compliance staff are stretched thin, it may be beneficial to partner with Intertek-ETL Semko, a proven leader in EMC test and certification worldwide. We have more than 322 laboratories in 110 countries around the world, 20 of them in the US alone, In addition to MRA arrangements, we have special agreements with agencies and labs in many other countries including Israel, Brazil, Russia, and Belarus.

By working with a partner lab, it is easier to assemble a product- or technology-specific test and certification plan that maximizes your testing dollar and gives you the additional resources needed to seek global compliance. You have the security of knowing that the plan is defensible in the face of management scrutiny and traceable in case of an audit. And it can be modified easily as technology and business structures change.

For more information, go to www.intertek-etlsemko.com. Call 1-800-967-5352 or email icenter@intertek.com. Intertek gets you the answers you need—within 24 hours. We look forward to helping you.

**EXHIBIT 16
(http://power-topics.blogspot.com/2007/11/guide-
to-emc-standards-for-power.html)**

**ᴥ** [ ]   SEARCH BLOG   FLAG BLOG   Next Blog»   Create Blog | Sign in

# Power Topics for Power Supply Users
Power packed full of useful information on AC-DC Power Supplies and DC-DC Converters.

Monday, November 5, 2007
## Guide to EMC Standards for Power Supplies
### Introduction:
**EMC** refers to **E**lectro**M**agnetic **C**ompatibility. Electrical equipment that takes power from a distributed AC or DC source which is connected to other equipment, such as the AC mains in a building, has to have minimal influence on that source. It also has to have minimal influence on other equipment through electromagnetic radiation. A power converter which incorporates switching devices operating at high frequency needs to employ special means to keep the electromagnetic interference within internationally agreed upon limits. In general, electrical equipment has to operate in its environment with minimal disturbance to its environment. The limits to disturbances are defined by the international standards described below.

### Types of Standards:
**1) Generic Standards:**
A top level standard for a type of equipment which encompasses specific basic standards in their references. The current relevant standard for power supplies is **EN61204-3: 2000**. This covers the EMC requirements for power supply units with DC output(s) of up to 200V, at power levels up to 30kW, and operating from AC or DC. source voltages of up to 600V. The **EN** refers to **Euro Norm** or European standard. Europe has led the field in establishing standards for EMC and many other areas which have been adopted worldwide, with some local deviations.

**2) Basic Standards List:**
The relevant basic standards called up in **EN61204-3** are:
EN55022 and EN55011. Conducted and radiated electromagnetic interference emitted by the power supply. This is also known as CISPR22. The FCC has similar standards in the USA. There are two levels for the emission limits, Class A and Class B. Class B is normally required which puts a lower limit on allowed emissions.
**EN61000-4-2.** Immunity to electrostatic discharge.
**EN61000-4-3.** Immunity to radiated radio frequencies.
**EN61000-4-4.** Immunity to fast transient voltages on the input lines.
**EN61000-4-5.** Immunity to lightning surges on the input lines.
**EN61000-4-6.** Immunity to conducted radio frequencies.
**EN61000-4-8.** Immunity to power frequency magnetic fields.
**EN61000-4-11.** Immunity to damage from input line voltage reductions.
**EN61000-3-2.** Limits to the harmonic currents that can be taken from the input line.
**EN61000-3-3.** Limits to the voltage fluctuations that the power supply can cause to the line input voltage.

**3) Performance Criteria:**
In immunity testing, there are four classes by which passing or failure are assessed.
Class A. No loss of function or performance due to the testing.
Class B. Temporary loss of function or performance, self recoverable.

### Power Links
Lambda Americas
Lambda University
Lambda Europe

### Power Topic Backup
▼ 2008 (6)
  ▼ June (1)
    Harvesting More Energy without Building More Power...
  ► May (1)
  ► April (1)
  ► March (1)
  ► February (1)
  ► January (1)
► 2007 (14)

### Power Subjects
AC-DC supplies (4)
Cooling Techniques (1)
DC-DC converters (1)
digital power (1)
DIN Rail Mounted (1)
Distributed Power (1)
Droop Mode Current Share (1)
EMC standards (2)
EMI Filter (1)
fault tolerance (1)
Green Power Supplies (2)
Modular Power Supplies (1)
Output Wire Gauges (1)
Power Derating (1)

Class C. Loss of function or performance which needs intervention to restore.
Class D. Permanent loss of function or performance due to damage. This would always represent a failure.

## Basic Emissions Standards

**EN55022** (IT equipment), **EN55011** (Industrial equipment), and FCC Class A or B (in the USA):
Conducted and radiated emission limits.
Conducted EMI (electromagnetic interference) is radio frequency energy that the power supply couples into the input power lines. The power supply input incorporates filtering to reduce the conducted emissions as necessary. The radio frequency noise is measured between 150kHz and 30 MHz using a spectrum analyzer or special receiver.

Radiated EMI is radio frequency energy emitted from the enclosure and input and output wiring of the power supply and is measured in the 30MHz to 1,000MHz frequency range. The measurement is usually performed at an "open" site which is an open air location selected to be in a radio frequency quiet zone where television and radio transmissions are weaker. The unit to be tested is placed on a wooden table above a large ground plane 10 meters away from a suitable receiving antenna connected to a spectrum analyzer.

### EN61000-3-2
Puts limits on the harmonic currents that the power supply is allowed to take from the AC mains source. The standard applies to power supplies with rated power between 75W and input line current of up to 16 amps per phase.

A power supply which is not power factor corrected will take a current from the source which is not the same shape as the voltage waveform. This is because the input storage capacitors can only charge when the input voltage is higher than the capacitor voltage. Thus the input current flows for only part of the cycle, and has a high peak value which causes currents which are harmonics of the line frequency. With three phase power distribution the absence of harmonic currents ensures that the neutral current is zero. This was not the case when large numbers of personal computers without power factor correction began to be used in office buildings, and the neutral wire would burn out. Most power supplies now incorporate power factor correction circuitry to ensure that the harmonic currents are low.

### EN6100-3-3
Limits voltage changes that the unit under test can impose upon the input power source. This is referred to as the flicker test.

Although this is not normally a problem with power supplies, some types of electrical equipment, especially in process control, can load the power source at regular or semi-random intervals. This can cause voltage changes that can affect the brightness of electric lighting and cause flicker. A survey was performed to determine what rates of flicker were the most disturbing to human subjects, and a curve of maximum percentage voltage variation at various frequencies was established. The most disturbing rate was just over 1,000 changes per minute, and the curve reflects the smallest percentage change at this frequency. Above 1,800 changes per minute the flicker is not noticed.

## Basic Immunity Standards

Power Factor Correction (1)

Rack Mounted (1)

water purification supplies (1)

What Does 1U Mean? (1)

**About Power Guy**

**POWER GUY**

The purpose of this blog is to provide end-users of AC-DC Power Supplies and DC-DC Converters with useful information regarding product applications, helpful hints, news, comments, and answers to your questions. My focus is on modern switch-mode power products in the range of 1 to 3,000-watts. My goal is to provide OEM designers, who select power products for their end-products, and purchasing agents, who buy these devices, with a valuable resource to assist you in making decisions involving power solutions for your next and/or existing products. I hope you find this website and blog informative and useful. You are invited to contact me with your questions and comments.

View my complete profile

Power Topics for Power Supply Users: Guide to EMC Standards for Power Supplies    Page 3 of 4

### EN61000-4-2
Tests immunity to electrostatic discharge from a simulated human body capacitance of 150pF. By walking across a carpet of artificial fiber in a low humidity condition, a person can build up a charge of several thousand volts. This can be discharged to electrical/electronic equipment, and so it is important that the equipment is immune to these discharges. The test is performed at a voltage of up to 8kV by discharging a probe to the chassis at various locations by direct contact, and at up to 15kV through the air, with the power supply operating. Test levels of 4kV and 8kV are common. Class B performance criterion applies.

### EN61000-4-3
Checks immunity to incident radio frequency energy in the frequency range of 80MHz to 1,000MHz, and a separate test at 800 MHz to 960MHz to simulate the effect of digital cellular telephone transmissions. The test is performed in an anechoic chamber which is a shielded room with cone shaped plastic moldings on the inside wall surfaces which absorb radio frequency energy, so there are no echoes. The field strength is 10V/m for the carrier. Class A performance criterion applies.

### EN61000-4-4
Tests the effect of a fast voltage transient or burst applied between each input line and ground in turn. The applied voltage has a peak level of 2kV, and rises to maximum in 5 nanoseconds, and falls back to zero in 50 nanoseconds. It is applied at a repetition rate of 5kHz. Class B performance criterion applies.

### EN61000-4-5
Simulates the effect of a lightning surge voltage applied to the input power lines. Surge voltages are applied between each line and ground, and also between lines. The line to ground peak voltage is normally twice that applied from line to line. 4kV and 2kV are typical test voltages. The voltage has a rise time of 1.2 microseconds, and a fall time of 50 microseconds. Class B performance criterion applies.

### EN61000-4-6
Tests the effect of conducted radio frequency energy which is inductively coupled into the input cables with a ground return. The frequency range is 150kHz to 80MHz at 10Vrms amplitude, and the frequency is increased in 1% steps. The carrier is 80% amplitude modulated at 1 kHz. Class A performance criterion applies.

### EN61000-4-8
Electromagnetic compatibility, testing and measurement techniques for power frequency magnetic fields. Criterion A, using Helmholtz coil at 50 Hz, to 30 amps (rms) per meter.

### EN6100-4-11
Checks the effect of input voltage dips on A.C. input power supplies only. There are three different degrees of test severity, a 30% reduction of input voltage for 0.5 period, a 60% reduction for 5 periods and a 95% reduction for 250 periods. For the first test, the unit should continue working with no change of output voltage because most units have a hold-up time of one period, which corresponds to 20 milliseconds at 50Hz. The other two tests will cause reduction or loss of output voltage, and intervention may be needed to restore the output. The unit should not be damaged by the testing. Class B and C performance criteria apply.

Posted by Power Guy at 3:35 PM

Labels: EMC standards

Power Topics for Power Supply Users: Guide to EMC Standards for Power Supplies

**0 comments:**

Post a Comment

Newer Post                          Home                          Older Post

Subscribe to: Post Comments (Atom)

**EXHIBIT 17**
**(March 14, 2008 Correspondence from E. Puknys**
**to M. Headley)**



**FINNEGAN**
**HENDERSON**
**FARABOW**
**GARRETT &**
**DUNNER** LLP

Stanford Research Park • 3300 Hillview Avenue • Palo Alto, CA 94304-1203 • 650.849.6600 • Fax 650.849.6666
www.finnegan.com

ERIK R. PUKNYS
650.849.6644
erik.puknys@finnegan.com

March 14, 2008

Michael Headley, Esq.
Fish and Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063-1526

> *Power Integrations, Inc., v. BCD Semiconductor Manufacturing Corp. et al.*
> Case No. 07-cv-03137 WHA

Dear Michael:

I write regarding a number of letters we received from you regarding discovery issues.

As I have told you previously, BCD is not yet in a position to produce additional documents. Also, contrary to what I told you earlier this week, BCD is not yet able to supplement its interrogatory answers. BCD is moving with deliberate and reasonable speed in investigating PI's discovery requests and responding to them, and we currently believe that BCD can supplement its discovery responses and produce documents by April 1, 2008.

As to several specific issues you raised, we respond as follows.

Interrogatories

You request that we provide our contention responses for Interrogatories Nos. 2-4. The Court's Schedule specifies that these are due by September 30, 2008. To the extent we complete our investigation and preparation of these contentions in advance of this date, we will provide them earlier. We note that PI has not yet even identified which claims it is asserting, much less provided an infringement analysis of them. Indeed, it appears from your recent filing of the Amended Complaint that you may still be in the process of formulating your own infringement and validity theories. Accordingly, your request for our contentions regarding claims not yet even identified is both premature and unreasonable.

Your requests directed to other interrogatories (Nos. 5-13 and 15) involve either responses we have responded to pursuant to Rule Fed. R. Civ. P. 33(d) or are still investigating.

Michael Headley, Esq.
March 14, 2008
Page 2

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

As explained above, we anticipate producing documents and supplementing our responses the first of April.

Requests for Admission

As to Requests Nos. 1, 3-7, you request that we explain our objection to the phrase "conducts business." It is not defined and is especially ambiguous given that BCD utilizes several distributors to resell BCD products to non-party manufacturers, as disclosed in the various declarations filed with BCD's motion to dismiss and related papers.

Requests for Production

PI is requesting BCD to produce documents relating to the AP3710 and AP3706. We are reviewing these products in further detail, including how and where they are distributed, if at all. Before we unnecessarily expend more time, energy and money, please let us know if PI is still pursuing these products given that PI has just amended its complaint to withdraw one of its patents.

You also state in one of your letters that PI is aware of one instance in which BCD shipped samples of the AP3700 into the United States. Please explain what information PI has on this issue.

Depositions of BCD's Technical Expert

We are requesting dates from our technical expert and will provide them to you in the near future.

PI's Document Production

As I discussed with you earlier this week, we are encountering problems with the CDs your law firm produced in this case. A review of the documents produced revealed that relevant documents were either missing or incomplete. For example, only pages 1, 5, 15, 16 and 19 of PI's supplemental responses to Fairchild's first set of interrogatories were produced. Other interrogatories were not produced at all, such as PI's original responses to Fairchild's first set of interrogatories. Similarly, it appears that the inventor depositions related to the '876 patent were not produced. In short, many of the documents provided are incomplete, and no explanation has been provided regarding whether (1) these documents are as complete as those found in the files from which they were produced and/or (2) these documents have been redacted. Accordingly, BCD requests that PI provide all documents related to the Fairchild litigation and the '876 patent in full, including, but not limited to, interrogatories and the responses to the interrogatories, admissions and responses to the admissions, and depositions and the exhibits entered in those depositions.

Michael Headley, Esq.
March 14, 2008
Page 3

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

We note that the problems we are encountering are substantially hampering our ability to go forward with the scheduled depositions. Here is a list of what we additionally require.

1) Bates numbers should be processed in a uniform, zero-filled format. The PIF and KE production sequences previously sent will need to be corrected to reflect the uniform, zero-filled format and replaced;

2) All documents need to be provided in a single-image TIFF format. As to the disks/documents received to date, CD011, CD039, CD062EV, CD074, 'L Images,' 'LEG 365' and 'PI Bailey Electronic Version' need to be corrected to reflect single-image TIFFs as well as production numbering conventions and replaced; CD066 is missing images, please correct and replace that CD; and

3) Of critical note, all documents produced in electronic format should be accompanied with LFP (load) and .dat files associated with the material on the disk and formatted for single-image TIFFs. Without this information it is extremely difficult, if not impossible, to access the produced CDs. Also, CD054's load file structure is incorrect, and we require a corrected, replacement CD.

In addition to the above corrections, we also would like to receive the following:

**In the Fairchild case:**

1)   All discovery requests or responses relating to either party, provide complete copies of all interrogatories, request for production and request for admissions and the corresponding responses. To the extent that Power Integrations served a Notice of Inspection, we are requesting copies of all such notices and any samples or other materials offered at such inspection;

2)   Copies of transcripts (in electronic format) of any deposition taken by either party in this matter;

3)   Copies of the all production sequences in the Fairchild case, including, but not limited to any documents with the prefix "FCS" and "BB";

4)   Confirmation of all production sequences exchanged by the parties in this case, including the range of documents produced, and copies of any privilege logs for documents obtained and not produced under any asserted privilege;

5)   Copies of any production sequences identified in #4 above which were not previously produced in their entirety;

Michael Headley, Esq.
March 14, 2008
Page 4

FINNEGAN
HENDERSON
FARABOW
GARRETT &
DUNNER LLP

6)  All datasheets produced by either party, including, but not limited to those relied upon in the formation of any expert report or opinion by any person acting as an expert for either party, including but not limited to Robert Blauschild; and

7)  All documents relied upon in the formation of Blauschild's expert report(s) which are not identified with a bates numbering convention, but are identified on Exhibit B "Index of Documents reviewed by Bob Blauschild."

**In the Motorola case:**

Please provide the following:

1)  Copies of transcripts (in electronic format) of any deposition taken by either party in this matter;

2)  Complete copies of all trial transcripts;

3)  All discovery requests or responses relating to either party, please provide complete copies of all interrogatories, request for production and request for admissions and the corresponding responses

4)  Identify all production sequences from the Motorola case, not produced in the Fairchild case;

5)  Please provide copies of all sequences identified in Motorola #4 not previously produced in their entirety; and

6)  Confirmation of all production sequences exchanged by the parties in this case, including the ranges of documents produced, and copies of any privilege logs for documents obtained and not produced under any asserted privilege by either party.

Sincerely,

Erik R. Puknys

ERP/nos