IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| POWER INTEGRATIONS, INC., | : | |
| Plaintiff, | : | |
| v. | : | Civ. No. 07-633-JJF-LPS |
| BCD SEMICONDUCTOR CORPORATION and SHANGHAI SIM-BCD SEMICONDUCTOR MANUFACTURING CO., LTD. | : | **PUBLIC VERSION** |
| Defendants. | : | |

### REPORT AND RECOMMENDATION REGARDING DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

In an earlier opinion, I concluded that Plaintiff "has articulated theories which, if supported by evidence, would establish jurisdiction." (D.I. 67 at 1; *see also id.* at 19) Consequently, I ordered jurisdictional discovery. *Id.* at 1, 19-21. The parties have completed that discovery and have provided supplemental briefing with their positions on the impact of the evidence thus elicited on Defendants' pending Motion to Dismiss for Lack of Personal Jurisdiction ("Motion"). (D.I.10; *see also* D.I. 102, 107, 109) Other than as set forth in this Report and Recommendation, it is not necessary to repeat the factual background and analysis contained in the earlier opinion, all of which I incorporate here by reference.

For the reasons set out below, I find that Plaintiff Power Integrations, Inc. ("PI") has satisfied its burden of proving that this Court has personal jurisdiction over Defendants BCD California and SIM-BCD (collectively "BCD" or "Defendants"). PI has produced sufficient

evidence to establish that BCD had an intent and purpose to serve the United States market, including Delaware, with one or more of its AP3700, AP3700A, AP3700E, and AP3710 power supply chips (the "accused chips").[1] This evidence, along with that referred to in the prior opinion, establishes jurisdiction in Delaware pursuant to the "dual jurisdictional theory" of personal jurisdiction developed by courts interpreting Delaware's long-arm statute.[2] This same evidence, along with evidence that BCD designed the accused chips to meet U.S. specifications, satisfies the due process analysis required by Justice O'Connor's plurality opinion in *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 112 (1987).

## DISCUSSION

The Standard PI Must Satisfy

Determining whether jurisdiction exists over a nonresident defendant involves a two-step analysis, requiring the Court to consider: (1) whether the defendant's actions come within any of the provisions of Delaware's long-arm statute, and (2) whether exercising jurisdiction comports with federal due process. *See Intel v. Broadcom*, 167 F. Supp.2d 692, 700 (D. Del. 2001). In my earlier opinion, I concluded that pursuant to Delaware's theory of dual jurisdiction, the first-step statutory requirement would be satisfied if there is

---

[1] The record shows that the only accused chips that have actually been sold are the AP3700s. (D.I. 107 at 1 n.1 & Ex. 1 at 45-46)

[2] Subsequent to my earlier opinion, the Delaware Superior Court has again applied the "dual jurisdictional theory" of personal jurisdiction in a stream of commerce case. *See Crane v. Home Depot, Inc.*, 2008 WL 2231472, at *4 (Del. Super. Ct. May 30, 2008).

> an intent or purpose on the part of [BCD] to serve the Delaware market with its product. . . . [I]t is enough if, based on ongoing relationships with others in the stream of commerce, it was reasonably foreseeable that BCD's accused products would make their way into the Delaware market.

(D.I. 67 at 15) (internal citation omitted)

As for the second step constitutional requirement, I concluded that in cases such as this one the analysis is "functionally equivalent" to the dual jurisdiction statutory analysis. *Id.* at 17. Justice O'Connor's test "requires placement of the product into the stream of commerce plus an act of the non-resident defendant purposefully directed toward the forum state." *Id.* at 16 (emphasis added). Justice O'Connor's "additional conduct" requirement, I reasoned, is important because, as Justice O'Connor herself explained, the additional conduct "may indicate an intent or purpose to serve the market in the forum State." *Id.* at 16 (internal citation omitted; emphasis added). While the jurisdictional analysis cannot be conflated into a single step, the same evidence that may satisfy the "intent or purpose" test under Delaware's dual jurisdiction theory of statutory jurisdiction may likewise satisfy Justice O'Connor's "intent or purpose" test for due process purposes. To comport with due process under Justice O'Connor's test, there must also be evidence of "[a]dditional conduct of the defendant [to] indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State." *Asahi*, 480 U.S. at 112.

Here, "[t]he outstanding, dispositive issue is quite narrow: is there evidence of BCD's intent and purpose to serve the Delaware market, as part of the United States market, with the accused chips?" (D.I. 67 at 20) I must now consider this issue in light of the expanded record the parties have put before me.

Evidence Satisfying Dual Jurisdiction Standard

Under the theory of dual jurisdiction, the Delaware long-arm statute is satisfied when the nonresident defendant manufacturer's activities show

> an intent or purpose on the part of the manufacturer to serve the Delaware market with its product. . . . [I]t is not important that the manufacturer itself act in Delaware. Instead, if the intent or purpose on behalf of the manufacturer to serve the Delaware market results in the introduction of the product to this State and plaintiff's cause of action arises from injuries caused by that product, this section is satisfied.

*Id.* at 11.

*The Accused Chip Has Been Introduced To The Delaware Market*

I begin by noting that I continue to rely on the finding in my earlier opinion that prior to the filing of PI's complaint, BCD's accused chips were in Delaware as components in 3.5-Watt Samsung cell phone chargers (and continue to be shipped here today). *Id.* at 3. It is undisputed that "tens of thousands of chargers containing the [accused] chips have been shipped into Delaware through established sales channels, including approximately 17,000 of the incorporating chargers that were sold in Delaware in the third quarter of 2007 alone." (D.I. 31 at 5)[3]

---

[3]Citing updated estimates of the number of BCD chips that have been incorporated in Samsung chargers sold in Delaware, PI invites me to revisit my conclusion that general jurisdiction (pursuant to 10 Del. C. § 3104(c)(4)) is not present here. *Compare* D.I. 67 at 14-15 *with* D.I. 102 at 14 *and* D.I. 109 at 4-5. I see no reason to do so. Data on the sales of the accused product in Delaware are, however, relevant to the dual jurisdictional analysis as "indicia of activity." *See* D.I. 67 at 14-15; *see also Boone*, 724 A.2d at 1158. It is in this dual jurisdiction context that I am considering the sales evidence.

*BCD Knew It Was Reasonably Likely Its Accused Chips Would Reach Delaware*

At his Rule 30(b)(6) deposition, Li-Jen Wang, who as BCD's Vice President of Sales, Marketing and Business Development oversees BCD's worldwide sales and marketing functions, testified that BCD knew that: Samsung is a customer for BCD's accused AP3700 chip, Samsung uses the accused chip in chargers for Samsung cell phones, and Samsung ships many cell phones to the United States. (D.I. 43 Ex. 1 at 1; D.I. 103 Ex. 4 at 18-19, 39) While Wang explained that Samsung did not tell him where it would sell its chargers containing the accused chips, he added that, to the best of his knowledge, BCD never requested that Samsung *not* sell chargers with BCD chips in the U.S. (D.I. 103 Ex. 4 at 18-20) I find that BCD knew it was reasonably likely that its accused chips would end up in the U.S., including in Delaware, as components of Samsung's cell phone chargers.

*BCD Intended To Serve The U.S. Market With The Samsung 3.5-Watt Charger*

BCD points out that the only chargers containing the accused chips that have been sold in Delaware are Samsung 3.5-Watt chargers. According to BCD, all of the evidence in the record showing that BCD was working with Samsung to serve the U.S. market references, instead, a 5-Watt charger.[4] BCD concedes that it helped design this 5-Watt charger for the United States, but stresses that Samsung never made nor sold such a charger. (D.I. 107 at 7)

---

[4] As Wang testified, by early 2007 BCD was working on a project to design a 5-Watt charger "specifically for the US market." (D.I. 107 Ex. 1 at 31) While it appears that this project involved use of the accused chips, I cannot be certain of this because the parties have not provided me with the entire transcript of Wang's testimony. (D.I. 107 Ex. 1 at 32: showing question "Did that project that you have in mind, the 5-watt project intended for the US, was that to use a 3700?" but omitting answer)

The expanded record belies BCD's claim that it did not intend to provide chips for the 3.5-Watt Samsung charger sold in the United States (including Delaware). Two internal BCD documents show that BCD planned for the AP3700 to be integrated into 3.5-Watt chargers for sale in the U.S. To understand these documents, it is first necessary to understand, as BCD has itself explained, that "the chargers sold by Samsung that incorporate the AP3700 output a voltage of 5 volts and a current of 0.7 amps (or 700 milliamps, 'mA') for a total power output of 3.5 Watts (5v x 700mA = 3.5W)." (D.I. 107 at 7 n.4) Thus, a reference to a "700 mA" charger is also a reference to a 3.5-Watt charger.

A May 9, 2007 BCD e-mail, describing a meeting involving Samsung, states: "The first supply q'ty: AP3700Z TR-E1 . . . Firstly, these q'ty will be applied to Model for Central&South America, Europe (700ma) and USA (700mA)." (D.I. 103 Ex.10) (emphasis added) Another e-mail in the same chain of correspondence, dated May 8, 2007 and also discussing a meeting involving Samsung, asks: "Can we suggest that you go ask RF Tech to send us their final approved samples of B/C (3.6W and 5W for USA Market) to Samsung." (D.I. 103 Ex. 10) (emphasis added)

BCD argues that the reference to a "700mA" USA model in the first e-mail "is clearly a typographical error." (D.I. 107 at 8 n.6) It notes that other e-mails in the record only mention a 5-Watt model for use in the United States, and consistently refer to the model intended for Central and South America and Europe as a 700mA/3.5W or 720mA/3.6W model. *Id.* I am unpersuaded

by BCD's argument, which does not even attempt to account for the second e-mail describing the 3.6W, as well as the 5W, Samsung model as being for the U.S. market.[5]

I therefore find that the two internal BCD e-mails show an intent to serve the United States market with the accused chips via their incorporation in 3.5- or 3.6-Watt Samsung cell phone chargers. Furthermore, I find this evidence is sufficient to establish an intent to serve the Delaware market, as (for reasons I will treat more fully below) there is no evidence that BCD intended to exclude from its marketing and distribution efforts some portion of the country including Delaware. *See Tobin v. Astra Pharmaceutical Prod., Inc.*, 993 F.2d 528, 544 (6th Cir. 1993).

*Evidence That BCD Indemnified Its Customers*

There is additional evidence of BCD's intent to serve the Delaware market with the accused chips through their incorporation into Samsung's 3.5-Watt cellular phone chargers. BCD provided customers purchasing the accused chips with indemnification from liability for infringement of U.S. patents. The expanded record includes correspondence from BCD customers seeking information regarding the status of infringement lawsuits involving BCD, including this action. *See, e.g.*, D.I. 103 Ex. 23 at 108932 ("Need letter of patent issue including 'BCD will bear the responsibility of patent issue' and Signature of responsible person."). The companies BCD indemnified with respect to U.S. patent infringement relating to the AP3700 included Samsung. *See* D.I. 103 Ex. 25 at 32718 (letter from BCD to Samsung offering to hold

---

[5] It is also noteable that the testimony of BCD's 30(b)(6) witness, Wang, was that he "assumed the 3.5 watt [charger] was for [the] non-US" market, not that he knew the 3.5-Watt charger was intended solely for the non-US market. (D.I. 107 Ex. 1 at 31) (emphasis added)

Samsung "harmless from liabilities . . . in the event of any Product [as part of "the AP3700 solution set" including the AP3700] . . . being subject to infringement claims"); *see also* D.I. 103 Ex. 4 at 59 (Wang testifying to awareness that BCD's agreements with distributors generally have patent indemnification provision). I find BCD's indemnification of its customers probative of both an intent by BCD to serve the U.S. market and of BCD's knowledge that its chips would end up in the U.S., where holders of U.S. patents allegedly infringed by sales of end products containing the accused chips could enforce their rights.

*BCD Did Not Exclude Delaware From its Marketing Efforts*

There is no evidence that BCD intended to exclude Delaware from its efforts to penetrate the U.S. market. Wang testified on behalf of BCD that he was unaware of any such intent. (D.I. 103 Ex. 4 at 120) While BCD evidently does not have a sales representative for the Northeast or Mid-Atlantic regions (including Delaware) (D.I. 107 at 12 & Ex. 6 at 70-75), there is no requirement that a defendant target each portion of the country with equal vigor. Absent evidence that BCD intends to exclude Delaware – of which there is none – a comparison of its marketing efforts in Delaware relative to its efforts in other states is irrelevant.

*Additional Relevant Evidence*

I also continue to find relevant, although not dispositive, the following undisputed evidence that was cited in my earlier opinion: BCD has established distribution channels in the U.S. (although it has not used them to ship the accused products); BCD has close relationships with end users of its products who regularly conduct business in the U.S., including in Delaware; and BCD's website is accessible throughout the U.S., including in Delaware. (D.I. 67 at 3-4)

Evidence Satisfying Due Process Standard

The evidence already described establishes BCD's intent and purpose to serve the Delaware market with its accused chips. This evidence satisfies the Delaware long-arm statute pursuant to Delaware's theory of dual jurisdiction. It also goes a considerable distance toward satisfying the "intent or purpose" component of the required Due Process analysis.

However, under Justice O'Connor's plurality opinion in *Asahi*, more is required in order for this Court's exercise of jurisdiction over BCD to comport with Due Process:

> The placement of a product into the stream of commerce, without more, is <u>not</u> an act of the defendant purposefully directed toward the forum State. <u>Additional conduct of the defendant</u> may indicate an intent or purpose to serve the market in the forum State, <u>for example, designing the product for the market in the forum State</u> . . . .

480 U.S. at 112 (emphasis added).

As is evident from the *Asahi* quotation just above, one manner of satisfying the "additional act" requirement is for a plaintiff to establish that a defendant "design[ed] the [accused] product for the market in the forum State." *Id.* With respect to the power supply chips for cell phone chargers at issue here, there has been no suggestion that design standards are any different in Delaware than in the other forty-nine United States. Hence, evidence that BCD designed the AP3700 for the U.S. market is evidence that BCD designed the product for the Delaware market; i.e., the forum state.

There is substantial evidence that BCD designed the accused chips to be integrated into cell phone chargers that would conform to U.S. regulatory standards. Wang testified that Samsung wanted BCD's charger solutions – of which BCD's AP3700 was a component – to meet

several U.S. regulatory standards, including U.S. "Energy Star" conservation standards. (D.I. 103 Ex. 4 at 60-63) Internal BCD documents show, specifically, that the 3.5-Watt charger – that is, the model present in Delaware – was tested for compliance with the Energy Star standards. (D.I. 103 Ex. 18 at 76683) ("Energy Star 2.0 required average efficiency is 68.5% for 3.5W. We passed it.") Wang also testified that BCD tested its charger solutions to ensure compliance with U.S. Federal Communications Commission ("FCC") regulations for electromagnetic interference. (D.I. 103 Ex. 4 at 63) Finally, Wang testified – and internal documents likewise demonstrate – that BCD further designed its solutions to meet the safety requirements of Underwriters Laboratories, Inc., another U.S. standard. (D.I. 103 Ex. 4 at 83-84, Ex. 7 at 76530, and Ex. 20 at 93111)

BCD offers two reasons why I should not rely on evidence that the accused chips were designed to comply with U.S. standards: (1) the internal BCD documents cited by PI post-date the filing of PI's complaint;[6] and (2) "most of the U.S. standards are standards for much of the world, so a manufacturer saying it intends to meet certain U.S. standards does not necessarily intend to sell its products here." (D.I. 107 at 10)

I reject BCD's first argument because the date of the documents describing BCD's attempts to conform to U.S. regulatory standards is irrelevant. What matters is the date of BCD's design efforts, not the date of the evidence confirming those efforts. I find that BCD's design

---

[6]*See* D.I. 103 Ex. 18 (e-mails dated December 6, 2007), Ex. 19 (e-mail dated November 30, 2007), Ex. 7 (undated attachment to e-mails ranging in date from October 29, 2007 to November 16, 2007), Ex. 20 (undated attachment to e-mails ranging in date from January 11, 2008 to January 23, 2008).

efforts well precede the filing of PI's complaint on October 15, 2007. By its own admission, BCD began developing the AP3700 in 2006. (D.I. 103 Ex. 4 at 20-21) The accused chip plainly was designed before October 2007, by which time, indisputably, they were in Delaware. Thus, I rely on these documents to the extent that they reflect a process to design the accused chips to meet U.S. standards, a process that began well before the date the documents themselves were created.

As for BCD's contention that U.S. design standards have become global standards, I observe that Justice O'Connor's opinion expressly identifies as an adequate additional act for purposes of the due process analysis that a defendant has "design[ed] the product for the market in the forum State." *Asahi*, 408 U.S. at 112. I think this means that designing to U.S. specifications satisfies the additional act requirement. To my knowledge, neither the Supreme Court, nor the Federal Circuit, has stated otherwise. Furthermore, although Wang testified that every cell phone manufacturer would want the power supply chips to meet U.S. regulatory standards even if the manufacturer did not intend to sell in the U.S. (D.I. 103 Ex. 4 at 124), the record shows that some of BCD's customers do not require BCD to design to U.S. standards. (D.I. 103 Ex. 19 at 93551 ("JX and FAE have visited and Get SPEC, no FCC 68.308 requirements. FAE completed 3700PSR demo board and finished internal evaluation test that passed customer SPEC.").

Finally, I find that the exercise of jurisdiction over BCD is reasonable. "Delaware has an interest in discouraging injuries that occur within the state; that interest extends to patent infringement actions such as this one." *LG Phillips LCD Co., Ltd. v. ChiMei Optoelectronics Corp.*, 551 F. Supp.2d 333, 341 (D. Del. 2008) (internal quotation marks omitted). Litigating this case in Delaware will not place such a substantial burden on BCD so as to violate its due process

rights. BCD has agreed that its dispute with PI must be litigated in American courts, but its preferred forum within this country is the Northern District of California. (D.I. 11 at 1, 12-13) The burden imposed on representatives of SIM-BCD, who now must travel from China to Delaware, is not substantially greater than the burden of traveling from China to California. Nor do I find that requiring BCD California, a two-employee organization, to defend itself in Delaware would be "unduly burdensome," despite BCD's suggestion to the contrary. (D.I. 11 at 13)

BCD's Counterarguments

In discussing the evidence above, I have already dealt with some of BCD's objections to finding personal jurisdiction in this District. BCD continues to press numerous additional arguments as well. I have considered each of these and am unpersuaded by them.

First, BCD emphasizes its "attenuated contacts" with Delaware, stressing that "at least four companies independent of BCD are responsible for the final destination of [the accused chips] after [they] leave BCD's control in China." (D.I. 107 at 1; *see also id.* at 3) But, based on my review of the law, as explained above and in my earlier opinion, I do not believe either the statutory or constitutional analyses turn on how attenuated a defendant's contacts may or may not be with a forum state. I find that the legal standards are as I have described them in my previous opinion and in this Report and Recommendation, and that those standards are satisfied here.

In a variation on the above argument, BCD contends that in each of the Delaware cases on which PI relies, "the defendant engaged a distributor who sold the accused product to customers

in Delaware, creating sufficient minimum contacts with the forum state." (D.I. 107 at 4)[7] I have reviewed these cases – indeed, I relied on five of them (*LaNuova, Boone, Wright, Philips,* and *Elonex*) in my earlier opinion – and find that none of them require the defendant's engagement of a distributor in order to establish jurisdiction.

BCD also reprises its argument that, where this Court has found personal jurisdiction in the absence of direct contacts with Delaware, it has required direct contacts between the nonresident defendant and alleged in-state infringers. (D.I. 107 at 3) BCD likewise insists that in this Court's decisions finding a lack of jurisdiction "the defendant, like BCD, sold a component to a manufacturer who incorporated it into another product distributed in Delaware through a channel the defendant did not create, control, or employ." (D.I. 107 at 4) However, in none of these cases did this Court expressly apply Delaware's concept of dual jurisdiction,[8] as I believe Delaware law requires me to do in this case.

Finally, BCD asserts that in *Asahi*, "Justice O'Connor rejected the 'mere foreseeability or awareness' standard, stating that 'a defendant's awareness that the stream of commerce may or

---

[7]*See LaNuova D&B, S.p.A. v. Bowe Co.*, 513 A.2d 764 (Del. 1986); *Boone v. Oy Partek Ab*, 724 A.2d 1150 (Del. Super. Ct. 1997); *Wright v. Am. Home Prods. Corp.*, 768 A.2d 518 (Del. Super. Ct. 2000); *Philips Elecs. N. Am. Corp. v. Contec Corp.*, 2004 WL 503602 (D. Del. Mar. 11, 2004); *In re Elonex Phase II Power Mgmt. Litig.*, 2003 WL 21026758 (D. Del. May 6, 2003); *Motorola, Inc. v. PC-Tel. Inc.*, 58 F. Supp.2d 349 (D. Del. 1999); *Energy Transp. Group, Inc. v. William Deman Holdings A/S*, 2008 WL 78748 (D. Del. Jan. 4, 2008); *Padcom, Inc. v. NetMotion Wireless, Inc.*, 2004 WL 1192641 (D. Del. May 24, 2004).

[8]*See M&M Techs., Inc. v. Gurtler Chems., Inc.*, 2005 WL 293509 (D. Del. Feb. 8, 2005); *Siemens Aktiengesellschaft v. LG Semicon*, 69 F. Supp.2d 622 (D. Del. 1999); *Intel Corp. v. Silicon Storage Tech, Inc.*, 20 F. Supp.2d 690 (D. Del. 1998); *Am. Bio Medica Corp. v. Peninsula Drug Analysis Co.*, 1999 WL 615175 (D. Del. Aug. 3, 1999).

will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.'" (D.I. 107 at 6 quoting 480 U.S. at 112) BCD has accurately quoted Justice O'Connor's opinion. However, I have also accurately quoted her statement that due process is satisfied where "additional conduct" – beyond mere placement of a product in the stream of commerce – "indicate[s] an intent or purpose to serve the market in the forum State." 480 U.S. at 112. Such conduct may include, per Justice O'Connor's example, "designing the product for the market in the forum State." *Id*. Here, as described above, that conduct is present. I therefore see no tension between my reading of Justice O'Connor's test and BCD's interpretation. I simply recognize that the test has been satisfied.

## RECOMMENDED DISPOSITION

For the reasons set forth above, I recommend that BCD's Motion to Dismiss for Lack of Personal Jurisdiction be DENIED.

Any party seeking to file an objection to this Report is reminded to adhere to the guidelines contained in the Court's Standing Order in Non-Pro Se Matters for Objections Filed Under Fed. R. Civ. P. 72, available at the District of Delaware's website (http://www.ded.uscourts.gov/StandingOrdersMain.htm).

DATED: August 1, 2008

[PUBLIC VERSION RELEASED
AUGUST 12, 2008]

_____
Honorable Leonard P. Stark
UNITED STATES MAGISTRATE JUDGE